**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


IN RE OSB ANTITRUST LITIGATION      :
                                 :   **Master File No. 06-826**
                                 :
THIS DOCUMENT RELATES TO:        :
ALL DIRECT ACTIONS                    :
                                 :

---------------------------------------------------------------------------------------------------------------

**Diamond, J.**                                                 **August 3, 2007**

## MEMORANDUM

Plaintiffs, direct purchasers of Oriented Strand Board, allege a horizontal price-fixing conspiracy among nine major OSB manufacturers in violation of the Sherman Antitrust Act.  See 15 U.S.C. §1.  Plaintiffs ask me to certify a class of businesses and individuals that purchased OSB structural panel products directly from Defendants since June 2002.  Defendants contend that Plaintiffs cannot satisfy the requirements of Federal Rule of Civil Procedure 23(b), and challenge Plaintiffs' inclusion of buying groups and cooperatives in the class.  I conclude that Plaintiffs here have met Rule 23(b)'s requirements.  Moreover, as Defendants concede, either members of group buying organizations or the organizations themselves have direct purchaser standing.  Accordingly, I will certify a class of customers that directly purchased OSB structural panel products.


## BACKGROUND

OSB is a structural wood-based paneling product widely used in residential and other construction.  *Direct Purchaser Pl. Second Amended Compl. ¶¶ 30-35.*  Defendants – Ainsworth Lumber Co., Ltd., Georgia-Pacific Corporation, Grant Forest Products, Inc., J.M. Huber Corporation,

1

Louisiana-Pacific Corporation, Norbord Industries, Inc., Potlatch Corporation, Tolko Industries, Inc., and Weyerhauser Company – manufacture OSB, and together control 95% of the OSB market in North America. *Direct Purchaser Pl. Second Amended Compl. ¶ 51*. Plaintiffs directly purchased OSB structural panel products manufactured by one or more of the Defendants.

Plaintiffs allege that on or about June 1, 2002, Defendants together tacitly agreed to raise OSB prices and so revitalize the stagnating OSB market. *Direct Purchaser Pl. Second Amended Compl. ¶ 3, 59, 66, 105*. Plaintiffs allege that Defendants' illegal actions were wildly successful, "caus[ing] a meteoric rise in OSB prices and ill-gotten, record profits at Plaintiffs' expense." *Pl. Class Cert. Mem. at 1*. Plaintiffs charge that the conspiracy continues to the present day.

Plaintiffs claim that Defendants took the following concerted actions to reduce the supply of OSB (and so drive up the price): (1) kept OSB from the market through mill shutdowns; (2) delayed or canceled the construction of new OSB mills; (3) bought OSB from competitors instead of manufacturing it themselves (which they could have done at a lower cost); and (4) maintained low operating rates at mills. *Direct Purchaser Pl. Second Amended Compl. ¶ 66*. Plaintiffs allege that Defendants fixed and maintained the price of OSB through the use of a twice-weekly published price list in *Random Lengths*, an industry periodical. *Direct Purchaser Pl. Second Amended Compl. ¶ 99-102*. Plaintiffs claim that because *Random Lengths* included lists of OSB prices by region, Defendants could monitor their competitors and ensure that no member of the conspiracy "cheated" by offering significantly different prices. *Direct Purchaser Pl. Second Amended Compl. ¶ 99-102*. Plaintiffs also allege that Defendants confirmed their agreements during meetings at industry trade shows and events. *Pl. Class Cert. Mem. at 10, n. 10; 16*.

Plaintiffs contend that they paid inflated OSB prices as a result of Defendants' price-fixing

conspiracy.  *Direct Purchaser Pl. Second Amended Compl. ¶ 2.*

## LEGAL STANDARDS

To certify, I must conclude that Plaintiffs have satisfied all the prerequisites of Fed. R. Civ. P. 23(a), and fulfilled one of the requirements of Rule 23(b).  See, e.g., Georgine v. Amchem Prods., Inc., 83 F.3d 610, 624 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997).  Plaintiffs bear the burden to show that the class should be certified.  See Freedman v. Arista Records, 137 F.R.D. 225, 227 (E.D. Pa. 1991) (citing Davis v. Romney, 490 F.2d 1360, 1366 (3d Cir. 1974)).

