IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Michael Hausfeld, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Cohen Milstein Sellers & Toll, PLLC,<br><br>Defendant. | Civil Action No. 06-CV-826 |

**Hausfeld LLP's Post-Trial Brief Regarding
Attorneys' Fees Awarded in *Air Passenger***

## Table of Contents

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF FACTS........................................................................5

      A.    Structure and Operation of the London Firm ...............................5

      B.    The *Air Passenger* Litigation..................................................10

      C.    CMST's Sale of the London Firm ...............................................14

      D.    The Confidential Agreement Between HLLP and CMST.....................17

      E.    Substitution of HLLP as Co-Lead Counsel....................................18

      F.    Resolution of the Appeal and Distribution of the Fees .....................19

III.  ARGUMENT.....................................................................................21

      A.    The Confidential Agreement Does Not Entitle CMST to Any
            Share of Fees for Work Done by Entities Other than "Cohen,
            Milstein, Hausfeld & Toll, P.L.L.C." .........................................22

      B.    HLLP Is Entitled to Its Share of the *Air Passenger* Fees for
            Work Done on or After November 6, 2008...................................24

            1.  The Fees Included Anticipated Post-Award Work ...................25

            2.  Post-Award Time Was Submitted to Judge Breyer and Was
                Used to Allocate Fees Among Other Counsel ........................27

            3.  HLLP Deserves a Multiplier on Its Lodestar ........................29

      C.    The London Firm Is Entitled to Its Share of the
            *Air Passenger* Fees............................................................31

            1.  The London Firm Worked on the *Air Passenger* Litigation
                and Submitted Time Records to Judge Breyer.......................32

            2.  Fees Earned by the London Firm Must Be Paid to the
                London Firm and Deposited in Its Bank Account ...................35

            3.  CMST Has Sold Its Right to the London Firm's Share
                of the *Air Passenger* Fees ...........................................37

IV.   CONCLUSION ................................................................................43

# Table of Authorities

## Cases

Avatar Bus. Connection, Inc. v. Uni-Marts, Inc., No. 04-1866, 2005 WL 3588482 (D.N.J. Dec. 29, 2005) ...................................................................23

Dover Ltd. v. Assemi, No. 08 Civ. 1337, 2009 WL 2424152 (S.D.N.Y. Aug. 5, 2009) ...........................................................................................................10

Excel Energy, Inc. v. Cannelton Sales Co., No. 08-6172, 2009 WL 2017957 (6th Cir. July 10, 2009) .................................................................................23

Focal Point LLC v. CNA Ins. Co., No. C 07-05764 MHP, 2008 WL 2397422 (N.D. Cal. June 10, 2008) .............................................................................19

Geisler v. Walters, 510 F.2d 887 (3d Cir. 1975)......................................................4

Grimer v. Grimer, No. 93-4086, 1993 WL 545261 (D. Kan. Dec. 8, 1993)................35

Hyundai Merchant Marine Co. v. Gesuri Chartering Co., [1991] 1 Lloyd's Rep. 100.............................................................................................................38

In re International Air Transport Surcharge Antitrust Litigation, MDL No. 1793 (N.D. Cal.).........................................................................................1

In re MGM Grand Hotel Fire Litig., 660 F. Supp. 522 (D. Nev. 1987).....................28

In re MRRM, P.A., 404 F.3d 863 (4th Cir. 2005) ..............................................26, 27

In re PaineWebber Ltd. P'ships Litig., 999 F. Supp. 719 (S.D.N.Y. 1998) ...............30

In re Savings Investment Serv. Corp. Loan Commitment Litig., MDL No. 718, 1990 WL 61936 (W.D. Okla. Jan. 22, 1990)...........................................28

In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445 (E.D. Pa. 1995) ............................................................................................28

Inntrepreneur Pub. Co. (GL) v. East Crown Ltd., [2000] 2 Lloyd's Rep. 611............38

Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co., No. 06-3043, 2007 WL 2874805 (E.D. La. Sept. 26, 2007) ...........................................23

O'Toole v. Northrop Grumman Corp., 499 F.3d 1218 (10th Cir. 2007) .....................4

Silva Run Worldwide Ltd. v. Gaming Lottery Corp., No. 96 Civ. 3231, 2003
    WL 1798255  (S.D.N.Y. Apr. 4, 2003)............................................................35

Spark v. MBNA Corp., 289 F. Supp. 2d 510 (D. Del. 2003)......................................29

Wolf v. Walt Disney Pictures & Television, 76 Cal. Rptr. 3d 585 (Cal. App.
    2008) ................................................................................................................23

## Rules

Fed. R. Evid. 201 ........................................................................................................4

## I.    INTRODUCTION

The attorneys' fees allocated on July 10, 2009 to Hausfeld LLP ("HLLP") by Judge Charles R. Breyer in *In re International Air Transport Surcharge Antitrust Litigation*, MDL No. 1793 (N.D. Cal.) ("*Air Passenger*") were for work done by three separate entities: (1) Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT"), for the period prior to November 6, 2008; (2) HLLP, for the period on or after November 6, 2008; and (3) CMHT-NY LLP ("the London Firm"). Pursuant to the Confidential Agreement between HLLP and Cohen Milstein Sellers & Toll, PLLC ("CMST"), CMST is entitled to 50 percent of the fees for work done by *CMHT* prior to November 6, 2008, and nothing more. Not content with the nearly $3.4 million it has received, CMST also demands 50 percent of the fees for work done by HLLP and the London Firm. As demonstrated by the evidence introduced at the trial of this matter, CMST's claim is without merit and should be rejected by this Court.

CMST's argument is premised on three assertions: (1) that Judge Breyer awarded fees to CMHT, "in its name," on October 31, 2008; (2) that HLLP is required to "eat" all or part of the time it spent working on behalf of the class after that date; and (3) that the London Firm is a "fictitious" law firm whose attorneys merely worked for CMST and earned no fees independent of CMST. (PX 113, Aug. 3, 2009 letter from John C. Keeney, Jr.; Sellers, Aug. 11, 2009, 125:17-19.) As proven at trial, each of these assertions is demonstrably untrue.

1

Judge Breyer's October 31, 2008 order did not award fees to any particular law firm; the aggregate fees still needed to be allocated among over fifty firms, which could not occur until after an appeal was resolved. *See In re International Air Transport Surcharge Antitrust Litig.*, MDL No. 1793, 2008 WL 4766824, at *3 (N.D. Cal. Oct. 31, 2008) ("*Fee Order I*").[1] Moreover, the fees included compensation for anticipated post-award work, and the time for such work was subsequently submitted to Judge Breyer by *all* counsel and used to determine final fee allocations for *all* counsel. HLLP should not be treated differently than any other counsel. Under the Confidential Agreement, it is entitled to 100 percent of the fees for the work that it did on or after November 6, 2008.

The London Firm also is not a "fictitious" law firm but a real one that is and was a separate legal entity from CMHT and that independently had fixed-share partners and other attorneys who were, by contract and law, **not** employees of CMHT. The London Firm did important, unique work on the *Air Passenger* litigation and submitted its time records to Judge Breyer. It was entitled to the fees for its work even before CMST sold it on January 15, 2009, because under the plain language of the London Firm's partnership agreement – signed by, among others, CMST's Managing Partner, Steven Toll – all fees earned by the London Firm belonged to the London Firm and had to be deposited in the London Firm's bank account. By the time of the July 2009 fee allocation to co-lead counsel (PX 115, *Fee*

---

[1] *Fee Order I* is also Exhibit 1 to PX 113.

*Order II*), it was even clearer that the fees earned by the London Firm belonged to the London Firm, because CMST (*prior to* executing the Confidential Agreement) had transferred all of its "right, interest and entitlement" in those fees to the solicitors who purchased the London Firm.

Given these uncontroverted facts, HLLP divided the nearly $11 million in fees allocated to it among the three firms (CMHT, HLLP, and the London Firm) whose time records had been submitted to Judge Breyer and whose work formed the basis of *Fee Order II*. Consistent with this order, which contemplated a multiplier of approximately four, each of the three firms received the same multiplier on its lodestar.

Based on the plain terms of the Confidential Agreement, HLLP did not believe there was any doubt that the fees it earned for the work it did after November 6, 2008, including any multiplier on those fees, belonged entirely to it. And because the London Firm had been sold by CMST by the time the Confidential Agreement was executed, was not a party to the Confidential Agreement, and was otherwise required to receive fees for the substantial work it did under its partnership agreement, the transfer agreement with CMST, and English law and regulation, HLLP also did not believe there was any doubt that such fees belonged to the London Firm, and believed that it had no basis to delay the payment of those fees to the London Firm (in which neither Michael Hausfeld nor HLLP has any ownership interest). HLLP then deposited the remainder of the fees, which

3

consisted of CMHT's share of nearly $6.8 million, into an escrow account. This was more than enough to satisfy CMST's present total claim for $5.5 million. HLLP disclosed all of this to the Court and to CMST the very same day it made the distributions.

