IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Michael Hausfeld, et al., | Civil Action No. 06-CV-826 |
| Plaintiffs, | |
| v. | |
| Cohen Milstein Sellers & Toll, PLLC, | |
| Defendant. | |

**Plaintiffs Michael Hausfeld and Richard Lewis' Post-Trial Brief
Regarding the Return of Capital Owed to Them**

## Table Of Contents

INTRODUCTION...........................................................................................................1

I.   CMST ACTED IN BAD FAITH BY USING PLAINTIFFS' 2007
     PERCENTAGE INTERESTS TO CALCULATE THEIR CAPITAL ACCOUNT
     BALANCES...........................................................................................................7

     A.   Evidence Showing CMST's Bad Faith Use of Plaintiffs' 2007
          Percentage Interests ...............................................................................9

          1.   On November 5, 2008, the CMHT Compensation Committee
               Reduced Hausfeld's and Lewis' Percentage Interests
               "Retroactive to the Beginning of 2008 and Effective
               Immediately" and Then Involuntarily Terminated Them from
               the Firm ............................................................................................9

          2.   CMST Used Plaintiffs' 2007 Percentage Interests to Allocate
               to Them Outsize Shares of the Firm's Book Loss as of October
               31, 2008............................................................................................14

          3.   CMST Withheld Material Information from Patricia Drolet
               Regarding Plaintiffs' Percentage Interests .......................................18

          4.   CMST Has Advanced Specious Justifications to Defend Its
               Use of Plaintiffs' 2007 Percentage Interests ....................................20

     B.   CMST's Decision to Use Plaintiffs' Reduced, 2008 Percentage
          Interests to Expel Hausfeld from the Firm, But at the Same Time
          Use Their Higher, 2007 Percentage Interest Figures to Increase
          Plaintiffs' Shares of CMHT's Loss as of October 31, 2008,
          Constitutes a Bad Faith Breach of the Settlement and Operating
          Agreements, a Bad Faith Breach of CMST's Contractual Duty of
          Good Faith and Fair Dealing, and a Bad Faith Breach of CMST's
          Fiduciary Duties ....................................................................................26

     C.   CMST's Breaches Require This Court to Fashion Appropriate
          Equitable Relief......................................................................................29

          1.   Plaintiffs' 2008 Percentage Interests Should be Applied When
               Calculating Their Liquidating Capital Account Balances................30

          2.   Plaintiff Hausfeld's Capital Account Balance Should be
               Calculated as of November 30, Instead of October 31, 2008,
               Especially in View of CMST's Bad Faith Conduct ..........................32

          3.   Lewis' Capital Account Balance Should Be Calculated As of
               November 30, 2008 Either Because CMST Involuntarily
               Terminated Him and Then Used His 2007 Percentage
               Interests to Calculate His Balance, or Because, if Lewis is
               Viewed as Having Withdrawn Voluntarily, the CMHT

Operating Agreement *Requires* His Balance to be Calculated as of November 30, 2008 ......................................................................36

II.    CMST'S WITHHOLDING OF MATERIAL INFORMATION FROM HAUSFELD AND LEWIS DURING SETTLEMENT NEGOTIATIONS ALTERNATIVELY ENTITLES THEM TO RELIEF REFLECTING THE DEAL THEY WERE LED TO BELIEVE THEY OBTAINED .....................................38

    A.    Evidence Establishing Fraud or Material Omission ................................38

        1.    Toll Held Onto the Controller's Calculations for Nearly a Month ................................................................................................38

        2.    CMST Withheld the Calculations during Negotiation of Confidential Settlement Agreement ...............................................40

        3.    CMST Did Not Provide the Capital Account Calculations to Drolet for Review Until the Settlement Agreement Was Signed ..........................................................................................45

        4.    CMST Continued to Withhold the Calculations from Hausfeld and Lewis Until After the *OSB* Fees Came In ...............................47

        5.    Only After Confirming Receipt of the *OSB* Fees, CMST Released the Calculations, Knowing They Would Cause an "Explosion" ...................................................................................49

    B.    CMST's Withholding of Plaintiffs' Capital Account Balance Calculations Constitutes Fraudulent Inducement or, Alternatively, Material Omission ...........................................................................................51

    C.    CMST's Fraud or Material Omission Entitles Plaintiffs to Damages in the Amount of What They Were Led To Believe They Would Receive ...............................................................................................56

III.    PLAINTIFFS ARE ALTERNATIVELY ENTITLED TO A RETURN OF THEIR CAPITAL ACCOUNTS USING BOTH THEIR 2008 EFFECTIVE PERCENTAGE INTERESTS AND AN INCOME/LOSS FIGURE AS OF OCTOBER 31 THAT IS CALCULATED IN ACCORDANCE WITH THE CMHT OPERATING AGREEMENT'S REQUIREMENT THAT THE FIRM'S BOOKS BE KEPT IN ACCORDANCE WITH GAAP ..............................................58

    A.    CMST Materially Breached the Settlement and Operating Agreements by Failing to Calculate Plaintiffs' Capital Account Balances Using GAAP ...............................................................................59

    B.    Plaintiffs' Remedy for CMST's Breach of Contract is a Return of their Capital Based on an Income Statement Calculated in Accordance with GAAP ...............................................................................64

    C.    The GAAP Provision in the Operating Agreement Is Enforceable Against CMST ...............................................................................66

      1.    The GAAP Provision Is Not a Mistake ........................................... 66

      2.    The GAAP Provision Was Not Modified by CMHT's Course of
            Conduct .......................................................................................... 70

      3.    Plaintiffs Did Not Waive Enforcement of the GAAP Provision
            in Connection with the Calculation of Their Liquidating
            Capital Account Balances ............................................................. 75

IV.   HAUSFELD AND LEWIS ARE ENTITLED TO AN AWARD OF PUNITIVE
       DAMAGES AND/OR ATTORNEYS' FEES AND COSTS BECAUSE OF
       CMST'S BAD FAITH CONDUCT ..................................................................... 78

V.    CONCLUSION ....................................................................................................... 88

## Table of Authorities

### Cases

American Fletcher Corp. v. United States, 832 F.2d 436 (7th Cir. 1987) ...............62

Andolsun v. Berlitz Schools of Languages of America, Inc., 196 A.2d 926 (D.C. 1964)................................................................................................................51

Barrer v. Women's National Bank, 761 F.2d 752 (D.C. Cir. 1985)..........................53

Brockmeyer v. Norris, 10 A.2d 326 (Md. 1940)........................................................67

BWX Electronics, Inc. v. Control Data Corp., 929 F.2d 707 (D.C. Cir. 1991)............79

C.I.T. Corp. v. Carl, 85 F.2d 809 (D.C. Cir. 1936)....................................................75

Canaras v. Lift Truck Services, Inc., 272 Md. 337 (Md. 1974)................................75

Cereberus Int'l, Ltd. v. Apollo Mgmt., L.P., 794 A.2d 1141 (Del. 2002) ..................67

Chavlier v. Moon, 576 A.2d 722 (D.C. 1990)............................................................79

Chimart Associates v. Paul, 66 N.Y.2d 570 (N.Y.App. 1986)....................................67

Continental Insurance Co. v. Rutledge & Co., 750 A.2d 1219 (Del. Ch. 2000)..........71

Darr v. D.R.S. Invs., 441 N.W.2d 197 (Neb. 1989) .............................................73, 74, 78

Davis v. Gulf Oil Corp., 485 A.2d 160 (D.C. 1984)..................................................57

Dresser v. Sunderland Apartments Tenants Ass'n, Inc., 465 A.2d 835 (D.C. 1983)................................................................................................................56

Eureka VIII LLC v. Niagara Falls Holdings LLC, 899 A.2d 95 (Del. Ch. 2006).......30

Fishman v. Estrin, 501 F.Supp. 208 (D.D.C. 1980) ................................................54

Goldstein v. Miles, 859 A.2d 313, 324 (Md. Ct. Spec. App. 2004) ..........................57

Gotham Partners v. Hallwood Realty Partners, 817 A.2d 160 (Del. 2002) .........30, 34

Interactive Corp. v. Vivendi Universal, S.A., 2004 WL 1572932 (Del. Ch. 2004)................................................................................................................67

JCM Constr. Co., Inc. v. Orleans Parish School Bd., 860 So.2d 610 (La. App. 2003)............................................................................................................60, 61

Jemison v. National Baptist Convention, USA, Inc., 720 A.2d 275 (D.C. 1998) .......79

Jung v. Jung, 844 A.2d 1099 (D.C. 2004)................................................................79

Kent Homes v. Frankel, 128 A.2d 444 (D.C. 1957)..................................................56

Kersey v. Washington Metropolitan Area Transit Authority, 533 F.Supp.2d 181 (D.D.C. 2008) ...........................................................................................75

Kramer v. Liberty Property Trust, 968 A.2d 120 (Md. 2009)....................................29

Lumpkins v. CSL Locksmith, LLC, 911 A.2d 418 (D.C. 2006) ................................. 67

Newby v. United States, 797 A.2d 1233 (D.C. 2002) ................................................ 29

Pyne v. Jamaica Nutrition Holdings, Ltd., 497 A.2d 118 (D.C. 1985) ...................... 52

Quality Products and Concepts Co. v. Nagel Precision, Inc., 666 N.W.2d 251
    (Mich. 2003) .................................................................................................. 71

Realty Growth Investors v. Council of Unit Owners, 453 A.2d 450 (Del. 1982) ........ 76

Rexnord Industries, LLC v. RHI Holdings, Inc., 2008 WL 4335871 (Del.
    Super. Ct. Sept. 23, 2008) .......................................................................... 70, 71

RS & P/WC Fields Limited Partnership, et al. v. BOSP Investments, 829
    F.Supp. 928 (N.D.Ill. 1993) ............................................................................ 67

Sage v. Broadcasting Publications, Inc., 997 F.Supp. 49 (D.D.C. 1998) ................... 51

Schuss v. Penfield Partners, 2008 WL 2433842 (Del. Ch. 2008) .............................. 29

Stein v. Treger, 182 F.2d 696 (D.C. Cir. 1950) ....................................................... 53

Synanon Foundation v. Bernstein, 517 A.2d 28 (D.C. 1986) .................................... 79

Washington Bancorporation v. Said, 812 F.Supp. 1256 (D.D.C. 1993) .................... 29

Willens v. 2720 Wis. Ave. Coop. Ass'n, 844 A.2d 1126 (D.C. 2004) ....................... 28

## Other Authorities

Finney & Miller, *Principles of Accounting* -Intermediate 12 (7th ed. 1974)") ........... 62

## Treatises

17A AM. JUR. CONTRACTS § 513 (2004) ................................................................. 70

27 Williston on Contracts § 39:28 (4th ed. 2000) .................................................... 75

37 C.J.S. *Fraud* § 59 (2008) ................................................................................. 54

RESTATEMENT (SECOND) OF CONTRACTS § 166 (1981) .................................... 57

## INTRODUCTION

At the conclusion of a four-day trial, this Court observed that, with respect to its handling of Michael Hausfeld's and Richard Lewis' liquidating capital account balances, Cohen, Milstein Sellers & Toll ("CMST") had "show[n] bad faith" and had acted in ways that were "shocking," "disturbing," "bothersome" and "not right." (Aug. 13, 2009 Tr. at 334:6-19; 292:9-293:2; 297:2-15). These observations were fully justified by the evidence.

CMST failed to furnish its capital account calculations to Plaintiffs until February 20, 2009 – *forty-one (41)* days after first completing them, two weeks after execution of the February 5, 2009 Confidential Agreement that this Court mediated ("Settlement Agreement"), and just over an hour after confirming receipt of an approximately $3 million fee in the *OSB* case, which Plaintiffs had given up in exchange for an accelerated return of their capital. CMST held back these calculations despite the fact that they were due under the Cohen Milstein Hausfeld & Toll ("CMHT") Operating Agreement ("Operating Agreement") as of early December 2008, despite Plaintiffs' repeated requests for them during and after the mediation and despite this Court's directives that CMST provide them. Moreover, despite knowing it would assert that Plaintiffs' capital accounts had suffered a "not insubstantial decline," CMST said nothing about this during the mediation, even in the face of Hausfeld's statements suggesting that he expected there would be little decline. (Toll, Aug. 13, 2009, 152:13-21). Within hours of finally furnishing the calculations to Plaintiffs, CMST Managing Partner Steve Toll, gleeful at having

1

duped Hausfeld, predicted a "return trip" to this Court and exulted, "now, can't wait for the [Hausfeld] explosion re the capital account..." (PX 42).

