least would have given them "a chance to walk away [from entering into the Agreement] if [they] didn't want to do it." (Aug. 13, 2009 Tr. at 296:8-16).

### C.    CMST's Fraud or Material Omission Entitles Plaintiffs to Damages in the Amount of What They Were Led To Believe They Would Receive

When a party to a contract proves fraud or a material misrepresentation or omission in connection with the execution of a contract, it can elect either to seek rescission or to affirm the contract and sue for damages. *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 840 (D.C. 1983). As Plaintiffs indicated in their letter to the Court on September 3, 2009, they have elected to affirm the Settlement Agreement and seek damages. Where, as here, affirmation is elected, an accepted measure of damages is "the difference between the value of that which was contracted for and the value of that which was received." *Kent Homes v. Frankel*, 128 A.2d 444, 446 (D.C. 1957). This measure of damages is known as the "loss of the bargain" or "benefit of the bargain."[5] Under the "benefit of the bargain" rule, the defrauded party is put in the same financial position as if the fraudulent misrepresentations or omissions had in fact been true. *Goldstein v. Miles*, 859 A.2d

---

[5] In the District of Columbia, when a victim of fraud elects to affirm the contract and sue for damages, the damages may be computed using either the "out of pocket" rule or "loss of the bargain" rule. Although the "out of pocket" rule – where the measure of damages is the difference between the amount paid and the market value of the thing acquired – is preferred in D.C., the "loss of the bargain" rule is applied when the "out of pocket" rule cannot be practically applied or otherwise when "necessary to effect justice." *Dresser*, 465 A.2d at 840 n.18. "Out of pocket" damages are not practicable here because the contract at issue – the Settlement Agreement – does not entail a readily determinable amount paid nor can a market value fairly be placed on what was acquired. Therefore, using the "loss of the bargain" rule is required.

313, 324 (Md. Ct. Spec. App. 2004). Similarly, a victim of fraud, misrepresentation or inequitable conduct can elect equitable relief whereby the court ensures that the effects of the writing correspond with the expectations of the victim at the time he was induced to enter into the contract. *Davis v. Gulf Oil Corp.*, 485 A.2d 160, 171 (D.C. 1984) (citing *Cafritz v. Cafritz*, 347 A.2d 267, 269 (D.C. 1975)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 166 (1981). This equitable remedy and a calculation of damages using the "benefit of the bargain rule" provide similar relief.

In this case, Hausfeld and Lewis believed that their liquidating capital account balances would differ only marginally from the balances at the end of 2007 because of representations made by CMST in September 2008, because the amount of CMHT's accounts receivable at the time of their terminations showed that the firm was in a "flat" position for the year, and because by the time of the settlement negotiations, it was clear that the firm in fact had had a flat year, eliminating its debt to SunTrust by year end. CMST reinforced Plaintiffs' beliefs during the January 23 mediation session, when, in the face of Hausfeld's clear statements that he believed his balance had not changed appreciably, Toll never disclosed CMST's position that the balances had suffered a "not insubstantial decline."

Although Plaintiffs' express understanding that their balances would change some, but not much, makes it difficult to specify the exact amount owed under the equitable principles explained above, a fair and equitable result mandated by those principles would be to calculate their balances by subtracting from their year-end

2007 balances the product of their correct, 2008 percentage interests and the firm's profit/loss, determined on a tax basis, as of November 30, 2008. This calculation produces the same liquidating balances determined in Section I above – *i.e.*, **$4,694,244** to Hausfeld and **$1,010,939** to Lewis. Such a result is appropriate under the benefit of the bargain rule and equitable principles because it is consistent with Plaintiffs' understanding, confirmed by Toll's November 6, 2008 letter to SunTrust and the firm's subsequent receipt of awarded fees, that the firm was in a "turnaround" or near break-even position at the time of their departure. This result, in other words, is appropriate because it approximates Plaintiffs' understanding that their final balances would be marginally, but not appreciably, different than their balances as of December 31, 2007.[6]

## III.    PLAINTIFFS ARE ALTERNATIVELY ENTITLED TO A RETURN OF THEIR CAPITAL ACCOUNTS USING BOTH THEIR 2008 EFFECTIVE PERCENTAGE INTERESTS AND AN INCOME/LOSS FIGURE AS OF OCTOBER 31 THAT IS CALCULATED IN ACCORDANCE WITH THE

---

[6] Another way to calculate Plaintiffs' damages under the benefit of the bargain and equitable theories set forth above is to apply Plaintiffs' 2008 percentage interests to the CMHT's tax basis book loss as of October 31, 2008, and then add back for Hausfeld LLP half of the fees CMST ultimately received from the *OSB* case. This alternative is rooted in the fact that, to finalize the deal struck on January 23, Plaintiffs gave up their earlier, fully justified demand for 50% of the *OSB* fees in exchange for an accelerated return of what they fairly believed was in their capital accounts. (To finalize the deal, as the Court knows, Hausfeld LLP also gave up all entitlement to the substantial, pre-November 6 lodestar in another significant case - - the *Air Cargo* case.) The result of this alternative is as follows: Hausfeld amount [$4,994,901 (year end 2007 balance) - (13.31% x $6,912,175 (loss as of Oct. 31)) - $8,750 (last guaranteed draw)] + Lewis amount [$1,163,142 (year end 2007 balance) - (6.56% x $6,912,175) - $8,333 (last guaranteed draw)] + 1/2 of *OSB* fee [$2,840,662 (*see* PX 42 at CMST 01357) / 2] = $6,187,842. Of this total amount, Hausfeld would receive $4,066,141, Lewis would receive $701,370 and Hausfeld LLP would receive $1,420,331.

## CMHT OPERATING AGREEMENT'S REQUIREMENT THAT THE FIRM'S BOOKS BE KEPT IN ACCORDANCE WITH GAAP

The Settlement Agreement incorporates the Operating Agreement's express requirement that CMHT's books and records be kept in accordance with GAAP. Accordingly, as an alternative to the remedies already discussed, Hausfeld and Lewis are contractually entitled to have their capital account balances recalculated as follows: (i) for the reasons discussed in Section I above, use their effective percentage interests, as determined by the Compensation Committee on November 5, 2008, to determine their respective shares of the firm's income/loss as of their dates of termination; **_and_** (ii) because of the GAAP requirement (and additionally because of the equity-triggering breaches CMST committed by using the 2007 percentage interests), adjust the firm's income/loss calculations as of October 31, 2008, based on GAAP-compliant accounting, as Plaintiffs' expert William Bavis did.

