**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | ) | |
| MICHAEL HAUSFELD, et al., | ) | |
| | ) | |
| | ) | Listed Under |
| v. | ) | Civil Action No. 06-CV-826 |
| | ) | |
| COHEN MILSTEIN SELLERS | ) | |
| & TOLL, PLLC. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**<u>COHEN MILSTEIN SELLERS & TOLL PLLC'S POST-HEARING BRIEF</u>**

On August 10, 2009 through August 13, 2009, this Court held an evidentiary hearing to resolve the dispute arising under the settlement agreement ("Confidential Agreement") between Hausfeld LLP and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein").  (Defendant's Exhibit ("DX") 2).  At the suggestion of Your Honor at the conclusion of the hearing on August 13, 2009, there were August and September exchanges of proposals by attorneys at Venable LLP and attorneys at Hogan & Hartson LLP attempting but unable to reach settlement on the capital accounts and *Air Passenger* fee allocation.

**I.    HAUSFELD LLP BREACHED PARAGRAPH 1 OF THE CONFIDENTIAL AGREEMENT BY NOT SPLITTING 50/50 THE *AIR PASSENGER* FEES**

**A.    Facts**

In the Confidential Agreement, Cohen Milstein and Hausfeld LLP agreed upon a 50/50 split of fees in *Air Passenger*.  Paragraph 1 of the Confidential Agreement states that, with respect to *Air Passenger* fees, "Hausfeld LLP and CMST shall each receive a 50% share of the

total fees awarded for work done by Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ('CMHT') prior to November 6, 2008."  (DX 2 (emphasis added)).  The parties agree that the first line of Plaintiff's Exhibit ("PX") 117 states correctly the "Fee Award $10,960,225.26."  Because Hausfeld LLP is the co-lead counsel in *Air Passenger*, paragraph 1 requires it to keep for itself 50% and to distribute to Cohen Milstein its 50% share of the award, by wire transfer within 48 hours of receipt.  (*Id.*).

On October 31, 2008, the court in *Air Passenger* issued an order awarding all class counsel $23 million in fees and costs.  (PX 113).  The court based this fee award on the percentage-of-the-fund method.  (*Id.*; Testimony of Kenneth Feinberg on August 13, 2009 Trial Transcript ("K.F. Test. 8/13/09 Tr.") 164:5-14).  The award was not based on lodestar or hours worked.  (K.F. Test. 8/13/09 Tr. 160:11-15, 166:25-167:5).  The award was issued before Michael Hausfeld's ("Hausfeld") employment was terminated at Cohen Milstein on November 6, 2008.  (PX 113).

The Confidential Agreement mandates immediate payment of the full 50% – exactly $5,480,112.63 – to Cohen Milstein.  Nothing about Hausfeld's post-November 6, 2008 lodestar of $250,000 in post-settlement work or the work done by CMHT-NY, LLP ("NY-LLP"), Cohen Milstein's London office, prior to October 31, 2008, changes the clear language of the Confidential Agreement.

As the Court's own involvement in the settlement of the numerous matters in the Confidential Agreement confirmed, and as that writing makes clear (DX 2), the fee award is to be shared 50/50 by the Cohen Milstein and Hausfeld LLP firms.  *Air Passenger* was one of a few specified cases with a precisely-negotiated 50/50 fee division and a short 48-hour wiring requirement agreed to by the initial recipient law firm; in fact, it was expected to produce, by far,

\\\DC - 032991/000001 - 2940462 v12

the largest fee, and the 50/50 deal was a major monetary term of that executed settlement agreement by Cohen Milstein.

Cohen Milstein expected *Air Passenger* to produce fees as high as $16 to $18 million dollars. (PX 70; Testimony of Joseph Sellers on August 11, 2009 Trial Transcript ("J.S. Test. 8/11/09 Tr.") 110:24-111:12; Testimony of Steven Toll on August 13, 2009 Trial Transcript ("S.T. Test. 8/13/09 Tr.") 233:22-234:6, 258:21-259:9). Hausfeld himself, as well as other partners in the antitrust group, gave this estimate for the *Air Passenger* fees to Cohen Milstein's partners on numerous occasions before October 31, 2008 and this was discussed on numerous occasions at Cohen Milstein's executive committee meetings in 2008. (S.T. Test. 8/13/09 Tr. 258:21-259:9). Cohen Milstein represented this $16-18 million figure to SunTrust Bank in early November, and Kenneth Feinberg ("Feinberg") reaffirmed this number in the early part of 2009. Hausfeld was aware of these representations. (PX 70; K.F. Test. 8/13/09 Tr. 173:2-12, 174:14-22). (It is doubtful that Hausfeld's expectation was any different than Feinberg's because they were both intimately involved in the structuring of the *Air Passenger* settlement.)

Thus, at the time the parties mediated this dispute before Your Honor on January 23 and February 2, 2009, Cohen Milstein's dollar expectation was clear, as was Hausfeld's, about what was being divided 50/50. (S.T. Test. 8/13/09 Tr. 258:21-259:9). Cohen Milstein agreed in the negotiation to give up 50% of that anticipated fee to Hausfeld LLP to achieve global peace. This was a significant concession because under the Amended and Restated Operating Agreement ("Operating Agreement"), departing partners have no right to claim any fees after they leave the firm.

Hausfeld LLP attempts to make much of Cohen Milstein's alleged lack of candor in failing to calculate more quickly the precise amount of the capital accounts to be returned, the

3

exact dollar amount of which was not specified in the Confidential Agreement.  Yet never was any mention made by Hausfeld, or anyone representing Hausfeld LLP, in the two settlement conferences before Your Honor, that Hausfeld intended to take millions of dollars off the top of the *Air Passenger* fees and to give himself and his lawyers in London a multipler of almost four times their alleged lodestar before it did a "50/50" split only of the remainder.  (S.T. Test. 8/13/09 Tr. 259:20-260:3).  Of course, in July 2009, Hausfeld did not even send that reduced "50%" to Cohen Milstein but withheld it on the spurious ground that fraudulent inducement nullified the February 2009 settlement, a frivolous legal remedy now disavowed by his counsel's letter dated September 3, 2009.  Hausfeld, ironically, is the one complaining about fraud, fraudulent inducement, and bad faith.  If there is any finding of fraud or material omission to be made by this Court, *Greene v. Gibraltar Mortgage Inv. Corp.*, 488 F. Supp. 177, 179 (D.D.C. 1980); *Railan v. Katyal*, 766 A.2d 998, 1009 (D.C. 2001); *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 757 (D.C. Cir. 1985), it applies to the blatant acts of Hausfeld in unilaterally disregarding a specific and clear obligation to transmit 50% of the *Air Passenger* fees to Cohen Milstein by wire transfer within 48 hours of receipt after agreeing to do so in paragraph 1 of the Confidential Agreement.

On July 10, 2009, the court in *Air Passenger* issued an order to resolve a two-firm dispute over the partition of the $23 million that the court had awarded to lead class counsel.  (PX 115). The court stated that "[t]he portion of this award allocated to non-lead counsel has already been distributed." (*Id*.).  Of the $23 million dollars awarded, the court allocated $17,859,008 between the two co-lead counsel firms, Cotchett, Pitre & McCarthy and Hausfeld LLP: $11,161,880[1] to Hausfeld LLP and $6,697,128 to Cotchett.  (*Id*.).  Although the court did not use the lodestar to

---

[1]Because of various undisputed payments to other counsel, the final payment received by Hausfeld LLP was $10,960,225.26.

4

divide fees between the two firms that were co-lead class counsel, the court noted that the fees awarded were roughly a multiplier of four of each firm's lodestar. (*Id*.). By virtue of the parties' agreed upon terms in the Confidential Agreement, Cohen Milstein is entitled to its 50% share, $5,480,112.63, of the *Air Passenger* fees awarded to Hausfeld LLP. (S.T. Test. 8/13/09 Tr. 241:13-24).

Hausfeld LLP unilaterally withheld *Air Passenger* fees from Cohen Milstein and so advised in a letter to this court on July 23, 2009. (DX 53). In addition, Hausfeld LLP unilaterally determined that it was entitled to $1,090,777.55 for about $250,000 of risk-free work done after November 6, 2008, that NY-LLP was entitled to $3,075,868.12, and that the remaining $6,793.579.59 was to be split 50-50 with Cohen Milstein. (DX 53; PX 113; PX 117; S.T. Test. 8/13/09 240:24-242:2). Hausfeld LLP did not pay Cohen Milstein its share of the *Air Passenger* fees within 48 hours. (PX 113). Nothing in the 50/50 split of Paragraph 1, Second Bullet Point of the Confidential Agreement, gives either party the right to deduct off the top or redirect payments to former Cohen Milstein attorneys, who are now members of Hausfeld LLP or Hausfeld & Co., LLP, London (Hausfeld LLP's London office), before the mandatory implementation of the 50/50 split.

### B.    Conclusions of Law

The evidence at the hearing established the following:

**1.    Cohen Milstein (and <u>not</u> NY-LLP) applied for fees in *Air Passenger*.** There was a single Cohen Milstein fee submission made in the *Air Passenger* case in September 2008. (DX 52). That submission included time entries from Cohen Milstein lawyers in various offices, including London. That fee application and the supporting declaration were first attached to Mr. Keeney's initial letter to this court of July 24, 2009. The supporting declaration (DX 52) clearly

5

references the total lodestar of "my firm" to include the lodestar and hours of the London office; indeed, this is the only permissible manner of including the time by Cohen Milstein's London attorneys as part of the fee application to a United States Court (foreign attorneys cannot independently and separately request fees in U.S. courts).  (*Id*.).  The fee application submitted to Judge Breyer in September 2008, before the parties met with Your Honor to mediate this matter, clearly showed, without any equivocation, doubt, or question of any kind, that the application for fees was submitted on behalf of Cohen, Milstein, Hausfeld, and Toll, P.L.L.C. (and not NY-LLP).  (*Id*.).  That application included both a fee memorandum submitted by Cohen, Milstein, Hausfeld, and Toll, P.L.L.C. (and not NY-LLP) and a September 5, 2008 declaration signed by Cohen Milstein and then non-equity partner Charles Tompkins.[2]  (*Id*.).  The Tompkins declaration submitted to Judge Breyer repeatedly emphasized that it was submitted on behalf of Cohen, Milstein, Hausfeld, and Toll, P.L.L.C.  (*Id*.).

The Tompkins declaration attached, as its Exhibit 1, the lodestar fees put in for by Cohen, Milstein, Hausfeld, and Toll, P.L.L.C.  It is evident on the face of the Tompkins declaration that the fees sought were only on behalf of Cohen, Milstein, Hausfeld, and Toll, P.L.L.C.

That is what the application and declaration say.  Moreover, that is what the lodestar calculation shows.  Cohen Milstein's U.S. office lodestar was about $1.6 million in that declaration and the lodestar of its London office was shown as $857,000.  The total lodestar submitted to the court by Cohen Milstein was $2.4 million (the $1.6 million from the U.S. office

---

[2]During the hearing, Michael Lehmann testified that Tompkins was not a partner at NY-LLP. (8/13/09 Tr. 280:15-16).  While correct, it is irrelevant (the name Michael Hausfeld, who was an equity partner of NY-LLP, appeared below the signature line of DX 52 on page 5 and on page 1, line 8 above the caption).  Most importantly, Tompkins was a non-equity partner of Cohen Milstein (the 99% partner of NY-LLP) at the time he submitted his declaration on behalf of the firm as is confirmed under oath in paragraph 1 of the Tompkins declaration.  (DX 52). Tompkins subsequently joined Hausfeld LLP, but has since left that firm.  (Testimony of Robert Eisler, 8/11/09 Tr. 219:2-6).

6

and the approximately $857,000 from the London office).  (DX 52, ¶ 9).  There was no separate

fee application submitted by NY-LLP.  There was no separate request for fees to be payable to

NY-LLP.  (DX 52 ¶¶ 1, 9; J.S. Test. 8/11/09 Tr. 131:24-135:13; Testimony of Anthony Maton

on August 13, 2009 ("A.M. Test. 8/13/09 Tr.") 229:17-230:2; S.T. Test. 8/13/09 Tr. 243:5-

244:4).

This simple conclusion is confirmed by the simultaneous submission for expense

reimbursement.  The reimbursement of over $600,000 in expenses was sought only for Cohen,

Milstein, Hausfeld, and Toll, P.L.L.C. that advanced these costs.  (DX 52, Ex. 2).

**2.      In the settlement conferences before Your Honor, the parties' expressed mutual**

**intent was a 50/50 split over the "total fees awarded" on October 31, 2008 in *Air Passenger*.**

The award of attorneys' fees was made by Judge Breyer on October 31, 2008.  (PX 116, Ex. A).

It thus preceded Michael Hausfeld's November 6, 2008 termination from Cohen Milstein and it

preceded the 2009 sale of the London office of Cohen Milstein.[3]  The operative date of Judge

Breyer's Order, October 31, 2008, was expressly referred to by the *Air Passenger* court in its

July fee allocation between Hausfeld LLP and the Cotchett firm. (PX 115).  Thus, Cohen

Milstein had secured an award for *Air Passenger* fees based on the work it had done before

November 6, 2008.  (PX 113).

The primary task of contract interpretation "is to give effect to the mutual intent of the

parties."  *Lindell v. Landis Corp. 401K Plan,* No. Civ. A. 08-1462, 2009 WL 2241682, at *2

(D.D.C. July 28, 2009).  When the parties mediated this matter and reached a settlement, Cohen

Milstein properly believed and understood it would receive the "total fees awarded" in *Air*

*Passenger* because they were awarded before November 6, 2008.  Cohen Milstein also expected

---

[3]Two of the three former London partners of NY-LLP have now set themselves up as Hausfeld & Co., LLP, London.

