IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| MICHAEL HAUSFELD, et al. | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COHEN MILSTEIN SELLERS | : | NO. 06-CV-826 |
| & TOLL, PLLC | : | |
| Defendants | : | |


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TIMOTHY R. RICE                                                November 30, 2009
U.S. MAGISTRATE JUDGE

This case requires examination of the inner-workings of a major class-action law firm,

Cohen Milstein Hausfeld & Toll, PLLC ("CMHT"), which suffered an arduous break-up,

resulting in two separate firms, Cohen Milstein Sellers & Toll, PLLC ("CMST") and Hausfeld

LLP ("HLLP"). Even after the parties settled disputes arising from the break-up with judicial

assistance, their mutual mistrust and bare-knuckle tactics spawned new disputes involving more

than $17 million in legal fees and capital accounts.

Pursuant to my role in resolving disagreements arising from the settlement, I held a four-

day evidentiary hearing on August 10, 2009 on the following issues: (1) whether the capital

account calculations of CMHT's departing partners, Michael Hausfeld and Richard Lewis, by

Drolet & Associates, CMST's outside accountant, was final and binding in accordance with

articles TENTH and FOURTEENTH of CMHT's 2003 Amended and Restated Operating

Agreement ("Operating Agreement"); (2) if Drolet & Associates' calculations were not binding,

whether Hausfeld's and Lewis' capital account balances were properly calculated; and (3) the

proper allocation of attorneys' fees awarded to HLLP from the case, In re Int'l Air Transp.

Surcharge Antitrust Litig., No. 06-1793 CRB (N.D. Cal.) ("Air Passenger").[1]

This case involves self-interest on both sides. Accordingly, I have relied on the testimony

of disinterested parties[2] Patricia Drolet[3] and Kenneth Feinberg, and documentary corroboration to

resolve conflicting testimony. Based on the factual findings and conclusions of law set forth

herein, I hold that: (1) Drolet & Associates' calculation of Hausfeld's and Lewis' capital account

was not final and binding;[4] (2) CMST breached the Confidential Agreement by using plaintiffs'

---

[1] CMST failed to preserve the emails of its controller, Hugh Diamond, specifically a February 5, 2009 email from Diamond to Drolet. Therefore, plaintiffs filed a motion requesting an adverse inference to support their claim that CMST strategically delayed releasing plaintiffs' capital account calculations; preclusion of Diamond from testifying about the content of any missing email; and/or attorneys fees. Plaintiffs' Motion for a Spoliation Inference at 1, 12, Hausfeld v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. Aug. 10, 2009). I have discretion to impose sanctions for spoliation of evidence after considering factors such as "the degree of negligence or bad faith involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point." Battocchi v. Wash. Hosp. Center, 581 A.2d 759, 767 (D.C. 1990); see also Williams v. Wash. Hosp. Center, 601 A.2d 28, 32 (D.C. 1991). This motion is denied as moot because I have found CMST's delay in providing plaintiffs' capital account calculations breached the Confidential Agreement, see infra Conclusion of Law ¶ 10; Diamond was not called as a witness during the evidentiary hearing; and both parties shall bear their own attorneys' fees based on their conduct, see infra Conclusion of Law ¶ 51.

[2] Anthony Maton may have some bias because he has formed a new law practice, Hausfeld & Co., LLP, in June 2009, in which Hausfeld has an interest. See infra Finding of Fact ¶ 70.

[3] I give great weight to the testimony of Drolet because I found her to be candid, conscientious, and competent. Although CMST is her client, her testimony showed no bias. See Hearing Tr. 266:14-24, Aug. 10, 2009.

[4] On August 10, 2009, I ruled from the bench that Drolet & Associates' calculation of plaintiffs' capital account was not final and binding. Hearing Tr. 260:9-262:23, Aug. 10, 2009. I found that even though both parties contemplated Drolet would function as an arbitrator, see

2007 percentage interests to calculate their capital account balances; and (3) HLLP breached the Confidential Agreement by failing to distribute Air Passenger fees to CMST.

I.    Findings of Fact

A.    Capital Account Calculations

    1.    Firm Division Background

    1.  Hausfeld was a founding member of CMHT and chairperson from 1986 to November 2008.  Michael Hausfeld Test., Hearing Tr. 5:23-6:22, Aug. 12, 2009 ("Hausfeld Test.").  He headed the firm's antitrust, international human rights, environmental, and mass torts practice group, and "drove the growth of the firm."  Steven Toll Test., Hearing Tr. 143:22-23, Aug. 13, 2009 ("8/13/09 Toll Test."); see PX105, Letter from Steven Toll to Michael Hausfeld (Apr. 9, 2008); Hausfeld Test. 6:6-12.

    2.  Lewis joined CMHT as an associate in 1987, and became partner in 1996.  His practice areas include pharmaceutical and environmental torts.  Richard Lewis Test., Hearing Tr. 273:16- 274:20, Aug. 10, 2009 ("Lewis Test.")

    3.  On November 5, 2008, CMHT's Compensation Committee voted to reduce Hausfeld's

---

PX2, DX3 at Art. TENTH A, 2003 Amended and Restated Operating Agreement of CMHT; 2200 M Street LLC v. Mackell, 940 A.2d 143, 151 (D.C. 2007), the requisite procedures and process were not followed.  Drolet candidly acknowledged she functioned on behalf CMST by simply reviewing CMST's calculations, and did not independently calculate the capital accounts. See infra Findings of Fact ¶¶ 32-33; see also infra Finding of Fact ¶ 34 (Drolet made recommendations on the capital account calculations, but they were not adopted by CMST.). Further, Drolet did not have all relevant information to calculate plaintiffs' capital account balances.  See infra Finding of Fact ¶ 36.  Drolet did not view herself as an arbitrator; did not possess all the relevant evidence; did not consider both parties' arguments; did not perform her own investigation and research; and therefore did not make an independent and neutral decision. See Mackell, 940 A.2d at 154; Booker v. Robert Half Int'l, Inc., 315 F Supp.2d 94 (D.D.C. 2004).

percentage interest in the firm from 28.95% to 14%.[5]  PX68, Memorandum from SJT to HEM, MDH, LMM, ANF, RSL, DSS, DAS, JMS, MIM, RAK, RGE, MPL with attachment (Nov. 5, 2008).  The Compensation Committee then reallocated Hausfeld's confiscated percentage interest to other partners of CMHT.  See PX68; 8/13/09 Toll Test. 117:22-119:10; Lewis Test. 283:18-284:25.  Lewis' percentage interest in CMHT was reduced from 7.02% to 6.5%, PX68; 8/13/09 Toll Test. 118:6-10.  A November 5, 2008 memorandum to all equity partners stated, without qualification, the new percentage interests were "retroactive to the beginning of 2008" and "effective immediately."  PX68.

4.  As a result, CMHT was able to expel Hausfeld from the firm by written consent of members owning two-thirds of the partners' equity interest.  Settlement Hearing Transcript 43:7-46:25, Apr. 28, 2009; PX93, DX40, Email from Daniel Sommers to Michael Hausfeld re: Consent - CONFIDENTIAL with attachment (Nov. 6, 2008); see 8/13/09 Toll Test. 125:20-126:2.

5.  Hausfeld was involuntarily terminated from the firm on November 6, 2008, effective immediately.  PX93, DX40.

6.  To hasten Hausfeld's departure, the Date of Withdrawal section of the Operating Agreement was amended on November 6, 2008.  The original section stated "the date of withdrawal shall be the date specified in the notice . . ., which may be not less than thirty (30) days after the date on which such notice is given."  PX2, DX3 at ¶ SIXTH A.  The section was amended to read "[t]he date of withdrawal [for an involuntarily terminated member] shall be the

---

[5] The underlying reasons for Hausfeld's ouster are relevant only to the extent they provide a context for the parties' ongoing hostility.

date written notice of termination is delivered."  PX93, DX40.

7.  On November 11, 2008, Lewis resigned from CMST, based in part on the changes in partnership percentage interests and involuntary termination of Hausfeld, and joined Hausfeld's new firm, HLLP.  PX94, Email from Richard Lewis to J. Sellers, H. Milstein, S. Toll, R. Koffman, D. Small, D. Sommers, L. Mezzetti, A. Friedman re: Termination; Lewis Test. 287:5-288:14.