In determining whether to certify, I must accept as true all substantive allegations in the Amended Complaint.  See Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976); see also Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 209 (E.D. Pa. 2000); Steward v. Assocs. Consumer Discount Co., 183 F.R.D. 189, 193 (E.D. Pa. 1998).  Although I may not consider whether Plaintiffs will prevail on the merits, I may look beyond the four corners of the Amended Complaint if Plaintiffs' allegations are unsupported, or even rebutted, by a well-developed record.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (internal quotations omitted); Johnston v. HBO Film Management, Inc., 265 F.3d 178, 186 (3d Cir. 2001).

## DISCUSSION

Plaintiffs seek to certify under Rule 23(b)(3) a class of plaintiffs who purchased OSB structural panel products directly from one or more of the Defendants between June 1, 2002 and the present.  *See Pl. Reply Mem. at 48.*  Plaintiffs seek treble damages and injunctive relief for Defendants' alleged violation of the Sherman Act.  See 15 U.S.C. §§ 1, 15.

**A. Rule 23(a) Prerequisites**

*Numerosity*

To certify, I must find that the class is so numerous that joinder of its members is impracticable.  "Generally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met." <u>Ketchum v. Sunoco, Inc.</u>, 217 F.R.D. 354, 357 (E.D. Pa. 2003) (citing <u>Stewart v. Abraham</u>, 275 F.3d 220, 227-228 (3d Cir. 2001)). Plaintiffs' proposed class consists of "thousands of persons and entities" nationwide who purchased OSB from Defendants between June 1, 2002 and the present.  *Pl. Class Cert. Mem. at 28*.  As Defendants concede, such a class certainly meets the numerosity requirement.

*Commonality*

Plaintiffs must also demonstrate that there are questions of law or fact common to the class. A single such issue will suffice.  <u>Johnston v. HBO Film Mgmt, Inc.</u>, 265 F.3d 178, 184 (3d Cir. 2001).  Here, Plaintiffs have identified, and Defendants do not dispute, the following common issues of law or fact: whether Defendants engaged in a conspiracy; the conspiracy's duration and extent; and whether Plaintiffs and the class members were injured by Defendants' conduct and, if so, the appropriate classwide measure of damages.  *Pl. Class Cert. Mem. at 29-30*.  These issues certainly satisfy the commonality requirement.

*Typicality*

Plaintiffs must show that the claims of the class representatives are typical of the claims of the class as a whole.  Thus, I must determine whether "the named plaintiff[s'] individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." <u>Johnston</u>, 265 F.3d

4

at 184 (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985)).  Here, Plaintiffs allege that all members of the class suffered economic injury when they made direct purchases of OSB manufactured by Defendants.  *Pl. Class Cert. Mem. at 31-32*.  Although damages may differ as to each class representative, all the representatives base their claims on the same legal theory as the class.  Thus, as Defendants concede, Plaintiffs have shown their claims to be typical of those of the proposed class.

### *Adequacy of Representation*

Finally, Plaintiffs must demonstrate that they will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  In evaluating this requirement, I must determine "whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class."  Johnston, 265 F.3d at 185.  Plaintiffs assert that the representatives have no conflicts with each other or with the members of the proposed class, and that their attorneys are highly experienced antitrust class action litigators.  *Pl. Class Cert. Mem. at 32-33*.  Defendants do not dispute class counsel's qualifications, or that most of the named Plaintiffs are adequate class representatives.  Defendants challenge only the standing of those named representatives who bought OSB through group buying organizations.  See Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) (indirect purchasers do not have standing to maintain antitrust treble-damages action under the Sherman Act because injury is too remote).  *See also Def. Joint Opp. Mem. at 18-19*.

As I explain below, members of group buying organizations who have a significant ownership interest in or functional control over their organizations have standing as direct purchasers.  Where no member has such interest or control, the direct purchaser is the group buying organization itself.  See Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 424 F.3d 363, 372

(3d Cir. 2005).  In the instant case, other than West Lumber Co., all the class representatives that purchased through group buying organizations also purchased OSB directly from Defendants.  *See Pl. Resp. To Defs. Sur-Reply at 13; Def. Joint. Opp. Mem. at 18-19*.  Accordingly, they are adequate class representatives, and I need not determine whether they also have direct purchaser standing to assert claims for purchases made through their group buying organizations.