HLLP now understands that the Court disapproves of the unilateral manner in which HLLP, as co-lead counsel, handled the fee distribution in *Air Passenger*, and sincerely apologizes for having acted without the Court's prior approval.[2] Apart from HLLP's handling of the distribution process for the *Air Passenger* fees, however, the facts and law demonstrate that substantive allocation decisions made

---

[2] To the extent that HLLP controls any other distribution of fees covered by the Confidential Agreement, it will first discuss its plans for distribution with counsel for CMST and, if it cannot reach agreement on such plans with CMST, bring the matter to this Court for resolution.

Notably, this is in contrast to the approach CMST took just last week in the *Hydrogen Peroxide Antitrust Litig.*, No. 05-CV-666 (E.D. Pa.) ("*Hydrogen Peroxide*"). pending before Judge Stewart Dalzell litigation pending before Judge Dalzell. HLLP had attempted to discuss fee allocation with CMST, but before negotiations were concluded and while the HLLP attorney handling the matter was on vacation, CMST prematurely filed a motion asking Judge Dalzell (not this Court) to award it over 90% of the fees earned *by HLLP* after November 6, 2008, despite the plain language of Paragraph 11 of the settlement agreement reached with this Court's assistance, which provides that HLLP is entitled to 100% of the fees it earns after November 6, 2008 (*See* PX 1, ¶ 11). With its motion, CMST is asking Judge Dalzell to award it a multiplier of more than 2.6 while permitting HLLP a multiplier of under 0.14 for the work it did during the same time period.

CMST's motion and HLLP's response are attached as Exhibits A and B. The Court may take judicial notice of them as adjudicative facts, and such notice is mandatory insofar as HLLP has supplied the necessary information. *See* Fed. R. Evid. 201; *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007) (holding that the district court erred in refusing to take judicial notice when requested to do so in a post-trial brief); U.S. ex rel. *Geisler v. Walters*, 510 F.2d 887, 890 n.4 (3d Cir. 1975) (taking judicial notice of briefs filed in a related proceeding).

4

by HLLP as to the *amounts* owed to each firm were entirely appropriate and should not be disturbed. Accordingly, the Court should deny CMST's claim for any portion of the *Air Passenger* fees over and above those CMST has already received.

## II.    STATEMENT OF FACTS

### A.    Structure and Operation of the London Firm

The London Firm, which is registered as CMHT-NY LLP, is a New York limited liability partnership with its place of business in London, in the United Kingdom. (PX 110, Partnership Agreement of CMHT-NY LLP.) At the time it was formed in March 2007, the London Firm had four equity partners: CMHT (99 percent), Mr. Hausfeld (0.45 percent), Mr. Toll (0.45 percent), and Andrew Friedman (0.10 percent). (*Id.* at 14; Maton, Aug. 13, 2009, 181:18-25, 182:1-9.) The London Firm also had two fixed-share partners, Robert Murray and Vincent Smith; shortly thereafter, a third fixed-share partner, Anthony Maton, was added. (PX 110, First Amendment to Partnership Agreement of CMHT-NY LLP; Maton, Aug. 13, 2009, 181:18-25.) CMHT (referenced in the agreement as "CMHT-DC") served as the Managing Partner of the London Firm (referenced in the agreement as "the LLP"). (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 4.1.)

The Partnership Agreement provides that "[e]xcept for amounts earned by a Partner on behalf of and payable to CMHT-DC, all fees, salaries, proceeds, commissions and other compensation earned or received by any Partner...for legal services...shall belong to the LLP and shall be deposited for and paid over to the

5

LLP as and when received in exactly the form received...." (*Id.*, ¶ 5.3; Maton, Aug. 13, 2009, 191:8-16.) As Mr. Maton explained, the exception at the start of that provision was intended to protect the U.S. lawyers who were partners in both CMHT and the London firm, and to ensure that fees earned by such U.S. lawyers on behalf of CMHT did not go to the London Firm. (Maton, Aug. 13, 2009, 224:9-25.)

In addition, the Partnership Agreement requires that "[a]ll funds, checks, notes and drafts received for or on behalf of the LLP shall be deposited promptly in the account or accounts maintained by the LLP in such bank or banks as shall be determined by the Managing Partner," and that "[t]he LLP shall at all times maintain a bank account or accounts at a United Kingdom clearing bank...." (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 5.1; Maton, Aug. 13, 2009, 191:23-192:8.) The London Firm also was required to and did keep books and records separate from the books and records of CMHT. (Maton, Aug. 13, 2009, 187:7-15.) Similarly, the London Firm filed its own, separate tax returns. (Drolet, Aug. 10, 2009, 229:25-230:12, 231:19-20.)

During its affiliation with CMHT, the London Firm did in fact take in revenue from legal fees, including fees from McGrigors, the London law firm for which Mr. Maton used to work, which instructed the London firm on behalf of British Petroleum PLC and Chevron, an African government, and a wealthy individual in a financial services matter. (Maton, Aug. 13, 2009, 187:20-189:1.) For each of these engagements, the London Firm – *not* CMHT – recorded time, billed

6

that time, and was paid for that time, and the fees received were deposited in the London Firm's office account, as required by the Solicitors' Regulatory Authority ("SRA"), HM Revenue and Customs ("HMRC"), and the London Firm's Partnership Agreement. (*Id.*) As Mr. Maton testified, these fees could not have been paid directly to CMHT, even though CMHT was the Managing Partner of the London Firm, for several reasons: "First of all, it did not have the right of entitlement to be paid; second, if we had done that, that would have been a fraud on our creditors; and, third, if we would have done that, it would have arguably been a fraud on the Revenue in the United Kingdom." (Maton, Aug. 13, 2009, 191:17-22.)

As the Managing Partner, CMHT was obligated under the London Firm's Partnership Agreement to provide the London Firm with "all funding and other support" necessary for it to remain solvent, with such funding to be recorded either as loans or capital contributions. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 4.4.) CMHT did so on a monthly basis, and these funds were recorded as capital contributions in the London Firm's books and records and characterized as such to the SRA and HMRC. (Maton, Aug. 13, 2009, 192:19-193:1, 204:25-206:7.)[3] Because these funds were capital contributions, there was no obligation on behalf of the London Firm or any of its fixed-share partners to repay CMHT for having

---

[3] In its own financial statements, CMST characterized these contributions both as payments for "outside services" and as an "investment" in CMHT-NY LLP (the London Firm). (PX 78, CMST Reviewed Financial Statements, at 2, 4, 5, 6, 10, 12; Drolet, Aug. 10, 2009, 228:7-11, 230:13-231:3.)

7

advanced them; they were simply obligations of CMHT under the London Firm's Partnership Agreement. (*Id.*, 193:20-194:15.)

Expenses of the London Firm, including salaries, were paid out of the London Firm's office account. (*Id.*, 192:9-18, 193:7-14.) Mr. Maton explained that any other arrangement, such as payment of expenses directly by CMHT, "would have been improper" under U.K. tax laws and for other reasons. (*Id.*, 193:2-6, 193:15-19.)

If the London Firm were profitable, it would pay taxes in the U.K. (*Id.*, 187:16-19.) The Managing Partner (i.e., CMHT) could then cause it to distribute profits to the equity partners. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 6.1; Maton, Aug. 13, 2009, 189:8-20.) To date, however, the London Firm has not made a profit and so has not paid any taxes or made any distributions. (Maton, Aug. 13, 2009, 187:16-19, 189:21-190:6.)

Addenda to the London Firm's Partnership Agreement set forth the terms of retention of each of the fixed-share partners of the London Firm. (PX 111, Terms of Retention of Anthony Maton.) Mr. Maton's addendum provided that he "shall not be a member of, employed by, or an agent of CMHT-DC." (*Id.*, ¶ 4.1; Maton, Aug. 13, 2009, 185:11-20; Sellers, Aug. 11, 2009, 130:6-17.) Mr. Maton's fixed share partnership term continued through May 31, 2010, and the London Firm was obligated to continue to pay him drawings until that date unless he were terminated for cause. (PX 111, Terms of Retention of Anthony Maton, ¶¶ 1.3, 5.7.) In addition, CMHT could not dissolve the entity prior to May 31, 2010 without the

8

consent of all of the equity *and* fixed-share partners. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 9.1.)

In connection with this dispute, CMST has referred to the London Firm as "a fictitious third law firm which is in fact simply the London office of Cohen Milstein...." (PX 113, Aug. 3, 2009 letter from John C. Keeney, Jr., at 2.) It is undisputed, however, that the London Firm is and was a valid, separate legal entity from CMHT. (Maton, Aug. 13, 2009, 182:22-183:1; Drolet, Aug. 10, 2009, 228:12-25, 231:9-18.) Indeed, this separation was required by the SRA and by U.K. tax rules. (Maton, Aug. 13, 2009, 183:2-184:2.) As Mr. Maton testified, CMST's description of the London Firm as "fictitious" is "extraordinary":

> I've already explained to you that this was a legal entity in its own right that was registered by and recognized by the SRA; as such, it had to enter into its own insurance arrangements, which it did; it had to enter into its own banking arrangements, which it did through the Royal Bank of Scotland in London; it had to have its own accountant and submit its own accounts; it was regulated and recognized by the Union of [Inland] Revenue in England and Wales; it employed people under employment contracts, which had to be regulated as a matter of European law; it had clients who engaged it and I spent the first four months of my practice in the firm being engaged by my former firm to finish off the rump of a very large gas contract dispute action for British Petroleum and Chevron/Texaco, and there's actually no way that they would have allowed that to take place if this was some sort of fictitious entity. And, lastly, it is an entity which litigated and, as such, has a duty to the court in London and I myself have, through that entity, duties to clients and duties to the court. So, the suggestion that that entity is somehow fictitious I find actually deeply insulting.