As the evidence established, the calculations CMST finally furnished to Plaintiffs were both inconsistent with the requirements of the Settlement and Operating Agreements and manifestly inequitable. First, CMST not only erred, but acted in bad faith, by calculating the liquidating balances using Plaintiffs' 2007 percentage interests to allocate to them greater-than-warranted shares of the firm's roughly $6.9 million tax basis-derived book loss as of October 31, 2008 (the date CMST argued was the required calculation date). CMST should have used Plaintiffs' much lower 2008 percentage interests, both because the CMHT Compensation Committee expressly made those figures "retroactive to the beginning of 2008 and effective immediately" and because the CMHT members who formed CMST had plotted to use, and did use, those very same figures "immediately" and "retroactively" for another purpose – namely, to expel Hausfeld from the firm. (PX 68). Second, CMST violated the plain terms of the Operating Agreement – terms to which CMST recommitted itself in the Settlement Agreement – by calculating the firm's income/loss as of October 31, 2008 using the tax basis method of accounting, rather than a method of accounting consistent with Generally Accepted Accounting Principles ("GAAP").

The combined effect of these miscalculations was to reduce Plaintiffs' account balances collectively by approximately $2.5 million. (PX 41 at CMST 00034-5). The first miscalculation alone – the bad faith application of the 2007 percentage

2

interests – was responsible for roughly $1 million of the reduction, most of it in Hausfeld's account. According to CMST's year-end reviewed financial statement, the $2.5 million in losses suffered by Hausfeld and Lewis was allocated as income to CMST's remaining partners, enabling each of them to realize increases in their own capital accounts. (PX 78; PX 108).

Based on this evidence, Plaintiffs are entitled to a return of their capital in accordance with one of the following three alternatives:

1.      Because of its refusal to employ the Compensation Committee's 2008 percentage interest determinations to calculate Plaintiffs' liquidating capital account balances, CMST breached the Settlement and Operating Agreements, its duty of good faith and fair dealing and its fiduciary duties. Indeed, as the Court observed, CMST's use of the much higher 2007 percentage interests, especially after having relied on the supposedly "effective immediately/retroactive" 2008 figures to expel Hausfeld from CMHT, "showed bad faith." (Aug. 13, 2009 Tr. at 334:6-19). Accordingly, Plaintiffs are entitled to a return of capital calculated (i) with their 2008 percentage interests _and_ (ii) as of November 30, 2008, rather than October 31, 2008.

Due to CMST's breaches, the Court is equitably empowered to and should use the November 30 date for Hausfeld. Using this date more accurately captures Hausfeld's true economic stake in the firm as of the date of his expulsion, and diminishes (but does not eliminate) the unseemly transfer of capital from Hausfeld to the CMHT partners who expelled him. Moreover, November 30 would have been

3

the calculation date if the members who expelled Hausfeld had not used their misbegotten voting power to eliminate the Operating Agreement's 30-day wind up period for involuntarily terminated members or if, at the very least, they had required Hausfeld to leave immediately but had permitted his termination date to be 30 days later, consistent with both the Operating Agreement and his having been the "driver and leading force" behind the firm's success for more than two decades. (PX 105; Toll, Aug. 13, 2009, 142:2-143:23).

The Court should also use the November 30 date for Lewis, either on the same equitable grounds given that Lewis was constructively terminated; _or_ if the Court concludes that Lewis was not constructively terminated, on the grounds that the Operating Agreement's express provisions _mandate_ that the calculations for Lewis – as a voluntarily withdrawn member – be done as of November 30.  (PX 2 at Arts. 6(C), 10).

Doing the calculations as of November 30 and with the correct percentages requires CMST to return **$4,694,244** to Hausfeld and **$1,010,939** to Lewis.

(CMST has argued that it could not use the 2008 percentage interests because, though effective for voting purposes immediately, those percentage interests could not become effective for profit/loss-sharing purposes until year end. However, under the Operating Agreement and as conceded by CMST members at trial, a member's percentage interest cannot be different numbers for different purposes on the same day.  Accordingly, on the grounds that the vote expelling Hausfeld (like the profit/loss-sharing determination) could not have become effective

4

until year end, the Court alternatively could fashion an equitable remedy using December 31 as the date for calculating Plaintiffs' capital account balances. The resulting balances would be **$5,056,786** for Hausfeld and **$1,189,622** for Lewis. (*See* notes 3 and 4, *infra.*)).

2.      Plaintiffs are alternatively entitled to an award of damages because CMST improperly withheld or otherwise failed to disclose information about Plaintiffs' capital account balances during the mediation that produced the Settlement Agreement, and further waited to disclose such information until CMST had secured both the Settlement Agreement and the receipt of the *OSB* fees. As a result of CMST's material misrepresentations or omissions, whether deliberate or not, Plaintiffs should receive, as a matter of both law and equity, what they fairly expected to receive when they executed the Settlement Agreement. This is particularly so insofar as Plaintiffs, with full information, would not have signed the Settlement Agreement in its present form and, as the Court observed, would have had "a chance to walk away ..." (Aug. 13, 2009 Tr. at 296:8-19). Although it may be difficult to identify a specific figure that would make Plaintiffs whole, given that they were deprived of the information in CMST's possession, a just result would be to adjust Plaintiffs' balances by applying the correct, 2008 percentage interests to the firm's income/loss as of November 30 (rather than as of October 31). That is because, as of November 30, CMST's books better reflect the firm's true financial condition, which Plaintiffs expected might cause their final balances to deviate from the prior year's ending balances, but not by much. As set forth above,

doing the calculations as of November 30 and with the correct percentages requires CMST to return **$4,694,244** to Hausfeld and **$1,010,939** to Lewis.

    3.    As a final alternative, Plaintiffs are entitled to a return of capital calculated (i) with their 2008 percentage interests, and (ii) based on an income statement as of October 31, 2008 that is prepared in accordance with GAAP, as required by the Operating Agreement. As the testimony of Plaintiffs' expert William Bavis established, a GAAP-compliant adjustment – which, importantly, is an adjustment that much more accurately captures the true financial condition of CMHT, and thus Plaintiffs' true economic interest in the firm, as of the dates of termination – requires CMST to return **$5,045,180.67** to Hausfeld and **$1,183,911.97** to Lewis. CMST's defenses that such a resolution is inappropriate because the GAAP requirement was a mistake, was modified by the parties' course of conduct, or was waived are unavailing.

    Because of CMST's misconduct, which includes certain bad faith positions the firm has advanced in this dispute, Plaintiffs are also entitled to an award of attorneys' fees and costs and/or punitive damages, or any other relief the Court deems just. The Court aptly made preliminary findings that what CMST did with Plaintiffs' percentage interests "showed bad faith," commenting, "I just don't think that was right." (Aug. 13, 2009 Tr. at 334:6-19). The Court also aptly observed that, by untimely providing its capital account figures to Plaintiffs, CMST played "hide the ball" and displayed a "lack of candor" that was "shocking," "disturbing," "bothersome" and "disappointing." (*Id.* at 292:9-293:2; 297:2-15). As to CMST's

position that Patricia Drolet made a final, binding decision regarding the capital account balances, the Court heard the evidence and, without awaiting further developments in the trial, immediately – and correctly – determined that CMST's position was groundless. CMST's bad faith actions and arguments necessitated this litigation in the first instance and made it more costly thereafter. Had CMST acted in good faith and been up front with Hausfeld and Lewis all along, the parties never would have had to incur the substantial costs they did. CMST should not be permitted to get away with what it has done by being required to do nothing more than it was obligated to do in the first place.

## I.    CMST ACTED IN BAD FAITH BY USING PLAINTIFFS' 2007 PERCENTAGE INTERESTS TO CALCULATE THEIR CAPITAL ACCOUNT BALANCES

CMST acted in bad faith when it reduced Hausfeld's and Lewis' percentage interests "retroactive to the beginning of 2008 and effective immediately" in order to expel Hausfeld from the firm, but then, for the purpose of calculating Hausfeld's and Lewis' liquidating capital account balances, turned around and used Hausfeld's and Lewis' *pre-expulsion* percentage interests to allocate to them their share of the firm's tax basis book loss as of October 31, 2008. (PX 68). Throughout this litigation, CMST has maintained that these manifestly unfair actions were proper – *i.e.,* that, on a single day, Hausfeld's and Lewis' percentage interests for voting strength purposes were one thing (14% and 6.5%, respectively), but for profit/loss-sharing purposes were something else (27.97% and 6.78%). This illogical position is directly at odds with: (i) the Settlement Agreement and the Operating Agreement it

incorporates, which makes no distinction between the two purposes of percentage interest determinations; (ii) Steve Toll's November 5, 2008 memo that, without limitation, memorialized the Compensation Committee's November 5, 2008 decisions to lower Hausfeld's and Lewis' percentage interests "effective immediately" and retroactive to January 1, 2008 (PX 68); (iii) CMST's duty of good faith and fair dealing; and (iv) CMST's fiduciary duties. Indeed, even Herbert Milstein—one of the firm's founding members—tacitly acknowledged that the rationale CMST has advanced to justify its misconduct is bogus, testifying that the Compensation Committee's annual determinations are for *both* voting and profit/loss-sharing purposes and that, accordingly, Hausfeld's percentage interest for profit/loss-sharing purposes as of October 31, 2008 was 14%, **not** 27.97%, as CMST has asserted. (Milstein, Aug. 12, 2009, 132:6-17; 133:7-134:8).

CMST's conduct justifies recalculating Hausfeld's and Lewis' capital account balances by: (i) using Hausfeld's and Lewis' effective percentage interests, as determined by the Compensation Committee on November 5, 2008, to determine their respective shares of the firm's income/loss as of their dates of termination; **_and_** (ii) because of CMST's breaches, which trigger this Court's equitable powers, using November 30, 2008, rather than October 31, 2008, as the date for calculating the firm's income/loss. Using the November 30 date for Hausfeld is justified because, *inter alia*, that would have been the operative date if the CMHT members who expelled him had not amended the Operating Agreement to deprive him of 30 days to wind up his affairs or, if at the very least, they had asked Hausfeld to leave

8

the firm immediately but, in light of Hausfeld's undisputed, outsize contributions to the firm, allowed his termination date to be 30 days after his departure date, consistent with the Operating Agreement. Using the November 30 date is justified for Lewis either because he was constructively terminated and thus should be treated the same as Hausfeld or because, if the Court agrees with CMST and believes Lewis left voluntarily, Lewis' termination date *under the plain and literal terms of the Operating Agreement* would be 30 days after his withdrawal – *i.e.,* December 10, 2009 – which would make November 30 the effective date for calculating his liquidating capital account balance.

### A.    Evidence Showing CMST's Bad Faith Use of Plaintiffs' 2007 Percentage Interests

1.    <u>On November 5, 2008, the CMHT Compensation Committee Reduced Hausfeld's and Lewis' Percentage Interests "Retroactive to the Beginning of 2008 and Effective Immediately" and Then Involuntarily Terminated Them from the Firm</u>

Michael Hausfeld was a founding member and the chairperson of CMHT, as well as the long-time head of CMHT's most profitable group, the antitrust practice group. (Hausfeld, Aug. 12, 2009, 5:23-6:12). As Toll testified, Hausfeld "drove the growth of the firm." (Toll, Aug. 13, 2009, 143:22-23). This is consistent with what Toll wrote to Hausfeld on April 9, 2008:

> You have been the driver and leading force for this firm
> for decades and I've been fortunate to compliment you in
> the way that I have. You deserve all the accolades for
> doing that for this firm and I thought I've been out front
> saying that repeatedly, as recently again as last month in
> my email to All Personnel of March 4. There is no

9

> question in my mind that the success, growth, reputation
> and stature of the firm is due mostly to you.

(PX 105).