### A.   CMST Materially Breached the Settlement and Operating Agreements by Failing to Calculate Plaintiffs' Capital Account Balances Using GAAP

Article Second, Section D of the Operating provides that CMHT's "books of account shall be kept and continually maintained in accordance with [GAAP]." (PX 2 at Art. 2(D); Bavis, Aug. 11, 2009, 142:1-7). The accrual method of accounting is consistent with GAAP; the income tax basis method of accounting is not. (Drolet, Aug. 10, 2009, 202:11-24). The accrual method is consistent with GAAP because it "is the method that gives the most accurate picture of a firm's financial condition." (Drolet, Aug. 10, 2009, 202:17-24; *see also* Bavis, Aug. 11, 2009, 159:21-160:12; 170:5-171:9). *See JCM Constr. Co., Inc. v. Orleans Parish School Bd.*, 860 So.2d

610, 631 (La. App. 2003) ("Accrual accounting is preferred because it is a fair reflection of what the business is actually doing, since the costs and expenses associated with revenue are matched to that revenue.").

CMHT added the GAAP provision to the Operating Agreement in 2003. (Toll, Aug. 11, 2009, 239:3-15). The firm had not before required its books and records to be maintained in accordance with GAAP. (*Compare* PX 2 at Art. 2(D) *with* PX 6 at Art. 2). According to Hausfeld's uncontroverted testimony, the GAAP provision was the result of Hausfeld's and Toll's joint desire to amend the former Operating Agreement so that the firm would diminish the termination allowances given to departing partners, but at the same time ensure that the firm would recognize departing partners' economic stake in the firm's accounts receivable, *i.e.*, the fees that had been awarded, but not yet paid, for work done while such departing partners were at the firm. (Hausfeld, Aug. 12, 2009, 21:9-24:3). Toll conveyed this desire to the firm's outside attorneys, who drafted the amended Operating Agreement. (*Id.* at 22:24-23:2). The results were a less generous termination allowance provision, coupled with a revised provision stating that a departing partner's interest in accounts receivable would be reflected not only in the termination allowance (as under Art. 11(F)(2) of the old Operating Agreement), but *also* in the return of capital. (*Compare* PX 2 at Arts. 2(D), 9(E), 10 and 11 *with* PX 6 at Arts. 3(C), 7(B) and 11)). Plaintiffs' expert William Bavis offered uncontradicted testimony that, from a purely economic standpoint, the changes between the old Operating Agreement and the new Operating Agreement justified the adoption of

the GAAP requirement, because without it, a departing partner's interest in accounts receivable would never be reflected in the return of capital, despite the language of Article Ninth, Section E of the new Agreement saying that it is intended to be. (Bavis, Aug. 11, 2009, 163:2-165:14; *see also* Drolet, Aug. 10, 2009, 214:12-215:16). Despite the 2003 changes in the Operating Agreement, CMHT did not begin keeping its books of account in accordance with GAAP. (Drolet, Aug. 10, 2009, 105:3-6; Toll, Aug. 13, 2009, 28:11-16). Accordingly, when it came time to calculate Hausfeld's and Lewis' capital account balances, the October 2008 income statement that was used to perform such calculations was not done according to GAAP. It was instead done using the income tax basis method of accounting. Had the books of account been kept in accordance with GAAP, as required by the 2003 Operating Agreement, this income statement would have been done according to GAAP (Drolet, Aug. 10, 2009, 109:12-21), particularly because Plaintiffs' interests in accounts receivable would not be reflected in the return of their capital, as contemplated by the Operating Agreement (PX 2, at Art. 9 (E)), unless the income statement were done according to GAAP. (Bavis, Aug. 11, 2009, 163:2-165:14; *see also* Drolet, Aug. 10, 2009, 214:12-215:16).

The result of using the tax basis method of accounting, rather than the accrual method, to calculate CMHT's income/loss as of October 31, 2008, was to radically understate CMHT's real world financial condition as of that date. (Bavis, Aug. 11, 2009, 150:7-16; 159:21-160:12; 170:5-171:9 214:13-215:2). *See, e.g., JCM Constr. Co., Inc.*, 860 So.2d at 631; *American Fletcher Corp. v. United States*, 832

61

F.2d 436, 439-40 (7th Cir. 1987) (because cash method of accounting, unlike the accrual method, does not clearly reflect income, "[t]he use of the cash method . . . is particularly inappropriate for [a business that] generates substantial amounts of receivables.") (*citing* Finney & Miller, *Principles of Accounting*-Intermediate 12 (7th ed. 1974)).   As a result, using the tax basis method of accounting also radically understated Plaintiffs' actual economic interests in the firm.  (Bavis, Aug. 11, 2009, 150:7-16; 159:21-160:12; 170:5-171:9 214:13-215:2), depriving them of their interests in the firm's substantial accounts receivable, contrary to Toll's and Hausfeld's intentions in having an amended Operating Agreement prepared.   The October income statement showed a loss of roughly $6.9 million.  (PX 21).  But this book loss did not reflect genuine, out of pocket loss to CMHT or its partners.  In real world terms, what it reflected was debt – money owed on the firm's annual line of credit with SunTrust Bank.  (*See* Hausfeld, Aug. 12, 2009, 17:1-7; 20:6-11; Sellers, Aug. 11, 2009, 86:3-5).  And as of October 31, 2008, the firm knew it would pay off that debt and erase any tax basis book loss by the end of the year.  In fact, on nearly the very same day, CMHT members met with SunTrust and assured them, based on accounts receivable, that the debt would be timely paid off.  (Hausfeld, Aug. 12, 2009, 17:8-17).  Moreover, just six days after October 31, on November 6, Toll sent a six-page, single-spaced letter to SunTrust setting forth all of the fees and other revenues that CMHT represented would be coming in by the end of the year and assuring SunTrust that these revenues would be sufficient to pay down the line of credit.  (PX 70).  These assurances were sufficient to persuade SunTrust not to call

62

the line of credit before the end of the year, which it had threatened to do. (Sellers, Aug. 11, 2009, 66:20-67:1; Toll, Aug. 13, 2009, 102:17-23, 109:24-110:10).