7

that their share of the "total fees awarded" would be $16-18 million based on representations by Hausfeld before his termination and Feinberg in early 2009. (S.T. Test. 8/13/09 Tr. 258:21-259:9; K.F. Test. 8/13/09 Tr. 173:2-12, 174:14-22). Because Hausfeld was the co-lead counsel, Cohen Milstein could not independently verify the underlying settlement structure in *Air Passenger* and had to rely on the representations by Hausfeld and Feinberg. (S.T. Test. 8/13/09 Tr. 258:21-259:9, 261:14-22). Thus, it was with this clear understanding, based upon undisputed written documentation submitted to Judge Breyer, that Cohen Milstein met with Your Honor on January 23 and February 2, 2009 and agreed to split 50/50 this particular *Air Passenger* fee, which had already been applied for and, indeed, approved on October 31, 2008, by Judge Breyer.[4]

Hausfeld knew that this was Cohen Milstein's understanding. (S.T. Test. 8/13/09 Tr. 258:21-259:9). If Hausfeld had a different understanding of how the fees would be paid at that time, he did not disclose that to the Court or Cohen Milstein, and certainly did not disclose any intent to divert proceeds off the top prior to the 50/50 split. Hausfeld never mentioned at either the January 23 or February 2, 2009 settlement conferences that any of the *Air Passenger* fees separately belonged to Hausfeld LLP for work done after November 6, 2008, and were not subject to the 50/50 split. Similarly, Hausfeld never mentioned at either the January 23 or February 2, 2009 mediations that he believed that over $3 million of the fee award (or any amount) belonged to Cohen Milstein's former London office and its partners and would be deducted off the top, thus reducing Cohen Milstein's 50% share.

Such unspoken intent supplies no basis for Hausfeld to evade his obligation to pay

---

[4]The fact that the fee award was $11 million instead of the initially expected amount of $16 to $18 million is not an issue or dispute in this case. It shows that expectations were not achieved, which frequently happens in this type of plaintiffs' practice.

8

immediately the 50/50 share in paragraph 1 of the Confidential Agreement and make Cohen

Milstein whole in the full contract amount of exactly $5,480,112.63.  In fact, Hausfeld's failure

to deliver, much less to inform Cohen Milstein at any time before his unilateral withholding in

July 2009 that it would receive less than 50% of the "total" award, amounts to fraud and material

misrepresentation.  The mutual intent of the parties, precisely reflected in the plain language of

the Confidential Agreement in paragraph 1, was a 50/50 split of the "total" *Air Passenger* fees

awarded on October 31, 2008.  (DX 2).

**3.      Hausfeld LLP deliberately tried to deceive the courts by submitting, *in camera*,**

**altered time entries that falsely changed the name from "Cohen Milstein" to "Hausfeld &**

**Co., LLP, London".**  Exhibits attached to PX 116, particularly exhibit D, thereto show

deliberate deception by Hausfeld LLP in post-October 31, 2008 filings before Judge Breyer in an

attempt to rewrite history.  On July 7, 2009, Hausfeld LLP resubmitted the identical "Cohen

Milstein" time entries previously filed in September 2008 with Judge Breyer and changed the

firm name on those identical entries to "Hausfeld & Co., LLP, London." (PX 116, Ex. D, page 1).

Indeed, Michael Lehmann (who signed the Confidential Agreement and therefore is charged

with knowledge of its contents including the 50/50 split with Cohen Milstein ) admitted that his

firm took Cohen Milstein entries previously submitted to Judge Breyer and submitted the

identical entries as "Hausfeld & Co., LLP, London."  (PX 116, Ex. D; Testimony of Michael

Lehmann on August 13, 2009 Trial Transcript ("M.L. Test. 8/13/09 Tr.") 284:4-285:4).  This is a

fraudulent attempt to evade a 50/50 split.  Such subterfuge in alteration of court documents (and

then knowingly concealing from Cohen Milstein by filing *in camera* under seal with Judge

Breyer) is real fraud on this Court.  *See Andolsun v. Berlitz Schools of Languages of Am.*, 196

A.2d 926, 927 (D.C. 1964) (holding that concealment may constitute fraud); Restatement

9

(Second) of Contract § 160 (stating that concealment is an "action intended or known to be likely to prevent another from learning a fact"). That act alone is sufficient grounds for immediate entry of an order awarding Cohen Milstein its full 50%, $5,480,112.63, from Hausfeld LLP.

**4.     Hausfeld LLP is not entitled to *Air Passenger* fees for post-settlement work.** With regard to the Hausfeld LLP claim for the $1 million for $250,000 in work performed by it after November 6, 2008, Feinberg's testimony clearly refutes any entitlement to that money. Feinberg mediated the fee and expense payment to be made by all the defendants in *Air Passenger*. It was quite clear that this was, in his words, an "all-in" negotiation. That meant it included all work done by the lawyers in the case whether pre-settlement or post-settlement. (K.F. Test. 8/13/09 Tr. 165). This was not a lodestar-based settlement. He thus testified that lodestar for work performed after the fee award would not be separately compensated. (K.F. Test. 8/13/09 Tr. 169). In other words, fees for post-award work were already included in the $23 million. This was what Feinberg negotiated with class counsel, who were Cohen Milstein (led by Hausfeld) and the Cotchett firm, in 2008, well before it was submitted to Judge Breyer for approval in September of that year.

The significance of the Feinberg testimony is as follows. Hausfeld knew, going into the mediation sessions before Your Honor in January and February 2009, that *Air Passenger* work, post-settlement, would not be separately compensated and was already included in the $23 million award. Thus, when the parties met with Your Honor, the clear understanding was that the award to Cohen Milstein (Hausfeld LLP replaced Cohen Milstein as lead counsel on *Air Passenger* on November 14, 2008) must be split 50/50. There was no reference, no agreement and in fact there was to be no separate payment to anyone for post-settlement work performed. It was all included. The fee award was to be split 50/50. The notion of a separate payment for

10

post-settlement administrative work was not raised by Mr. Hausfeld, not discussed by the parties, not part of the negotiation process, and obviously not part of the final agreement. "[A] 50% share of the total fees <u>awarded</u> for work done by Cohen[] Milstein . . . prior to November 6, 2008" unambiguously refers to 50% of the portion of the October 31, 2008 fees already <u>awarded</u>. Vague reliance on generalized statements in of the Confidential Agreement about post-November 6, 2008 work do not supersede the more specific 50/50 fee split agreed for this case in the first paragraph of the Confidential Agreement. *Washington Automotive Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 880 (D.C. 2006) ("Specific terms and exact terms are given greater weight than general language."). If Hausfeld LLP intended to take post-settlement work "off the top" of this 50/50 award, it had an absolute duty of candor and fairness to tell Your Honor when the parties met with you in January and February. *Allworth v. Howard Univ.*, 890 A.2d 194, 201-02 (D.C. 2006) (holding that D.C. law requires "faithfulness to an agreed common purpose and consistency with the expectations of the other party"). It did not. There was not one indication by Hausfeld and his attorneys in the January and February 2009 mediation sessions, or in the negotiations with respect to the final wording of the agreement, that Hausfeld LLP would receive more than 50% or that Cohen Milstein would receive anything but 50% of the award. That is what the Confidential Agreement says and it should be enforced.

Hausfeld LLP lists about $250,000 in lodestar for its post-settlement work but awarded itself $1 million off the top. However, that was not the deal struck in the February 2009 Confidential Agreement before Your Honor. Hausfeld LLP gets 50% or precisely the same $5,480,112.63 to which Cohen Milstein is entitled. How Hausfeld LLP chooses to divide its $5,480,112.63 between the attorneys at Hausfeld LLP, including Hausfeld & Co., LLP, London, is up to Hausfeld LLP. The only issue for decision by this Court is immediate entry of an order

11

compelling full payment by Hausfeld LLP of $5,480,112.63 to Cohen Milstein, without deduction or offset other than a credit for the partial amount already received by this Court's order releasing funds from escrow on August 13, 2009.

Cohen Milstein is entitled to the remaining $2,083,322.83 now.

**5.     NY-LLP never had rights to the *Air Passenger* fees.**  The clear and unambiguous language of Section 5.3 of the NY-LLP Partnership Agreement does not allow NY-LLP partners to collect legal fees for work performed "on behalf of" Cohen Milstein.  Section 5.3 provides:

> LLP Income.  *Except for amounts earned by a Partner on behalf of and payable to CMHT-DC*, all fees, salaries, proceeds, commissions and other compensation earned or received by any Partner (a) for legal services (but excluding any amounts earned or received by any Partner for legal services rendered before the Partner became affiliated with the LLP), (b) as a corporate officer or director, trustee, receiver, executor, guardian, administrator, commissioner, master, referee, arbitrator, (c) as an author, editor, lecturer or teacher on legal matters, (d) from similar or related professional activities shall belong to the LLP and shall be deposited for an paid over to the LLP as when received in exactly in the form received (except for endorsement where required).

(PX 110; A.M. Test. 8/13/09 Tr. 190:7-191:3, 224:9-225:5) (emphasis added).  Cohen Milstein was the 99% partner of NY-LLP (its London office).  The *Air Passenger* fees were "earned by a Partner [Cohen Milstein] on behalf of . . . CMHT-DC," which was defined in the NY-LLP Partnership Agreement as Cohen Milstein, and applied for as Cohen Milstein and awarded on October 31, 2008 to Cohen Milstein.  In other words, Cohen Milstein <u>always</u> had rights in <u>its</u> own fee application.  It did not give them up to NY-LLP.  To the contrary, the "Except" clause is

12

explicit.[5]

NY-LLP had the right to collect and retain its own legal fees for work performed in its own European cases, but not Cohen Milstein's cases (i.e., where it was doing work on behalf of and payable to Cohen Milstein).  (PX 110, § 5.3).  Because NY-LLP was only formed in 2007, it had not yet generated any of its own cases.  (P.D. Test. 8/10/09 Tr. 227:23-25, 233:1-3).  Where NY-LLP attorneys performed work on behalf of Cohen Milstein, as was the case in *Air Passenger*, NY-LLP was not entitled to separate legal fees.  (PX 110, § 5.3; S.T. Test. 8/13/09 Tr. 247:21-248:8).  The reason for this contractual arrangement is that Cohen Milstein was already paying NY-LLP attorneys at the rate of approximately $400-$500 per hour for each hour of work they performed "on behalf of" Cohen Milstein in Cohen Milstein's cases.  (P.D. Test. 8/10/09 Tr. 232:6-13, 233:1-234:11).  A contrary interpretation would (1) fly in the face of this clear contractual language, agreed to by all interested parties, (2) nullify the first clause of section 5.3, "[e]xcept for amounts earned by a Partner on behalf of and payable to CMHT-DC"; and (3) make no business sense (which is always a disfavored contractual construction) insofar as Cohen Milstein was already paying NY-LLP on an hourly basis for its work on Cohen Milstein's cases.  Hausfeld's interpretation would mean NY-LLP performed risk-free work on Cohen Milstein's cases but was entitled not only to a *second* lodestar for the work already paid for, but a four-times multiplier on that work.  (PX 110; P.D. Test. 8/10/09 Tr. 232:6-233:11, 233:22-235:2; S.T. Test. 8/13/09 Tr. 247:21-248:8, 258:3-9, 267:25-268:1-14).  But of course, this Court's task is more limited.  Hausfeld, under the February 2009 Confidential Agreement, must split the October 31, 2008 award 50/50 with Cohen Milstein.  This court does not need to decide how

---

[5]To the extent "Partner" in Section 5.3 includes the London lawyers and there is any argument they "earned" something for their work in *Air Passenger*, it was earned "on behalf of and payable to CMHT-DC [Cohen Milstein]," thus clearly exempting it from NY-LLP income.

13

much NY-LLP, Hausfeld & Co., LLP, London ("It is partially owned by Hausfeld in the United States," A.M. Test. 8/13/09 Tr. 216:11), and Hausfeld LLP get.  Rather, this Court must enforce the Confidential Agreement, which provides that Hausfeld LLP gets 50% and Cohen Milstein gets 50%.

The transfer pricing rules – which govern the taxation of revenue belonging to Cohen Milstein on the one hand, and NY-LLP on the other hand – are further evidence of Cohen Milstein's ownership of the *Air Passenger* fees.  When Cohen Milstein began to conduct business in London, England in 2007 through its 99% ownership in NY-LLP, by law it had to divide the tax base of its multinational enterprise between the two taxing jurisdictions of the United Kingdom and the United States.  (P.D. Test. 8/10/09 Tr. 232:6-233:6, 234:15-19).  This was explained by Cohen Milstein's outside accountant, Patricia Drolet ("Drolet").  Such intra-company transfer pricing is particularly scrutinized by tax authorities, and therefore it is very important to clearly establish in advance (1) which legal fees (revenue) belong to Cohen Milstein and which belong to NY-LLP and (2) the method by which Cohen Milstein would fund NY-LLP's operations.  (*Id*. at 234:15-19).  Establishing in advance to whom legal fees are payable and who has the primary ownership interest over those revenues serves to prevent double taxation and establishes to which country taxes must be paid.  (*Id*. at 232:6-233:6, 234:15-19).