2.       Confidential Agreement

8.  As a result of the November 2008 CMHT terminations, I held settlement conferences with representatives of HLLP and CMST on January 23 and February 3, 2009.  These settlement conferences led to the Confidential Agreement, which embodies and implements the oral agreement reached between HLLP and CMST in the settlement conferences and was signed by all parties by February 5, 2009.  PX1, DX2, Confidential Agreement between HLLP and CMST.

9.  Both parties made concessions in the Confidential Agreement, including:

a.  The accelerated return of capital to Hausfeld and Lewis.  The first half of capital shall be paid by December 31, 2009, and the second half by July 31, 2010.  Compare PX1, DX2 at ¶ 14; with PX2, DX3 at art. TENTH (capital account balances shall be paid in five annual installments).

b.  All In re OSB Antitrust Litig., No. 06-cv-826 (E.D. Pa.) fees, approximately $3 million, were conceded to CMST, even though Hausfeld had originated and helped resolve the case.  PX1, DX2 at ¶ 4; Hausfeld Test. 18:5-19:1; Robert Eisler Test., Hearing Tr. 220:15-19, Aug. 11, 2009 ("Eisler Test.").

c.  CMST split anticipated fees with HLLP.  8/13/09 Toll Test. 153:1-13; compare

PX1, DX2 at ¶¶ 1-2; with PX2, DX3 at ¶¶ NINTH, ELEVENTH (departing partners have no right to claim any fees after they leave the firm)

d.  Hausfeld and Lewis each agreed to forgo their $500,000 termination allowance.  See PX2, DX3 at ¶ ELEVENTH A; Hausfeld Test. 13:2-15; Lewis Test. 289:17-20; 292:17-24.

10.  Paragraph 18(b) of the Confidential Agreement states "the parties shall work in good faith to effectuate the provisions and purposes of this Agreement, including, as necessary, performing reasonable acts not specifically required by this Agreement in order to carry out the provisions and purposes of this Agreement."  PX1, DX2

11.  Paragraph 16 of Confidential Agreement states any causes of action and claims arising before January 1, 2009 have been mutually released.  Id.

3.    Capital Account Calculations

12.  The capital account balances of Hausfeld as of November 6, 2008, and Lewis as of November 10, 2008, were to be calculated and provided as stated in the Operating Agreement. PX1, DX2 at ¶ 14.  CMST was required to promptly furnish Hausfeld and Lewis with a statement of the balance in their capital accounts and of the income or loss of CMST for the fiscal year of the last full month immediately preceding the Termination Date.  PX2, DX3 at art. TENTH A.

13.  A partner's percentage interest applies to both allocation of profit or loss and to voting strength.  Herbert Milstein Test., Hearing Tr. 132:6-17, 133:6-134:8, Aug. 12, 2009 ("Milstein Test."); see 8/13/09 Toll Test. 124:15-17; see also Drolet Test., Hearing Tr. 121:20-122:5, Aug. 10, 2009 ("Drolet Test.") (never known the firm to use a different percentage for voting interests and income/loss determinations).

14. Article THIRD C of the Operating Agreement permits CMHT to allocate 10% of distributable income to the Members on a per capita basis. The actual percentage interest is the percentage interest fixed by the Compensation Committee each year. The effective rate is the percentage interest that results from distributing 10% to the firm's income equally among the partners prior to applying each partner's actual percentage interest to the remaining amount of income. PX2, DX3.

15. All equity partners at CMHT, including Hausfeld and Lewis, received monthly financial statements reflecting the financial status of the firm. 8/13/09 Toll Test. 21:22-22:11; Daniel Sommers Test., Hearing Tr. 77:18-20, 78:23-79:5, 80:21-25, Aug. 12, 2009 ("Sommers Test."); Joseph Sellers, Hearing Tr. 52:21-54:15, Aug. 11, 2009 ("Sellers Test."); Lewis Test. 306:11-13; see DX18, CMHT Monthly Financial Statements, September 2008; DX19, CMHT Monthly Financial Statements, October 2008; Hausfeld Test. 50:2-22. Partners usually received these statements two-to-three weeks after the end of the month. Sommers Test. 80:21-25; see Sellers Test. 52:24-25.

16. The September 2008 monthly financial statement showed CMHT had a year-to-date net loss of $5.5 million. DX18; 8/13/09 Toll Test. 21:22-22:11; Sommers Test. 79:17-19; Sellers Test. 53:16-22.

17. In 2008, there were many months where CMHT's expenses exceeded its revenue. As a result, CMHT extended its line of credit with Sun Trust Bank twice in 2008; and after Hausfeld's termination, CMST partners had to execute personal loans to the firm. See Milstein Test. 116:17-117:19; Sommers Test. 77:25-78:19; Sellers Test. 67:2-68:2.

18. As of the third-quarter of 2008, plaintiffs believed, after the firm collected its fees at

the end of the year, 2008 would be a "flat year," like 2007. See Hausfeld Test. 17:8-22 (fees collected after Hausfeld's termination would pay down CMST's line of credit to the bank), 50:14-25; see also Lewis Test. 289:2-12, 292:17-293:6 (knew at the end of 2008, CMHT paid a line of credit completely and there was no loss at the firm).

> a.      Timeline of Calculations

19.  At least as early as January 2009, Steven Toll, CMST's managing partner, Drolet Test. 110:23, was aware CMST had an obligation under Operating Agreement to provide Hausfeld and Lewis with their capital account balance calculations, Toll Deposition Test., Hearing Tr. 229:11-16, Aug. 11, 2009 ("8/11/09 Toll Test."); PX1, DX2 at art. TENTH.

20.  On January 8, 2009, Toll sent an email to Diamond, stating the "[n]eed to start doing capital account analysis for [Hausfeld], and other departing equity partners . . . as required by the Operating Agreement . . . . [M]ust have it in a few days." PX15, Email from Steve Toll to Hugh Diamond (Jan. 8, 2009).

21.  Diamond emailed Toll draft calculations of plaintiffs' capital accounts on January 10, 2009 to review, and asked Toll to let him know when he could forward his calculations to Drolet for review. PX15, Email from Hugh Diamond to Steve Toll (Jan. 10, 2009). Drolet had requested plaintiffs' capital account calculations on January 5, 2009. PX13, Email from Hugh Diamond to Patricia Drolet re: Updated Forecast (Jan. 5, 2009); Drolet Test. 47:14-48:8.

22.  Toll placed a copy of Diamond's calculations in his briefcase, but did not forward the calculations to anyone else. 8/13/09 Toll Test. 5:8-23; 8/11/09 Toll Test. 228:4-229:9.

23.  On January 15, 2009, Drolet again requested the capital account calculations from Diamond. However, Toll had not authorized Diamond to release them to Drolet. PX16, Email

8

from Hugh Diamond to Patricia Drolet re: Year End (Jan. 15, 2009).

24. During the January 23, 2009 settlement conference, Hausfeld asked Toll to reveal the exact calculation of plaintiffs' capital account balances. Hausfeld Test. 12:4-11; Eisler Test. 223:21-224:3; cf. 8/13/09 Toll Test. 65:4-12 (Toll knew the calculations were due to Hausfeld and Lewis at the January 2009 settlement conference). Toll assured prompt compliance.

25. The second settlement conference took place in my chambers on February 2, 2009. CMST still had neither provided the calculations to Hausfeld or Lewis, nor given them to Drolet for review. 8/13/09 Toll Test. 63:19-21; 65:23-66:5.

26. Hausfeld and I both requested plaintiffs' capital account balances at the February 2, 2009 settlement conference. 8/13/09 Toll Test. 26:15-27:24, 65:13-17, 66:13-22; Hausfeld Test. 14:2-11. Toll assured prompt compliance.

27. At the settlement conferences, plaintiffs estimated the amount of the capital to be returned to them was approximately $5 million for Hausfeld and approximately $1 million for Lewis. Hausfeld Test. 11:19-24; Eisler Test. 223:1-13; see Lewis Test. 289:2-20.

28. At both settlement conferences, Toll stated he did not know the exact balances of Hausfeld's and Lewis' capital accounts. 8/13/09 Toll Test. 4:8-5:23. However, based on his knowledge of CMST's fiscal year loss as of October 31, 2008, Toll knew plaintiffs' capital account balances would be lower than they expected and they would be unhappy. See id. at 85:13-18, 151:2-152:12, 152:22-153:13; 8/11/09 Toll Test. 237:7-14. Neither Hausfeld nor Lewis knew the October 31, 2008 loss figures because they had left the firm before those figures were released to CMHT partners. See Sommers Test. 80:21-25; Sellers Test. 52:24-25.