The Third Circuit has held that if there is "factual unity" between a customer and the buying organization through which it makes its purchases, the customer has standing to pursue antitrust damages claims.  See Howard Hess, 424 F.3d at 372.  See also Illinois Brick, 431 U.S. at 726 n.16 (establishing "ownership or control" exception).  The corporate representative of West Lumber Co. – the sole class representative to purchase OSB only through group buying organizations – testified that West is an owner of Philadelphia Reserve, a group organization through which West bought OSB.  *Bernstein Dep. (West Lumber), at 82*.  I cannot determine, however, whether West's ownership interest creates a "functional unity" between West and Philadelphia Reserve. Accordingly, Plaintiffs have not shown that West Lumber Co. is an adequate class representative.

Finally, counsel must have the ability and incentive to represent the class vigorously.  In re Cendent Corp. Litig., 264 F.3d 201, 265 (3d Cir. 2001).  At the outset of this litigation, I appointed Spector Roseman & Kodroff, P.C. Lead Counsel for the Direct Purchaser Plaintiffs.  As Co-Lead Counsel, I appointed the firm of Cohen Milstein, Hausfeld & Toll, P.C.  See Order of May 25, 2006 (Doc. No. 78).  To date, Lead and Co-Lead Counsel have vigorously and capably prosecuted this extremely demanding litigation, and I am satisfied that they will continue to do so.  Accordingly, Plaintiffs have satisfied Rule 23's adequacy requirement.

**B. Rule 23(b)(3) Requirements**

To certify a class under Rule 23(b)(3), Plaintiffs must show both that common questions of law and fact predominate over questions unique to individual plaintiffs, and that a class action is superior to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  Defendants concede superiority, but argue that Plaintiffs cannot meet the predominance requirement because they have not shown that impact is susceptible of common proof.

*Predominance*

In determining whether common questions of law or fact predominate over issues unique to individual plaintiffs, I must consider whether Plaintiffs have demonstrated that they can prove the three elements of their case through common proof: (1) existence of the alleged conspiracy; (2) injury or impact; and (3) damages.  See In re Linerboard Antitrust Litig., 305 F.3d 145, 156 (3d Cir. 2002); In re Hydrogen Peroxide Antitrust Litig., 240 F.R.D. 163, 172 (E.D. Pa. 2007).  Although Plaintiffs need not actually prove these elements at this stage, they must offer a valid and detailed method by which they will do so at trial.  See Hydrogen Peroxide, 240 F.R.D. at 170-72; In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 486-87 (W.D. Pa. 1999).

Defendants concede that proof of conspiracy is common to the class, but argue that Plaintiffs have not established that impact or injury and damages are susceptible of common proof.  *Def. Mem. in Opp. to Class. Cert. at 20-59*.  I disagree.

**1. Common Proof of Impact**

Plaintiffs offer two arguments in favor of common proof of injury or impact.  First, they invoke the "Bogosian short cut," by which injury may be presumed in certain antitrust cases.  See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454-55 (3d Cir. 1977); *Pl. Class Cert. Mem. at 37*.

Second, they propose to show, through economic theory and analysis of the OSB market, that actual impact or injury is susceptible of common proof. *See Pl. Class Cert. Mem. at 37, 39-41; N.T. of June 14, 2007 at 24-25, 32.*

Courts in this Circuit have frequently applied the <u>Bogosian</u> doctrine in direct purchaser antitrust actions. <u>See, e.g.</u>, <u>Linerboard</u>, 305 F.3d at 152 (applying the <u>Bogosian</u> short cut); <u>Hydrogen Peroxide</u>, 240 F.R.D. at 173 (same); <u>In re Mercedez-Benz Antitrust Litig.</u>, 213 F.R.D. 180, 188 (D. N.J. 2003) (same). In <u>Bogosian</u>, the plaintiffs alleged that the defendants, major oil companies, conspired  unlawfully to tie gas station leases to purchases of gasoline supplied by the lessors. The Third Circuit held that once the plaintiffs established that there was a nationwide conspiracy to raise prices, that the free market prices would be lower than the prices paid, and that the plaintiffs made some purchases at the higher price, economic injury to all class members could be presumed. <u>See Bogosian</u>, 561 F.2d at 455.

Accepting their substantive allegations as true, I find that Plaintiffs have established these three elements. <u>See Blackie</u>, 524 F.2d at 901 n.17 (at the class certification stage, I am required to accept as true the substantive allegations in the complaint). Plaintiffs have offered evidence consistent with their theory that Defendants conspired to raise prices. *See N.T. of June 14, 2007 at 14-24*. They have shown that prices rose dramatically during the alleged conspiracy period and that prices would likely have been lower in a free market. *See N.T. of June 14, 2007 at 20-24*. Finally, they have testified that they in fact made purchases at the higher price. *See Pl. Class Cert. Mem. at 33*.