9

(*Id.*, 186:2-187:4.)

### B.    The *Air Passenger* Litigation

*Air Passenger* (also known as the "BA/VA" case) was a cartel case in which British Airways and Virgin Atlantic allegedly conspired to overcharge passengers flying to and from the United States and to and from the United Kingdom. (Maton, Aug. 13, 2009, 207:9-14.) Virgin Atlantic stipulated that its conduct violated both Section 1 of the Sherman Act, 15 U.S.C. § 1, and Chapter I(2)(1) of the United Kingdom's Competition Act 1998, Chapter 41. (Stip. as to Violation by Def. Virgin Atlantic Airways Ltd., so ordered Sept. 21, 2007, ¶¶ 3-4.)[4]

Because most of the injury impacted U.K. passengers, counsel's strategy was twofold: first, to begin proceedings in a U.S. court on behalf of a U.S. class, with an eye toward including claims of U.K. passengers as well; and second, to persuade the defendants that the U.K. passengers and their counsel had the capacity and capability to begin proceedings in London if the U.S. court did not exercise jurisdiction over the U.K. claims. (Maton, Aug. 13, 2009, 207:25-208:14.)

Solicitors in the London Firm worked on the second prong of this strategy by developing the potential U.K. case. (*Id.*, 208:15-209:8.) Ultimately, with the assistance of Kenneth Feinberg, a court-appointed mediator, the parties reached a settlement that encompassed both U.S. and U.K. claims, so it was not necessary to

---

[4] The stipulation and order is attached as Exhibit C. *See supra* note 2; *see also Dover Ltd. v. Assemi*, No. 08 Civ. 1337, 2009 WL 2424152, at *4 n.5 (S.D.N.Y. Aug. 5, 2009) (taking judicial notice of a stipulation and order).

file a separate U.K. action. (Feinberg, Aug. 13, 2009, 158:16-159:9; Maton, Aug. 13, 2009, 209:9-11.)

As Mr. Feinberg testified, the U.K. component "was the critical innovative part of this settlement." (Feinberg, Aug. 13, 2009, 162:7-8.) Solicitors in the London Firm developed a methodology for making the settlement binding under English law and an unprecedented publication and notice program to inform U.K. claimants about the settlement. (Maton, Aug. 13, 2009, 209:19-211:8.) This work could only have been done by solicitors licensed to practice in England. (*Id.*; Toll, Aug. 13, 2009, 266:14-25.)

Under the separate settlements with Virgin Atlantic Airways, Ltd. and British Airways PLC, the defendants agreed to pay approximately $60 million to U.S. passengers, up to approximately £74 million ($136 million) to U.K. passengers, and $23 million in attorneys' fees and costs. *See Fee Order I*, 2008 WL 4766824, at *2. The claims period would remain open until December 31, 2012. *Id.*

The fee negotiated with the defendants was intended to cover work done both before and after the settlements were approved. (Feinberg, Aug. 13, 2009, 161:1-14.) The parties anticipated that the plaintiffs' attorneys – and Michael Hausfeld in particular – would need to spend additional time after approval overseeing the administration of the settlements. (*Id.*, 162:2-163:5.) At the defendants' insistence, the negotiated fee did not reflect the hours that had been spent on the case to date. (*Id.*, 160:11-25.)

11

Judge Breyer approved the settlements. Significantly, prior to approval, he rejected a jurisdictional challenge to the inclusion of U.K. purchasers. (Maton, Aug. 13, 2009, 211:9-18.)[5] Separately, Plaintiffs' counsel filed an application for attorneys' fees and submitted 57 declarations detailing the time spent and work done by the numerous law firms that worked on the litigation. (Lehmann, Aug. 13, 2009, 279:8-10.) One of these declarations was submitted by Charles Tompkins, a non-equity partner at CMHT. (DX 52, Tompkins Decl.)

The Tompkins Declaration, which covered the period through August 15, 2008, reported the hours worked by lawyers at "Cohen, Milstein, Hausfeld & Toll, P.L.L.C. (US Offices)" and, on a separate page, the hours worked by lawyers at "Cohen, Milstein, Hausfeld & Toll, L.L.P. (UK Office)," the trading name of the London Firm at that time. (DX 52, Tompkins Decl., Ex. 1.) Mr. Maton prepared the London Firm's time records and forwarded them to Mr. Tompkins so that they could be submitted to the district court and paid. (Maton, Aug. 13, 2009, 212:10-17, 222:24-223:7.) But Mr. Maton never saw the Tompkins Declaration until he testified at trial in this matter. (*Id.*, 229:17-230:2.)

In the text of his declaration, Mr. Tompkins referred collectively to both CMHT and the London Firm as "my firm." (DX 52, Tompkins Decl., ¶ 9.) This was an inaccurate characterization, as the London Firm was a separate legal entity in

---

[5] The settlements were the subjects of two separate approval orders issued on October 3, 2008. Judge Breyer separately issued an opinion on subject matter jurisdiction on October 2, 2008.

which Mr. Tompkins was not a partner. (Lehmann, Aug. 13, 2009, 280:9-20.) And in the exhibit to his declaration, Mr. Tompkins separately reported the time of each entity. (*Id.*, 279:2-13.)

Although these declarations from various firms were presented to the Court on September 5, 2008, the plaintiffs did not rely on them in seeking an award of attorneys' fees, but rather suggested that fees should be awarded pursuant to a "percentage of the common fund" approach, rather than a lodestar approach, arguing that the lodestar method was used in employment, civil rights, and other injunctive relief cases where no fund was created. (Notice of Motion, Motion and Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Litigation Expenses, at 10-11.)[6]

Judge Breyer's order awarding fees was not based on the hours worked. (Feinberg, Aug. 13, 2009, 166:16-167:9.) Rather, the district court specifically held that, while it had discretion to base fees on lodestar, it found a percentage-of-the-fund method to be more appropriate, and the requested fees to be fair and reasonable, "in light of the nature of the recovery, expertise of counsel, the extraordinary notice procedures, the long claims period, and the claims process." *Fee Order I*, 2008 WL 4766824, at *2.

Consistent with the plaintiffs' motion, Judge Breyer ultimately awarded $22.2 million in fees and $800,000 in costs. The notice procedures, claims period,

---

[6] These materials are attached as Exhibit D. *See supra* note 2.

and claims process referenced by Judge Breyer were all contemplated to take place after the fee award. (Feinberg, Aug. 13, 2008, 164:15-25.) And as Mr. Feinberg recommended to Judge Breyer, the fee award reflected past work, as well as anticipated future work. (*Id.*, 165:21-166:1.) Thus, fees for work done after October 31, 2008 were to be included in the $22.2 million award. (*Id.*, 169:16-23.)

Judge Breyer's *Fee Order I* did not make an award to any particular law firm. (Feinberg, Aug. 13, 2009, 165:1-3; Sellers, Aug. 11, 2009, 126:10-22.) *See also Fee Order I*, 2008 WL 4766824, at *3. Nor was it limited to co-lead counsel. (Feinberg, Aug. 13, 2009, 174:8-13; Toll, Aug. 13, 2009, 261:23-262:1.)[7] Instead, as is typical in large antitrust cases, Judge Breyer left it to the firms to work out an allocation among themselves. (Feinberg, Aug. 13, 2009, 165:9-20.)

The fees were not allocated at that point, however, because three objectors appealed Judge Breyer's orders approving the settlement and awarding attorneys' fees. (Lehmann, Aug. 13, 2009, 271:15-19.)

## C.    CMST's Sale of the London Firm

While the appeal was pending, and before any decisions had been made about how to allocate the *Air Passenger* fees, Mr. Hausfeld was expelled from CMHT and the firm (renamed CMST) sold all of its interest in the London Firm. Pursuant to an agreement made on January 15, 2009, CMST, Mr. Toll, and Mr. Friedman

---

[7] Testimony from CMST partner Joseph Sellers that the October 31, 2008 order awarded fees "to our firm, in its name" is inaccurate. (Sellers, Aug. 11, 2009, 125:17-19.)

14

transferred "all of their rights, interest and entitlements in CMHT-NY LLP" to Messrs. Maton, Murray, and Smith. (PX 112, Agreement Transfer of CMHT-NY LLP, at 1.) Mr. Murray subsequently resigned from the partnership and is no longer an owner, and the London Firm is now entirely owned by Messrs. Maton and Smith. (Maton, Aug. 13, 2009, 196:11-15.) HLLP has no ownership interest in the London Firm and no right or agreement to share in any of its assets, including the *Air Passenger* fees earned by the London Firm. (*Id.*, 217:11-23.)