During 2008, as disagreements among CMHT's equity partners about the firm's strategic direction made separation inevitable, the partners engaged in negotiations as to how separation might be amicably accomplished. (Lewis, Aug. 10, 2009, 275:6-22; 282:10-21; Sellers, Aug. 11, 2009, 70:21-24). When these negotiations proved unfruitful, and as acrimony between the two factions in the firm continued to grow, the faction aligned against Hausfeld began plotting to expel Hausfeld from CMHT. (Toll, Aug. 13, 2009, 116:6-117:3; Sellers, Aug. 11, 2009, 29:8-17).

At the time, the faction aligned with Hausfeld, which included Hausfeld, Lewis and two other equity partners, Michael Lehmann and Robert Eisler, roughly had a combined 44 percent interest in the firm. (Lewis, Aug. 10, 2008, 284:20-25). Because the Operating Agreement required a vote of two-thirds of all percentage interests to expel a member (PX 2 at Art. 6(B)), the faction aligned against Hausfeld knew they did not possess sufficient voting power to effectuate Hausfeld's expulsion. (Milstein, Aug. 12, 2009, 119:19-120:18; Toll, Aug. 13, 2009, 115:1-9; 116:6-16; Sellers, Aug. 11, 2009, 27:9-28:3). They believed they would need to use the Compensation Committee to reduce Hausfeld's interests, and to reallocate those interests only to themselves – something that was not authorized by the Operating Agreement and had never been done before – so that they would have the necessary two-thirds of all percentage interests. (Milstein, Aug. 12,

10

2009, 120:19-22; Hausfeld, Aug. 12, 2009, 26:9-24).  Accordingly, Toll, Milstein and other members of their faction began meeting to discuss reducing Hausfeld's interests.  (Toll, Aug. 13, 2009, 116:6-117:17).  The anti-Hausfeld faction did not include Lewis (an equity member of the firm since 1996), Eisler or Lehmann in these meetings because they were viewed as supporting Hausfeld.  (Toll, Aug. 13, 2009, 117:10-21; 118:15-21; Lewis, Aug. 10, 2009, 273:16-20).

At a Compensation Committee meeting held on November 5, 2008, partners Toll, Milstein, Andrew Friedman and Daniel Small voted, as planned, to reduce Hausfeld's percentage interest from 28.95% to 14%, effective immediately.  (PX 68). Toll, Milstein, Friedman and Small also voted to reallocate all of Hausfeld's confiscated points in equal shares to themselves and their allies, Joseph Sellers, Daniel Sommers, Lisa Mezzetti and Richard Koffman – but not to Lewis, Lehmann or Eisler, each of whom had their percentage interests reduced.  (*Id.*; Toll, Aug. 13, 2009, 117:22-119:10; Lewis, Aug. 10, 2009, 283:18-284:4).  Lewis' interest was reduced from 7.02% to 6.5%.  (PX 68).  The obvious and admitted goal of the Compensation Committee's actions was to facilitate Hausfeld's expulsion from the firm.  (Milstein, Aug. 12, 2009, 120:8-18; 120:23-121:3; Toll, Aug. 13, 2009, 125:20-126:2).

Toll set forth the new percentage interests in a November 5, 2008 memorandum to all the equity partners. (PX 68).  In the memorandum, Toll announced that the new percentage interests would be "retroactive to the beginning of 2008" and "effective immediately."  (*Id.*).  The Compensation Committee made the

11

reduction in Hausfeld's interests "effective immediately" so that, with their new voting power, the Committee's members and their allies outside the Committee could expel Hausfeld the next day. (Toll, Aug. 13, 2009, 113:25-114:7, 125:20-126:1). Anticipating litigation once Hausfeld was expelled, Toll and his allies also wanted to make the reduction in interests retroactive to the beginning of the year in order to block Hausfeld from challenging any firm action that had occurred during the year prior to the Compensation Committee's determinations. (Toll, Aug. 13, 2009, 126:3-9). Making the determinations retroactive, however, was also consistent with what the Compensation Committee always had done. (Milstein, Aug. 12, 2009, 111:3-25; Drolet, Aug. 10, 2009, 123:2-11; Sellers, Aug. 11, 2009, 20:6-21:4; 21:10-17; see Toll, Aug. 13, 2009, 124:18-125:3).

On November 6, 2008, the day following the Compensation Committee's determinations, the faction aligned against Hausfeld did as they had planned: they used their misbegotten two-thirds majority to expel Hausfeld from the firm. (PX 93). Despite the fact that Hausfeld had been the firm's "driver and leading force" for years, the eight members also amended the Operating Agreement to make the termination effective immediately, removing a provision that had allowed terminated partners a 30-day period to wind up their affairs. (PX 93; PX 2 at Art. 6(D); Sellers, Aug. 11, 2009, 28:19-29:17; Toll, Aug. 13, 2009, 130:25-131:11). Hausfeld received the notice of his immediate termination when he found it placed on his office chair after returning from lunch. (Lewis, Aug. 10, 2009, 286:17-287:4).

12

CMST has stipulated that the reduction in Hausfeld's points, and the reallocation of those points to those who became CMST's partners, facilitated Hausfeld's expulsion from CMHT. (Apr. 28, 2009 Tr. at 43:7-46:25).

Once Hausfeld was terminated, Lewis found himself in a "hostile environment" in which he could not "possibly practice law." (Lewis, Aug. 10, 2009, 288:12-14; PX 94). He had been a member of the faction that negotiated, with Hausfeld, to separate from the "anti-Hausfeld" faction, had been consistently excluded from the "anti-Hausfeld" faction's meetings about Hausfeld and the state of the firm, and was not even informed of the vote to expel Hausfeld and to amend the Operating Agreement – the Operating Agreement of the firm of which he was ostensibly still an equity partner – until the written consent reflecting the vote was delivered to him. (Lewis, Aug. 10, 2009, 285:25-286:5). In addition, the Compensation Committee had voted to reduce his percentage interests, even though he had brought in a substantial fee that, according to the firm's policies, should have warranted a special bonus. (Lewis, Aug. 10, 2009, 287:23-288:5). At the same time, members of the firm who were not as productive as Lewis – including two who had been found liable for legal malpractice that year – received an increase in points. (Toll, Aug. 13, 2009, 122:7-24). And in case the anti-Hausfeld faction had not done enough to underscore Lewis' pariah status, staff members informed Lewis following Hausfeld's expulsion that he had to obtain prior approval from Joseph Sellers or a firm administrator to make any photocopies. (Lewis, Aug. 10, 2009, 288:8-14; PX 94).

13

As a result of the treatment he received from the anti-Hausfeld faction, Lewis announced his departure from the firm on November 11, 2009. In a detailed letter, Lewis explained that he had been forced out because of, among others things: the firm's abuse of the Compensation Committee process and end run around the Operating Agreement to expel Hausfeld; his exclusion from important firm decisions; his exclusion from any discussions regarding Hausfeld, including the firm's vote to amend the Operating Agreement and expel Hausfeld; the reduction of his percentage interests in a year in which he brought in a fee in excess of $5 million; and his being informed that he could not make photocopies without prior approval. (PX 94; Lewis, Aug. 10, 2009, 288:8-14).

    2.    <u>CMST Used Plaintiffs' 2007 Percentage Interests to Allocate to Them Outsize Shares of the Firm's Book Loss as of October 31, 2008</u>

The Operating Agreement requires the firm to return to all terminated partners their capital accounts. (PX 2 at Art. 10). It obligates the firm to furnish a terminated member with a statement of his capital account balance, as well as a statement of the firm's income or loss as of the last day of the last full month prior to termination. (*Id.*) This information must be provided "[p]romptly," and in no event more than 30 days, after the termination date. (*Id.*; Toll, Aug. 11, 2009, 240:17-241:7). CMST acknowledges that it failed to do this. (Toll, Aug. 11, 2009, 241:10-19).

Several months after terminating Hausfeld and Lewis – and well after it was obligated to furnish such information, *see* Section II, *infra* – CMST provided

Hausfeld and Lewis with what it claimed to be their liquidating capital account balances. (PX 41). According to CMST, the capital account balance owed to Plaintiff Hausfeld was $3,053,115.88, and the balance owed to Plaintiff Lewis was $686,194.32. (*Id.*). These figures were, respectively, a staggering $1,941,785.42 (or 39%) and $476,947.98 (or 41 percent) *less* than Plaintiffs' capital account balances at the end of December 31, 2007. (*Id.*).

CMST arrived at these figures by calculating, on an income tax accounting basis, the income/loss of CMST as of the last day of the last full month prior to the termination of Hausfeld and Lewis, *i.e.*, October 31, 2008, and then allocating to each Plaintiff what it claimed to be their respective shares of such income/loss based on their respective percentage interests in CMST as of that date. (*Id.*). Specifically, CMST used the income tax basis of accounting to conclude that the firm had a loss of $6,912,175.39 as of October 31, 2008. (*Id.*). (This was not a tangible, out-of-pocket loss; it merely reflected debt the firm owed on its line of credit with SunTrust Bank – debt the firm knew it would pay off, and did pay off, by year end). (Hausfeld, Aug. 12, 2009, 17:1-25). CMST then allocated 27.97% of that loss to Plaintiff Hausfeld and 6.78% of such loss to Plaintiff Lewis. (PX 41). CMST used Hausfeld's and Lewis' higher, 2007 percentage interests, despite the Compensation Committee's November 5, 2008 reduction of their percentage interests "effective immediately" and retroactive to January 1, 2008. (PX 68).

In addition to using the higher percentage interest figures, CMST departed from its historical practice of calculating a departing member's liquidating capital

15

account balance using the Compensation Committee's *most recent* percentage interest determinations to allocate to the member his share of the firm's profit or loss as of the date of termination. For each of the partners who had departed since 2000 prior to Hausfeld and Lewis – Anne Yahner, Gary Mason, Paul Gallagher and Linda Nussbaum – CMHT used the most recent determination. In each case, that determination had been made the year prior to departure because, at the time each of those members left the firm, the Compensation Committee had not yet met during the year of departure. (Toll, Aug. 13, 2009, 57:11-60:7; Drolet, Aug. 10, 2009, 123:1-127:23; Hausfeld, Aug. 12, 2009, 26:25-28:15). Prior to the departures of Hausfeld and Lewis, however, the Compensation Committee *had* met to make its determinations for the year. (Toll, Aug. 13, 2009, 60:8-14; Drolet, Aug. 10, 2009, 127:4-6; Hausfeld, Aug. 12, 2009, 28:5-15). As it had always done, it made its determinations retroactive to the beginning of the year. (Milstein, Aug. 12, 2009, 111:3-25; Drolet, Aug. 10, 2009, 123:2-11; Sellers, Aug. 11, 2009, 20:6-21:4; 21:10-17; *see* Toll, Aug. 13, 2009, 124:18-125:3). Using the old percentage interests was therefore historically anomalous, in addition to being directly contrary to the Compensation Committee's express mandate making the new percentage interests "retroactive to the beginning of 2008 and effective immediately." (PX 68).

CMST also departed from its practice of using a terminated partner's effective percentage interest, rather than his actual percentage interest, to allocate his share of the firm's loss as of the date of termination. The actual percentage interest is the percentage interest fixed by the Compensation Committee each year.

16

The effective rate, as prescribed in the 2003 Operating Agreement, is the percentage interest that results from distributing 10% of the firm's income equally among the partners prior to applying each partner's actual percentage interest to the remaining amount of income. (PX 2 at Art. 3(C)). In the case of Paul Gallagher and Linda Nussbaum – the only other partners who had left the firm and had their capital account balances determined under the 2003 Operating Agreement prior to Hausfeld's and Lewis' terminations – CMST used the effective percentage interest to allocate each one's share of the loss that appeared on the books as of the last day of the last full month prior to termination. (PX 90; Toll, Aug. 13, 2009, 54:19-55:12; Drolet, Aug. 10, 209, 69:1-13). By contrast, CMST did not use Hausfeld and Lewis' effective percentage interests to determine their share of the loss that appeared on the books, using tax basis accounting, as of October 31, 2008. (PX 41).