Consistent with all of its projections and representations about its financial stability, CMST paid off the line of credit, suffered no loss, and actually realized net income of over half a million dollars by the end of 2008. (PX 78 at 5). Accordingly, as expected, the firm's books showed a swing of approximately $7.4 million in the last two months of the year, with the firm realizing over a third of its annual revenue in those two months alone. (PX 11; PX 12; Bavis, Aug. 11, 2009, 170:5-171:9; Drolet, Aug. 10, 2009, 128:21-23; Sellers, Aug. 11, 2009, 80:1-82:14). Based in part on the firm's profit in 2008, the capital accounts of each of the equity partners who remained at CMST at the end of the year actually increased during 2008. (PX 78 at 8; PX 108). At the same time, as noted, the capital accounts of Plaintiffs Hausfeld and Lewis were reduced by $1,941,785.42 (39%) and $476,947.98 (41%) during 2008. (Id.). As a result, by failing to use GAAP-compliant accounting, CMST's partners effectively shifted income from Plaintiffs Hausfeld and Lewis to themselves. According to CMST's internally-prepared, year-end capital income net income calculations, the firm had a tax basis loss of $2,356,653 at the end of 2008; but after allocating more than $2.4 million in losses to Plaintiffs, as well as a small amount to another terminated partner, the remaining partners suddenly shared net income of $367,773. (PX 21 at CMST 01447). CMST's reviewed financial statement and corresponding work papers, prepared by Drolet and her firm, contain corrected numbers, but similarly show that, by using the tax basis method of accounting,

63

CMST's partners effectively took over $2.4 million from Plaintiffs. (PX 78 at 108, PX 108; Bavis, Aug. 11, 2009, 165:23-168:8).

**B.      Plaintiffs' Remedy for CMST's Breach of Contract is a Return of their Capital Based on an Income Statement Calculated in Accordance with GAAP**

To remedy CMST's breach of the GAAP provision of the Operating Agreement, together with the various bad faith breaches CMST committed in using Hausfeld's and Lewis' 2007 percentage interests, this Court may recalculate the capital account balances using both a GAAP-corrected October 2008 income statement and the percentage interests determined by the Compensation Committee on November 5, 2008. This is what Mr. Bavis did in his trial testimony. He arrived at figures consistent with the Operating Agreement's requirements by using the accrual method to calculate the firm's income/loss as of October 31 (PX 62; PX 63; PX 64), and then by applying Hausfeld and Lewis' percentage interests to arrive at the liquidating balances. (Bavis, Aug. 11, 2009, 142:1-7). Bavis explained that, because the accrual method much more accurately captured the firm's financial condition as of October 31, an accrual method-based calculation provides a fairer result, particularly in light of the fact that the firm swung from a $6.9 million loss on October 31 to a $0.5 million profit just two months later, 45 percent of which was attributable to Hausfeld-generated cases. (Bavis, Aug. 11, 2009, 159:21-160:12; 170:5-171:9).

Using the accrual method of accounting, CMHT had approximately $7.5 million dollars more in net income as of October 31 than CMST now claims. (PX 62;

64

Bavis, Aug. 11, 2009, 148:11-150:11). Accordingly, rather than showing a book loss of $6,925,152 million as of October 31, 2008, CMHT's October 2008 income statement should have shown net income of $430,377. (PX 64; Bavis, Aug. 11, 2009, 150:13-16). This is a conservative estimate. (Bavis, Aug. 11, 2009, 213:13-214:2). Although Toll projected in his letter to SunTrust that the firm would bring in between $43 and $47 million in November and December 2008, Bavis himself only accounted for $7,845,720 using GAAP. (PX 63; PX 70; Bavis, Aug. 11, 2009, 212:10-25).[7]

After determining that, based on the accrual method, the firm had a profit of $443,353.61 as of October 31, 2008, Bavis went on to calculate Hausfeld and Lewis' capital accounts using their effective percentage rates, based on the percentage interests determined by the compensation committee on November 5, 2008. (Bavis, Aug. 11, 2009, 155:3-9). Applying an effective 13.31% for Hausfeld and an effective 6.56% for Lewis, the final balances are **$5,045,180.67** for Hausfeld (PX 66) and **$1,183,911.97** for Lewis. (PX 67). These figures, to be sure, are required by the plain terms of the Operating Agreement. Additionally, however,

---

[7] CMST apparently claims that Bavis' calculations are inaccurate because they do not reflect a nearly $5 million write-down of client advances determined to be unrecoverable in certain cases. But as Bavis persuasively explained, this $5 million write-down would *not* affect accrual method calculations as of October 31, 2008, because the firm decided that the write down could not be recognized until December 31, 2008. (Bavis, Aug. 11, 2009, 188:12-192:3). Bavis also explained that several other expense items would not have an impact on his accrual method calculations as of October 31. (Bavis, Aug. 11, 2009, 181:1-181:21; 184:4-10; 184:16-185:10; 187:2-188:10). To the extent, however, that there are expense items that CMST claims might have such an impact, the Court, to settle on final numbers,

given the firm's fully anticipated turnaround in November and December 2008 (as well as the bad faith breaches CMST committed by applying the 2007 percentages), they achieve equity.  In contrast to the tax basis-derived figures that CMST has set forth, these figures capture Plaintiffs' true economic interests in CMHT, including their interest in accounts receivable, at the time they were terminated.

## C.    The GAAP Provision in the Operating Agreement Is Enforceable Against CMST

### 1.    The GAAP Provision Is Not a Mistake

In an attempt to get out from under the terms of the Operating Agreement, CMST has characterized the GAAP provision as a mistake.  (*See* CMST's Pre-Trial Submission at 11; Milstein, Aug. 12, 2009, 123:13-25).  There is no evidence, however, that the GAAP provision, which was drafted by counsel and signed by all of CMHT's members, was a mistake.  To the contrary, Hausfeld's uncontroverted testimony about why the Operating Agreement was amended in 2003, coupled with Bavis' uncontroverted testimony about why it made economic sense to insert the GAAP requirement into the new Agreement, demonstrates that the adoption of the GAAP requirement was intentional.

To establish mutual mistake, one must prove by ***clear and convincing evidence*** that all interested parties reached an agreement as to the issue in contention, but that "in reducing such agreement . . . to writing, through the mistake common to [all] parties, the written instrument fails to express the real

---

could order CMST to provide that *yet-to-be-furnished information* to Bavis and have Bavis make any necessary corrections to his calculations.