Because NY-LLP had no cases of its own in 2008, its operations, expenses and salaries were funded exclusively by Cohen Milstein.  (*Id*. at 233:1-3).  Thus, as Drolet testified, monies paid by Cohen Milstein to London were recorded as revenue to NY-LLP.  (*Id*. at 232:18-233:10).

In order that the monies transferred from Cohen Milstein to NY-LLP comply with transfer pricing rules, Cohen Milstein was required, by Section 482 of the Internal Revenue Code and Treasury Regulations enacted pursuant thereto, to pay NY-LLP attorneys the same amount

14

that it would have paid to engage an unaffiliated firm in the United Kingdom to perform the same work.  26 U.S.C. § 482; 26 C.F.R. §§ 1.482-1, 1.482-9(c).  Cohen Milstein therefore paid NY-LLP attorneys for its legal services on Cohen Milstein's cases using prevailing hourly billing rates that are comparable in the U.K. market, that Drolet testified were about $400-$500 per hour.  (P.D. Test. 8/10/09 Tr. at 234:3-19); *see also* 26 C.F.R. § 1-482-9(c), Example 2.  To allow NY-LLP to recover *Air Passenger* fees with a four-times multiplier on top of these prevailing hourly billing rates would violate the tax laws because Cohen Milstein would <u>not</u> have paid essentially <u>five times</u> a prevailing hourly billing rate to hire another U.K. attorney or firm (a four times multiplier on lodestar after already paying for the services by the hour), or $2000-$2500 per hour, to perform the same work.  26 C.F.R. § 1.482-1 (intra-company transfer of payments must be priced at comparable market rate, *i.e.*, the same rate that would have been negotiated at arm's length with an unrelated entity).

Notwithstanding Anthony Maton's ("Maton") undoubtedly sincerely-held but erroneous belief to the contrary, the London attorneys were, in essence, contract attorneys hired by Cohen Milstein and paid for by Cohen Milstein on a dollar-for-dollar basis as if they were an unrelated party.  (P.D. Test. 8/10/09 Tr. 232:6-233:11, 233:22-235:2; S.T. Test. 8/13/09 Tr. 251:8-21).  This "arm's length" payment arrangement is mandated by Section 1.482-1 of the Treasury Regulations.  Thus, NY-LLP was already paid in salary by Cohen Milstein for their legal services in *Air Passenger*.  (S.T. Test. 8/13/09 Tr. 257:20-258:17).  Because Cohen Milstein was NY-LLP's client, the lawyers in the London office worked on the *Air Passenger* case "on behalf of" Cohen Milstein.  (A.M. Test. 8/13/09 Tr. 214:6-16, 227:24-5; S.T. Test. 8/13/09 Tr. 248:1-8).  Hence, the amounts earned by NY-LLP in *Air Passenger* were never the property of NY-LLP but the property of Cohen Milstein.  (PX 110).

15

Further, the *Air Passenger* fees were "payable to CMHT-DC" under the "Except" clause of § 5.3 of the NY-LLP Partnership Agreement, and not to NY-LLP, because none of the London attorneys is a member of any bar in the United States and none is or could be attorney of record in the United States District Court for the Northern District of California.  (A.M. Test. 8/13/09 Tr. 185:11-20; S.T. Test. 8/13/09 Tr. 248:1-8).  Foreign attorneys who are neither admitted to the bar of the court nor attorneys of record are not entitled to share attorney fees awarded to class counsel.  *See Kruman v. Christie's Int'l PLC*, No. 00 Civ. 6322, 2003 WL 21277116, at *1 (S.D.N.Y. June 2, 2003), *aff'd sub nom. Kruman v. Class Law Solicitors*, No. 05-0336-CV, 2005 WL 3556188 (2d Cir. Dec. 28, 2005) (unpublished).  Thus, even if the "Except" clause in Section 5.3 of the NY-LLP Partnership Agreement did not exist, the London attorneys would not be legally entitled to fees issued by the U.S. court in *Air Passenger*.

Finally, NY-LLP's work in *Air Passenger* was not on the U.S. litigation but was predominately spent pursuing the possibility of bringing litigation in the United Kingdom.  (PX 116; A.M. Test. 8/13/09 Tr. 223:20-21; S.T. Test. 8/13/09 Tr. 251:8-21, 258:4-5).  Foreign attorneys are not entitled to fees awarded in a class action settlement for preparing a foreign suit under foreign law that was never prosecuted.  *Kruman v. Class Law Solicitors*, No. 05-0336-CV, 2005 WL 3556188, at *1 (2d Cir. Dec. 28, 2005) (unpublished).  Thus, the U.S. courts simply cannot issue payment for those efforts.  *See id*.

At the hearing, the question asked by this Court, whether the *Air Passenger* defendants would have settled without getting the comfort that they would not be sued again (8/13/09 Tr. 249), assumed that they got this comfort.  They did not.  (Notice Program, *In re Int'l Air Trans. Surcharge Antitrust Litig*., No. 06-CV-01793, Dkt. #225-4 at Ex. A(Ex. 5) (N.D. Cal. March 21,

16

2008); Long Form Notice to Claimants[6], ¶13; British Airways Plc and Virgin Atlantic Airways, Ltd. Passenger Settlement, Frequently Asked Questions, "Your Legal Right to Sue on Your Own," Question 13[7] (hereinafter "FAQ No. __").  Hausfeld LLP never fully explained the *Air Passenger* settlement to the Court, trying to leave the impression that they had achieved a global opt out settlement with complete releases as typically done in a U.S. settlement.  This global settlement did not give defendants a global release for claims in the U.K. or elsewhere outside the United States.  The legal notice published in the United Kingdom clarifies the *Air Passenger* settlement as it relates to United Kingdom claim; it provides:

What Should I Do?

> . . .
> File a claim for a refund.  When you claim your refund, you give up your legal right to bring any further claims regarding the issues in this case.  However, you can object to or comment on the Settlement, and you have a right to appear in Court.  Claims must be filed by 31 December 2012.
>
> <u>Do nothing.  If you are a U.K. purchaser, you will keep any right you may have to sue British Airways or Virgin Atlantic in the U.K.</u>  If you are a U.S. purchaser, you will give up your legal right to bring any further claims regarding the issues in this case.

(Short Form Notice to Claimants (emphasis added)).[8]  Thus, the way the settlement was

---

[6] Available at the official website for U.K. claimants that has been approved by the settlement administrator, https://www.airpassengerrefund.co.uk (follow "Important Document" hyperlink; then follow "Notice to Claimants" hyperlink).

[7] Available at https://www.airpassengerrefund.co.uk (The official website for U.K. claimants approved by the settlement administrator).

[8] The Short Form Notice to U.K. Claimants appeared, inter alia, in the following U.K. publications, of which this Court can take judicial notice:  Independent on Sunday, July 6, 2008, at 30; Mail on Sunday, July 6, 2008, at 26; News of the World, July 6, 2008, at 64; Observer, July 6, 2008, at 42; Sunday Times, July 6, 2008, at 16; The People/Sunday Mirror, July 6, 2008, at 32, 34; Daily Express, July 10, 2008, at 31; Daily Mail, July 10, 2008, at 20; Daily Telegraph, July 10, 2008. at 15; Guardian, July 10, 2008, at 15; Independent, July 10, 2008, at 19; Metro,

17

structured with regard to the U.K. claimants is that only those making claims sign a release. (Notice Program, *In re Int'l Air Trans. Surcharge Antitrust Litig.*, No. 06-CV-01793, Dkt. #225-4 at Ex. A(Ex. 5) (N.D. Cal. March 21, 2008); Long Form Notice to Claimants, ¶ 9-11; FAQ No. 10-12; K.F. Test. 8/13/09 Tr. 162:7-21; *see also* Toll Test. 8/13/09 Tr. 250:9-14). There is no class mechanism that releases everyone else in the U.K. who does not file a claim. (Notice Program, *In re Int'l Air Trans. Surcharge Antitrust Litig.*, No. 06-CV-01793, Dkt. #225-4 at Ex. A(Ex. 5) (N.D. Cal. March 21, 2008); Long Form Notice to Claimants, ¶ 9-11; FAQ No. 10-12).  The Court's question appears to give too much credit to the London lawyers for the United States class settlement with its carve-out for possible individual claims to be presented in the U.K.  If U.K. claims are not made, the *Air Passenger* defendants will not have to make any payments.  ((Notice Program, *In re Int'l Air Trans. Surcharge Antitrust Litig.*, No. 06-CV-01793, Dkt. #225-4 at Ex. A(Ex. 5) (N.D. Cal. March 21, 2008); Long Form Notice to Claimants, ¶ 9; FAQ No. 10; K.F. Test. Tr. 162:7-21).  Thus, the portion of the $200 million settlement that was set aside for potential U.K. claims, which was about $150 million, will likely never have to be paid by the *Air Passenger* defendants because very few claims have been filed. This U.S. settlement did not give defendants a release like they get in the U.S. from all members of the class.  The only releases obtained in the U.K. are from those that make claims, which thus

---

July 10, 2008, at 18; Mirror, July 10, 2008, at 25; Sun, July 10, 2008, at 43; Times, July 10, 2008, at 32; News of the World, July 13, 2008, at 64; Observer, July 13, 2008, at 40; Sunday Times, July 13, 2008, at 6; Daily Express, July 14, 2008, at 10; Daily Mail, July 14, 2008, at 24; Daily Telegraph, July 14, 2008, at 17; Guardian, July 14, 2008, at 20; Independent, July 14, 2008, at 19; Independent on Sunday, July 13, 2008, at 14; Metro, July 14, 2008, at 12; Mirror, July 14, 2008, at 31; Sun, July 14, 2008, at 43; Times, July 14, 2008, at 31; Belfast Telegraph, July 14, 2008, at 3; Sunday Mail (Scotland), July 14, 2009, at 37.  The Short Form Notice identified settlement claimants' counsel as "Cohen Milstein Hausfeld & Toll, P.L.L.C." with its Washington address, and contains no mention of NY-LLP, the London office, or the firm's London address.

\\\DC - 032991/000001 - 2940462 v12

far has been a *de minimus* segment of all potential claimants.

**6.      The Transfer Agreement (PX 112) could not and did not give NY-LLP rights to fees that it had no entitlement to prior to the sale.**  The subsequent sale of the Cohen Milstein London office did not change Cohen Milstein's initial and continuing entitlement to its *Air Passenger* fees.  Put simply, these U.S. fees were under the "Except" clause in Section 5.3 of the NY-LLP Partnership Agreement ("Except for amounts earned by a Partner on behalf of and payable to CMHT-DC . . . .") (PX 110) and never an asset of NY-LLP.

In paragraph 2.1 of the Agreement of Transfer, transferors (Cohen Milstein and the other equity partners of NY-LLP) agreed "to transfer to the Transferees all of their right, interest, and entitlement in CMHT [NY-LLP] and in any or all of its business or practice, wheresover, and whatsoever, as carried on at the Agreement Date" (PX 112 (emphasis applied)).  It did not transfer any of Cohen Milstein's rights in Cohen Milstein, only in "CMHT," which was another name for NY-LLP.  Prior to the Transfer Agreement, there was no right "in CMHT [NY-LLP]" to fees earned and awarded to Cohen Milstein.  To the contrary, Section 5.3 of the NY-LLP Partnership Agreement (PX 110) was explicit in its "Except" clause that NY-LLP had no rights in "amounts earned by a Partner [of NY-LLP] on behalf of and payable to CMHT-DC."  (PX 110).  The defined term CMHT-DC refers to Cohen Milstein.  Thus, the Transfer Agreement could and did transfer only rights in NY-LLP.  Those rights did not include a rights to fees earned and payable to Cohen Milstein, i.e., *Air Passenger* fees.  (PX 110, § 5.3).  These U.S. fees earned and payable to Cohen Milstein at all times belonged to Cohen Milstein; they never became assets of the NY-LLP and therefore were not an asset transferred in the sale of the London office.

Cohen Milstein negotiated with the London attorneys from late December 2008 to

19

January 2009, to sell the London office.  During those negotiations, there was no mention, much less an understanding or agreement, that attorneys in the London office would keep any portion of the *Air Passenger* fees previously awarded to Cohen Milstein on October 31, 2008.  (J.S. Test. 8/11/09 Tr. 97:18-98:13, 108:6-12; S.T. Test. 8/13/09 Tr. 255:16-19).  If NY-LLP believed it was entitled to fees in *Air Passenger*, it could have negotiated a specific clause to claim that right for the first time, since it was not a right that it had under the "Except" clause in Section 5.3 of the NY-LLP Partnership Agreement.  Additionally, NY-LLP never submitted a separate declaration in *Air Passenger* for fees or a separate fee application.

The London office now asserts that the Transfer Agreement provided them with the "whole shooting match," which included the *Air Passenger* fees.  (A.M. Test. 8/13/09 Tr. 203:2-10).  However, as previously mentioned, the *Air Passenger* fees were <u>never</u> the legal property of the NY-LLP.  (S.T. Test. 8/13/09 Tr. 256:22-257:5).  Hence, the *Air Passenger* fees were not – and never could be – a part of this "whole shooting match."  They were excluded under the "Except" clause in Section 5.3 of the NY-LLP Partnership Agreement as "amounts earned by a Partner on behalf of" Cohen Milstein, and had been applied for by the September 2008 *Air Passenger* fee application as granted on October 31, 2008, by Judge Breyer on that basis.  The Transfer Agreement did not provide NY-LLP with greater rights to *Air Passenger* fees than it had before the transfer.  (*Id.* at 257:11-19; PX 112).