29. Although Toll possessed Diamond's January 10, 2009 draft calculations during the

settlement conferences, he did not disclose them.  It did not "dawn on [him] to look at" or review the calculations until February 3, 4, or 5, 2009.  8/13/09 Toll Test. 66:1-5, 67:7-16, 152:13-21.

30.  Plaintiffs' counsel sent CMST's counsel an email on February 3, 2009, again requesting plaintiffs' capital account calculations.  PX19, Email from Seth A. Rosenthal to John C. Keeney, Jr. re: Settlement Agreement 2-3-09 V redline (Feb. 3, 2009).

31.  In an effort to conclude settlement negotiations and because plaintiffs believed all parties acted in good faith under judicially supervised mediation, plaintiffs' counsel nevertheless transmitted HLLP signatures to the Confidential Agreement without knowledge of plaintiffs' exact capital account balances.  See Hausfeld Test. 45:20-46:20.  Counsel again demanded plaintiffs' capital account calculations on February 5, 2009.  PX20, Email from Seth A. Rosenthal to Lynne Baum-Villavicencio re: settlement agreement (Feb. 5, 2009).

32.  On February 5, 2009, Toll authorized Diamond to send the calculations to Drolet for review.  See 8/13/09 Toll Test. 67:17-68:16; Drolet Test. 53:20-54:11.

33.  Drolet reviewed and discussed with Diamond and Toll, the draft capital calculations on February 6, 2009.  PX21, Email from Hugh Diamond to Steve Toll re: Partner Capital Account Calculation (Feb. 6, 2009); PX61, Billing Records for Drolet & Associates, PLLC (Jan. 2008 - Apr. 2009); Drolet Test. 55:22-57:7, 74:21-75:8.  Drolet found errors in Diamond's calculations, including the incorrect use of the effective rate instead of the actual percentage interest rate for the purpose of determining allocable share of CMST's income or loss.  Drolet Test. 58:11-20, 60:23-68:15, 70:20-73:8.  Drolet also recommended to Diamond and Toll that CMST include a $5 million loss in the firm's capital balance as of October 31, 2008 to account for cases that were uncollectible before October 31, 2008.  Id. at 75:9-12, 76:12-77:5, 107:7-

108:19, 189:2-9.

34.  CMST partially adopted Drolet's recommendations.  CMST's Executive Committee decided not to include the suggested $5 million loss until the end of the year to avoid conflict by further reducing Hausfeld's and Lewis' capital accounts.  8/13/09 Toll Test. 18:6-21:3; Sommers Test. 85:19-87; Drolet Test. 77:1-5.

35.  On February 6, 2009, Diamond sent a revised draft, incorporating Drolet's corrections (except for the $5 million loss).  PX21; Drolet Test. 64:19-22.

36.  Drolet was not informed that Hausfeld's and Lewis' percentage interest reduction had been imposed retroactively.  Drolet Test. 73:9-74:19, 83:15-84:4, 85:2-86:2.  When Drolet eventually discovered this information, see PX48, Email from Patricia Drolet to Steve Toll FW: response to your voice message to me today (Mar. 2, 2009), Toll surprisingly told her there was no document indicating that the percentage interest determinations were to be applied retroactively, Drolet Test. 88:16-89:18; but see PX68.

37.  Drolet stated a retroactive change in plaintiffs' percentage interest would have had a material effect on plaintiffs' capital account calculations.  Drolet Test. 92:8-20; see also id. at 120:20-122:5 (Drolet found it "odd" that CMST used a lower percentage for plaintiffs' voting strength, but a higher percentage for computing plaintiffs' capital accounts).  She would have used 14% for Hausfeld and 6.5% for Lewis in calculating their capital accounts.  Id. at 85:2-86:2, 92:8-93:12; see also Milstein Test. 132:6-134:6. (agreeing 14% should have been used to calculate CMHT's loss allocated to Hausfeld).  Drolet admitted she was glad she was unaware of the Compensation Committee's November 5, 2008 actions because her review of plaintiffs' capital account calculations would have "look[ed] really bad right now."  Drolet Test. 121:20-

122:2.

38. Plaintiffs made a fifth request to CMST for plaintiffs' capital account calculations on February 6, 2009. PX24, Email from Seth A. Rosenthal to Lynne Baum-Villavicencio re: OSB fee disbursement (Feb. 6, 2009). CMST did not comply.

39. On February 13, 2009, CMST's Executive Committee considered and approved the revised capital account calculations for Hausfeld and Lewis. 8/13/09 Toll Test. 70:9-15.

40. Plaintiffs requested the capital account calculations for the sixth and seventh time on February 15 and 19, 2009. PX37, Email from Seth A. Rosenthal to John C. Kenney, Jr. & Steven M. Kaufman re: Capital Accounts (Feb. 15, 2009); PX39, Email from Seth A. Rosenthal to Lynne Baum-Villavicencio re: ChoiceDek/Wade v. Kroger (Feb. 19, 2009). CMST did not comply.

41. On February 20, 2009, CMST partner Patrick Tillou confirmed to Toll and other CMST partners that CMST was in receipt of OSB litigation fees provided by Hausfeld pursuant to the Confidential Agreement. See supra Finding of Fact ¶ 9.b. Tillou advised Toll, "[t]he eagle has landed . . . ." PX42, Email from Patrick Tillou to Daniel Sommers, Joe Sellers, Daniel Small & Steve Toll FW: Allocation of Expenses and Fees (Feb. 20, 2009); Sellers Test. 7:15-8:3.

42. Only then did CMST finally disclosed plaintiffs' capital account balances. PX41, Email from Steven M. Kaufman to Seth A. Rosenthal re: Capital Account Information with attachment (Feb. 20, 2009); Sellers Test. 8:5-9:2; 8/11/09 Toll Test. 238:1-239:1.

43. After CMST finally gave calculations to plaintiffs, Toll wrote an email to Sellers stating "Now, can't wait for the [sic] [Hausfeld] explosion re the capital account - we should be okay on that, but I expect a repeat trip to Philadelphia [sic] to see the Magistrate." PX42, Email from Steve Toll to Joe Sellers RE: Allocation of Expenses and Fees (Feb. 20, 2009).

44. According to CMST, the capital account balance owed to Hausfeld was $3,053,115.88 and the balance owed to Lewis was $686,194.32. PX41. CMST calculated the balances, on an income tax accounting basis, using the $6,912,175.39 loss of CMST as of the last day of the last full month prior to the termination of Hausfeld and Lewis, i.e., October 31, 2008. CMST then allocated to each plaintiff what it claimed to be their respected shares of the loss based on their respective actual percentage interests in 2007, allocating 27.97% of the loss to Hausfeld and 6.78% to Lewis. Hausfeld's and Lewis' share of the loss was then subtracted from their December 2007 capital account balances. PX41; Drolet Test. 70:20-71:18; 73:1-5. If CMST calculated the capital account balances using its year-end profit or loss, plaintiffs' capital account balances would have suffered no loss. See PX 78, CMST Reviewed Financial Statements, December 31, 2008 and 2007.

45. By using plaintiffs' 2007 percentage interests, plaintiffs were allocated a larger share of the loss than if their 2008 percentage interests had been used.

46. In determining the capital account balances of Anne Yahner, Gary Mason, Paul Gallagher, and Linda Nussbaum, partners who departed CMHT after 2000, CMHT had used the prior year's percentage interest. For each of these partners, the Compensation Committee had not yet met that year before their departure. However, the Compensation Committee met and made percentage interest determinations before the departure of Hausfeld and Lewis. 8/13/09 Toll Test. 57:11-60:14; Hausfeld Test. 26:25-28:15; Drolet Test. 123:15-127:23.

b.    GAAP

47. Article SECOND of the Operating Agreement states the "books of account shall be kept and continually maintained in accordance with generally accepted accounting principles

13

[("GAAP")]."  PX2, DX3 at SECOND (A), (D).

48.  No prior Operating Agreement required the books of account to be kept in accordance with GAAP.  Drolet Test. 104:16-105:6; see PX6, Operating Agreement of CMHT (Jan. 1, 1996).