Defendants contend: (1) that <u>Bogosian</u> is discredited in this Circuit; and (2) that the instant case is factually distinguishable from <u>Bogosian</u>. *See N.T. of June 14, 2007 at 71-74*. I disagree. The

Third Circuit has confirmed <u>Bogosian</u>'s viability.  <u>See</u> <u>Linerboard</u>, 305 F.3d at 152.  Moreover, Plaintiffs' allegations closely track those in <u>Linerboard</u>, where the Third Circuit approved the district court's application of the "<u>Bogosian</u> short cut." <u>See</u> <u>Linerboard</u>, 305 F.3d at 158.  In these circumstances, I am prepared to presume that any customer who purchased OSB at allegedly inflated prices directly from Defendants sustained economic injury.

Reliance on the <u>Bogosian</u> presumption alone is insufficient, however.  Rather, Plaintiffs must offer proof of actual economic injury in addition to the "short cut": the "belt and suspenders" approach favored by the Third Circuit.  <u>See</u> <u>Linerboard</u>, 305 F.3d at 153.  To satisfy this requirement, Plaintiffs offer the expert opinion of Dr. John Beyer that a price-fixing conspiracy necessarily injured each class member, and that such injury can be shown on a classwide basis.

The Third Circuit has held that an antitrust plaintiff may, at the class certification stage, employ expert opinion to demonstrate predominance.  <u>Cf.</u> <u>Linerboard</u>, 305 F.3d at 153.  It is the plaintiff's burden to establish that its expert's methodology is generally accepted, "will comport with the basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all members of the proposed class." <u>Nichols v. SmithKline Beecham Corp.</u>, 2003 WL 302352, at *4 (E.D. Pa. Jan. 29, 2003); <u>see also</u> <u>Wiesfeld v. Sun Chemical Corp.</u>, 84 Fed. App'x 257, 261-262 (3d Cir. 2004) (at class certification, a district court should consider only whether the expert will employ a valid methodology and whether he has supported his conclusions with appropriately detailed analysis).

Having analyzed both the structure of the OSB market and Defendants' actual transaction prices, Dr. Beyer opines that the market is concentrated and that OSB – including the more sophisticated "value-added" specialty OSB products – is a fungible commodity product.  *See Pl.*

9

*Class Cert. Mem. at 39-40*, *Beyer Report ¶ 11, 26-37, 43-51*.  He believes that in such a market, a conspiracy to raise prices of such products would – and, as reflected in Defendants' transaction prices, did – injure every direct purchaser.  *Beyer Decl. ¶ 11, 36, 51, 56*.

In response, Defendants offer the expert opinion of Dr. Ramsey Shehadeh, who, apparently using the same data as Dr. Beyer, employs a different methodology to reach an opposite conclusion. *See, e.g., Shehadeh Decl. ¶ 4*.  Dr. Shehadeh first contests Dr. Beyer's assertion that basic OSB is a commodity product. *See Shehadeh Decl. ¶ 51, 56; N.T. of June 14, 2007 at 58, 72*.  Defendants have offered little convincing evidence, however, to support their claim that OSB is "not commodity in the economic sense of the term," or that the economic definition varies significantly from the layperson's definition.  *N.T. of June 14, 2007 at 58*.  Indeed, Defendants' own documents describe basic OSB as a fungible commodity product. *See N.T. of June 14, 2007 at 25-26*.

Beyond this threshold question, Drs. Beyer and Shehadeh differ on the following issues: whether the OSB market is highly concentrated or consolidated; whether "value-added" products should be analyzed separately from basic OSB products; whether analysis of pricing trends should be performed using averages or individual transactions; whether Defendants' reported transaction prices move within a narrow band (and, indeed, the definition of "narrow band"); whether OSB pricing varies significantly by region; and whether Defendants could have effectuated the alleged conspiracy through reference to *Random Lengths* price lists.  *See Beyer Decl. ¶ 26, 30-34, 43-55, 80; Shehadeh Decl. ¶ 30, 33, 51-55, 61-62; 65, 69-70; N.T. of June 14, 2007 at 13, 25-27, 30-32, 55-56, 58-69; Def. Sur-Reply Mem. at 26*.