The transfer agreement provides that it "represents the whole agreement between the Parties as to its subject matter" and that "[t]he Parties acknowledge and agree that in entering into this Agreement they do not rely on, and shall have no remedy in respect of, any statement, representation, warranty or understanding (whether negligently or innocently made) of any person (whether party to this Agreement or not)." (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 6.7.) The agreement is governed by English law, with any disputes referred to arbitration in London. (*Id.*, ¶ 6.3.) It "confers no rights and imposes no obligations on third parties...." (*Id.*, ¶ 6.2.)

The transfer agreement provides as follows:

> In consideration of payment of the Consideration and the execution by each of the Transferees of the Transferee Releases, the Transferors each individually and jointly agree to transfer to the Transferees all of their right, interest and entitlement in [CMHT-NY LLP] and in any or all of its business or practice, wheresoever and whatsoever, as carried on at the agreement date.

15

(*Id.*, ¶ 2.1.) As Mr. Maton testified, under English law, this language means, in "common parlance, the whole shooting match...everything that is owned by and belongs to." (Maton, Aug. 13, 2009, 203:2-7.) None of the London Firm's assets, and none of the fees from *Air Passenger* or any other case, were excluded from the agreement. (*Id.*, 203:8-18.) Indeed, Mr. Maton specifically testified that he and his partners believed that they were buying all rights, interest and entitlement to the *Air Passenger* fees earned from the time recorded and work done by the London Firm. (*Id.*, 198:18-23, 215:10-23.)[8]

The "Consideration" under the agreement was $2 million, payable over time out of the London Firm's year-end profits. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 3.) Yet there was other consideration for CMST as well. The Transferee Release relieved CMST of its obligation to fund the London Firm and pay the salaries of the fixed-share partners through May 31, 2010. (*Id.*, Appx. 1.) This saved CMST over £1 million in salaries and over $10 million in future funding. (Maton, Aug. 13, 2009, 200:11:201:19.)

When it sold its interest in the London Firm, CMST became a Former Partner under the terms of the Partnership Agreement, which provides that "[n]o

---

[8] Mr. Sellers testified that the transfer agreement was limited to "European antitrust cases" such as *Marine Hose,* which he asserted was referenced in the agreement. (Sellers, Aug. 11, 2009, 101:4-10, 109:25-8.) As he later admitted, however, the agreement itself is not limited to European cases, and *Marine Hose* is not mentioned in it at all. (*Id.*, 123:17-124:3.) Rather, *Marine Hose* is discussed in the Confidential Agreement, to which CMHT-NY LLP and its owners are not parties. (PX 1, Confidential Agreement, ¶ 8.)

Former Partner shall have any right to have LLP property distributed to him, nor to have the value of his interest in the LLP ascertained and paid to him." (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 8.6; Maton, Aug. 13, 2009, 206:9-207:2.) Moreover, Former Partners are required to cooperate with the LLP, including with respect to billing matters. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 8.7.) During his testimony, Mr. Sellers admitted that he was not familiar with this cooperation requirement. (Sellers, Aug. 11, 2009, 119:7-14.)

### D.     The Confidential Agreement Between HLLP and CMST

HLLP and CMST executed a Confidential Agreement on February 5, 2009. (PX 1, Confidential Agreement.) The agreement was drafted by CMST's counsel. (Hausfeld, Aug. 12, 2009, 43:22-44:1.) With respect to *Air Passenger*, it provided that HLLP and CMST "shall each receive a 50% share of the total fees awarded for work done by Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ('CMHT') prior to November 6, 2008." (PX 1, Confidential Agreement, ¶ 1.)

The *Air Passenger* provision does not cover the fees earned by the London Firm (i.e., the separate legal entity CMHT-NY LLP), and it actually could not have done so, because the London Firm was not a party to the Confidential Agreement and, moreover, because CMST had sold the London Firm on January 15, 2009, several weeks *before* entering into the Confidential Agreement. The *Air Passenger* provision, by its terms, also excludes fees earned by HLLP after November 6, 2008.

17

In fact, Paragraph 11 of the Confidential Agreement expressly provides that such fees belong to HLLP:

> As to any and all cases in which CMHT was involved prior to November 6, 2008 and in which Hausfeld LLP is or will become involved as counsel, Hausfeld LLP shall receive 100% of any fees and expense reimbursements awarded for work done by Hausfeld LLP on or after November 6, 2008, and CMST and each of the individual attorneys at CMST unconditionally waive any claim to any share of fees and expense reimbursements awarded in such cases for work done by Hausfeld LLP on or after November 6, 2008.

(*Id.*, ¶ 11.) The Confidential Agreement further provides that Judge Breyer would decide the appointment of co-lead counsel in *Air Passenger*, which was being disputed by the firms at that time. (*Id.*, ¶ 12.) It also has an integration clause as to all of its topics. (*Id.*, ¶ 18(e)).

### E.     Substitution of HLLP as Co-Lead Counsel

As contemplated by the Confidential Agreement, Judge Breyer did decide the appointment of co-lead counsel in *Air Passenger*. Shortly after Mr. Hausfeld was expelled from CMHT, Judge Breyer issued an administrative order appointing HLLP as co-lead counsel in *Air Passenger* in place of CMHT. (Lehmann, Aug. 13, 2009, 271:20-272.6.) CMST moved for reconsideration and, following a hearing in January 2009, Judge Breyer denied CMST's motion. (*Id.*; Toll, Aug. 13, 2009, 234:11-23.) At the hearing, Patrick Tillou, a partner at CMST, referred to the

18

pending appeal as a "major obstacle" in the case requiring counsel experienced in appellate advocacy. (Hr'g Tr. Jan. 29, 2009, at 7:18-20.)[9]

**F.      Resolution of the Appeal and Distribution of the Fees**

On April 1, 2009, the *Air Passenger* appeal was resolved through the Ninth Circuit's mediation program, after HLLP and the other co-lead counsel, Cotchett, Pitre & McCarthy ("CPM"), had prepared a motion to dismiss the appeal, which, because of the mediation resolution, did not need to be filed. (Lehmann, Aug. 13, 2009, 280:21-281:8.)

In late April 2009, Steve Williams of CPM wrote to all of the other plaintiffs' firms in the litigation, inviting them to supplement their prior submissions with additional time they wanted considered in the fee allocation. (*Id.*, 272:14-273:17.) This request was made in part because the aggregate fee award was intended to cover all counsel fees both before and after the order was issued on October 31, 2008. (*Id.*, 278:18-279:1.) Daniel Small, a partner at CMST, responded on June 2, 2009 by submitting what he described as "my firm's lodestar information for Aug. 15, 2008 to the present." (PX 114, June 2, 2009 email from Daniel Small.) Although he included hours worked by lawyers at CMST after the October 31, 2008 fee order, Mr. Small did not include any hours worked by solicitors at the London Firm, including during the period the London Firm was 99-percent owned by CMST. (*Id.*)

---

[9] The January 29, 2009 hearing transcript is attached as Exhibit E. *See supra* note 2; *see also Focal Point LLC v. CNA Ins. Co.*, No. C 07-05764 MHP, 2008 WL 2397422, at *1 n.5 (N.D. Cal. June 10, 2008) (taking judicial notice of a hearing transcript).

19

Following receipt of additional hours from the various law firms, most counsel were paid their shares of the fees by mid-June. (Lehmann, Aug. 13, 2009, 274:10-16.) But HLLP and CPM reached an impasse as to how to allocate the remaining portion of the fees, and Judge Breyer referred the matter to mediation before Magistrate Judge Edward Chen. (*Id.*, 274:16-21.) The mediation was unsuccessful, and Magistrate Judge Chen advised HLLP that it would need to submit to Judge Breyer the actual timesheets underlying the summaries that had been submitted previously. (*Id.*, 274:21-275:3.)

On July 7, 2009, HLLP submitted three sets of time records to Judge Breyer: (1) time recorded by CMHT between June 2006 and November 5, 2008; (2) time recorded by HLLP from November 7, 2008 through April 30, 2009; and (3) time recorded by the London Firm between April 2007 through April 2009. (*Id.*, 277:5-278:17; PX 116, July 28, 2009 letter from Seth A. Rosenthal, Exs. B, C, & D.)[10]

Three days after receiving the time records, Judge Breyer issued an order allocating fees as between CPM and HLLP. (PX 115, *Fee Order II.*) Judge Breyer used a hybrid approach, awarding HLLP 62.5 percent and CPM 37.5 percent, but

---

[10] These time records were submitted to Judge Breyer *in camera*, and with the consent of counsel for the parties, this Court approved maintaining them *in camera* here as well. (Tr. Aug. 13, 2009, 276:20-277:3.) The London Firm's time records bear the name "Hausfeld & Co. LLP, London" rather than "CMHT-NY LLP" because the new owners of the London Firm (which do not include Mr. Hausfeld or HLLP) were required by the sale agreement to change the entity's trading name to another name not including the names "Cohen," "Milstein," or "Toll." (PX 116, July 28, 2009 letter from Seth A. Rosenthal, at 2 n.1; PX 112, Agreement Transfer of CMHT-NY, LLP, ¶ 2.6; Lehmann, Aug. 13, 2009, 277:21-23.) *See also infra* note 11.

also referring to the hours and lodestar submitted and finding that the resulting multiplier of "more than four" appropriately reflected each firm's contributions to the resolution of the case. (*Id.*; Lehmann, Aug. 13, 2009, 275:12-276:8, 281:9-16.)