By the time CMST calculated Plaintiffs' account balances in 2009, it had full information regarding how the firm had performed during 2008, including the fact that the firm had suffered no loss. In fact, consistent with the representations of incoming fees that Toll made to SunTrust Bank the very same day the firm voted to expel Hausfeld (PX 70), CMST knew that it actually had turned a modest profit of $530,692 during 2008. (PX 78 at 5; Drolet, Aug. 10, 2009, 128:5-16; Sellers, Aug. 11, 2009, 77:12-78:4). This was because, as Toll had predicted in his letter, the firm brought in a significant amount of fee revenue—amounting to more than one-third of the firm's annual revenue—during November and December. (Drolet, Aug. 10, 2009, 128:21-23; Sellers, Aug. 11, 2009, 79:22-25; 82:11-14; Bavis, Aug. 11, 2009,

170:9-171:9; PX 11 at CMST00674; PX 12 at CMST 00687). Moreover, in just the first month after Plaintiffs were terminated, CMST had reduced its book loss from $6,912,175.39 to $2,193,143. (PX 21 at CMST 01438; PX 11 at CMST 00676). And by year's end, the fees that came in wiped out the outstanding balance on the firm's line of credit. (PX 78; Drolet, Aug. 10, 2009, 129:7-10). The firm's expected year-end turnaround enabled each of the partners who had voted to expel Hausfeld to realize an increase in their own capital account balances. (PX 78; Drolet, Aug. 10, 2009, 131:5-8; 133:6-10; 134:6-8; Sellers, Aug. 11, 2009, 79:8-21).

### 3. CMST Withheld Material Information from Patricia Drolet Regarding Plaintiffs' Percentage Interests

After its controller completed a draft of its calculations, CMST sent the draft calculations to Drolet & Associates, its outside accountants, for review. When it did so, no one at CMST informed Drolet that, on November 5, 2008, the firm had reduced Plaintiffs' percentage interests effective immediately and retroactive to January 1, 2008. Accordingly, when Drolet reviewed the calculations, she did so without this knowledge. (Drolet, Aug. 10, 2009, 84:2-4). In fact, the first time Drolet learned that Hausfeld's percentage interest had been reduced retroactively to January 1, 2008 was when Hausfeld's counsel wrote to her on March 2, 2009 and informed her. (Drolet, Aug. 10, 2009, 83:15-84:1). Upon receiving this information, Drolet immediately wrote to Toll asking him whether the retroactivity of the percentage interest determinations was "ever discussed with Michael or put it into writing." (PX 48; Drolet, Aug. 10, 2009, 84:5-15). In a follow up telephone conversation several days later, during which Drolet repeated her request for a

18

document reflecting the retroactivity language, Toll did not inform Drolet of his November 5 memorandum; in fact, Toll told her that there was **_no_** document indicating that the percentage interest determinations were to be applied retroactively. (Drolet, Aug. 10, 2009, 89:16-18).  Similarly, in an earlier discussion that Joseph Sellers had with Drolet about the percentages to be applied for Hausfeld and Lewis, Sellers never informed Drolet about the November 5 memo. (Sellers, Aug. 11, 2009, 17:2-5; 18:6-11).  Despite his admission that the November 5 memo meant that Hausfeld's percentage interest on October 31, 2008 was 14 percent, Sellers actually told Drolet that Hausfeld's percentage interest as of October 31, 2008 was 28 percent. (*Id.*).  Drolet never saw and was never informed about the November 5 memo until Hausfeld's counsel showed it to her – much to her surprise – at her deposition on July 13, 2009.  (PX 48; Drolet, Aug. 10, 2009, 85:2-86:2; Toll, Aug. 10, 2009, 256:9-14).

Drolet has admitted that a retroactive change in Hausfeld's and Lewis' percentage interests would have a material effect on the calculation of their capital account balances. (Drolet, Aug. 10, 2009, 85:12-15).  That is why she asked CMST for documentation of any such change.  It is also why she candidly testified at trial that she was "glad" she did not know about the November 5 memorandum when she reviewed the calculations because, if she had had it in her possession, she would "look really bad right now." (Drolet, Aug. 10, 2009, 85:12-15; 92:11-16; 121:25-122:2).

19

4.    CMST Has Advanced Specious Justifications to Defend Its Use of Plaintiffs' 2007 Percentage Interests

CMST has invoked different rationales at different times for contravening the Compensation Committee's express "effective immediately-retroactive" mandate and instead using the Compensation Committee's old, 2007 percentage interest determinations to calculate Plaintiffs' liquidating capital account balances. None of these varying rationales withstands even the mildest scrutiny.

CMST has claimed that using the prior year's percentage interests was what the firm did for every other member who departed prior to Plaintiffs. (CMST Pre-hearing brief at 10, 15; Toll, Aug. 13, 2009; 37:10-39:23; Sellers, Aug. 11, 2009, 32:11-33:8). But as explained above, *see* Section I.A.2., *supra*, CMHT used the prior year's percentage interests for Yahner, Mason, Gallagher and Nussbaum because the Compensation Committee *had not yet met* during the year of their respective departures. (Toll, Aug. 13, 2009, 57:11-60:14). Hausfeld and Lewis were the only partners whose departures occurred *after* the Compensation Committee had made its determinations – effective immediately and retroactively – for the year.

CMST also has tried to defend its conduct by claiming that, for profit/loss-sharing purposes, the Compensation Committee's decisions would not have been effective until the end of the year, when the firm would actually apply them, and because Hausfeld and Lewis were gone from the firm by year end, they were meaningless as to Plaintiffs. (Sellers, Aug. 11, 2009, 19:19-21:4; 40:6-18; Toll, Aug. 13, 2009, 37:10-40:2; 123:24-124:8; 124:18-125:3; 126:10-127:5; 127:21-128:6). In other words, CMST has claimed that what the Compensation Committee did was

"retroactive to the beginning of 2008 and effective immediately" for the purpose of determining Plaintiffs' voting power, but utterly ineffectual for the purpose of determining their allocable share of the firm's income or loss.

This claim is, of course, directly at odds with what the Compensation Committee purported to do, as memorialized by the plain language of Toll's November 5 memo. The memo fails to draw any distinctions between percentage interests for voting strength purposes and percentage interests for profit/loss sharing purposes. By its plain terms, it simply makes the Compensation Committee's percentage interest determination for all purposes "retroactive to the beginning of 2008 and effective immediately." (PX 68).

This is consistent with what the Operating Agreement provides. There is nothing in the Operating Agreement that permits a member's percentage interest to be one number for voting purposes and another number for profit/loss-sharing purposes. The Operating Agreement simply refers to a member's percentage interest, which will be used to determine *both* profit/loss sharing (*see, e.g.,* PX 2 at Art. 3(C)) and voting strength (*see, e.g., id.* at Art. 5(A)).

When pressed at trial, no testifying member of CMST could cogently justify obviating the plain language of the Operating Agreement or the plain language of the November 5 memo. Put differently, no one could justify using the Compensation Committee's memorialized, immediately-effective, retroactive determinations to effectuate Hausfeld's expulsion from the firm, while at the same time refusing to use those determinations, and instead using Hausfeld's 2007

21

percentage interest, to double the losses CMST claims Hausfeld suffered in his capital account. Joe Sellers, for instance, conceded that no provision in the Operating Agreement "talk[ed] about the compensation committee slashing somebody's points in order to diminish their voting rights." (Sellers, Aug. 11, 2009, 32:11-33:14). Toll, too, was unable to point to anything in the Operating Agreement that justified doing this. (Toll, Aug. 13, 2009, 128:7-21). In fact, Toll ultimately admitted that a partner's percentage interest applies to *both* allocation of profit or loss and to voting strength. (Toll, Aug. 13, 2009, 124:15-17). In her twenty or more years as the firm's outside accountant, Drolet likewise had never known the firm to "use a different percentage for voting interests and a separate percentage for income and loss." (Drolet, Aug. 10, 2009, 121:20-23).

Moreover, what Toll and Sellers would not ultimately concede, Herbert Milstein did. In direct contravention of the position that CMST has taken throughout these proceedings, Milstein testified that, for the purpose of determining Hausfeld's share of the firm's profit or loss as of October 31, 2008, Hausfeld's percentage interest was 14 percent – not the 28 percent that the firm has used in its calculations:

> Q:    Now, getting back to the Compensation Committee, the percentage interest in the firm the Compensation Committee relegates to an equity partner, that is, what, his voting interest in the firm?
>
> A:    Yes.
>
> Q:    It's also his interest in the either profit or loss of the firm?
>
> A:    Yes.

22

Q:    They're not separate pieces of right, are they?

A:    No.

Q:    They're the same?

A:    Yes.

* * *

Q:    The Compensation Committee met on November the 5th, reducing some partners, increasing other partners, and coming up with new percentages?

A:    Yes.

Q:    Effective immediately and retroactive to January the 1st. What was Michael Hausfeld's equity interest in the partnership on October 31st, 2008?

A:    I'm having difficulty – can I describe to you what my difficulty with the question is?

Q:    No.  Can you tell me what his –

A:    I can't answer it that way.

Q:    You cannot answer it?

A:    No.

Q:    What does effective immediately and retroactive to January the 1st, 2008, mean, Mr. Milstein, when you voted on that at the Compensation Committee meeting of November the 5th, what did that mean?

A:    It meant that his compensation for the entire year would be 14 percent of whatever earnings or losses we incurred for the year.

Q:    So, what was his percentage interest in losses or profits as of October 31st –

A:    After November 5?

23

Q:    Yes, sir.

A:    14 percent.

Q:    As of October 31, 2008?

A:    Yes.

(Milstein, Aug. 12, 2009, 132:6-17, 133:7-134:8).

CMST's final claim has been that it was appropriate to use the 2007 percentage interests, rather than the 2008 figures, because it would be improper for the Compensation Committee to retroactively adjust a departed member's capital account. (CMST Prehearing Brief at 5-6, 15; Toll, Aug. 13, 2009, 37:10-39:23; Sommers, Aug. 12, 2009, 82:25-84:9; Sellers, Aug. 11, 2009, 14:23-15:11; 19:16-21:17; 22:17). But as CMST surely knows, this claim makes no sense. The Compensation Committee's November 5, 2008 percentage interest determinations, if applied, would not "retroactively change" Hausfeld's and Lewis' capital account balances; those were fixed figures and could not be changed, as several CMST witnesses acknowledged during trial. (Toll, Aug. 13, 2009, 128:22-129:12; Drolet, Aug. 10, 2009, 217:12-218:14; Milstein, Aug. 12, 2009, 124:4-126:16). Moreover, applying the 2008 figures would simply adjust Plaintiffs' capital account balances *as of the date of termination*, not "retroactively," based on the firm's profit or loss as of that date. Importantly, that is *no different* than what applying the 2007 figures would do. Applying *either year's* figures to the firm's October 31 book loss would affect Plaintiffs' liquidating capital account balances as of the date of termination

24

(CMST's application of the 2007 figures doubtlessly did), but it would not "change" a prior existing balance nor would it do anything "retroactively."