66

agreement." *Brockmeyer v. Norris*, 10 A.2d 326, 329 (Md. 1940); *see also Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 423-424 (D.C. 2006) (citing *Issac v. First Nat'l Bank*, 647 A.2d 1159, 1163 (D.C. 1994)). In other words, when a party challenges the provisions of an unambiguous contract, it must provide "clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement." *Cereberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1153 (Del. 2002) (the purpose of requiring clear and convincing evidence to prove mistake is to "uphold a contract as to the parties' written expression of their intent"); *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932 (Del. Ch. 2004) (defendant's assertion that provision of partnership agreement relating to distribution of taxes was a product of mutual mistake and therefore should be reformed was denied because the defendant did not offer sufficient evidence of a prior agreement as to contested provision).

Courts have held that mutual mistake is unlikely to be found when a contract is the product of negotiations over multimillion dollar transactions conducted by counseled businessmen dealing at arm's length. *See RS & P/WC Fields Limited Partnership, et al. v. BOSP Investments*, 829 F.Supp. 928, 969 (N.D.Ill. 1993); *Chimart Associates v. Paul*, 66 N.Y.2d 570, 574 (N.Y.App. 1986). In these circumstances, a failure to read the agreement does not rise to the level of mutual mistake necessary for contract reformation. *Id.*

There is no evidence, let alone clear and convincing evidence, that when the Operating Agreement was amended in 2003 to prescribe GAAP-compliant

67

accounting for the firm's books and records, the firm's members had a different agreement as to how the books and records ought to be kept. There was no discussion or agreement among all the members that they wanted to maintain the books and records on an income tax basis. (Sellers, Aug. 11, 2009, 36:5-12; Hausfeld, Aug. 12, 2009, 25:3-8; Lewis, Aug. 10, 2009, 303:9-13). In fact, there was no discussion of all the partners about *any* method of accounting. (Sellers, Aug. 11, 2009, 36:10-14; Hausfeld, Aug. 12, 2009, 25:3-12; Lewis, Aug. 10, 2009, 14-17). Additionally, there is no evidence of any other agreement signed by all the partners in the firm that calls for any method of accounting other than GAAP. (Toll, Aug. 11, 2009, 240:7-15; Drolet, Aug. 10, 2009, 110:10-19, Hausfeld, Aug. 12, 2009, 25:3-12; Lewis, Aug. 10, 2009, 303:14-17). The *only* document signed by all partners which prescribes the method of accounting for the firm is the 2003 Operating Agreement that calls for GAAP. (Drolet, Aug. 10, 2009, 220:16-20; Hausfeld, Aug. 12, 2009, 24:4-8; Toll, Aug. 11, 2009, 240:7-15).

Moreover, the record contains uncontroverted evidence that the GAAP provision was intentionally inserted into the 2003 Agreement and that, when the 2003 Agreement is compared to the former Operating Agreement, the GAAP provision makes economic sense. As discussed above, Hausfeld and Toll agreed to direct the firm's outside counsel to revise the Operating Agreement in 2003 so that the amended Agreement would substantially curtail a departing partner's right to a termination allowance but nevertheless give him or her a continuing interest in accounts receivable. (Hausfeld, Aug. 12, 2009, 21:15-23:15). A comparison of the

68

old and new agreements shows that this was accomplished by, *inter alia*, making departing partners eligible for termination allowances only if they have been at the firm 10 years (PX 2 at Art. 11(A)) (rather than for any length of time, no matter how small (PX 6 at Art. 11)) , by significantly reducing the amount of any termination allowance (from a maximum of over $1.5 million as of 2002 (PX 6 at Art. 11) to $500,000 (PX 2 at Art. 11(A)), by taking away the termination allowance entirely if the departing partner engages in competitive legal practice (PX 2 at Art. 9(F)) (which the old Agreement did not do (PX 6 at Art. 11(D)), by providing that the partner's interest in accounts receivable be reflected not only in the termination allowance, but also in the return of capital (*compare* PX 6 at Art. 11(F) at 12 *with* PX 2 at Art. 9(E)), and finally, by ensuring that accounts receivable are reflected in the return of capital by requiring, for the first time, the books and records to be kept according to GAAP.  (PX 2 at Art. 2(D); Drolet, Aug. 10, 2009, 203:7-215:8; Bavis, Aug. 11, 2009, 162:15-165:14).

As Bavis testified—and as Drolet admitted—the changes from the 1996 to 2003 Operating Agreements "were meaningful differences between the two agreements in economic terms . . . ." (Bavis, Aug. 11, 2009, 164:3-7; Drolet, Aug. 10, 2009, 215:9-15).  In addition, Bavis testified that these changes made sense from an economic standpoint because, given the insertion of the GAAP provision in the 2003 Operating Agreement, a departing partner is "giving up their rights to the accounts receivable, [but] now they're giving it up in exchange for their interest in their capital account." (Bavis, Aug. 11, 2009, 163:2-165:14).

69

There is no evidence of any agreement as to how to calculate a departing partner's capital account other than what is reflected in the Operating Agreement. Given this, the uncontroverted testimony of Hausfeld, Bavis and Drolet, and CMST's failure to provide any evidence, much less clear and convincing evidence, of a separate agreement of all the members calling for income tax basis accounting, CMST's assertion that the GAAP provision is a mistake is groundless.

2.    The GAAP Provision Was Not Modified by CMHT's Course of Conduct

CMST also claims that the GAAP provision has been obviated by the firm's course of dealing since 2003, when the Operating Agreement went into effect. There is, however, insufficient evidence to conclude that the parties' course of conduct modified the Operating Agreement to allow for tax basis accounting.

In order to prove that there has been an oral modification of the Operating Agreement through the parties' course of conduct, CMST must show that, as to the parties' conduct, there has been "such specificity and directness as to leave no doubt of the intention of the parties to change what the previously solemnized by formal document." *Rexnord Industries, LLC v. RHI Holdings, Inc.*, 2008 WL 4335871, at *8 (Del. Super. Ct. Sept. 23, 2008) (internal quotation marks omitted); *see also* 17A AM. JUR. *CONTRACTS* § 513 (2004).   Moreover, given the plain language in the Operating Agreement restricting any amendments to those that have been reduced to writing upon a two-thirds vote of the percentage interests (PX 2 at Art. 14(G)), CMST must show that that written amendment requirement was waived, and that

70

the parties agreed to the new terms through their conduct.  As the Michigan Supreme Court recognized:

> [W]hereas an original contract's written modification or anti-waiver clauses do not serve as barriers to subsequent modification by express mutual agreement, the significance of such clauses regarding the parties' intent to amend is heightened where a party relies on a course of conduct to establish modification.  This is because such restrictive amendment clauses are an *express mutual statement* regarding the parties' expectations regarding amendments. . . . Any clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses.

*Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258-59 (Mich. 2003).  *See also Continental Insurance Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) (noting that the "parties' prior course of conduct, however, demonstrates that they did, in fact, on a prior occasion reduce a modification to writing" and therefore the modification requirement was not waived); *see also Rexnord*, 2008 WL 4335871, at *8 (acknowledging that although in some cases a provision requiring written modification can be waived by course of conduct, the provision "usually will not be waived if the parties have reduced a modification to writing on a prior occasion.").

In this case, the Operating Agreement clearly states that it "may be amended *only* with the written consent of Members owning at least two-thirds (2/3) of all Percentage Interests."  (PX 2 at Art. 14(G)) (emphasis added).  The uniform, uncontroverted testimony of every witness who testified on this subject was that

71

that the members *always* followed this procedure, such that every time the firm has amended the Operating Agreement, it has done so in writing. (Sellers, Aug. 11, 2009, 37:1-4; 38:5-8; Lewis, Aug. 10, 2009, 303:25-304:20; Toll, Aug. 13, 2009, 94:20-95:1; Hausfeld, Aug. 12, 2009, 25:20-23; Drolet, Aug. 10, 2009, 220:21-24). It is also the practice of the firm that there must be a vote of at least two-thirds of all percentage interests to amend the Operating Agreement. (Toll, Aug. 13, 2009, 98:5-13). The only way to amend the Operating Agreement has been to amend the agreements in writing by a vote of the membership; there has been "no other way." (Hausfeld, Aug. 12, 2009, 25:20-25). This is borne out by the fact that each of the seven amendments to the 1996 Operating Agreement (PX 2 at 1; Drolet, Aug. 10, 2009, 221:2-18; Sellers, Aug. 11, 2009, 37:8-17; Hausfeld, Aug. 12, 2009, 24:15-22) were in writing, that the Operating Agreement was amended in writing and restated in its entirety in 2003 (PX 2), and that when the firm terminated Hausfeld, it eliminated, in writing, the 30-day wind up period provision for involuntarily terminated partners. (PX 93).

The firm's uniform, historical practice of amending the Operating Agreement only in writing and only by a two-thirds vote of the percentage interests demonstrates that the members never intended to waive the Operating Agreement's express provision requiring that amendments be in writing. As a result, CMHT's members cannot have modified the GAAP provision by allowing the firm's books and records to be kept on an income tax basis. Indeed, if anything, CMST's members *reaffirmed* the GAAP provision when they signed the Settlement

72

Agreement earlier this year, as they raised no objections to having Hausfeld's and Lewis' capital account balances calculated "as provided for" in the Operating Agreement – which, again, requires, by its terms, the use of GAAP-based income statements.

Moreover, even apart from the writing requirement, the fact that CMHT kept its books using the tax method after the adoption of the 2003 GAAP requirement does not establish a course of conduct that obviates using the accrual method for the purpose of determining Plaintiffs' final capital account balances. The Nebraska Supreme Court's decision in *Darr v. D.R.S. Invs.*, 441 N.W.2d 197 (Neb. 1989), is instructive. In that case, a retiring partner brought an action for dissolution of a partnership and an accounting. *Id.* at 198. The partnership agreement provided for the use of cash basis accounting. *Id.* at 199. In the partnership's second year of operation, however, the business switched to accrual basis accounting for income tax purposes and, without amending the partnership agreement, used the accrual method for five years. *Id.* Notwithstanding this course of conduct, the Supreme Court of Nebraska held that the cash basis accounting method provided for in the partnership agreement should be used to determine the final balance of the retiring partner's capital account. *Id.* at 201-02. In reaching this conclusion, the Court noted that "all the partners of DRS were experienced businessmen and that they saw and had an opportunity to read the partnership agreement and to discuss it before signing it." *Id.* at 201. Additionally, the Court stated:

> Given the uncontradicted record that accrual accounting
> was solely motivated by income tax considerations, that

73

> the partnership could lawfully and properly use accrual accounting for that purpose only and cash basis accounting for other purposes, that the agreement provides for the use of cash basis accounting for partnership purposes, and that prior to this dispute accrual accounting was used only for income tax purposes, we find the valuation of a retiring partner's capital account should be determined upon a cash basis as provided in the agreement.

*Id.* at 202.

It is true in this case that, following the adoption of the Operating Agreement in 2003 and prior to Plaintiffs' departures, two CMHT members left the firm and (unbeknownst to Plaintiffs) had their final capital account balances determined using the tax basis method of accounting. But one of those members, Linda Nussbaum, protested the figures CMHT had produced and, as result of lengthy negotiations over the issue, received an extremely favorable, immediate lump sum payment of her *full* balance, rather than five payments stretched out over five years, as provided for in the 2003 Operating Agreement. (Hausfeld, Aug. 12, 2009, 67:19-68:4; DX 46 at Tab 5). Therefore, as in *Darr Investments*, there was no set course of dealing as to the method of determining return of departing partners' capital that displaced the plain terms of the 2003 Operating Agreement.

In light of the Operating Agreement's written amendment requirement, the firm's history of strictly adhering to that requirement, the firm's reaffirmation of that requirement when its members executed the Settlement Agreement, and the fact that firm had no established course of dealing as to the return of capital to departed partners under the Operating Agreement, CMST has not met its burden of

74

demonstrating that the parties modified the Operating Agreement to permit the firm to maintain, on an income tax basis, the financial statements used to determine departing partners' final capital account balances. Accordingly, Hausfeld's and Lewis' capital account balances may be, and should be, calculated using a corrected, GAAP-based October 2008 income statement.

3.    Plaintiffs Did Not Waive Enforcement of the GAAP Provision in Connection with the Calculation of Their Liquidating Capital Account Balances

CMST finally claims that the Operating Agreement's GAAP provision is unenforceable in the context of calculating Plaintiffs' liquidating capital account balances because Plaintiffs waived the right to its enforcement by failing to push for its application until now. Like the other defenses, this last defense is unavailing.

It is well settled that a party claiming waiver must show that there has been an intentional relinquishment or abandonment of a known right. *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936). Accordingly, waiver of a contractual right that is implied by conduct, as opposed to expressed orally or in writing, "may arise only if the actions or conduct of the person against whom the waiver is asserted are inconsistent with anything other than an intention to waive the right." *Kersey v. Washington Metropolitan Area Transit Authority*, 533 F.Supp.2d 181, 196 (D.D.C. 2008) (*quoting* 27 Williston on Contracts § 39:28 at 625-627 (4th ed. 2000)); *see also Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 360-361 (Md. 1974) (the assent necessary for an implied waiver must be clearly established and will not be inferred from doubtful or equivocal acts or language) (citation omitted); *Realty Growth*

75

*Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982) (waiver implies knowledge of all material facts, and intent to waive).