Additionally, the Transfer Agreement would make no economic sense if Cohen Milstein was transferring a part of its interest to guaranteed fees already awarded to it.  (S.T. Test. 8/13/09 Tr. 255:20-256-21).  Cohen Milstein had put $5-6 million into the London office with no return. (*Id.*).  They agreed to transfer NY-LLP to the London attorneys in exchange for the payment of roughly $2 million over six years.  (PX 112).  If NY-LLP was entitled to a portion of the *Air*

20

*Passenger* fees, Cohen Milstein would be selling those $3 million in fees and the sunk $5-6 million for only $2 million.  This would have been entirely illogical and not Cohen Milstein's intent.

Finally, under the Transfer Agreement, NY-LLP is required to provide a percentage of their profit, not exceeding $2 million, to Cohen Milstein.  However, Maton testified that the partners from the London office have formed a new law practice, which is named Hausfeld & Co., LLP and that Hausfeld is partial owner of Hausfeld & Co., LLP.  (A.M. Test. 8/13/09 Tr. 215:24-217:13).  It is not clear if NY-LLP is any longer active or merely a shell company meant to evade its owners' future economic obligations under the Transfer Agreement, but that is for a different forum and is not before this Court for decision under the Confidential Agreement.

**7.      All the parties involved understood that NY-LLP was not entitled to any fees in *Air Passenger*.**  The Tomkins declaration explicitly stated that fees should be awarded to Cohen Milstein, it included NY-LLP's time as part of Cohen Milstein's fee submission, and it never suggested at any point that NY-LLP was separately entitled to fees or that the London office should be treated as a separate law firm.  (DX 52 ¶¶ 1, 9; J.S. Test. 8/11/09 Tr. 131:24-135:13; A.M. Test. 8/13/09 Tr. 229:17-230:2; S.T. Test. 8/13/09 Tr. 243:5-244:4).  Likewise, the London attorneys never submitted a separate declaration for fees or fee application in *Air Passenger*. They also did not represent an entitlement to the fees during the transfer negotiations, and *Air Passenger* fees were not mentioned in the Transfer Agreement.

Steven Toll ("Toll") submitted a letter to SunTrust Bank representing that Cohen Milstein expected $16 to $18 million from *Air Passenger*; Toll did not express or suggest that any portion of this fee award would have to be provided to NY-LLP.  (PX 70: J.S. Test. 8/11/09 Tr. 110:24-111:12).  Hausfeld was aware of Cohen Milstein's expectation but never suggested

21

that it was wrong. (S.T. Test. 8/13/09 Tr. 258:21-259:9). Neither Hausfeld nor anyone representing Hausfeld LLP in the two settlement conferences ever mentioned that NY-LLP was entitled to *Air Passenger* fees or that Hausfeld intended to take money off the top of the *Air Passenger* award and to give it to the London attorneys. (S.T. Test. 8/13/09 Tr. 259:20-260:3). In conversations with Toll, Feinberg also stated that he expected Cohen Milstein to receive $16 to $17 million. (K.F. Test. 8/13/09 Tr. 173:2-12). He did not indicate that NY-LLP would be entitled to separate fees.

Most importantly, Judge Breyer did not allocate any fees for NY-LLP. In its July 10, 2009 order, the *Air Passenger* court stated that "[t]he portion of this award allocated to non-lead counsel has already been distributed." (PX 115). NY-LLP was not lead-counsel; Judge Breyer's July Order mentioned the two lead counsel by name, neither were London-based. If NY-LLP had a separate claim to fees, then it should have already been assigned a portion of the award to "non-lead counsel." Instead, the *Air Passenger* court in July 2009 only dealt with the distribution of fees between the Cotchett firm and Hausfeld LLP. (*Id.*). In contrast, Cohen Milstein's share of the *Air Passenger* fees is memorialized in the Confidential Agreement between it and Hausfeld LLP. (DX 2).

Had NY-LLP, Cohen Milstein, Hausfeld LLP, Toll, Hausfeld, Sellers, Lehmann, Maton, the other London attorneys, Tompkins, Feinberg, or Judge Breyer believed or understood that NY-LLP was entitled to fees in *Air Passenger*, someone would have mentioned it far earlier than the July 23, 2009 after-the-fact notice to this Court of how Hausfeld had distributed the money in a non-50/50 basis.

**8.     This Court's remedial power is limited in the Confidential Agreement to enforcement of its specific terms that Cohen Milstein receive 50% of the "total fees**

22

**awarded" in** *Air Passenger***.**  Even if this Court believed that NY-LLP had any claim to the *Air Passenger* fees, it still must order Hausfeld LLP to disburse the full 50% share of the fees to Cohen Milstein.  Paragraph 18(c) of the Confidential Agreement provides that this Court can only resolve disputes that arise under the Confidential Agreement.  (DX 2).  Under the Confidential Agreement, Hausfeld LLP was obligated to provide 50% of the *Air Passenger* fees to Cohen Milstein for work done prior to November 6, 2008.  (*Id.*).  Hausfeld made the unilateral decision to transfer money to London, outside the jurisdiction of the Court.  He bears the full risk of that legal misjudgment under the Confidential Agreement and its 50/50 split.  Additionally, if NY-LLP believes *Air Passenger* fees were transferred assets under the Transfer Agreement, such disputes must be brought and established under the Transfer Agreement's arbitration provision.  Regardless of these hypothetical disputes, this Court is obligated, under the Confidential Agreement, to ensure that Cohen Milstein receive 50% of the "total fees awarded" in *Air Passenger*, which would be $5,480,112.63.

9.        **In any event, Hausfeld's unilateral conveyance to London attorneys formerly of Cohen Milstein of a risk-contingency multiplier out of fees awarded on October 31, 2008 is unwarranted.**  Even if Hausfeld LLP or NY-LLP believed that NY-LLP had a colorable claim to any portion of the *Air Passenger* fees, which it clearly does not under the "Except" clause of § 5.3 of the NY-LLP Partnership Agreement, NY-LLP would not be entitled to any multiplier because it did not engage in any of the risk.  Under the lodestar method, a court may apply "a multiplier based upon certain factors, the most prominent of which is an adjustment for the risk of loss associated with the undertaking of representation on a contingent basis."  *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733, 741 (S.D.N.Y. 1994).  According to the Terms of Retention, Cohen Milstein guaranteed payment to NY-LLP partners

\\\DC - 032991/000001 - 2940462 v12

for any amount due and any indemnities.  (PX 111; A.M. Test. 8/13/09 Tr. 228:10-229:8).

Hence, Cohen Milstein engaged in the risk and not NY-LLP.  Because NY-LLP did not engage

in any of the risk involved in the case, a multiplier would be inappropriate.

The United States Supreme Court actually prohibits the use of a multiplier in this case.

The Supreme Court has stated that

> when [a party] has agreed to pay its attorney, win or lose, the
> attorney has not assumed the risk of nonpayment and there is no
> occasion to adjust the lodestar fee because the case was a risky
> one. . . . [A] lawyer may not preserve a right of recourse against his
> client for fees and still expect to be compensated as if he had
> sacrificed completely his right to payment in the event of
> unsuccessful outcome.

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 716-17 (1987)

(internal quotations and citations omitted).  Here, Cohen Milstein was NY-LLP's client and

agreed to pay (and did pay) NY-LLP, win or lose.  Therefore, there would be no grounds for

payment four times NY-LLP's lodestar because there was no risk.

In addition, although Hausfeld LLP was not entitled to the *Air Passenger* fees for post-

settlement work, the use of a multiplier for these fees is especially egregious because there is no

risk involved at that stage of the litigation.  (S.T. Test. 8/13/09 Tr. 253:16-254:19).  *See In re*

*McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733, 741 (S.D.N.Y. 1994).

Hausfeld LLP breached the Confidential Agreement.  First, Hausfeld LLP did not pay

Cohen Milstein its portion of the *Air Passenger* fees within 48 hours.  Second, Hausfeld LLP

only purported to set aside $3,396,789.80 for Cohen Milstein when it was obligated to provide

$5,480,112.63.  Hausfeld LLP was unjustified in distributing unilaterally $3,075,868.12 to NY-

LLP and in distributing $1,090,777.55 to itself.  Thus, Hausfeld LLP breached the Confidential

Agreement.  His actions also constituted fraud and blatant breach of duties of good faith and fair

24

dealing.  Informing the Court in late July, after he had already taken the actions, does not cure the breach or the fraud.

Therefore, this Court should order that Hausfeld LLP provide the balance of the full $5,480,112.63 to Cohen Milstein by wire transfer within 24 hours.  That amount is $2,083,322.83.

## II.    CAPITAL ACCOUNT CALCULATIONS FOR FIRST PAYMENT DUE DECEMBER 31, 2009

During the hearing, Your Honor requested that expert witness William Bavis revise PX 66 for Hausfeld and PX 67 for Lewis to assume losses as of October 31, 2008 but to apply Compensation Committee percentages.  Assuming, arguendo, that the Court intends to rule on the capital account calculations based on its comments on August 13, 2009 – using the income tax method but applying the Compensation Committee percentages – the evidence supports the following arithmetic as revisions to DX 1, the calculations submitted by Cohen Milstein to counsel for Hausfeld and Richard Lewis ('Lewis") on February 20, 2009.

1.      *Changes to Percentage of October 31, 2008 Losses*.  The Hausfeld percentage would be 14% and the Lewis percentage would be 6.5%, as shown in the memorandum of the Compensation Committee action.  (DX 39).  This Court should not use 13.31% or 6.56% for Hausfeld and Lewis respectively, as has been suggested.  Those suggested percentages are a result of a misunderstanding of Article THIRD (C) of the 2003 Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld & Toll, P.L.L.C.  (DX 3).  Article THIRD (C) permits Cohen Milstein to distribute 10% of the income to the Members on a per capita basis.  This distribution would reduce the total percentage for Hausfeld and increase the total percentage for Lewis.  However, Article THIRD is not applicable here for two reasons.  First, Article THIRD (E) explicitly states that Article THIRD does not apply to the calculation of a departing partner's

\\\DC - 032991/000001 - 2940462 v12

capital account balance.  Second, the 10% distribution applies only to the distribution of profit; whereas, Cohen Milstein had a loss as of October 31, 2008.  Thus, the correct percentage would be 14% for Hausfeld and 6.5% for Lewis.

2.     *Changes to Net Loss as of October 31, 2008.*  If this Court engages in a de novo calculation, it should correct all the numbers.  The "net income (loss) through October 31, 2008 to be allocated" is not $6,912,175.39 as shown on DX 1.  There was undisputed testimony from Drolet and Toll that the accountant recommended and that Cohen Milstein should have calculated the October 31, 2008 losses as $5 million higher at that time.  The testimony used a rounded number.  DX 14 sets the exact number ▮▮▮▮▮▮▮ in the first sentence of that exhibit.  That number is both more exact and more favorable to Hausfeld and Lewis then rounding upward.  Thus, on DX 1, for both Hausfeld and Lewis, the correct "net income (loss) through October 31, 2008 to be allocated" is ▮▮▮▮▮▮▮.

Therefore, if Your Honor used retroactive percentages and the actual October 31, 2008 loss, the line item "share of income (loss) to Hausfeld" should be $1,658,082.70 (14% of ▮▮▮▮▮▮▮) and to Lewis $769,824.11 (6.5% of ▮▮▮▮▮▮▮).

*Wherefore*, on the basis of the Court's anticipated ruling to take into account Compensation Committee changes in percentage interests and the evidence at the hearing, Cohen Milstein respectfully suggests:

(a)     Hausfeld's capital account balance as of October 31, 2008 would be $3,336,818.60 (Hausfeld's capital account balance of $4,994,901.30 as of December 31, 2007 minus the 2008 year to date loss of $1,658,082.70); and

(b)     Lewis' capital account as of October 31 would be $393,318.19 (Lewis's capital account balance of $1,163,142.30 as of December 31, 2007 minus the loss of

26

$769,824.11).

Because Cohen Milstein believes that the calculation provided in DX 1 are correct as a matter of law and to ensure the record is clear, Cohen Milstein also responds in detail below to various issues raised at the hearing about the capital account balances.

### A.    Settlement Agreement

Four provisions of the February 5, 2009 Confidential Agreement are most relevant to the disputed capital account calculations.  (DX 2; PX 1).

Paragraph 14 of the Confidential Agreement provides that Hausfeld's and Lewis's capital account balances, "as provided for in the Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld & Toll, P.L.L.C.," shall be paid on an accelerated schedule with the first 50% installment owed "by December 31, 2009."  This paragraph incorporates the Operating Agreement by reference.  (*Id*.).

In Paragraph 16 of the Confidential Agreement, the parties

> mutually release and forever discharge each other from any and all claims, complaints, and causes of action arising prior to January 1, 2009, whether in law or equity, whether under the Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., or under federal, state, local or other law, whether known or unknown, whether accrued or unaccrued, whether upon statutory claim, contract, tort or other basis, including but not limited to any claim for salary, bonus, reimbursement, profit distributions, any other payment arising out of employment at CMHT, or any share of legal fees and/or reimbursed expenses for time or expenses in cases worked on at CMHT, and any claim, whether in contract or in tort, known or unknown, arising out of or concerning in any way employment with CMHT, termination or alleged constructive termination or withdrawal from CMHT or formation of Hausfeld LLP; provided, however, that the provisions of this paragraph 16 specifically do not constitute a release or waiver of any claim arising out of the violation of any of the commitments or obligations set forth in this Agreement.

27

(*Id*.).