49.  CMHT added the GAAP provision to the Operating Agreement in 2003.  8/11/09 Toll Test. 239:15.  The GAAP provision was the result of Hausfeld's and Toll's joint desire to amend the former Operating Agreement so the firm would diminish the termination allowance, while ensuring recognition of the departing partners' economic stake in the firm's accounts receivable.  Hausfeld Test. 21:19-24:15.  GAAP also gives a better picture of the firm's financial condition.  Drolet Test. 202:17-24; Joseph Bavis Test., Hearing Tr. 159:21-160:12, 170:5-171:9, Aug. 11, 2009.

50.  CMHT always used the income tax method of accounting for its books, records, and financial statements.  Despite article SECOND of the 2003 amendment to the Operating Agreement, the firm has never used the GAAP method of accounting for any purpose from its founding in 1986 to present.  8/13/09 Toll Test. 28:14-19; Milstein Test. 104:23-106:14, 123:18-25; Drolet Test. 104:21-105:6, 175:20-176:4, 186:16-188:17, 191:16-18.

51.  Gallagher and Nussbaum, the two partners who left the firm after the 2003 amendment, both had their capital account balances calculated using the income tax method.  DX46, Tab 4, 5, Capital Account for Paul Gallagher & Linda Nussbaum.

52.  Since the 2003 Operating Agreement was adopted, Hausfeld and Lewis have never objected to, or cited, CMHT's failure to use GAAP.  See 8/13/09 Toll Test. 28:20-26; Hausfeld Test. 59:22-60:9; Sellers Test. 62:25-63:14; Drolet Test. 185:23-15, 222:15-19.

B.     Air Passenger Fees

1.     Division of Fees Pursuant to Confidential Agreement

53.  Paragraph 1 of the Confidential Agreement states that, with respect to Air Passenger fees, "Hausfeld LLP and CMST shall each receive a 50% share of the total fees awarded for work done by [CMHT] prior to November 6, 2008. . . . [L]ead counsel . . . shall distribute such fees and expense reimbursements . . . by wire transfer within 48 hours of receipt . . . ." PX1, DX2 at ¶ 1.

54.  Splitting the anticipated fees of Air Passenger with HLLP was a significant concession by CMST because under the Operating Agreement, departing partners have no right to claim any fees after they leave the firm.  See PX2 at ¶¶ NINTH, ELEVENTH; see also Finding of Fact ¶ 9.c.

55.  In the settlement conferences in my chambers, Hausfeld never mentioned HLLP intended to give the London firm a percentage of the Air Passenger fees before HLLP split the total fees.  See Toll Test. 259:19-260:3.

2.     London Firm

56.  To develop an European antitrust and securities practice in 2007, CMHT formed a separate legal entity, CMHT-NY LLP ("London firm"), which employed lawyers recognized by the Solicitors' Regulatory Authority[6] for tax and regulation reasons.  PX110 at ¶ 2.4, Partnership Agreement of CMHT-NY, LLP; Anthony Maton Test., Hearing Tr., 182:22-184:23, Aug. 13, 2009 ("Maton Test.").

57.  The London firm is a New York limited liability partnership with its place of

_____

[6] To practice law in London, a lawyer must be recognized by the Solicitors Regulatory Authority.  Maton Test. 184:10-23.

15

business in London, United Kingdom.  PX110 at 1.

58.  The London Firm was owned by CMHT (99%), Hausfeld (0.45%), Toll (0.45%), and Andrew N. Friedman (0.10%).  PX110 at 14.

59.  CMHT was the managing partner of the London firm, and was required to provide the London firm with all funding, loans or capital contributions, to remain solvent.  PX110 at ¶¶ 4.1, 4.4.

60.  When lawyers of the London firm performed work on behalf of the firm, they recorded and billed for the work, and the London Firm was paid for that work.  Maton Test. 191:8-16.

61.  The fixed share partners of the London firm received a fixed monthly profit share and annual discretionary bonus.  See PX111 at ¶ 2.1, Terms of Retention of Anthony Maton as Fixed Share Partner of CMHT-NY, LLP.

62.  Each month, CMHT deposited money in the London firm's account.  Money from the London firm's account was used to pay the hourly legal fees of the London firm's lawyers. Maton Test. 192:5-193:1; Drolet Test. 232:1-233:11.  Therefore, fees paid by CMHT to the London firm were recorded as revenue to the London Firm and as an expense to CMHT.  This arm's length relationship between CMHT and the London firm was the result of the transfer pricing rules between the United States and the United Kingdom.  Drolet Test. 232:1-233:11; see Maton Test. 193:2-23.

63.  Paragraph 5.3 of the London firm Partnership Agreement provides "[e]xcept for amounts earned by a Partner on behalf of and payable to [CMHT], all fees, salaries, proceeds, commissions and other compensation earned or received by any Partner . . . for legal services . . .

16

shall belong to the [London firm] and shall be deposited for and paid over to the [London firm] as and when received in exactly the form received." PX110.

64. Paragraph 8.6 of the London firm Partnership Agreement states "[n]o [f]ormer [p]artner shall have any right to have [London firm] property distributed to him, nor to have the value of his interest in the LLP ascertained and paid to him. Id.

65. The London firm generated revenue while it was affiliated with CMHT working on a petroleum case, acting for an African government, consulting on a cartel case run by another London firm, and working on an individual's financial services matter. Maton Test. 187:20-189:1.

66. On January 15, 2009, CMST, Toll, and Friedman transferred to Anthony John Maton, Robert Paul Murray, and Vincent Neil Smith "all of their right[s], interest[s], and entitlement[s] in [the London firm] and in any or all of its business or practice, wheresoever, and whatsoever, as carried on at [January 15, 2009]." PX112 at ¶ 2.1, Agreement Transfer of CMHT-NY LLP.

67. The consideration paid by Maton, Murray, and Smith for the transfer of the London firm was $2 million, payable over time by March 31, 2015, from the London firm's profits. PX112 ¶¶ 3.1-3.2. In addition, the Transfer Agreement released CMST from its obligation to fund the London firm and pay fixed-share partners' salaries through May 31, 2010. Maton Test. 200:11-201:19; see PX110 at ¶ 9.1.

68. As of August 13, 2009, the London firm has never made a profit. Maton Test. 189:24-190:6.

69. Maton, Murray, and Smith believed that they were buying all rights, interest, and

17

entitlement to the fees earned from time recorded and work done by the London Firm prior to January 15, 2009.  Maton Test. 198:18-23, 214:17-215:23.

70.  Maton and Smith formed a new law practice with Hausfeld, Hausfeld & Co., LLP, in June 2009.  This entity is separate from the London firm.  Maton Test. 215:24-216:15.

3.  Air Passenger Settlement and Fee Distribution

71.  Air Passenger was an antitrust price-fixing class action in which British Airways and Virgin Atlantic allegedly conspired to fix the price of the fuel surcharge to passengers flying to and from the United States and to and from the United Kingdom.  PX115, Order Awarding Attorneys' Fees and Costs at 1, In re Int'l Air Transp. Surcharge Antitrust Litig., No. 06-1793 CRB (N.D. Cal. Oct. 31, 2008); see Maton Test. 207:8-17.

72.  The London firm worked on the strategy for the United Kingdom class action case because only firms registered and recognized in England and Wales can begin proceedings in a London court.  See Maton Test. 207:24-209:18.  However, the United Kingdom case was never filed due to the Air Passenger settlement.  See id.

73.  Kenneth Feinberg mediated the Air Passenger settlement.  Kenneth Feinberg Test., Hearing Tr. 158:16-159:2, Aug. 13, 2009 ("Feinberg Test.").

74.  The parties in Air Passenger reached a settlement that encompassed both United States and United Kingdom claims.  PX115 at 3.  The United States District Court for the Northern District of California exercised supplemental jurisdiction of the United Kingdom claims.  PX115 at 7.

75.  The London firm was instructed by co-lead class counsel, CMHT, to work on English aspects of the settlement, developing a methodology for making the settlement binding

18

under English law, and a program to inform United Kingdom claimants about the settlement. Maton Test. 209:19- 211:18, 214:6-16, 227:24-5; see also 8/13/09 Toll Test. 266:4-25.