Significantly, it does not appear that Dr. Shehadeh disputes Dr. Beyer's methodology, but, rather, his conclusions.  This dispute goes to the merits of Plaintiffs' allegations, and so may be

considered at trial, not at class certification.  See Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir. 2005) (district court may not resolve "disputes between the parties' experts that go to the merits of the case"); In re Foundry Resins Antitrust Litig., 2007 WL 1346569, at *18 (S.D. Ohio May 2, 2007) (the trier of fact must decide the defendant's merits challenge to the conclusions of the plaintiff's expert witness).  Indeed, to resolve the dispute now would require me to determine which expert is correct – something I may not do at the class certification stage.  See, e.g., Hydrogen Peroxide, 240 F.R.D. at 171 (at class certification, even under Daubert's more restrictive standard, the Court may not weigh the relative credibility of battling experts or choose between their opinions). Moreover, this is not a case where the record flatly contradicts Plaintiffs' allegations, requiring a closer inquiry into the merits.  See Johnston, 265 F.3d at 186 (court may look beyond the four corners of the amended complaint if the plaintiffs' allegations are unsupported, or even rebutted, by a well-developed record).  There appears to be at least as much record support for Dr. Beyer's conclusions as for those of Dr. Shehadeh.  See, e.g., N.T. of June 14, 2007 at 26-32, 34-38. Accordingly, I may reject Dr. Beyer's analysis only if it has no probative value – if he has not identified a valid method by which Plaintiffs will attempt to prove his conclusions at trial, or if he has not shown that he can apply such a method to the facts of this case.  See Blades, 400 F.3d at 575; Linerboard, 305 F.3d at 155.

I believe Dr. Beyer's analysis has probative value.  His proposed methods of proving impact on a classwide basis – multiple regression analysis and analysis of the OSB market and Defendants' transactions – are widely accepted in direct purchaser antitrust suits.  See, e.g., Foundry Resins, 2007 WL 1346569 at *18 (approving analysis of the industry market); Hydrogen Peroxide, 240 F.R.D. at 171 (expert performed multiple regression analysis and evaluated the industry market); Flat Glass,

11

191 F.R.D. at 486 (approving multiple regression analysis).  Moreover, Dr. Beyer is confident that

he has the data necessary to perform these analyses, and has, in fact, already performed them.  *See*

*Beyer Decl. ¶ 25-36, 40, 52-56; Beyer Reply Decl. ¶ 5-6, 16, 26.*

In these circumstances, Plaintiffs have offered a "belt and suspenders" method of proving

classwide injury with common proof.  Accordingly, I conclude that – except with respect to members

of group buying organizations (as I explain below) – they have shown that impact is susceptible of

common proof.

### 2. Common Proof of Damages

Plaintiffs propose to offer common proof of damages by means of benchmark and multiple

regression analysis – both accepted methods of common proof in this Circuit.  *Pl. Class Cert. Mem.*

*at 26, 42*.  See, e.g., Hydrogen Peroxide, 240 F.R.D. at 175.  A benchmark analysis compares price

differences before and during the alleged conspiracy.  *See Beyer Decl. ¶ 58-60.*  "Multiple regression

analysis is a statistical technique designed to determine the effect that two or more explanatory

independent variables have on a single dependent variable."  Flat Glass, 191 F.R.D. at 486; see also

Daniel L. Rubinfeld, Reference Guide on Multiple Regression, Reference Manual on Scientific

Evidence at 181 (Federal Judicial Center 2000).  Other courts in this Circuit have found such

analyses – including similar analyses performed by Dr. Beyer – sufficient to establish that damages

are susceptible of common proof.  See, e.g., Hydrogen Peroxide, 240 F.R.D.  at 173; In re Linerboard

Antitrust Litig., 203 F.R.D. 197, 220 (E.D. Pa. 2001), aff'd 305 F.3d 145 (3d Cir. 2002); Flat Glass,

191 F.R.D. at 486.

Defendants concede that benchmark and multiple regression analyses are commonly used to

assess damages, but argue that Dr. Beyer has not finalized his statistical model and, in fact, cannot

do so because he lacks the requisite data.  *N.T. of June 14, 2007 at 74-75*.  Dr. Beyer need not have

finalized his model, however, unless it is apparent even at this early stage that the preliminary model

is deficient.  See Foundry Resins, 2007 WL 1346569 at *19 (where the plaintiffs' expert has

identified a model and expects to obtain the necessary data, his method should not be disregarded

unless it is "so insubstantial as to amount to no method at all"); Flat Glass, 191 F.R.D. at 486-87

(plaintiffs' expert need present only a viable, generally accepted model for proving damages on a

classwide basis).  Dr. Beyer has identified the variables he will need to finalize his model: measures

of demand such as housing starts and refinancing rates; measures of supply such as cost of

production and production capacity; and other possible influences on price, including customer

characteristics, geographic location, purchase amounts, and product characteristics.  *Beyer Decl. ¶

63-65*.  He has indicated that although the data he requires is readily available, he need not actually

obtain the data or perform his analysis to conclude that he would be able to establish damages

through common proof.  *See Beyer Decl. ¶ 63, 65*.