Of course, even though Judge Breyer's order awarded fees to HLLP, that award was based on the time submitted to him by HLLP on behalf of three separate entities: CMHT, HLLP, and the London Firm. Therefore, the award needed to be further allocated among those three entities, which was accomplished by applying a common multiplier of approximately 3.96 to the lodestar of each firm. (Lehmann, Aug. 13, 2009, 281:17-283:2; PX 117, chart.) Using this methodology, $1,090,777.55 was wired to HLLP; $3,075,868.12 was wired to the London Firm; and the CMHT share of $6,793,579 (which CMST and HLLP would split under the terms of the Confidential Agreement) was placed in an escrow account pending further order of this Court. (PX 117, chart.) Subsequently, the shares of CMHT and HLLP were deposited into the registry of this Court, where they remained until the Court's order releasing CMST's share at the conclusion of the trial.

## III. ARGUMENT

The *Air Passenger* fees were properly allocated among CMHT, HLLP and the London Firm. The Confidential Agreement limits CMST's share of the fees to 50 percent of the fees awarded for work done by CMHT prior to November 6, 2008. CMST has no right to a share of fees awarded for work done by HLLP (which it gave

up in the Confidential Agreement) or the London Firm (which it gave up in the transfer agreement). Both HLLP and the London Firm, each of which submitted separate time reports to Judge Breyer, are entitled to the fees they earned for their respective work.[11]

### A. The Confidential Agreement Does Not Entitle CMST to Any Share of Fees for Work Done by Entities Other than "Cohen, Milstein, Hausfeld & Toll, P.L.L.C."

By its plain language, the Confidential Agreement provides for a split of fees awarded only for work done by "Cohen, Milstein, Hausfeld & Toll, P.L.L.C." (PX 1, Confidential Agreement.) It does not entitle CMST to any share of fees for work done by other entities, including HLLP or the London Firm. To the contrary, it specifically states that HLLP would receive 100 percent of fees for work done by HLLP on or after November 6, 2008. (*Id.*, ¶ 11.) And it contains no mention of the London Firm at all.

---

[11] Messrs. Maton and Smith are the sole owners of the London Firm and have absolute and sole authority over what occurs with the London Firm's share of the *Air Passenger* fees. (Maton, Aug. 13, 2009, 181:5-12, 217:20-23.) Mr. Hausfeld and HLLP have no ownership interest in the London Firm, no right or agreement to share in its assets, and no right or agreement to share in the *Air Passenger* fees earned by the London Firm. (*Id.*, 217:11-19.) And although Messrs. Maton and Smith have formed a new law practice in which Mr. Hausfeld does have an interest, that entity is separate from the London Firm and likewise has no claim on the London Firm's *Air Passenger* fees. (*Id.*, 215:24-216:11.) At no time during the negotiations regarding the new law practice or otherwise did Mr. Hausfeld or HLLP attempt to entice Messrs. Maton or Smith by promising that the London Firm would be paid in the *Air Passenger* case. (*Id.*, 217:24-218:11.) Thus, contrary to CMST's insinuations, there was absolutely no self-dealing here.

The specific reference to "Cohen, Milstein, Hausfeld & Toll, P.L.L.C." cannot reasonably be read to include the London Firm, which the undisputed evidence establishes is a separate legal entity that CMST already had sold by the time the Confidential Agreement was executed. *See Excel Energy, Inc. v. Cannelton Sales Co.*, No. 08-6172, 2009 WL 2017957, at *2 (6th Cir. July 10, 2009) ("As evidenced by their final agreement, the parties chose to make the obligations of the contract the responsibility of Cannelton Sales alone, not of Cannelton and its affiliates or subsidiaries...."); *Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 609 (Cal. App. 2008) (holding that because the definition of "Purchaser" in the contract did not include subsidiaries, the seller was entitled to a percentage of revenue earned only by the purchaser itself, not the purchaser's subsidiaries).

As the original drafter of the Confidential Agreement and a sophisticated party, CMST could have included a reference to the London Firm, but instead expressly limited the language to the P.L.L.C. alone. *See Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, No. 06-3043, 2007 WL 2874805, at *2 (E.D. La. Sept. 26, 2007) ("Had Sea Mar, as the drafter, intended for the exculpatory provision to apply to additional parties, such as Nexen Petroleum's affiliates or contractors, it easily could have done so."); *Avatar Bus. Connection, Inc. v. Uni-Marts, Inc.*, No. 04-1866, 2005 WL 3588482, at *10 (D.N.J. Dec. 29, 2005) ("There is no question that the Second Brokerage Agreement could have been drafted so that the term 'buyer' included not only the party that Plaintiff introduces

23

to Defendant, but also the party's affiliates and partners....This is especially true...in a contract between two sophisticated parties such as Plaintiff and Defendant....However, such language was not included in the Second Brokerage Agreement and this Court declines to rewrite the Second Brokerage Agreement in this way.").

Thus, the fee-splitting provision of the Confidential Agreement applies only to fees for work done by CMHT prior to November 6, 2008, and not to fees for work done by HLLP (on or after November 6, 2008) or the London Firm (at any time). As discussed below, both HLLP and the London Firm are entitled to their separate shares of the *Air Passenger* fees.

**B.    HLLP Is Entitled to Its Share of the *Air Passenger* Fees for Work Done on or After November 6, 2008**

In addition to its 50 percent share of the fees for work done by CMHT prior to November 6, 2008, HLLP is entitled to 100 percent of fees for work done by HLLP on or after November 6, 2008. The fee awarded by Judge Breyer, which was not based on lodestar, included both past and anticipated future work. Consistent with that award, all counsel – including CMST itself – submitted post-award time, and those submissions were used to allocate fees among other counsel in the case. As established by the testimony of Mr. Feinberg, an experienced mediator of fee awards, it was entirely appropriate to take post-award time into account in allocating the *Air Passenger* fees. (Feinberg, Aug. 13, 2009, 169:24-170:2.)

24

Even CMST seems to have abandoned its original position that HLLP should "eat" the additional time it spent working on the case after October 31, 2008, conceding that it is "not really contending that, you know, Mr. Hausfeld's entitled to nothing" for this work, only that he should not receive a multiplier. (PX 113, Aug. 3, 2009 letter from John C. Keeney, Jr., at 3; Tr. Aug. 13, 2009, 305:14-306:6.) But even as to this point, CMST is legally and factually incorrect, particularly because the post-award work included time spent resolving an appeal that could have undermined the entire settlement.

### 1.    The Fees Included Anticipated Post-Award Work

Judge Breyer's *Fee Order I* awarded a fee not only for the work that had already been completed on the case, but also for the significant work that remained to be done, as evidenced by the following:

- Judge Breyer based aggregate fees on a percentage of the fund, not lodestar. *See Fee Order I*, 2008 WL 4766824, at *2.

- The fee was intended to cover work done both before and after the settlement was approved, and at the defendants' insistence did not reflect the hours that had been spent on the case to date. (Feinberg, Aug. 13, 2009, 160:11-161:14, 165:21-166:1, 169:16-23.)

- Some of this future work – including the extraordinary notice procedures and long claims process – was specifically referenced by Judge Breyer in approving the fee award. (Feinberg, Aug. 13, 2009, 164:15-25.) *See also Fee Order I*, 2008 WL 4766824, at *2.

Thus, CMST's original argument (which it has apparently since abandoned) that post-October 31, 2008 work "is not part of the fee award or considered as such" is not supported by the facts. (PX 113, Aug. 3, 2009 letter from John C. Keeney, Jr.,

25

at 3.) Nor is it true, as Mr. Toll testified, that "part of the deal we struck" in the Confidential Agreement was that HLLP's share of the CMHT fee would include its future work. (Toll, Aug. 13, 2009, 264:20-24.) The Confidential Agreement specifically left open the issue of which firm would be appointed as co-lead counsel in the *Air Passenger* case; if CMST had been appointed in place of HLLP, then CMST would have been responsible for this future work. (PX 1, Confidential Agreement, ¶ 12.) Moreover, the Confidential Agreement makes clear that HLLP is entitled to 100 percent of fees for work it did on or after November 6, 2008. (*Id.*, ¶ 11.)

The situation here is analogous to *In re MRRM, P.A.*, 404 F.3d 863 (4th Cir. 2005), in which the district court awarded $20 million in fees to two firms that had served as class counsel for over a decade. *See id.* at 867. The firms divided $12 million, but could not agree on the allocation of the remainder. *See id.* at 868. Several shareholders subsequently left one of the firms (Ness Motley) and the court designated their new firm (RPWB) to continue as co-lead counsel. *See id.* The court then allocated $1.2 million of the previously-awarded fee to RPWB for the work it would do, independent of Ness Motley, to resolve all remaining issues regarding the settlement fund. *See id.* at 868-69.