There is one final, fundamental flaw in CMST's argument that applying the 2008 figures would mean that the Compensation Committee was wielding power it did not have to adjust a departed member's capital account: on November 5, 2008, when the Compensation Committee made its decisions, Plaintiffs *were still members of the* firm; neither had departed. As a result, the Compensation Committee's 2008 determinations, *when made*, were simply allocations of income or loss among *existing* members, *including Plaintiffs,* and could not possibly have applied or been used to adjust Plaintiffs' *liquidating* capital account balances. Using the 2008 percentage interests to determine Plaintiffs' allocable share of the firm's income/loss as of October 31, therefore, would be no more an indication of some illicit Compensation Committee action to affect a departed member's liquidating capital account balance than using the percentage interests from 2007 – which is to say that it would be no indication at all. In other words, because neither Hausfeld nor Lewis had departed the firm prior to the Compensation Committee's determinations in 2007 <u>or</u> in 2008, applying the 2008 figures, like applying the 2007 figures, would not – and could not – mean that the Compensation Committee was improperly adjusting the *liquidating* capital account balance of a *departed* member.[1]

---

[1] To the extent there is any confusion about this point, it is confusion sown by the anti-Hausfeld faction's illicit scheme to end run the Operating Agreement and use the Compensation Committee process to facilitate Hausfeld's expulsion from CMHT. Toll claims that using the 2008 percentage interests would be unfair because, if the firm had had net income rather than loss as of October 31, the 2008

B.     **CMST's Decision to Use Plaintiffs' Reduced, 2008 Percentage Interests to Expel Hausfeld from the Firm, But at the Same Time Use Their Higher, 2007 Percentage Interest Figures to Increase Plaintiffs' Shares of CMHT's Loss as of October 31, 2008, Constitutes a Bad Faith Breach of the Settlement and Operating Agreements, a Bad Faith Breach of CMST's Contractual Duty of Good Faith and Fair Dealing, and a Bad Faith Breach of CMST's Fiduciary Duties**

After hearing this evidence, this Court correctly made a preliminary finding that CMST "showed bad faith" when it saddled Hausfeld with 27.97%, and Lewis with 6.78%, of the firm's loss as of October 31, 2008. (Aug. 13, 2009 Tr. at 334:9-19). Indeed, to slash Hausfeld's percentage interests in order to expel him from CMHT, and then to turn around and use his *pre-expulsion* percentage interests – percentage interests that would have *prevented* the expulsion – to slash his capital account balance, violates all manner of contractual obligations, equitable principles and fiduciary duties. Either it was legitimate to reduce Plaintiff Hausfeld's percentage interests to expel him from the firm immediately, in which case the same, newly-determined percentage interests must be applied to determine his allocable share of income or loss at the point of his expulsion; or it was illegitimate

---

determinations would entitle Hausfeld to only 14%, rather than 28%, of such net income. But what was unfair was using the Compensation Committee to effectuate Hausfeld's expulsion in the first place – which as Sellers conceded, the Operating Agreement does not provide for. (Sellers, Aug. 11, 2009, 22:13-17). Had the anti-Hausfeld faction not abused the Compensation Committee process to expel Hausfeld, CMST would never be in a position to assert that it would be "unfair" to use a lower percentage to deprive Hausfeld of any share of hypothetical firm profits. Perhaps more importantly, in *this* case, when CMST calculated Hausfeld's liquidating balance, it knew that the firm, as of the date of Hausfeld's termination, did *not* have net income, but rather had a significant tax basis book loss. So what was unfair *here,* as CMST surely understood, was refusing to use the 2008 percentages – especially after it had used them to expel Hausfeld.

to reduce his percentage interests effective immediately, and as Toll and Sellers asserted, such action could not take effect until year end (Sellers, Aug. 11, 2009, 19:19-21:4; 40:6-18; Toll, Aug. 13, 2009, 37:10-40:2; 123:24-124:8; 124:18-125:3; 126:10-127:5; 127:21-128:6), in which case the calculation of Hausfeld's and Lewis' share of the firm's income or loss should have been done as of December 31, 2008 – not October 31.  CMST cannot have its cake and eat it, too.

Paragraph 14 of the Confidential Agreement expressly provides that the capital owed to Hausfeld and Lewis should be determined in accordance with the Operating Agreement.  As discussed above, the Operating Agreement does not distinguish between percentage interests for voting purposes and percentage interests for profit/loss sharing purposes.  CMST's members have admitted this, Pat Drolet acknowledged it, the November 5 memo was consistent with it, and Milstein reluctantly conceded that, as a result, Hausfeld's percentage interest as of October 31, 2008 was 14 percent.  There is little question, then, that what CMST has tried to do by allocating Hausfeld and Lewis 27.97% and 6.78% of the loss, rather than 13.31% and 6.56% of the loss, as of October 31, 2008, is a breach of the Settlement and Operating Agreements.

The Settlement Agreement also expressly requires CMST to act in good faith toward Hausfeld and Lewis.  The Settlement Agreement provides that the "parties shall work in good faith to effectuate the provisions and purposes of this Agreement, including, as necessary, performing reasonable acts not specifically required by this Agreement in order to carry out the provisions and purposes of this Agreement."

(PX 1 at 18(b)).  CMST violated this provision by allocating to Hausfeld and Lewis 27.97% and 6.78% of the firm's book loss as of October 31, 2008, in the face of the Compensation Committee November 5, 2008 determinations, in the face of the plain language of the November 5 memo memorializing those determinations as "effective immediately" and "retroactive to the beginning of 2008," and in the face of its knowledge that a member's percentage interest cannot possibly be different numbers for different purposes on the same day.

CMST's use of the old percentage interests also violated its implied duty of good faith and fair dealing, which it owed to Hausfeld and Lewis under the Settlement and Operating Agreements.  *See Willens v. 2720 Wis. Ave. Coop. Ass'n*, 844 A.2d 1126, 1135 (D.C. 2004) ("In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.") (internal quotations and citations omitted).

Finally, under the Operating Agreement, as incorporated into Paragraph 14 of the Settlement Agreement, CMST owed Hausfeld and Lewis a continuing fiduciary duty that obligated it to calculate Hausfeld's and Lewis' capital account balances in a manner that fairly provided Hausfeld and Lewis everything they were due and did not unfairly enrich CMST at Hausfeld's and Lewis' expense.  CMST has violated this fiduciary duty by taking the unreasonable and unsupported position it has taken as to Plaintiffs' percentage interests as of October 31, 2008.  This is

28

especially so because, by virtue of applying the higher percentage interest figures to determine Hausfeld's and Lewis' shares of the firm's loss, CMST's partners enriched themselves, realizing an increase in their capital account balances in 2008 as a result of the dramatic decrease in Hausfeld's and Lewis' accounts. (Drolet, Aug. 10, 2009, 131:5-8; 133:6-10; 134:6-8; Sellers, Aug. 11, 2009, 79:8-21). *See Schuss v. Penfield Partners*, 2008 WL 2433842 (Del. Ch. 2008) (finding that Plaintiffs who had withdrawn from limited partnership could potentially prove that general partners breached their fiduciary duties because the method used to determine the amounts due to be distributed to Plaintiffs arguably violated the partnership agreement, reflected an unreasonable interpretation of the partnership agreement, and caused significant damage to Plaintiffs to the benefit of Defendants).[2]

### C.    CMST's Breaches Require This Court to Fashion Appropriate Equitable Relief

Because the Settlement and Operating Agreements are silent as to the remedy for CMST's breaches, the Court has broad discretion to fashion relief that would achieve equity and "is not limited to awarding contract damages for breach of the agreement." *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 107

---

[2] Given the Delaware courts' expertise in business and corporate issues, D.C. courts have turned to Delaware law for guidance on business issues that are unsettled in D.C. *See, e.g., Washington Bancorporation v. Said*, 812 F.Supp. 1256, 1265 (D.D.C. 1993). Moreover, Maryland—to which D.C. looks when D.C. is not dispositive on a particular issue—also finds Delaware corporate law cases "highly persuasive." *See Newby v. United States*, 797 A.2d 1233, 1242 (D.C. 2002); *see also Kramer v. Liberty Property Trust*, 968 A.2d 120, 134 (Md. 2009) (holding that "because the Delaware courts have gained a reputation for their expertise in matters of corporate law, we deem decisions of the Delaware Supreme Court and Court of Chancery to be highly persuasive . . . .").

(Del. Ch. 2006) (declaring that member of LLC who had breached anti-transfer provisions of LLC agreement with 50 percent partner would be stripped of its rights to participate in management of LLC because, through breaching member's conduct, non-breaching member found itself in business with a partner it had not approved—the very position that the terms of LLC agreement were designed to prevent); *see also Gotham Partners v. Hallwood Realty Partners*, 817 A.2d 160 (Del. 2002) (holding that, where general partner had breached the procedural and substantive provisions of the partnership agreement that memorialized the partners' fiduciary duties, trial court should determine how challenged transaction would have been consummated had defendants adhered to those provisions). The equities in this case require not only that Hausfeld's and Lewis' capital account balances be recalculated using their 2008 effective percentage interests, but that the loss figure to which such percentage interests should be applied should be the loss figure as November 30, 2008, rather than the loss figure as of October 31, 2008.

1.    Plaintiffs' 2008 Percentage Interests Should be Applied When Calculating Their Liquidating Capital Account Balances

As this Court preliminarily found, there is little question that, to allocate Hausfeld's and Lewis' shares of the firm's profit or loss as of the last day of the last full month prior to termination, CMST should have applied the percentage interest determinations made by the Compensation Committee on November 5, 2008. The plain terms of the November 5 memo – which make the Committee's determinations "retroactive to the beginning of 2008 and effective immediately" – say so. Milstein said so in his trial testimony. And given that certain CMHT members used those

30

determinations to expel Hausfeld the following day, employing different figures to determine Hausfeld's and Lewis' share of the loss would be inconsistent with the Operating Agreement – which, as Milstein, Toll and Drolet acknowledged, treats percentage interests the same for all purposes – and with equity. Accordingly, Plaintiff Hausfeld's actual percentage interest as of November 5 and retroactive to January 1 was 14%, not 27.97%, and Plaintiff Lewis' actual percentage interest as of November 5 and retroactive to January 1 was 6.5%, not 6.78%. This was how CMST applied the Compensation Committee's November 5 determinations for every other partner. (PX 21 at CMST 1448-49). Hausfeld's and Lewis' percentage interests should be applied no differently.

Due to the firm's past practice, moreover, the percentage to be used should be the effective percentage interest, rather than the actual percentage interest. As set forth above, for the only two partners who left the firm and had their capital account balances calculated under the 2003 Operating Agreement prior to Hausfeld and Lewis, the firm applied effective percentage interests – not actual percentage interests – to the firm's book loss as of the last day of the last full month prior to termination. Again, Hausfeld and Lewis should be treated no differently. Accordingly, the percentage interests that should be used to calculate their shares of the firm's profit or loss as of November 5 and retroactive to January 1 should be 13.31% and 6.56%. (PX 65, 66, 67).

31

2.    <u>Plaintiff Hausfeld's Capital Account Balance Should be</u>
<u>Calculated as of November 30, Instead of October 31, 2008,</u>
<u>Especially in View of CMST's Bad Faith Conduct</u> [3]

The Court's authority to equitably remedy breaches of contract and fiduciary

duty, especially bad faith breaches, justifies using November 30, 2008, rather than

October 31, 2008, as the date for calculating Hausfeld's liquidating capital account

balance.  For Hausfeld, November 30 is the logical date for restoring equity.  The

partners who expelled Hausfeld from CMHT simultaneously amended the

Operating Agreement to effectuate the expulsion immediately, rather than within

30 days, as the Operating Agreement had provided.  If the partners had not

eliminated the 30-day wind-up provision, Hausfeld's termination date would have

---

[3]  As an alternative, the Court, sitting in equity, could calculate Hausfeld's capital account as of December 31, 2008.  CMST has taken the position that, for profit/loss sharing purposes, the Compensation Committee's November 5, 2008 percentage interest determinations did not become effective until the end of 2008, notwithstanding the statement in the November 5 memo that they were "effective immediately." (CMST Prehearing Brief at 15; Toll, Aug. 13, 2009, 123:5-124:8).  If that is so, then for voting purposes, too, the Committee's determinations could not have become effective until December 31, 2008.  That is because, as Milstein testified, a member's percentage interest cannot be different numbers for different purposes on the same day. (Milstein, Aug. 12, 2009, 132:6-17).  As discussed above, this testimony is consistent with the Operating Agreement, which treats percentage interests as indivisible for their dual voting and profit-sharing purposes.

If the Compensation Committee's determinations did not become effective until December 31, then CMHT's "anti-Hausfeld" faction could not have secured the votes necessary to expel Hausfeld until December 31, and could not have expelled Hausfeld until that date.  Accordingly, even assuming the Operating Agreement was amended to make the expulsion effective immediately, Hausfeld's capital account balances would have to be calculated as of December 31 – the last day of the last full month prior to termination.  Doing the calculations as of that date, at which point the firm had net income of $530,692, would leave Hausfeld with a liquidating balance of **$5,056,786** ($4,994,901 (2007 year end balance) + ($530,692 x 13.31%) – $8,750 (last guaranteed draw)).