Here, Plaintiffs never intentionally waived their right to have GAAP used to adjust their liquidating capital account balances. Neither of them had knowledge that, under the 2003 Operating Agreement, the tax basis method of accounting would be used in those circumstances, and the record reveals no affirmative or unequivocal actions demonstrating their assent to waiving the GAAP requirement. Since the adoption of the 2003 Agreement and prior to Plaintiffs' departure, only two members, Paul Gallagher and Linda Nussbaum, left the firm and had their balances calculated. (Toll, Aug. 13, 2009, 45:12-14; 54:5-7; Drolet, Aug. 10, 2009, 126:3-11, Hausfeld, Aug. 12, 2009, 27:10-28:1). While both had those balances determined using tax basis income statements, Plaintiffs did not know this prior to their terminations in 2008. (Hausfeld, Aug. 12, 2009, 65:1-67:3; Lewis, Aug. 10, 2009, 303:9-21). That is because, among the members, only Toll handled accounting matters related to the capital accounts of departed members. (Toll, Aug. 13, 2009, 52:21-53:15; Sommers, Aug. 12, 2009, 99:12-16; Hausfeld, Aug. 12, 2009, 65:1-67:3; DX 46 (a large binder containing numerous documents regarding the liquidating balances of other departed members, *none* of which involving the actual calculation of the balances was authored or received by any member other than Toll)). And although Nussbaum's liquidating balance was a topic of discussion within the firm, neither Hausfeld nor Lewis were part of any conversations about the *accounting method* the firm used to arrive at her balance. (Hausfeld, Aug. 12, 2009, 65:1-67:3;

76

Lewis, Aug. 10, 2009, 303:9-21). In addition, as discussed in the prior Section, Nussbaum's protests actually secured a favorable, immediate lump sum payment; as a result, when Plaintiffs were terminated, there was no set custom about how capital account balances were determined. Without Plaintiffs possessing specific knowledge of how Gallagher's and Nussbaum's final balances were calculated, and without the firm even having an established practice of performing such calculations under the 2003 Operating Agreement, CMST cannot show, as it must, that Plaintiffs intentionally waived their contractual right to GAAP-computed liquidating capital balances.

Moreover, Hausfeld's uncontroverted testimony is that, when they discussed amending the Operating Agreement in 2003, Hausfeld and Toll actually *intended* departing partners to have their interest in accounts receivable reflected in their liquidating capital account balances, not just their termination allowances, as they wanted to scale back (and did scale back) the termination allowance considerably. (*See supra* at III.C.1; PX 2 at Art. 9(E)). Hausfeld further understood that the firm's lawyers had crafted an amended Agreement that effectuated that intention. (*Id.*). Hausfeld, therefore, had no reason to believe that his own balance would be calculated by a method that did not reflect accounts receivable. And because tax basis accounting does not reflect accounts receivable, while GAAP does, Hausfeld could not have not intentionally waived having his liquidating balance calculated according to GAAP.

77

CMST has not carried its burden of proving that Plaintiffs waived their contractual right to have their liquidating capital account balances determined under GAAP. *See, e.g., Darr*, 441 N.W. 2d at 201-02 (although partnership agreement, which required cash basis accounting, had been modified by course of conduct such that the books were maintained on an accrual basis, the reasons for the modification had nothing to do with the valuation of a departing partner's interest, and therefore departing partner's interest still had to be computed using cash basis method prescribed by the agreement).

## IV.   HAUSFELD AND LEWIS ARE ENTITLED TO AN AWARD OF PUNITIVE DAMAGES AND/OR ATTORNEYS' FEES AND COSTS BECAUSE OF CMST'S BAD FAITH CONDUCT

On account of CMST's bad faith in calculating Plaintiffs' capital account balances, as well as certain baseless litigation positions CMST has advanced to defend its misconduct, Plaintiffs are entitled to an award of punitive damages and/or attorneys' fees and costs. Such an award is justified by: (i) CMST's bad faith use of Plaintiffs' 2007 percentage interests to allocate to them a dramatically higher share of the firm's October 31, 2008 book loss, while at the same time relying on Plaintiffs' diminished 2008 percentage interests to expel Hausfeld from the firm; (ii) CMST's – and particularly Toll's – fraudulent withholding of CMST's determination of Plaintiffs' capital account balances until after the parties had executed the Settlement Agreement and CMST had secured the *OSB* fees; and (iii) taking and forcing Plaintiffs to respond to the baseless position that Patricia Drolet rendered a final and binding arbitral ruling.

78

In D.C., punitive damages are warranted "when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of plaintiff's rights, or other circumstances tending to aggravate the injury." *Jemison v. National Baptist Convention, USA, Inc.*, 720 A.2d 275, 286 (D.C. 1998) (citations and internal quotation marks omitted); *see also BWX Electronics, Inc. v. Control Data Corp.*, 929 F.2d 707, 712 (D.C. Cir. 1991) (quoting *Boynton v. Lopez,* 473 A.2d 375, 377 (D.C.1984)) (stating that, for fraud, the plaintiff must also prove "evil motive, actual malice, deliberate violence or oppression . . . willful and outrageous conduct . . . or gross fraud.").

Similarly, although not the measure of punitive damages that may be awarded, *Synanon Foundation v. Bernstein*, 517 A.2d 28, 39 (D.C. 1986), attorneys fees' are warranted when an opposing party acts in bad faith, vexatiously, wantonly or for oppressive reasons. *See Jung v. Jung*, 844 A.2d 1099, 1107 (D.C. 2004).  A party acts in bad faith when it asserts a claim or defense that it reasonably should know is meritless, when it continues to press a claim or defense after it is shown to be meritless, or when it otherwise engages in groundless, bad faith procedural moves during litigation.  *Id.* at 1108; *Synanon Foundation*, 517 A.2d at 38-42; *Chavlier v. Moon*, 576 A.2d 722, 724 (D.C. 1990) (party awarded attorneys' fees because it was forced to expend time and effort responding to opposing party's groundless assertions).