Paragraph 18(a) directs that the Confidential Agreement shall be governed by the laws of the District of Columbia. (*Id*.).

Paragraph 18(c) states that any dispute or disagreement "regarding any provision of this Agreement" shall be submitted to this Court for resolution.  (*Id*. (emphasis added)).

### B.    Operating Agreement

In 2003, the partners of Cohen Milstein, including Hausfeld, entered into an Amended and Restated Operating Agreement ("Operating Agreement").  (DX 3).

Article TENTH (A) governs the calculation of a departing partner's capital account balance.  It states:

> [T]he Company shall furnish to the Terminated Member a statement of the balance in the capital account of the Terminated Member and of the income or loss of the Company for the fiscal year of the Company to the last full month immediately preceding the Termination Date.  The Terminated Member shall not be entitled to any other or further accounting from the Company. After the Company [Cohen Milstein] gives such statement to the Terminated Member, the Company and the Terminated Member shall attempt in good faith to agree in writing on the balance in the capital account of the Terminated Member as of such date.  If they cannot agree, however, within thirty (30) days after the Termination Date, the amount of such balance shall be determined by the independent accountants regularly retained by the Company (the 'Accountants'), and the determination of the Accountants shall be final and binding upon all parties.

(DX 3).

Article TENTH (B) provides for the repayment of the capital account balance over a period of five years.  (*Id*.).

The Operating Agreement is governed by the laws of the District of Columbia.  (*Id*. at

28

FOURTEENTH (A)).

### C.    Capital Account Calculation

On January 10, 2008, Hugh Diamond ("Diamond"), Cohen Milstein's controller, sent a preliminary draft of Hausfeld's and Lewis's capital account balance calculations to Toll, Cohen Milstein's Managing Partner, for his review.  (PX 15; Testimony of Patricia Drolet on August 10, 2009 Trial Transcript ("P.D. Test. 8/10/09 Tr.") 47:12-13, 58:4-20).  Hausfeld's and Lewis's capital account balances were calculated based on the income or loss of Cohen Milstein as of October 31, 2008, "the last full month immediately preceding the Termination Date."  (DX 3, PX 15).  According to the firm's financial statements, Cohen Milstein had a loss of $6,461,087.00 (before adjustments) as of October 31, 2008.  (DX 19; PX 15; J.S. Test. Tr. 8/11/09 Tr. 59:13-17).

After the second settlement conference, on February 3, 2009, Toll analyzed the draft calculations and authorized the release of the preliminary draft for additional error-checking by the firm's outside accountant.  (S.T. Test. 8/13/09 Tr. 5:17-23, 6:20-7:9, 152:13-153:13).

Drolet from Drolet & Associates, P.L.L.C. was Cohen Milstein's regularly-retained, independent, outside accountant for approximately twenty years.  (P.D. Test. 8/10/09 Tr. 45:21-46:19, 139:19-24, 173:8-12).  On February 5, 2009, Diamond sent the draft calculations to Drolet for her review.  (PX 61, P.D. Test. 8/10/09 Tr. 53:20-54:15).  Drolet noticed errors in Diamond's calculations, including, and most pertinent to any de novo calculation by this court, that the calculations incorrectly used the effective rate rather than the relative percentage interest rate. (P.D. Test. 8/10/09 Tr. 60:23-63:6, 65:11-66:3, 66:21-68:15).  She informed Diamond and Toll of the errors in the calculations.  (P.D. Test. 8/10/09 Tr. 64:13-18, 65:3-7, 75:1-8).

On February 6, 2009, Diamond sent a revised draft, which incorporated Drolet's

\\\DC - 032991/000001 - 2940462 v12

corrections, to Toll and Drolet. (PX 21, P.D. Test. 8/10/09 Tr. 64:19-22). The calculations used 27.97% as Hausfeld's equity interest and 6.78% as Lewis's equity interest, which was their equity interest in the firm after Mark Willis's August resignation and before both Mark Machiz's resignation and the Compensation Committee meeting. (PX 21; P.D. Test. 8/10/09 Tr. 68:3-5, 72:12-14; J.S. Test. 8/11/09 Tr. 45:6-50:4, 63:15-64:20).

Hausfeld's and Lewis's share of the loss as of October 31, 2008, was subtracted from their December 31, 2007 capital account balances. As a result, Hausfeld's capital account balance of $4,994,901.30 on December 31, 2007, was calculated by Cohen Milstein as $3,061,865.88 on October 31, 2008. Lewis's capital account balance of $1,163,142.30 on December 31, 2007, was calculated by Cohen Milstein as $694,527.65 on October 31, 2008. (PX 21; P.D. Test. 8/10/09 Tr. 70:20-71:18; 73:1-5; Testimony of Richard Lewis on August 10, 2009 Trial Transcript ("R.L. Test. 8/10/09 Tr.") 306:25-307:2).

Drolet suggested that Cohen Milstein should write down approximately $5 million of expenses for cases that were uncollectible prior to October 31, 2008. (P.D. Test. 8/10/09 Tr. 75:9-12, 76:12-77:5, 108:2-17, 189:2-9). If the firm wrote down this $5 million in losses prior to October 31, 2008, this would have further decreased Hausfeld's and Lewis's capital account balances. If the firm wrote down this loss at the end of the year, then (1) the remaining partners at Cohen Milstein would pay a greater share of these pre-October 31, 2008 losses, and (2) Hausfeld and Lewis would pay no share of these additional $5 million in pre-October 31, 2008 losses and thereby receive a greater return of capital than they were entitled to as October 31, 2008. (P.D. Test. 8/10/09 Tr. 108:2-19, 189:2-190:9, 195:5-25; S.T. Test. 8/13/09 Tr. 18:11-19:2).

The issue was discussed at an Executive Committee meeting in the middle of February.

30

(S.T. Test. 8/13/09 Tr. 17:24-19:16).  Although it was appropriate to write down the $5 million

prior to October 31, 2008, Cohen Milstein eventually decided to write down the losses at the end

of the year so as not to reduce further the capital to be repaid to Hausfeld and Lewis.  (*Id.* at

17:24-21:3; Testimony of Daniel Sommers on August 12, 2009 Trial Transcript ("D.S. Test.

8/12/09 Tr.") 85:19-87:7).  Hausfeld and Lewis benefitted from this decision.  (P.D. Test.

8/10/09 Tr. 109:5-8).

After rejecting Drolet's suggestion of the proper accounting treatment as of October 31,

2008, Cohen Milstein sent the final capital account calculations and the firm's loss statement for

the period ending on October 31, 2008, to its counsel.  Its counsel transmitted these to Hausfeld's

and Lewis's counsel, Venable LLP, on February 20, 2009.  (DX 1; S.T. Test. 8/13/09 Tr. 16:18-

24).

On February 27, 2009, Stefan Tucker of Venable LLP left a voicemail with Drolet to

request the information "that went into" the calculations of Hausfeld's and Lewis's capital

account balances.  (DX 4; P.D. Test. 8/10/09 Tr. 78:8-16, 141:20-23, 142:5-10).

On March 2, 2009, Hausfeld and Lewis, through counsel, expressed their disagreements

to Drolet.  Venable claimed that Hausfeld's and Lewis's capital account balances should have

been calculated (1) by using a pro rata percentage (5/6) of the income or loss as of December 31,

2008 and (2) by using the equity interest as set by the Compensation Committee on November 5,

2008, which was 14% for Hausfeld and 6.5% for Lewis.  (DX 5; PX 48; P.D. Test. 8/10/09 Tr.

83:2-18).

Drolet drafted a response to Venable's objections.  On March 5, 2009, Drolet sent the

draft response to Toll in accordance with her practice of obtaining client approval before sending

client-related information to third parties.  (PX 51; P.D. Test. 8/10/09 Tr. 94:8-95:5, 158:22-

31

159:13).  Toll suggested one cosmetic change, which Drolet adopted.  (P.D. Test. 8/10/09 Tr.

96:18-21, 141:8-18, 170:7-16).

### D.    Drolet's Rejection of Venable's Arguments

On March 6, 2009, Drolet sent Venable her response to Hausfeld's and Lewis's

disagreements over the capital account calculations, which stated:

> As to your question about the accuracy of the calculation and your suggestion to use a pro-rata portion of the results of the entire year, Article TENTH of the firm's partnership agreement is specific as to how the capital account should be calculated and it is clear that is should be done using the financial results of the firm through the 'last day of the last full month immediately preceding the Termination Date.'  There is no discussion in the partnership agreement about using a pro-rata calculation based on a full year's results.  It had been calculated in the same manner as it was for other partners who left the firm in 2008 and years prior to 2008.
>
> Finally, with respect to the percentage used for the calculation of the departing partner's share of 2008 income (loss) through the termination date, the calculation was done consistent with how it was done with other partners who left the firm in 2008, as well as how it was done for numerous partners who left the firm in previous years.  The percentage in effect at the close of business on the last day of the month immediately preceding has always been used.  The partnership agreement is clear that you look at the end of the previous month prior to termination to make the calculation.  If in fact, 2008 was a year that had significant income instead of loss as of October 31, 2008, I can't imagine you would make an argument that would justify such a retroactive reduction in your client's percentage share.

(DX 7, 8; PX 55; P.D. Test. 8/10/08 Tr. 99:7-9, 160:1-161:21).

In response, Hausfeld and Lewis brought their disagreement to this Court pursuant to

paragraph 18(c) of the Confidential Agreement, which allows only limited review "regarding any

provision of this Agreement," thus permitting this Court to construe this Agreement only, but not

permitting a damage penalty for its breach.  (*See* DX 2 (emphasis added), PX 58).

\\\DC - 032991/000001 - 2940462 v12

The choice-of-law provisions of both the Operating Agreement and the Confidential Agreement provide for the application of the laws of the District of Columbia.  (DX 2, 3).  The parties agree that the laws of the District of Columbia govern this dispute.

Drolet's response to Venable on March 6, 2009 was the accountant's decision as specified in Article TENTH (A) of the Operating Agreement.

Cohen Milstein notes its continuing objection to the holding on August 10, 2009, that this Court will not give deference to the accountant's March 6, 2009 e-mail.  (8/10/09 Tr. 260:17-23).  The Operating Agreement does not require the additional dispute resolution procedures that this court found lacking.  This Court, having heard Drolet's testimony, also found that Drolet believes that she made no "determination."  But her March 6, 2009 e-mail speaks for itself.  (DX 9).  No matter how characterized, it is, within the meaning of Article TENTH (A), the accountant's decision as to Hausfeld's objections.  District of Columbia law definitively construes the contractual significance of parties' referral of disputes over capital account balances to Ms. Drolet's firm for a "final and binding determination."  Her characterization of her role is legally irrelevant.  Under binding District of Columbia law, Ms. Drolet's final and binding rejection of Hausfeld's objection, cannot be set aside entirely, as a matter of contract law.  *See 2200 M St. LLC v. Mackell*, 940 A.2d 143, 151 (D.C. 2007).

Under D.C. law, an "agreement to have third parties decide disputes [is] the essence of arbitration[, n]o magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefit of [the private dispute resolution by the contract's designee]."  *2200 M St. LLC*, 940 A.2d at 151.  When a contractual provision "direct[s] that the resolution of certain disputes is to be decided by a third party," such as an architect or an accountant, and that the decision is final and binding on all the parties, the provision is

33

enforceable as a matter of contract law.  *Id.*; *see Moran v. Carey Limousine, Inc.*, 737 A.2d 532, 533 (D.C. 1999) (refusing to overturn the district court's decision enforcing an agreement to have an accountant resolve disputes); *Washington Automotive Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 875 (D.C. 2006) ( "a written agreement to settle an existing or future dispute regarding the value of land or other property via an appraisal process"); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005) (that a corporate bylaw of an Orthodox Jewish congregation requiring disputes between the congregation and a member to be resolved by a "Beth Din" of Orthodox Jewish rabbis).  Lack of quasi-judicial process is not determinative of whether an accountant's or an appraiser's decision is a final and binding determination as a matter of contract law or with respect to the parties' intent.  D.C. courts will defer to the accountant as long as it does not exceed the accountant's authority.  *See Dogget v. McLachlen Bancshares Corp.*, 663 A.2d 511, 516 (D.C. 1995) (applying a deferential standard of review without deciding if the accountant was an arbitrator).  For these reasons, Cohen Milstein notes its continuing objection that this Court does not intend to apply a deferential standard of review.

### E.    D.C. Contract Law Applied to the Confidential Agreement

Settlement agreements are contracts, and courts apply contract law to interpret them. *Lindell*, No. Civ. A. 08-1462, 2009 WL 2241682, at *2.  "A contract is breached if a party fails to perform when <u>performance is due</u>." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 320 (D.C. 2008) (emphasis added).  This is important here because performance under the Confidential Agreement is first due by December 31, 2009, and thus, as a matter of D.C. law, there has been no breach of contract.  To determine if there is a breach of contract in this case, this Court must interpret the Confidential Agreement pursuant to D.C. rules of contract interpretation.  *See id.*; *D.C. v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1153-54 (D.C. 2009).