76. Co-lead plaintiffs' counsel were the firms, CMHT and Cotchett, Pitre & McCarthy ("Cochett"). See PX115 at 1. After Hausfeld left CMHT, The Honorable Charles R. Breyer of the United States District Court for the Northern District of California appointed HLLP over CMST as co-lead counsel. 8/13/09 Toll Test. 234:11-20; see PX1 at ¶ FIRST; PX115, Order re Fees at 1, In re Int'l Air Transp. Surcharge Antitrust Litig., No. 06-1793 CRB (N.D. Cal. July 10, 2009).

77. Judge Breyer approved the Air Passenger settlement, which provides refunds to members of the settlement classes who purchased tickets sold in the United States or in the United Kingdom for travel on British Airways or Virgin Atlantic long-haul flights. PX115 at 3.

78. British Airways agreed to pay $47,371,405 to resolve United States claims and up to £45,549, 989 to settle United Kingdom claims, and Virgin Atlantic agreed to pay $12,635,868 to resolve United States claims and up to £27,991,087 for United Kingdom claims. Id.

79. The United States settlement class is "opt out," those class members who do not exclude themselves will release their claims, while the United Kingdom settlement class is "opt in," those class members who do not affirmatively choose to participate in the settlement will not release any claims. PX115 at 4.

80. The United Kingdom component was the critical innovative part of the settlement, which remains open for five years from the date of settlement. Feinberg Test. 162:6-13.

81. Three British individuals appealed the Air Passenger settlement and fee order. Cochett drafted a motion to dismiss, which HLLP edited. The appeal was resolved through the

Ninth Circuit's mediation program on April 1, 2009.  Michael P. Lehmann, Hearing Tr. 270:15-25, 271:15-19, 280:21-281:8, Aug. 13, 2009; 8/13/09 Toll Test. 235:3-17.

82.  On October 31, 2008, Judge Breyer awarded $22.2 million in attorneys' fees based on percentage-of-the-fund method.[7]  Judge Breyer found the award "fair and reasonable in light of the nature of recovery, expertise of counsel, the extraordinary notice procedures, the long claims period, and the claims process."  PX115 at 5-6; see also Feinberg Test. 164:3-25.  The fee award was not based on lodestar[8] because the defendants in Air Passenger insisted lodestar not be a variable in the settlement negotiations, and lodestar is not favored in England.  Feinberg Test. 160:11-25.

83.  The final attorneys' fee agreement in the Air Passenger settlement included the attorneys' fees for work performed up to and after the date of the settlement.  Feinberg Test. 161:1-162:1, 167:10-170:2.  The parties in Air Passenger anticipated plaintiffs' attorneys would be required to do some supplemental work for five-years after the settlement approval, such as encouraging future filings and claims administration.  Id. at 162:2-163:3.  HLLP has and will

---

[7] The percentage-of-the-fund method awards a specific percentage of the common fund to plaintiffs' attorneys.  In determining a reasonable percentage-of-fund to award, courts evaluate "less objective factors" such as (1) time and labor expended by counsel; (2) magnitude and complexities of the litigation; (3) risk of litigation; (4) quality of representation; and (5) public policy considerations.  Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1266 (D.C. Cir. 1993); Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47, 50 (2d Cir. 2000).

[8] Under the lodestar method, attorneys' fees are determined by multiplying the number of reasonable hours expended by counsel's reasonable hourly billing rates.  Burlington v. Dague, 505 U.S. 557, 559 (1992); In re Painewebber Ltd. P'ships Litig., 999 F. Supp. 719, 723 (S.D.N.Y.1998).  After the lodestar is calculated, the court may adjust the attorneys' fees using a multiplier, based on the "less objective factors" used in the percentage-of-fund method.  See Shalala, 1 F.3d at 1266; Goldberger, 209 F.3d at 50; Painewebber, 999 F. Supp. at 724; see also supra Finding of Fact ¶ 82 n.7.

handle the supplemental work.  Feinberg Test. 163:3-5.

84.  Judge Breyer believed plaintiffs' class-counsel in Air Passenger would allocate the $22.2 million attorney fee award amongst themselves.  Id. at 165:1-20.

85.  CMST expected Air Passenger to produce fees as high as $16-$18 million dollars. PX70 at CMST 00111; 8/13/09 Toll Test. 258:18-259:9; Feinberg Test. 173:2-12, 174:14-22.

86.  The attorneys' fee for non-lead counsel in Air Passenger were distributed before July 2009.  See PX115 at 1-2.  However, co-lead counsel were unable to allocate the remaining award, $17,859,008, between themselves.  Id.

87.  On July 10, 2009, Judge Breyer entered an order "split[ting] the difference" of the fee percentage co-lead counsel proposed, awarding HLLP 62.5% and Cotchett 37.5% of the remaining fee award.  Id. at 1-2.  Although lodestar did not determine the fee award, Judge Breyer noted co-lead counsel received a multiplier of more than four.[9]  Id.

88.  The final fee award received by HLLP for Air Passenger was $10,960,225.26 on July 23, 2009.  PX117, Fee Award; Letter from Seth A. Rosenthal to Judge Rice, Hausfeld, et al. v. Cohen Milstein Sellers & Toll PLLC at 3 (July 23, 2009) [hereinafter July 23, 2009 letter].

89.  Without advising CMST, HLLP divided the award among three firms, not two as agreed in the Confidential Agreement: $6,793,579.59 to CMHT (for work before November 6, 2008); $1,090,777.55 to HLLP (for work after November 6, 2008); and $3,075,868.12 to the London firm, giving each of the three firms the same multiplier on its lodestar.  July 23, 2009

---

[9] Although the lodestar method may not be favorably viewed, a court may use the lodestar as a baseline to cross-check the reasonableness of the percentage-of-fund awarded.  See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002); Shalala, 1 F.3d at 1267; Goldberger, 209 F.3d at 50.

letter at 3; PX117.  The lodestar for the amount of work performed in Air Passenger is: (a) $1,716781.25 for CMHT, (b) $777,291.65 for the London firm, and $275,646.50 for HLLP. PX117.

90.  Without notifying CMST or me, HLLP wired $3,075,868.12 to the London firm, see DX 53, Letter from Seth A. Rosenthal to Judge Rice re: Hausfeld, et al. v. Cohen, Milstein Sellers & Toll PLLC (July 24, 2009), and on July 23, 2009, HLLP deposited the $6,793,579.59 it allocated to CMHT and $1,090,777.55 to HLLP into an escrow account it established, pending the outcome of the evidentiary hearing, July 23, 2009 letter at 3-4.

91.  After notification of HLLP's actions, I ordered HLLP to deposit the entire $7,884,357.14 (the HLLP and CMHT allocated shares) into an escrow account established by the Clerk of Court of the United States District Court for the Eastern of District of Pennsylvania. Order, Hausfeld LLP v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. July 31, 2009).

II.    Conclusions of Law

1.  The parties agree, I must apply the law of the District of Columbia in this dispute. PX1, DX2 at ¶ 18(b).

A.    Capital Account Balance Claims

1.    Breach of Contract

2.  A breach of contract is "an unjustified failure to perform all or any part of what is promised in a contract."  District Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 729 (D.C. 2003) (quoting Fowler v. A&A Co., 262 A.2d 344, 347 (D.C. 1970)).

3.  Every contract contains an implied covenant of good faith and fair dealing.  Murray v.

Wells Fargo Home Mortg. 953 A.2d 308, 321 (D.C. 2008).  Therefore, "neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to receive

the fruits of the contract."  Id. (quoting Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C.

2006)).

4.  A party breaches the duty of good faith and fair dealing if the party acts in bad faith by

"evad[ing] the spirit of the contract, willfully render[ing] imperfect performance, or interfer[ing]

with performance by the other party."  Murray, 953 A.2d at 321 (quoting Paul v. Howard Univ.,

754 A.2d 297, 310 (D.C. 2000)); Allworth, 890 A.2d at 201-02 (good faith performance includes

consistency with the justified expectations of the other party); Alden v. Georgetown Univ., 734

A.2d 1103, 1112 n.11 (D.C. 1999).

        a.      Percentage Interests

5.  CMST breached the Confidential Agreement by using Hausfeld's and Lewis' higher

2007 percentage interest to allocate plaintiffs' share of CMHT's 2008 loss.[10]  See Findings of Fact

---

[10] Defendant argues it has not breached the Confidential Agreement because partial payment of plaintiffs' capital accounts is not due until December 31, 2009.  See Cohen Milstein Sellers & Toll PLLC's Post-Hearing Brief at 34, Hausfeld v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. Sept. 15, 2009).  However, the Confidential Agreement required CMST to provide plaintiffs' capital account calculations before December 31, 2009.  CMST did not comply with that provision.  See District Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 729 (D.C. 2003).  Further, CMST evaded the spirit of the contract by using plaintiffs' 2007 percentage interest in its capital account calculations.  See Murray, 953 A.2d at 321.