Defendants also contend that, as discussed by Dr. Shehadeh, even if Dr. Beyer obtained the

necessary data, his analysis would be flawed because he uses averages rather than individual price

transactions.  *N.T. of June 14, 2007 at 76-77; Shehadeh Decl. ¶ 61-66*.  I do not believe this criticism

renders Dr. Beyer's methodology invalid.  See, e.g., Hydrogen Peroxide, 240 F.R.D. at 171.

Finally, Defendants argue that Dr. Beyer's regression model is flawed because it is designed

to yield a single percentage overcharge, obscuring pricing differences – and differences in the

amount of damages – among products, contracts, or regions.  *N.T. of June 14, 2007 at 77*.  Although

this is troubling, I do not believe it renders Dr. Beyer's analysis invalid and without probative value.

Should the need arise, it would not be difficult to create subclasses for specific products or regions,

13

or to bifurcate the liability and damages phases of the trial.  Moreover, although damages might vary

even within subclasses, such variation does not defeat class certification.  See  Linerboard, 230 at

220 (citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 817

(3d Cir. 1995)).

     In sum, I conclude that Plaintiffs have shown that they will prove damages through classwide

proof.  Accordingly, Plaintiffs have satisfied the Rule 23(b)(3) predominance requirement.

     ***Superiority***

     In determining whether a class action is superior to other forms of adjudication, I must

consider:

> (A) the interest of members of the class in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already commenced by or against members of the class; (C) the
> desirability or undesirability of concentrating the litigation of the claims in the
> particular forum; [and] (D) the difficulties likely to be encountered in the
> management of a class action.

Fed. R. Civ. P. 23(b)(3).

     Defendants do not contest that any individual recovery would be far too small to justify

individual suits, or that any plaintiff who  wishes to litigate individually will have the opportunity

to opt out of the class.  Defendants acknowledge that this suit was originally brought as a class action

and consolidated in this Court.  In addition, the Parties have identified no pre-existing individual

litigation with which the class action might conflict.  Defendants do not dispute the desirability of

concentrating the litigation of Plaintiffs' claims in this Court, and they do not contend that a class

action would be unmanageable.  Accordingly, I find that Plaintiffs have satisfied the superiority

requirement.

C.      **Purchases Made Through Group Buying Clubs Or Cooperatives**

Defendants estimate that approximately 20% to 30% of the proposed class is composed of entities that purchased OSB from Defendants through group buying organizations. *See N.T. of June 14, 2007 at 82-83; Def. Joint Supp. Mem. in Response to the Court's July 18, 2007 Order, at 3*. If these entities are indirect OSB purchasers, they may not have standing to sue for damages. See Illinois Brick, 431 U.S. at 720. Plaintiffs argue these entities are direct purchasers under Illinois Brick's "ownership/control" exception, or, alternatively, that they are indirect purchasers that are entitled to recover under Illinois Brick's "fixed-quantity cost-plus" exception. *Pl. Reply Mem. at 46, N.T. of June 14, 2007 at 39*. Defendants argue that the difficulty of determining whether the group buying organizations or the members themselves have direct purchaser standing requires me to strike all buying groups and their members from the proposed class. *Def. Opp. Mem. at 59; Def. Sur-Reply Mem. at 39*.

The Illinois Brick Court established an exception for indirect purchases made pursuant to a pre-existing, fixed-quantity, cost-plus contract. See 431 U.S. at 736; Mid-West Paper, 596 F.2d at 577. The Court reasoned that such contracts would allow common proof of impact, as pass-through of any overcharge would be contractually required. See 431 U.S. at 736; Mid-West Paper, 596 F.2d at 577. Courts have almost never applied this exception, however. See, e.g., McCarthy v. Recordex Service, Inc., 80 F.3d 842, 855 (3d Cir. 1996) ("the vitality of the 'pre-existing cost-plus contract' exception is doubtful") (citing Kansas v. Utilicorp United, Inc., 497 U.S. 199, 216 (1990)); City of Philadelphia v. Public Employees Ben. Services Corp., 842 F. Supp. 827, 833 (E.D. Pa. 1994) ("the pre-existing cost-plus exception ... is so eviscerated that it is virtually non-existent"). In these circumstances, the exception's viability is doubtful, at best.