Ness Motley appealed, arguing that RPWB should receive nothing because the fee had already been awarded, conditioned on the lawyers doing the necessary future work, and that the RPWB attorneys (who received a share of Ness Motley's

fees) should not be paid "twice" by being allocated a share of the fees for this additional work. *Id.* at 896. The Fourth Circuit disagreed:

> We are not persuaded that any of these arguments require that, as a matter of law, RPWB receive no part of the fee. RPWB continues to perform significant services on behalf of the class. The allocation does not pay anyone "twice." The simple fact that the case now involves three parties and the members of one party were formerly employed by another does not render their continued remuneration objectionable. The allocation instead simply adjusts the payment among the parties to reflect the efforts of each. We find no abuse of discretion in including RPWB.

*Id.* To the extent CMST likewise argues that no portion of the fees previously awarded should be allocated for HLLP's subsequent work, this Court should reject its argument for the same reasons articulated by the Fourth Circuit.

### 2. Post-Award Time Was Submitted to Judge Breyer and Was Used to Allocate Fees Among Other Counsel

In connection with the proceedings before Judge Breyer regarding allocation of the fees, the parties submitted time records for work done on the case through April 2009. (PX 116, July 28, 2009 letter from Seth A. Rosenthal, Exs. B, C, & D; Lehmann, Aug. 13, 2009, 277:5-278:17.) These time records, including for hours worked after October 31, 2008, formed a basis of Judge Breyer's order allocating fees: Judge Breyer discussed the lodestar totals and found that a multiplier of approximately four would appropriately compensate each of the firms. (PX 115, July 10, 2009 Order re Fees; Lehmann, Aug. 13, 2009, 275:12-276:8, 281:9-16.)

Additionally, other plaintiffs' counsel were compensated taking into account their subsequent time. (Lehmann, Aug. 13, 2009, 272:14-273:17, 274:10-16, 278:18-279:1.) Even CMST itself submitted additional time for consideration, including hours worked after October 31, 2008. (PX 114, June 2, 2009 email from Daniel Small.) This submission is an implicit concession that post-award time is compensable. If HLLP is denied fees for its post-award work on behalf of the class, it would be the *only* firm disadvantaged in this manner, as CPM and the non-lead firms all had their fee allocations based on their total time. The Court should not permit such an anomalous result.

To the extent CMST is contending that lodestar cannot be used to allocate fees when the aggregate award was based on a percentage of the fund, it is mistaken for three reasons. (Toll, Aug. 13, 2009, 252:2-253:14.) First, while Judge Breyer did not use a lodestar method in his initial order, he did refer to lodestar in his order regarding fee allocation. Second, other firms in the *Air Passenger* case were in fact paid based on the hours they worked. Third, lodestar is frequently used in class actions to allocate a percentage fee among counsel. *See, e.g., In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445, 482 n.87 (E.D. Pa. 1995); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 530 (D. Nev. 1987) (Bechtle, J., sitting by designation); *In re Savings Investment Serv. Corp. Loan Commitment Litig.*, MDL No. 718, 1990 WL 61936, at *5 (W.D. Okla. Jan. 22, 1990). The allocation here was therefore appropriate.

28

3.    HLLP Deserves a Multiplier on Its Lodestar

When the *Air Passenger* fees were allocated among CMHT, HLLP and the London Firm, each firm received the same multiplier. (PX 117, chart; Lehmann, Aug. 13, 2009, 281:17-283:2.) This was consistent with Judge Breyer's fee allocation order, in which he held that a multiplier of approximately four would appropriately compensate each of the firms. (PX 115, *Fee Order II.*) It was also consistent with principles of fairness, so that no one firm was favored or disfavored in the allocation.

For several reasons, CMST's challenge to the use of a multiplier for HLLP's post-award time is without merit:

*First*, Judge Breyer's *Fee Order II* referred to multipliers of approximately four; it did not suggest that multipliers should vary based on when throughout the litigation time was incurred. (*Id.*)

*Second*, while it is true that multipliers often are awarded to reflect risk, HLLP's post-award time included work on the appeal, which CMST itself characterized as a "major obstacle" and which, if successful, would have undermined the entire settlement. *See, e.g., Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 514 (D. Del. 2003) (rejecting argument that class counsel should not receive a multiplier for appellate work, holding that "there was a risk inherent in defending the class action on appeal" and noting that the appellants sought a reversal of the settlement approval order).

29

*Third*, even tasks related to settlement administration are deserving of multipliers. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 999 F. Supp. 719, 725 (S.D.N.Y. 1998) (awarding multiplier both for time already incurred and for future time monitoring and implementing settlement distributions). This is particularly true for the *Air Passenger* settlement, for which Judge Breyer recognized the "extraordinary notice procedures" and "the long claims period" ahead. (PX 113, Ex. 1, October 31, 2008 Order Awarding Attorneys' Fees and Costs.)

*Fourth*, the HLLP time used in the allocation necessarily understates the total time HLLP will spend administering the settlement because the claims period will remain open until December 31, 2012 (*id.* at 2), over which time HLLP will continue to devote many hours to the litigation. By then, HLLP's effective multiplier could be considerably lower or even nonexistent.

*Fifth*, if CMST's challenge is limited to what multiplier is appropriate for HLLP's post-award work, CMST should bring that dispute before Judge Breyer, who has jurisdiction over allocation of the *Air Passenger* fee. Respectfully, it is not for this Court to tinker with Judge Breyer's fee allocation order.[12]

---

[12] Judge Breyer did not require HLLP to submit the allocations to CMHT, HLLP and the London Firm to him for approval. (Lehmann, Aug. 13, 2009, 285:10-12.) But any challenge to the multiplier applied to each firm's lodestar should be brought before Judge Breyer in the first instance. Indeed, CMST has conceded as much in the motion it filed last week in the *Hydrogen Peroxide* case, in which it argued that the amount of fees allocated to each firm, and as a consequence the multipliers awarded, should be determined by Judge Dalzell rather than this Court. *See* note 2, *supra*.

For these reasons, HLLP is entitled to $1,090,777.55 of the *Air Passenger* fees in addition to its 50 percent share of CMHT's fees.

### C.    The London Firm Is Entitled to Its Share of the *Air Passenger* Fees

Having now heard the evidence, the Court is well aware that CMST's description of the London Firm as a "fictitious" law firm is devoid of any factual or legal support. (PX 113, Aug. 3, 2009 letter from John C. Keeney, Jr., at 2.) The London Firm is a real law firm, with a real partnership agreement and real obligations to its clients, the English courts, and HMRC. (PX 110, Partnership Agreement of CMHT-NY LLP; Maton, Aug. 13, 2009, 183:2-184:2, 186:2-187:4.)

The London Firm worked on the *Air Passenger* litigation and submitted its time records to Judge Breyer so that it could be paid for that work. Judge Breyer allocated the fees based in part on this submission, and the London Firm is entitled to its share of those fees. Pursuant to the London Firm's partnership agreement and U.K. tax law, those fees must be paid directly to the London Firm. While CMST once owned 99 percent of the London Firm and would have had a right to receive a distribution of any profits from the *Air Passenger* fees, it sold all of its "right, interest and entitlement" in the London Firm and no longer has any claim on the fees earned by the London Firm from *Air Passenger* or any other case. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 2.1.)

1.    The London Firm Worked on the *Air Passenger* Litigation and Submitted Time Records to Judge Breyer

The London Firm did substantial work on the *Air Passenger* litigation, in particular by developing a potential U.K. case, a methodology for making the settlement binding under English law, and an unprecedented publication and notice program. (Maton, Aug. 13, 2009, 208:15-211:8.) In the words of Mr. Feinberg, the court-appointed mediator, the U.K. component "was the critical innovative part of this settlement," and as Mr. Toll conceded, the work could only have been done by English solicitors. (Feinberg, Aug. 13, 2009, 162:7-8; Toll, Aug. 13, 2009, 266:14-25.)

While the solicitors at the London Firm did not work on the U.S. case itself, they did work on the overall *Air Passenger* litigation, of which the U.K. portion was extremely significant. (Maton, Aug. 13, 2009, 207:25-208:14.) Because Judge Breyer took jurisdiction over the entire settlement, all attorneys' fees – including fees for the U.K. portion – had to be approved by him. (*Id.*, 211:9-18.) And in doing so, Judge Breyer rejected a jurisdictional challenge to the inclusion of the U.K. claims. (*Id.*) Thus, to use this Court's words, the U.S. and U.K. aspects of the litigation became "inextricably intertwined" at the settlement stage. (Tr. Aug. 13, 2009, 249:12-14.)

In September 2008, the London Firm submitted a summary of its time records to Judge Breyer as part of the Tompkins Declaration. (*Id.*, 212:10-17, 222:24-223:7; DX 52, Tompkins Decl., Ex. 1.) CMST places great weight on the reference by Mr. Tompkins to "my firm," by which he apparently meant both CMHT and the London Firm. (DX 52, Tompkins Decl., ¶ 9.) But the mere fact that

Mr. Tompkins said that cannot make it so, and the weight of the evidence

demonstrates otherwise:

- The London Firm was and is a separate legal entity from CMHT. (Maton, Aug. 13, 2009, 182:22-183:1; Drolet, Aug. 10, 2009, 228:12-25, 231:9-18.) Among other things, it kept separate books and records and filed separate tax returns. (Maton, Aug. 13, 2009, 187:7-15; Drolet, Aug. 10, 2009, 229:25-230:12, 231:19-20.)