32

been December 6, 2008. The same would be true if the anti-Hausfeld partners had asked Hausfeld to leave the firm immediately but made his termination date consistent with the 30-day wind-up provision. Toll admitted the firm could have done this (Toll, Aug. 13, 2009, 131:8-135:1), and the firm in fact did something similar with Linda Nussbaum, allowing her to leave on one day but not to have her termination effective until a later date. (Toll, Aug. 13, 2009, 131:12-132:15). Under the Operating Agreement, either course of action would have made November 30, 2008 the date for determining Plaintiff Hausfeld's liquidating capital account balance.

Using November 30 would also be equitable from an economic standpoint. If, notwithstanding the requirements of the Operating Agreement, the Court chooses not to require the liquidating capital account balances to be recalculated using a GAAP-compliant October income statement, *see* Section III, *infra*, using November 30 would allow for consideration of at least some – though not nearly all – of the firm's accounts receivable as of the date Hausfeld was expelled, including, importantly, accounts receivable that *Hausfeld generated.* As a result, using November 30 would give a much truer picture of the firm's financial condition as of the date of Hausfeld's expulsion and, accordingly, a much truer picture of Hausfeld's actual financial stake in the firm as of that date. It would also diminish, but not eliminate, the radical inequity of the situation created by the partners who expelled Hausfeld: *only* by amending the Operating Agreement to expel the person whom Toll conceded was "the driver and leading force of [the] firm for decades" effective

33

immediately, rather than after 30 days, those partners have been able to seek to allocate roughly $2 million in losses to Hausfeld's capital account in 2008, but at the same time realize gains in their own capital accounts (*see* PX 78 at 8; PX 108), due in large part to the losses they allocated to Hausfeld (*see* PX 78 at 8; PX 108; Bavis, Aug. 11, 2009, 165:23-168:8; PX 21 at CMST 01447).

Finally, using November 30 would provide a remedy for CMST's otherwise unremedied breaches of the procedural provisions of Article Tenth of the Operating Agreement, namely the provisions requiring that the firm "promptly" furnish capital account information to departed partners, engage in good faith negotiations over the final balance and, barring agreement, have the firm's outside accountant make an independent, fully-informed determination of the final balance. This Court found that CMST breached these "due process" provisions of the Operating Agreement. (Aug. 10, 2009 Tr. at 260:17-20; 269:2-11; Toll, Aug. 11, 2009, 241:10-19). Indeed, as the Court suggested, the provisions of Article Tenth were intended to produce a fair result by allowing a prompt and fair process for a departing partner to obtain and potentially challenge the firm's calculation of his final capital account balance. There is no dispute that the firm breached the process set forth in Article Tenth. These breaches are not meaningless. *See, e.g. Gotham*, 817 A.2d at 164, 177-78. Had the firm complied with them, Plaintiffs would have known how CMST intended to calculate their capital accounts weeks before the mediation sessions.

With a termination date of November 30, CMST would have had to use the firm's November income statement, rather than its October income statement, to determine Plaintiff Hausfeld's capital account balance. (Toll, Aug. 13, 2009, 135:3-136:4; PX 11 at 674-76). And as of November 30, as CMHT had predicted in a detailed letter to its creditor bank on the very same day Hausfeld was expelled (PX 70), as well as in assurances made to the bank in the days leading up to Hausfeld's expulsion (Hausfeld, Aug. 12, 2009, 17:1-17; Sellers, Aug. 11, 2009, 74:13-21-75:15; 91:1-7; Toll, Aug., 13, 2009, 102:14-103:3), CMST had reduced its tax basis method-derived book loss significantly, due principally to the receipt of a nearly $5 million account receivable from an antitrust class action case *generated and resolved by Hausfeld*. Specifically, largely as a result of the fee from that Hausfeld-generated case, the firm reduced its tax method basis-derived book loss from $6,912,175.39 as of October 31 to $2,193,143. That is a difference of $4,719,032, achieved in just 30 days.

Using the correct, effective percentage interest (13.31%) to calculate Hausfeld's capital account as of November 30, at which time the firm's tax basis book loss was $2,193,143 (PX 11), Hausfeld's liquidating balance would be **$4,694,244**, calculated as follows:  $4,994,901 (2007 year end balance) – (($2,193,143 x 13.31%) – $8,750 (guaranteed draw prior to expulsion)).

Recalculating Hausfeld's liquidating balance in this manner will more equitably compensate Hausfeld for CMST's bad faith breaches of contract and fiduciary duty. Failing to recalculate Hausfeld's balance in this or a similar

35

manner, at least in the absence of an award for punitive damages and/or attorneys' fees and costs, would permit CMST to get away with what they have done by requiring them to do nothing more than they should have done in the first place, at great additional cost to Hausfeld. In this case, where the Court has preliminarily found that CMST's actions were not "right" and "showed bad faith," (Aug. 13, 2009, 334:6-19), the law not only allows but demands something more.

> 3.    Lewis' Capital Account Balance Should Be Calculated As of November 30, 2008 Either Because CMST Involuntarily Terminated Him and Then Used His 2007 Percentage Interests to Calculate His Balance, or Because, if Lewis is Viewed as Having Withdrawn Voluntarily, the CMHT Operating Agreement *Requires* His Balance to be Calculated as of November 30, 2008 [4]

Because Lewis, like Hausfeld, was involuntarily terminated, as set forth in Section I.A.1 above, all of the reasons for using November 30, rather than October 31, to calculate Hausfeld's liquidating capital account balance apply equally to Lewis. In fact, if Hausfeld had not been terminated and treated as he was, Lewis would not have left.

Moreover, even if the Court finds that Lewis was not involuntarily terminated, as CMST has asserted throughout this dispute, the Operating Agreement nevertheless ***requires*** that November 30 serve as the date for calculating Lewis' liquidating capital account balance. Article Sixth, Section A

---

[4] If, for the reasons set forth in footnote 3, *supra,* the Court instead deems it appropriate to use December 31, 2008 as the proper date for calculating Lewis' capital account balance, Lewis' liquidating capital account balance would be **$1,189,622**, calculated as follows: $1,163,142 [2007 year end balance] + ($530,692

36

provides that "any member may voluntarily withdraw from the Company by giving the other members, at the principal office of the Company, written notice." (PX 2 at Art. 6(A)). Article Sixth, Section C then provides that, "unless the withdrawing Member and the continuing members otherwise agree, the date of withdrawal shall be the date specified in the notice given pursuant to Section A ..., which date *shall not be less than thirty (30) days after the date on which such notice is given.*" (*Id.* at Art. 6(C)) At the time of Hausfeld's expulsion, Section C was amended to eliminate the 30-day period for members *involuntarily terminated* under Article Sixth, Section B. (PX 93). Section C was *not* amended, however, to eliminate the 30-day period for voluntarily withdrawing members. In fact, the amendment expressly continues to provide that in the case of voluntarily withdrawing members, "unless the withdrawing Member and the continuing members otherwise agree, the date of withdrawal shall be the date specified in the notice given pursuant to Section A, which date *shall not be less than thirty (30) days after the date on which such notice is given.*" (*Id.*) (emphasis added). Accordingly, if the Court agrees with CMST and finds that Lewis voluntarily withdrew, his November 11 notice of resignation (*see* PX 94) would make December 11 his termination date under the amended Article Sixth, Section C, as Lewis and CMST did not "otherwise agree" on another date. And if December 11 is his termination date, November 30, as the last day of the last full month prior to the termination date, is the date to be used to calculate his liquidating capital account balance. (*See* PX 2 at Art. 10).

---

[Dec. 31 net income figure] x 6.56% [effective percentage interest]) – $8,333 [last

Using November 30 as the operative date – whether because equity requires it in the event Lewis is deemed to have been involuntarily terminated, or because the Operating Agreement requires it in the event he is deemed to have voluntarily withdrawn – Lewis' liquidating capital account balance is **$1,010,939**. That figure is calculated as follows:  $1,163,142 [2007 year end balance] – ($2,193,143 [Nov. 30 loss figure] x 6.56% [effective percentage interest]) – $8,333 (last guaranteed draw).

## II.    CMST'S WITHHOLDING OF MATERIAL INFORMATION FROM HAUSFELD AND LEWIS DURING SETTLEMENT NEGOTIATIONS ALTERNATIVELY ENTITLES THEM TO RELIEF REFLECTING THE DEAL THEY WERE LED TO BELIEVE THEY OBTAINED

### A.    Evidence Establishing Fraud or Material Omission

#### 1.    Toll Held Onto the Controller's Calculations for Nearly a Month

As of early January 2009, Toll was well aware that CMST had an obligation under the Operating Agreement to provide Hausfeld and Lewis with their capital account balance calculations.  (Toll, Aug. 11, 2009, 229:11-16; 233:15-20; PX 2 at Art. 10).  On January 8, 2009, 32 days after the Operating Agreement's deadline for providing Hausfeld his capital account balance information, Toll sent an email to the firm's controller, Hugh Diamond, indicating a "[n]eed to start doing capital account analysis for MDH [Michael D. Hausfeld], and other departing equity partners as I think we need [sic] send them our analysis of the balance as adjusted as required by the Operating Agreement.  See me if any questions-otherwise, must have it in a few days." (PX 15).  By this time, CMST had available all of the information it needed to prepare its calculations of Plaintiffs' capital account

---

guaranteed draw].

balances.  (Toll, Aug. 11, 2009, 227:2-6).  Such information consisted of nothing more than the income statement for October 2008, which was prepared and distributed to CMST's equity partners in or around November 2008.  (Toll, Aug. 11, 2009, 227:7-17).

Diamond dutifully complied with Toll's request and sent Toll the calculations on January 10, 2009.  (PX 15).  Diamond asked Toll to let him know when he could forward them to Drolet for her review (*id.*), as it was the firm's standard practice to have Drolet review such calculations before providing them to a departed partner.  (Drolet, Aug. 10, 2009, 59:12-18).  Drolet had already requested the figures from Diamond at the beginning of the month.  (PX 13; Drolet, Aug. 10, 2009, 47:6-48:8).  The balance Diamond calculated for Hausfeld was $3,899,821.39, and the balance calculated for Lewis was $873,065.46 – collectively, nearly *$1.4 million lower* than Plaintiffs' balances at the end of 2007.  (PX 15).

As of January 15, 2009, when Drolet again asked Diamond for the calculations, Toll still had not given Diamond authorization to release them, and Diamond wrote that he would ask Toll again for his approval.  (PX 16).  Nevertheless, more than three more weeks passed before Toll finally authorized Diamond to send the calculations to Drolet.  (Toll, Aug. 11, 2009, 231:15-22; Drolet, Aug. 10, 2009, 53:20-54:4).  For that entire period, despite knowing that CMST would contend that Hausfeld would be receiving more than a million dollars less than he had in the beginning of January 2008, Toll kept this information to himself, putting the calculations in his briefcase to get to at a later time.  (Toll, Aug. 11,

39

2009, 228:4-229:9; Toll, Aug. 13, 2009, 5:8-23). As described in more detail below, Toll held on to the information despite knowing that it was due to Plaintiffs under the Operating Agreement, despite Plaintiffs' repeated requests for it, despite this Court's directive that it be furnished and despite the understanding he had during the settlement negotiations with this Court that CMST planned to assert that Hausfeld's account would see a "not insubstantial decline" from the roughly $5 million he knew Hausfeld expected to receive. (Toll, Aug. 13, 2009, 152:13-25).

2. CMST Withheld the Calculations during Negotiation of Confidential Settlement Agreement

To resolve the disputes arising from Hausfeld's and Lewis' expulsion from CMHT, the parties to this matter engaged in settlement negotiations before this Court on January 23 and February 2, 2009. The negotiations resulted in the comprehensive Settlement Agreement signed on February 5, 2009. (PX 1; Hausfeld, Aug. 12, 2009, 7:16-22).