By concealing material information from Plaintiffs during settlement negotiations, by calculating Plaintiffs' liquidating capital account balances in the

79

manner it did, and by advancing certain groundless positions in this case, CMST's

misconduct satisfies the standards for an award of punitive damages and/or

attorneys' fees and costs.

First, CMST should be punished for playing "hide the ball" with Plaintiffs'

capital account balances until after it had secured both the executed Settlement

Agreement and the *OSB* fees. As this Court observed, CMST's "lack of candor" was

"shocking," "disturbing," and "disappointing":

> ". . . [t]he lack of candor seemed disappointing, I have to tell you. Because I think it's fair to say that Mr. Toll and the other partners who were here, at least, judging by the admissions in the deposition, were aware that Mr. Hausfeld thought he was getting around $5 million bucks. And the fact that they sat there and subjectively knew that he was making a mistake in that assumption and didn't tell me or didn't tell Mr. Hausfeld, is disappointing . . . that, combined with the delay in giving him the numbers, what am I supposed to take from that? I mean . . . it's just shocking to me.

* * *

> "[W]hy didn't somebody affirm, at some point before that settlement agreement was signed . . . [and] say to him, you know what, we don't have the exact figure yet, but it looks like you're going to come in, in this range and give him a chance to walk away if he didn't want to do it. I mean, doesn't that – wouldn't that have been right thing to do?"

* * *

> "That number could have been obtained relatively easily. It's just disturbing to me that it took so long when everyone knew that was, at least, one of the main eight or whatever terms of the agreement. It's just the way people treat each other in this case has just been so bothersome, I have to tell you. I don't understand why we had to hide the ball so long."

(Aug. 13, 2009 Tr. at 292:9-293:2; 296:8-16; 297:9-15).

80

CMST knew it had an obligation under the Operating Agreement to provide Plaintiffs its calculations – which were not complicated – by December 2008. It had all the information needed to perform the calculations in its possession no later than early January 2009, and in fact had its internal calculations completed on January 10. Toll, however, kept the calculations to himself, halting even the outside accountant review procedure, for the next 26 days. He did this despite CMST's contractual obligations, despite Plaintiffs' requests for the calculations during two intervening mediation sessions, and despite this Court's intervening directives to furnish the calculations. Moreover, although knowing full well that Plaintiffs' capital accounts would suffer a "not insubstantial decline," Toll and his colleagues said absolutely nothing about such a decline (and, importantly, nothing about the percentage interests they would use to exaggerate the decline) during the mediation sessions, even in the face of Hausfeld's statements that he believed his balance to be approximately $5 million. Toll finally released the calculations only after the Settlement Agreement was executed and, despite repeated requests from Plaintiffs' counsel, only after CMST had secured the big payout of the *OSB* fees that Plaintiffs had given up at the tail end of the settlement negotiations in exchange for an accelerated return of capital.

The timing and release of the calculations were not coincidental. The evidence established that CMST kept its capital account calculations from Plaintiffs in order to secure more favorable settlement terms for itself, and then continued to secrete the information for another two weeks in order to ensure receipt of the *OSB*

81

fees before Plaintiffs had a chance to protest what CMST was doing to their capital accounts. Toll's February 20 email to Sellers (PX 42) – written approximately four hours after the *OSB* fees came in and only about three hours after CMST finally provided Plaintiffs with its calculations – strongly confirms that CMST withheld the calculations and strategically delayed their release in bad faith. Having secured both the Settlement Agreement and the *OSB* fees, "*now*," Toll wrote, he "c[ouldn't] wait" for Hausfeld's "explosion" over the capital accounts – or, as he later explained, "c[ouldn't] wait" for Hausfeld's unhappiness over "seeing a number that's less than the 5 million." (Toll, Aug. 11, 2009, 237:9-11). Toll, in other words, exulted in how, by holding back information about the capital account balances, he was able to dupe Hausfeld into a deal that did not give Hausfeld what he thought he had bargained for. It is hard to imagine a piece of evidence that more directly establishes that a party acted oppressively.

If, rather than "hiding the ball," CMST had disclosed its capital account calculations, or at least a rough estimate of its calculations, at any time prior to the execution of the Settlement Agreement, this litigation never would have occurred. Even Toll recognized this, telling Sellers that "now" that he had finally disclosed the calculations, he "expect[ed] a repeat trip to Phildelphia [sic] to see the Magistrate." (PX 42). Had Plaintiffs received the calculations in a timely manner and not been kept in the dark, they simply would have negotiated an agreement on different terms or, as the Court noted, "walk[ed] away." (Aug. 13, 2009 Tr. at 296:8-19).

82

Either way, there would have been no need for Plaintiffs to bring this particular matter to the Court for resolution.

CMST also should be punished for its position regarding the applicable percentage interests. This Court made preliminary findings that what CMST did with Plaintiffs' percentage interests was "not right" and "showed bad faith":

> ". . . I think that gives me a lot of concern whether Cohen Milstein's going to be able to convince me that the use of that percentage, because I've heard the arguments and I've heard the testimony and I'm very troubled by it, that switching somebody's ownership interest in a firm to 14 percent and then, when they find out they're losing money, switching it back to calculate his capital account. I just don't think that was right. I think it showed bad faith on their part."

(Aug. 13, 2009 Tr. at 334:9-19). The Court's observations were entirely justified. As discussed at length above, CMST's effort to allocate 27.97% of the firm's October 31 book loss to Hausfeld and 6.78% to Lewis, while simultaneously using the Compensation Committee's November 5 allocations of 14% and 6.5% to expel Hausfeld from the firm, contravened what the Compensation Committee actually had determined on November 5, had no basis in the Settlement or Operating Agreements, contradicted the plain terms of Toll's November 5 memo, and flew in the face of the firm's historical practice of adjusting a departing partner's capital account balance using the Compensation Committee's most recent determinations to allocate profit/loss. What makes CMST's conduct even more egregious is the fact that, by and through it, CMST's members enriched themselves: the roughly $1 million diminution in Hausfeld's capital account resulting from the application of

83

the higher percentage figure was transferred to them, enabling each of them to realize an *increase* in their own capital accounts in 2008.

CMST's effort to defend its position on the applicable percentage interests with the alternating, entirely specious justifications discussed in Section I is also disquieting. For instance, CMST asserted that the Compensation Committee's November 5 determinations were effective immediately and retroactively for voting purposes but not for profit/loss-sharing purposes, even when CMST surely knew that, as founding member Herbert Milstein conceded at trial, a partner cannot have different percentage interests on the same day for different purposes and that, accordingly, Hausfeld's percentage interest as of October 31 had to be 14 percent for *all* purposes (or otherwise 28 percent for all purposes, meaning that the reduction in Hausfeld's points and thus his termination could not have been made effective until year end, *see* footnote 3, *supra*).