34

The primary task of contract interpretation "is to give effect to the mutual intent of the parties." *Lindell*, 2009 WL 2241682, at *2. "[W]hen the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties. Any assertions of ambiguity in the terms of the agreement must be established by objective evidence." *Id.*

Of particular relevance to the purported GAAP argument, D.C. law recognizes modification of a contract or waiver of written terms based on the course of performance between the parties. *See Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 87-89 (D.D.C. 2004) (applying D.C. law) ("[I]ntent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right."); D.C. Standardized Civil Jury Instruction No. 11-14; Restatement (Second) of Contracts § 202(4), cmt. g. The "course of performance between contracting parties can modify a contract between them despite a provision prohibiting non-written modification." *Caring People Alliance v. Educ. Data Sys., Inc.*, No. Civ. A. 07-12672008 WL 4441994, at *8 (E.D. Pa. Sept. 29, 2008) (applying Pennsylvania law); *accord Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 858 A.2d 392, 411-13 (Del. Ch. 2004) (applying NY law), *rev'd in part on other grounds*, 872 A.2d 944 (Del. 2005).

In *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, the court, applying D.C. law, found a waiver of contractual rights through course of performance in a $35 million lawsuit. 298 F. Supp. 2d at 87-88. There, NETtel asked G & A Transfer for a loan; G & A arranged by letter agreement of July 17, 2000, to provide subordinate financing to NETtel in the principal amount of up to $35 million by September 15, 2000. One of the conditions in this agreement was that NETtel provide prior written notice of at least fifteen business days to request disbursement of

35

funds.  At no time did NETtel provide prior written notice, but G & A disbursed more than $13 million in financing on two occasions notwithstanding.  G & A eventually refused to disburse the remaining $21.2 million.  G & A claimed that it did not breach its contract because NETtel did not provide prior written request for the funds as required in the letter agreement.  The District Court held that G & A waived this contractual provision because the "practice that had developed between the parties was plainly inconsistent with the July agreement's requirement of written notice . . . ."  *Id.* at 89.  The court noted that it "perceives no evidence that G & A sought to preserve its right to prior written notice when NETtel requested funds pursuant to the July agreement.  G & A's *two extensions* of funds in the summer of 2000 without any objection as to the absence of written notice constitute a clear waiver of the provision on which it now insists." *Id.* (emphasis own).

Of particular relevance to the capital account calculation and to Hausfeld LLP's refusal to transfer 50% of the *Air Passenger* fees to Cohen Milstein, all contracts contain an implied duty of good faith and fair dealing.  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2006).  A claim that a party breached the implied duty of good faith and fair dealing requires evidence that the party acted in "bad faith" or rendered an "arbitrary and capricious" decision.  *See Hill v. Medlantic Health Care Group*, 933 A.2d 314, 333-34 (D.C. 2007); *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1112 n.11 (D.C. 1999); Restatement (Second) of Contracts § 205 cmt. a.  "If a party to the contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing."  *Paul*, 754 A.2d at 310.

Of dispositive significance on Hausfeld's various claims of fraudulent inducement and material misrepresentation are two lines of District of Columbia cases.  First, the duty of good

36

faith and fair dealing does not apply to parties' pre-contract negotiations. *Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 373-74 (D.D.C. 2008). In *Ellipso, Inc. v. Mann*, Ellipso hired defendant Robert Patterson to secure financing from investors. Patterson secured an unfavorable loan from Mann Technologies but did not inform Ellipso that he was a 50% owner of Mann Technologies. *Id.* at 369-70. Upon learning about Patterson's dual role, Ellipso sued the defendant for breach of implied covenant of good faith and fair dealing among other claims. The District Court granted defendant's summary judgment motion to the good faith and fair dealing claim because this duty does not exist in parties' pre-contract negotiations. *Id.* at 373-74. Instead, the courts only consider the extent to which the parties *performed* under the contract in good faith and fair dealing. *Id.*

Second, sophisticated and educated individuals are not justified in relying on representations made during settlement negotiations, especially where the truth of the representation is easily verifiable. *Weaver v. Bratt*, 421 F. Supp. 2d 25, 33 (D.D.C. 2006). "This rule especially applies to licensed attorneys, who possess a heightened knowledge of the law of contracts when compared with non-attorneys." *Id.*

In *Weaver v. Bratt*, Jane Weaver worked for the Criminal Division in the U.S. Department of Justice ("DOJ") and claimed that she was being retaliated against by her supervisors. Weaver entered into a settlement agreement with the DOJ, which provided her a detail assignment with the U.S. Attorney's Office for the District of Columbia for no less than 410 days. Weaver eventually brought suit to rescind the settlement agreement for misrepresentation. She alleged that the DOJ promised to provide permanent employment after her detail. The court held that Weaver could not have justifiably relied on this misrepresentation. The court stated that "[r]eliance by sophisticated and educated individuals vitiates a party's claim

37

of fraud or misrepresentation." *Id.* at 33. The court further noted that the truth could easily have been ascertained by reading the settlement agreement. *Id.* at 33-34 Therefore, the court denied her misrepresentation claims. *Id.*

## F. Accounting Method for Article TENTH(A) Statements

Article SECOND (A) of the Operating Agreement states that the "accounting method of the Company shall be determined by the Members." (DX 3).

Although Article SECOND (D) provides that the "books of account shall be kept and continually maintained in accordance with generally accepted accounting principles," no prior Operating Agreement had ever required that the books of account be kept in accordance with generally accepted accounting principles ("GAAP"). (DX 3; P.D. Test. 8/10/09 Tr. 104:21-23). Cohen Milstein has always used the income tax method of accounting for its books, records, and financial statements, and the firm has never used GAAP accounting for any purpose at any time from its founding in 1986 to the present. (P.D. Test. 8/10/09 Tr. 104:21-105:6, 175:20-176:4, 186:16-188:17, 191:16-18; Testimony of Herb Milstein on August 12, 2009 Trial Transcript ("H.M. Test. 8/12/09 Tr.") 104:23-105:13). Additionally, the engagement letters between Cohen Milstein and Drolet and the management representation letters have always stated that all financial statements shall be prepared using the income tax method of accounting. (DX 48A-E; P.D. Test. 8/10/09 Tr. 110:19-21, 176:5-177:19, 179:24-181:8, 182:2-184:3, 185:3-186:3). The GAAP language in Article SECOND (D) was a mistake. (P.D. Test. 8/10/09 Tr. 104:21-105:6; H.M. Test. 8/12/09 Tr. 105:13-108:18, 123:18-25).

Article SECOND (D) does not require capital account balances to be calculated using GAAP. It only states that the "books of account" be maintained under GAAP. (DX 3). Pursuant to Article SECOND (A), the Members have chosen the income tax method for financial

38

statements and capital account calculations as demonstrated by Cohen Milstein's use of that

method of accounting throughout its entire history.  As expert accountant William Bavis testified,

it is acceptable for a company to use the income tax method for its monthly and yearly financial

statements and to maintain its books and records under GAAP:

> Q      Now , is it possible to do financial statements on a monthly basis or on a yearly basis on a cash basis [income tax basis] and also keep your books according to GAAP?
> A.      Certainly.   Your Honor, it's not uncommon at all, in my experience.  Some people talk about making two sets of books, but that's really not the case, and it doesn't have the implication that I think we . . .

(Testimony of William Bavis on August 11, 2009 Trial Transcript ("W.B. Test. 8/11/09 Tr.")

168:9-169:1, 203:15-204:4).  Because financial statements and capital account calculations can

utilize different accounting practices than those used for the books of account, even Hausfeld's

expert conceded that it is appropriate to use income tax accounting to prepare Hausfeld's and

Lewis's capital account calculations under a second set of books.  (*Id*.).  The testimony about

whether a first set of "books of account" should comply with GAAP is irrelevant to the instant

dispute about the Article TENTH (A) statements sent to Hausfeld and Lewis, which are not, have

not, and need not be prepared on a GAAP basis.

In any event, Hausfeld and Lewis waived any claim to have their capital account

balances calculated using GAAP by acceptance and/or acquiescence in Cohen Milstein's course

of performance.  Cohen Milstein has consistently and historically maintained its books and

records and prepared its monthly and yearly financial statements using the income tax method of

accounting; the firm has never once used the GAAP method of accounting.  For over five years

since the 2003 Operating Agreement was adopted, not once did Hausfeld or Lewis ever complain

39

\\\DC - 032991/000001 - 2940462 v12

that Cohen Milstein was using the wrong accounting method or request that the firm use GAAP accounting. (P.D. Test. 8/10/09 Tr.168:16-21, 186:4-15, 222:15-19; R.L. Test. 8/10/09 Tr. 303:18-21; J.S. Test. 8/11/09 Tr. 62:25-63:14; Testimony of Michael Hausfeld on August 12, 2009 Trial Transcript ("M. H. Test. 8/12/09 Tr.") 59:22-60:10; H.M. Test. 8/12/09 Tr. 116:8-16; S.T. Test. 8/13/09 Tr. 28:20-29:6). Hausfeld and Lewis also had numerous opportunities to object: over 1,826 daily opportunities to object to the method of accounting used for the books of account; over 60 monthly opportunities to object to the method of accounting used for the monthly financial statements; and over 5 annual opportunities to object to the method of accounting used for the yearly financial statements. Hausfeld and Lewis even had opportunities to object to the use of the income tax method for calculating capital account balances of Linda Nussbaum and Paul Gallagher in 2007. (*See* DX 46; M.H. Test. 8/12/09 Tr. 12:10-28:1; S.T. Test. 8/13/09 Tr. 59:22-25, 60:5-7). Nonetheless, Hausfeld and Lewis did not object to use of the income tax method of accounting until this year, months after their separation from Cohen Misltein, and only because it would artificially inflate their capital account balances. Hausfeld's and Lewis's acceptance and/or acquiescence in the use of the income tax method of accounting was relied on by Cohen Milstein in operating its business from the adoption of the 2003 Operating Agreement to the present time. Because Hausfeld and Lewis accepted and/or acquiesced in Cohen Milstein's use of the income tax method of accounting, they have waived this issue.

Even if the Operating Agreement contained a provision prohibiting non-written modifications, the firm's course of performance can still modify the contract as a matter of law. *See Caring People Alliance*, 2008 WL 4441994, at *8; *Honeywell Int'l Inc.*, 858 A.2d at 411-13.

<u>Cohen Milstein did not breach the Confidential Agreement or the Operating Agreement</u>

40

incorporated therein by reference by using the income tax method of accounting. The Operating Agreement only provided that GAAP be used in maintaining the books of account; it did not require the use of GAAP or prohibit the use of the income tax method in calculating the "owed" capital account balances. The Operating Agreement allowed the Members to choose which accounting method to use, and Cohen Milstein choose the income tax method. Even if the Operating Agreement required the use of GAAP, it did so only for maintaining books of account and not for preparing financial statements; in any event, Hausfeld and Lewis waived this claim by their acceptance or acquiescence in the firm's use of the income tax method for over twenty-three years.

Cohen Milstein did not breach its duty of good faith or fair dealing by using the income tax method of accounting. Cohen Milstein has historically used the income tax method of accounting and did not breach any contracts by using such accounting practice in calculating Hausfeld's and Lewis's capital account balances. Because there is no evidence that Cohen Milstein acted in bad faith in using the income tax method or in deciding to use the income tax method, Cohen Milstein did not breach any expressed or implied duties of good faith and fair dealing.

Cohen Milstein did not commit any fraud or material omission or misrepresentations by using the income tax method of accounting. Hausfeld and Lewis have not yet claimed that Cohen Milstein committed fraud or material misrepresentation by using the income tax method of accounting. To the extent that they are making this claim, there are no representations or omissions concerning the method of accounting to justify a fraud or material misrepresentation claim.

41

### G.     Equity Partner Percent Interest

A departing partner's share of the income or loss for the current fiscal year is based on the partner's percent equity interest and the firm's income or loss as of "the last day of the last full month immediately proceeding the Termination Date," which was October 31, 2008 in this case. (DX 3; R.L. Test. 8/10/09 Tr. 308:12-309:15, 316:13-23; M.H. Test. 8/12/09 Tr. 29:4-19; D.S. Test. 8/12/09 Tr. 77:7-14).

Hausfeld's and Lewis's equity interest on October 31, 2008 was 27.97% and 6.78% respectively. On November 5, 2008, Cohen Milstein's Compensation Committee lowered Hausfeld's equity interest in the firm 14 percent, and lowered Lewis's equity interest to 6.5 percent. (DX 39). That same day, Toll sent a memorandum to all equity partners that stated that the equity interests are "retroactive to the beginning of 2008 and effective immediately." (*Id.*).

On November 6, 2008, members owning at least two-thirds (2/3) of the partnership's equity interest acted by written consent to terminate Hausfeld from the firm and to amend the Operating Agreement to make Hausfeld's termination effective immediately. (DX 40). Neither action was related to Hausfeld's capital account balance. (*Id.*; PX 93; R.L. Test. 8/10/09 Tr. 285:7-286:16; D.S. Test. 8/11/09 Tr. 28:4-29:14; 8/13/09 Tr. 148:17-23). On November 11, 2008, Lewis left Cohen Milstein and joined Hausfeld LLP immediately. (PX 94; R.L. Test. 8/10/09 Tr. 287:5-12; 8/13/09 Tr.140:2-141:4).

The retroactivity of the Compensation Committee's decision meant that the newly-set equity interests would apply to the end-of-the-year calculations to determine each partners' share of the profits or losses going back to the beginning of the year and that the equity interest for the purpose of voting was effective immediately. Retroactivity does not mean that the newly-set equity interests apply to the calculation of departing partners' capital account balances. Cohen

42

Milstein has always applied this interpretation to the Compensation Committee's determinations. (J.S. Test. 8/11/09 Tr. 19:19-22:11; D.S. Test. 8/12/09 Tr. 83:6-15; H.M. Test. 8/12/09 Tr. 111:3-14; S.T. Test. 8/13/09 Tr. 37:10-39:23, 124:18-125:19).