Plaintiffs also claim CMST breached its fiduciary duty that obligated it to calculate plaintiffs' capital account balances properly, which is based on the same arguments as plaintiffs' breach of contract claim.  See Plaintiffs Michael Hausfeld and Richard Lewis' Post-Trial Brief Regarding the Return of Capital Owed to Them at 28, Hausfeld v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. Sept. 15, 2009) [hereinafter Plaintiffs' Post-Trial Brief].  Because I have already found CMST breached the Confidential Agreement by failing to properly calculate plaintiffs' capital account balances, see Conclusion of Law ¶ 5, I find no need to address this separate claim.

¶¶ 3-7, 44.

6. Although CMHT used the prior year's percentage interest in determining the capital account balances of previous partners who had departed from the firm, plaintiffs' situation is unique. Unlike previous partner departures, the Compensation Committee met before plaintiffs were terminated and assigned plaintiffs a new percentage interest in the firm for the current year. See Findings of Fact ¶¶ 3, 46.

7. The Confidential Agreement required CMST to calculate plaintiffs' capital accounts in good faith pursuant to the Operating Agreement. Under the Operating Agreement, a member's percentage interest in the firm is the same for voting strength and allocation of profit or loss. Finding of Fact ¶ 13.

8. By using the plaintiffs' 2007 percentage interest and not the reduced percentage interest that led to plaintiffs' terminations in 2008, CMST allocated a larger share of CMHT's 2008 loss to plaintiffs. This tactic evaded the spirit of the Confidential Agreement and attempted to prevent plaintiffs from receiving the full benefit they bargained for in the Confidential Agreement. See Murray, 953 A.2d at 321.

9. Drolet stated a retroactive change in plaintiffs' percentage interest would have a material effect on plaintiffs' capital account calculations. Accordingly, she would have used 14% for Hausfeld and 6.5% for Lewis in calculating their capital accounts. Finding of Fact ¶ 37.

10. Moreover, the timing of when Toll reviewed the calculations and when CMST finally released the calculations to plaintiffs establishes CMST's bad faith. See Murray, 953 A.2d at 321.

a. CMST unjustifiably delayed giving plaintiffs their capital account calculations. Although plaintiffs forfeited any claims for CMST's failure to provide plaintiffs' capital account

balances promptly before January 1, 2009, see Finding of Fact ¶ 11, plaintiffs requested the information numerous times, and defendants withheld plaintiffs' capital account balances until February 20, 2009 -- well after plaintiffs' November 2008 termination dates.  See Findings of Fact ¶¶ 24-42.

b.  Toll had draft calculations and the information necessary to review the calculations in early January.  See Findings of Fact ¶¶ 21-22, 29.  Despite the settlement conferences and numerous requests, Toll failed to have Diamond send the calculations to Drolet until plaintiffs signed the Confidential Agreement, on February 5, 2009.  See Findings of Fact ¶¶ 24-32.

c.  Although the Executive Committee had approved plaintiffs' capital account calculations on February 13, 2009, defendants withheld plaintiffs' calculations until CMST received the fee award from OSB.  Findings of Fact ¶¶ 39, 41-42.

d.  Further, CMST knew at the time of the settlement conference that the capital account calculations would not meet plaintiffs' expectations and refused to alert plaintiffs of their mistaken belief.  Finding of Fact ¶ 28; see Allworth, 890 A.2d at 201-02

b.    Accounting Method

11.  "[W]hen the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties." Lindell v. Landis Corp. 401(K) Plan, 640 F. Supp. 2d 11, 15 (D.D.C. 2009).

12.  A party implicitly waives its contractual right, without expressly modifying the contract orally or in writing, if the actions or conduct of the party against whom the waiver is asserted are inconsistent with an intent to enforce.  Kersey v. Wash. Metro. Area Transity

Authority, 533 F. Supp. 2d 181, 196 (D.D.C. 2008); Nortel Networks, Inc. v. Gold & Appel

Transfer, S.A., 298 F. Supp. 2d 81, 88 (D.D.C. 2004); Fed. Deposit Ins. Corp. v. Interdonato, 988

F. Supp. 1, 10 (D.D.C. 1997).

13.  Where a party to a contract acquiesces for an unreasonable length of time to another party's breach of contract, the court may presume a waiver of the provision sought to be enforced. K-Com Micrographics, Inc. v. Neighborhood Econo. Dev. Corp., 159 B.R. 61, 68 (Bankr. D.C. 1993) (waiver where plaintiff failed to enforce contract against defendant for 20 months).

14.  Implicit waiver is an equitable principle that prevents a party from insisting on a right upon which he could have insisted earlier and where the parties have conducted themselves in such a way that would make enforcement unfair.  Nortel, 298 F. Supp. 2d at 88.

15.  Although CMHT adopted the GAAP provision in its 2003 Operating Agreement, CMHT has yet to keep its books and records under the GAAP method, and has used the income tax method since its inception.  Findings of Fact ¶¶ 47-51.

16.  As a founding member and chairperson of CMHT, Hausfeld has reviewed CMHT's financial statements, and has never objected to the use of the income tax method of accounting after the 2003 amendment to the Operating Agreement.  See Findings of Fact ¶¶ 1, 50, 52.

17.  As a partner of CMHT for more than ten years, Lewis has reviewed CMHT's financial statements, and has never objected to the use of the income method of accounting after the 2003 amendment to the Operating Agreement.  See Findings of Fact ¶¶ 2, 50, 52.

18.  Plaintiffs waived any claim to have their capital account balances calculated using the GAAP method by acceptance of and acquiescence to CMST's course of performance.  CMST has consistently and historically maintained its books and records, prepared its monthly and yearly

financial statements, and calculated other departing partners' capital accounts using the income tax method of accounting.  The firm never used the GAAP method.

19.  Hausfeld and Lewis object to the income tax method of accounting, for the first time, only because use of GAAP would now benefit them.  Enforcement of the 2003 GAAP provision would be unfair and inequitable.  See Nortel, 298 F. Supp. 2d at 88.

20.  Accordingly, I hold CMST did not breach the Confidential Agreement by calculating plaintiffs' capital accounts using the income tax method of accounting.

2.    Misrepresentation

21.  To prove fraudulent misrepresentation, plaintiffs must show by clear and convincing evidence that (1) defendant made a false representation or willfully omitted a material fact; (2) defendant had knowledge of the misrepresentation or willful omission; (3) defendant intended to induce plaintiffs to rely on the misrepresentation or willful omission; (4) plaintiffs acted in reliance on that misrepresentation or willful omission; and (5) plaintiffs suffered damages as a result of their reliance.  In re McKenney, 953 A.2d 336, 341-42 (D.C. 2008); Schiff v. Am. Ass'n of Retired Persons, 697 A.2d 1193, 1198 (D.C. 1997); Hercules & Co., Ltd. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992).

22.  To prove material misrepresentation,[11] plaintiffs must show by clear and convincing evidence that defendant made an assertion or omission (1) not in accord with the facts; (2) that was material; (3) that was relied upon (4) justifiably by the recipient in manifesting his assent to the agreement; and (5) plaintiffs relied on the assertion to their detriment.  Barrer v. Women's

---

[11] Plaintiffs may rescind a contract, but may not recover monetary damages for material misrepresentation.  Monetary damages for misrepresentation may be recovered only if fraud is established.  In re McKenney, 953 A.2d 336, 341-42 (D.C. 2008).

27

Nat'l Bank, 761 F.2d 752, 758-59 (D.C. Cir. 1985); see McKenney, 953 A.2d at 342.

23. Failure to know or discover facts before making the contract does not make plaintiffs reliance unjustified unless their failure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. McKenney, 953 A.2d at 343.

24. Reliance by sophisticated and educated individuals, such as attorneys, however, amounts to a failure to act in good faith and within reasonable standards of fair dealing when the assertions could have been easily verified. See Weaver v. Bratt, 421 F. Supp. 2d 25, 33 (D.C. 2006) ("[A]s a licensed attorney, [plaintiff] should have especially appreciated the implications of signing an agreement . . . . It is not justifiable for a licensed attorney to sign an agreement based solely on the representations of the other party to the agreement."); see, e.g., Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1208 (D.C. 1999) (failure of sophisticated party to read contract and accompanying documents barred misrepresentation claim).