15

Even if the exception remains viable, however, Plaintiffs have not shown that it applies here. The record does not establish that Plaintiffs entered into pre-existing, fixed-quantity, cost-plus contracts to buy OSB from the group buying organizations. Rather, the corporate representative of one named Plaintiff that bought through such organizations testified that he did not know how the pricing worked; another testified that pricing varied depending on the product, and was not necessarily "cost-plus." *See Bernstein Dep. (West Lumber) at 79-80; Arronson Dep. (Grubb Lumber) at 133-137; McDermid Dep. (Frontier Lumber) at 51-53.* This testimony simply does not establish the exception's applicability. See McCarthy, 80 F.3d at 855 (requiring factual showing that each element of the exception was satisfied).

The Illinois Brick Court also held that an indirect purchaser may recover "where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736 n.16. Evidently, the Court reasoned that in such a situation, the customer would in effect be the real direct purchaser; the putative direct purchaser would have no independent existence apart from the customer. See In re Mercedes-Benz Antitrust Litig., 157 F. Supp.2d 355, 366 (D. N.J. 2001) ("It is also well-established that the rationale of Illinois Brick's bar to indirect purchaser suits does not apply where the supposed intermediary is controlled by one or the other of the parties."). See also In re Sugar Industry Antitrust Litig., 579 F.2d 13, 19 (3d Cir. 1978) (control exception may apply where either the customer or the alleged price-fixer owns the direct purchaser); Fisher v. Wattles, 639 F.Supp. 7, 9 (M.D. Pa. 1985) ("[the plaintiff] must show that it owns or exerts such significant control over [intermediate distributor] as to be virtually the same entity.").

As I have discussed, the Third Circuit has held that this exception applies only where, because of ownership interest or corporate or agency control, "functional unity exists" between the

intermediate distributor and one of the parties. Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 424 F.3d 363, 372 (3d Cir. 2005) (citing Jewish Hospital Ass'n v. Stewart Mechanical Enterprises, Inc., 628 F.2d 971 (6th Cir. 1980)); Mid-West Paper, 596 F.2d at 589. Thus, only members of group buying organizations who have a significant ownership interest in or functional control over their organizations have standing as direct purchasers. Where no member has such interest or control, the direct purchaser is the group buying organization itself. See Howard Hess, 424 F.3d at 372. I will modify the class definition to reflect this determination. Because the proposed class need only be ascertainable by some objective criteria, not actually ascertained, challenges to individual claims based on class membership may be resolved at the claims phase of the litigation. See In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 506 (S.D.N.Y. 1996) (evidence respecting class membership and damages entitlement may be submitted after settlement or judgment). See also In re Methyl Tertiary Butyl Ether (MBTE) Products Liability Litig., 241 F.R.D. 185, 196 (S.D.N.Y. 2007) ("[I]t is the class, not each member, that must be ascertained ... the ascertainability of a class depends on whether there will be a definitive membership in the class once judgment is rendered."); Chaz Concrete Co. v. Codell, 2006 WL 2453302, at *5 (E.D. Ky. Aug. 23, 2006 ) ("The identities of the class members do not need to be specified for certification, but the proposed class must be sufficiently definite in order to demonstrate that a class actually exists"). But see Miller v. Janssen Pharm. Prods., L.P., 2007 WL 1295824, at *5 (S.D. Ill. May 1, 2007) (the Court must be able to determine from the outset whether a particular individual is a member of the proposed class).

**D.      Grant Forest Products, Inc.**

Finally, Defendant Grant Forest Products, Inc. argues that Plaintiffs have not established that any Plaintiff bought OSB from Grant, and therefore cannot satisfy any of the Rule 23 factors as to Grant. *See Grant Forest Products, Inc.'s Joinder and Opp., at 1*.  The <u>Bogosian</u> Court held that an antitrust plaintiff need not claim damages from every defendant to satisfy Rule 23:

> The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all – for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser.