- Mr. Tompkins was not a partner in the London Firm, and solicitors at the London Firm were not members, employees, or agents of CMHT. (Lehmann, Aug. 13, 2009, 280:9-20; Maton, Aug. 13, 2009, 185:11-20; Sellers, Aug. 11, 2009, 130:6-17; PX 111, Terms of Retention of Anthony Maton, ¶ 4.1.)

- In the Tompkins Declaration, the London Firm's hours appear on a separate page from CMHT's hours with a heading clearly identifying them as having been incurred by a different legal entity. (DX 52, Tompkins Decl., Ex. 1.)

- Although Mr. Maton provided the London Firm's time to Mr. Tompkins for submission to Judge Breyer, he did not see the declaration or know about the erroneous reference to "my firm" until he testified at trial in this matter, so he could not have clarified it earlier. (Maton, Aug. 13, 2009, 229:17-230:2.)

- When Mr. Small provided the post-August 14, 2008 lodestar for what he likewise called "my firm" in June 2009, he did not include any time incurred by the London Firm, including for the time it was 99-percent owned by CMST. (PX 114, June 2, 2009 email from Daniel Small.)

Ultimately, like the other 56 declarations submitted in September 2008, the

Tompkins Declaration proved to be immaterial to the fee awarded by Judge Breyer,

which was based on a percentage of the fund rather than lodestar. (PX 113, Ex. 1,

Oct. 31, 2008 Order Awarding Attorneys' Fees and Costs, at 3-4; Feinberg, Aug. 13,

2009, 166:16-167:9.) The London Firm submitted its time records to Judge Breyer

33

once again, however, in connection with the fee allocation dispute in July 2009. (Lehmann, Aug. 13, 2009, 277:5-278:17.) Then too, the London Firm's time records were provided separately from those of either HLLP or CMHT. (*Id.*; PX 116, July 28, 2009 letter from Seth A. Rosenthal, Ex. D.)[13]

As Judge Breyer implicitly recognized when he allocated fees based on the time records submitted to him, including from the London Firm, the work done by the English solicitors on the *Air Passenger* litigation is fully compensable. CMST's after-the-fact argument that only U.S. lawyers can receive fees from a U.S. court is disingenuous. (Toll, Aug. 13, 2009, 248:3-8.) CMST does not complain that the London Firm's hours were submitted to Judge Breyer in support of the aggregate fee award, nor does it complain that those hours enabled CMST to receive a larger share of the *Air Passenger* fees than it otherwise would have received. Rather, CMST wants to reap the benefit of those hours while simultaneously denying their validity. In essence, CMST is arguing that fees should be awarded for the London Firm's work, but that the London Firm itself should be ineligible to receive any of them.

---

[13] CMST's suggestion that there is something sinister about the *in camera* submission of the London Firm's time is baseless. (Tr. Aug. 13, 2009, 304:8-15.) All of the fee allocation proceedings before Judge Breyer and Magistrate Judge Chen were nonpublic, and all of the firms' time records were submitted *in camera.* Furthermore, this submission was not a "redo of the London time" attributed to a "totally separate entity," as CMST claims. (*Id.*) Both the September 2008 and July 2009 submissions identified the London Firm's time as having been incurred by the London Firm; the change in title reflected the fact that the London Firm changed its trading name, as it was required to do by agreement with CMST. *See supra* note 10.

Moreover, contrary to CMST's argument, U.S. courts *can* award fees for work done by foreign lawyers. *See, e.g., Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 Civ. 3231, 2003 WL 1798255, at *3-4 (S.D.N.Y. Apr. 4, 2003) (awarding fees for work done by Canadian lawyers defending a lawsuit prosecuted in violation of a court order and rejecting as "frivolous" an argument that those fees should be determined by a Canadian court); *Grimer v. Grimer*, No. 93-4086, 1993 WL 545261, at *1 (D. Kan. Dec. 8, 1993) (awarding fees for English solicitor under the International Child Abduction Remedies Act).

Most significant, however, is the fact that despite having been presented twice with hours worked by the London Firm, Judge Breyer never indicated that those hours were improper or non-compensable in a U.S. court. To the contrary, the undisputed evidence establishes that the London Firm's work was indispensable to the innovative and unprecedented *Air Passenger* settlement. This Court should decline CMST's invitation to second-guess Judge Breyer's judgment on this point.

2.    Fees Earned by the London Firm Must Be Paid to the London Firm and Deposited in Its Bank Account

The London Firm's partnership agreement is clear that fees, such as the *Air Passenger* fees, earned by a partner in the London Firm belong to the London Firm and that funds received by or on behalf of the London Firm must be deposited into the London Firm's bank account. (PX 110, Partnership Agreement of CMHT-NY

35

LLP, ¶¶ 5.1, 5.3.)[14] This arrangement was required by the SRA and HMRC. (Maton, Aug. 13, 2009, 187:20-189:1.) And it is precisely how the London Firm was paid its legal fees in other matters during its affiliation with CMHT. (*Id.*)

CMST's suggestion that fees earned by the London Firm should be paid directly to CMST is contrary to the partnership agreement, SRA rules and English law. (Maton, Aug. 13, 2009, 191:17-22.) In particular, because the London Firm has not made a profit to date and so has never paid taxes in the U.K., payment of the London Firm's share of the *Air Passenger* fees directly to a U.S. firm would deprive the U.K. government of the opportunity to tax that revenue. (*Id.*, 187:16-19.)

The London Firm's share of the *Air Passenger* fees must be paid directly to the London Firm.[15]

---

[14] Paragraph 5.1 allows the London Firm's Managing Partner (formerly CMST) to determine which bank account should receive these funds, but the account must belong to the London Firm; CMST could not have designated one of its own accounts. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 5.1.) And although Paragraph 5.3 excludes "amounts earned by a Partner on behalf of and payable to CMHT-DC," this exception was intended only to protect the U.S. lawyers who were partners in both CMHT and the London Firm. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 5.3; Maton, Aug. 13, 2009, 224:9-25.) Because the English solicitors in the London Firm were not members, employees, or agents of CMHT, amounts they earned could never be "on behalf of and payable to CMHT-DC." (PX 111, Terms of Retention of Anthony Maton, ¶ 4.1, Maton, Aug. 13, 2009, 185:11-20; Sellers, Aug. 11, 2009, 130:6-17.)

[15] Mr. Toll testified that one could "hire any London solicitor" to do the work done by the London Firm in the *Air Passenger* case. (Toll, Aug. 13, 2009, 251:12-14.) Putting aside the fact that Mr. Toll has no personal knowledge about the *Air Passenger* case or any basis to know whether "any London solicitor" could have accomplished what the London Firm did here, Mr. Toll certainly is not suggesting that this hypothetical solicitor would perform services for no payment whatsoever, as he proposes should occur with respect to the London Firm.

3.    CMST Has Sold Its Right to the London Firm's Share of the *Air Passenger* Fees

If CMST still owned 99 percent of the equity in the London Firm, it would be entitled to receive a distribution of any profits from the London Firm's share of the *Air Passenger* fees. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 6.1; Maton, Aug. 13, 2009, 189:8-20.) But in January 2009, prior to the execution of the Confidential Agreement, CMST elected to sell all of its "right, interest and entitlement" in the London Firm and in "any of its business or practice, wheresoever and whatsoever," including any right it had as an equity partner to the London Firm's share of the *Air Passenger* fees. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 2.1.)

This broad language did not exclude the *Air Passenger* fees or any of the London Firm's other assets. (Maton, Aug. 13, 2009, 203:8-18.) Under English law, which governs the transfer agreement, CMST conveyed "the whole shooting match," everything owned by and belonging to the London Firm, including the forthcoming *Air Passenger* fees, which had not yet been paid or even allocated among counsel at the time of the sale. (*Id.*, 203:2-7; PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 6.3.) *See Hyundai Merchant Marine Co. v. Gesuri Chartering Co.*, [1991] 1 Lloyd's

---

And although Mr. Toll breezily claimed that "we do this all the time," in fact many elements of the *Air Passenger* case (including but not limited to the negotiated fee) were "very unusual." (Toll, Aug. 13, 2009, 264:5, 267:20.) For instance, at no other time has a non-U.S. defendant admitted to violating a non-U.S. law, as Virgin Atlantic stipulated. *See supra* note 4. This stipulation, entered into before the settlement was reached, made the possibility of being sued in Europe both real and substantial, since liability was uncontested.