At the beginning of the January 23 mediation, as the parties went through the issues between them, Hausfeld indicated that if there was to be a global resolution of all disputes, there would need to be a resolution of any issues regarding Plaintiffs' capital accounts and termination payments. (Hausfeld, Aug. 12, 2009, 9:3-19). In a subsequent joint session on January 23, during which Toll and CMST member Dan Small were present, Hausfeld informed Judge Rice that his capital account payment was roughly $5 million, to be paid out in equal installments over five years. (Hausfeld, Aug. 12, 2009, 9:24-10:10; Eisler, Aug. 11, 2009, 222:8-223:7; Toll, Aug.13, 2009, 26:3-12). At one point, Hausfeld asked that

40

his and Lewis' capital and $500,000 termination allowances be returned immediately, rather than over the course of five years, as provided in the Operating Agreement. (Eisler, Aug. 11, 2009, 223:1-7; Hausfeld, Aug. 12, 2009, 10:11-17). Hausfeld also insisted that CMST provide him and Lewis with the final statements of their capital account balances. (Hausfeld, Aug. 12, 2009, 12:4-11). This Court also directed CMST to provide Hausfeld and Lewis with such information. (Eisler, Aug. 11, 2009, 223:21-224:3).

Despite having had Diamond's calculations in his possession for nearly two weeks, despite knowing that CMST had an obligation to Plaintiffs to get them the figures, and despite being asked for them during the mediation session, Toll stood silent. Even when Hausfeld repeated that he expected to receive approximately $5 million dollars (Hausfeld, Aug. 12, 2009, 11:19-24), neither Toll nor anyone on behalf of CMST provided Hausfeld with *any indication* that CMST had completed preliminary calculations and that the capital owed to Hausfeld would be substantially less than $5 million. (Toll, Aug. 11, 2009, 230:9-17; Hausfeld, Aug. 12, 2009, 11:25-12:3). Yet, as Toll admitted he knew by January 23 that CMST would take the position that Hausfeld had suffered a significant loss in his capital account:

> THE COURT:  Now, my question is: How could you have
>             known at that time whether they would agree
>             to an accelerated distribution if you didn't have
>             a figure in mind as to what amount was
>             involved?
>
> A:      Oh, I have a general idea, your Honor.
>
> Q:      And what was the general idea?

41

> A: Well, the general idea that it would be less than his –
> the 4.99 it was on January, you know, December 31,
> '07.
>
> ***
>
> Q: But didn't you have the e-mail from Mr. Diamond in your
> briefcase, and it didn't dawn on you to look at it?
>
> A: No, it didn't dawn on me to look at it, but, again, I probably
> knew in general that it was going to be a significant –not
> significant—*not insubstantial decline* . . .

(Toll, Aug. 13, 2009, 151:12-152:21) (emphasis added).

By the second mediation session on February 2, ten days later, Toll *still* had neither provided the calculations to Plaintiffs nor given them to Drolet for her prior review. (Toll, Aug. 13, 63:13-21; 65:23-66:5). During the second session, Plaintiffs again requested the calculations, both at the beginning and end of the session. (Toll, Aug. 13, 2009, 27:15-21; Hausfeld, Aug. 12, 2009, 12:4-11; 14:2-8; Toll, Aug. 11, 2009, 229:18-230:8). The Court ordered counsel to produce the calculations "quickly," to which counsel for CMST stated that it would be "no problem." (Hausfeld, Aug. 12, 2009, 14:7-8; Toll, Aug. 13, 2009, 66:11-22; Toll, Aug. 11, 2009, 230:4-8).

At this time, although 23 days had elapsed from the time Diamond had provided the calculations to Toll, Toll again failed to provide the information to Plaintiffs or disclose to Plaintiffs or the Court that the balances, in CMST's eyes, were substantially less than Toll knew Hausfeld expected. (Toll, Aug. 13, 2009, 66:6-10; 75:8-19, 79:5-13). Toll revealed nothing, even when Hausfeld squarely

42

asked him not to "mess with [his] capital account." (*Id.*; Hausfeld, Aug. 12, 2009, 48:4-5).

CMST ultimately agreed to accelerate the return of Plaintiffs' capital over the course of two years, with the first half of the amount due to be distributed at the end of 2009 and the second half to be distributed by July 31, 2010. (PX 1 at ¶ 14; Eisler, Aug. 11, 2009, 222:8-223:30). With respect to the *OSB* fees, although Plaintiffs' initial position was to split them 50-50 between CMST and Hausfeld LLP, Plaintiffs ultimately conceded all of them — approximately $3 million – to CMST, even though *OSB* was an antitrust case that Hausfeld had originated and helped resolve. (PX 1 at ¶ 4; Hausfeld, Aug. 12, 2009, 18:11-19:1; Eisler, Aug. 11, 2009, 220:15-19; 221:14-24). Plaintiffs agreed to this at the end of the January 23 session in exchange for, *inter alia*, the accelerated return of capital. (Hausfeld, Aug. 12, 2009, 18:5-19:1). Additionally, in lieu of receiving their capital accounts in 20 months instead over five years, Hausfeld and Lewis each agreed to forgo his $500,000 termination allowance. (Hausfeld, Aug. 12, 2009, 13:2-15; Lewis, Aug. 10, 2009, 289:17-20; 292:17-23).

Throughout the mediation sessions, Hausfeld and Lewis believed that the approximate amount of the capital to be returned – about $5 million for Hausfeld and about $1 million for Lewis – was never materially in dispute and only required final adjustments. (Lewis, Aug. 10, 2009, 289:2-6; Hausfeld, Aug. 12, 2009, 11:19-12:3). They believed this because of representations made to them in September 2008 by CMST's counsel, because CMST was forecasting (and ultimately had) a flat

43

year at the time they were terminated, which meant that their balances would be largely unchanged from the prior year's ending balance, and because CMST stood silent during the mediation sessions, saying nothing in response to the assertions that Hausfeld's account had roughly $5 million. (Hausfeld, Aug. 12, 2009, 11:19-12:3; 16:5-17:22; 20:3-16; 30:5-15; 31:25-32:3; 47:13-19; 45:24-46:13; Lewis, Aug. 10, 2009, 289:2-20; 292:17-293:15; 294:15-295:1; 300:4-15; 305:1-13). As to the firm's financial condition, Hausfeld and Lewis believed it had turned around at the time of his expulsion based on the firm's accounts receivable and that any loss was "a fiction." (Hausfeld, Aug. 12, 2009, 20:3-16; Lewis, Aug. 10, 2009, 318:19-319:24). Hausfeld recalled meetings with SunTrust Bank at the time in which firm members:

> expressly represented to the bank days before my separation that there was no problem, that the firm almost guaranteed that there would be sufficient funds coming in from cases which had already been worked on and for which there were awards made by courts, it was just a matter of timing, before the end of the year that would retire the line of credit that year.

(Hausfeld, Aug. 12, 2009, 17:1-17). Validating Hausfeld's and Lewis' beliefs, Toll's letter to SunTrust on November 6, 2008 – the very day of Hausfeld's expulsion – demonstrates that CMST fully expected to pay down the line of credit by year end. (PX 63).

Given the concessions they made, Hausfeld and Lewis would not have signed the Settlement Agreement had CMST indicated to them at the time of the negotiations that it planned to reduce their capital account balances significantly.

(Hausfeld, Aug. 12, 2009, 20:17-21; Lewis, Aug. 10, 2009, 300:8-19; 302:5-7). This Court, having presided over the settlement negotiations, has recognized as much:

> THE COURT: Well, why didn't – why didn't somebody affirm, at some point before that settlement agreement was signed . . . say to [Hausfeld], you know what, we don't have the exact figure yet, but it looks like you're going to come in, in this range and give him a chance to walk away if he didn't want to do it. I mean, doesn't that – *wouldn't that have been the right thing to do?*
>
> MR. KEENEY: Well, your Honor, it couldn't be done. Let me just explain.
>
> THE COURT: Oh, no, I don't buy that for a minute.

(Aug. 13, 2009, Tr. at 296:8-19) (emphasis added). The strong possibility that Plaintiffs would have insisted on a different deal, of course, is exactly why Toll held on to the calculations as long as he did.

### 3.    CMST Did Not Provide the Capital Account Calculations to Drolet for Review Until the Settlement Agreement Was Signed

Following up on CMST's promise at the February 2 mediation session to provide the calculations, Plaintiffs' counsel sent CMST's counsel an email on February 3 asking that CMST advise as soon as possible "exactly how much is in the capital accounts of Michael Hausfeld and Richard Lewis." (PX19). CMST's counsel did not respond. Two days later, on February 5, when Plaintiffs' counsel transmitted Plaintiffs' signatures to the Confidential Agreement to CMST's counsel, he reiterated his demand for the exact amounts in Plaintiffs' capital accounts. (PX 20). It was only at that point, *after* Plaintiffs signed the Settlement Agreement, that Toll and CMST began to take action to get the calculations to Hausfeld and

45

Lewis. On February 5, after having kept Diamond's calculations in his briefcase for 26 days, Toll finally authorized Diamond to provide them to Drolet – something for which Diamond had asked permission from the very beginning. (Drolet, Aug. 10, 2009, 53:20-54:1; PX 15). No one at CMST ever gave Drolet any reason for the delay, despite the fact that she had requested the calculations on January 5 and again on January 15. (PX 13; PX 16; Drolet, Aug. 10, 2009, 48:24-49:18; 50:4-9; 50:16-23; 58:21-59:8). Nor did Toll have any credible explanation for his failure to authorize Diamond to send the calculations to Drolet, despite CMST's contractual obligation to produce them to Plaintiffs, Plaintiffs' repeated requests and the Court's directives. All Toll could muster was that the calculations were "probably in my briefcase" and that he just "hadn't gotten to it." (Toll, Aug. 13, 2009, 67:3-4).

Significantly, the February 5 email in which CMST finally transmitted Diamond's calculations to Drolet is missing. As set forth at length in Plaintiffs' Motion for a Spoliation Inference, filed during trial, CMST destroyed it and took no precautions to preserve it, despite being put on notice of its relevance. For the reasons set forth in the Spoliation Motion, Plaintiffs are entitled to an inference that the email would have been favorable to Plaintiffs and adverse to CMST.

Performing and checking the calculations was not a cumbersome task. Once Drolet received them, she needed only five hours on February 6 to review them, make several suggested corrections, and then discuss her suggestions with both Diamond and Toll. (Drolet, Aug. 10, 2009, 54:7-11; 55:6-9; 57:1-4). Neither Drolet nor Toll made any further changes to the calculations after February 6, and the

46

calculations Drolet provided to CMST that day were the same numbers that CMST ultimately gave to Plaintiffs two weeks later.  (Drolet, Aug. 10, 2009, 75:9-12; 76:9-14; Toll, Aug. 13, 2009, 69:25-70:1; 233:1-6, Toll, Aug. 11, 2009, 233:1-6).

#### 4.    CMST Continued to Withhold the Calculations from Hausfeld and Lewis Until After the *OSB* Fees Came In

Although the calculations were completed on February 6, CMST failed to furnish them to Plaintiffs for another 14 days, despite Plaintiffs' counsel's repeated requests for them.  On February 6, Plaintiffs' counsel again asked CMST's counsel for the information.  (PX 24).  CMST responded, "Checking again with client," and forwarded the email to Toll and others at CMST.  (*Id.*).  Three days later, on February 9, Toll sent CMST's counsel an email stating that the firm would provide Plaintiffs with the capital account information "[l]ikely in the next day or so."  (PX 36; Toll, Aug. 11, 2009, 234:7-22).  Toll, however, did not provide the information the next day or even the next week; it was not provided until 11 days later.  (PX 41).

On February 13, CMST's Executive Committee considered and approved the February 6 calculations.  (Toll, Aug. 13, 2009, 70:7-15; 72:11-13; PX 40).  Yet, on February 15, when Plaintiffs' counsel sent CMST's counsel another email asking for both Plaintiffs' capital account information and an explanation for the delay of over two weeks, CMST's counsel responded that: "We have seen *draft numbers* prepared by our clients, an early set about a week ago and a revised set on Friday. We understand that the review will be complete and the numbers will be sent to you and your clients in a few more days."  (PX 37) (emphasis added).  Despite the reference to "draft numbers," "an early set," and a "revised set," the calculations had

47

already been approved for release by the Executive Committee and did not differ in any way from those completed by Drolet on February 6.