Finally, CMST should be forced to pay for misrepresenting – and continuing to misrepresent through trial – that Drolet rendered a final, arbitral ruling entitled to a presumption of correctness under the D.C. Arbitration Act. CMST took this position from the outset, even though the firm: (i) never informed Drolet that it was asking her to render such a decision, and she did not believe she was rendering such a decision (Toll, Aug. 10, 2009, 255:12-15; Drolet, Aug. 10, 2009, 105:22-106:2); (ii) knew that Drolet assisted CMST in arriving at its calculation *before* they were furnished to Plaintiffs, and therefore, had she been the final decision-maker, she would be in the untenable position of judging her own work (Drolet, Aug. 10, 2009,

84

75:1-11; Toll, Aug. 13, 2009, 63:22-64:6); and (iii) knew that Drolet simply acted as the firm's mouthpiece in her communications with Plaintiffs' counsel, engaging in repeated *ex parte* communications with CMST and going so far as to pre-clear with Toll every single communication she had with Plaintiffs' counsel about the calculations, *including* the e-mail that CMST contended represented Drolet's final, binding decision. (PXs 45-55, 58; Drolet, Aug. 10, 2009, 79:25-81:12; 84:10-85:1; 86:15-87:3; 93:21-95:12; 101:11-102:17).  Moreover, CMST took this position from the beginning despite the fact that it never even provided Drolet the information needed to make a legitimate final determination.  Upon receiving an email from Plaintiffs' counsel that the 2008 percentage interest determinations were retroactive to the beginning of the year, Drolet asked Toll several times, both in writing and orally, for any document confirming Plaintiffs' counsel representation. (PX 48; PX 49, Drolet, Aug. 10, 2009, 84:5-86:2; 88:12-90:2; 114:3-14).  Yet Toll failed to provide her with his November 5 memo and in fact told her that no document reflecting the retroactivity of the determinations existed.  (Drolet, Aug. 10, 2009, 89:16-18, 113:9-114:14; Toll, Aug. 10, 2009, 256:4-257:14; 258:10-12).

Troublingly, CMST continued to try to hide behind Drolet even after her July 13, 2009 deposition.  CMST did so, despite Drolet's testimony that, *inter alia*, she served neither as an arbitrator nor as a final decisionmaker, she was doing nothing more than reviewing her client's calculations, the decision regarding the retroactivity of the reduction of Plaintiffs' equity interests should be made by the Court, not her, and she could not say whether she agreed with the firm's

calculations and "would want to know more." *See* Plaintiffs' Motion to Preclude Evidence and Argument that Drolet & Associates PLLC Made a Final and Binding Determination of Plaintiffs' Capital Account Balances, for a full account of the speciousness of CMST's position.

After hearing the foregoing evidence at trial, the Court immediately rejected CMST's position and determined that Drolet "did not function as an arbitrator." (Aug. 10, 2009 Tr. at 260-62). Rather than being "neutral, independent," the Court found, Drolet was "functioning on behalf of her client, which was the law firm" and "did not view herself a function[ing] in a decision-making role." (*Id.* at 260-261). Additionally, because, among other things, Drolet had not been provided Toll's November 5 memo, Drolet "did not hear all the evidence, consider all the arguments, do her own kind of investigation and research and make a neutral decision." (*Id.* at 262).

CMST's baseless, bad faith positions regarding both the applicable percentage interests and Drolet's role made this litigation far more costly. As the Court knows, a sizeable portion of this case – discovery, briefing, argument and evidence – focused on the percentage interests issue. Similarly, Plaintiffs were forced to spend considerable resources seeking document discovery, eliciting deposition testimony, drafting a pre-trial motion and presenting trial evidence to make the obvious point that Drolet was not in fact an independent, neutral "arbitrator" under D.C. law.

CMST must not be permitted to get away with what it has done in connection with Plaintiffs' capital accounts with an order limited to requiring certain corrections in the liquidating adjustments. The recklessness, oppressiveness, malice and disregard of Plaintiffs' rights that CMST has displayed, as well as the obviously meritless positions it has required Plaintiffs to litigate, justify an award of punitive damages and/or attorneys' fees and costs.

CMST has been and remains a lucrative firm. In the past month alone, for instance, it has secured not only its $3.4 million portion of the *Air Passenger* fee but, *inter alia*, as one of only two lead counsel, a doubtlessly sizeable portion of a lead counsel fee and cost award of over $19 million in *In Re Merrill Lynch & Co., Inc. Securities, Derivative and Erisa Litigation,* Master File No. 07-cv-9633 (JSR)(DFE). *an* ERISA case. *See* "Order and Final Judgment," August 24, 2009, ¶12, available at http://amlawdaily.typepad.com/merrillsettlement.pdf. To punish CMST for its bad faith conduct and, given its success, to meaningfully deter it from engaging in future misconduct, the Court should assess an award of punitive damages in excess of **$500,000**. Because of CMST's bad faith positions, which necessitated this litigation in the first instance and made it needlessly costly thereafter, the Court should also assess an award of attorneys' fees and costs. If the Court chooses to do so, Plaintiffs will submit its fees and costs upon request.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs Hausfeld and Lewis request that this

Court enter judgment in their favor and award the damages, attorneys' fees and

costs they are seeking, as well as any additional relief this Court finds appropriate.

Dated: September 15, 2009                         Respectfully submitted,

                                                  Seth A. Rosenthal
                                                  Moxila A. Upadhyaya
                                                  VENABLE LLP
                                                  575 7th Street, NW
                                                  Washington, DC  20015
                                                  (202) 344-4000
                                                  sarosenthal@venable.com
                                                  maupadhyaya@venable.com

                                                  Patrick W. Kittredge
                                                  Joseph M. Donley
                                                  THORP, REED & ARMSTRONG, LLP
                                                  2005Market Street, Suite 1000
                                                  Philadelphia, PA 19103
                                                  pkittredge@thorpreed.com
                                                  jdonley@thorpreed.com

89

## CERTIFICATE OF SERVICE

I hereby certify that, on September 15, 2009, I served a copy of the foregoing

by U.S. Mail, first class postage prepaid, and by electronic mail, on the following:

John C. Keeney, Jr.
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC  20004
jckeeney@hhlaw.com

Seth A. Rosenthal