The Cohen Milstein capital calculations were provided by e-mail from Hogan & Hartson to Venable on February 20, 2009.  (DX 1).  This was just two days after the February 18, 2009 letter that Diamond sent by U.S. mail to Mark Willis ("Willis") containing his capital account balance and loss calculation for his ▮▮▮▮ interest as of July 31, 2008; Willis left the firm on August 21, 2008, and the delay in his case had nothing to do with the Confidential Agreement to which he was not a signatory.  (DX 16).  Of course, Willis's November 5, 2008 Compensation Committee percentage of zero (0%) was not applied immediately and retroactively to January 1 to change his capital account calculation as of July 31, 2008.  (*See* DX 39, MSW reduced from ▮▮▮▮ to zero)

Hausfeld and Lewis assert that their situation is unique because their Termination Date was after the Compensation Committee meeting.  They argue that if a departing partner's Termination Date was before the Compensation Committee meeting, then the prior year's equity interest would apply; however, if the Termination Date was after the Compensation Committee meeting, then the newly-determined equity interest must apply.  (P.D. Test. 8/10/09 Tr. 123:15-127:9; 8/12/09 Tr. 26:25-28:15; S.T. Test. 8/13/09 Tr. 58:2-60:14).

Hausfeld's and Lewis's proposed distinction that the retroactive to January 1, 2008 equity interest applies only to partners who are still at the firm as of November 5, 2008, and not to partners who had left earlier and received zero interest from the same Compensation Committee (for whom its decision is not retroactive), is not a distinction made in the Operating Agreement. It is not a distinction ever made by Cohen Milstein.  It is not a distinction made by firm

43

accountant Drolet, although in her testimony she described it as a close question as a matter of law for this Court to decide.  Actually it presents two interrelated legal issues.  First, does the action of a Compensation Committee made retroactive to January 1 have any application at all to Article TENTH (A) for calculation of capital account balances of departed partners?  Given the lack of textual support in the Operating Agreement, firm history would ordinarily be decisive as a matter of District of Columbia law.  *See* Restatement (Second) of Contracts § 203(b).  But even assuming that Hausfeld was correct that Compensation Committee percentages are also to be applied for Article TENTH (A) calculations, retroactive to January 1, there is no support for his further argument that they are applied solely to him and Lewis and not to every other partner who had left previously in 2008, and whose equity interest in the firm was reduced retroactively to January 1, 2008.  Once again, there is no basis in the language of Article TENTH(A) to apply percentages retroactively to January 1, 2008, to some partners but not to all for purposes of capital account balance calculations.  That is one reason why such Compensation Committee changes have not ever applied retroactively to departing partners whose calculation date (here October 31, 2008) has already passed at the time of the Compensation Committee decision.

Furthermore, it is doubtful that Hausfeld and Lewis would argue for such an interpretation if Cohen Milstein had a profit as of October 31, 2008.  Because Cohen Milstein may encounter similar situations in the future, it needs one standard to apply that is not dependent on whether there is a profit or a loss.  Cohen Milstein's interpretation is consistent with the Operating Agreement.  Therefore, Hausfeld's and Lewis's equity interest as of October 31, 2008, was 27.97% and 6.78% respectively.

Cohen Milstein acted in accordance with the terms that Hausfeld, Lewis, and the other partners agreed upon in the Operating Agreement.  (*See* DX3).

\\\DC - 032991/000001 - 2940462 v12

Cohen Milstein did not breach the Confidential Agreement or the Operating Agreement by using the pre-Compensation Committee equity percentage. Under paragraph 14 of the Confidential Agreement (DX 2), the first 50% installment of the capital is due "December 31, 2009"; therefore, until December 31, 2009, there can be no breach of the Confidential Agreement.

Cohen Milstein did not breach the Operating Agreement as the firm accountant found no such breach in her decision, which is final and determinative. Reliance on the accountant's March 6, 2009 e-mail to Stef Tucker of Venable negates any claims of bad faith by Cohen Milstein. Because Cohen Milstein correctly applied 27.97% and 6.78% for Hausfeld's and Lewis's capital account calculations respectively, the law firm did not breach any agreements.

Cohen Milstein did not breach its duty of good faith and fair dealing under the Confidential Agreement by using the pre-Compensation Committee equity percentage. Hausfeld and Lewis assert that Cohen Milstein acted in bad faith in not providing Drolet with Toll's November 5, 2008 memorandum. However, Drolet asked Toll whether there was an amendment to the Operating Agreement concerning retroactivity, and Toll accurately stated that there was no such amendment. Nonetheless, Toll did discuss the retroactivity issue with Drolet, informing her that the Compensation Committee had mentioned retroactivity and that he believed the newly-determined equity percentage only applied to the end-of-the-year calculations. (Testimony of Steven Toll on August 10, 2009 Trial Transcript ("S.T. Test. 8/10/09 Tr.") 256:22-258:9). Thus, to blame Toll for not providing this memorandum is pretextual because the memorandum was not asked for and Drolet was only interested in written amendments to the Operating Agreement. *Importantly, Hausfeld and Lewis also had possession of this memorandum and also failed to provide it to Drolet.* (DX 39; S.T. Test. 8/10/09 Tr. 252:18-255:4). If this memorandum was as

45

critical as the plaintiffs now assert, they could have easily provided it to Drolet to address their concerns.

In any event, Cohen Milstein rejected Drolet's suggestion to write down $5 million prior to October 31, 2008. Thus, the remaining partners at the firm took the full $5 million loss and effectively excused Hausfeld and Lewis from their share in that loss. If Hausfeld and Lewis shared in this $5 million loss, their total capital account balance would have been further reduced. It is difficult to find that a party acted in bad faith when they acted accordingly under the contract and acted in a manner to save the opposing parties over $1 million. Because there is no evidence that Cohen Milstein acted in bad faith in using the pre-Compensation Committee equity percentage or in not providing the Toll memorandum to Drolet, Cohen Milstein did not breach any express or implied duties of good faith and fair dealing in the Confidential Agreement.

Moreover, there was no continuing duty of good faith and fair dealing in the Operating Agreement to terminated partners. Their rights are supplanted by specific provisions that are strictly limited. The only "good faith" obligation is explicit in Article TENTH (A). It says "[A]fter the Company gives such statement to the Terminated Member [here, February 20, 2009], the Company and the Terminated Member shall attempt in good faith to agree . . . ." It then provides "[i]f they cannot agree . . . the amount of such balance shall be determined by the independent accountants . . . ."

Cohen Milstein did not breach any fiduciary duties by using the pre-Compensation Committee equity percentage. Because the percentage used was appropriate, there was no injury to Hausfeld or Lewis. To the extent that Hausfeld or Lewis claim that Cohen Milstein breached its fiduciary duty when it reduced their equity interest or when it terminated Hausfeld, the plaintiffs have waived this claim through paragraph 16 of the Confidential Agreement, which

46

waived all claims arising before January 1, 2009, and by stipulating that the amendment to make Hausfeld's termination effective immediately had nothing to do with his capital account.  (DX 2; 8/13/09 Tr. 148:5-23).

In closing arguments on August 13, counsel for Hausfeld and Lewis argued an entitlement to have capital account balances calculated as of November 30, 2008.  This argument has no support.  In paragraph 14 of the Confidential Agreement, the return of capital owed to Hausfeld as of November 6, 2008, and Lewis as of November 10, 2008, "as provided for in the Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld, & Toll, P.L.L.C." would be accelerated.  The requested November 30, 2008 calculation violates the Confidential Agreement in two ways.  First, the Confidential Agreement specifies capital owed as of November 6 for Hausfeld and as of November 10 for Lewis.  It does not say November 30. Second, it provides that the capital owed as of those two withdrawal dates in early November is "as provided for in the Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld, & Toll, P.L.L.C."  That Operating Agreement in Article TENTH (A) sets the calculation date as October 31, 2008, which is "the last day of the last full month immediately preceding the Termination Date" within the meaning of Article TENTH (A).

Hausfeld and Lewis argue that if Cohen Milstein had not amended the Operating Agreement to eliminate the 30-day waiting period for the effective date of a written notice of termination, November 30 would have been the operative date and therefore this Court should ignore the amendment to the Operating Agreement.  First, as this Court correctly pointed out, the amended termination date applied only to Hausfeld.  (8/13/09 Tr.140:2-141:23).  It did not apply by its terms to Lewis.  His resignation, dated November 10, 2008, for whatever reason, was effected immediately by his choice.  (PX 94; 8/13/09 Tr.140:2-141:23).  A consequence of that

\\\DC - 032991/000001 - 2940462 v12

choice is that October 31, 2008 is the date for calculation of his capital account balance. Second, with respect to Hausfeld, Hausfeld stipulated and the evidence was undisputed at the hearing from every witness at Cohen Milstein that the reason for an immediate expulsion of Hausfeld that justified the elimination of the 30-day waiting period had nothing to with his capital account. (J.S. Test. 8/11/09 Tr. 65:4-66:19; D.S. Test. 8/12/09 Tr. 88:7-89:20; H.M. Test. 8/12/09 Tr. 115:7-15; 8/13/09 Tr. 148:5-23).

Hausfeld cannot now claim the extraordinary injunctive remedy to enjoin an Operating Agreement amendment on a purported claim that the timing of his removal was somehow unfair, especially when he stipulated at the hearing that the timing was not related to his capital account balance. (8/13/09 Tr. 148:5-23) The back door attempt by Hausfeld's counsel to argue that it was somehow unfair to amend the notice provision and therefore Hausfeld is entitled to ignore (a) the amendment, (b) the Settlement Agreement, (c) the Operating Agreement, and (d) his own stipulation to receive his capital account balance as of November 30, 2008 is unpersuasive.

In any event, this claim was waived by his mutual release in the Confidential Agreement. Paragraph 16 of the Confidential Agreement is broad and inclusive. It states:

> [the parties] hereby, mutually release and forever discharge each other from any and all claims, complaints, and causes of action arising prior to January 1, 2009, whether in law or equity, whether under the Amended and Restated Operating Agreement of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., or under federal, state, local or other law, whether known or unknown, whether accrued or unaccrued, whether upon statutory claim, contract, tort or other basis, including but not limited to any claim for salary, bonus, reimbursement, profit distributions, any other payment arising out of employment at CMHT, or any share of legal fees and/or reimbursed expenses for time or expenses in cases worked on at CMHT, and any claim, whether in contract or in tort, known or unknown, arising out of or concerning in any way employment with CMHT, termination or alleged constructive termination or withdrawal from CMHT or formation of Hausfeld LLP; provided,

48

however, that the provisions of this paragraph 16 specifically do not constitute a release or waiver of any claim arising out of the violation of any of the commitments or obligations set forth in this Agreement.

(DX 2).

Cohen Milstein did not commit any fraud or material omissions or misrepresentations by using the pre-Compensation Committee equity percentage. Hausfeld and Lewis do not yet claim that Cohen Milstein committed fraud or material misrepresentation by using the pre-Compensation Committee equity percentage. If they do, there is no representations or omissions concerning the equity percentage to justify a claim for fraud or material misrepresentation. To the contrary, Toll (as one member of Cohen Milstein's Executive Committee), at the February 2, 2009 settlement conference, did orally disclose in response to an oral request by Hausfeld in chambers the intended use of pre-Compensation Committee equity interests and not post-Compensation Committee equity interests. (S.T. Test. 8/13/09 Tr. 28:2-10). Your Honor's notes in the second joint session of February 2, 2009 should also confirm Hausfeld's oral request and Toll's oral agreement about the use of pre-Compensation Committee equity interests in the capital account calculation which Toll testified about at the hearing and which Hausfeld does not recall. (*Id.*). It is hardly fraud or bad faith when Cohen Milstein agreed in the second settlement conference before Your Honor to Hausfeld's request to use a particular percentage in his still-to-be-done capital account calculation.

### H.      Disclosure of Capital Account Balance

Pursuant to paragraph 16 of the Confidential Agreement, any causes of action and claims arising prior to January 1, 2009 have been mutually released by the parties. (DX 2). Under the Operating Agreement, Cohen Milstein had 30 days after the Termination Date to provide the

\\\DC - 032991/000001 - 2940462 v12

capital account balances, which meant that Cohen Milstein was to provide these calculations to Hausfeld on December 6, 2008, and to Lewis on December 11, 2008. (DX 3; M.H. Test. 8/12/09 Tr. 40:5-12). Thus, any causes of action concerning this 30-day requirement arose prior to January 1, 2009. Therefore, pursuant to paragraph 16 of the Confidential Agreement, Hausfeld and Lewis have waived any causes of action or claims concerning this 30-day provision.

Paragraph 18(c) of the Confidential Agreement provides that this Court can only resolve disputes that arise under the Confidential Agreement. (DX 2). Any claim of unreasonable delay or concealment before the first settlement conference is outside this Court's scope of review.