25. Further, "reliance is only justifiable if the fact misrepresented is material." Hercules, 613 A.2d at 934 (citations omitted). Sophisticated parties would condition their contract agreement on inclusion of all material provisions. Therefore, reliance on assurances not included in a contract between sophisticated parties is unjustified. See id. at 932-34.

26. Plaintiffs fail to prove they justifiably relied on CMST's alleged assurance that Hausfeld's capital account balance was approximately $5 million and Lewis's capital account balance was approximately $1 million. Settlement discussions never focused on the precise value of the capital accounts. Rather, the parties focused on whether the funds could be disbursed to plaintiffs on an accelerated basis. See Finding of Fact ¶ 9.a.

27. Although Hausfeld and Lewis subjectively may have believed their capital account

balances would be approximately $5 million and $1 million, respectively, and trusted that CMST agreed with their beliefs, see Finding of Fact ¶ 31, it was unreasonable for plaintiffs, sophisticated attorneys who handled complex multi-million dollar cases, see Findings of Fact ¶¶ 1, 2, 9.b., 78, to believe their capital account balances would suffer no loss. There was ample information regarding their capital account balances at their disposal. Plaintiffs knew CMHT had suffered significant losses as of September 2008. See Findings of Fact ¶¶ 15-18. Plaintiffs could have estimated their capital account balances by reviewing CMHT's monthly financial statements, which showed CMHT had a year-to-date net loss of $5.5 million as of September 30, 2008. Although plaintiffs hoped CMST would have no loss by December 31, 2008, such beliefs are irrelevant. Plaintiffs' capital accounts are calculated using CMHT's October 31, 2008 profit/loss, not December 31, 2008. See Finding of Fact ¶ 12. Further, plaintiffs did not condition their agreement to the Confidential Agreement based on a specific capital account balance amount.

B.      Air Passenger Claims[12]

28. HLLP breached Paragraph 1 of the Confidential Agreement by failing to distribute to CMST 50% of CMHT's Air Passenger award by wire transfer within 48 hours of receipt.

29. HLLP had no authority to divide the award among three firms, wire $3,075,868.12 to the London firm,[13] and place CMHT's alleged share into its own escrow account before informing

---

[12] Defendant did not raise a misrepresentation claim, see Letter from John C. Keeney, Jr. to Judge Rice RE: Reply to Hausfeld LLP's Frivolous Request to Strike (Sept. 30, 2009); therefore, plaintiffs' Request to Strike Allegations Made for the First Time in the Post-Hearing Brief of CMST is moot. See Letter from Seth A. Rosenthal to Judge Rice re: Plaintiffs' Request to Strike Allegations Made for the First Time in the Post-Hearing Brief of Cohen, Milstein, Sellers & Toll (Sept. 22, 2009).

[13] The London firm claimed it is not within jurisdiction of this Court and its counsel said the firm would refuse to return the funds until I resolve this dispute. See Memorandum,

CMST or me of its deviation from the Confidential Agreement.  Its unilateral actions violated the letter and spirit of the Confidential Agreement.

30.  Judge Breyer's October 31, 2008 Order addressed only fees for co-lead counsel.  See Findings of Fact ¶¶ 86-87.  Therefore, the $10,960,225.26 HLLP received for Air Passenger was awarded to co-lead counsel, HLLP and CMHT, not the London firm.  See Findings of Fact ¶¶ 76, 86-88.  Non-lead counsel fees in Air Passenger had already been awarded.  Finding of Fact ¶ 86.  Although the work the London firm performed for Air Passenger was related to the settlement, it worked on behalf of CMHT, and not as non-lead counsel.  See Findings of Fact ¶¶ 75, 86.

31.  The London firm worked on generating its own Air Passenger case by developing strategies for the United Kingdom class action case.  However, no case was filed in the United Kingdom.  Finding of Fact ¶ 72.  The London firm never received any non-lead counsel attorneys' fee award for Air Passenger, and therefore worked on the United Kingdom aspects of the Air Passenger settlement only on behalf of CMHT.  See Finding of Fact ¶ 75.

32.  Section 5.3 of the London Firm Partnership Agreement does not permit the London Firm to collect fees for work performed "on behalf of" CMHT.  Finding of Fact ¶ 63.

33.  Further, the January 2009 Transfer Agreement would make no economic sense if CMST was transferring a part of its interest to guaranteed fees already awarded to CMST in October 2008.  According to HLLP's reasoning, the terms of the Transfer Agreement would include the right to the Air Passenger fees, totaling more than $3 million,[14] in return for

---

Hausfeld v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. Aug. 13, 2009).

[14] CMST expected to receive approximately $5-7 million more of the attorneys' fees it was awarded in Air Passenger.  See Finding of Fact ¶ 85.  Under HLLP's theory, CMST would have relinquished more than $4 million in guaranteed fees for only $2 million in consideration.

consideration of only $2 million to be paid over six years.  Findings of Fact ¶¶ 67, 89.

34.  HLLP and Maton's argument that the Transfer Agreement saved CMST more than £1 million in salaries and over $10 million in future funding, see Hausfeld LLP's Post-Trial Brief Regarding Attorneys' Fees Awarded in Air Passenger at 39-40, Hausfeld v. Cohen Milstein Sellers & Toll, PLLC, No. 06-cv-826 (E.D. Pa. Sept. 15, 2009) [hereinafter HLLP Post-Trial Brief]; see also Maton Test. 200:11-201:19, is unconvincing.  This argument assumes CMST would receive no business benefit had they continued its relationship with the London firm.

35.  If HLLP knew at the time of the settlement conference the Air Passenger fees would be divided three ways, see HLLP's Post-Trial Brief at 3, HLLP deceived CMST during the negotiations, see Murray, 953 A.2d at 321; Allworth, 890 A.2d at 201-02.  The London firm was not mentioned during the settlement negotiations or referenced in the Confidential Agreement. See Finding of Fact ¶ 55.

C.    Damages

36.  In a breach of contract action, damages "are intended to give the [non-breaching party] the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been [sic] had the contract been performed." Vector Realty Group, Inc. v. 711 Fourteenth Street, Inc., 659 A.2d 230, 234 n.8 (D.C. 1994) (quoting Restatement (Second) of Contracts § 347 cmt. a (1981)); Rowan Heating-Air Conditioning-Sheet Metal, Inc. v. Williams, 580 A.2d 583, 585 (D.C. 1990).

1.    Breach of Contract Damages

a.    Damages Owed to Plaintiff

37.  Plaintiffs' capital account balance shall be calculated in accordance with the

Confidential and Operating Agreements: using plaintiffs' 2008 actual percentage interests;[15]

CMHT's October 2008 income statement;[16] and income method of accounting.[17]  See Finding of

Fact ¶ 12.

38.  Drolet's suggestion that CMST account for an additional $5 million is irrelevant

because CMST made an independent decision to allocate that loss to the end of the year.  Finding

of Fact ¶ 34

---

[15] The Operating Agreement requires the percentage interests used in calculating departing partners' capital account to be the actual rate.  See Findings of Fact ¶¶ 14, 33. Although the capital accounts of departing partners Nussbaum and Gallagher were calculated using the effective rate, it was an admitted mistake, see Finding of Fact ¶ 33, that did not establish a waiver by CMST.  Unlike plaintiffs' waiver of the GAAP method, see supra Conclusion of Law ¶ 18, CMST failed to correct this mistake twice, whereas plaintiffs failed to object to the use of the income tax method of accounting on numerous occasions, i.e., every time they received or reviewed a CMHT's financial statements, which they received on a monthly basis, at minimum, see supra Conclusion of Law ¶¶ 16-18; Finding of Fact ¶ 15.

[16] The fact that Hausfeld was involuntarily terminated and the Operating Agreement was amended so the effective date of his termination was the date he received written notice of his termination did not affect the calculation of Hausfeld's capital account balance.  The capital account balance is to be determined by using the income or loss of CMST of the last full month immediately preceding a Member's termination date.  See Finding of Fact ¶ 12.  Before the November 6, 2008 Operating Agreement amendment, "the date of withdrawal shall be the date specified in the notice."  Finding of Fact ¶ 6.  Contrary to plaintiffs' belief, this does not mean Hausfeld's capital account balance would have been calculated with CMST's income or loss as of November 2008 had there not been a November 6, 2008 amendment.  See Plaintiffs' Post-Trial Brief at 32-33.