561 F.2d at 448.  Thus, for class certification purposes, Plaintiffs need not establish that any Plaintiff bought OSB from Grant.  <u>Accord</u> <u>Linerboard</u>, 203 F.R.D. at 208.  To the extent Grant is arguing that Plaintiffs have failed to state a claim against Grant, I will address this contention when I decide Grant's Motion for Judgment on the Pleadings.  (Doc. No. 402.)

## **CONCLUSION**

In sum, Plaintiffs meet all the requirements of Rules 23(a) and 23(b)(3).  Because West

Lumber Co. purchased OSB only through buying clubs and has not established that it has direct

purchaser standing, however, it may not serve as a class representative.

Accordingly, the Motion for Class Certification by Direct Purchaser Plaintiffs is granted in

part and denied in part.  I certify the following class:

> All individuals and entities who purchased OSB structural panel products in the United
> States directly from Defendants during the Class Period from June 1, 2002 through the
> present.  For group buying organizations and their members, direct purchasers are either: (1)
> members who have a significant ownership interest in or functional control over their
> organizations; or (2) if no member has such interest or control, the organizations themselves.
> Excluded from the Class are Defendants, their co-conspirators, their respective parents,
> subsidiaries, and affiliates, and any government entities.

An appropriate Order follows.

/s Paul S. Diamond

_____

**Paul S. Diamond, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE OSB ANTITRUST LITIGATION** | : | |
| | : | **Master File No. 06-826** |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| **ALL DIRECT ACTIONS** | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this 3rd day of August, 2007, upon consideration of Direct Purchaser Plaintiffs'

Motion to Certify Class (Doc. No. 272), Defendants' Joint Opposition (Doc. No. 314), Plaintiffs'

Reply (Doc. No. 348), Defendants' Sur-reply (Doc. No. 380), Plaintiffs' Response (Doc. No. 433),

Grant Forest Products, Inc.'s Joinder and Opposition (Doc. No. 441), Plaintiff's Response (Doc. No.

437), Grant Forest Products, Inc.'s Supplemental Opposition (Doc. No. 444), Plaintiffs'

Supplemental Memorandum of Law Regarding Group Buying Organizations (Doc. No. 462),

Defendants' Joint Supplemental Memorandum in Response to the Court's July 18, 2007 Order (Doc.

No. 464), and all related exhibits, and after oral argument, it is hereby ORDERED that the Motion

for Class Certification is **GRANTED** in part and **DENIED** in part, as follows:

1.      A class is hereby **CERTIFIED** pursuant to Rule 23(b)(3) consisting of:

All individuals and entities who purchased OSB structural panel products in the United
States directly from Defendants during the Class Period from June 1, 2002 through the
present.  For group buying organizations and their members, direct purchasers are either: (1)
members who have a significant ownership interest in or functional control over their
organizations; or (2) if no member has such interest or control, the organizations themselves.
Excluded from the Class are Defendants, their co-conspirators, their respective parents,
subsidiaries, and affiliates, and any government entities.

2.      The class is certified for resolution of the following factual and legal issues:

a.      Whether Defendants and their co-conspirators engaged in a combination or

conspiracy to raise, fix, and maintain OSB prices in the United States;

 b. The duration and extent of the combination or conspiracy;

 c. Whether each Defendant participated in the combination or conspiracy;

 d. Whether Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

 e. The effect of the combination or conspiracy upon the OSB prices in the United States during the Class Period;

 f. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and the Class; and

 g. The appropriate measure of damages sustained by Plaintiffs and the Class.

3. The following representative parties will fairly and adequately protect the interests of the class:

 a. Sawbell Lumber Co.

 b. Columbare, Inc.

 c. Norwood Sash & Door Manufacturing Co.

 d. Frontier Lumber Co., Inc.

 e. Grubb Lumber Co., Inc.

 f. New Deal Lumber & Millwork Co., Inc.

4. Pursuant to Rule 23(g), the following law firms are appointed as Class Counsel: Spector Roseman & Kodroff, P.C. (Lead Counsel) and Cohen Milstein, Hausfeld & Toll, P.C. (Co-Lead Counsel).

8. By **September 4, 2007**, the Parties shall jointly submit a class notice program and forms of notice.  If the Parties are unable to agree on forms of notice, the Parties shall submit

proposed notice programs and forms of notice, accompanied by a memorandum explaining that

Party's position.  Each Party shall respond to the other's proposed notice programs and forms of

notice no later than **September 11, 2007**.


AND IT IS SO ORDERED.

/s Paul S. Diamond

_____

**Paul S. Diamond, J.**