37

Rep. 100, 102 ("The basic principle or starting point for the Court or other tribunal is to examine the words and phrases which the parties have chosen to use in the context in which they were used in order to seek to determine on an objective basis what the parties intended their bargain to be. In general terms words and phrases are taken to bear their natural or ordinary meaning on the not unreasonable hypothesis that the parties probably meant that meaning...."). Consistent with the contractual language, Mr. Maton and his partners believed that what they were buying included the *Air Passenger* fees. (Maton, Aug. 13, 2009, 198:18-23, 215:10-23.)[16]

Any attempt by CMST to avoid the plain language of the transfer agreement on the basis of purported and uncorroborated statements made by Messrs. Maton and Smith as to fees that the London Firm might receive in the future would be barred by the agreement's integration clause. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 6.7.) *See Inntrepreneur Pub. Co. (GL) v. East Crown Ltd.*, [2000] 2 Lloyd's Rep. 611, 614 (holding that such a clause "constitutes a binding agreement between the parties that the full contractual terms are to be found in the document containing the clause and not elsewhere," in order to "preclude a party to a written agreement from threshing through the undergrowth" to find "some (chance) remark or statement"). In any event, for all of the reasons stated in this Section III.C., there

---

[16] Nothing in the transfer agreement limits its terms to "European antitrust cases," as CMST has asserted. *See supra* note 8. Moreover, such a limitation would directly conflict with the "wheresover and whatsoever" language in the agreement. (PX 112, Agreement of CMHT-NY LLP, ¶ 2.1.)

should have been no doubt on the part of CMST or anyone else that the London Firm was entitled to receive the *Air Passenger* fees awarded for the work that it did.

Nor should there be any doubt that CMST now has no right to come after the London Firm's fees because, when it sold the London Firm, it became a "Former Partner" under the Partnership Agreement, without "any right to have LLP property distributed to [it]." (PX 110 Partnership Agreement of CMHT-NY LLP, ¶ 8.6; Maton, Aug. 13, 2009, 206:9-207:2.)[17]

Mr. Toll's testimony that it would have made "zero economic sense" for CMST to have sold its interest in the London Firm's share of the *Air Passenger* fees is simply not credible. (Toll, Aug. 13, 2009, 255:22.) The transfer agreement gives CMST the right to recover up to $2 million in future profits, which could include profits from the *Air Passenger* fees. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 3.) In addition, by entering into the agreement and obtaining the Transferee Release, CMST saved over £1 million in salaries and over $10 million in future funding that it otherwise would have been obligated to pay. (*Id.*, Appx. 1; Maton, Aug. 13, 2009, 200:11-201:19.) And as discussed above, the broad language of the transfer agreement encompasses the London Firm's right to receive its share of the *Air Passenger* fees; CMST could have negotiated to exclude these fees but did not do

---

[17] CMST appears to be in breach of its obligation under the Partnership Agreement, as a Former Partner, to cooperate with the London Firm with respect to billing matters. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 8.7.) Perhaps unsurprisingly given the position CMST has taken in this dispute, Mr. Sellers admitted to being unfamiliar with this provision. (Sellers, Aug. 11, 2009, 119:7-14.)

so. Of course, if CMST had sought to exclude *Air Passenger* fees, the transaction would not have made economic sense for Messrs. Maton and Smith. They would have given up seventeen (17) months of guaranteed salaries and funding and incurred a $2 million obligation to CMST without the benefit of the revenue they anticipated. As a result, they almost certainly would not have agreed to the sale.

CMST's argument that it has already paid for the London Firm's *Air Passenger* work and should therefore keep the London Firm's fees for itself is also untenable, for several reasons.

*First*, contributions made by CMST to the London Firm were not payments of legal fees, but rather part of CMST's obligation under the Partnership Agreement to keep the London Firm solvent. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 4.4.) These payments were required by the Partnership Agreement regardless of whether the London Firm performed any services at all, and they were recorded by the London Firm as capital contributions, as contemplated by the Partnership Agreement. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 4.4; Maton, Aug. 13, 2009, 192:19-193:1, 204:25-206:7.) Indeed, CMST has referred to its "investment" in the London Firm. (PX 78, Cohen Milstein Sellers & Toll, PLLC Reviewed Financial Statements, at 2, 5, 6, 1; Drolet, Aug. 10, 2009, 228:7-11.) [18] The

---

[18] The fact that, in its own financial statements, CMST characterized its contributions to the London Firm as payment for "outside services" or "arms length legal fees" is irrelevant. (PX 78, Cohen Milstein Sellers & Toll, PLLC Reviewed Financial Statements, at 4, 12.) As discussed above, that is not how the partnership agreement characterizes the contributions, and that is not how they were reported

London Firm had no obligation to repay CMST for this investment, and the provisions of the transfer agreement did not encompass any such repayment. (Maton, Aug. 13, 2009, 193:20-194:15.)

*Second*, CMST (as the Managing Partner) never caused the London Firm to issue it an invoice for its *Air Passenger* work, and CMST never paid such an invoice. There are, in other words, no legal fees already paid to the London Firm for its *Air Passenger* work. When the London Firm did receive legal fees during its affiliation with CMST, it received them not from CMST but from clients that received and paid invoices issued by the London Firm. (Maton, Aug. 13, 2009, 187:20-189:1.)

*Third*, the Partnership Agreement specifically provides a mechanism for equity partners to receive distributions of profits. (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 6.1.) Thus, Mr. Toll is wrong when he contends that it would be "incomprehensible" for CMST to invest millions of dollars while the London Firm is paid the fees it has earned. (Toll, Aug. 13, 2009, 268:4-14.) This is how an investment in a separate company works. Had CMST not sold its interest in the London Firm, it would be entitled to take a distribution of 99 percent of the profits

---

to the SRA and HMRC. (Maton, Aug. 13, 2009, 192:19-193:1, 204:25-206:7.) Furthermore, the transfer pricing rules referenced by Ms. Drolet are intended to ensure that no country's government is deprived of tax revenue, but CMST's argument would subvert this goal by denying the U.K. government – which has not yet received any tax payments from the London Firm – any share of the *Air Passenger* fees earned by the London Firm. (Drolet, Aug. 10, 2009, 232:14-11; Maton, Aug. 13, 2009, 187:16-19.) This is why bypassing the London Firm, as CMST contends should have been done, "would have arguably been a fraud on the Revenue of the United Kingdom." (Maton, Aug. 13, 2009, 191:17-22.)

41

from the *Air Passenger* fee (after payment of taxes to HMRC). But CMST *did* sell all of its "rights, interest, and entitlement" in the London Firm. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 2.1.) And as a Former Partner of the London Firm, it has "no right" to any of the London Firm's property (except for the year-end payments set forth in the transfer agreement). (PX 110, Partnership Agreement of CMHT-NY LLP, ¶ 8.6; Maton, Aug. 13, 2009, 206:9-207:2.)

*Fourth*, even if the London Firm had issued an invoice to CMST and had been paid hourly fees for the work it did on *Air Passenger* (neither of which occurred), it has never received a multiplier on its lodestar. It is entitled to such a multiplier by Judge Breyer's fee allocation order, which referred to multipliers of approximately four without suggesting that the London Firm, which submitted separate time records, could not share in that multiplier on the same terms as the other firms. (PX 115, July 10, 2009 Order re Fees.) Denying a multiplier to the London Firm would be particularly unjust, given the London Firm's work on novel issues concerning what Mr. Feinberg described as "the critical innovative part of this settlement." (Feinberg, Aug. 13, 2009, 162:7-8; Maton, Aug. 13, 2009, 209:19-211:8.)

By the plain language of the transfer agreement, CMST sold any right it had to the London Firm's share of the *Air Passenger* fees. This Court should therefore reject CMST's claim that it should receive 50 percent of those fees.

If, however, the Court has any doubt about whether the *Air Passenger* fees were included in the sale of the London Firm, it should defer to the dispute

42

resolution procedures contained in the transfer agreement – which provide for arbitration under English law – and make no finding with respect to the fees allocated to the London Firm. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 6.3.)[19]

## IV.    CONCLUSION

HLLP properly allocated the *Air Passenger* fees among CMHT, HLLP and the London Firm. CMST has now received its 50 percent share of the CMHT fees, and it has no right to any portion of the HLLP or London Firm fees. Accordingly, the Court should deny CMST's request for additional fees related to the *Air Passenger* case.

Dated: September 15, 2009.                     Respectfully submitted,

Seth A. Rosenthal
Moxila A. Upadhyaya
VENABLE LLP
575 7th Street, NW
Washington, DC  20015
(202) 344-4000
sarosenthal@venable.com
maupadhyaya@venable.com

---

[19] Awarding CMST 50 percent of the London Firm's fees out of HLLP's own share of the *Air Passenger* fees, as CMST suggests, would still require this Court to adjudicate issues of English law that CMST has instead agreed to submit to arbitration. It is no answer to suggest, as CMST does, that the issue could be resolved in an arbitration between HLLP and the London Firm, as HLLP – which is not a party to the transfer agreement – has no rights or obligations under the transfer agreement. (PX 112, Agreement Transfer of CMHT-NY LLP, ¶ 6.1; Tr. Aug. 13, 2009, 304:19-23.)

43

Patrick W. Kittredge
Joseph M. Donley
THORP, REED & ARMSTRONG, LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
pkittredge@thorpreed.com
jdonley@thorpreed.com

44

## CERTIFICATE OF SERVICE

I hereby certify that, on September 15, 2009, I served a copy of the foregoing

by U.S. Mail, first class postage prepaid, and by electronic mail, on the following:

John C. Keeney, Jr.
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC  20004
jckeeney@hhlaw.com

Seth A. Rosenthal