On February 18, CMST provided Mark Willis, an equity partner who left the firm in 2008, with his capital account information.  (PX 38).  CMST calculated Willis' capital account balance at the same time that it calculated Plaintiffs' balances.  (Toll, Aug. 11, 2009, 235:10-12).  Nevertheless, despite CMST's counsel's repeated promises that Plaintiffs' capital account information was imminently forthcoming, CMST continued to withhold such information from Plaintiffs.  Toll had no explanation for why, although the calculations were complete, it took until February 20 to get the calculations to Hausfeld and Lewis, except to say that "you have to ask our counsel.  They – we had – they had the numbers.  We didn't send it to Hausfeld."  (Toll, Aug. 11, 2009, 235:6-16).

On February 19, 2009, Plaintiffs' counsel sent yet another email to CMST's counsel indicating Plaintiffs were "**still** awaiting information regarding [their] capital accounts."  (PX 39) (emphasis in original).  CMST's counsel responded later in the day on February 19: "My apologies again.  We had expected that the numbers would be to you by now.  I will follow up."  (PX 40).  Yet, by this time, according to Toll, the calculations were already complete, had been approved by CMST's executive committee, and even had been forwarded to the firm's counsel for release to Plaintiffs.  (Toll, Aug. 11, 2009, 234:23-235:16; Toll, Aug. 13, 2009, 70:7-15; 72:11-13; PX 40).  Accordingly, either CMST's counsel was being coy with Plaintiffs'

counsel – which Plaintiffs' counsel doubts – or Toll continued to withhold the calculations even from his own attorneys, waiting for the *OSB* fees to come in.

> 5.  Only After Confirming Receipt of the *OSB* Fees, CMST Released the Calculations, Knowing They Would Cause an "Explosion"

At 2:29 p.m. on February 20, 2009, CMST partner Patrick Tillou confirmed to Toll and others that CMST was in receipt of the fees related to the *OSB* litigation, reporting that "[t]he eagle has landed, sort of." (PX 42; Sellers, Aug. 11, 2009, 7:15-8:4). Just one hour later, at 3:37 p.m., CMST's counsel finally sent Plaintiffs' counsel an email attaching Plaintiffs' capital account information, with "apologies for this taking so long." (PX 41; Sellers, Aug. 11, 2009, 8:20-9:2; Toll, Aug. 11, 2009, 238:19-239:1). This was a month and ten days after Toll had first received the calculations from Diamond. (Toll, Aug. 13, 2009, 71:7-9).

Within several hours after CMST finally furnished its calculations to Plaintiffs, Toll wrote the following email to CMST member Joseph Sellers, in response to Sellers' telling Toll that all lingering concerns about the *OSB* fees were squared away: *"ok, thanks – sounds fine. Now, can't wait for trhe [sic] MDH explosion re the capital account – we should be okay on that, but I expect a repeat trip to Phildelphia [sic] to see the Magistrate."* (PX 42) (emphasis added).

In just a handful of words, this email explains much of what the Court preliminarily has described as CMST's "shocking" and "disturbing" "lack of candor" with regard to Plaintiffs' capital account balances. Toll testified that he thought Hausfeld would explode because Toll expected that "when [Hausfeld] saw a number

49

that's less than the 5 million, he would not be happy." (Toll, Aug. 11, 2009, 237:7-14; Toll, Aug. 13, 2009, 85:13-18). Toll, in other words, knew that Hausfeld expected $5 million; and he undoubtedly knew this because, as Hausfeld and Eisler testified, this is the figure that Hausfeld expressly mentioned during mediation. Yet as Toll conceded, he stood silent regarding the anticipated figures for Hausfeld and Lewis, despite knowing that CMST would claim that Hausfeld's and Lewis' capital accounts had suffered a "not insubstantial decline." (Toll, Aug. 13, 2009, 152:13-21).

Toll further explained that he expected Hausfeld would "explode" because after seeing the calculations, Hausfeld would "recognize that he and [his counsel] made a mistake in negotiating this deal . . . ." (Toll, Aug. 13, 2009, 85:25-86:8). In other words, Toll believed that, by virtue of what he saw as Hausfeld's comparatively inferior knowledge of the firm's operating agreement, (Toll, Aug. 11, 2009, 237:15-19). CMST had exploited a negotiating advantage over Hausfeld – an advantage that Hausfeld would recognize once CMST finally provided him its figures. And as evidenced by his statement that he "*can't wait*" to see Hausfeld's "explosion," Toll relished the idea of angering and punishing Hausfeld, particularly if it involved outsmarting him. (PX 42).

By anticipating both an "explosion" and a "return trip" to this Court, Toll doubtlessly understood that what CMST had done was, at the very least, controversial. The prefatory words in Toll's email – "ok, thanks – sounds fine. *Now* . . ." – underscore this understanding. (*Id.*). They show that Toll withheld the

information regarding Plaintiffs' capital account balances until after receiving the *OSB* fees because he knew that, if Plaintiffs had been provided CMST's bad faith calculations beforehand, they would have sought to delay the payment of *OSB* fees until the matter of the capital account balances could be resolved by this Court.

**B.      CMST's Withholding of Plaintiffs' Capital Account Balance Calculations Constitutes Fraudulent Inducement or, Alternatively, Material Omission**

The evidence set forth above shows that Toll knew Plaintiffs were expecting far greater liquidating capital distributions than CMST now claims they should receive, and that CMST withheld its calculations so that it could (i) obtain concessions from Plaintiffs in the Settlement Agreement, and then (ii) enjoy some of the most important fruits of the deal – *i.e.*, the *OSB* fees – before Plaintiffs had a chance to protest that CMST was not living up to its end of the bargain. Accordingly, the evidence shows that CMST fraudulently induced Plaintiffs to enter into the Settlement Agreement.

To prove fraudulent inducement, the following elements must be satisfied: (i) a false representation (or omission), (ii) made (or omitted) in reference to a material fact, (iii) with the knowledge of its falsity (or materiality), (iv) with the intent to deceive, and (v) action taken in reliance on that representation (or omission)). *Sage v. Broadcasting Publications, Inc.*, 997 F.Supp. 49, 51-52 (D.D.C. 1998). D.C. case law makes clear that "concealment or suppression of a material fact is as fraudulent as a positive direct misrepresentation . . . ." *Andolsun v. Berlitz Schools of Languages of America, Inc.*, 196 A.2d 926, 927 (D.C. 1964); *see also Pyne v. Jamaica*

51

*Nutrition Holdings, Ltd.*, 497 A.2d 118, 131 (D.C. 1985) ("Nondisclosure of material information may constitute fraud . . . especially where there is a duty to disclose.").

Each of the elements of fraud is met here. First, during the mediation, CMST withheld information it had about what it claimed to be the substantial diminution in Plaintiffs' capital account balances. Second, because Plaintiffs' liquidating capital account balances were a key feature of the settlement negotiations and, ultimately, the Settlement Agreement, the withheld information was material. Third, CMST undoubtedly knew the information was material, as the parties spent a substantial amount of time negotiating the capital account aspect of the Settlement Agreement. Fourth, CMST intentionally withheld the information in order to obtain and exploit what it saw as a negotiating advantage, rooted in what Toll believed to be his superior knowledge of the firm's accounting practices. And fifth, Plaintiffs took action in reliance on CMST's omissions by executing an agreement they never would have executed had they been in possession of the information that CMST possessed.

Even if the Court were to find that CMST's omissions were not made with an intent to deceive, CMST's omissions, at the very least, constitute actionable material misrepresentation. To prove a material misrepresentation or omission claim, the plaintiff must show that the defendant made an assertion (or omission): "(1) that was not in accord with the facts, (2) that was material, [] (3) that was relied upon (4) justifiably by the recipient in manifesting his assent to the agreement . . . [and (5)] that the recipient relied to his detriment." *Barrer v.*

*Women's National Bank*, 761 F.2d 752, 757-58 (D.C. Cir. 1985); *Stein v. Treger*, 182 F.2d 696, 699 (D.C. Cir. 1950) ("representations, even though believed to be true, or made as of one's own knowledge, are fraudulent if, in fact, false [even when] innocent of any wrongful intent"); *Addy v. Piedmonte*, 2009 WL 707641, at *18, n. 98 (Del. Ch. 2009) ("innocent or negligent misrepresentations or omissions suffice to prove equitable fraud").

The evidence adduced at trial satisfies the elements of material omission for the same reason it satisfies the element of fraud. The only difference is that, to prove material omission, the evidence need not demonstrate CMST's intent to deceive.

CMST has defended against Plaintiffs' claims of fraud and material omission by arguing that Hausfeld and Lewis, as sophisticated parties, could not have believed that their capital accounts would not be depleted given the firm's purportedly anemic financial condition as of October 31, 2008. This is not, however, a legal defense to Plaintiffs' claims. Regardless of Plaintiffs' level of sophistication, and regardless of the fact that Hausfeld had been chairman of CMHT, CMST was obligated to disclose the specific information it had within its sole possession about Plaintiffs' capital account balances because of its ongoing contractual and fiduciary duties to treat Plaintiffs with honesty and fairness in connection with the return of their capital – duties with which Plaintiffs fully trusted CMST to comply, particularly in the context of an open mediation before a federal court. (Hausfeld, Aug. 12, 2009, 46:9-13). *See Kero v. Terminal Constr. Corp.*, 78 A.2d 814, 818 (N.J.

53

1951) (citing cases); 37 C.J.S. *Fraud* § 59 (2008) ("the general rule requiring the [victim of fraud] to exercise due diligence, and to avail himself or herself of a means of knowledge within reach, does not apply where a relation of trust or confidence exists between the parties . . . and in such cases the [trusted party] is under a duty to make a full and truthful disclosure of all material facts and is liable for either misrepresentation or concealment . . . "); *cf. In re U.S. Office Products Co. Securities Litigation*, 251 F.Supp.2d 58, 74-75 (D.D.C. 2003) (in the District of Columbia, in the context of fraud, "one cannot close his eyes and rely blindly upon the assurances of another *absent some fiduciary relationship* . . .") (emphasis added); *Fishman v. Estrin*, 501 F.Supp. 208, 211 (D.D.C. 1980) (stating that a reasonable person "has every right to believe that persons of 'high integrity' will carry out their contracts.").

Moreover, CMST's defense is not supported by the evidence. There was no way Plaintiffs, regardless of their sophistication, could have known that CMST would act in bad faith by using their 2007 percentage interests to determine their shares of the firm's loss as of October 31, while at the very same time using their 2008 percentage interests for voting purposes to effectuate Hausfeld's expulsion from the firm. Plaintiffs could not have foreseen anything like this because it is so palpably unfair. They also could not have foreseen it because: (i) the Operating Agreement did not permit such inconsistent application of members' percentage interests; (ii) Toll's November 5, 2008 memorandum declared the Compensation Committee's percentage interest decisions to be "retroactive to the beginning of 2008 and effective immediately," and did not suggest in any way that the decisions

54

somehow were ineffectual only for profit/loss-sharing purposes; and (iii) the firm always had used the most recent percentage interest determinations to calculate a departing partner's share of the firm's income or loss to arrive at a liquidating capital account balance.

Hausfeld and Lewis also could not have actually known the firm's loss figure as of October 31, 2008, because the firm's October financial statement was not available prior to Hausfeld's and Lewis' terminations. (Sellers, Aug. 11, 2009, 91:14-92:10; Toll, Aug. 11, 2009, 227:7-17). As the Court observed, "[f]or all [Hausfeld] knew, you guys could have turned the firm around by that October statement. He didn't get the benefit of that financial statement, because he was out the door." (Aug. 13, 2009 Tr. at 298:24-299:2). And indeed, at the time of Plaintiffs' terminations, Plaintiffs understood that the firm's financial condition *was* turning around. Just days beforehand the terminations, CMHT members informed SunTrust that the firm had sufficient accounts receivable from earned-and-soon-to-be-received fee awards to timely satisfy its outstanding debt. (Hausfeld, Aug. 12, 2009, 17:1-17; Sellers, Aug. 11, 2009, 74:13-21-75:15; 91:1-7). Additionally, on the day of Hausfeld's expulsion, Toll sent SunTrust a painstakingly detailed letter explaining both these accounts receivable and other fees the firm expected to bring in by year end. (PX 68). Neither Hausfeld nor Lewis, therefore, had reason to believe that the loss as of October 31, 2008 would be as high as CMST said it was. If CMST had given them information showing that CMST thought they were wrong, that would "have been the right thing to do," as the Court observed, and at the very