At the February 2, 2009 settlement conference, Hausfeld requested his and Lewis's exact capital account balances. This Court also asked Cohen Milstein to provide these calculations to the plaintiffs. (M.H. Test. 8/12/09 Tr. 12:4-13, 14:2-11, 63:21-24; S.T. Test. 8/13/09 Tr. 27:15-21, 65:5-22, 66:13-22). However, Cohen Milstein did not know the exact capital account balances at the time. (S.T. Test. 8/13/09 Tr. 4:8-5:23; 6:20-7: 9, 66:1-5, 152:13-15). Cohen Milstein knew that the firm sustained a loss as of October 31, 2008, and that Hausfeld's and Lewis's capital account balances would be reduced, but the firm did not know the degree that these balances would be reduced. (S.T. Test. 8/13/09 Tr. 22:2-11). Likewise, Hausfeld and Lewis knew that there would be some fluctuation in their capital account balances but did not know to what degree. (8/13/09 Tr. 314:5-15). Although Toll had Diamond's January 10, 2009 draft calculations, he had not looked at these calculations before the settlement conferences. (S.T. Test. 8/13/09 Tr. 152:13-15). Even if Toll had glanced at Diamond's calculations, it had not been verified and could not be relied upon for accuracy. If Toll had made any representations based on these draft calculations, Cohen Milstein would have been liable for affirmative misrepresentations if the numbers had changed, which they clearly did.

50

In addition, Hausfeld knew or should have known that his capital account balances would be significantly reduced.  Hausfeld was the Chairman of Cohen Milstein from 1986 to November 2008.  (M.H. Test. 8/12/09 5:23-6:2).  As Chairman, he was familiar with how the firm handled departing partners in the past and, most importantly, the state of the firm as of October 31, 2008.  (*Id*. at 17:1-25, 59:8-12).  Hausfeld also knew that Cohen Milstein had significant losses at the end of October and that the firm was in substantial debt to SunTrust Bank at that time.  (M.H. Test. 8/12/09 Tr. 17:1-18:4, 20:8-16).  Because Hausfeld was personally liable for a portion of this debt, he knew that significant efforts had to be taken to pay it off in November and December.  (M.H. Test. 8/12/09 Tr. 17:1-25).  Also, all the equity partners at Cohen Milstein received monthly financial statements.  (D.S. Test. 8/12/09 Tr. 77:18-20, 78:23-79:5, 80:21-25; J.S. Test. 8/11/09 Tr. 52:21-54:14; S.T. Test. 8/13/09 Tr. 22:2-11).  Hausfeld had seen the firm's financial statements for September 2008, which reported that the firm suffered $5,562,209.00 in losses as of September 30, 2008.  (M.H. Test. 8/12/09 Tr. 50:2-10).  He could have easily used the September financial statements to estimate his capital account balance, which showed that his balance was significantly reduced as of September 30, 2008.  (J.S. Test. 8/11/09 Tr. 52:21-54:14; S.T. Test. 8/13/09 Tr. 22:2-11)  Finally, Hausfeld also was a Member of the Executive Committee.  (J.S. Test. 8/11/09 41:24-42:15).  The Executive Committee had unlimited access to the firm's financial data and had discussed the firm's operating losses at its meetings in October 2008.  (J.S. Test. 8/11/09 Tr. 56:21-59:1, 60:21-61:9; D.S. Test. 8/12/09 Tr. 81:4-10; S.T. Test. 8/13/09 Tr. 12:6-13).  Members of the Executive Committee also oversaw the collection of fees and knew that very little income came in during October 2008.  (S.T. Test. 8/13/09 Tr. 12:14-14:16).  Thus, Hausfeld, who was at the firm throughout October, did not need financial

\\\DC - 032991/000001 - 2940462 v12

statements for October to know that the firm received very little revenue that month and that the loss would be slightly higher at the end of October than in September.

Lewis did not attend all of the settlement conferences. He asserts that he learned about the details of the negotiations concerning capital account balances through a telephone conversation with Hausfeld. (R.L. Test. 8/10/09 Tr. 290:18-291:10, 294:15-295:1; M.H. Test. 8/12/09 Tr. 13:6-15). Because he did not attend the relevant conferences, he cannot claim he was misled by Cohen Milstein. Lewis believed that he was getting $1.1 million because of a phone call with Hausfeld and because Cohen Milstein did not have a loss at the end of the year, even though end-of-the-year results are not part of the capital account calculations. (R.L. Test. 8/10/09 Tr. 289:8-293:7, 294:15-295:1). Nonetheless, Lewis knew that Cohen Milstein had significant losses at the end of October. (*Id.* at 313:17-19). He also knew that the money used to pay down Cohen Milstein's line of credit with SunTrust bank came in November and December. (*Id.* at 292:24-293:7). Additionally, like Hausfeld, Lewis received the monthly financial statements and could have easily estimated his capital account balance as of September 30, 2008. (R.L. Test. 8/10/09 Tr. 306:7-307:18, 314:24-315:5; J.S. Test. 8/11/09 Tr. 52:21-54:14; S.T. Test. 8/13/09 Tr. 22:2-11).

Cohen Milstein has historically been late at producing capital account balances to departing partners. It has never been an issue of concern because the firm's first payment is not due until over a year after the partner departs. (S.T. Test. 8/13/09 Tr. 5:13-16, 64:18-65:4). For example, Mark Willis received his capital account balance six months after his departure. (PX 38; P.D. Test. 8/10/09 Tr. 192:1-17; S.T. Test. 8/13/09 Tr. 16:25-17:18). Thus, there was nothing unusual or sinister in this delay when the parties first met to mediate in late January. After Hausfeld and Lewis requested their capital account balances on February 2, 2009, Toll

\\\DC - 032991/000001 - 2940462 v12

reviewed the draft calculations and authorized Diamond to send the calculations to Drolet. (S.T. Test. 8/13/09 Tr. 5:17-23, 6:20-7:9, 152:13-153:13). After Drolet corrected some significant errors, Cohen Milstein had a revised draft of the calculation by February 6, 2009. (PX 21, P.D. Test. 8/10/09 Tr. 60:23-63:6, 64:19-22, 65:11-66:3, 66:21-68:15). However, Drolet also recommended that Cohen Milstein write down $5 million before October 31, 2008. (P.D. Test. 8/10/09 Tr. 75:9-12, 76:12-77:5, 108:2-17, 189:2-9). This suggestion would have further reduced Hausfeld's and Lewis's capital accounts. (P.D. Test. 8/10/09 Tr. 108:2-19, 189:2-190:9, 195:5-25; S.T. Test. 8/13/09 Tr. 18:11-19:2). Alternatively, taking this write down at the end of the year would force partners at Cohen Milstein to take a larger share of the firm's loss than they were obligated to take. Over the next week or two, Cohen Milstein carefully deliberated about Drolet's suggestion. The firm discussed the matter internally and sought approval from the Executive Committee. (D.S. Test. 8/12/09 Tr. 85:19-87:7; S.T. Test. 8/13/09 Tr. 17:24-21:3). After deciding against the Drolet's suggestion, on February 20, 2009, the firm's outside counsel sent Hausfeld and Lewis their capital account balances. (DX 1; S.T. Test. 8/13/09 Tr. 16:18-24). If there was any delay, it was because the firm took the time to ensure that the calculations were done correctly and to discuss the write down issue thoroughly.

Cohen Milstein did not breach any contracts by not disclosing the capital account balances until February 20, 2009. Pursuant to paragraph 16 of the Confidential Agreement, Hausfeld and Lewis waived any causes of action arising prior to January 1, 2009, concerning the Operating Agreement. Although Cohen Milstein exceed the 30-day provision under the Operating Agreement, any cause of action concerning this provision arose prior to January 1, 2009. Therefore, Hausfeld and Lewis waived this claim.

53

Cohen Milstein did not breach its duty of good faith or fair dealing by not disclosing the capital account balances until February 20, 2009. Under D.C. law, the implied duty of good faith and fair dealing in contracts does not apply to parties' pre-contract negotiations. *See Ellipso*, 541 F. Supp. 2d at 373-74. To the extent that Hausfeld and Lewis claim that Cohen Milstein breached this duty in not disclosing the exact capital account balances at the settlement conferences, this claim is not actionable under D.C. law because it pertains to the parties pre-contract negotiations.

In any event, it is difficult to find that a party delayed in bad faith when its reason for delay saved the opposing parties their legitimate share of an additional $5million in pre-October 31, 2008 losses (over $1 million in the capital account balances of Hausfeld and Lewis) by rejecting its accountant's advice and writing down 2008 losses later in the year than the accounting justified. Further, Cohen Milstein sent the information to Hausfeld and Lewis within just three weeks of it being requested in Your Honor's chambers, after reviewing, discussing, and resolving a number of issues, particularly the $5 million write down.

Cohen Milstein did not breach any fiduciary duties by not disclosing the capital account balances until February 20, 2009. Cohen Milstein did not breach its fiduciary duty to return and to accurately calculate a departing partner's capital account balance. Hausfeld's and Lewis's alleged non-disclosure claims did not result in Cohen Milstein miscalculating the capital account balances or missing a payment. The discussions that delayed disclosure resulted in the firm deciding to take a greater share of the loss than they were obligated to take. Thus, the delay did not cause injury to Hausfeld's and Lewis's capital account balances, and Cohen Milstein did not profit from it.

54

Cohen Milstein did not commit any fraud or material omissions and misrepresentations by not disclosing the capital account balances until February 20, 2009. Cohen Milstein did not make any affirmative representations concerning Hausfeld's and Lewis's capital account balances nor did it conceal any relevant information during the settlement conference. Under the Restatement (Second) of Contracts, concealment is an action taken to prevent another from learning a fact. Cohen Milstein did not prevent Hausfeld or Lewis from learning that their capital account balances had decreased. In fact, both Hausfeld and Lewis knew or should have known that Cohen Milstein suffered a loss as of October 31, 2008 and could easily have estimated their capital account balances. Moreover, neither Hausfeld nor Lewis articulated any assumptions about their capital account balances to Cohen Milstein during the settlement negotiations.

Finally, neither Hausfeld nor Lewis can justifiably rely upon the alleged non-disclosure of their capital account balances. Both Hausfeld and Lewis are sophisticated and highly intelligent lawyers who could have easily verified their assumptions. *See Weaver*, 421 F. Supp. 2d at 33. Hausfeld and Lewis knew that Cohen Milstein had suffered significant losses as of October 31, 2008. Hausfeld, especially, was privy to the financial situation at the firm because he was on the Executive Committee, through which he was or should have been familiar with the firm's financial concerns in October. Hausfeld was also the Chairman of the firm for over twenty years, through which he would have been familiar with the Operating Agreement and the firm's handling of departing partners. Furthermore, both Hausfeld and Lewis knew that Cohen Milstein had a significant line of credit owed to SunTrust Bank at the end of October. Hausfeld and Lewis also could have easily estimated their capital account balances by reviewing the

\\\DC - 032991/000001 - 2940462 v12

September financial statements, which showed significant reductions in the capital accounts as of September 30, 2008.

Negotiations always involve give and take.  Hausfeld and Lewis did not insist that the Confidential Agreement provide a dollar figure for their capital accounts; instead, they made their own independent decision, with the assistance of counsel, to incorporate by reference the Operating Agreement's clearly stated procedures for calculating them.  (DX 2 ¶ 14; R.L. Test. 8/10/09 Tr. 315:25-36:12).  As sophisticated professionals, their reliance on non-disclosures at an arm's-length negotiation vitiates their claims of fraud and misrepresentation.  *See Weaver*, 421 F. Supp. 2d at 33.

### I.    Unavailability of Damage Remedy on Equitable Reformation

There is no damage remedy or equitable reformation available in the Confidential Agreement or the Operating Agreement.  The Confidential Agreement itself contains no damage remedy, no equitable reformation remedy and limits this Court's role as a matter of contract law to construe the parties' terms used in the Confidential Agreement, not to change them.  Moreover, a damage remedy for the calculation of the withdrawing partners capital account balance under Article TENTH is not permitted under the Operating Agreement.  Article FIRST (E) captioned "Term" states that "each Member agrees that he or she may withdraw from the Company, or cause the dissolution of the Company, only in the manner, and on the conditions, specifically set forth in this Agreement."  (DX 3).  Article TENTH (A) makes no provision for damages and therefore is precluded by the Article FIRST (E), which limits the departing member only to "the manner, and on the conditions, specifically set forth in this Agreement."

That this Court has decided that it will not defer to Drolet's judgment as final and binding upon all the parties" is already one deviation from the parties' intent as specified in the

56

57

Operating Agreement.  In any event, the Court does not have the delegated power from the

parties in the Confidential Agreement to insert additional terms into the Operating Agreement.

\\\DC - 032991/000001 - 2940462 v12

Respectfully submitted,

John C. Keeney, Jr.
Lynne M. Baum
HOGAN & HARTSON L.L.P.
555 13th Street, NW
Washington, D.C. 20004
(202) 637-5600 (Tel.)
(202) 637-5910 (Fax)

Dated:  September 15, 2009


COHEN MILSTEIN'S REQUEST FOR CONFIDENTIAL TREATMENT FOR ALL NUMBERS.

Cohen Milstein respectfully requests that this Court seal and treat confidential all entries with respect to numbers to protect the personal financial privacy of all parties and to avoid undue competitive harm by public release of such financial data to other third-party competitor law firms.

John C. Keeney, Jr.
Lynne M. Baum
HOGAN & HARTSON L.L.P.
555 13th Street, NW
Washington, D.C. 20004
(202) 637-5600 (Tel.)
(202) 637-5910 (Fax)

Dated:  September 15, 2009

\\\DC - 032991/000001 - 2940462 v12

## Certificate of Service

I hereby certify that on this 15th day of September, 2009, I caused copies of the foregoing Defendant Cohen, Milstein, Sellers & Toll PLLC's Post-Trial Brief to be transmitted by electronic mail, and mailed, first-class postage prepaid, to the following:

Mr. Seth Rosenthal
Venable LLP
575 Seventh St. NW
Washington, DC 2009

Counsel for Defendants

_____
John C. Keeney, Jr.