Similarly, whether Lewis was involuntarily or voluntarily terminated has no bearing on the calculation of his capital account balance.  The capital account balance is to be determined by using the income or loss of CMST of the last full month immediately preceding a Member's termination date, either voluntarily or involuntarily.  See Finding of Fact ¶ 12.  Whether Lewis voluntarily left CMST on November 11, 2008 or was involuntarily terminated did not affect Lewis' capital account balance.  The last full month immediately preceding his termination was October 2008 whether he was voluntarily or involuntarily terminated from CMST.

[17] As discussed in Conclusion of Law Section II.A.1.b., plaintiffs waived their right to have their capital accounts calculated under GAAP.

39.  Therefore, CMST must pay plaintiffs half of their capital account balances by December 31, 2009.  See Finding of Fact ¶ 9.a.  Hausfeld's capital account balance is $4,018,446.75; Lewis' capital account balance is $705,517.57.[18]

b.    Damages Owed to Defendant

40.  Under the Confidential Agreement, CMST is entitled to 50% of the Air Passenger fees awarded for CMHT work performed only before November 6, 2008.  Finding of Fact ¶ 53.

41.  The Air Passenger attorneys' fee award included post-settlement work performed after November 6, 2008, such as appellate work and future settlement filings in the United Kingdom.  Finding of Fact ¶ 83.  Therefore, it is appropriate to allocate part of the fee award to post-settlement work.  See, e.g., In re MRRM, P.A., 404 F.3d 863, 869 (4th Cir. 2005); Painewebber, 999 F. Supp. at 723-25.  CMST is not entitled to the Air Passenger fees for work performed after November 6, 2008.

42.  Under the lodestar method, a court may apply "a multiplier based upon certain factors, the most prominent of which is an adjustment for the risk of loss associated with the undertaking of representation on a contingent basis."  In re McDonnell Douglas Equip. Leasing Sec. Litig., 842 F. Supp. 733, 741 (S.D.N.Y. 1994); see In re Oracle Secs. Litig., 131 F.R.D. 688, 693 (N.D. Cal. 1990) (risk demands a premium); see supra, Conclusion of Law ¶ 82 n.7.

43.  Courts awarding fees based on the lodestar method often have declined to apply a multiplier to claims administration because the risk involved at this stage in the proceedings is

---

[18] I determined these figures by multiplying the October 31, 2008 $6,912,175.39 loss of CMST by plaintiffs' 2008 retroactive actual percentage interests, 14% to Hausfeld and 6.5% to Lewis.  I subtracted these figures from plaintiffs' December 2007 capital account balances, then subtracted plaintiffs' "subsequent payments, which reduce capital account."  See Finding of Fact ¶ 44; PX41.

minimal.  See, e.g., Roberts v. Texaco, Inc., 979 F. Supp. 185, 200 (S.D.N.Y. 1997); In re Equity Funding Corp. of Am. Secs. Litig., 438 F. Supp. 1303, 1330, 1336, 1339 n.53 (C.D. Cal. 1977); City of N.Y. v. Darling-Delaware, 440 F. Supp. 1132, 1136 (S.D.N.Y. 1977); but see Painewebber, 999 F. Supp. at 725 (awarding multiplier of lodestar for future benefits including claims administration).

44.  Where attorneys provide additional services post-settlement, however, courts should award fees for those services.  See, e.g., Painewebber, 999 F. Supp. at 723-25 (applying multiplier to lodestar for future services including claims administration because the class would likely receive additional benefits from attorneys for the next nine years and any future benefits received by the class is the result of the efforts and risk previously undertaken by class counsel); Roberts, 979 F. Supp. at 200 (did not apply multiplier to claims administration, but recommended a future fee award be made for subsequent claim administration services).

45.  $1,090,777.55 shall be allocated to HLLP for its post-November 6, 2006 Air Passenger work.  This amount, which is the lodestar and roughly a multiplier of four, will compensate HLLP for past and future post-settlement work on Air Passenger.  Although HLLP's post-settlement work no longer poses risk, HLLP previously undertook risk in handling the case, including a possible appeal.  See Painewebber, 999 F. Supp. at 723-25; Finding of Fact ¶ 81; cf. In re Oracle Secs. Litig., 131 F.R.D. 688, 692 (N.D. Cal. 1990) ("It is inherently illogical for lawyers to undertake litigation on the basis of the risks and rewards they perceive at the beginning, yet be compensated on the basis of the risks and rewards the court perceives at the end of the litigation.").  This case is also distinguished from cases such as Roberts v. Texaco, Inc., In re Equity Funding Corp. of Am. Secs. Litig., and City of N.Y. v. Darling-Delaware because the

attorneys' fee award in this case was based on the percentage-of-fund method, not the lodestar method.

I award HLLP its full attorneys' fee now, because, based on the parties' past actions, I fear a recommendation of a future fee award for the supplemental United Kingdom claims administration would trigger more litigation and further consume judicial resources.  See Shalala, 1 F.3d at 1270 (quoting Bebchick v. Wash. Metro. Transit Area Comm'n, 805 F.2d 396, 401 (D.C. Cir. 1986)) ("[a] request for attorney[s'] fees should not result in a second major litigation"); Rappaport v. State Farm Lloyds, 2001 WL 1467357, at *2 (5th Cir. Oct. 26, 2001); Rawlings v. Prudential-Bache Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993) (determining class action attorneys' fees is time-consuming for the court).

46.  Therefore, CMST is entitled to 50% of the $9,869,447.71 Air Passenger fees awarded to CMHT for work performed before November 6, 2008.

47.  HLLP took an extraordinary risk by unilaterally sending $3,075,868.12 to the London firm.  As a result, the $3,075,868.12 HLLP wired to the London firm shall be paid from HLLP's 50% share of the Air Passenger award.  HLLP must resolve any financial issues with the London firm by dealing with the principals, who now share a financial interest with HLLP in Hausfeld & Co., LLP.

48.  Therefore, HLLP must pay CMST its remaining portion of the Air Passenger fees, $1,537,934.06, within 48 hours of this Order.[19]  See Finding of Fact ¶ 53.

---

[19] The record is unclear whether CMST paid the London firm for the hours it worked on the Air Passenger settlement, see HLLP Post-Trial Brief at 41, pursuant to the payment arrangement discussed by Drolet and Maton.  See Drolet Test. 232:1-233:11; Maton Test. 193:2-23.  Any disputes involving this issue appear to be subject to arbitration under English law pursuant paragraph 6.3 of the Transfer Agreement.  See PX112.

2.    Attorneys' Fees

49.    Under District of Columbia law, a prevailing litigant may not recover attorneys' fees unless the other party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Jung v. Jung, 844 A.2d 1099, 1107 (D.C. 2004).  The bad faith exception serves a purpose similar to punitive damages,[20] to punish abuses of the judicial process and deter future misconduct. Id. at 1107-08; Dalo v. Kivitz, 596 A.2d 35, 40 (D.C. 1991).

50.    Attorney's fees under the bad faith exception may not be awarded where the prevailing litigant's "hands [were] far from clean." Jung, 844 A.2d at 1111 (citing Dalo, 596 A.2d at 40).

51.    CMST acted in bad faith by failing to review or supply plaintiffs with their capital account information in a timely manner.  Normally, such acts would merit a fee award to plaintiffs.  Eighteen days before the evidentiary hearing, however, HLLP unilaterally chose to retaliate by transferring approximately $3 million of the Air Passenger fees to the London Firm.  Such conduct was unnecessary because the parties already were engaged in litigation to address CMST's breach.  Rather than seek judicial resolution, which is the hallmark of our legal system, HLLP attempted to dispense its own form of justice.  Like CMST, HLLP acted in bad faith.  As a result, both parties shall bear their own costs, and legal fees.

An appropriate order follows.

---

[20] Punitive damages are available only when the breach of contract "merges with, and assumes the character of, a willful tort," even if the breach was willful, wanton, or malicious. Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1090 (D.C. 2008).  Neither party has established a willful tort, and therefore all parties' breaches of the Confidential Agreement cannot support an award of punitive damages. See Bernstein v. Fernandez, 649 A.2d 1064, 1073-74 (D.C. 1991).