```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

                              - - -

```
MICHAEL HAUSFELD, et al      :  CIVIL ACTION NO. 06-0826
              Plaintiffs     :
                             :
              v.             :  Philadelphia, Pennsylvania
                             :  August 10, 2009
COHEN MILSTEIN SELLERS       :  9:09 o'clock a.m.
& TOLL, PLLC                 :
              Defendants     :
. . . . . . . . . . . . . . . . .
```

```
                     SETTLEMENT HEARING
           BEFORE THE HONORABLE TIMOTHY R. RICE
              UNITED STATES MAGISTRATE JUDGE
```

                              - - -

APPEARANCES:


For Plaintiffs:


        PATRICK KITTREDGE, ESQUIRE
        Thorp Reed & Armstrong
        400 Market Street, Suite 200
        Philadelphia, PA  19106-2535
               -and-
        MICHAEL D. HAUSFELD, ESQUIRE
        RICHARD S. LEWIS, ESQUIRE
        Hausfeld LLP
        1700 K Street, NW
        Suite 650
        Washington, DC  20006
               -and-
        SETH ROSENTHAL, ESQUIRE
        MOXILA UPADHYAYA, ESQUIRE

        Venable LLP
        575 75th Street, NW
        Washington, DC  20004
        -- for Plaintiffs Michael Hausfeld
           and Richard Lewis

APPEARANCES:   (Continued)

For the Defendants:

      STEVEN J. TOLL, ESQUIRE
      DANIEL A. SMALL, ESQUIRE
      Cohen Milstein Sellers &
      Toll PLLC
      1100 New York Avenue, NW
      Suite 500 West Tower
      Washington, DC  2005
         -and-
      JACK KEENEY, ESQUIRE
      LYNNE BAUM, ESQUIRE
      Hogan & Hartson LLP
      555 Thirteenth Street, NW
      Washington, DC  20004
     -- for Cohen Milstein Sellers
       & Toll, PLLC

                 - - -

Audio Operator:      Inna Goldshteyn

Transcribed by:      Grace Williams, CET
                Tracey Williams, CET
                Paula L. Curran, CET

     (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcribers.)

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

(The following occurred in open court at 9:09 o'clock a.m.:)

THE COURT:  Good morning.

COUNSEL:  Good morning, your Honor.

THE COURT:  Please be seated.  Our court reporter today is Inna so you'll be with us all week, Inna?  Welcome.

Why doesn't everybody introduce themselves, just so Inna knows all the faces and players.

MR. ROSENTHAL:  Seth Rosenthal and Moxila Upadhyaya on behalf of Richard Lewis and Michael Hausfeld.

THE COURT:  Welcome.

MR. KITTREDGE:  Patrick W. Kittredge.

THE COURT:  Mr. Kittredge, good to see you again.

Mr. Keeney?

MR. KEENEY:  Jack Keeney, Jr., on behalf of Cohen Milstein, accompanied by ...

MS. BAUM:  Lynn Baum also on behalf of Cohen Milstein.

THE COURT:  Welcome.  Hope everyone had a nice weekend.  Are you ready to proceed?

COUNSEL:  Yes, your Honor.

COUNSEL:  We are, your Honor.

THE COURT:  Before we do that I have one quick question.  The gentleman you just saw leaving here was the technical support person for court and have you guys decided

4

what you're doing with this deposition issue that was raised Friday?

MR. ROSENTHAL:  Yes, your Honor.  Mr. Sellers concluded that since it was equally inconvenient for him to get to Norfolk we're trying to set up the deposition.  He's going to be here in person tomorrow, Tuesday.

THE COURT:  Wonderful, thank you so much.  We're making progress already.  All right, Mr. Rosenthal, are you ready to proceed?

MR. ROSENTHAL:  Sure.  We have one preliminary issue.  We don't actually have it with us today but based on those two Diamond e-mails that were an issue at our pretrial conference the other day we did get a letter from Mr. Keeney and Ms. Baum, I think it was the end of the day Thursday, indicating that they had looked for Mr. Diamond's e-mails, that the auto deletion policy, despite the litigation, all requests we had made, had not been suspended for his e-mail, for his e-mail account.

And we don't have any back-up tapes, the firm doesn't keep back-up tapes, and so we're going to be filing a motion with your Honor today.  I imagine that they'll be filing a response for an adverse inference regarding what would have been contained in that e-mail that has now been destroyed.

So that should be coming to your Honor hopefully

later this morning, it's just that we left it in the car.

THE COURT:  Understandable.

COUNSEL:  And we will file an opposition, your Honor.

THE COURT:  Understandable, also.  All right.  What else, are you ready to proceed?

MR. ROSENTHAL:  Ready to proceed.

THE COURT:  Okay, go ahead.

MR. ROSENTHAL:  Hold on one second.

THE COURT:  All right, take your time.

MR. ROSENTHAL:  Thank you.

(Discussion off the record.)

MR. ROSENTHAL:  May it please the Court.  On February 20th, 2009, Cohen Milstein Sellers and Toll finally provided my clients with their liquidating capital account balance calculations.  They told my client, Richard Lewis, that his capital account had been reduced from approximately 1.16 million to about 680,000.

They told my client, Michael Hausfeld, that his capital account balance had been reduced by about two million dollars from about five million to about three million dollars.  Hours, just hours after Cohen Milstein provided that information to my clients, Steve Toll, the managing partner of Cohen Milstein, sent the celebratory note to his fellow named partner, Joe Sellers, and the note read as

follows:

"Now can't wait for the Hausfeld explosion regarding the capital accounts." Let me say that again. "Now can't wait for the Hausfeld explosion regarding the capital accounts."

Then he goes on to say that he imagines that that will require a return trip to Philadelphia to see your Honor.

That e-mail explains just about -- explains as well as just about anything else what this case is about here. What Cohen Milstein did with respect to my clients' capital accounts was unfair. They understood full well that it was unfair and now they are pressing arguments that are odds with the Cohen Milstein operating agreement, are at odds with their contractual duties of good faith and fair dealing and in the process they are trying to hide behind the firm's outside accountant, Pat Drolet, saying that Ms. Drolet made a final and binding termination regarding my clients' capital account balances when, as the evidence will show, she did absolutely nothing of the sort.

Now there are three principal ways in which Cohen Milstein have treated my clients unfairly with respect to their capital account balances. First, Cohen Milstein calculated the capital account balances using a method of accounting that violates the plain terms of the operating agreement, terms that were unambiguously re-committed to by

the parties in the settlement agreement that your Honor helped us hammer out.

Rather than using generally accepted accounting principles or the accrual method of accounting which is required by both the settlement and operating agreements, the firm used the tax basis method of accounting.

That method of accounting produced results that dramatically understated the firm's true financial condition and therefore dramatically understated my clients' true economic interest in the firm as of October 31st, 2008, which is a date you're going to hear a lot about because that was the effective date of my clients' supposed termination under the operating agreement.

In fact while Cohen Milstein maintains that my clients suffered approximately $2.4 million collectively in losses to their capital accounts, the remaining partners at Cohen Milstein, each and every one of them, saw an increase in their capital accounts by the end of the year, just two months later, just two months later, based on the receipt of fees that as of October 31st, as of that effective date of termination everybody in the firm knew would be coming in.

And they were fees, by the way, your Honor, that my client, Michael Hausfeld, was at least in part responsible for generating. So that's the first thing.

The second thing that Cohen Milstein did unfairly

was to tag my client, Michael Hausfeld, with twice as much of the firm's supposed loss as of October 31st as was permitted. This depleted his capital account, even under the tax method of accounting, by a million dollars, a million dollars.

We contend that when they did this they acted in bad faith and here's why, your Honor. In order to expel Mr. Hausfeld --

THE COURT: Somebody's delivering some papers for you.

MR. ROSENTHAL: That's okay.

THE COURT: Sorry.

MR. ROSENTHAL: In order to expel Mr. Hausfeld from the firm they reduced his percentage interest in the firm from 28 to 14 percent, they needed to do that. And they made it effective immediately and retroactive to the beginning of the year, January 1st, 2008.

Now, however, they are turning around and saying that the 14 percent figure is not effective immediately and not retroactive to the beginning of the year for the purpose of determining Mr. Hausfeld's allocable share of income or loss as of October 31st.

The evidence is going to show, your Honor, that the firm cannot have it both ways and you're going to see that there is nothing in our operating agreement or anything else that allows them to have it both ways.

9

Either it was legitimate for the firm to reduce his percentage interests in order to kick him out of the firm, in which case his percentage interest for the purpose of determining his allocable share of income or loss has to be at that reduced amount, 14 percent, or, as the evidence will show, if it was illegitimate to reduce his percentage interests to 14 percent for the purpose of determining income, his allocable share of income or loss, then it had to be illegitimate to reduce his voting percentage, his voting strength to kick him out of the firm.

And, as the evidence will show, if they couldn't kick him out of the firm they wouldn't be in the position of calculating and liquidating capital account balance in the first place which means that, if he was terminated at all, it would have had to be by the end of the year, December 31st. And even under the tax method of accounting you would be looking at that date for the purpose of determining his liquidating balance, not October 31st.

Again, your Honor, the evidence is going to show they can't have it both ways, they can't have their cake and eat it, too.

Now the third thing that Cohen Milstein did here was to withhold or to fail to disclose during the settlement negotiations with your Honor the fact that Cohen Milstein planned to claim that my clients suffered significant losses

10

in their capital accounts, a fact that obviously if disclosed would have had a significant impact on the shape of the settlement agreement.

This is information that CMST had in draft form two weeks before the negotiations before your Honor. And it was information that could have been provided even earlier. CMST failed to provide this information during the negotiations, however, despite four things that the evidence are going to show-- is going to show.

Despite the fact that Mr. Hausfeld insisted on receiving five million dollars, that was a firm figure during the course of the settlement negotiations.

Despite the fact that Mr. Hausfeld -- honestly, despite the fact that the operating agreement, the Cohen Milstein operating agreement had actually required Cohen Milstein to supply this information to Mr. Hausfeld and Mr. Lewis within 30 days of termination, therefore back in December.

Third, despite the fact that Mr. Hausfeld expressly asked for this information during both mediation sessions.

And, fourth, despite the fact that your Honor requested and directed Cohen Milstein to provide this information to my clients.

Let me talk just a little bit, your Honor, about how the evidence unfolded, how things unfolded in this case. As

11

I mentioned, the first thing that occurred here was the compensation committee's determination of November 5th, 2008, where they reduced Mr. Hausfeld's voting percent -- they reduced Mr. Hausfeld's percentage interests from 28 to 14 percent.

The following day they expelled Mr. Hausfeld from the firm, the partners that were aligned against him expelled him from the firm.  They did not have the requisite percentage interests, the requisite voting strength to expel him from the firm before that reduction in his percentage interests but with, with the new percentage interest that they re-allocated to himself from Mr. Hausfeld's reduction they expelled him the next day.

Mr. Lewis was terminated several days later.  He submitted a letter of resignation because at that point he was left with no choice but to leave the firm.  And you'll hear why about -- you'll hear why.

Now the operating agreement requires that the capital account balance calculations and the statement of the firm's income or loss as of the last day of the last full month prior to termination be provided to the terminating or departing partners 30 days, 30 days after termination. There's no dispute that that didn't happen here.

But the relevant income statement here, your Honor, would be the income statement from October 2008, the

12

internally prepared income statement from October of 2008. That was prepared and circulated to the equity partners at Cohen Milstein in or around November 2008 and it was available to be provided to my clients by then. But it wasn't provided in November and it wasn't provided in December.

In early January the firm's outside accountant, Pat Drolet, started asking the firm's controller, Hugh Diamond, for this information because she needed to start preparing the partners' estimated taxes.

And around the same time on January 8th Mr. Toll himself in an e-mail recognized the firm's obligations under the operating agreement and asked Mr. Diamond to prepare those figures and said "Must have in a few days."

Mr. Diamond diligently complied with Mr. Toll's request and within two days, by January 10th, sent Mr. Toll the calculations.

But Mr. Toll didn't do anything with those calculations. He didn't do anything on the 11th, the 12th, the 13th, the 14th, the 15th of January and on the 15th Ms. Drolet again asks Mr. Diamond for the figures. And Mr. Diamond says in an e-mail to her, well, I've given them to Mr. Toll and I'm waiting on his approval. That was the 15th.

But it wasn't until another three weeks after that that Mr. Toll actually authorized Mr. Diamond to provide the

13

figures to Pat Drolet. And that's important because the way the firm works with respect to providing liquidating capital account balance calculations to departing partners is they have the outside accountant review the information first and until she signs off on it, they don't send it out.

Now in the interim between January 10th and February 5th when Mr. Toll finally authorized Mr. Diamond to provide the information to Pat Drolet, the outside accountant, there were mediation sessions before your Honor. There was a mediation session on January 23rd.

At that mediation session, as you recall, Mr. Hausfeld specifically said that he expected to receive five million dollars, and you'll hear testimony about that, your Honor, and you'll hear that at the end of the day he gave up his termination allowance of $500,000 in expectation that he would receive the full amount of five million dollars.

And there was a negotiation before your Honor not over the amount but over how quickly the capital would be returned. So rather than being returned over five years, as required by the operating agreement, there was a negotiation over how quickly it would be done, a negotiation produced a result that it would be produced over -- produced over about a year and a half.

But at no point during that mediation session, despite the fact that those figures had been made available

14

to Mr. Toll in draft form, did Mr. Toll indicate to Mr. Hausfeld or anybody on Mr. Hausfeld's side of the table that Mr. Hausfeld's numbers were going to be dramatically reduced.

Mr. Hausfeld during that first session asked to see the numbers and your Honor asked Mr. Keeney and Mr. Toll to make sure that they were going to be provided to our clients for review.  But that was January 23rd.

Between January 23rd and February 2nd which was the second mediation session my clients never received the numbers.  February 2nd was the second mediation session where we had to clean up some issues.  The capital account really wasn't the issue at the second mediation session, as you recall, because it had been dealt with at the first session but Mr. Hausfeld again asked to receive the figures on February 2nd at the mediation session.

At no point during the February mediation session did Mr. Toll or Mr. Keeney indicate that the figures would be anything less than five million dollars.  And when Mr. Hausfeld asked for the figures you again asked Mr. Keeney and Mr. Toll to provide the figures to counsel, to us, and Mr. Keeney said that he would.

The following day I sent an e-mail to Mr. Keeney, which you'll see, again insisting on the provision of the numbers.

Now the settlement agreement was finalized on

February 4th, the following day, two days after we met with you, and then it was fully and finally executed on February 5th. And it was only after the settlement agreement was finalized, despite the fact that Mr. Toll had had these figures for 26 days, that Mr. Toll authorized Mr. Diamond to send the figures over to Ms. Drolet for review.

And Ms. Drolet did review them, as you'll hear. She reviewed them on February 6th, the next day. It only took her five hours. And actually this will become an issue but, you know, she made several fairly large corrections to the capital account calculations and she told the -- she suggested that the firm make those corrections and they did make those corrections based upon her recommendation. So those final figures actually represent not only the firm's calculations but Ms. Drolet's calculations herself.

Ms. Drolet looked at these figures even before they were provided and approved these figures even before they were provided to the other side, to my clients.

But even though the figures were finalized by Ms. Drolet on February 6th it was still another two weeks, despite repeated requests from us, before the figures were provided to my clients, to us.

And on February 20th, when they were provided, the -- your Honor will recall the OSB case which was actually before this Court. And one of the larger concessions that

16

Mr. Hausfeld and his side made in the case was to allow all of the fees from the OSB case to go over to CMST.

Well, on February 20th the CMST fees of about three million dollars were actually received by Cohen Milstein. At 2:20 there was a confirming e-mail whereby one of the CMST partners says "The eagle has landed," 2:20. An hour and 17, an hour and 17 minutes later Cohen Milstein finally provides my clients through us with the capital account balance figures. So it wasn't until the OSB money came in that the figures were provided to us. And it's then, then that you see Mr. Toll say in an e-mail to Mr. Sellers now, now, meaning after the OSB money comes in, "can't wait to see the Hausfeld explosion."

And when Mr. Toll was asked in his deposition, as you'll see, what he meant by explosion, he said well I thought, I mean I thought he would explode because he knew Hausfeld would be upset when, quote, "he didn't get his five million." He didn't get his five million.

So that thing-- that's how things unfolded, your Honor, prior to the provision of the capital account balances. And when my clients got the figures on February 20th the figures were wrong. And there were two fundamental flaws with the calculations but let me explain just very briefly what the evidence is going to show Cohen Milstein did with the calculations.

17

The firm said that as of October 31st, 2008 the firm's books and records showed a $6.9 million loss.  That's what they said using tax basis method of accounting, not GAAP, the generally accepted accounting principles but the tax basis method of accounting.

And for Mr. Hausfeld they multiplied it by 27.97 percent which was a hit of three -- which was his percentage interest before they voted to reduce him and kick him out of the firm.

And then they took this multiple and then they subtracted the product from the five million dollars or approximate five million dollars capital account, capital account balance that appeared for Mr. Hausfeld at the beginning of 2008.

They did roughly the same thing with Mr. Lewis, they took the 6.9 million in loss and they charged him with 6.78 percent of that loss.  Again this is his pre-expulsion percentage interest, it's not the percentage interest that had been determined by the compensation committee before.

They took the product of this, Mr. Lewis' capital account balance was approximately 1.6 million as of the beginning of 2008, they subtracted the product of this 6.9 and 6.78 million and they came up with what they claimed to be Mr. Lewis' liquidated capital account balance.

For Hausfeld the result was to reduce him by about

18

two million dollars to three million.  For Lewis the result was to reduce him by about 460, $470,000, about $680,000.  That's what the firm did.

Now, as I said, the evidence is going to show there were two fundamental errors there.  The first fundamental flaw was how they calculated this loss figure, $6.9 million dollars.  As I said they used the tax basis method of accounting to calculate that loss figure.  The tax basis of accounting takes a look, as you'll hear, at a snapshot of the firm's finances as of a date certain but it doesn't include accounts receivable or accounts payable.  And as you'll hear, it doesn't really capture the true financial condition of a business.

The operating agreement and it was the operating that had been in effect since 2003 actually requires the firm to use GAAP or the accrual method to keep the firm's books and records.  And the firm unambiguously re-committed themselves in the settlement agreement to doing what the operating agreement called for which is again to use GAAP.

THE COURT:  That was used in past years.

MR. ROSENTHAL:  In past years for what, your Honor?

THE COURT:  For calculating these tax method or accrual.

MR. ROSENTHAL:  Under -- under this operating agreement which was in 2003 there were only two partners who

19

left before, okay.  And the evidence is going to show that one of them actually contested the method of accounting that was used but it was the tax basis method of accounting that had been used for those partners, we would contend in violation of the operating agreement.

But the evidence is going to show that for those two partners who left prior to Mr. Hausfeld and Mr. Lewis that's how it was done.  Okay.  But this violation of the operating agreement makes a significant difference, as you'll hear.

As I said, GAAP requires the recognition of accounts receivable.  And as of October 31st, 2008, there were a lot of accounts receivable that the firm had.  And those accounts receivable are reflected in a letter that Mr. Toll wrote to Sun Trust Bank, the firm's creditor, on November 6th, the same day that Mr. Hausfeld was expelled from the firm.  It's a six-page, single-spaced letter that goes chapter and verse through all the money that the firm expects to come in.

And you're going to hear from our expert,  Bill Davis, about which of those forecasted earnings could be or should have been recognized under GAAP.  And he takes a very conservative approach, as you'll see.  He doesn't recognize all of the income that Mr. Toll indicates would be forthcoming or incoming in his letter, he recognizes about half of it.

But you'll hear from Mr. Davis that what happens

when you use GAAP is rather than the firm showing a $6.9 million loss it actually shows about a $500,000 gain, give or take. And that obviously makes a significant difference.

And, your Honor, that actually bears, as you'll hear, resemblance to the economic reality of the firm, the true financial condition of the firm. As you'll see, that $6.9 million is not out-of-pocket loss, it was debt that was owed to Sun Trust and it was debt that, as their financial statements will show, was fully paid off at the end of the year, as forecasted by Mr. Toll in that November 6th letter.

And as you'll see and as forecasted by the end of the year, the firm wasn't suffering any loss by the end of the year. They had a pretty bad year for this firm which is a very successful firm but they still turned a profit for the year.

And so not only was that loss wiped out, they turned a profit of about $530,000. And as a result every remaining partner at the firm saw an increase in their capital account balance. They were trying to tag my clients with collectively $2.5 million in loss but every other partner who remained at the firm saw actually an increase in their capital account balance.

And you'll see evidence, your Honor, that what happens, one of the reasons that they saw an increase in the capital account balance was because the losses allocated to

21

my two clients ended up being income allocated to the remaining partners of the firm. So that's one of the reasons why you'll see that the partners who remained at the firm actually ended up with as much money as they did for the year while tagging my clients with $2.5 million in loss.

Now you'll hear Cohen Milstein say that, well, this GAAP provision in the operating agreement was a mistake, that it was erroneously inserted, that's what their pretrial submission says. But as the evidence is going to show, your Honor, all 13 partners, sophisticated lawyers, signed that agreement which worked the change because no agreement before that had indicated GAAP, had required GAAP. It was prepared by outside counsel and they all signed it.

There was never any other written agreement regarding how the books and records should be kept. There was never a written agreement, as you'll hear, that the books and records should be kept according to the income tax basis method of accounting.

And what you'll also hear, your Honor, is that were actually a significant change between the 1996 operating agreement and the 2003 operating agreement that shows why GAAP was inserted. It's a little bit complicated but what you're going to hear is that in the 1996 operating agreement there was a very generous termination allowance.

And that termination allowance, by the express terms

22

of the agreement, as you'll see, was to compensate or was to be in lieu of the partner's interests, the departing partner's interests in accounts receivable.  But only the termination allowance was supposed to be in lieu of accounts receivable, not the capital account balance.  The capital account balance was supposed to represent something else but they were going to get both of those things.

You'll hear testimony, your Honor, that Mr. Hausfeld and Mr. Toll in 2002 became concerned that the termination allowance, if a number of partners left at the same time, might end up working a financial hardship on the firm because two partners left in 2002.  And so they resolved to change the termination allowance and make it much less generous and you'll see how it was made much less generous.

At the same time, however, they wanted to make sure in fairness to departing partners that they would maintain an interest in the accounts receivable.  And so the new agreement says that a partner's interest in accounts receivable is not only to be reflected in the termination allowance as under the '96 agreement but also in the capital account balance, both.  The termination allowance and the return of capital.

And if the books and records, your Honor, as you'll hear, weren't going to be -- weren't maintained in accordance with GAAP, that provision saying that the capital accounts

23

would also be in lieu of accounts receivable would be meaningless.  And that's what you're going to hear about mistake, your Honor.

I've also mentioned that the other thing that they did wrong was they applied the wrong percentage interests.  They applied this 28 percent figure roughly to Mr. Hausfeld and they applied this 6.78 figure to Mr. Lewis.  But you're going to see a document, your Honor, that memorializes what the compensation committee did on November 5th.  And that document says that the percentage interest determinations are effective immediately, immediately and made retroactive to the beginning of the year.

THE COURT:  Is there a symmetry between what the compensation committee did in terms of ownership in the firm with the percentage of your capital account?

MR. ROSENTHAL:  Your Honor, we think the evidence is going to show there has to be.  There is no way to do it different, okay.  There is no way to say the compensation committee can determine voting interest and make it effective immediately and retroactive to the beginning of the year but somehow not determine percentage interest for the purpose of determining the allocable share of income and loss.

THE COURT:  Because Mr. Keeney seems to suggest that a different committee of the firm or some other group of partners would have to set that, right?

24

MR. ROSENTHAL: Right. I don't know if that's what he suggested. If it is, it doesn't make any sense, your Honor. That would be -- that would be our -- we think that's what's the evidence is going to show, number one.

Number two, if that's the case, if the percentage interest determination made by the compensation committee couldn't go in effect until the end of the year then the percentage interest determination for voting strength purposes couldn't go in effect until the end of the year either. Again, this is the thing about not being able to have it both ways.

THE COURT: Right.

MR. ROSENTHAL: You know. And if the percentage interest determination doesn't go in effect until the end of the year for voting strength purposes Mr. Hausfeld and Mr. Lewis couldn't have been terminated or expelled in November which means you have to look at the end of the year, not October 31st, for the purpose of determining their allocable share of income.

THE COURT: Maybe that's the easy way to resolve the case, we'll just put everyone back together again.

(Laughter.)

MR. ROSENTHAL: So anyway that, I mean, that's really what we're going to show on the retroactivity issue, on the issue of 2814.

25

You might also hear them say that it doesn't make sense to retroactively change the capital account. But as the evidence is going to show, your Honor, by applying a percent, a percent allocable -- to determine allocable share of income or loss you're not retroactively changing the capital account, you're not saying that their capital account balance as of December 31st, 2007, wasn't five million dollars, wasn't $1.6 million.

You're simply taking that as the beginning figure and then you're multiplying the percent interest by the firm's income or loss as of a particular date and you're adjusting the capital account accordingly. That's what the firm did with every partner, terminated or not, every year. So you're not retroactively adjusting the capital account.

You might also hear, well, this is the way we've always done it. But if you take a look at the partners who left before, your Honor, as the evidence is going to show, none of those partners left the firm at a point during the year before the compensation committee met and made its determination retroactive.

So you might hear about Ann Yahaer and Gary Mason and Linda Nussbaum and Paul Gallagher, all of them left at a point during the year prior to the compensation committee meeting. So of course you had to use the prior year's interest because there was no other interest in effect.

26

Hausfeld and Lewis, they were forced out of the firm after the compensation committee met and after the compensation committee, quote, unquote, "made its determinations effective immediately and retroactive to the beginning of the year."

So when you hear them say this is how it was always done, your Honor, please keep that in mind.

Now the final thing you're going to hear them say, it might actually be the first thing you're going to hear them say, is that Ms. Drolet made a final and binding determination under the operating agreement regarding the capital account balances owed and that determination is entitled to a presumption of correctness under the DC Arbitration Act.  I'm going to leave the legal arguments obviously until closing because this is opening.

But the evidence is going to show, your Honor, that Ms. Drolet was not a final decision-maker.  She'll say she wasn't a final decision-maker unless she deviates from her deposition testimony and she was never told that she was the final decision-maker.

What the evidence is going to show is that she was representing her client the entire time.  She helped them come up with the capital account balance figures before they were provided to my clients and then after the figures were provided she worked with Mr. Toll to devise responses to me

27

and to my partner about the capital account balance calculations, defending what the firm had done.

THE COURT: So you're saying she didn't do that independently.

MR. ROSENTHAL: Yes, that's the idea.

THE COURT: That she was acting at the direction of Mr. Toll.

MR. ROSENTHAL: She was acting with Mr. Toll, she was communicating on behalf --

THE COURT: Was she acting at his direction?

MR. ROSENTHAL: She -- we'll see what the evidence shows, your Honor. She was communicating ex parte with Mr. Toll the entire time. The legal argument, that's not something an arbitrator or somebody making a final independent neutral decision does.

THE COURT: But Mr. Keeney, I take it, at least from his papers, seems to suggest this is the process that Mr. Hausfeld agreed to have, that you didn't want a judge or a court to resolve this, that you wanted the accountant to just resolve it finally and forever and everybody agreed that's what was going to happen in the operating agreement, was that Article 10?

MR. ROSENTHAL: Article 10, your Honor, right. But even if that's the case there was no agreement that, you know, the arbitrator or that Ms. Drolet would be in a

28

position of basically defending her own work as the neutral independent decision-maker which is basically what position that she was in here because she helped the firm come up with the calculations.

We were talking, what the -- what the agreement requires is that it's going to be handed to the outside accountants afterward, after the determination by the firm of what the balance is so she can make an independent determination of what the final figure should be.  And that's not what happened here.

And, again, your Honor, what you'll see is that with the final, with the e-mail that she sent to me and my partner, Seth Tucker, on March 6th which they claim is the final determination made by Ms. Drolet, Ms. Drolet talked about the contents of the e-mail ex parte with Mr. Toll beforehand, she drafted it and sent it to Mr. Toll for his prior approval because she wouldn't want to send anything out on behalf of a client that wasn't previously approved by them.

Mr. Toll made a minor suggested change.  They talked on the phone and he said you can let it go.  And then and only then did she send it to our clients.  That is supposedly the final determination that was made.

And at one point where we are informed that this was part of, you know, a process that would lead to a final and

binding decision we were simply told to talk to the accountant.  And at no point was Ms. Drolet ever told that she was making a final and binding decision here.

THE COURT:  Well, who did Mr. Hausfeld think was doing all this?

MR. ROSENTHAL:  Doing all what?

THE COURT:  Making these calculations.  If you read the agreement --

MR. ROSENTHAL:  The firm has a controller, your Honor, and the controller is the one who makes the calculations, okay.

THE COURT:  But I guess the agreement focuses on the 30 days after that, right?  The agreement focuses on if they cannot agree within 30 days, the amount of such balance shall be determined by the independent accountants regularly retained by the company and that determination shall be final and binding.

MR. ROSENTHAL:  Yes.

THE COURT:  So let's look at the period 30 days after.  Was she acting --

MR. ROSENTHAL:  That's what I say because nothing happened in the period 30 days after termination.  The firm was required to give my clients the capital account balances and they didn't.  So it was due December 6th for Mr. Hausfeld and December 10th for Mr. Lewis.  We didn't get it until

February 20th.

THE COURT: Well, let's assume they were late. At some point you got something from Ms. Drolet and Mr. Diamond and then there was some process where you filed your objections to that, right?

MR. ROSENTHAL: Yes. We were told -- well, I guess that's right, yes.

THE COURT: Yeah.

MR. ROSENTHAL: Mm-hmm.

THE COURT: And then did she, when she resolved your objections, are you suggesting that she was acting at Mr. Toll's direction or was she acting independently then?

MR. ROSENTHAL: I think she will testify, your Honor, that she was acting on behalf of her client at the time.

THE COURT: Well, I guess she has to say that because that's who was paying her. But I guess Mr. Keeney's going to argue that that's the process that Mr. Hausfeld and Mr. Lewis set up.

MR. ROSENTHAL: Your Honor, whether it's the process that they set up or not, the question is whether in fact she is acting as a final decision-maker, okay? If she is not, the operating agreement is not being complied with. Okay? That's the first question.

The second question is even assuming she's acting as

31

a final decision-maker is what she did consistent or does it meet the requirements of an arbitration, does it bear the hallmarks of an arbitration?  And that's a threshold issue before you even get to whether the DC Arbitration Act, whether we have to have complied with one of the escape hatches in the DC Arbitration Act.

THE COURT:  Well, you agree that DC law applies, right?

MR. ROSENTHAL:  yes.

THE COURT:  All right.  So if the Arbitration Act doesn't govern, what does, just general contract principles?

MR. ROSENTHAL:  Well, like I said, first of all, the question is whether or not she acted as a final decision-maker at all.

THE COURT:  Mm-hmm.

MR. ROSENTHAL:  And the second question is let's assume she acted as a final decision-maker under the operating agreement, is what she did consistent with what an arbitrator must do in order to do something that is entitled to a presumption of correctness under the act.

THE COURT:  Mm-hmm.

THE COURT:  And then the third question, if you answered both of those in the affirmative, yes-yes, then the third and only the third, then and only then do you get to the question of, okay, the DC Arbitration Act clearly applies

32

here and do we meet any of the exceptions to the DC Arbitration Act, can we meet any of the standards that allows for either vacating the arbitration decision or amending it.

So it's a three-step process, your Honor, and I think that, you know, we're going to put on evidence to show that they cannot answer either of the first two threshold questions in the affirmative, either that she acted as a final decision-maker or that what she did met all the requirements of an arbitration.

THE COURT:  Let me ask you this: let's say they didn't use Ms. Drolet.  Let's say Mr. Hausfeld, Mr. Lewis and the firm decided, you know, if there's disputes over the capital account we're going to have our news vendor on the corner resolve them because he's a good guy and we both trust him.  All right?

And so everybody gives it to him and he says nope, I think it should be this amount.  Is that a valid arbitration award if they agreed to let him do that?

MR. ROSENTHAL:  If he himself acts as a final decision-maker, okay.

THE COURT:  What would he have to do to act as a final decision-maker?

MR. ROSENTHAL:  He would have to make a final decision, something that didn't just represent the view of his client.

33

THE COURT: Okay.

MR. ROSENTHAL: Okay. So he'd have to act as a final decision-maker, number one. What he did, what he would do, that would have to bear the hallmarks of an arbitration and we've briefed up that issue so he would have to be independent.

THE COURT: Mm-hmm.

MR. ROSENTHAL: He would have to follow certain procedures.

THE COURT: What procedures are they?

MR. ROSENTHAL: Well, at least letting both parties know that they're engaged in something that's going to produce a final decision. And I'm sorry, I didn't actually--

THE COURT: That's all right, I don't mean to press you.

MR. ROSENTHAL: Well, no, no, you should press me. And then there's a third, and I'm sorry, I'm forgetting right now, there's a third requirement.

THE COURT: Well, I have your brief.

MR. ROSENTHAL: You've got our brief. And the idea is so we have to do that in order to actually meet the requirements for an arbitration. And if that's the case, your Honor, both of those questions are answered in the affirmative, yes, he was a final decision-maker, this newspaper guy and, yes, what he did was independent and it

34

had standards and he issued some kind of final decision that everybody could live with.

THE COURT:  So if he just said, okay, Michael and Richard, let me see your stock and he said Mr. Toll, let me see your stock.  And he goes into his little booth and says, okay, I've read everything and this is what I think the amount should be.

MR. ROSENTHAL:  Then that would be a decision we would concede entitled to a presumption of correctness under the Arbitration Act and we would only be able to undo it for having a miscalculation or showing a partiality or in the DC Arbitration Act other reasonable grounds.  And that's important, your Honor, other reasonable grounds is a ground under the revised DC Arbitration Act which applies here for vacating or correcting an order.

So --

THE COURT:  I didn't mean to get you off track, I'm sorry.

MR. ROSENTHAL:  That's okay.  So that's where we are on Ms. Drolet and she's going to be our first witness, your Honor, so you might have a chance to sort of get a better sense of where all this is going at that point.

When you review all the evidence here, your Honor, you're going to see that the firm breached the settlement and operating agreement by using the tax basis method of

35

accounting rather than GAAP to calculate the firm's income or loss. You'll see that the firm violated its fiduciary duties and the covenant of good faith and fair dealing, they acted in bad faith when they tried to tag my clients with far greater shares of any loss than appropriate and you'll see that the firm cannot hide behind Ms. Drolet as some kind of final decision-maker to defend their actions.

In addition, your Honor, you're going to see after all the evidence is that during settlement negotiations CMST had information that they could have provided and did not provide to my clients. And the failure to provide that information, whether it was deliberate or negligent, altered the course of the settlement negotiations significantly.

My clients, as you'll hear, would not have signed the settlement agreement had they known they were going to be collectively tagged with a $2.5 million loss in their capital accounts.

Based on this evidence, your Honor, we're going to ask at the end that you find, among other things, that my clients are entitled to a full return of their capital, roughly $6.1 million or, in other words, that any change in their capital accounts had to be synonymous or roughly the same as the change in the capital accounts of all the other partners at the firm who saw an increase in their capital accounts just two months later.

In the end, what my clients are going to be asking, your Honor, is to do not only what's fair but what the settlement agreement, the operating agreement and the law requires. And in this case, as you'll see, it just so happens that what the law requires is in fact what's fair.

THE COURT: Thank you, very helpful. Now Mr. -- one other thing, Mr. Rosenthal, I'm sorry. Mr. -- you had sent me a letter saying that this air passenger issue, I thought we had agreed Friday we're going to deal with all the witnesses and resolve all the disputes this week?

MR. KEENEY: We did, your Honor. And then Mr. Rosenthal --

THE COURT: Because I was a little confused by that.

MR. ROSENTHAL: Okay. And, your Honor, the -- I guess it's sort of in hindsight, it's like, well, it's actually going to take a decent amount of evidence, not too, too much evidence, I imagine maybe a day's worth, to actually show what happened here, okay, and why my clients took the justified actions that they took with respect to the distribution of these fees.

Now let me say this: if your Honor is inclined to just get it all done this week we will make every effort to get that done. But what I would suggest is that we separate out the two issues because they really are totally unrelated.

THE COURT: Well, I agree with you.

37

MR. ROSENTHAL:  Mm-hmm.

THE COURT:  It's just a question of if we have time it seems like, since we have everybody here, we should try to do it.  I mean it's always going to be inconvenient for someone but I mean all of you are here and I hate to drag -- you know, you guys all have big burgeoning practices and come from far away.  I hate to drag you all back again sometime in December or January to do another two days of hearings.

MR. ROSENTHAL:  Well, we're not suggesting that, your Honor, we're actually suggesting doing it at the end of August.  I mean we understand --

THE COURT:  Yeah, but I can't.

MR. ROSENTHAL:  Okay.

THE COURT:  That's the problem, I have two more trials after this and another trial in September.

MR. ROSENTHAL:  You have other stuff going on?

THE COURT:  Pardon me?

MR. ROSENTHAL:  Do you have other stuff going on?

THE COURT:  Yeah.

(Laughter.)

THE COURT:  So I don't know if I could schedule you that quick, that's the problem.  But let's see how much we can get done this week.  I know it might be physically impossible to put all the testimony on but let's do what we can.

38

MR. ROSENTHAL:  Can I consult with my client for one minute, your Honor?

THE COURT:  Yeah, you have a note there from him, too.

(Laughter.)

(Discussion off the record.)

MR. ROSENTHAL:  But, your Honor, the idea is that, you know, it's just a logistics issue here.

THE COURT:  Well --

MR. ROSENTHAL:  And --

THE COURT:  -- the witnesses are going to have to be inconvenienced.  I mean all of you are here.  I don't want to -- I know they're all important people but we're going to have to --

MR. HAUSFELD:  Your Honor, your Honor, if I may, we have other witnesses.

THE COURT:  Well, why don't you ask Mr. Rosenthal if he wants you to say anything first.

He's doing an excellent job, Mr. Hausfeld.

MR. HAUSFELD:  I don't doubt that.  I'm, right now, I'm working with logistics.

THE COURT:  I understand but people are going to have to -- you're going to be a witness in the case, let me just deal with Mr. Rosenthal.  Is that -- let's just do that, all right?

39

MR. HAUSFELD:  May I have a moment to explain the logistics?

THE COURT:  I think he explained it very well in his letter.  Let's do as much as we can this week.  If we have time we're going to have to call the people in.

All right, Mr. Rosenthal, go ahead.

MR. KEENEY:  Your Honor, just an inquiry.  I want to make sure your Honor actually received a letter which we filed after hours on Friday, objection to Mr. Rosenthal's letter.

THE COURT:  Did not get that.

MR. KEENEY:  If I could just hand it up.

THE COURT:  All right.  I have a letter August 6th.

MR. KEENEY:  Your Honor, there are two, two different letters of August 7th.

THE COURT:  Oh, August 7th?

(Discussion off the record.)

MR. ROSENTHAL:  Your Honor, can I make a logistics suggestion, given the witnesses we have to bring in?

THE COURT:  Yes, certainly.

MR. ROSENTHAL:  To the extent that we finish up the capital accounts matter by tomorrow or even Wednesday morning, we would ask to do the air passenger stuff on Thursday because we think that to the extent we're able to get any of these witnesses here, that would be the day.  And

40

so, you know, if we have a half a day break or a whole day break in between, that's what we would ask.

THE COURT:  That's reasonable.  I mean we're only doing a half day Wednesday anyway.

MR. KEENEY:  Your Honor, could I just make a point? Mr. Sellers, who was intimately involved in the negotiations with London is only here Tuesday morning.  So it actually makes sense for us in our part of the case to put on Mr. Sellers, what he's going to say about London, and then whenever Mr. Rosenthal wants to call his people to discuss about London --

THE COURT:  That seems logical. Okay?  And then if we happen to go at full tilt and finish before, by the end of the day Tuesday, we can just take a break all day Wednesday and start again Thursday.

MR. ROSENTHAL:  Okay.

THE COURT:  Is that what you're proposing?

MR. KEENEY:  I think that's fine.

THE COURT:  And if we're not, then we'll finish up the capital account stuff on Wednesday morning and then we'll just -- we're taking Wednesday afternoon off anyway.

MR. ROSENTHAL:  Yes, I understand.

THE COURT:  Yes.

MR. ROSENTHAL:  One last thing, your Honor, let me just consult with Mr. Hausfeld.

41

THE COURT: Sure, take your time.

(Discussion off the record.)

MR. ROSENTHAL: Your Honor, on the -- this is something that I think I still need to talk to Mr. Hausfeld about but I just wanted to inform you about the issue. I'm clearly lead counsel on the capital accounts issue and Mr. Kittredge is with me and will be taking at least a witness.

But on the passenger issue Mr. Hausfeld has asked me at this point whether he can take the lead. And so --

THE COURT: Well, he's the client, you're -- you're his lawyer.

MR. ROSENTHAL: He's the client, he's also -- go ahead, I'm sorry.

THE COURT: Well, I'd prefer, I think it would be much easier to manage this proceeding here. I mean you and Mr. Keeney are both very capable and able and I'm sure your clients are capable and able but it's just I think it would be better if we just had you run the proceeding and have Mr. Hausfeld consult with you or testify, whichever he prefers.

MR. ROSENTHAL: Okay. Well, let me consult with him again.

THE COURT: I mean I can't preclude him from proceeding pro se if that's what he wants to do but I mean with you and Mr. Kittredge here that would be a shocking decision, given the capability of both of you.

42

It's just as if Mr. Toll wanted to run co-counsel with Mr. Keeney, I mean.

MR. ROSENTHAL:  Okay.  I can --

THE COURT:  -- you've got the best lawyers in the country here.  I don't understand it.

MR. ROSENTHAL:  I will consult with Mr. Hausfeld about the issue.  Thank you.

THE COURT:  I think the proceedings will get very unwieldy if I have Mr. Hausfeld, Mr. Lewis and Mr. Toll popping up throughout the trial while you and Mr. Keeney and Mr. Kittredge are trying to try this case with Ms. Baum and-- how do you pronounce your name?

MS. UPADHYAYA:  Upadhyaya.

THE COURT:  Ms. Upadhyaya.

MS. UPADHYAYA:  Thank you.

THE COURT:  I didn't mean to diminish your stature.

MS. UPADHYAYA:  It's not phonetic so...

THE COURT:  All right.  It would just be easier for me.  I'd appreciate it if you could but if he wants to proceed pro se, that's fine.

MR. ROSENTHAL:  We've got a little time to talk about it, your Honor, thank you.

THE COURT:  All right, thank you.  All right, do you want --

MR. KEENEY:  We've waived opening argument, your

43

Honor, we're looking forward to the first witness, Ms. Drolet.

THE COURT: All right, is Ms. Drolet here?

MR. KEENEY: Yes.

MR. ROSENTHAL: She is.

THE COURT: All right, do you want to bring her in? And you tell me, Mr. Rosenthal, when you want to take a break, all right? We'll take a mid-morning break.

MR. ROSENTHAL: I think I'll probably be fine and, you know, I'm on adrenaline so --

THE COURT: All right, okay.

MR. ROSENTHAL: I think your court reporter probably needs to tell all of us when she needs to take a break.

THE COURT: All right. If anybody needs a break, just raise your hand. How's that?

(Laughter.)

COUNSEL: At some point we'll need a bathroom break.

THE COURT: Yeah. I'm not a coffee drinker so I'm not a good barometer. Those of you who are coffee drinkers may need it before me.

MR. ROSENTHAL: We have an expert witness that we're going to call after Ms. Drolet and although I know the rule is invoked, he's an expert witness, he's in the courtroom. He's in the back, his name is William Davis. Okay?

THE COURT: Ms. Baum, any objection to that?

44

MS. BAUM: Probably, yes, but let me just ask Mr. Keeney ...

THE COURT: Mr. Keeney -- Ms. Drolet, good morning, ma'am, you can sit right here.

Mr. Keeney, before we get started their expert witness is in the courtroom.

MR. KEENEY: No.

THE COURT: Do you have a problem with that?

MR. KEENEY: Oh, there is? Oh, I'm sorry. I'm sorry.

THE COURT: Do you have a problem with him staying?

COUNSEL: Judge, may I approach with our exhibit binders.

THE COURT: Oh, sure.

I take it he's going to be talking about --

MR. ROSENTHAL: Well, I think I'm leaving it up to Mr. Keeney.

THE COURT: All right.

MR. KEENEY: Your Honor, we have no problem with Mr.-- it's Mr. Stevens? -- Davis, I'm sorry, staying for Ms. Drolet's testimony but Ms. Drolet's testimony only.

THE COURT: All right. And you should be flattered by that, Ms. Drolet.

THE WITNESS: Thank you.

THE COURT: Go ahead, Inna, do you want to swear

45

her?

PATRICIA DROLET, Plaintiff's Witness, Sworn.

THE COURT CLERK:  Please be seated.  State your full name and spell your last name, please.

THE WITNESS:  My full name is Patricia Ann Drolet.  My last name is spelled D-r-o-l-e-t.

THE COURT:  My thanks for coming today, ma'am.

MR. ROSENTHAL:  Judge, I just want to make sure you've got an exhibit binder with you.

THE COURT:  Yes, plaintiff's exhibit binder.

MR. ROSENTHAL:  Plaintiff's exhibit binder, okay.

THE COURT:  Your associate or partner, I don't know which you are --

COUNSEL:  Colleague.

THE COURT:  -- colleague brought it up.  Thank you.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Good morning, Ms. Drolet.

A   Good morning.

Q   You're an accountant, is that right?

A   I am.

Q   And you have your own firm called Drolet and Associates?

A   Yes.

Q   You've been the outside accountant for the Cohen Milstein firm for over 20 years, is that right?

Drolet - Direct                                        46

A    That's correct.

Q    And for the Cohen Milstein firm you prepare year-end
reviewed financial statements, is that right?

A    That's right.

Q    What does that mean?

A    Reviewed financial statements are a form of financial
statement compilation, audit and review.  It's in the middle
and I prepare a tax basis review financial statements once a
year at the end of the year, in December at the calendar year
end.

Q    Apart from preparing those year-end review financial
statements, do you perform any other accounting services for
CMST?

A    I prepare their partnership tax returns.  They are an LLC
and they file under the partnership rules so I prepare those.
They also have a pension plan and we compile financial
statements for the pension plan so that it can be audited by
outside accountants, other, other accountants.

Q    Okay.  You've got an exhibit book in front of you, Ms.
Drolet, and I'll ask you to open up to Exhibit 13.  It's a
little unwieldy so just tell me when you find that.

        THE COURT:  Mr. Kittredge, do you need that easel
moved so you can see?  Is that all right?

        MR. KITTREDGE:  I'm fine, your Honor.

        THE COURT:  Okay.

Drolet - Direct                                    47

THE WITNESS:  I'm there.

BY MR. ROSENTHAL:

Q   Do you see that?

A   Yes.

Q   Okay.  I'd ask you to take a look at the e-mail at the bottom of that page on Exhibit 13, do you see that?

A   Yes.

Q   And that's an e-mail from you to Hugh Diamond on January 5th, 2009, at 10:37 a.m., correct?

A   Correct.

Q   Mr. Diamond is the controller of the Cohen Milstein firm?

A   That is correct.

Q   Can you read that very last paragraph in the e-mail from you to Hugh?

A   "Whenever you have an estimate on allocated loss to Michael, Rich and the other departing partners let me know so we can incorporate those figures in our analysis." Parentheses, "I assume they would be based on October 31, 2008 ending numbers based on the date they left the firm," period, close parentheses.

Q   When you're talking about our analysis, you're talking about first the estimated taxes for the partners who remain at the firm after Mr. Hausfeld, Mr. Lewis and the other partners left in 2008?

A   On this particular day I believe that's what I'm talking

about.

Q   And you're also talking about determining the liquidating balances in their capital accounts, correct?

A   Yes.

Q   And so you're asking Mr. Diamond for that on January 5th, right?

A   Correct.

Q   I'll ask you to go e-mail at the top of the page?

A   Okay.

Q   And it's an e-mail from Hugh Diamond to you on Monday, January 5th, at 4:00 o'clock.  Do you see that?

A   I do.

Q   Okay.  And, if you would, please read bullet point three in that e-mail from Mr. Diamond to you.

A   "Preparing capital account analysis for Steve to review on Wednesday regarding the partners who left the firm.  Will forward to your attention once it is reviewed."

Q   So Mr. Diamond lets you know on January 5th that he's in the process of preparing that analysis and he'll get it to you as soon as Mr. Toll, that's Steve, okays sending it to you, is that right?

A   That's correct.

Q   If you would, turn to Exhibit 16, Ms. Drolet.  And I'll ask you to take a look at the second e-mail on the string, an e-mail from you to Mr. Diamond on January 15th, 2009, 9:54,

do you see that?

A    Yes.

Q    And that's ten days after the first e-mail you sent?

A    Correct.

Q    Okay.  Can you read the very first paragraph of your e-mail to Mr. Diamond?

A    "Do you have any updated reports for 2008 which include writedowns by Steve Toll on the cases and also wondering if any preliminary calculations have been done with respect to the partners who left the firm in this year of income or loss allocation."

Q    On that second sentence you're asking for the same information that you had asked for on January 5th, correct?

A    That's correct.

Q    And you had not received that information between January 5th and January 15th, correct?

A    Correct.

Q    And you wanted that information because January 15th is the deadline for estimating taxes, right?

A    That's correct.

Q    And you needed to know that information in order to prepare estimated taxes?

A    It helps.

Q    Why does it help?

A    It helps to look at this information so you can determine

Drolet - Direct                                          50

what people shared the allocated income or losses because you need that information in order to estimate taxes.

Q   And so I guess what's going on here is that you need to know how much loss is going to be allocated to Hausfeld and Lewis and the other partners who left in order to determine how much estimated income to be allocated to the partners who remain?

A   Income or loss, whatever it is, yes.

Q   Income or loss, yes.  And if you go to the e-mail at the top of the page which is Mr. Diamond's response to you on January 15th at 9:58, do you see that?

A   I do.

Q   And could you read the second sentence on the second paragraph of that e-mail?

A   "The income calculations for partners who left was given to Steve on Monday and he has not gotten back to you regarding those calculations.  I will see if it's okay to send those calculations for you to review."

Q   So at this point Mr. Diamond is telling you that he'd sent the calculations to Mr. Toll on for approval to send to you but he had not yet gotten approval?

A   That's correct.

Q   Now did you in fact prepare estimated taxes for the partners at CMST as of January 15th or on January 15th, 2009?

A   Yes, I sort of guessed at what they should pay that day.

Drolet - Direct                                51

Q   Explain what you mean by guessed at what they should pay?

A   I used the information that I had.  I had, you know, an estimate of 12/31 income, I had financial statements that had been provided for the periods July and October so --

Q   Let me stop you right there, okay?

A   Okay.

Q   Please take a look at Exhibit 17.  And this is an e-mail from Mr. Diamond to you also on January 15th at 1:19 p.m., correct?

A   Correct.

Q   It says that the quarter tax forecast for fourth quarter is attached, right?

A   Correct.

Q   So when you're talking about the income statement, this is the income statement that you're talking about for purposes of kind of guesstimating what the estimated taxes would be?

A   It appears as though it is, yes.

Q   I'll also ask you to take a look at Exhibit 107 near the back of the binder.  This is also -- you just let me know when you're there.

A   Mm-hmm.  Okay, I'm there.

Q   Okay.  Also an e-mail from Mr. Diamond to you on Thursday, January 15th, 2009, correct?

A   Correct.

Drolet - Direct                                    52

Q   And it says "Per conversation, attached are the financial statements for July and October 2008"?

A   Correct.

Q   Were those the monthly financial statements that you said you needed to determine what the departed partners' allocable share of income or loss would be?

A   Correct.

Q   Okay.  And what did you do with this information, the information contained in Exhibit 17 and Exhibit 107 to determine estimated taxes?

A   I looked at it and guessed at what I should tell my clients as to what to do.

Q   Did you tell your clients based on those guesses what your clients -- what they should do?

A   Yes.  In particular on that particular day I found out that the firm had approximately five million in advanced client costs which is a capitalized tax asset for purposes of income tax basis financial statements.  And I was told that it was going to be -- that they were no good and they were going to be written off.  So it kind of threw a lot of information into the ball game on the last day that the taxes were due.  And I had already told I think several members of the firm to pay their taxes based on what we refer to as exception one which is a safe harbor, if you will, for paying estimated taxes.  And so I was kind of scrambling, trying to

Drolet - Direct                                          53

figure out whether or not I should call people up and tell them that they didn't have to pay based on exception one or what they should do to change that.

Q   And did in fact they pay based on exception one?

A   Some did, some didn't.

Q   Okay.  And for those that didn't you would have to tell those partners how much loss would have been allocated to the partners who left the firm in 2008, correct?

A   No, they don't, they don't ask those questions nor do they care, they just want to know what they write on the coupon and what to write the check to.

Q   Okay.  Did you come up with an estimate of the allocated losses to Hausfeld, Lewis and the other partners who left the firm?

A   On that day, no, no.  As a matter of fact I went back and looked at how I did this and I was quite conservative.  I put zeroes in for anybody I didn't know a number for and that's the way I approached it.

Q   Now with the information that you were asking Mr. Diamond for, the income loss allocations from the firm on both January 5th and January 15th, you didn't actually receive that information until February 5th, correct?

A   That's correct.

Q   A full month after you initially asked for it, right?

A   Correct.

Drolet - Direct                                    54

Q   Okay.  And you asked for that information many times, isn't that right?

A   It appears as though I've asked for it twice.

Q   And you also asked for it by telephone, is that right?

A   I probably did.

Q   And when you got that information on February 5th you received an e-mail with an attachment late in the day, right?

A   Mm-hmm, yes.

Q   Is that a yes?

A   Yes.

Q   Okay.  And you think you probably looked at it pretty quickly on the 5th, knowing that you were going to get to it on the 6th, the next day, is that right?

A   That's correct.

Q   Okay.  And ordinarily you had somebody else at your firm actually look at those loss allocations, look at those capital account balance calculations, isn't that right?

A   Yes.

Q   Okay.  And that's Winnie (ph.) Yeng?

A   Yes.

Q   But Ms. Yeng was out of the office on the 6th, isn't that right?

A   That's correct.

Q   Okay.  So on the 6th you actually looked at this stuff yourself?

A    I did.

Q    Okay.  And you consulted with two of your colleagues as well?

A    I did.

Q    Okay.  And in total it took you about five hours to review the information that was provided to you by Cohen Milstein, isn't that right?

A    Correct.  There were about five calculations.

Q    About five calculations that were done.  All right, if you'd take a look at Exhibit 61, please?  And these are your billing records for the work you and your firm did on behalf of Cohen Milstein, is that right?

A    That's correct.

Q    And I'm sorry, I got these from you and they're not paginated but if you go about two-thirds of the way through I'll ask you to take a look at the billing statement for January of 2009?

A    I have it.

Q    Actually, I'm sorry, February of 2009.

A    I have it.

Q    Okay.  If you take a look at the very top entry where it says 2/5/09, February 5th, '09, telephone calls and review cap numbers, do you see that?

A    I do.

Q    And then it's got your initials, PAD, next to it?

Drolet - Direct                                    56

A    Yes.

Q    And 1.0 hours, right?

A    Yes.

Q    Okay.  So that's the sort of quick amount of time you spent late in the afternoon on the 5th reviewing this stuff preliminarily, is that right?

A    I believe that's right.

Q    Okay.  If you take two line items down where it says February 6th, '09, review of financial information from HD, do you see that?

A    I do.

Q    HD is Hugh Diamond?

A    Yes.

Q    It's got your initials, PAD, next to it, right?

A    Yes.

Q    Okay.  And then it says 5.0, is that right?

A    That's correct.

Q    Okay.  And that's the sum total of hours you spent on February 6th reviewing the capital account calculations, talking to Mr. Diamond and talking to Mr. Toll, is that right?

A    Yes, I believe so, yes.

Q    And talking to your two colleagues who helped you?

A    Yes.

Q    So again it took you five hours sum total to review the

Drolet - Direct                                      57

calculations, make some suggested corrections and get it out the door, effectively?

A   Yes.

Q   Okay.  Now the information that you reviewed was not entirely correct in your view, is that right?

A   That's correct.

Q   And -- well, let me ask you -- I'm sorry, back up.  On February 5th, that e-mail that you got from Mr. Diamond?

A   Yes.

Q   Okay.  You yourself couldn't find that e-mail in response to a subpoena that we gave you, isn't that right?

A   The original e-mail, yes.

Q   Right.  And you think you destroyed it because the numbers were wrong?

A   I -- I erased it, I'm sure I did.

Q   Okay.  So you --

A   I did subsequently see it though, it's in the information I provided.

Q   You don't actually have the e-mail, you have the attachment you think that you received?

A   I have the attachments but I did subsequently see the e-mail, the original e-mail in deposition when you showed it to me from Hugh Diamond.

Q   Well, let's take a look.  I don't think I ever showed you an e-mail from February --

Drolet - Direct                                        58

A   Well, you showed me the attach-- you showed me the calculation that -- the original one I got, I think.

Q   Right.  Let's take a look at Exhibit 15.

A   Okay.

Q   Now this is an e-mail from Mr. Diamond to Mr. Toll on January 10th, correct?

A   Yes.

Q   You did not actually receive this e-mail?

A   No.

Q   Okay.  But if you take a look at the attachments to this e-mail, let me know if these are the attachments to the e-mail from February 5th that you received.  And take your time.

        (Pause.)

A   I believe this is it.  I remember it was an erroneous calculation using a number from the financials that was incorrect in the four million range, this looks like it but I'm not positive.  But this, I believe, what you showed me in deposition, as well.

Q   Okay.  And this is the information that you remember very well asking for and not getting until a long time later, correct?

A   Yes.

Q   Okay.  And you were never given any explanation for the month-long delay from anybody at Cohen Milstein, is that

Drolet - Direct                                               59

right?

A    No, I don't believe I was given any reason.

Q    Not from Mr. Diamond?

A    No.    I mean I don't think I was asking for a reason.

Q    Not from Mr. Toll, he never gave you a reason for the delay?

A    Not that I recall.

Q    Okay.  Did you talk to anybody else besides Mr. Diamond or Mr. Toll about these calculations from the firm?

A    I don't think so at that time, I don't think so.

Q    Okay.  And ordinarily the process for getting the party partners their capital account balances, you and your firm look at it first, right?

A    Normally the calculation is provided to me before it's given to the partners that are leaving, yes.

Q    And then you give the firm your own input, right?

A    Yes.

Q    Okay.  And then the firm makes suggestion, makes changes if you've got suggested changes that they want, correct?

A    Yes.  I, if it appears wrong to me, I tell them that is wrong.  If I determine it looks accurate, I tell them that I think it's accurate.

Q    Okay.  And just so we're clear, what you did here by reviewing these calculations, capital account calculations, that's beyond the scope of your formal engagement with the

firm, isn't that right?

A   You know, it is in a sense.  However, I can't do my normal work for the firm without this being done correctly because this is part of the reviewed financial statements in the end and it's part of the income tax return.  So it's only realistic that I would review it and I'd have to feel comfortable with it.  And if it were provided to a partner before I reviewed and then it was given to me after to do my work, if I saw an error in it I would have to inform the firm.  So even though you may say it's outside of the scope, I'm not quite sure I fully see it that way because I can't do my work without this being done correctly.

Q   The bottom line is you review it before it's provided to the partners, right?

A   I do.

Q   Okay.  And so what's ultimately provided to the partners is in some respects your work, right?

A   Yes.  Well, it's what they prepared, I have reviewed and sort of given my okay that it looks accurate.

Q   So it's in part your work?

A   Yes.

Q   Okay.  Now there were three changes that you made to or three big changes that you made to the capital account balance calculations from what Mr. Diamond provided you finally on February 5th, is that right?

Drolet - Direct                                          61

A    Three that I remember, yes.

Q    What are those three?

A    The biggest one was basically this net income number that he started with and actually it's a loss, it has parentheses around it.  I'm looking at your Exhibit 15.  It's in the four million range and it kind of threw me because I had the financial statements that he had previously provided.  I looked at them and I couldn't figure out why he was starting with that number when the firm had a loss of approximately six million.  And so I figured it out.  And he had used the wrong number, he had picked up the wrong line item on the income statement to multiply the percentage by.  So that was the first thing, that was the biggest error.

          The other item was an adjustment that I had talked to him about earlier, he was supposed to post it and correct it and it had to do with a previous partner who had left the firm in 2007, I believe, and the capital account was paid out in early of 2008.  And the capital account payout -- and I say capital account -- the payout to this departed partner consisted of two things: one was a return of her original capital and her accumulated capital, I should say, in the firm's books and the other was a smaller part of that payment which is a termination allowance and is considered taxable income to her and a deduction for the firm because it wasn't part of the capital account payout.

Drolet - Direct                                                    62

And when he had originally recorded the entire payment to her he booked it to the capital account. And so I had alerted him that 300 and some thousand of it --

Q   365,000.

A   -- 365,000, thank you, should have been in the income statement as an additional deduction and he needed to correct it. And he hadn't gotten around to correcting it so I told him to correct it again and that was the other, one of the other ones.

The third one was that he used the percentage that's referred to as the effective rate instead of using the stated rate from the operating agreement. And here again he had made that mistake --

Q   Can I interrupt you for a minute?

A   Sure.

Q   You mean the effective rate as the stated rate for the purpose of determining allocable share of income or loss, correct?

A   Yes, right.

Q   What percentage of the loss the departing partners, Hausfeld, Lewis and the others, would be tagged with?

A   Exactly.

Q   I'm sorry. Continue.

A   So he used the effective rate. And whenever I look at these calculations I do go back and refer to the particular

Drolet - Direct                                    63

paragraphs in the operating agreement that talk about termination payments and how they should be calculated and in looking at it closely I thought it shouldn't be the effective rate, it should be the stated rate. And so I suggested he change that and correct it.

Q   Okay. Because I see the Court's eyes glazing over a little bit, let's take a look at the exhibits so we can actually--

(Laughter.)

Q   -- so we can actually understand this a little better.

A   Okay.

Q   Maybe I should talk about myself and my eyes glazing over. But take, if you would, because I think this is the best way to do it, if you can pull Exhibit 15 and Exhibit 21 out of the exhibit binder? And put them side by side.

A   Okay.

Q   And let me know when you've got them.

A   I'm there.

Q   Okay. Now Exhibit 21, that's an e-mail from Mr. Diamond to Mr. Toll CC-ing you on February 6th, 2009, at 4:32 p.m., correct?

A   Correct.

Q   And if you'll take a look at the attachments, these are the figures that you and your colleagues at Drolet and Associates came up with and suggested to Mr. Diamond,

Drolet - Direct                                            64

correct?  And take your time to confirm that.

(Pause.)

A    Yes, these do look like those.

Q    Okay.  And the way the process went is you reviewed the doc-- you reviewed these figures in -- I won't say in Exhibit 15 but behind Exhibit 15, the attachments to Exhibit 15, on February 6th with your colleagues, correct?

A    Correct.

Q    Okay.  You identified certain mistakes, the ones you've just described, correct?

A    Yes.

Q    And then you gave Mr. Diamond a call and explained these mistakes to him, correct?

A    I did.

Q    Okay.  And then Mr. Diamond said "Pat, that makes sense," and he went ahead and made the changes, correct?

A    Correct.

Q    And then the changes are now reflected in this e-mail that Mr. Diamond sends to Mr. Toll, CC-ing you in Exhibit 21, is that correct?

A    Correct.

Q    All right.  And what the e-mail says is at the very bottom "Pat, we'll be giving you call this afternoon to discuss changes made in this calculation versus the schedules you previously received," do you see that?

Drolet - Direct                                65

A    I do.

Q    Okay.  So Mr. Diamond is letting -- I'm sorry, Mr. Diamond is letting Mr. Toll know that you're going to be giving Mr. Toll a call to explain to Mr. Toll what you had already explained earlier that day to Mr. Diamond?

A    Yes.

Q    All right.  If you would, take a look on Exhibit 15 at Page 1427, Bates marked 14-- 01427 at the bottom?

A    Okay.

Q    And let's take a look at Exhibit 21, Exhibit 1438 at the bottom.

A    Okay.

Q    Okay.  Now you were explaining before that the biggest change you made was making sure that the guaranteed draws by the partners were not actually backed out of the loss figure, is that right?

A    Correct.

Q    Okay.  So if you take a look at CMST 1427 in Exhibit 15?

A    Yes.

Q    The third line from the bottom says "Add equity partner guaranteed draws $2.174 million"?

A    Correct.

Q    Okay.  And Mr. Diamond actually subtracted that figure from the loss, correct?

A    Correct.

Drolet - Direct                          66

Q    Okay.  And he shouldn't have, in your view?

A    Correct.

Q    And he ultimately agreed with you that he shouldn't have?

A    Yes.

Q    Okay.  And that had the effect of increasing the loss figure, right?

A    Yes.  And it's not in my view, it's erroneous to do it that way, doesn't work if you do it that way.

Q    The same thing is true with the insurance payments, which is the line below on CMST-1427, Exhibit 15, right?

A    Yes.  And I don't remember speaking to him about that but it's the same concept so he took that out as well.

Q    Okay.  Now I'm going to get to this later but at the time that you were having these discussions with Mr. Diamond you did not know that the CMST operating agreement called for the books and records to be kept in accordance with generally accepted accounting principles, correct?

A    I didn't know that that paragraph was in the operating agreement, no.

Q    Like I said, we'll get back to that.  Okay.  I think we can put this aside for a minute and let's look at Exhibit 15, CMST-1428.

A    Okay.

Q    And Exhibit 21, CMST-1439.

A    Okay.

Drolet - Direct                                    67

Q   Okay.  Now if you take a look at the, I guess, third line from the top on CMST-1428.

A   Yes.

Q   It says "Effective percentage interest," do you see that?

A   I do.

Q   25.9383 percent?

A   Correct.

Q   And then you compare that to CMST-1439 and it says "Partners percentage interest" three lines from the top and it says 27.97 percent, do you see that?

A   I do.

Q   Okay.  Is that the change to the allocable share of income or loss that you were referring to before?

A   Yes.

Q   Okay.  So in the statement that or the calculation that Mr. Diamond had made he used the effective percentage interest, correct?

A   Correct.

Q   And that effective percentage interest means that, I guess, for this purposes it meant whatever the loss was, what he did is allocate the first ten percent of the loss equally among all the partners, correct?

A   Correct.

Q   And then he allocated the rest of it based on every partner's individual percentage interest, correct?

Drolet - Direct                                    68

A    Correct.

Q    Right.  So Mr. Hausfeld's actual percentage interest at the time was 27.97 percent?

A    Yes.

Q    But if you actually took that ten percent off the top the effective rate becomes 25.9 percent, right?

A    Correct.

Q    Okay.  And what you did is you told Mr. Diamond that that was incorrect, you shouldn't apply the effective percentage interest, you should actually apply the actual percentage interest?

A    Yes, based on the operating agreement.

Q    And that, based on the operating agreement.

A    Yes.

Q    And that has the effect of increasing Mr. Hausfeld's allocable share of income or loss, right?

A    Correct.

Q    Okay.  Now that actually had not been done with two partners who left in 2007, correct?

A    Correct.

Q    Okay.

A    However, it was very immaterial at the time.

        THE COURT:  Let him ask you a question, ma'am.

BY MR. ROSENTHAL:

Q    So Paul Gallagher left in 2007, right?

Drolet - Direct                                          69

A   Yes.

Q   Okay.  And the firm applied and you signed off on the application of the effective percentage interest for Mr. Gallagher, even though the firm's books showed a loss at the time, right?

A   Yes, I didn't notice it.

Q   And the same is true with Linda Nussbaum who also left in 2007, correct?

A   At the same time and I didn't notice it, yes.

Q   Right.  So the firm applied her effective, not her actual percentage interest, right?

A   Correct.

Q   And that had the effect of actually reducing the amount of loss for her or the amount of allocable loss for her?

A   Well, actually, one of them went one way, the other one went the other way and the net effect was $1,400, approximately.

Q   But it had the effect for those individual partners certainly?

A   Well, it had an effect on one in their favor and the other one not in their favor.  The net effect to the firm was about 1,400 and I noticed it after the fact.

Q   Okay.  But here, even though you had done or the firm had done that, I should say, applying the effective percentage interest for Nussbaum and Gallagher, the firm ultimately did

Drolet - Direct                                70

not apply the effective percentage interest for Hausfeld or for Lewis, correct?

A   Correct.

Q   But that was one of the -- one of the changes you asked or suggested Mr. Diamond make --

A   Yes.

Q   -- and that he made?

A   Yes.

THE COURT:  If you had noticed that would you have corrected it?

THE WITNESS:  Yes.  Had I noticed it when he originally did it, I would have corrected it right away.  I did notice it after the fact and when I went back and checked the calculations and saw that it really didn't amount to a whole heck of a lot, I invol-- I did tell Mr. Toll though that we had done it incorrect -- that they had done it incorrectly at that time.

BY MR. ROSENTHAL:

Q   Okay.  If you'd take a look again CMST-1428 and 1439, in the middle of the page it says "Capital account as of October 31st, 2008"?

A   Yes.

Q   And on the Exhibit 15 it says 3.899 million, right?

A   Yes.

Q   And that was the amount that was calculated by Mr.

Drolet - Direct                                          71

Diamond as of January 10th remaining in Mr. Hausfeld's

capital account, right?

A    Yes.

Q    Down from the top figure on the page, $4.994 million,

right?

A    Yes, allocating income, I mean a loss for the period of

ten months, yes.

Q    Right.  Being that his capital account under Mr.

Diamond's preliminary calculations, his original calculations

of early January, was reducing Mr. Hausfeld by that $1.1

million, right?

A    Yes, correct.

Q    Okay.  And then with your, if you look to CMST-1439,

looking at your -- the effect of your suggested changes which

the firm adopted, you end up with a final balance of

$3,061,865, right?

A    That's correct.

Q    Okay.  So it actually increases the amount of loss to

Hausfeld by $800,000 or so?

A    That's correct.

Q    A little more than $800,000, right?

A    Yes.

Q    Okay.  All right, one more page comparing these two

exhibits.  If you'd just go to the next page in each exhibit,

Page 1429, Exhibit 15 and Page 1440, Exhibit 21?

Drolet - Direct                                72

A    Yes.

Q    Just looking at Mr. Hausfeld's effective percentage interest figures --

THE COURT:  This is Mr. Lewis?

MR. ROSENTHAL:  I'm sorry, Mr. Lewis, thank you, Judge.

BY MR. ROSENTHAL:

Q    Third line down, Mr. Diamond on January 10th used 6.87, the effective percentage interest, correct?

A    Correct.

Q    And then you suggested and he adopted the change you suggested so that the interest was 6.78 percent, right?

A    Correct.

Q    Okay.  And if you go down to the capital account as of October 31st on CMST-1429?

A    Yes.

Q    Okay.  Mr. Lewis has been reduced from on these preliminary calculations of early January, from 1.163 million to 873,000, right?

A    Yes.

Q    Okay.  So approximately a $290,000 loss for Mr. Lewis--

A    Correct.

Q    -- under those preliminary calculations?

A    Yes.

Q    If you move over to CMST-1440 which are the calculations

Drolet - Direct                                73

made pursuant to your corrections, Mr. Lewis is reduced from his opening balance of 1.163 million down to a closing balance of $694,527, right?

A    Yes, that's correct.

Q    Okay.  And so your suggested changes also increased the amount of loss for Mr. Lewis, right?

A    Yes.

Q    Okay.  Now going back up to the partners interest, for Mr. Lewis and Mr. Hausfeld, at the time, February 6th, when you reviewed these calculations you did not know that the firm had purported to reduce Mr. Hausfeld's and Mr. Lewis' percentage interests on November 5th, 2008 retroactive to the beginning of the year, effective immediately, correct?

A    That's correct.

Q    You were provided that information by Mr. Diamond at that time?

A    No.

Q    Or by anybody else at the firm, correct?

A    No.  I was aware that there was a percentage change though because it was part of the attachments he had sent me, I just wasn't aware of anything having to do with retroactivity.

Q    They were effective immediately?

A    Yes.  I -- I only knew that the percentage change had to do with the vote that was taken to ask Mr. Hausfeld to leave

Drolet - Direct                                  74

the firm, that's all I knew.

Q   Okay.

THE COURT:  So when did you think it took effect, the decreased ownership interest?

THE WITNESS:  I assumed they took effect on November 7th or the day that it was voted, whatever date that was.

THE COURT:  Well, go ahead, we'll follow up on that.

MR. ROSENTHAL:  We'll get to that issue...

THE COURT:  I mean my question there is if that's the case why did you use this 28 percent and not the 14 percent.

THE WITNESS:  Because I didn't -- I didn't, I assumed that the vote changing percentage was effective the day it happened going forward but not retroactive to the prior --

THE COURT:  Okay, that's what he asked you before.

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. ROSENTHAL:

Q   You can put those two exhibits, 15 and 21, back in the binder, Ms. Drolet.  Thank you.  Now after you talked to Mr. Diamond about this he sent that, that Exhibit 21 on to Mr. Toll, CC-ing you, correct?

A   Yes.

Q   Okay.  And that same date, February 6th, you had a

Drolet - Direct                                          75

discussion with Mr. Toll, correct?

A    I did.

Q    And you explained to him the changes that you had suggested and that Mr. Diamond adopted, correct?

A    Yes.

Q    And Mr. Toll agreed with your work, right?

A    I believe so, yes.

Q    You made no further suggestions regarding those calculations prior to those calculations being provided to my clients on February 20th, correct?

A    I did make one suggestion but it wasn't adopted.

Q    Okay.  Let me ask you to turn back to Exhibit 61.  If you would turn to the February timesheet, please, which is about two-thirds of the way through?

A    Okay.

Q    Between February 6th, 2009, and February 20th, 2009, do you have any time recorded at all for work on behalf of CMST?

A    Yes, I have -- I mean I did some things for them.

Q    Is there any time recorded?

A    February 7th I wrote a letter to New York State, to New York State about an audit that was going on for them.

Q    I'm sorry, we're looking at 2009, not 2008.

A    Oh, I'm sorry, I'm sorry, my mistake.  Okay.  February 6th, you say?

Q    Yes, between February 6th and February 20th you have no--

Drolet - Direct                                76

A   On the 25th I have a con-- I had a conference call --

THE COURT:  No, ma'am, he's question was between the, I guess it would be the 7th --

MR. ROSENTHAL:  February 6th and February 20th.

THE COURT:  -- and the 20th.

THE WITNESS:  Oh, okay, no, nothing, right.

BY MR. ROSENTHAL:

Q   No recorded time, correct?  And you made no further suggestions to the firm between February 6th and February 20th, correct?

A   Correct.  On February 6th though I made a suggestion but it wasn't adopted and it had to do with the five million writedown in client advances.

Q   Right.

A   But that wasn't adopted, it wasn't part of the changes.

Q   And you didn't make that suggestion to Mr. Diamond, did you?

A   I -- I'm sure I discussed it with Mr. Diamond and I discussed it with Mr. Toll.

Q   Mm-hmm.  But that wasn't actually reflected in the figures that you provided to Mr. Diamond?

A   It wasn't reflected in the changes that Mr. Diamond made based on my recommendations, no.  But I did at some point around that time discuss it with Mr. Toll.

Q   And the firm ultimately decided to take that writedown at

Drolet - Direct                                            77

year end, correct?

A    Yes.

Q    But not as of October 31st?

A    Correct.

Q    You were never given any explanation about -- by Cohen Milstein about why it took 14 days after February 6th to have those calculations provided to my clients, Mr. Hausfeld and Mr. Lewis, were you?

A    No, I don't believe I asked and I wasn't told.

Q    It's fair to say, Ms. Drolet, that you assisted CMST in coming up with the figures that they ultimately provided to Mr. Hausfeld and Mr. Lewis, correct?

A    Yes.

Q    It reflected your work?

A    Yes, I determined the accuracy of them.

Q    Okay.  If you would, for yourself, just look through Exhibits 43, 45, 46 and 47.  I'll say that again, before asking any questions I just wanted you to familiarize yourself briefly with those four exhibits.

          (Pause.)

Q    If you need me to recite them again just let me know, please.

A    Could you, please?

Q    Yes.  It's 43.

A    Mm-hmm.

Drolet - Direct                                78

Q   45, 46 and 47.

          (Pause.)

A   Okay.

Q   These are all exhibits dated Friday, February 27th, 2009, correct?

A   Correct.

Q   And you received an e-mail, I mean a voicemail message from my partner, Stef Tucker, in the morning on Friday, February 27th, 2009, right?

A   Yes.

Q   And Mr. Tucker asked for information backing up what the firm had done to produce the liquidating balance -- liquidating capital account balance calculations for Mr. Hausfeld and Mr. Lewis, correct?

A   Correct.

Q   When you got that phone -- that voicemail message from Mr. Tucker you called Mr. Toll, right?

A   I believe I did, yes.

Q   And you told Mr. Toll that you'd gotten a request from Mr. Tucker for this information, right?

A   Correct.

Q   And you called Mr. Toll because the firm was your client, right?

A   Yes.

Q   And you didn't want to provide any information to Mr.

Drolet - Direct                              79

Tucker without getting approval from your client, right?

A    Correct.

Q    Now Exhibit 43 is an e-mail from Mr. Diamond to you that day, Friday, February 27th at 11:12 a.m., right?

A    Yes.

Q    Okay.  And it attaches the worksheets regarding the capital accounts for the partners who left the firm, right?

A    Yes.

Q    And this is what you told Mr. Toll Mr. Tucker was asking for, right?

A    Yes, I believe so.

Q    And Mr. -- did you have also a follow-up conversation with Mr. Diamond saying that you needed this information?

A    I don't remember.

Q    Okay.  But Mr. Diamond obviously is providing this information to you in this e-mail, right?

A    Yeah, he's providing me a clean copy of financial statements because I didn't have a clean copy.

Q    And if you'd turn to Page -- Exhibit 45?  This is an e-mail from you to Mr. Toll a little while later on Friday, February 27th, 2009, 1:14, entitled "Stef Tucker's request for information," right?

A    Yes.

Q    And it says "Steve, attachments as discussed," do you see that?

Drolet - Direct                                        80

A    Yes.

Q    And so what's going on here is you wanted to let Mr. Toll know about the documents that you were going to be providing to Mr. Tucker, right?

A    Yes, and I wanted him to have a copy of them.

Q    And you previously had discussed with Mr. Toll those documents that you'd been providing -- that you would be providing to Mr. Tucker, right?

A    Correct.

Q    And the reason that you had this discussion was because Mr. Toll or Cohen Milstein is your client, right?

A    Absolutely.

Q    And the reason that you got prior approval to have this communication with Mr. Tucker is because Cohen Milstein is your client, right?

A    Yes, and I wouldn't release information without their permission.

Q    Right, you wouldn't release information without your client's permission, okay.  If you would, turn to Exhibit 46, please?

A    Okay.

Q    And this is an e-mail from you to Mr. Toll again, same day, Friday, February 27th, 5:06 p.m., right?

A    Yes.

Q    And it says "Steve, below is the e-mail I sent to Stef

Tucker with attachments," right?

A   Correct.

Q   So you forwarded on to Mr. Toll what you sent to Mr. Tucker by e-mail, right?

A   Correct.

Q   And that's because Mr. Toll was your client, right?

A   Yes.

Q   And you didn't want to, well, you wanted to let your client know the communications you were having with Mr. Tucker?

A   Yes.

Q   Exhibit 47, please.  This is an e-mail from Mr. Toll to you at the top of the page responding to your provision of the information you were giving to Mr. Tucker by Mr. Toll, right?

A   Correct.

Q   And he says "Thanks much," acknowledging what you'd done, right?

A   Yes.

Q   Okay.  If you would, turn again to Exhibit 61?  And again go back to the February time records.

A   Okay.

Q   February '09 time records, I'm sorry.

A   Yes.

Q   And it shows near the bottom of the page it says 2/27/09?

A    Yes.

Q    October 31st, '08 information and teleconference with clients?

A    Yes.

Q    Says PAD, that's you, right?

A    Yes.

Q    You spent an hour and a half that day working on this information that you were going to be providing to Mr. Tucker, right?

A    Yes.

Q    On behalf of your clients, right?

A    Yes.

Q    I'd ask you to turn to Exhibit 48, Ms. Drolet.

        MR. ROSENTHAL:  Let me ask the court reporter how are you doing?  You're doing okay?  Thanks.

        THE COURT:  You want to take a break?

        MR. ROSENTHAL:  No, I'm fine.

        THE COURT:  Does anybody need a break?  Why don't we go until about another 15 minutes.

        MR. ROSENTHAL:  That's great.  Thank you, Judge.

        THE COURT:  And then we'll go until around 12:00, 12:15.

        MR. ROSENTHAL:  Okay.

        THE COURT:  All right?

BY MR. ROSENTHAL:

Drolet - Direct                                              83

Q   Ms. Drolet, this Exhibit 48 is an e-mail from you to --
well, let me ask you, let's go to -- I'm sorry, the middle of
the page, the e-mail in the middle of the page from Stef
Tucker to you dated March 2nd, 2009, noon, do you see that?

A   I do.

Q   Okay.  And this is Mr. Tucker's response to the
information you've provided or that you provided on February
27th, a few days earlier, right?

A   Correct.

Q   Or actually you provided it on late on the day on Friday
on February 27th and he's getting back to you noon the next
Monday, right?

A   Correct.

Q   And in this e-mail, Mr. Tucker alerts you to the fact
that Mr. Hausfeld's percentage interest per share was reduced
retroactively, effective January 1, 2008, right?

A   Correct.

Q   That's the very first time that you heard that
information?

A   Yes.

Q   The very first time you heard the information that
percentage interest was supposed to be applied effective
immediately and retroactive to the beginning of the year,
right?

A   Yes.

Q   And when you did the calculations with Mr. Diamond, a month before, early February, you did not know that, right?

A   Correct.

Q   If you'd go to the e-mail at the top of the page, Ms. Drolet, which is an e-mail a couple hours later at 2:22 p.m. from you to Mr. Toll saying, "Forward, response to your voice message to me today."  Do you see that?

A   Yes.

Q   And you say, "Steve, this is the reply I received from Stef Tucker, see below.  I have not responded yet.  He mentioned that Michael's percentage was changed retroactively to 1/1/08.  Was that ever discussed with Michael according to writing?"  Do you see that?

A   I do.

Q   Okay.  And you said you have not responded yet, right?

A   Yes.

Q   And you didn't want to respond because you wanted to talk to your client first about what was going on, right?

A   Yes.

Q   And you wanted to get Mr. Toll's explanation of what the firm was doing first, correct?

A   Correct.

Q   And you forwarded this response to Mr. Toll because, again, the firm is you client, right?

A   Correct.

Drolet - Direct                                          85

Q   Now, prior to this time, you had never talked to Mr. Toll about the fact that these percentage interest determinations were made effective immediately and retroactive to the beginning of the year, right?

A   I don't believe so, no.

Q   You hadn't talked to anybody else at the firm about it?

A   I don't believe so.

Q   Okay, did you ever talk to Mr. Sellers about it?

A   I don't, I don't remember talking to Mr. Sellers about it, no.  It's possible, but I don't remember.

Q   Okay, and you were concerned because a retroactive change would make a material difference in the calculations, right?

A   If it were retroactive and it were agreed upon, it would make a difference, yes.

Q   Okay.  Now, you asked here if it was put into writing, right?

A   Yes.

Q   Okay.  And you were never actually provided a document showing that that had been put into writing, correct?

A   Correct.

Q   In fact, you didn't see a document until I showed it to you at your deposition a month ago, right?

A   Yes.

Q   So, you did not have that document in hand when you actually did the calculations, right?

Drolet - Direct                    86

A    I had nothing in hand, no.

Q    Okay, if we can turn to Exhibit 49, please, Ms. Drolet. This is an e-mail from you to Mr. Toll three days later, Thursday, March 5th, at 9:04 in the morning, correct?

A    Correct.

Q    And you say, "Hi, Steve, I sent this to you earlier in the week and I haven't heard back from you,"  correct?

A    Yes.

Q    And when you're talking about this, you're talking about that e-mail from Mr. Tucker advising you of the retroactive change in the percentage interest made effective immediately, right?

A    Correct.

Q    And you said, "I have not yet responded to this e-mail." Right?

A    Yes.

Q    "And I wanted to discuss before I do."  Correct?

A    Correct.

Q    And you hadn't responded, yet again, because you wanted to talk to your client about it before?

A    Yes.

Q    And you say, "I want to discuss it with Mr. Toll", before you did respond, right?

A    Correct.

Q    You didn't call Mr. Tucker and ask to talk to him about

Drolet - Direct                                87

it, did you?

A    No.

Q    You didn't ask Mr. Tucker for any documents that might show that the change was retroactive, did you?

A    I assumed he didn't have any, he didn't supply anything.

Q    Did you ask Mr. Tucker to supply such documents?

A    No, no.

Q    All your communications on this subject of retroactivity were with Mr. Toll, is that right?

A    I believe so.

Q    At that time, I should say, the beginning of March?

A    I believe so, yes.

Q    Let's take a look at Exhibit 50, Ms. Drolet.  Let's take a look at the e-mail in the middle of the page from Mr. Toll, do you see that?

A    I do.

Q    And he responds to your e-mail of March 5th, about five minutes later, I'm sorry, about ten minutes later and he says "I am playing phone tag with our lawyer, Jack Keeney, to get his input, we'll get back to you today."  Right?

A    Yes.

Q    So, he's informing you that he was going to talk to his lawyer about it before talking to you?

A    Correct.

Q    And on March 5th, after getting this e-mail, you did not

Drolet - Direct                                88

call Mr. Tucker first, because you were waiting to hear from your client about this, right?

A   Correct.

Q   And at the very top of the page, you respond 46 minutes later, on March 5th and you say, "Okay, thanks."  That's your response, right?

A   Yes.

Q   Okay.  And in fact, you did wait to hear back from Mr. Toll that day, right?

A   I did wait.  I don't remember when he got back to me.

Q   Okay.  And you talked to Mr. Toll later that day, right?

A   March 5th?

Q   March 5th, right.

A   I don't remember.

Q   Do you remember talking to him about the issue regarding whether the percentage interests were retroactive or not, right?

A   Yes, at some point, I had a discussion with him.  I don't know if it was on that day.

Q   Okay.  And you responded, I mean, you talked to him about that before you responded to Mr. Tucker, right?

A   I believe so, yes.

Q   Okay.  And he told you that he may have mentioned, at the compensation committee, that the percentage interests were going to be retroactive and effective immediately, is that

right?

A    Yes.

Q    But he wasn't sure about it?

A    I don't remember what he was or wasn't sure about.  He said that he might have used the word retroactive at some point when speaking.

Q    And in your mind, there was some confusion over the issue, right?

A    Yes, it appeared to be a little bit of a confusing issue.

Q    Right.  And Mr. Toll told you that there was no document regarding the retroactivity, right?

A    Yes, because I wanted to know if the partnership agreement had been amended or adjusted because I needed to know that.

Q    Right.  And he told you there was no document reflecting the retroactive, effective immediate change, right?

A    Yes.

Q    And although the change, well, let me see -- let me back up.  Mr. Toll never told you to do the calculation using anything but the prior year's percentage interests, right? For Mr. Hausfeld and Mr. Lewis?

A    Yes.  He actually didn't tell me to use that percentage, it was used in the calculation I got, the effective rate and I suggested they change it, but he didn't call me and say use this rate.

Drolet - Direct                                        90

Q    Okay.

A    I got the calculation from you, Diamond, without any discussion about that.

Q    Right.  The firm's position, as conveyed to you by Mr. Toll, was that the change wasn't retroactive for the purpose of determining allocable shares, income or loss, right?

A    Correct.

Q    And that's the position you adopted, too, right?

A    Yes.  It's what's called for in the operating -- in the partnership operating agreement, I use that word interchangeably, so excuse me if I do, but it seems -- it's what's called for in the operating agreement, in my opinion and it's what's always been used, so, that's what I used.

Q    Well, the operating agreement doesn't call for anything regarding the percentage interest to be allocated or the percentage interest to be used to determine a departing partner's share -- share of income or loss, does it?

A    I believe it infers that it should be -- you calculate the percentage of the partner that's departing in the middle of the year, using the percentage that was in place as of the day that they left.  I believe it infers that.  I get that inference from it.

Q    Let's turn to Exhibit 2 and I'll ask you to turn to page 9, Article 10.  This is the provision having to do with the determination of capital account balances for departing

Drolet - Direct                                91

partners, correct?

A    Yes.

Q    Okay.  And there is nothing in there talking about the percentage interest to be applied to the income or loss as of the date or effective date of termination, is there?

A    It might not be in there, but I believe there are other paragraphs in this document, that do infer that and it's always been done that way.

Q    So, your idea though, it's supposed to be the percentage interest in effect at the time of departure, right?

A    On the month -- the last day of the month preceding the departure date.

Q    Right.  And the reason that you were concerned about whether or not the percentage interest determinations made by the comp committee were retroactive, is because if, in fact, they were retroactive and in fact, if they were, in fact, effective immediately, that would mean that Mr. Hausfeld's percentage interests under the operating agreement as of October 31st, would have been 14 percent, not 28 percent, right?

            MR. KEENEY:  Objection.

            THE WITNESS:  If it were agreed --

            THE COURT:  Hold on.

            MR. KEENEY:  Objection, your Honor.  There were a couple different assumptions built into the question.  If

Drolet - Direct                          92

you'd separate out those assumptions, I think -- it's very compound, that's how he phrased it.

THE COURT:  All right, why don't you just ask them one at a time.

MR. ROSENTHAL:  Okay.

BY MR. ROSENTHAL:

Q   You were concerned, in that March 2nd e-mail to Mr. Toll, that the percentage interest determinations may have been, in fact, retroactive, right?

A   If there was a written agreement that suggested the change was retroactive, I would have been concerned about that, yes.

Q   Because it might have made a material difference in your calculations, right?

A   Yes.

Q   Because you used the percentage interest in effect at the time, meaning at the effective -- on the effective date of termination, right?

A   Correct.

Q   And so, if the compensation committee's decision as of November 5, 2008, was in fact, retroactive and effective immediately to the beginning of the year, that would mean Mr. Hausfeld's percentage interest would have been 28 percent rather than 14 percent as applied to the loss that you calculated, right?

Drolet - Direct                                93

A    If it was retroactive with respect to the allocable
shares income or loss, yes.
Q    And the same is true with respect to Mr. Lewis'.  If, in
fact, the comp committee's determinations on November 5th,
were effective immediately and retroactive to the beginning
of the year, then you would have used the percentage interest
as determined by the compensation committee on November 5,
2008, correct?
A    Yes, I'll caveat just by saying if it's retroactive and
acceptable, it seems to me you would have to have a written
agreement to allow that to happen.
Q    Okay, you're not --
A    A written agreement signed by everybody.
Q    -- you're not a lawyer, right?
A    No, I'm not.
Q    Okay.
        THE COURT:  You're probably happy about that, too,
right?
        THE WITNESS:  Yes, for the last few weeks, yes.
Q    Okay, we'll get back to that issue again.  Now, in this
conversation that you had about retroactivity, with Mr. Toll,
where there was some confusion over the issue, you also
discussed the response to Mr. Tucker's e-mail, correct?
A    Correct.
Q    And you did discuss that you would draft a response and

Drolet - Direct                                  94

show it to Mr. Toll before you sent it, right?

A    Yes.

Q    Okay.  And you wanted to show it to Mr. Toll before you sent it to Mr. Tucker because Cohen Milstein's your client, right?

A    Yes.

Q    Okay.  That same day, November 5th -- I'm sorry, November 5th, I'm sorry -- March 5th, you did, in fact, draft a response for Mr. Tucker, right?

A    Yes.

Q    Okay.  And you sent it to Mr. Toll first, right?

A    I did.

Q    And that's because Cohen Milstein's your client, right?

A    Yes.

Q    And you don't want to send anything to other people relating to your client without your client's permission, right?

A    Correct.

Q    I'd ask you to open up to Exhibit 51.  This is an e-mail from you to Mr. Toll on Thursday, March 5th, at 3:51, right?

A    Yes.

Q    And the subject is "Response to consider", right?

A    Yes.

Q    And this was the e-mail that you and Mr. Toll talked about sending to Mr. Tucker in response to his March 2nd

e-mail, is that right?

A    Yes.

Q    And below it says, "Steve, let me know."  Right?

A    Yes.

Q    So, this was your -- this was following up on the conversation that you'd had with Mr. Toll, right?

A    Yes.

Q    Where you told him that you'd provide this to him for his prior approval before sending it on to Mr. Tucker, right?

A    I wanted to see -- I wanted him to see the draft before I sent it, yes.

Q    Right.  Okay, can you turn to Exhibit 52, please. Actually, I'm sorry, 53.  And if you look at the e-mail on the bottom of the page, this is an e-mail from Mr. Tucker to you, dated Thursday, March 5th, 6:50 p.m., is that right?

A    Yes.

Q    And Mr. Tucker says, "Ms. Drolet, have you been able to obtain the information that I need?  I am meeting with Michael Hausfeld on Monday and we're looking forward to being able to resolve the substantive and significant questions that we have."  Right?

A    Yes.

Q    Okay.  Now, Mr. Tucker sent this to you before you had received approval for your draft response to Mr. Tucker, from Mr. Toll, correct?

Drolet - Direct                              96

A    I believe so, yes.

Q    Okay.  And then the following morning, March 6, 2009, you send or you forward this e-mail from Mr. Tucker to Mr. Toll, right?

A    Yes.

Q    Again, because Mr. Toll is your client, right?

A    Yes.  And I was waiting for him to get back to me on the draft, I think.

Q    He hadn't yet gotten back to you on the draft, right?

A    I believe so, yes.

Q    So, you hadn't yet sent anything to Mr. Tucker, right?

A    Yes.

Q    Okay.  On March 6th, Friday, 2009, you did have a discussion with Mr. Toll about the draft that he had sent to you, right or that you had sent to him?

A    I believe so, yes.

Q    And Mr. Toll made a minor change to the document, right?

A    Yes.

Q    And you adopted that change?

A    It was cosmetic, yes.  I can't remember what it was.

Q    Okay.  And Exhibit 54 is an e-mail from Mr. Toll to you, saying "Response to Consider" and there's an attachment saying, "Draft.doc", do you see that?  Exhibit 54.

A    Yes.

Q    And is this the, I guess what you would call, redline

Drolet - Direct                                97

draft sent back to you with that change that Mr. Toll was suggesting?

A    You know, I assume it is, without reading the whole thing.

THE COURT:  Ma'am, at this point, what did you perceive your role to be?  Were you advising Mr. Toll on how to handle this or as a client?  Or were you acting as a referee or an umpire between Mr. Tucker and the firm?

THE WITNESS:  No, I don't see myself as an umpire. I kind of see myself as trying to explain the calculation to somebody and why the 27.97 percent was used instead of the 14 percent.  Based on my understanding of the operating agreement and the way it had been done many, many times before.  So, I don't see myself as an umpire or anything like that, I just see myself trying to explain something to somebody.

THE COURT:  Okay, thank you.

Q    In trying to explain what the firm had done with respect to the calculations, right?

A    Yes.

Q    With your input?

A    Yes.

THE COURT:  This might be a good point to break, Mr. Rosenthal.  If that works for you, unless you're in the middle of a point.

Drolet - Direct                    98

MR. ROSENTHAL:  Fine with me, Judge, thank you.

THE COURT:  Okay, it is 10:55, what if we break until 11:10.  Does that give everyone enough time?

MR. ROSENTHAL:  Yes, thank you, Judge.

THE COURT:  Ma'am, is that okay with you?

THE WITNESS:  That's fine, thank you.

THE COURT:  All right, I'll see you at 11:10, thanks.

(Court in recess 10:55 to 11:12 o'clock a.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated, everyone.  Ms. Drolet, we're going to have to impose on you to come back.  Now, what's that, a Boston accent?

THE WITNESS:  New Bedford.

THE COURT:  Yes.

THE WITNESS:  60 miles south.

THE COURT:  I was sitting here trying to figure out which town it is from.  At first, you kind of concealed it, you look like you had assimilated into D.C., but it came through.

THE WITNESS:  It pops up.

THE COURT:  Yes.  Mr. Rosenthal, go ahead.

MR. ROSENTHAL:  Thank you.

BY MR. ROSENTHAL:

Q   Ms. Drolet, thanks for your patience.  If you would, open

Drolet - Direct                                99

up to Exhibit 55.

A    Okay.

Q    At the bottom of the page is an e-mail from you to Stef Tucker, dated Friday, March 6th at 10:57, right?

A    Yes.

Q    And that's the response that, after getting Mr. Toll's prior approval, you sent on to Mr. Tucker, right?

A    Yes.

Q    And then the top e-mail on the page, the one that's not redacted, the top e-mail, is an e-mail from you to Mr. Toll at the same time, 10:57, indicating to Mr. Toll that this was response that you had sent, correct?

A    Yes.

Q    And you sent that again because Mr. Toll is your client and you wanted to let your client know what was going on?

A    Yes.

Q    Take a look at Exhibit 57, please, Ms. Drolet?  At the very top of the page, that's an e-mail from Mr. Tucker to you, same day, Friday, March 6th, responding to the e-mail that you sent to him with Mr. Toll's prior approval, correct?

A    Yes.

Q    And then on page, I'm sorry, Exhibit 58, Ms. Drolet.  The top e-mail from you to Mr. Toll on Saturday, March 7th, 10:28 in the morning, do you see that?

A    Yes.

Drolet - Direct                            100

Q    And you said, "Hi, Steve, see below the response from Stef Tucker.  He's not asking for a reply and I haven't responded."

A    Yes, I see it.

THE COURT:  Which exhibit is it, I'm sorry.

MR. ROSENTHAL:  I'm sorry, 58, Judge.

THE COURT:  58, okay.

Q    And again, you were just relaying information to your client, right?

A    Yes, I wanted him to see that Mr. Tucker responded.

Q    Right.  And you wanted to let your client know that there was no more explaining that had to be done on your behalf or by you?

MR. KEENEY:  Objection.

THE COURT:  Hold on, ma'am.  What's your objection?

MR. KEENEY:  That's leading, your Honor.

THE COURT:  Well, they've all been leading.

MR. KEENEY:  That's the one we're objecting to, because the choice of words.

THE COURT:  Why don't you rephrase the question.

MR. ROSENTHAL:  I'll move on.

THE COURT:  I can't remember where it was.  Just ask it again.  Try to ask it a different way.

MR. ROSENTHAL:  Okay.

BY MR. ROSENTHAL:

Drolet - Direct                    101

Q   You say, "He's not asking for a reply and I haven't responded."  Right?

A   Correct.

Q   And are you here explaining to your client or telling your client that there's no more explanation of what's been done needed?

A   No, I'm just telling him that there was no question asked of me, so, I'm not responding and I'm just sharing the e-mail with him.

Q   Now, it's true, Ms. Drolet, that you weren't conveying to Mr. Tucker any of the conversations that you had with Mr. Toll, correct?

A   No.

Q   Because and it's true that you weren't conveying any of the e-mails that you exchanged with Mr. Toll, to Mr. Tucker, correct?

A   Correct.

Q   And it's true that you weren't consulting Mr. Tucker about your communications with Mr. Toll before reaching out to Mr. Toll, correct?

A   Correct.

        THE COURT:  Who reached out to Mr. Tucker?

        MR. ROSENTHAL:  No, before reaching out to Mr. Toll.

        THE COURT:  All right, say that again, so I hear it. I'm sorry.

Drolet - Direct                        102

Q   It's true that you weren't consulting with Mr. Tucker about your --

THE COURT:   Oh, okay.

Q   -- communications with Mr. Toll before reaching out with Mr. Toll, correct?

A   Correct.

Q   In other words, you weren't getting prior approval from Mr. Tucker for the communications you had with Mr. Toll, right?

A   No, I was not.

Q   Right and that's because Cohen Milstein was your client, right?

A   Correct.

Q   And Mr. Tucker's clients were Mr. Hausfeld and Mr. Lewis, right?

A   Yes.

Q   And they weren't your clients?

A   He was asking me questions.  I was trying to explain how the calculation was done.

Q   Right.  Explain how the calculation was done by the firm, right?

A   By the firm, in accordance with the operating agreement, which I had reviewed and agreed with.

Q   You say in accordance with the operating agreement. We've already established that you didn't recognize, at the

Drolet - Direct                                 103

time, that the operating agreement required for the books and records to be kept in accordance with GAAP, correct?

A    I didn't focus on that particular paragraph.  But there are several paragraphs in the operating agreement that, to me, make it clear that the percentage to be used is the percentage that was in effect before termination.

Q    I'm not talking about the percentage right now, I'm talking about the books and records being kept in accordance with GAAP.

A    Yes, I wasn't -- I wasn't aware that that paragraph was in there.

Q    Right.  And --

THE COURT:  Wait, show her what paragraph you're talking about.  This is Exhibit 2?

MR. ROSENTHAL:  That's Exhibit 2.

THE COURT:  What paragraph are you referring to?

MR. ROSENTHAL:  That would be Article 2-D, Judge, which is on page three.

THE COURT:  Okay.

Q    And the second -- the first two sentences read "books and records, should be kept at all times at the principal office of the company, accurate books of account reflecting all moneys received, paid, advanced or expended by the company, including salaries and distributions paid to members."  Do you see that, Ms. Drolet?

Drolet - Direct                    104

A    Yes.

Q    And then the next sentence says, "The books of account shall be kept and continually maintained in accordance with Generally Accepted Accounting Principles," right?

A    Yes.

Q    At the time that you were reviewing and making suggestions to the calculations and communicating with Mr. Tucker about the calculations, you did not know about the existence of this provision, correct?

A    Yes.

THE COURT:  How can that be?  If you're interpreting the operating agreement, how can you not know this was in it?

THE WITNESS:  I'd like to explain, sir.

THE COURT:  Okay.

THE WITNESS:  If you look at the top of the page, in Item A, fiscal year, it says, "the fiscal year, accounting period and accounting method of the company shall be determined by the members."  That particular sentence has always been in this operating agreement.  This operating agreement has been amended a couple of different times.  All previous versions, it was that sentence, without this GAAP commentary at the bottom.  So, in all honesty, I don't know who was aware of this.  I don't even believe Mr. Tucker brought it to my attention.  I'm not sure who recognized that this little paragraph was thrown in.  I believe it was a

Drolet - Direct                                    105

typographical error when they amended this particular agreement.  It wasn't in the two prior agreements.  The books and records for this firm have never, ever, ever been kept by GAAP.  I've never been asked to do it.  They've never asked for a change in accounting method.

So, in all honesty, your Honor, when I looked at this partnership agreement, to do the calculations, I went right to the paragraph that addressed the calculation and the termination paragraphs.  I didn't even go back and look at this, because I didn't know it got slipped into this agreement at any point.  So, that's my explanation.

THE COURT:  This was done in 2003?

MR. ROSENTHAL:  2003, correct.

THE WITNESS:  As odd as that sounds, that's what happened.

THE COURT:  Okay.  Go ahead, you can follow up, Mr. Rosenthal.

MR. ROSENTHAL:  We can leave the GAAP point for the moment.

THE COURT:  Okay.

Q   Now, with respect to what you did in connection with these capital account calculations, you were not a final decisionmaker or did not consider yourself to be a final decisionmaker, did you?

A   The way I would say it, I would not consider myself to be

Drolet - Direct                        106

a decisionmaker.

THE COURT:  On what topic?

MR. ROSENTHAL:  On the topic of the capital account calculations.

THE COURT:  Okay.  So, you did not consider yourself a decisionmaker on capital account calculations?

THE WITNESS:  For a couple of reasons.

THE COURT:  Okay.

Q   And you did not see yourself as acting as an arbitrator here, correct?

A   Absolutely not.

MR. KEENEY:  Excuse me, your Honor.  The witness said for a couple reasons.  I think she's entitled to say what the reasons are.

THE COURT:  All right, let's do that and then you can ask the arbitrator question, all right.

BY MR. ROSENTHAL:

Q   Okay, so, you said that there were a couple reasons that you didn't view yourself as a decisionmaker here, right?

A   That's correct.

Q   Okay.

A   I've always viewed myself in this particular role, as checking the calculation to make sure it's accurate and proper, so that it can be put into the final reviewed financial statements and included in the partnership

Drolet - Direct                                    107

agreement and to make sure that the controller didn't make any errors in doing the calculation.  That's one thing.  That's the way I view my role and I think it has to be done in order for me to feel comfortable with the rest of the work I produce.

The second thing is that I actually recommended something else at the time that this calculation was done.  I found out on January 15th that the firm was going to writing off $5 million approximately in client advances that are a tax asset on the books, of a tax-basis financial statement.  It is the biggest asset this firm has on their books.  It basically makes up the capital account. So, if you think of the capital accounts being worth about $20 million, in this case, the client advances were probably close to $20 million.  IRS rules do not allow a firm to write off these advances.  Whereas, other companies would treat them as an ordinary and necessary business deduction.  IRS requires that they be treated as sort of loans, if you will, to a client, until the case is resolved, won or lost.  And at that point, you write them off.

I found out on January 15th, when I was trying to do the estimated tax payments for the firm, that $5 million of the capitalized client costs were no good.  And so, I suggested to Mr. Toll and I don't think I suggested it on January 15th, because I didn't even think of it that day.

Drolet - Direct                                108

When I reviewed the calculations and realized that the financial statements had not been adjusted for what I had been told, a few weeks earlier, were going to be big write offs, I said to Steve and I believe to Hugh Diamond, when did these occur?  When did these cases go bad, where they're no good anymore.  And they told me, well, it was early in the year, a long time ago.  And I said, well, quite frankly, they should have set the capital account calculations for whoever left, because they were actually incurred -- the losses were incurred prior to July and one partner had left in July.  I suggested that the financial statements should reflect those losses, because in fact, I think the firm was in worse condition on that October 31 date than what the financial statements that they sent me were.  And so, I made that recommendation and it was decided that they weren't going to do that.  And so, I don't think my decision was final, because had it been my decision, I think the loss would have been greater, in all honesty.

Q   Right, so, the bottom line is, that the ultimate figures provided to Mr. Hausfeld and Lewis, did not represent your decision, correct?

A   Correct.

Q   Right and the e-mail of March 6th, that you finally sent to Mr. Tucker, did not represent your decision regarding the matter, correct?

Drolet - Direct                                    109

A    No, just my explanation.

Q    Just your explanation, right?

A    Yes.

Q    Give me a moment, Ms. Drolet.

     THE COURT:  Well, the question that you were interrupted on was -- with the objection -- was the arbitrator question.  Did you want to ask that still?

     MR. ROSENTHAL:  I don't think I need to ask it, your Honor.

     THE COURT:  Okay.

Q    Now, Ms. Drolet, the October, 2008 income statement that became the basis for the adjustment of Mr. Lewis' and Mr. Hausfeld's capital account, you're familiar with that, right?

A    Yes.

Q    Okay.  And had that, well, to the extent that the books and records of the firm had been kept in accordance with GAAP, that income statement would have been kept in accordance with GAAP, too, correct?

A    Had the books been kept on GAAP basis, the income statement would be GAAP.

Q    Right and that might well have made a material difference in the ultimate determination of the income or loss of the firm, as of October 31st, right?

A    Right, one way or another.  I don't know which way.

Q    You'd have to do adjustments for accounts receivable,

Drolet - Direct                                        110

right?

A    You'd have to do a lot of work and you'd have to analyze the client advances to see if they were -- which ones were good and you'd have to calculate an allowance for doubtful accounts with respect to that.  It would be a lot of work, prepaids, all kinds of things affect accrual basis financials, accounts payable, et cetera, along with accounts receivable.

Q    Now, apart from this provision in the current operating agreement that requires GAAP based accounting for the books and records, you've never seen any other document signed by all the partners in the firm, that calls for any other method of accounting, have you?

A    Any other method, meaning which one?

Q    Any method of accounting other than GAAP.

A    Oh, yes, I have.

Q    Signed by all the partners in the firm?

A    Oh, no, I'm sorry.  They sign an engagement letter -- the firm signs an engagement letter with me every year to prepare tax basis financial statements.

Q    And that's signed by one partner only, Steve Toll, correct?

A    The managing partner, yes, Steve Toll.

Q    Okay.  And Mr. Toll is typically the person that you deal with in the firm regarding the firm's accounting, right?

Drolet - Direct                              111

A    Regarding the accounting, but certainly, I've talked to all the partners.

Q    Right, because you prepare their personal income tax returns, right?

A    I've talked to them about capital accounts.  I've talked to them about all kinds of things over the years.  They all call me and I always answer all of their questions.

Q    If you had talked to -- I mean, I'm sorry -- turn to Exhibit 42, please.  Ms. Drolet, I'm asking you to take a look at the second e-mail down, the e-mail from Joe Sellers to Steve Toll on Friday, February 20th?

A    Yes.

Q    2009, at 7:07.  Do you see it says, "I spoke with Pat Drolet today to fill her in on the rationale for the 14v28 percent distinction."

A    I do, yes.

Q    Okay.  You don't recall having any such discussion with Mr. Sellers about this, do you?

A    I just can't remember talking to him about it.

Q    Did you have --

A    I don't doubt that I did, because he said I did.  But I just don't remember the details and I can't imagine it was a long conversation, because I just don't remember it, at all.

          THE COURT:  And who is Sellers, in what --

          THE WITNESS:  He's one of the partners at the firm.

Drolet - Direct                          112

THE COURT:  Why was he involved in this discussion, do you know?

THE WITNESS:  You know, I remember one time I tried to reach Steve for something and I didn't get him and I ended up talking to Joe and it may have been about this.  I mean, it may have been that I contacted him and that somehow, this discussion came up.  But I don't remember ever having a substantive discussion with him about rationale having to do with 14 and 28.  So, the way he puts it there, because I wasn't looking for a rationale.  I might have inquired about this retroactivity suggest -- I mean, not a word that had come up.  But I wasn't really looking for anyone to explain it to me, because I was very content with the operating agreement and the way it was being done.  So, I really didn't think it was an issue, quite frankly.

Q   Let's make sure we've got our dates straight here.

A   Yes.

Q   It was on March 2, 2009, that you received an e-mail from Mr. Tucker, alerting you, for the very first time, about retroactivity, right?

A   Yes, that's correct.

Q   And the date of this e-mail is February 20th, right?

A   Yes.

Q   Okay, so, Mr. Sellers, if he had such a discussion with you, would not have told you that the percentage interest

Drolet - Direct                          113

determinations by the comp committee on November 5th were made retroactive --

A    No.

Q    -- in a meeting, would he have?

A    No and I don't remember discussing retroactivity with him.  So, I don't remember what this conversation was about, but I don't think it was about the retroactive issue.

Q    Okay.  Turn to Exhibit 68, please, Ms. Drolet.  This is a memo from Mr. Toll, SJP, to all of the equity partners, dated November 5, 2008, right?

A    Yes.

Q    And the memo says, "Attached is a chart setting forth the final equitable partners percentage interest in the firm for 2008", right?

A    Yes.

Q    And the chart is contained on page two of that exhibit, right?

A    Yes.

Q    And it said that those percentage interests were approved today by the compensation committee, right?

A    Yes.

Q    That they were retroactive in the beginning of 2008, right?

A    Yes.

Q    And that they were effective immediately, right?

Drolet - Direct                                    114

A    Yes.

Q    The first time that you ever saw this memo was on July 13, 2009 during your deposition in this case, right?

A    That's correct.

Q    You were not provided this memo at any point, any time prior to that, right?

A    Never.

Q    Never by Mr. Toll?

A    Never.

Q    Despite the fact that you asked for a document that might memorialize retroactive decisions regarding percentage interest, right?

A    That's correct, I never received it.

Q    And you concede that as to whether this memo was relevant to the capital account calculations, you say let the Judge decide, right?

A    Well, clearly now, in retrospect, there's an issue with respect to this 28 and 14 percent and there was an issue in July when you brought it up at my deposition.  And so, I believe the Judge is going to be deciding this issue, so, I did say that, yes.

Q    Right.

       THE COURT:  Well, but the Judge wants to know what your view of this is.

       THE WITNESS:  You know, I'm confounded by it a

Drolet - Direct                                    115

little bit, but it's not clear to me exactly what it means. There isn't a discussion about income or loss and I am, I constantly go back to the operating agreement and if you read the operating agreement in its full document, there are several paragraphs in there that seem to make it clear to me that you cannot go back and retroactively change a percentage when someone leaves to penalize them, one way or the other. And usually, this is a firm that has income and so, these last couple of years have been difficult years for the firm, but in all other years there'd be income. So, I kind of put myself in the position if this were income, would you be allowed to change someone's percentage, ask them to leave the firm and then not give them their due and it seems to me that you wouldn't be able to do it. So, that's why I wasn't -- that's why it wasn't an issue to me prior to it becoming an issue, because I just didn't even see the point.

Q    Right, now again, let's make -- you're not a lawyer and so, you're not offering a legal opinion on this, right?

A    No, but I do read documents to incorporate them into accounting matters, yes.

Q    And at your deposition, you said as to the relevance of this, it's a difficult question, you would need to know more, right?

A    It is, it is, it's difficult because of the way it's worded and I don't know what was meant behind it. So, I do

Drolet - Direct                                116

agree to that.

Q    And you still would need to know more, right?

A    Well, I don't now, because the Judge is going to ultimately decide it.  So, I'm glad that I don't need to know any more about it, at this point.

Q    Right.  You said that you think that there are provisions in Exhibit 2, the operating agreement?

A    I do.

Q    Which would forbid something like this?

A    I think so.

Q    Well, we know it's not in Article 10 on page 9, right?  This is the provision that deals with departing partner's capital accounts, right?

A    Yeah, it doesn't specifically say there, but there are two other paragraphs that I think it's addressed in.  Do you want me to point them out?

Q    I would.

A    Okay, on page three, third item, income tax allocations and distributions.  If you go to the next page 4, Item E, sharing of distributions and allocations after termination of a member.  Did you want me to read it or do you want to read it?

        THE COURT:  Well, why don't you just explain to us what it says, in your view and why.

        THE WITNESS:  It says, "that at the date of

Drolet - Direct                          117

termination of a member, because of withdrawal, death, disability or member termination event, such member's right to receive any allocations of income, gain, loss and deduction and distributions from the company under Article 3rd shall cease.  And such member, on his or her estate would be entitled to receive only the amounts specified in Articles 9, 10th or 11th below.  Absent further action by the company, the remaining member's percentage for periods following the member termination event shall be re-stated to increase their percentage increase by the percentage interest thereto for held by the member that withdrew."

This is the way the firm has always done it for departing partners.  So, the percentage would be what it was as of the date of termination or the last day of the month prior and then the percentage interests of the firm would change.  That's one item that I kind of think infers it. And there's another one in Article 8, on page seven and then it's Item E, liability of terminated member for company liabilities.  And it says, "Although a terminating member shall cease to be a member of the company as of the terms" --

Q   I'm sorry, Ms. Drolet, where are you right now?

A   I'm on, sorry, page 8, at the very top of the page, where it's Item E, starts on page 7, liability of terminated member for company liabilities.  "Although a terminated member shall cease to be a member of the company as of the termination

Drolet - Direct                                    118

date, the terminated member will remain liable for the company and to other members for such members pro rata share of all company liabilities incurred prior to such termination date, with such pro rata share to be determined by reference of the members' relative percentage interest."  And I go on and on.

But I think those two paragraphs suggest to me that you can't change it.  You can't ask someone to leave and reduce their percentage and penalize them.  So, you can't throw somebody out of the firm and say, you're going to get zero income for the year, if in fact, they had made a lot of money that year.  And I just don't see the reverse as being true either.  That's the way I read it.  And up until all this, the e-mails in March from Stef Tucker to me, I really didn't realize there was a problem between 28 and 14.  I just didn't see a problem.  I thought it was 28 and that was that.  And then, I did get the impression clearly, from Mr. Tucker, that it was an issue.

Q    And this says effective immediately, right?

A    That memo does say that.

Q    And retroactive to the beginning of the year?

A    And I didn't have that memo when I looked at -- at this time, I didn't have that, so I didn't know what the hullabaloo was about the 28 versus 14.

Q    But if this memo is to read literally, the percentage

Drolet - Direct                                119

interest in effect as of October 31st for Mr. Hausfeld is 14,
correct?

A    That's what the memo says.  This is where I don't know
what the memo means, I'm not --

          THE COURT:  We know, but he's just asking you a
question.

          THE WITNESS:  Okay.

          THE COURT:  So, just follow his questions.

          THE WITNESS:  Okay, please re-state the question.

Q    If this memo was to -- according to its literal terms,
Mr. Hausfeld's percentage interest, as of October 31st would
have been 14 percent, right?

A    It's not clear to me if it means based on income or loss
or voting or it doesn't say income or loss.  It does say --

Q    It says percentage interest in the firm?

A    Yeah.

Q    Which is allocable share of income or loss?

A    I'm not sure.  It could be with respect to voting rights.
I don't know what that memo means and I don't claim to.

Q    Well, it says, it says, "Attached", means the document
attached, right?

A    Yes.

Q    And the document attached was the percentage interests,
right?

A    What exhibit are we on, I can't see that.

Drolet - Direct                    120

Q    68.

A    68.  Let me go to the attachment.  I guess I'm saying I don't know what the memo means and I'm not trying to interpret it.

Q    You're not trying to --

A    At this point, I'm not.

          THE COURT:  What he's saying, he's asking you to assume is assume you had it.

          THE WITNESS:  If I had it, I admit that I would have been confused and I think I would have asked for more information as to what exactly they meant when they wrote this.

Q    So, you don't know whether this applies to percentage interest with the purpose of determining allocable shares of income or loss or whether it applies to voting strength or whether it applies to both, right?

A    I have no idea.  That's why I say I would have needed more information, had I had this memo.

Q    As a matter of equity, you can't apply the one thing and not apply to another, correct?

A    I have no idea.

Q    (Inaudible).

A    I mean, I'm not sure that that's an accurate statement.  I know that -- my understanding of this is that the percentage changed so that Michael could be voted out of the

Drolet - Direct                          121

firm on that day.  That's the -- and at that point, going forward, there was a lower percent.  It wasn't my understanding that it was to be retroactive.  So, I don't know what that memo means.  But I do see that it is confusing and I would want more information if it were in my hands when I was doing the calculation, I would definitely ask for more information.  But it wasn't in my hands and so, I went on what I had.

THE COURT:  What does the word retroactive mean to you in that memo?  What about that is confusing?

THE WITNESS:  Well, what's confusing about it is it's not specific as to whether or not this retroactivity has to do with the share of income or loss at the date of the departing partner.  I just don't know.  I don't know if it has to do with the voting interest going back to 1/1.

THE COURT:  Well, have you ever known -- how long have you worked within the firm?

THE WITNESS:  20 years.

THE COURT:  Have you ever known in 20 years, the firm to use a different percentage for voting interests and a separate percentage for income and loss?

THE WITNESS:  No, I mean, I don't and I don't know how their voting interests work necessarily either.  So, your Honor, I recognize that this is a confusing memorandum.  I'm glad I didn't have it when I did this or else I'd look really

Drolet - Direct                                    122

bad right now.  But I didn't have it and it's -- I would have asked for more information had it been in my hands at the time.  And I understand it's confusing.  I just find it odd that you could be able to do that, that's all.

THE COURT:  If you had been the person arbitrating a dispute over this, would you have found that memo to be helpful?

THE WITNESS:  I probably would have used it in arbitration.  I'm not an arbitrator, so, it's hard for me to say.  I don't do that kind of work, but I can't imagine being an arbitrator and not asking for more information as to what was meant by this memo.

THE COURT:  Thank you.

THE WITNESS:  Does that answer your question?

THE COURT:  Yes, it does, thank you.

Q   In your 20 years at the firm, the compensation committee never made a decision like this, making something retroactive to the beginning of the year and effective immediately.

MR. KEENEY:  Excuse me, just a minor objection.  You say in your 20 years at the firm.  She's never at the firm.  That's actually important.

THE WITNESS:  Right.

THE COURT:  Working for the firm, representing the firm, whatever the term.

BY MR. ROSENTHAL:

Drolet - Direct                                      123

Q    In your years with the firm as your client, 20 or so years, the firm never or the compensation committee of the firm never before made its decisions effective immediately and retroactively to the beginning of the year, correct?

A    Not to my knowledge.

Q    Every year, however, the firm's percentage interest in terminations were retroactive to the beginning of the year for the purposes of determining each partner's allocable share, income or loss, right?

A    Yes.

Q    So, that was --

A    Yes and it usually changed when new members came to the firm, but yes.

Q    Now, Ms. Drolet, do you remember Ann Yahaer (ph)?

A    Yes, I do.

Q    Okay, and Ann Yahaer left at a point during the year prior to the compensation committee meeting for that year, is that right?

A    You know, I don't remember.  It's been a while.

        MR. ROSENTHAL:  Approach the witness, your Honor?

        THE COURT:  Of course.  You don't have to ask.

Q    Take a look at this and tell me when you --

A    And I'm sorry, what was the question, she left?

Q    I'm just asking you to take a look at this.

Q    Okay.

Drolet - Direct                              124

MR. KEENEY:  Excuse me, could I see a copy, too?

MR. ROSENTHAL:  Sure, I'm just refreshing her recollection.

THE WITNESS:  Okay, I see it.

BY MR. ROSENTHAL:

Q   Does that refresh your recollection about what the effective date of Ann Yahaer's departure was?

A   Yes, it looks like --

THE COURT:  How do you spell her name?

MR. ROSENTHAL:  Y-A-H-A-E-R.

THE COURT:  Okay.

THE WITNESS:  You mean as of August, is that what you mean?

Q   What was it?

A   August 31, I think.

Q   2002, correct?

A   Yes.

Q   And the compensation committee had not yet met yet during that year, right, because it always meets in November or December, right?

A   I don't know, I mean, that's possible, but I don't know when they met that year.

Q   To the extent the compensation committee had not yet met for the year, it only make sense to use the prior year's percentage interest, that that would be the only percentage

Drolet - Direct                                    125

interest around, right?

A    I don't know how they do that.  I don't know when they meet and when they make those decisions.  But if you say so, I'm -- I'm not part of those meetings.

THE COURT:  Well, I guess what he's asking, if the committee had not changed any of the allocations, what percentage would you use to calculate the capital account?

THE WITNESS:  I'd always use the previous percentage.

Q    This is the only time, in your history with the firm, that the compensation committee made decisions regarding percentage interest -- well, let me back up -- made a decision -- I'm sorry.  You remember Gary Mason, as well?

A    Yes.

Q    Okay. And Mr. Mason left the firm in May of 2002, is that right?

A    It sounds correct, I can't remember exactly.

THE COURT:  Can we agree on that, Mr. Keeney?

MR. KEENEY:  We can agree to that, your Honor.

THE COURT:  Okay.  So, that's a stipulation.  We finally got the lawyers to agree to something.

THE WITNESS:  Okay.

BY MR. ROSENTHAL:

Q    And that would have been prior to the compensation committee meeting that year?

Drolet - Direct                                126

A    Yes.

Q    Linda Nussbaum left in February of 2007, correct?

A    Yes.

Q    That would have been prior to the compensation committee meeting during 2007, right?

A    I assume so, yes.

Q    Okay.  And Paul Gallo, do you remember him?

A    Yes.

Q    Also left in February of 2007, correct?

A    Yes.

Q    That would have also been prior to the compensation committee meeting for the year?

A    I assume so, yes.

Q    So, for each of those four partners, the only percentage interest that could have been in effect at the time, was the percentage interest as determined by the compensation committee the prior year, right?

A    Yes, I assume so.

Q    But here, the compensation committee actually met after, right?

          THE COURT:  After what?

          MR. ROSENTHAL:  I'm sorry, the compensation committee -- I'm getting my words mixed up.

          THE COURT:  That's all right, start again.

          MR. ROSENTHAL:  Right.

Drolet - Direct                                   127

THE COURT:  I got lost there, that's all.

MR. ROSENTHAL:  Right.

Q    Here, Mr. Hausfeld and Mr. Lewis actually left the firm after the compensation committee left for the year, right?

A    It appears so, yes.

Q    And that's unlike any of those other partners that we mentioned before, right?

A    It, yes, that's correct.

Q    Which means that there was, at least, on paper, if nothing else, a new percentage interest for each of those partners, right?

A    Yes.

Q    The new percentage interest for Hausfeld, effective immediately and retroactive to the beginning of the year, was 14 percent, right?

A    Yes.

Q    And for Lewis, it was 6.5 percent, right?

A    Yes.

Q    And those percentages, according to the compensation committee, had replaced the prior year's percentage interests for Hausfeld and Lewis, right?

A    Yes.

MR. ROSENTHAL:  Excuse me, your Honor.

THE COURT:  Oh, take your time.

(Pause.)

Drolet - Direct                    128

Q    If you would, Ms. Drolet, please turn to Exhibit 78.   And you're familiar with this document?

A    Yes.

Q    Okay, this is the year-end reviewed financial statement for 2008 that you prepared, is that right?

A    Correct.

Q    If you would, turn to page 5, please.

A    Okay.

Q    And do you see for 2008, the very bottom figure, $530,692?

A    Correct.

Q    That is net income to the firm for the year, right?

A    Yes.

Q    So, the firm actually turned a profit for the year?

A    Yes.

Q    Even though, according to the firm's calculations, it was suffering approximately a $6.9 million loss just two months before, right?

A    Correct.

Q    So, a lot of money came in, in November and December, right?

A    Yes.

Q    And if you would, turn to the top of page 10 and if you would, take a look at the second paragraph under Note B, line of credit?

Drolet - Direct                                  129

A    Yes.

Q    And it says, as of December 31, 2008 and 2007, the outstanding line of credit balance was zero and the line of credit was closed, right?

A    Correct.

Q    Which means that whatever amount was outstanding as of October 31st on the line of credit, was completely paid down, right?

A    Yes.

Q    I ask you to turn to page 8.  And I want you to take a look at the chart at the top.  Let's take a look at Mr. Milstein.  He began the year -- let me -- what is this?  What does this show?

A    This is a summary of opening capital account, share of net income or loss for the year, less withdrawals for the year and the ending capital balance.

Q    So, this shows what happens to all the partners' capital accounts for the year, right?

A    Correct.

Q    Okay, Herb Milstein began the year at XXXXXXXXXXXXXX, right?

            THE COURT:  Could I just ask to just tell me what page you're on?

            MR. ROSENTHAL:  Yes, I'm sorry, page 8 of Exhibit 78, your Honor.

Drolet - Direct                    130

THE COURT:  Page 8, I'm sorry. Okay, I'm there.

Q   Okay, Mr. Milstein began the year at XXXXXXXXXXXXX, right?

A   Yes.

Q   Okay.  Net income or loss of XXXXXXXX, right?

A   Yes.

Q   Okay, those withdrawals are his salary and you take that out, right?

A   Yes.

Q   And he ends the year at XXXXXXXXXX, correct?

A   Correct.

Q   So, he saw an increase in his capital account of about XXXXXXX, right?

A   Yes.

Q   Go down to Mr. Toll, the third one down.  He starts at about XXXXXXXXXX or so, correct?

A   Yes.

Q   The next column shows his allocable share of income, right?

A   Yes.

Q   And you back out the withdrawals in the next column, right?

A   Yes.

Q   And he ends with XXXXXXXXXX, correct?

A   Correct.

Q   So, his capital account increased by about XXXXXXX, right?

A   Correct.

Q   And it's true for all the partners who remained at the firm, this document shows that their capital accounts actually went up in 2008, right?

A   I believe they probably all did, yes.

Q   Okay.  Now, let's take a look at Michael Hausfeld, the second row.  It shows his capital account balance began at $4,994,000, right?

A   Yes.

Q   And it shows an ending balance of $3,052,000, right?

A   Yes.

Q   So, his capital account balance for the year actually goes down $1.9 million, right?

A   Correct.

Q   And Rich Lewis is, I think, the sixth one down.  He begins the year at $1,163,000, right?

A   Yes.

Q   Okay.  And his ending balance is $686,000, right?

A   Correct.

Q   So, he goes down about $480,000 or so, correct?

A   Yes.

Q   I'll ask you to take a look at Exhibit 108, Ms. Drolet. I'm going to ask you if you recognize this?

Drolet - Direct                                     132

A    I do.

Q    What is it?

A    It's a journal entry to record the income and loss for the year to the capital accounts.

Q    Capital accounts of all the partners who were with the firm in 2008, right?

A    Yes.

Q    Okay.  And the left column that says, debits, what does that show?

A    It shows the partners that had losses allocated to them.

Q    And the first figure, the rounding account at the top of the page?

A    Yes.

Q    That actually becomes net income --

A    Yes, the close-out income.

Q    Okay.  And then the $741,000 next to Hausfeld's name is the loss allocated to him?

A    Yes.

Q    And the $289,150 is the loss allocated to Lewis?

A    Yes.

Q    And $192,650 is the loss allocated to Lewis, right?

A    Correct.

Q    Now, you prepared this document when you were preparing the year end reviewed financial statements?

A    Yes.

Drolet - Direct                                         133

Q    And the right-hand side of the column, that shows the increases in each of the other partner's capital account balances, right?

A    Yes.

Q    So, it's true, isn't it, that as a result of the allocations of loss to Mr. Hausfeld and Mr. Lewis, the capital accounts of the partners who remained at the firm went up?

A    Yes.  And to Mr. Lewis, all three of them.

Q    To Mr. Lewis?

A    Yes.

Q    Okay, so, in effect, we have money being taken out of Mr. Hausfeld's, Mr. Lewis' and Mr. Lewis' pockets and being put into the pocket of the firm -- partners who remained at the firm, correct?

A    I don't look at it quite like that.  I don't think it is money being put into one pocket, taken from another.  To me, it's the allocation of income or loss for the firm for the year.

Q    The allocation of income or loss --

A    Ultimately --

Q    -- that is the transfer of money?

A    -- it does.  I just wouldn't use those words.

        THE COURT:  Somebody's losing money, somebody's making money.

Drolet - Direct                                    134

THE WITNESS:  Correct.  It's just the pocket implication is just -- I don't use those kinds of words.

Q    And Hausfeld and Lewis are losing money, right?

A    Yes, they --

Q    And as a result of their losses, remaining partners are making it, right?

A    Yes.

Q    Okay.  And the firm, itself, didn't lose any money for the year, correct?

A    Before guaranteed draws, no.  But if you take the guaranteed draws out, they did.  Guaranteed draws are not included in that $500,000, I mean the half million number.

Q    But the firm, itself, had net income of $530,000, right?

A    Yes, before guaranteed draws.

Q    Isn't that after guaranteed draws?

A    In this particular financial statement, I think it doesn't, because they're not treated as an expense on the financial statements.  We have them run through there, I'm pretty sure.  I'd have to go back and look.

Q    The firm realized a net income of $530,000 -- it's $530,692 for the year, correct?

A    Before guaranteed draws, I think if you looked at page 1 of the partnership return, I think it's a negative after guaranteed draws.  Financial statements are prepared, it's slightly different than the financial statements, that's all.

Drolet - Direct                                           135

Q    What -- the financial statements?

A    To -- in the financial statements, they're showing income there, but that's before the guaranteed draws are paid out and I think, if you had a partnership return in front of you on page 1, I believe it's a loss.  I could be wrong.

Q    Which means that the only reason that firm was able to realized this net income in the year, was because of the loss as allocated to these three individuals, right?

A    The allocation of the loss to some, yes, created an income allocation to others, yes.

Q    And it resulted, ultimately, in net income to the firm for the year?

A    Yes.

Q    Yes, the answer is yes?

A    Yes. Well, before guaranteed draws.  Do you have the partnership return, at all, because I'm pretty sure it was a loss on the partnership return, but.

Q    I'm sorry, I don't --

A    Yeah.  What's the exhibit for the financial statements, again, the number?

Q    78.

A    78.  I'm just trying to make a point that the financial statements are presented slightly different than the tax return.  And so, I believe, if you look at the income statement on the tax, I mean, in the financial statements,

Drolet - Direct                                136

you will not see a guaranteed payment to partner draw.  It's

not shown up here in that regard.

Q    What are you referring to?

A    So, if you go to page 5 of the financial statement and

you see net income of 530, that doesn't -- this is not

accounted for the draws to the partners, because we don't

treat them that way on the reviewed -- it comes out the same

way, it's all the same thing.  But the firm, if you include

the guaranteed payments to partners, the firm showed a loss

on its U.S. 1065 Partnership Return for the year, that's all

I'm saying, just to clarify.

THE COURT:  Aside from that, the firm took in more

money than it spent?

THE WITNESS:  Besides from the --

THE COURT:  Aside from the guaranteed draws?

THE WITNESS:  -- guaranteed draws paid to the

partners.  But if you do count those, there was a negative,

so, it's just a different presentation.

MR. ROSENTHAL:  Thanks, Ms. Drolet.  Pass the

witness.

THE COURT:  Now, Mr. Keeney, I'll give you an option

here.  We can break and you can start after lunch.  Or if you

want to start, you can break in 20 minutes or so.

MR. ROSENTHAL:  Can I just say one thing?

THE COURT:  Yes.

Drolet - Direct                                   137

MR. ROSENTHAL:  Mr. Lay (ph) may have relevant testimony to offer on the year passenger issue.  I would prefer if Mr. Keeney does his direct examination of Ms. Drolet now and then we come back and deal with that issue, which shouldn't take, at least, from our side, very long at all.  It's going to be made clear that they are really two separate issues.

MR. KEENEY:  I agree with that, your Honor.

THE COURT:  Yes, okay.  Go ahead.

MR. KEENEY:  My examination's going to be approximately an hour and 15 minutes.  I think it makes sense to break now for lunch, come back and then just do it.

THE COURT:  All right, why don't we do that.  Why don't we break and we'll begin about 1:00 o'clock.

MR. KEENEY:  Okay.

THE COURT:  Does that give everyone enough time for lunch?

MR. ROSENTHAL:  Yes, your Honor.

THE COURT:  Okay, see you at 1:00 o'clock.

(Court in recess 11:56 to 1:05 o'clock p.m.)

THE COURT:  Welcome back, everyone, please be seated.  All right, Ms. Drolet?

MR. ROSENTHAL:  I have just two housekeeping matters, Judge.

THE COURT:  Oh, yes, sure.  You can be seated,

Drolet - Direct                                138

ma'am, while we're talking.

MR. ROSENTHAL:  First, this motion for a spoliation inference, which I served on Mr. Keeney.

THE COURT:  Okay.

MR. ROSENTHAL:  Should I give this to Ms. Powell or do you want me to give it to you?

THE COURT:  Either one.

MR. ROSENTHAL:  Okay.

THE COURT:  We're working together.

MR. ROSENTHAL:  The second thing is that Mr. Keeney and I wanted to let you know that we had reached joint agreement that if we're going to be using exhibits that are not objected to, they're automatically in evidence.

THE COURT:  Okay.

MR. ROSENTHAL:  And so, we're keeping track of that.

THE COURT:  Okay.

MR. ROSENTHAL:  The only time that we have to worry about the admissibility of an exhibit is if somebody objects to it.

THE COURT:  Okay and we haven't had any yet, so, everything's admitted that's been shown so far.

MR. ROSENTHAL:  Thank you.

THE COURT:  Great, all right, Mr. Keeney.

MR. KEENEY:  Thank you, your Honor.  And your Honor, just --

Drolet - Direct                          139

THE COURT:  You're still under oath, ma'am, all right?

THE WITNESS:  Okay, thank you, yes.

MR. KEENEY:  Your Honor, just a housekeeping detail. We have put before the witness and we have put before the court reporter, two additional binders.  These are defendant's exhibits.

THE COURT:  All right.

MR. KEENEY:  They're marked Cohen Milstein binders.

THE COURT:  Thanks.

MR. KEENEY:  And just so I could explain to the witness, the one big binder is Mr. Hausfeld's binder and the two smaller ones are our binders and I'll try to be very clear as to which binder you're supposed to be looking at.

THE COURT:  All right.

                    CROSS-EXAMINATION

BY MR. KEENEY:

Q    Ms. Drolet, as you testified on direct, your firm is currently the outside accounting firm for Cohen Milstein, right?

A    Yes.

Q    Been so for approximately, how long?

A    I think approximately 20 years.

Q    Were you involved in the initial hiring by Cohen Milstein of your firm?

Drolet - Cross                                    140

A    Yes, I was.

Q    And was your firm hired at the recommendation of Michael Hausfeld?

A    No.

Q    Okay, how was it hired?

A    I believe Ann Yahaer introduced my firm.  I believe I was doing her income tax return and she introduced me to Steve Toll and I was hired that way.

Q    And when you were hired by Cohen Milstein, were you, at about the same time, hired as a personal accountant to work for Michael Hausfeld?

A    I believe so, yes.  Approximately, the same time.

Q    Okay.  So, is it fair to say that you were Michael Hausfeld's personal accountant for approximately the same 20-year period you referred to?

A    Approximately, yes.

Q    And are you also, at one point, the personal accountant for Rich Lewis?

A    Yes.

Q    And when did that start?

A    I don't remember that.  I don't know how long.

Q    It wasn't as long as the 20 years, was it?

A    No, no, no.  No, I just don't remember how long.

Q    Okay.  More than two or three, though, right?

A    Yes, yes.

Drolet - Cross                                    141

Q    I'm going to start you by showing you in our exhibit binder, Exhibit Number 4.  It's marked DX-4.  If you could turn to that, it's an e-mail of February 27th.

A    Yes.

Q    And do you have that in front of you?

A    I do.

Q    And is that an e-mail that you wrote?

A    Yes.

Q    Is there any word in that e-mail that was written by Steve Toll rather than you?

           MR. ROSENTHAL:  Objection, leading.

           THE WITNESS:  I don't believe so --

           THE COURT:  Hold on, hold on.  I don't think that's leading.

           THE WITNESS:  I don't believe so, I wrote the e-mail.

           THE COURT:  So, I'll overrule the objection.

BY MR. KEENEY:

Q    The subject line of your e-mail refers to a voicemail message received today.  My question, did Stef Tucker leave you a voicemail on that day?

A    Yes.

Q    And had you talked to Stef Tucker before he left you that voicemail?

A    No.

Drolet - Cross                                    142

Q   Had you received any communication, of any sort, from Stef Tucker before he left you that voicemail?

A   I don't believe so.

Q   Okay.  I'd like to direct your attention to the first sentence of your e-mail.  Is your e-mail accurately reflecting that it was a voicemail request for information "that went into" the calculation of Michael Hausfeld and Richer Lewis' capital account balance as of October 31, 2008?

A   That's correct.

Q   Did you understand that Mr. Tucker was the attorney for Mr. Hausfeld and Mr. Lewis?

A   I believe I understood that, yes.

Q   Okay.

A   I'm familiar with the firm.

Q   Okay.  As you sit here today, do you recall anything else that was said by Mr. Tucker in that voicemail that he left for you?

A   I don't.

Q   Do you think he said anything else?

        MR. ROSENTHAL:  Objection, calls for speculation.

        THE COURT:  Sustained.

        THE WITNESS:  I don't recall.

        THE COURT:  He'll ask another question.

        THE WITNESS:  Okay.

BY MR. KEENEY:

Drolet - Cross                                    143

Q   Directing your attention now to the second sentence of your e-mail.  Your e-mail refers to the information for 2008 that was used to calculate the capital account balances of October 31, 2008 pursuant to the firm's partnership agreement.  Did you write that?

A   I did.

Q   And when you refer to the partnership agreement, are you referring to the operating agreement of Cohen Milstein?

A   Yes, I am.

Q   I'd like to, please, turn to Defendant's Exhibit 3, which is in our binder.  And the question for the witness, is that a copy of the Cohen Milstein operating agreement that you were referring to?

A   Yes, I believe it is.

Q   I want to approach the witness and show her a second copy of the amended and re-stated operating agreement that was marked at her deposition.

        MR. ROSENTHAL:  I think this is actually Plaintiff's Exhibit 3.

BY MR. KEENEY:

Q   Now, my question to the witness, is the copy of the operating agreement, that I just gave you, a copy of the actual operating agreement that you have in your files?

A   The one you just gave me, yes.

Q   And does it have your handwritten notes on it?

Drolet - Cross                                    144

A    Yes.

Q    What does the handwritten note in the upper right-hand side mean?

A    It says most recent agreement signed as of -- signed end of 2002? -- received by us 2007.

Q    And when it says received by us, 2007, is that in your handwriting?

A    Yes.

Q    And when you say received by us in 2007, the us is Drolet & Associates, is it?

A    Yes, yes.

Q    Is it fair to say that Drolet & Associates had this in its file since 2007?

A    Since 2007, yes.  I got it in February of '07.

Q    Okay.  I'd like now, to turn your attention, in our exhibit binder, to Defendant's Exhibit 1.  And I'm not going to be asking about the cover letter between the attorneys, but I am going to be asking you about the three attachments. So, if you can take a look at the three pages of attachments to Defendant's Exhibit 1?

A    Okay.

Q    And my question, do you know what these attachments are?

A    They look like the summary of the income or loss for the firm through October 31 and then the calculation for Michael Hausfeld and Rich Lewis.

Drolet - Cross                                145

Q   And when you look at the attachments to Defendant's Exhibit 1, are those attachments what you understood Mr. Tucker's voicemail to be referring to when he referred to the calculations of Michael Hausfeld's and Richard Lewis' capital account balance as of October 31, 2008?

A   Yes, I believe so.

Q   If you could, please, turn in our exhibit binder to Defendant's Exhibit Number 5.  It's dated March 2, 2009.  And my first question, did Stef Tucker reply to your earlier e-mail of February 27th, which we showed you as DX-4?

A   Yes.

Q   And is DX-5 that reply?

A   It looks like it is, yes.

Q   Okay.  And I'd like to direct your attention very specifically to the first paragraph of Defendant's Exhibit 5 and specifically --

THE COURT:  Which is it?

MR. KEENEY:  Excuse me, that's the middle e-mail, your Honor.

THE COURT:  Middle of the page?

MR. KEENEY:  Yes, I'm very sorry.

THE COURT:  That's all right.

MR. KEENEY:  March 2, 2009 e-mail.

Q   And in that first paragraph, is he seeking some more information from you?

Drolet - Cross                                    146

A    Yes.

Q    Now, directing your attention to the second paragraph, could you read that into record, what he told you in the second paragraph?

A    "Inasmuch as Michael's share was reduced to 13 percent effective January 1, 2008 and he was terminated by CMAST on or as of November 6, 2008, I am not comfortable that the calculations were done accurately.  Illustratively, I believe that one should probably look at the results as of December 31, 2008 and then take a pro rata underlined portion thereof. (That is, 3/11ths over 365).  Further, the calculation imposed 27.97 percent on the purported loss through October 31 on Michael, but his share was retroactively reduced to 13 percent effective January 1, 2008."

Q    And did you understand, from that second paragraph, that in the second paragraph, at least, Mr. Tucker was or was not requesting more information from you?

A    In the second paragraph, he's just stating his thoughts on the numbers.  In the first paragraph, he's asking for more information.

Q    Did you ever have any telephone conversations with Mr. Tucker, other than the one voicemail that he left you and the e-mail exchanges?

A    No.

Q    What did you do after you received this response from Mr.

Drolet - Cross                                    147

Tucker?

A    I, obviously, e-mailed Steve above that and said this is the reply I got from Mr. Tucker.  I have not responded yet. He mentions Michael's percentage has changed retroactively to 1/1/08.  Was that ever discussed with Michael or put in writing?

Q    And in the last question of your e-mail, are you seeking information from Steve Toll or are you telling him something?

A    Well, I'm asking him was that ever discussed with Michael or put in writing, question mark, so I'm asking him a question.

Q    And if you could now change binders and go to the big binder, Plaintiff's Exhibit 52.  Could you put that in front of you?

A    Okay.

Q    And in Plaintiff's Exhibit 52, is that an e-mail from you to Steve Toll?

A    It is.

Q    In that e-mail, are you seeking more information from Steve Toll?

A    Yes.

Q    And what information are you seeking?

A    I'm asking for a copy of the agreement that was signed with Michael and Rich and other partners who may have left the firm.  I was aware, at that point, that there was a

Drolet - Cross                                        148

document that was signed and I asked for it.

Q   And did you believe that you should also take a look at that before you responded to Stef Tucker's e-mail?

A   I can't remember when did I -- when did I respond to Stef.  Yes, I believe so, but I think it was around the 6th that I responded.  I'm not sure.

Q   Okay, directing your attention then --

A   I believe so, I think this was the document I wanted to see because I thought if there was anything in writing, it would be in that document.

Q   Okay and directing your attention very specifically to the second sentence, does that refresh your recollection about whether you were requesting this before or after you replied to Mr. Tucker?

A   Yes, exactly, thank you for refreshing my memory.

Q   Okay.  And your memory, as refreshed, is you sent this to Steve Toll before you replied to Mr. Tucker --

A   Yes.

Q   -- right?

A   Right, exactly.

Q   If you could turn in our exhibit binder, to Defendant's Exhibit 39 and if I may approach other counsel's table, I'd like to put up their matching exhibit, which they had shown to the witness.

THE COURT:  Okay, do you guys --

Drolet - Cross                                    149

MR. KEENEY:  It was Plaintiff's Exhibit 68.

THE COURT:  Mr. Keeney, do you have an extra set of your exhibits for Jen?

MR. KEENEY:  Pardon?

THE COURT:  Do you happen to have an extra set for Jen to follow along?  Do you, okay, great.

MR. KEENEY:  Yes, I'm sorry.

THE COURT:  That's all right.

MR. KEENEY:  We didn't mean to exclude her.

THE COURT:  No, I know.  Thanks, Lynn.  Lynn's going to walk by you with books.

MR. KEENEY:  Oh, okay, thank you.

THE COURT:  I'm not leaving you without any, am I?

MR. KEENEY:  Yeah, we're sharing, we're okay.

THE COURT:  Okay.  I don't want to take your only copy.

Q    Okay, first question to the witness, comparing Defendant's Exhibit 39, which you have in front of you, reading from the top of this plaintiff's exhibit down to here, are the documents identical?

A    It's hard for me to see that one.

Q    Oh, okay, sorry.

THE COURT:  You can show it, bring it over to her or move that closer.

MR. KEENEY:  Okay.

Drolet - Cross                          150

THE COURT:  Whatever works for you.  Weren't you comparing 39 with that?

THE WITNESS:  This?

MR. KEENEY:  Comparing their exhibit with --

THE COURT:  What number is that?

MR. KEENEY:  Their exhibit is Defendant's 68.

THE COURT:  68?

MR. KEENEY:  68, yes, your Honor.

THE COURT:  Okay, so, 68 and 39, the question is are they the same?

MR. KEENEY:  Right.

Q   Down to here, are they essentially the same?

A   It appears so.

Q   On Defendant's Exhibit 39, which you have in front of you, what is the letter and number in the bottom right-hand corner?

A   HAUS-0294.

Q   And on their exhibit, what is the number at the bottom?

A   CMST00070.

Q   Do you have any understanding whether HAUS means that document was given to Cohen Milstein by Michael Hausfeld?

MR. ROSENTHAL:  Objection, it calls for hearsay.

THE COURT:  Hold on, hold on, ma'am.  Do you know either way?

THE WITNESS:  No.

Drolet - Cross                               151

THE COURT:  Of your own knowledge?

THE WITNESS:  No.

THE COURT:  Okay.  I don't think there's a foundation for this, so, I'll sustain the objection.

BY MR. KEENEY:

Q   The question to the witness then will be, in March, 2009, did Mr. Hausfeld's attorney give you a copy of Defendant's Exhibit 39?

A   No.

Q   Prior to your deposition, had you ever seen a copy of Defendant's Exhibit 39 --

A   No.

Q   -- any source?

A   No.

Q   Directing your attention back now, to your e-mail inquiry of March 2, 2009, where in the last sentence you say, "Was this ever discussed with Michael or put in writing?"  Do you see that?

A   Which exhibit are we at now?

Q   I'm sorry.

THE COURT:  We're back to --

MR. KEENEY:  We're back to Defendant's Exhibit 5.

THE COURT:  -- 5, okay.

THE WITNESS:  Okay, I'm sorry, what was your question?

Drolet - Cross                                    152

Q   The question is, first, do you see the last sentence of that e-mail of March 2, 2009 from you to Steve Toll?

A   Yes.

Q   Okay.  And the next question, did you ever have a discussion with Steve Toll about that topic prior to responding to Stef Tucker?

A   I don't believe so.

Q   Okay.  Do you recall having any discussion with Steve Toll about the compensation committee?

A   I don't recall.

Q   Okay, do you recall having any discussion with Steve Toll about whether there was a partnership amendment to permit a retroactive adjustment downward?

        MR. ROSENTHAL:  Objection, calls for hearsay.

        MR. KEENEY:  She's part of the conversation, your Honor.  It's not hearsay, verbal act, what she was told.

        THE WITNESS:  And so, the question --

        THE COURT:  All right, hold on, hold on one second. I'm sorry, ma'am, I don't mean to keep interrupting you.

        THE WITNESS:  That's all right, please do.

        THE COURT:  All right, so, you're saying it's not hearsay why?

        MR. KEENEY:  Because it's what she was told comes in.  What she was told, not necessarily for the truth of the statement made to her by the speaker.

Drolet - Cross                        153

THE COURT:  I understand.  All right, I agree.  I'll overrule the objection.

THE WITNESS:  May I ask that you repeat the question, please?

MR. KEENEY:  Okay.  May I have the court reporter read that one back?

THE COURT:  He took a few legal detours there.

THE WITNESS:  Sorry.

THE COURT:  I don't know if we can read it back verbatim, we just tape it.  Do you want it played?

MR. KEENEY:  Give me just five seconds, your Honor.

THE COURT:  See if you can re-formulate it.

MR. KEENEY:  No, that's exactly what I was trying to do in my head.

THE COURT:  All right.

MR. KEENEY:  Such a good question for it to be objected to and I don't know what it was.

BY MR. KEENEY:

Q    Do you recall discussing with Steve Toll whether there was a partnership amendment making adjustments retroactively?

A    No, I don't remember him telling me that or discussing it with him.  I do remember we talked about a committee voting the percentage for Michael different than 28 percent.

Q    Okay.

A    But not, I don't remember a retroactive discussion or

Drolet - Cross                                    154

amendment or anything like that.

Q    Okay.  And what do you remember about the committee voting to change Michael's percentage?

A    Well, I was told that that's how he was voted out of the firm.  That they adjusted he percentage down, he was voted out of the firm.  So, that's what I remember about it.

Q    In addition to being voted out of the firm, do you recall any discussion with respect to how this vote of November would be used in setting compensation for bonuses, for example, at the end of the year?

A    No, I don't --

         MR. ROSENTHAL:  Objection, again, it calls for hearsay.

         MR. KEENEY:  Your Honor, it's the same --

         MR. ROSENTHAL:  It's being offered for its truth.

         MR. KEENEY:  Not offering for the truth.

         THE COURT:  I don't think it is.  I think he's offering it to show why she did what she did.  Not necessarily because it was true, just to explain the basis for her actions and why she made her calculations.

         THE WITNESS:  I did not have those discussions.

BY MR. KEENEY:

Q    Is your testimony that you did not have the discussions or is your testimony you don't recall whether you had the discussions?

Drolet - Cross                                      155

A    I don't recall --

THE COURT:  Hold on, hold on.  You don't have to answer that.  She said she didn't have them.

MR. KEENEY:  I know and I'm clarifying that, your Honor, as to whether she really meant to say didn't have or didn't recall.  I think that's a legitimate question, your Honor.

MR. ROSENTHAL:  Well, objection, your Honor.

THE WITNESS:  I don't recall having them.

THE COURT:  Hold on, ma'am, hold on.

THE WITNESS:  Okay.

THE COURT:  Usually what we have to do is we usually have a little go round and you just have to sit back quietly and watch us.

THE WITNESS:  Sorry.

THE COURT:  All right, what's your objection?

MR. ROSENTHAL:  My objection is it's been asked and answered.

THE COURT:  All right, I'm going to sustain it.  You can ask a different question.

MR. KEENEY:  Okay.

THE COURT:  You can ask her, you can follow up on it, but just don't ask the same question again, because she said she didn't.

MR. KEENEY:  Okay.

Drolet - Cross                                        156

BY MR. KEENEY:

Q    When you said you didn't have the conversation, what did you mean?

A    I don't remember having the conversation, so, as far as I'm concerned, I didn't have it, but I don't recall.  That I didn't, per se, for sure, but I don't recall it, at all.

Q    Okay, directing your attention then back, very specifically, to Defendant's Exhibit 5 and the second sentence, actually, the third sentence of your e-mail at the top, what sort of writing were you asking Mr. Toll to tell you about?

A    Well, I was assuming that if the percentage had been changed retroactively, that there would be an amendment to this partnership agreement or that perhaps, maybe the agreement that they had signed reflected a change that was retroactive.  So, I was just asking for anything that was a written agreement between the parties that would change the percentage, that's all.

Q    Okay.

A    Not knowing what that might be.

Q    Sure.  And did you ask Stef Tucker for such a document?

A    No, I didn't.

Q    Okay.  And when you asked Mr. Toll, in what was in plaintiff's big binder, that's Plaintiff's Exhibit 52, for the signed agreement with Michael Hausfeld, were you looking

Drolet - Cross                                    157

for evidence of retroactivity in that signed agreement?

A    Yes.

Q    If you could turn to Defendant's Exhibit 7, that's in the small binder.  And did you prepare a response to Mr. Tucker's March 2nd e-mail, particularly his paragraph 2, where he was talking about being uncomfortable with the calculations?

A    Yes, I did.

Q    At the time that you prepared the response to Mr. Tucker, had you read Article 10-A of the operating agreement?

A    Yes.

Q    Did you understand that under Article 10-A, the operating agreement, you were the accountant for Cohen Milstein?

         MR. ROSENTHAL:  Objection, leading.

         THE COURT:  Sustained.

BY MR. KEENEY:

Q    When you read the operating agreement, did you have any understanding who the accountant was --

A    Yes.

Q    -- in Article 10-A?  Who was it?

A    Me.

Q    What did you understand that you, as the accountant, had to do?

A    The way I understand the paragraph is that I would review the calculation that was prepared by the firm's controller and determine its accuracy.  And then report back to the firm

Drolet - Cross                                  158

and say if I agreed with the calculation or not.  And if not, tell them why so that corrections could be made if they were deemed appropriate.

Q   On the basis of the last two sentences of your answer, is it your testimony that if you were aware of errors, you would bring them to the firm's attention for correction?

A   Yes.

Q   Now, is what's marked as Defendant's Exhibit 7, the response that you ultimately sent to Stef Tucker in response to his questions?

A   Yes.

Q   And did you also send a copy of your e-mail response to Mr. Toll at Cohen Milstein?

A   I did.

Q   And why was that?

A   I -- whenever I send any information on behalf of a client, to an outside party, regardless of who it is, I get permission to do it and I usually try to get them to see it before it goes and then I always follow up and give them a copy of what I do.

Q   Okay.  Direct your attention, very specifically, to Defendant's Exhibit 7.  That is a letter, excuse me, an e-mail letter of approximately four paragraphs, is that right?

A   Yes.

Drolet - Cross                                    159

Q   Paragraph 1, did you write all those words?

A   Starting with I?

Q   Yes.

A   Yes.

Q   Paragraph 2, did you write all those words?

A   Yes.

Q   Paragraph 3, did you write all those words?

A   Yes.

Q   And paragraph 4, did you write all those words?

A   I did.

Q   Did Mr. Toll direct you to write DX-7?

A   No.

Q   If you could turn to the next e-mail string in your binder, that's DX-8.  At the bottom of the page, there is the e-mail with the e-mail header, do you see that?

A   Yes.

Q   Am I correct that this e-mail to Stef Tucker was sent by you on Friday, March 6, 2009 at 10:57 a.m.?

A   Yes.

Q   Directing your attention now to the text of that e-mail. Specifically, third paragraph.  Could you read to the Court the third paragraph of your e-mail to Stef Tucker?

A   Starting with, "As to your question"?

Q   Yes, please.

A   "As to your question about the accuracy of the

Drolet - Cross                                    160

calculation and your suggestion to use a pro rata portion of the results of the entire year, Article 10 of the firm's partnership agreement is specific as to how the capital account should be calculated and it is clear that it should be done using the financial results of the firm to the last day of the full month -- the last day of the last full month immediately preceding the termination date.  There is no discussion in the partnership agreement about using a pro rata calculation based on a full year's results.  It has been calculated in the same manner as it was for other partners who left the firm in 2008 and years prior to 2008."

Q   In this paragraph, were you agreeing or disagreeing with Stef Tucker's suggestion to use a pro rata method?

A   I was disagreeing.

Q   And was that disagreement based on your own reasons or reasons that Cohen Milstein had told you?

A   No, based on the actual -- my interpretation of the operating agreement and the way it's been interpreted for many years.

Q   Okay.  I'd like to turn now to paragraph 4.  Could you, please, read that into the record?

A   "Finally, with respect to the percentage used for the calculation of the departing partner's share of 2008 income (loss), through determination date.  The calculation was done consistent with how it was done for other partners who left

Drolet - Cross                                    161

the firm in 2008, as well as for how it was done for numerous partners who left the firm in previous years.  The percentage in effect at the close of business on the last day of the month immediately preceding termination has always been used.  The partnership agreement is clear that you look at the end of the previous month prior to termination to make the calculation.  In, in fact, 2008 was a year that had significant income instead of loss as of October 31, 2008, I can't imagine you would make an argument that would justify such a retroactive reduction in your client's percentage share."

Q   Directing your attention specifically to that last sentence, could you explain what you meant by you couldn't imagine them making such an argument in other circumstances?

A   Well, it's just a comment that had it been an income of $6 million, instead of a loss, I can't imagine that anyone would have asked me to do it at 14 percent instead of 28 percent.  And I can't imagine that if it were done at 14 percent instead of 28 percent, that we wouldn't be sitting here have this same discussion, that's all.

Q   Okay.  You referred in your direct testimony to some sort of unfairness about calculating what is to be given to a departed partner by the remaining partners.  Could you explain what you meant by that?

A   You mean during my deposition?

Drolet - Cross                                  162

Q    No, I actually mean during your testimony this morning.

A    Oh, okay, did I say that again?

Q    Yes.

A    Yeah, I just, you know, it seems to me that if you're involved in a partnership and you have an agreement or an operating agreement between the partners, that it seems odd that you would have a formula to calculate a partner's share of income through the date of termination and that that formula would be able to be adjusted by just edict of members of the firm.  So that, for instance, if I'm a partner in a firm and I have a 25 percent share and I leave the firm midyear and the agreement suggests that I get 25 percent of the income through that time period, if the other partners voted now, you get zero instead, it just seems unfair to me, that's all.  That's just my opinion, nothing more than that.

Q    In that situation, would you have raised questions about the firm reducing a percentage from 25 percent to zero for a departed partner?

A    Yes, I would have.

         THE COURT:  What if you raised those questions and the firm disagreed with you, what happens then?

         THE WITNESS:  You know, it's hard to say what you would do, after time has gone by, knowing other facts have entered the picture.  I think I would have been inclined to be -- to want to get somebody else involved, because I think,

Drolet - Cross                                        163

at that point, I would have felt that I'm not quite sure I should make this determination, because then it would be clear that there was an argument between people in the firm. I would like to think that I would have stopped, at that point and asked for the firm to seek another accountant's advice or a legal opinion or something like that. I don't know, because it didn't happen, but I would like to think that that's what I would have done.

THE COURT: But your determination of that issue, in your mind, giving your relationship with the firm, would not have been binding on the firm?

THE WITNESS: I don't see it as binding. I feel that my role is to review it for accuracy mainly because I review the firm's records for accuracy at the end of the year and suggest adjustments to make the records correct before the partnership return is done, before the reviewed financial statements are done. If it were wrong, I would have to suggest a correction anyway, so, I always look at my role as helping the firm make sure the calculation is correct before giving it to the partner. I've never really paid much attention to the binding part, because it hasn't been an issue before.

THE COURT: Okay.

Q   Well, directing your attention very specifically to Article 10-A and if you could put either Defendant's Exhibit

3 or your copy of it, with your handwritten notes, in front of you.

A   Okay.

Q   Under Article 10-A, if you had agreed with Mr. Tucker on pro rata, would you have informed Cohen Milstein that you agreed with Mr. Tucker on the pro rata portion?

A   If I had agree with it --

Q   If you had agreed?

A   -- yes, I would have informed them that.

Q   Okay.  And with respect to the fourth paragraph of your e-mail to Stef Tucker, if you had agreed with Stef Tucker's point, would you have told Cohen Milstein that you agreed with Stef Tucker's point?

A   About the 20 -- the 13 --

Q   That's the 28 percent versus 13 or 14 percent.

MR. ROSENTHAL:  Provided that she had all the information, of course, your Honor.

THE WITNESS:  Yes, I would have told them that I agreed with him, but -- with him on that point, if I did. But instead, I believe I asked for -- if there was any information to support that statement by him.

BY MR. KEENEY:

Q   Okay, did you have any hesitancy in telling Cohen Milstein that you thought the calculation had been done in error?

Drolet - Cross                              165

THE COURT:  Before or after Tucker raised a dispute?

MR. KEENEY:  After Mr. Tucker raised his dispute, did you have any hesitancy, at all, in telling Cohen Milstein that you agreed with Mr. Tucker and disagreed with Cohen Milstein?

THE WITNESS:  Oh, I didn't agree with Mr. Tucker and I didn't have any hesitancy to talk to Mr. Toll about the calculation.  I'm not sure what you mean.  I didn't agree with Mr. Tucker.

Q   Okay.  And if you had agreed with Mr. Tucker, would --

A   Oh, right, I would have had no problem talking about it.

Q   Okay, the reason why we ask is because Cohen Milstein is a client of yours, so, I want to be absolutely clear, your answer is clear, you would have told Cohen Milstein?

A   Absolutely, yes.

Q   Directing your attention back to the e-mail of -- this is in Exhibit 8.

THE COURT:  Could I just follow up on that question?

MR. KEENEY:  Oh, yes, your Honor.

THE COURT:  To follow up with what Mr. Keeney was asking you about, Mr. Tucker versus Cohen Milstein, did you view what you were doing as making a final, binding determination or did you view what you were doing as giving advice to your client?

THE WITNESS:  I viewed it as giving advice to my

Drolet - Cross                                          166

client on whether or not the calculation appeared correct.

That's the way I viewed it.

Q   And was Stef Tucker your client?

A   No.

Q   When you were giving advice to Stef Tucker, were you

giving advice to a client?

        THE COURT:  Well, she didn't give any advice to him,

did you?

        THE WITNESS:  No.

        MR. KEENEY:  Yes, she did, your Honor, in her

e-mail, paragraphs 3 and 4.

        THE COURT:  Okay.

        MR. ROSENTHAL:  I'll object on leading grounds.

        THE COURT:  All right, I understand the e-mail

changed that.

        MR. ROSENTHAL:  You can ask a foundational question

first.

        THE WITNESS:  You call that advice?  I didn't

realize I was giving advice to Mr. Tucker.  I was responding

to his queries.

BY MR. KEENEY:

Q   Right.  And so the record is clear, were you, at any

time, giving advice to Mr. Tucker as a client of yours?

A   No.

Q   And that's because why?

Drolet - Cross                                    167

A    He's not a client of mine.

Q    And in your e-mail of March 6, 2009, in Exhibit 8, that's the one that's at the bottom of the page, referring you to the two references to Article 10, which contain -- those references contain quotations from Article 10 of the operating agreement, right?

A    Yes.

Q    Did you have the operating agreement --

A    I do.

Q    -- when you wrote that e-mail?

A    Yes.  Oh, did I have it in front of me?

Q    When you wrote the e-mail?

A    I'm sure I -- I'm sure I did to quote it, yes.

Q    When you were writing this e-mail, did you believe that you were acting under Article 10-A?

A    I don't believe I was acting under Article 10. I believe I was explaining Article 10.

Q    Did you have any understanding why Mr. Tucker was writing to you as opposed to writing to Mr. Diamond or anyone else?

A    Well, I guess -- no, I don't know exactly why he wrote to me, but I assume that he did because Article 10 --

THE COURT:  You can't assume, ma'am.

THE WITNESS:  Okay.

Q    What was your understanding?

A    It was clear that I'm the accountant for the firm and so,

Drolet - Cross                              168

that I had -- I assume that he knew -- I can't assume.  I guess he was writing to me because I'm the accountant for the firm and it says in Article 10, that the independent accountant for the firm will have the final say over the calculation.

Q   And when he wrote to you, you wrote back to him, right?

A   I did.

Q   When you wrote back to him, did you agree or disagree with the points he had made?

MR. ROSENTHAL:  Objection, asked and answered.

THE COURT:  I think it's clear she disagreed.

MR. KEENEY:  Okay, we'll take that.

THE COURT:  Yes.

BY MR. KEENEY:

Q   In the e-mails from Mr. Tucker, did he ever mention the word, GAAP?

A   No.

Q   In the voicemail from Mr. Tucker, did he ever mention the word GAAP?

A   I don't believe so, no.

Q   In the voicemail from Mr. Tucker, did he ever mention the ethics of the accounting profession?

A   No.

Q   In the voicemail from Mr. Tucker, did he ever mention AICPA?

Drolet - Cross                                169

A    No.

Q    In the e-mails from Mr. Tucker, did he ever mention the ethics of the accounting profession?

A    No.

        MR. ROSENTHAL:  Objection, asked and answered.

        MR. KEENEY:  No, no, I asked about voicemails.

        MR. ROSENTHAL:  I apologize.

        THE COURT:  I understand, withdrawn, no problem.

BY MR. KEENEY:

Q    In the e-mails from Mr. Tucker, did he ever refer to the ethics of the accounting profession?

A    No.

Q    In the e-mails from Mr. Tucker, did he ever refer to the AICPA code of conduct?

A    No.

Q    On the basis of the e-mails that you had with Mr. Tucker, what were the two objections that you were responding to?

A    I believe the pro rata issue and the 13 percent issue. And there was a third, the request for information after October 31.

Q    Okay.  And in addition to your e-mail of March 6, 2008 to Stef Tucker, did you have any other reasons for rejecting the contentions that were made by Mr. Tucker?

A    Any other reasons for rejecting them?

Q    Right, right.

Drolet - Cross                                    170

A    I'm not sure what you mean.

Q    Okay, let me phrase it this way.  Does what's been marked as Exhibit 8, in defendant's exhibit binder, accurately summarize your reasons for disagreeing with Mr. Tucker?

A    Yes.

Q    Now, I believe in your direct testimony, you testified that in your e-mail, that there was a change of one word somewhere that was suggested by Mr. Toll, do you recall that testimony?

A    I do.

Q    And you described, as I recall your testimony, as a cosmetic change, is that still your understanding?

A    Yes.

Q    And was that a cosmetic change you agreed with?

A    Yes.

Q    If you could turn to Defendant's Exhibit 9 in the exhibit binder, that's our exhibit binder.  And the question is, did Attorney Tucker respond to your March 6, 2009 e-mail?

A    Yes.

Q    And is Defendant's Exhibit 9 his response?

A    Yes.

Q    Did anything in Defendant's Exhibit 9 cause you to change your mind about what you had said in your e-mail of March 6, 2009?

A    No.

Drolet - Cross                    171

Q   After receipt of this e-mail from Stef Tucker, did you have any further communications from Stef Tucker, at all?

A   No.

Q   Did this final e-mail from Stef Tucker end the process, as far as you were concerned?

        MR. ROSENTHAL:  Objection, characterizing -- this is a process.

        THE COURT:  Sustained, sustained.

BY MR. KEENEY:

Q   Okay, rephrasing the question.  Did this e-mail from Stef Tucker end your role in Article 10-A, as you understood it?

        MR. ROSENTHAL:  Same objection, your Honor.

        THE COURT:  I'm going to sustain that.

BY MR. KEENEY:

Q   Under Article 10-A, when does the role of the accountant end, if you know?

A   I really hadn't thought much about that.  But I do think that, at some point, clearly there was a dispute that had gone beyond where my role was.  So, this probably was the point where -- I was trying to explain --

        THE COURT:  Ma'am, you can't, let me just caution you, all right?

        THE WITNESS:  Okay.

        THE COURT:  I can only rely on what you knew, what you did, what you said.  You can't kind of speculate --

Drolet - Cross                                    172

THE WITNESS:  Okay.

THE COURT:  -- and kind of second guess.  You've just got to tell us what you knew at the time and what you thought at the time.

THE WITNESS:  I wasn't thinking about my role at the time.  I was just explaining the calculation and that's the way I thought of my role.  Does that help?

THE COURT:  Yes.

THE WITNESS:  Okay.

Q   And after you received what's been marked as Defendant's Exhibit 9, did you expect to be receiving any further e-mail from Stef Tucker?

A   I didn't expect either way.  I don't know.

Q   And if I asked this question, I apologize.  And after March 6, 2009, you didn't receive any e-mails or voicemails or any communications from Stef Tucker, right?

A   I don't believe so.

Q   After Defendant's Exhibit 9?

A   That's correct.

Q   I'd like to turn your attention now, once again, to Article 10-A, that's in Defendant's Exhibit 3, that's the operating agreement and you can use either version, either our version or the version with your handwritten notes.

THE COURT:  You're on page 3 and 4?

MR. KEENEY:  I'm at DX-3, looking at Article 10,

Drolet - Cross                          173

Section A.

THE COURT:  Oh, I'm sorry.  That's page 9.

THE WITNESS:  I'm sorry.

MR. KEENEY:  Thank you, your Honor.

THE COURT:  And it's three?

MR. KEENEY:  Yes, Defense Exhibit 3.

Q   Question, is Drolet Associates regularly retained by Cohen Milstein?

A   Yes.

Q   Is Drolet Associates independent of Cohen Milstein?

A   Yes.

Q   You testified on direct that prior to reviewing calculations of capital accounts for Michael Hausfeld and Richard Lewis, you had reviewed capital accounts of other departed partners, is that your testimony?

A   Yes.

Q   And do you have any understanding whether the Cohen Milstein calculation under Article 10-A for a departing partner, changes or is the same when the departure is due to an involuntary termination?

A   This is the first time there was one, but I -- it didn't appear to me that it would require anything different.

Q   Did you have any understanding that you, as the accountant to Cohen Milstein, were permitted or not permitted to review capital account calculations before they went to a

Drolet - Cross                          174

departed partner?

A    I didn't see that it was not permitted, no.

Q    And what reasons would you have for seeing it before it went to the departed partner?

A    To save time.  To make sure it was accurate before it went out.

Q    Is there any relation to the tax, estimated tax filings of other partners?

A    Well, there clearly is a relation, but it's not necessary.  I mean, it wasn't -- I didn't use it for that purpose here, if that's what you mean.

Q    Okay.  Having reviewed the calculations before they were sent out, did you have any understanding that you had a bias to upholding those calculations?

A    Bias?

        MR. ROSENTHAL:  Objection, leading.

        MR. KEENEY:  It's phrased with a "did you have."

        THE COURT:  Yes, it's not a leading question, but it suggests the answer, so I'll allow it.

        THE WITNESS:  And can you repeat the question again.

BY MR. KEENEY:

Q    Okay.  Having reviewed the calculations in advance, did you believe that you had any bias in hearing objection to departed partners to the calculations?

A    I didn't.  I don't believe I had any bias.

Drolet - Cross                                        175

(Pause.)

Q   In February and March 2009, did you have any involvement in negotiations between attorneys at Hogan & Hartson and attorneys at Venable with respect to any issue?

A   No.

MR. ROSENTHAL:  Objection.  It calls for foundation to the extent that any such negotiation --

THE COURT:  Well, there was a foundation.  She didn't.

MR. ROSENTHAL:  Okay.

THE COURT:  She never had anything to do with you guys.  I know that disappoints you that she wasn't involved in that, but whatever important business you guys were transacting at that time.

MR. KEENEY:  She probably appreciates that.

THE COURT:  Yes.

MR. KEENEY:  Yes.

BY MR. KENNY:

Q   Shifting gears, have the books and records of Cohen Milstein ever been maintained on a GAAP basis?

A   No.

Q   Are you sure of that?

A   Absolutely positive.

Q   And why are you absolutely positive?

A   Well, I've been working with the firm for 20 years as I

said, and nobody has ever kept the books and records on a GAAP basis in any shape or form. To my knowledge, I've never seen them.

Q   I'd like to turn your attention in the defendant's exhibit binder to an exhibit which has been marked 48-C. And just for explanation, there are a whole series of documents under 48, so I'd ask you to look at 48-C.

THE COURT:   This is your 48?

MR. KEENEY:   Yes, this is our 48, your Honor.

THE COURT:   Okay.

BY MR. KEENEY:

Q   Do you have that document --

A   I do.

Q   -- in front of you?

A   I do.

Q   And is Defendant's Exhibit 48-C an engagement letter between Drolet & Associates (ph) and Cohen Milstein?

A   Yes.

Q   When is it dated?

A   January 30th of 2008.

Q   Okay. Directing your attention to Paragraph 1. Could you read Paragraph 1 in its entirety? That's numbered Paragraph 1.

A   "We will review the statements of assets, liabilities, and member's capital, income tax basis, of Cohen, Milstein,

Drolet - Cross                                    177

Hausfeld & Toll, P.L.L.C, as of December 21, 2007 and 2006, and the related statements of income and expenses, changes in member's capital, and cash flows, income tax basis for the years then ended, and issue an accountant's report thereon in accordance with statements on standards for accounting and review sources instituted by the American Institute of Certified Public Accountants.  We will not perform an audit of such financial statements, the objective of which is the expression of an opinion regarding the financial statements taken as a whole, and accordingly, we will not express such an opinion on them."

Q    And is there any reference to GAAP in that numbered Paragraph 1?

A    No.

Q    And is the income tax basis, which is referenced in numbered Paragraph 1, inconsistent with the use of GAAP?

A    It's different -- it's totally different from the use of GAAP, yes.

Q    Okay.  Turning your attention to Page 3 --

        THE COURT:  Hold on one second.

        What do you mean by that, ma'am?  Explain that to me.  How is it different?

        THE WITNESS:  The income tax basis prepares financial statements that are similar to an income tax return, and so the things that are allowed on an income tax

Drolet - Cross                                  178

return, based on the method you're filing, is the way they're included. In this case, I would call that a modified cash basis method of accounting. And GAAP accounting is an accrual basis accounting, which has a lot of other things in it that are not in these financial statements.

THE COURT: Okay. Thank you.

BY MR. KEENEY:

Q    And if I could just give you an example. If a law firm was expecting a $10 million payment by year end, and it didn't come in by December 31 of that year, under the income tax method, is the law firm allowed to take that payment into income?

A    No.

Q    Under GAAP, could the law firm be allowed to take that payment into income --

A    Yes.

Q    -- by December 31st.

A    If it's a legitimate receivable, yes.

Q    Okay. And can you explain to the Judge why that is?

A    Oh, the GAAP method of accounting is based on the accrual method, which looks at each accounting period, and accounts for expected receivables that are good, expected accounts payable that you -- true liabilities that you know you're going to owe, and incorporates those into the financial statements.

Drolet - Cross                                    179

The income tax basis in this case is a modified cash basis where the partners, the members of the firm are paying tax only on the income they get, and taking deductions for only the expenses that they incur.  And in this case it's significant because with the exception of this capital asset that they have, which is a big number for them, those are expenditures that they incur, and pay out the door, but cannot take a deduction for for tax purposes.

So they do have a big asset on their books that is totally inconsistent with GAAP accounting, but it's an asset for tax purposes, not allowed by the I.R.S. as a deduction, but the money has gone out the door.  So they're very, very different financial statements.

Q   Directing your attention now very specifically to Page 3 of what we've marked as Defendant's Exhibit 48-C.  So it's the same exhibit, we're now turning to Page 3.

Does Page 3 contain an acknowledgement of Cohen Milstein as a firm?

A   Yes.

Q   And what does that acknowledgement state?

A   This letter correctly sets forth the understanding of Cohen, Milstein, Hausfeld & Toll, P.L.L.C.

Q   And in 2008, pursuant to this engagement letter, did Drolet & Associates use the income tax basis of accounting?

A   Yes.

Drolet - Cross                          180

Q    Please turn in your exhibit binder to Defendant's Exhibit 48-B as in boy.

Do you have it in front of you?

A    I do.

Q    Is this the 2009 engagement letter between Drolet & Associates and the Cohen Milstein law firm?

A    It is.

Q    I draw your attention to numbered Paragraph 1.  Could you read that in full?

A    "We will review the statements of assets, liabilities, and member's capital, income tax basis, of Cohen, Milstein, Sellers & Toll, P.L.L.C. as of December 31, 2008, and 2007, and the related statements of income and expenses, changes in member's capital and cash flows, income tax basis for the years then ended, and issue an accountant's report thereon in accordance with statements and standards for accounting, and review services issued by the American Institute of Certified Public Accountants.  The objective of a review engagement is to express limited assurance that there are no material modifications that should be made to the financial statements in order for the statements to be in accordance with the income tax basis of accounting."

Q    And directing your attention to Page 4 of that exhibit, is there a written acknowledgement?

A    There is.

Drolet - Cross                                            181

Q    Would you please read the written acknowledgement?

A    "This letter correctly sets forth the understanding of Cohen, Milstein, Sellers & Toll, P.L.L.C."

Q    And with respect to both Exhibit 48-C and Exhibit 48-B, those were prepared by your law firm or by Cohen Milstein?

A    My accounting firm prepared the letter, sent it to Cohen Milstein, and they signed it.

Q    Directing your attention to the bottom of Page 3, this is the Exhibit 48-B as in boy, is it correct that you were the engagement partner for Drolet & Associates with Cohen Milstein?

A    Yes.

Q    And what does the engagement partner do?

A    In my firm, the engagement partner is very involved and reviews in detail the financial statements and the tax returns before they go final.

Q    Anything else that you recall?

A    For this engagement?  No, that's basically it.

Q    Okay.

A    I review all the work papers.  I review everything.

Q    Okay.  Is there a separate engagement letter between Drolet & Associates and Cohen Milstein for the work that you did in responding to e-mails and voice mails from Seth Tucker?

A    No.

Q    Please turn in the exhibit binder to Defendant's Exhibit 48-E as in elephant.

          (Pause.)

A    I'm there.

Q    And is this a letter dated February 24th, 2006?

A    Yes.

Q    And is this a letter from Cohen Milstein to your firm?

A    Yes.

Q    Is Defendant's Exhibit 48-E, what I've heard referred to as a management representation letter?

A    Yes.

Q    And can you tell the Judge what a management representation letter is?

A    Your Honor, accountants typically ask a firm to issue -- usually around the time the financial statements are going to be issued -- to send us a letter saying that they understand the services that we're providing, and that they have given us all the information that we need to do the -- to do the job.

Q    And directing your attention in Exhibit 48-E to representation No. 1 what did Cohen Milstein represent to you?

A    "The financial statements referred to above present the balance sheet, statements of income expenses, and changes in partners' capital and cash flows of Cohen Milstein Hausfeld

Drolet - Cross                              183

and Toll, P.L.L.C., in conformity with the income tax basis of accounting."

Q   And anywhere in what has been marked as Defendant's Exhibit 48-E, is there any reference to GAAP?

A   No.

Q   Directing your attention to Defendant's Exhibit 48-D as in dog.  Can you put that document in front of you?

          (Pause.)

A   I'm there.  I'm sorry.

Q   Okay.  Is Defendant's Exhibit 48-D the 2007 management representation letter?

A   It's actually for the period December 31, '06.

Q   Okay.  Thank you.

A   Dated March 5th, 2007.

Q   Okay.  And is it a management representation letter?

A   Yes.

Q   Okay.  And in Exhibit 48-D, is there a representation in numbered Paragraph 1 on Page 1?

A   Yes.

Q   And can you read into the record what that representation is?

A   "The financial statements referred to above present the statements of assets, liabilities, and member's equity, statements of revenues, expenses and changes in member's equity and cash flows of Cohen, Milstein, Hausfeld & Toll,

P.L.L.C, in conformity with the income tax basis of accounting."

Q   Okay.  Do you know why a slight change was made in the words?  I notice in DX-48-E the words "changes in partners' capital," and then I compare that to this letter which says "changes in member's equity."  Do you see those comparisons between forty --

A   When you say "this letter," which one did you go to?

Q   Oh, I'm sorry.  If we start with 48-E, numbered Paragraph 1 --

A   Mm-hmm.

Q   -- it has a reference to "changes in partners' capital."  Then when we go to DX-48-D, we have the words "changes in member's equity."

A   I -- I think clearly we were just cleaning up our own letter and referring to the proper -- they used to be a partnership, they really are an L.L.C., and the word "member" places the word "partner," so it's just a cleaning of the wording --

Q   Okay.

A   -- on my firm's part.

Q   Okay.  Was there any sort of substantive accounting change that was meant by any of those words?

A   No, no.  One is the same as the other.  I believe they refer to themselves as partners and technically because

Drolet - Cross                                    185

they're a P.L.L.C, their members.

Q   Okay.  If you could now turn to the exhibit binder, to
another one of these, this is Defendant's Exhibit 48-A?

        (Pause.)

A   I'm there.

Q   Okay.  And can you describe what Exhibit 48-A is?

A   This is the -- the rep letter for the 2008 year dated
March 23, '09.

Q   Okay.  And directing your attention to numbered Paragraph
1, can you read what Cohen Milstein certified?

A   "We are providing this letter in connection with your
review of the statements of assets, liabilities, and member's
equity, income tax basis, statements of revenues, expenses,
and changes in member's equity, income tax basis, and cash
flows, income tax basis, of Cohen, Milstein, Sellers & Toll,
P.L.L.C, as of December 31, 2008, and 2007, for the years
then ended for the purpose of expressing limited assurance
that there are no material modifications that should be made
to the statements in order for them to be in conformity with
the income tax basis of accounting.  We confirm that we are
responsible for the fair presentation of the financial
statements."

Q   And just to summarize here a lot more quickly, in your 20
years in preparing engagement letters, and representation
letters with Cohen Milstein, did any of those letters ever

refer to GAAP?

A    No.

Q    Did Mr. Hausfeld ever complain to you that Cohen Milstein was using the income tax base method of accounting?

A    No.

Q    Did Mr. Hausfeld ever complain to you why Cohen Milstein wasn't using GAAP?

A    No.

Q    Did you ever discuss with Michael Hausfeld whether Cohen Milstein should or should not use GAAP?

A    No.

Q    Did Mr. Lewis ever have any conversations with you about GAAP?

A    No.

Q    I'd like to direct your attention to DX-11.  That's in our binder, Defendant's Exhibit 11.

        (Pause.)

A    Okay.  And can you tell us what Defendant's Exhibit 11 is?

A    It's a copy of the reviewed financial statements as prepared by my firm for 2008 and 2007.

Q    Okay.  Could you please turn to Page 9?

        (Pause.)

A    Okay.

Q    Under Note A captioned "Basis of Accounting," could you

Drolet - Cross                                187

please read that into the record?

A    "The financial statements have been prepared on the income tax basis, which is a comprehensive basis of accounting, other than U.S. generally-accepted accounting principles.  In general, with exceptions for depreciation, pension expense, and capitalized client advances, under the income tax basis, revenues are recognized when received rather than earned, and expenses are recognized when paid rather than when an obligation is incurred.  In addition, CMHT-New York L.L.P. and the Cochran Firm, D.C., P.L.L.C. (ph) file separate income tax returns.  The firm reports its share of the income or loss of these law practices based on the amounts reported in the respective tax returns."

Q    Thank you.

       Could you now turn to Page 17 of that exhibit?

       (Pause.)

A    Okay.

Q    And can you explain to the Court what Page 17 is?

A    It's a summary of Michael Hausfeld's capital account for 2008, starting with the opening balance as of December 31, 2007, showing his share of the loss allocated to him, and then showing withdrawals, various things, starting with guaranteed draws and some other insurance matters, and things like that, and then ending an ending equity balance as of December 31, 2008.

Drolet - Cross                              188

Q    And directing your attention to the three lines in all caps in the upper right-hand corner, do you see those?

A    Yes.

Q    Can you read them into the record?

A    "Cohen Milstein Sellers & Toll, P.L.L.C, member's income and equity information, income tax basis."

Q    And, once again, no reference to GAAP there, right?

A    No.

Q    And did you prepare a document similar to Page 17 in this exhibit for every partner at Cohen Milstein who was an equity partner each year during your 20 years of doing the accounting?

A    Yes.

Q    And did those statements include the same big, bold disclaimers up in the top right corner?

A    Yes.

Q    Do you have any understanding whether the financial statement marked as Defendant's Exhibit 11 is given to the partners in Cohen Milstein?

A    I believe it is.

Q    And what's the basis for your belief?

A    We usually send over bound copies.  I -- I believe we send enough bound copies to cover all the partners.  I don't personally give them to anybody that we send them to, Hugh Diamond (ph), usually at the firm.

Drolet - Cross                                      189

Q   Okay.  You testified in your direct testimony that there were approximately $5 million of losses that you recommended to the Cohen Milstein be allocated to capital balances prior to October 31, 2008.  Is that an accurate summary of what you testified to?

A   Well, I would caveat it by saying that I recommended that after they told me that the cases were no good since the beginning of the year.

Q   And do you have an understanding, if Cohen Milstein had accepted your recommendation for that additional $5 million of capital losses, whether the capital account of Michael Hausfeld as of October 31, 2008, would have gone up, or would have gone down?

A   It would have gone down.

Q   And for Mr. Lewis, would his capital account have gone up or down?

A   Down.

        THE COURT:  How about the other partners?

        THE WITNESS:  Everybody's would have gone down, but they went down anyway, because they recorded the loss as of December 31 instead, so it was -- the cases were no good, they had to be written off, you couldn't prepare the year-end tax return, all financial statements with a bad assets on the books.  So the partners did take the deduction.  It just didn't happen prior to October 31.  They booked it at the

Drolet - Cross                                          190

last quarter.

THE COURT:  So their capital accounts --

THE WITNESS:  Went down.

THE COURT:  -- went down.  So the only person who benefitted from this are the people who left on October 31st?

THE WITNESS:  People that left prior to year end benefitted from that, yes.

THE COURT:  Okay.

BY MR. KEENEY:

Q   I'd like to direct your attention back to the operating agreement.  This is Article 10th A.  This is in Defendant's Exhibit 3, either our version or your handwritten version.

(Pause.)

A   And I would like to direct your attention specifically to the last sentence of Article 10th A, and could you please read that into the record?

A   "The accountant shall accept as correct the financial statements prepared for the company prior to the date of the member termination event, and shall make no audit of the books and records for the periods covered by such financial statements."

Q   And were the financial statements that were prepared by the company, prior to the date of the member termination event, prepared on the basis of GAAP or on the basis of the income tax basis?

Drolet - Cross                                    191

A    Income tax basis.

Q    In your view, was use of the income tax basis an evident miscalculation --

A    No.

Q    -- by Cohen Milstein?

A    No.

        MR. ROSENTHAL:  Objection, leading.

BY MR. KEENEY:

Q    Why not?

        THE COURT:  Well, hold on.  Overruled.  I don't think that's leading.  He asked in her view was it.

        MR. KEENEY:  Yes, that's right.

BY MR. KEENEY:

Q    And why not?

A    Well, the financial statements for the firm are always kept on an income tax basis, so I saw no reason -- I mean, it doesn't make sense to me it would be done any other way.

Q    Okay.  Did you also help Cohen Milstein calculate the amount of capital being returned to another partner whose effective date was October 31, 2008?  We've already talked about Mr. Hausfeld and Mr. Lewis.

A    Yes.

Q    There was another partner?

A    Yes.

Q    Who was that other partner?

Drolet - Cross                    192

A    I believe it was Mark Willis.

Q    Mark Matches (ph) did you say?

A    I think Mark Willis.

Q    Okay.

A    I might have to look at his name to be sure.

Q    Okay.  I'll come back to that.

A    I can tell you in a second.

Q    Okay.

          (Pause.)

A    Mark S. Willis.

Q    Okay.  Now, with respect to Mark S. Willis, he had left in August; isn't that right?

A    Yes.

Q    And so that calculation would have been done as of what date?

A    July 31.

Q    Okay.  Was there another partner that you did a calculation -- well, excuse me -- was there another partner that you helped Cohen Milstein do a calculation for who left on October 31, 2008, who was not Michael Hausfeld, and who was not Rich Lewis?

          THE COURT:  I think Mr. Rosenthal would probably let you lead on that since we've narrowed it down.

          MR. KEENEY:  All right.

          THE COURT:  Who are we talking about?

Drolet - Cross                                          193

MR. ROSENTHAL:  I have no problem.

MR. KEENEY:  We're talking about Mark Matches.

THE COURT:  Okay.

THE WITNESS:  Okay.  Thank you.  Yes.  There were three, I believe three other partners who left around that time.

THE COURT:  I appreciate your efforts to be nonleading, Mr. Keeney.

MR. KEENEY:  I think I'm going backwards, your Honor.

(Laughter.)

BY MR. KEENEY:

Q   Okay.  And on Mark Matches, did you use the same formula for reviewing the calculations for Mark Matches that you did for reviewing the formulas used for Mr. Hausfeld and Mr. Lewis?

A   It was a little different, because he -- he had no capital to be returned.

Q   And in addition, where there two other partners who left with Mr. Hausfeld who had no capital to be returned?

A   Yes.

Q   And who were they?

A   Robert Eisler (ph) and Michael Layman (ph).

Q   Okay.  And jumping back now to Mr. Willis, so July --

THE COURT:  We need to stick with Matches, is that

Drolet - Cross                                    194

his name?

THE WITNESS:  Yes.

THE COURT:  Tell me, Mr. Keeney, what's the relevance of that if they had no capital?

MR. KEENEY:  You have to do the calculation anyway to see if they have capital, your Honor, and you're going to hear expert witness testimony from them under GAAP, that gives a lot of capital to a lot of people who don't have capital.  That's the only reason.  I'm just laying the foundation for what their capital was.  It was a negative. It also shows capital goes up and down.

THE COURT:  Mm-hmm.

MR. KEENEY:  You can lose capital from month-to-month.

THE COURT:  Okay.

BY MR. KEENEY:

Q   But now I'm switching back to July 31.  You're doing the calculation for Mark Willis.  At the time that Cohen Milstein did the calculation for Mark Willis, as of July 31, was Mark Willis losing money in his capital account compared to his starting balance as of December 31, 2007?

A   Yes.

Q   And why was that?

A   The firm has a loss as of July 31 as well.

Q   Excuse me for returning to a topic that we already --

Drolet - Cross                                              195

THE COURT:  That's all right.

BY MR. KEENEY:

Q   -- covered.

With respect to the $5 million in untaken losses, which you recommended that Cohen Milstein take as of October 31, which would have reduced Michael Hausfeld and Rich Lewis even further, how much more would it have reduced Michael Hausfeld, if there was $5 million loss, and his percentage was 28 percent?

A   Another million-and-a-half probably.

Q   Okay.  And for Mr. Lewis --

A   Don't quote me on that.

Q   Well, no, I was --

A   Without calculating, don't quote me.

Q   -- asking for an approximate.

THE COURT:  That's exactly what we're doing.

(Laughter.)

THE WITNESS:  Can I have a calculator, please?

THE COURT:  I hate to break it to you.

BY MR. KEENEY:

Q   And for Mr. Lewis who's share was approximately 6.5 percent of that additional $5 million loss, how much did he benefit by Cohen Milstein not taking it October 31?

A   Approximately 300,000, 350, somewhere in that range.

Q   Switching to another topic, there were questions that

Drolet - Cross                                          196

were raised of you today in your direct about an e-mail from

Hugh Diamond of February 5th.  Is it your testimony that you

have the attachments, but you just don't have the e-mail

itself; is that your testimony?

A    I don't have any of it.

Q    I thought you said you had the attachments?

A    Oh, I have the attachments.  I -- I have the financial

statements.  I don't have the attachments that are in this

booklet.  I just recognize them.

Q    Ah.

A    Right.  The only reason I have the financial statements

is he sent me those on January 15th anyway.  So the actual

e-mail, the original e-mail he sent me, I didn't keep.  It

was wrong, I deleted it, got it corrected, and printed off

the final one for my file.

        I was shown the attachments to that e-mail that I

believe I recognized to be that original e-mail.  Does that

make sense?

Q    Yes.

A    Okay.

Q    And some of those had your handwriting on them; is that

correct?

A    That's a set of financial statements for the July and

October time period.  Those were sent to me by him on January

15th without the calculations.  And I kept those, printed

Drolet - Cross                                        197

them off, and they're in my office.  When he did finally send me the calculations on February 5th, I referred back to those financial statements and wrote on them, and made notes on them, yes.

Q   Okay.  And getting back to the e-mail of February 5th, do you have any recollection of whether it was significant in light of the fact that you deleted it, and concluded that the attachments were wrong?

A   It was one e-mail with attachments, and it was wrong, I deleted it.  He gave me the revised one and I kept it.

The significance of it?  What do you mean?

Q   Oh, was there anything in the nature of a smoking gun, for example, that was in the e-mail that you deleted?

A   No, no.

MR. ROSENTHAL:  Objection, your Honor.  Leading.

THE COURT:  Yes, I'll sustain it.  I think that was leading.

MR. KEENEY:  Yes, yes.

THE COURT:  But I think I understand her answer, and I think I understand what happened.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q   Were you involved back in the 2005-2006 period in the only time that Cohen Milstein returned capital to current partners?

Drolet - Cross                                    198

A    I -- I would have been involved, yes.

Q    What do you recall about that?

A    Who were the members.

Q    The members who had capital returned -- just assume that --

A    In 2008?

Q    No --

          THE COURT:  5-6.

          THE WITNESS:  5-6?

BY MR. KEENEY:

Q    -- 2005 and 6.  Michael Hausfeld, Herb Milstein --

A    Oh --

Q    -- and Steve Toll.

A    -- that.  Yes, yes, yes.  They stayed with the firm.

Q    Yes.

A    Okay.  Yes, not terminated partners.

Q    Okay.  Could you explain what you recall about the process in which capital was returned to those three?

A    It was a rather lengthy process.  It went over several months.  The partnership -- several of the partners, the members of the firm were concerned that they were overcapitalizing the firm compared to others.  So you had -- and this happens when you have a firm where partners are brought in and they're not buying in, okay?

          So they're coming into the firm, they're giving a

share of income, but they're not required to pay for it, so they're starting out with zero capital, and all of a sudden you find a -- and they are given a share of percentage, okay? So somebody that may have been a, let's say a 30 percent partner, that percentage partner goes down a couple shares, because someone new comes in, but -- but his percentage in the capital account is at the 30 percent, and all of a sudden you might only be earning 28.

So over time you can have discrepancies where the longer-term partners that are -- that have the higher capital account percentages, or income share percentages, I should say, their capital accounts can start to get overstacked against everybody else where they've got a lot of money on the table, and they're really capitalizing and paying for the firm where some of the younger and newer partners don't have as much at risk and on the table.

And so the partners were concerned about that, and wanted to return some of that money to the -- in this case, to the three oldest members of the firm, and by that I don't mean age, I mean have been with the firm longer, and those three people; Michael Hausfeld, Herbert Milstein, and Steve Toll at the time.  And they asked me to do a lot of analysis on it, on how to get it right, and make recommendations to them on how to -- how to get those capital accounts more in line with the actual current percentages of earning shares

Drolet - Cross                                         200

that they had.

         And so my firm did a lot of analysis, you know, attended several partner meetings, explaining the capital accounts to -- to folks, explaining to them why they could -- how they could get out of line like that, and then making recommendations on how to fix it.

         And ultimately they decided to distribute money to the three top partners, and not from income, but from capital.  They had some assets, money in the bank, basically savings set aside at the firm level, and they used that money to pay out the -- these three partners to get their capital accounts more in line with the other partners.

Q    And in your answer you referred to several partnership meetings that you were present at?

A    Yes.

Q    Do you have any recollection about how many partner meetings there were that were devoted in part to this topic?

A    I believe there were several, and I think I attended two or three of them.  I don't remember exactly.

Q    Do you have a recollection of whether there was a partnership vote in order to return capital?

A    I believe there was a vote at some point or another, and I know it was communicated to us what amounts were going to be returned to the -- to the three partners.

Q    Okay.  And when it was communicated to you, it was

Drolet - Cross                                    201

communicated as it had happened?

A    Yes, it had already happened, and we were apprised of the exact amounts.

Q    In your e-mail of March 6th, 2009, to Stef Tucker, so we're going way back.

A    Mm-hmm.

Q    Did you have any concerns that your actions were in any way unethical within the Ethics Code of your accounting profession?

A    Absolutely not.

        MR. KEENEY:  We have no further questions, your Honor.

        THE COURT:  All right.  Very good.

        Mr. Rosenthal, do you have any follow-up?

        MR. ROSENTHAL:  I do, your Honor.

        THE COURT:  All right.

        MR. ROSENTHAL:  May I have just one second to get situated?

        THE COURT:  Take your time.  Do you need time?  Do you want to take a break and then you can get situated or... I don't want to rush you.

        MR. ROSENTHAL:  No, let's continue.

        THE COURT:  Okay.

        MR. ROSENTHAL:  If Ms. Drolet's okay with it?

        THE WITNESS:  Mm-hmm, yes.  Thank you.

Drolet - Redirect                                   202

REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q    GAAP-based accounting gives a truer picture of a business's financial condition than income-tax basis accounting, correct?

A    In some case -- in most cases, but not all necessarily.

Q    And that is why -- well, I should say -- any accrual-basis accounting is consistent with GAAP, right?

A    Yes.

Q    And that is why -- and because accrual-basis accounting gives a more accurate picture of a firm's financial condition, it is consistent with GAAP, right?

A    It is GAAP, yes, accrual-basis accounting.

Q    Accrual basis is GAAP?

A    Yes.

Q    Right.  And the reason accrual basis is consistent with generally-accepted accounting principles is because it is the method that gives the most accurate picture of a firm's financial condition, right?

A    In most cases, yes.

Q    Right.  And income-tax basis accounting is not consistent with generally-accepted accounting principles, correct?

A    Correct.

Q    Nor is cash-basis accounting, correct?

A    Correct.

Drolet - Redirect                                203

Q   If you would, would you turn to Plaintiff's Exhibit --
this is the big binder --

A   Mm-hmm.

Q   -- okay?

A   Got it.

Q   Exhibit 6.

        (Pause.)

A   And this is the former operating agreement of Cohen
Milstein Hausfeld & Toll; is that correct?

A   It appears it is, yes.

Q   Okay.  Effective date, January 1, 1996, correct?

A   Yes.

Q   Okay.  This is a document that you used between 1996 and
the adoption of the amended agreement in 2003, correct?

A   Correct.

Q   Actually, because you didn't receive the amended
agreement until 2007, did you actually use this up until
2007?

A   I don't -- I probably didn't need to, because I don't
think any partners left during that time period.

Q   Okay.  I'm going to ask you to take a look at Article
11th on Page 9.

        (Pause.)

A   Yes.

Q   And this is the termination allowance provision that

Drolet - Redirect                                    204

applies to departing partners, correct?

A    Correct.

Q    You were familiar with this provision, right?

A    Yes.

Q    Okay.  Ann Yahaer left the firm in 2002, right?

A    Yes.

Q    And she received a termination allowance under this provision?

A    I believe so, yes.

Q    Gary Mason (ph) left in 2002, correct?

A    Yes.

Q    He received a termination allowance under this provision, right?

A    Yes.

Q    Okay.  And the termination allowance provision enables a departing member to get an allowance in the amount either of the members vested percentage times base earnings or one year's salary; is that right?

A    Yes.

Q    And the agreement provides for this formula about how to come up with the vested percentage times base earnings, right?

A    Yes.

Q    And if base earnings ends up being higher than that multiple, the termination allowance will be, or would have

Drolet - Redirect                                        205

been, the salary, right?

A    Yes.

Q    Okay.  And if the base earnings times vested interest multiple was greater than the base salary, the termination allowance would have been that multiple, correct?

A    Correct.

Q    And I'm not going to walk you through how the base earnings is provided, but -- well, maybe I should.  It's on Page 11, Subparagraph B.

        (Pause.)

        THE COURT:  Does it matter, Mr. Rosenthal?  I don't have a Page 10.  My Page 10 is blank.

        MR. ROSENTHAL:  Your Page 10 is blank.

        THE COURT:  Okay.

        MR. ROSENTHAL:  Mm-hmm.

        (Pause.)

BY MR. ROSENTHAL:

Q    Let me know when you're done reading it, Ms. Drolet.

        (Pause.)

A    Okay.

Q    Okay.  And the base earnings is determined by taking the last five years of earnings from the partner, throwing out the top number, throwing out the bottom number, and averaging out the middle three, right?

A    Correct.

Drolet - Redirect                                        206

Q    Okay.  And then you would multiply that by a partner's vested percentage --

A    Yes.

Q    -- right?  And a partner, under this agreement, fully vests, meaning vests 100 percent after five years, right?

A    Yes.

Q    Okay.  Moving on to Subparagraph B, capital B, it says the maximum amount of the termination allowance is going to be $1,088,000, right?

A    Correct.

Q    As of January 1, 1996, the date of the agreement, right?

A    Yes.

Q    But it's going to go up, according to the Consumer Price Index every year --

A    Correct.

Q    -- right?  And then if you go to Paragraph D on Page 12...

        Would you take a minute to read it?

        (Pause.)

A    Okay.

Q    And under this it says that even if a departing partner engages in competitive legal practice, he or she will still get one times the multiple of base earnings or salary, whichever is greater, right?

A    Yes.

Drolet - Redirect                          207

Q   Okay.  Will you open up Defendant's Exhibit 47, and I'll ask you to go to Page 3?

(Pause.)

This is Tab 2, Page 3.  It says at the very top, "Cohen Milstein Hausfeld & Toll, Ann Yahaer, Capital Account Payments Calculation."

A   I think I'm in the wrong binder.  This is in the binder -- Binder, Cohen Milstein 47; is that what you said?

Q   I'm sorry.  46, is it?  46.  I'm sorry.  It's Exhibit 46, Tab 2.

A   I have nothing in 46.

SPEAKER:  It should be the second binder.

THE COURT:  We're going to put one before her.

(Pause.)

MR. KEENEY:  I don't have anything in 46 either.

SPEAKER:  It's Binder No. 211, your Honor.

MR. KEENEY:  The whole binder is 46 --

THE COURT:  Oh.

MR. KEENEY:  -- your Honor.

MR. ROSENTHAL:  Oh.

THE COURT:  And what tab, Tab 2?

MR. ROSENTHAL:  Tab 2, Page 3, your Honor.

THE COURT:  Okay.

(Pause.)

THE WITNESS:  Okay.

Drolet - Redirect                                      208

BY MR. ROSENTHAL:

Q    Are we there, Ms. Drolet?

A    Yes.

Q    Okay.  And this shows that Ms. Yahaer is going to be getting a termination allowance of XXXXXXXX; isn't that right?

A    Correct.

Q    Okay.  In addition to her return of capital, which is XXXXXXXX, right?

A    Yes.

Q    Okay.  So she's getting both the capital account return and a termination allowance, right?

A    Correct.

Q    And that termination allowance is going to be based on this vested percentage times based earnings, right?

A    Yes.

Q    And because she had been at the firm more than five years, she's vested 100 percent, right?

A    Correct.

Q    Okay.  If we go to two pages beyond, to Page 5... the very bottom of the page?

A    Okay.

Q    This shows what happens under the Consumer Price Index under the agreement, right?

A    Yes.

Drolet - Redirect                                209

Q   Okay.  So as of the date of the signing of the agreement in 1996, the maximum allowable termination allowance was $1,088,000, right?

A   Yes.

Q   But six years later, by 2002, it goes all the way up to $1,533,812, right?

A   Yes.

Q   And that's the maximum allowable termination allowance, right?

A   Yes.

Q   Okay.  You can put that aside for just a minute.

    If we look at the old operating agreement, Exhibit 6, Plaintiff's Exhibit 6, and you go to Page 12...

A   Okay.

Q   ... can you read Paragraph F2?

A   "The payments of the amounts specified as the termination allowance if the withdrawing, deceased, disabled, or retired member shall be in lieu of such member's interest and accounts receivable for all business of the company billed or unbilled on or prior to the date of the member's withdrawal, death, or retirement, or the date of the member's disability is determined."

Q   You can end there.  Because this indicates that the termination allowance is to be in lieu of the departing member's interest in accounts receivable, right?

Drolet - Redirect                                    210

A    Yes.

Q    If you take a look at the paragraph before, Paragraph F1, do you see that?

A    Yes.

Q    And can you read it a loud?

A    "The payment of the balance of the capital account constitutes the full purchase price paid by the surviving or continuing members for all of the interest of the withdrawing deceased, disabled, or retired member in the property of the company."

Q    Okay.  So this indicates that the return of capital, unlike the termination allowance, is not, not in lieu of accounts receivable, correct?

A    Correct.

Q    Okay.  I'm going to ask you to turn now to Exhibit 2, which is the 2003 operating agreement, and I'll ask you to turn to Article 11th.

        (Pause.)

        And I'll ask you to read the first sentence of Article 11th out loud, please, 11-A I should say.

A    "Members entitled to payment.  Any terminated member who was a member of the company for at least ten years shall be entitled to a termination allowance in the amount of $500,000 subject to reduction or offset pursuant to Sections F and G of Article 9th.  For purposes of satisfying this ten-year

Drolet - Redirect                                      211

requirement, years during which a member was an equity partner in the partnership, shall be counted as years of membership in the company.  However, the company's executive committee has the authority to waive or modify this ten-year requirement for those persons joining the company as a lateral member."

Q   You would agree that this termination allowance provision is much, much different than the termination allowance provision in the original operating agreement, the 1996 operating agreement, correct?

A   It is different, yes.

Q   Right.  Because in the original operating agreement, there was no trigger at all, right?

A   Correct.

Q   The partner would get a termination allowance regardless of how long she or he had been there, right?

A   Yes.

Q   And here the termination allowance doesn't kick in unless the partner's been there ten years, right?

A   Correct.

Q   And under the new termination allowance, the maximum is $500,000, right?

A   Correct.

Q   And as of the time the partnership agreement was amended, the maximum under the old agreement was in excess of 1.5

Drolet - Redirect                                    212

million, right?

A    Yes.

Q    Now, I'll ask you to turn back to Page 9 of Exhibit 2, where it says "Competitive Legal Practice."

A    Mm-hmm, okay.

Q    And ask you to read that, the first sentence of it a loud?

A    "Notwithstanding any other provisions of this agreement to the contrary, if a terminated member engages in competitive legal practice prior to the company's payment of the entire termination allowance payable to him or her pursuant to Article 11th below, the company shall be fully and automatically relieved from its obligation to pay any further portion of the termination allowance as of the date on which the terminated member becomes engaged in competitive legal practice."

Q    This is also a difference from the other agreement, right?

A    Yes.

Q    Because under this agreement, if you engage in competitive legal practice, you forfeit your termination allowance, right?

A    Correct.

Q    But under the old agreement, you still get a termination allowance, it's only a multiple of one of your base earnings,

right?

A    Correct.

Q    That's the limit.

So those are three significant differences between the termination allowance under the first operating agreement and the second operating agreement, correct?

A    Correct.

Q    I'll ask you then to take a look at and read the paragraph above, Paragraph 9-E on Page 9.  Please read it a loud.

A    Paragraph -- which one?

Q    Paragraph 9 -- I'm sorry -- 9-E entitled "Full Satisfaction," on Page 9.

A    Okay.  "The payments to a terminating member under Article 10th and 11th shall be in lieu of and in full satisfaction of all claims on the part of the terminated member to any interest in the good will assets, unbilled work, accounts receivable, cases, furniture and fixtures, earnings, and other assets of the company."

Q    And Article 10th refers to the terminated members capital account balance, right?

A    Correct.

Q    And Article 11th refers to the termination allowance, correct?

A    Correct.

Drolet - Redirect                                   214

Q    This also is a change from the old operating agreement, correct?

A    I don't remember.

Q    Okay.  Well, let's compare that to Exhibit 6, Page 12, Paragraph F-2.

We established under that paragraph on Page 12 of Exhibit 6, that the termination allowance, but only the termination allowance is in lieu of accounts receivable, right?

A    Correct.

Q    But under the new agreement, it's both the capital account balance and the termination allowance that are in lieu of or in full satisfaction of any good will, assets, unbilled work, accounts receivable, cases, furniture and fixtures, correct?

A    Correct.

Q    So we now have the capital account balance also being in lieu of those items, right?

A    Correct.

Q    And if the capital account calculation -- I mean if the capital -- if the income statement that goes into a terminating partner's capital account calculation is prepared in accordance with the tax basis, that won't substitute at all for accounts receivable, because the cash basis doesn't actually account for accounts receivable, right?

Drolet - Redirect                                    215

A    Correct.

Q    However, if the income statement provided to or provides the basis for a terminating partner's liquidating capital account balance is prepared under GAAP, that would substitute for or be in lieu of that departing member's interest in accounts receivable, correct?

A    I guess you could look at it that way, yes.

Q    Is it fair to say these are fairly significant changes between the two agreements?

A    Yes.

Q    Fairly significant economic changes --

A    Absolutely.

Q    -- between the two agreements?

A    Yes.

Q    Okay.

        MR. ROSENTHAL:  If you could give me one moment, your Honor?

        THE COURT:  Take your time.

        (Pause.)

        It's about quarter of 3:00.  Why don't we take a break until 3:00.

        MR. ROSENTHAL:  Okay.

        THE COURT:  And it will give you a chance to find what you need and --

        MR. ROSENTHAL:  That's fine.

Drolet - Redirect                          216

THE COURT:  -- then we'll go until about 4:30; is that agreeable to everyone?

MR. ROSENTHAL:  That's fine with us, your Honor.

THE COURT:  Okay.

MR. KEENEY:  Your Honor, we would consider going longer.  I mean, this is just the first witness.  We could be here for months.

THE COURT:  I don't know what to tell you.

MR. KENNY:  Okay.

THE COURT:  One of you or both of you were optimistic enough to suggest we'd be done with this portion of the case tomorrow, so --

MR. ROSENTHAL:  Yes.

THE COURT:  -- I'm still counting on that.

MR. ROSENTHAL:  Okay.

(Laughter.)

THE COURT:  I don't know what else you have.

MR. ROSENTHAL:  Thank you, your Honor.

THE COURT:  Thank you.

(A recess was taken from 2:43 o'clock p.m. until 3:06 o'clock p.m.)

THE COURT:  Please be seated.  I'm sorry.  I'm trying to get us a little fresh air there.

All righty.  Where were we?

Ms. Drolet, this is your second time back.

Drolet - Redirect                          217

You're still under oath ma'am, all right?

THE WITNESS:  Yes.

All right.  Mr. Rosenthal, do you want to proceed?

BY  MR. ROSENTHAL:

Q   Ms. Drolet, if you could you look at the plaintiff's
exhibit binder, and look at Exhibit 41, and look at
CMST00034, which is Page 3 of Exhibit 41.  If you look at
where it says "Partners Percent Interest, 27.97," do you see
that?

A   Yes.

THE COURT:  All right.  I want to make sure of
something.  41, Page 3.  Got you.  Sorry.

MR. ROSENTHAL:  Yes.

BY MR. ROSENTHAL:

Q   That partner's percentage interest is being applied to
the $6,912,000 figure in this calculation, correct?

A   Correct.

Q   It is not being applied to the top figure on the page,
the $4,994,000 figure, correct?

A   Correct.

Q   All right.  And, so, if this percentage were to change,
the 27.97 percent were to change to 14, it would change -- it
would not change the $4,949,000 figure, correct?

A   Correct.

Q   It's not a retroactive change to the capital account as

of December 31st, 2007, correct?

A    Correct.

Q    The capital account as of December 31st, 2007, remains the same, regardless which percentage interest you apply to the income and loss, right?

A    Correct.

Q    So if you were to change the 28 percent to the 14 percent, what you're doing is changing the allocable share of income or less, correct?

A    Correct.

Q    You are not retroactively changing the capital account amount as of the end of the prior year?

A    That is correct.

Q    Mr. Keeney has showed you some engagement letters that you -- that you had with Cohen Milstein, right?

A    Yes.

Q    And he also showed you these management representation letters, right?

A    Yes.

Q    Okay.  Each and every one of those was signed by one partner, Steve Toll, correct?

A    The ones I looked at, yes.

Q    Okay.  And they were not signed by any of the other partners?

A    Correct.

Drolet - Redirect                          219

Q   Right.

            THE COURT:  I don't know if he signed all of them.

            MR. ROSENTHAL:  Okay.  Well, let's look --

            THE COURT:  He signed some of them.

            MR. ROSENTHAL:  -- let's look back at them, okay?

            THE COURT:  Okay.

            MR. ROSENTHAL:  Okay.

            THE COURT:  I mean, I know some other person signed some of them as I recall.

            MR. ROSENTHAL:  Okay.  That's fine.  Why don't we go back.  I think it's Defendant's Exhibit --

            THE COURT:  I don't know if that matters to you.

            MR. ROSENTHAL:  Well, I might as well clear up the record.

            THE COURT:  Okay.

BY MR. ROSENTHAL:

Q   Defendant's Exhibit 48, starting with 48-A.

A   Okay.

            (Pause.)

Q   And 48-A is one of the representation letters.  If you'd look at the third page, the last page of 48-A?  That's signed by Steve Toll, correct?

A   It is.

Q   Let's go to Exhibit 48-B.  The last page, Page 4.

A   Yes.

Drolet - Redirect                                    220

Q    Also signed by Mr. Toll?

A    Yes.

Q    Go to C.  The last page is Page 3.  Also signed by Mr. Toll, correct?

A    Yes.

Q    Go to 48-D.  The last page also signed by Mr. Toll, correct?

A    Yes.

Q    And 48-E.  The last page --

A    Yes.

Q    -- also signed by Mr. Toll, correct?

A    Yes.

Q    That's only one partner, not all 12 or 13, right?

A    Correct.

Q    Okay.  So at this point the only document that you've seen that describes an accounting method for the firm signed by all the partners is the 2003 operating agreement that describes a GAAP basis method of accounting, correct?

A    Yes.

Q    Okay.  In your experience with Cohen Milstein, when they make amendments to their operating or partnership agreements, they do so in writing, correct?

A    Yes.

Q    Okay.  Let's take a look at Exhibit 2.

        (Pause.)

Drolet - Redirect                              221

The first page of Exhibit 2.  Do you see a third "Whereas" clause?

A    Yes.

Q    Okay.  Can you read that into the record, please?

A    "Whereas the original operating agreement was amended by the first amendment to operating agreement dated as of January 1, 1997, the second amendment to operating agreement dated as of January 1, 1998, the third amendment to operating agreement dated as of January 1, 1999, the fourth amendment to operating agreement dated as of January 1, 2001, the fifth amendment to operating agreement dated as of March 19th, 2001, the sixth amendment to operating agreement dated as of September 1, 2001, and the seventh amendment to operating agreement dated as of January 1, 2001, and."

Q    Thank you.  That indicates that there had been seven amendments to the 1996 partnership agreement, correct?

A    Correct.

Q    And one of the reasons they're coming up with an amended agreement is because of all of those amendments, right?

A    Yes, I -- I assume so.

Q    All right.  Now, I'll ask you to look at the very last page, Page 13 of Exhibit 2.

A    Exhibit 2?

Q    Yes.

          (Pause.)

Drolet - Redirect                                    222

A    Okay.

Q    Okay.  Can you read that Subparagraph G that says "Amendment"?

A    "This agreement may be amended only with the written consent of members owning at least two-thirds of all percentage interest."

Q    To your knowledge, has Cohen Milstein ever amended the provision, Article 2nd D of this operating agreement that requires for the books and records to be kept in accordance with GAAP by a vote of two-thirds of the percentage interests in writing?

A    Not to my knowledge.

Q    Would you turn to Exhibit 52, please?

        THE COURT:  Did Mr. Hausfeld ever ask you to do that when he was involved in the firm?

        THE WITNESS:  To do what?

        THE COURT:  Switch the GAAP method?

        THE WITNESS:  No, no.  No one has.

        I'm sorry, which exhibit?


BY MR. ROSENTHAL:

Q    Exhibit 52, Ms. Drolet.

        (Pause.)

        And this is the e-mail where you're asking for a copy of the confidential agreement entered into between the

Drolet - Redirect                                    223

Hausfeld Group and Cohen Milstein, right?

A    Correct.

Q    Did Mr. Toll ever provide you a copy of that?

A    I did get a copy, yes.

Q    How did he transmit it to you?

A    I believe he e-mailed it to me.  That's my recollection.

Q    You didn't produce that e-mail to us, did you?

A    I did.  I believe I did.

Q    The e-mail where he transmitted the operating -- I mean the confidential agreement to us?

A    I'm pretty sure I gave you the confidential agreement. It should have been in my documents that I gave you.  I had it.

Q    Okay.  Take a look at page -- I'm sorry -- Exhibit 57, please?

        (Pause.)

        And if you take a look at the third paragraph that beings, "Moving back"?

A    Yes.

Q    Can you read the second sentence in that paragraph?  Let me say, this is the e-mail from Mr. Tucker to you responding to your March 6th, 2009, e-mail to him, correct?

A    Correct.

Q    Okay.  And what does he say there --

A    "Furthermore" --

Drolet - Redirect                    224

Q    -- in the second sentence?

A    There?

Q    Yes.

A    "Furthermore, isolating a moment in time is not consistent with standard accounting practices."

Q    Standard accounting practices, right?  Is that he says?

A    That's what he says, yes.

Q    You talked about Mark Matches, a partner at Cohen Milstein, right?

A    Yes.

Q    He's still with the firm, right?

A    Yes.

Q    He did not leave the firm?

A    Correct.

Q    Okay.  Then the last thing.  You mentioned this $5 million in client advances that were written off as of year end 2008?

A    Yes.

Q    Okay.  You determined that those amounts were actually uncollectible going back to the beginning of the prior year, January 1, 2008, correct?

A    I didn't determine that.  The firm determined that and told me that.

Q    Okay.  So the firm determined that these amounts could have been written off prior to January 1, 2008, right?

Drolet - Redirect                                            225

A    Prior to January -- no.  They told me that they were no good as of the beginning of the year.  We didn't discuss anything prior to January 1, '08.

Q    Okay.  So --

A    January 1, '08, this last year, fiscal year?

Q    Yes.

A    As of January 1, '08, I -- I think they were okay.  I was told that they were no good at somewhere at the beginning of the year before July, before October.  I don't know when.  But not prior to '08.  Because if they were no good prior to '08, they wouldn't have been on the 12/31/07 financial statements as an asset.

Q    All right.

A    Are we talking about the 5 million loss that --

Q    Yes.

A    Okay.  That happened as of the year ending 12/31/08.

Q    Right.

A    So they went back some time during that year, January 1, through December 31, 2008, not prior to that.

Q    Okay.  And you looked at the books and records and confirmed that they hadn't gone back prior to that?

A    I didn't confirm it.  The firm tells me at the end of the year which cases are considered, you know, gone, not going to happen.  I mean, it's to their advantage.  They don't want to pay tax on income that they don't have.  And so they look at

Drolet - Redirect                                          226

them very carefully and tell me what shouldn't be in that account any more, and they write off.

Q   Okay.

A   And they do that --

Q   But you made no independent determination of when exactly those advances should have been written up?

A   I don't usually do that, no.

Q   Okay.  It's possible they could have been written off the year before, and they just, for some reason, didn't tell you about it?

A   Well, no.  I do go out of my way to ask them, because I'm preparing reviewed financial statements for them that go to a bank, and I know they're going to a bank, so I go out of my way to drill into them that it's important that they look at every one of those cases and determine which ones are no good.  And they do that at least once a year at my request. I believe from time-to-time they do it on their own.

Q   Okay.  And you're relying on their representation?

A   I am.

        MR. ROSENTHAL:  No further questions.  Thank you very much for your patience.

        THE WITNESS:  Okay.

        MR. ROSENTHAL:  We do have some questions on the air passenger issue, but I'd like to just separate those out.

        THE COURT:  Okay.  Do you have any other questions?

Drolet - Redirect                                227

MR. KEENEY:  No, we don't, your Honor.

THE COURT:  All right.  Do you want to switch on air passenger now?

MR. ROSENTHAL:  Yes.

THE COURT:  Is that what you want to do?

MR. ROSENTHAL:  Sure.

THE COURT:  All right.  Why don't we do that.

(Pause.)

MR. ROSENTHAL:  If Mr. Keeney has questions of Ms. Drolet on this, since they're the ones who are sort of the moving party, maybe he should go first.

MR. KEENEY:  Well, I don't have any questions of Ms. Drolet on that.

MR. ROSENTHAL:  Okay.  Fair enough.

BY MR. ROSENTHAL:

Q   Ms. Drolet, I'm going to detain you only a little bit longer.  If you could turn to Plaintiff's Exhibit 78, please?

(Pause.)

And can you look at Note E on Page 10?

(Pause.)

Can you read where it says, Note E, Investment in CMHT-New York, L.L.P, please, into the record?

A   It says, "On March 1, 2007, the firm established CMHT-New York, L.L.P., the L.L.P., a limited liability partnership formed in the State of New York.  CMHT-NY, L.L.P. is a

Drolet - Redirect                          228

multi-national partnership regulated by the Law Society of England, Wales, with an office located in London, England, for the years ending December 31, 2008, and 2007, Cohen, Milstein, Sellers & Toll, P.L.L.C., recorded income of 100" -- a little typo there -- "of $192,848, and loss of $2,609,309 respectively for the operations of the L.L.P."

Q   Now, you characterized Cohen Milstein's interest in CMHT-New York, L.L.P., as an investment; is that right?

A   I -- I call it that, yes, here --

Q   All right.

A   -- as an investment.

Q   CMHT-New York is a separate legal entity --

A   It is.

Q   -- isn't that right?

A   It is.

Q   Okay.  And if you take a look at Note D above, Investment in the Cochran Firm, D.C., P.L.L.C.?

A   Yes.

Q   Okay.  And Cohen Milstein has an interest in the separate legal entity of CMHT-New York, L.L.P., just like it has an interest in the separate legal entity of the Cochran Firm, D.C., P.L.L.C.; isn't that right?

A   Correct.

Q   The answer's correct?

A   Yes.

Drolet - Redirect                                    229

Q    Okay.  I'll ask you to look at Page 4 of Exhibit 78.  I'm sorry, Page 5.

(Pause.)

And if you take a look under "Other Revenues or Expenses," do you see the line, three lines up from the bottom that says "Income or Loss on Investment in CMHT-New York, L.L.P.?

A    Yes.

Q    Okay.  Why does the investment in that entity come under other revenues or expenses?

A    It's a -- I'm separating it -- we're separating it from the D.C. Cohen Milstein operation, and this is income flowing through directly from a K-1, so those firms both filed U.S. Partnership Returns, Form 1065, and from that they -- those forms produce K-1s for the share of income that goes to wherever the owners are.  And so there are four owners of the Cochran Firm and each of the firms that owns the Cochran Firm get a K-1 with their share of income.  That's what their share is.  And the same thing with the New York, L.L.P. There are, I believe, three -- four owners of the L.L.P., 99 percent Cohen Milstein, and they get a K-1, and that K-1 flows through here, because this is income tax basis.

So that's the income that's being reported on their tax return that is the share that belongs to Cohen Milstein.

Q    Okay.  So CMHT-New York, L.L.P. is a separate entity that

Drolet - Redirect                    230

prepares separate U.S. tax returns for Cohen Milstein,
correct?

A    Yes.

Q    Do you prepare those separate tax returns for CMHT-New
York, L.L.P.?

A    Yes.

Q    Do you prepare one set of tax returns for Cohen Milstein,
right?

A    Yes.

Q    And one set of tax returns for the separately legal
entity CMHT-New York, L.L.P., correct?

A    Yes.

Q    Okay.  And the revenues are expenses -- and expenses of
CMHT-New York, L.L.P., are not treated for tax purposes as
revenues for expenses of Cohen Milstein, correct?

A    The net income, the shear of net income associated with
those entities, Cohen Milstein's portion of it is reflected
here --

Q    Right.  But their --

A    -- for tax purposes.

Q    -- their portion in their investment in the separate
legal entity in CMHT-New York, L.L.P. is --

A    So this is --

Q    -- reflected on their financial statements, meaning Cohen
Milstein's financial statements, right?

Drolet - Redirect                                    231

A    Yes, Cohen Milstein's picking up its share of their revenue or loss.

Q    Right.

A    Okay.

Q    Will you turn back to Page 4?

        (Pause.)

        Do you see where it says, "Revenue, The Income"?

A    Yes.

Q    Okay.  Would the income earned by CMHT-New York, L.L.P. be reflected here on this line, revenue, the income, or would it be reflected on Page 5 under income loss and investment in CMHT-New York, L.L.P.?

A    On Page 5.

Q    All right.  You don't match it up with the income or the fees earned by Cohen Milstein, right?

A    That's correct.

Q    Because they're two separate legal entities, right?

A    Correct.

Q    That file two separate tax returns, right?

A    Correct.

Q    And if the -- if money earned by Cohen Milstein -- CMHT-New York, L.L.P. went directly to Cohen Milstein, without going through CMHT-New York, L.L.P. first, that would be a violation of the law, wouldn't it?

A    Yeah, when it happened.

Drolet - Redirect                                        232

Q    It didn't happen?

A    Right.  It is a little bit more complicated with a New York firm, though.  There is a relationship between the two, and there is -- basically the revenue that the New York firm earned in '08, also shows as an expense here in Cohen Milstein's financials.  They have an arm's length relationship and so any legal fees that they earned based on hours that they're working in the New York, L.L.P, Cohen Milstein was paying them dollar-for-dollar as if they were an unrelated party, and they were doing that in accordance with the transfer pricing rules between international organizations over the, you know, between the U.K. and the U.S.

Q    You said that Cohen Milstein and CMHT-New York, L.L.P. had an arm's length relationship; is that right?

A    Yes.

Q    What do you mean by that?

A    To put it clearly, in this financial statement, Cohen Milstein took a deduction for fees that it paid for the New York Office to work on cases of its, and so -- and this is all done in accordance with the laws required for transfer pricing between countries.  The reason being is that the I.R.S. and the Revenue Service in the U.K. want to make sure they get their share of the revenues, and so you have to put something in place to account for your income or expense.

Drolet - Redirect                                    233

So, in this case, the London firm had none of its own cases.  The U.S. firm had the cases, and the London firm was working on them, or I should say, if the London firm had their own cases, the London firm was being financed by the D.C. Office.  And so in order to do this correctly, it was set up as an arm's length transaction between the two.

So any hours that they worked, the London lawyers worked in the U.K., they got paid arm's length for an hourly rate for the amounts they worked, and the U.K. -- I mean the U.S. Office was paying for that.  So we have an expense here for that.

Q   I'm sorry.  I hope I'm --

A   I know it's complicated.

Q   -- getting this straight.

But the idea is that the fees earned by CMHT-New York, L.L.P. go to them, correct?

A   Yes.

Q   And then they're reimbursed for those by Cohen Milstein --

A   Well, but the --

Q   -- in the United States.

A   -- fees that they were earning, were actually being paid to them by Cohen Milstein.  So, in essence, the London firm had a big loss in 2008.

If you look at 2007, you see a big loss there, that

Drolet - Redirect                                    234

was the, you know, they started out, they didn't have any income, they had a big loss.  In 2008, they also had a loss.  It's just that it shows income because all the hours that they worked on cases, regardless if they were paid for by -- by the client, Cohen Milstein was paying them for those hours.  So they were getting paid a fair wage, a lawyer's wage, which was probably four or $500 an hour, for everything they worked on in London, and Cohen Milstein paid that, and then Cohen Milstein took a deduction for it on their tax return because it was treated as if they were hiring outside counsel.

Q   Hiring outside counsel?

A   Right.

Q   That's how it's treated for tax purposes?

A   For tax purposes there has to be some kind of an agreed-upon arrangement under the transfer pricing rules, so that it's considered fair.  So that the income that's earned from either place ends up in the right place, because the countries will fight over it if you don't do it correctly.

Q   Okay.

A   So I guess my point is, the firm did not have any revenue that year from -- other than from Cohen Milstein, so they actually would have had a loss, but it doesn't show up as a loss, because they recorded the income that Cohen Milstein paid them to work on the cases, and then they paid it out as

Drolet - Redirect                    235

expenses to pay the salaries and the rent and the operation costs for the New York Office.

The net effect of that was 192,000 approximately, or 193,000, which they filed on an income tax return, and it flowed through to Cohen Milstein.  But Cohen Milstein, in their expenses within their Page 4 here, have a big expense for paying out fees to the London Office to keep it alive.  So that's how I'd explain it.  I know it's complicated.

Q   Okay.  I guess somebody's got to know how to do all these complicated things, and thankfully you're one of the ones who knows how to do it.

Would you look at Page 14 of Exhibit 78?

(Pause.)

And under "Note L.  Subsequent Events Continued."  Can you read the very last paragraph out loud, please?

A   "On January 15th, 2009, the firm entered into an agreement to sell all of its interest in CMHT-N.Y., L.L.P. which is the entity that operated the firm's offices in London, so the non-equity partners of CMHT-N.Y., L.L.P.  The agreement calls for certain payments by and between the parties relating to future revenues."

MR. ROSENTHAL:  One moment, your Honor.

THE COURT:  Okay.

(Pause.)

MR. ROSENTHAL:  Thank you, Ms. Drolet.  I appreciate

Drolet - Redirect                              236

your patience.

THE COURT:  All right.  Do you have any questions, Mr. Keeney?

MR. KEENEY:  We have absolutely no questions.  Can we suggest that we can send Ms. Drolet home?

MR. ROSENTHAL:  That's fine by us, your Honor.

MR. KEENEY:  Thank you, Ms. Drolet.

THE COURT:  Do you want to go home?

THE WITNESS:  I'd love to.

(Laughter.)

THE COURT:  Thank you for coming down, ma'am.

THE WITNESS:  Okay.  Thank you.

No, I don't want to go home if you're going to call me back tomorrow?

MR. ROSENTHAL:  No.

MR. KEENEY:  No.

THE COURT:  No, I think the lawyers have been very thorough in their questioning.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Let me just Mr. Keeney and Mr. Rosenthal, is there other people, other than Ms. Drolet, who are going to give testimony that sheds light on Ms. Drolet's role as an arbitrator?

MR. ROSENTHAL:  Your Honor, actually at this point,

237

we would renew the motion that we filed the other day to preclude any defense based on the notion that she acted as the final decision-maker. We don't have any other evidence, but if they're going to put up Mr. Toll, or somebody else, we'd obviously cross-examine those witnesses, if your Honor were not to make the ruling that we're asking you to make now.

MR. KEENEY: Well, your Honor, there's no question that Mr. Toll is going to testify. His name has been mentioned much in vein today by Ms. Drolet and other people. He's going testify about what happened. I think that part and parcel of the determination that this Court has to make with respect to Ms. Drolet, and I think you really ought to wait until you hear from all the witnesses who were mentioned, but, you know, I think you certainly have to wait for Mr. Toll.

THE COURT: Well, would it make sense then to have Mr. Toll testify now, because I think the issue -- I don't know if my resolution of that issue will streamline things, which I know both of you are anxious to do, if it's... it seems that Ms. Drolet's testimony on the point is fairly uncontested.

Now, if you've got other evidence you want me to hear on that, I'll be happy to do it. Do you want to take a minute and --

238

MR. KEENEY: We have no problem with Mr. Toll testifying right now, your Honor. He wasn't on their list, so, you know, it's actually putting somewhat of a burden on them, because that wasn't the order --

THE COURT: I don't think Mr. Rosenthal would mind ; would you?

MR. ROSENTHAL: I wouldn't mind. Frankly, I don't know how much Mr. Toll has to offer about what Ms. Drolet herself thought she was doing or doing --

THE COURT: Yeah, I would only have him testify just on that point, on her role on Article 10th.

MR. KEENEY: Sure.

THE COURT: Do you want to do that?

MR. ROSENTHAL: I understand. All I'm saying is that I frankly don't know how much Mr. Toll really has to offer on that issue given that Ms. Drolet was here on the stand and she testified what she did and what she thought she was doing and about all the communications that occurred.

THE COURT: No, I understand, but Mr. Keeney seems to think there's something else I should hear on that before I make a decision. And what I would like to do ideally is give you that decision today, because I think it might help frame our evidence going forward.

MR. ROSENTHAL: Okay.

THE COURT: Are you agreeable with that, Mr. Keeney?

MR. KEENEY:  Yes, we are, your Honor.

THE COURT:  Okay.  How long do you think this will take?  I don't want to hold up your other witnesses.

MR. ROSENTHAL:  Well, I'm afraid at this point Mr. Lewis, who needs to go to New Orleans tonight, but he'll be back tomorrow night, so we can recall him on Wednesday and he's not going to be a very long witness --

THE COURT:  Maybe we'll still get to him, I don't know how long Mr. Toll is going to be on the stand.

MR. ROSENTHAL:  Well, I think we're actually going to go with Mr. Davis next, but okay, that's fine, we'll --

THE COURT:  Sorry.

MR. ROSENTHAL:  -- we'll do what we can, we'll do what we can.

THE COURT:  All right.  And you don't have to ask him about all the areas other than this one point, Mr. Keeney.

(Pause.)

MR. KEENEY:  And I assume -- I'm calling Mr. Toll.

THE COURT:  Yes.

MR. KEENEY:  Yes.

THE COURT:  All right.  Mr. Toll?

MR. KEENEY:  Okay.

THE COURT:  I know you've been waiting patiently. If you want to recall him later on other points other than

240

this, that's fine.

MR. KEENEY: And we will have to, your Honor. What I'm doing now is I'm just doing in my head the redacted, very short version.

THE COURT: Okay.

THE DEPUTY CLERK: Please raise your right hand.

STEVEN TOLL, Defendant's Witness, Sworn.

THE DEPUTY CLERK: State your full name and spell your last name for the record.

THE WITNESS: Steven Toll, T-o-l-l.

DIRECT EXAMINATION

BY MR. KEENEY:

Q   Mr. Toll, do you have in front of you two sets of binders, one marked a Cohen Milstein binders and one marked Michael Hausfeld binders?

A   I do.

Q   Okay. I'm going to start where I started with Ms. Drolet and could you please turn to Defendant's Exhibit 4 in the binder marked Cohen Milstein Exhibits?

A   I have it.

Q   Okay. And my question to you is, did Ms. Drolet bring Defendant's Exhibit 4 to your attention at or about the time she sent the e-mail to Stef Tucker?

A   My memory is she did, although if there is an exhibit that shows that -- an e-mail that I be more comfortable, but

Toll - Direct                          241

I'm sure -- I think she sent me an e-mail, a copy of what she sent.

Q   Did you have an understanding why Ms. Drolet was receiving voice mails from Stef Tucker?

A   Yes.

MR. ROSENTHAL:  Objection, your Honor.

THE COURT:  What's the objection?

MR. ROSENTHAL:  To the extent that the answer is going to rely on hearsay.

MR. KEENEY:  It's his understanding, your Honor.

MR. ROSENTHAL:  It's the foundation of --

THE COURT:  Oh, I understand, but --

MR. KEENEY:   Then I can ask the basis for the understanding.

THE COURT:  All right, why don't you do that.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q   You already said you understand -- what is the basis for your understanding?

A   Well, I was familiar with the partnership agreement or the operating agreement and how it reads and what happens if you have a disagreement with a partner on the capital balance, and here we obviously had a disagreement, which is why Mr. Tucker was calling.

Q   And when you refer to the operating agreement, are you

Toll - Direct                                    242

referring to Article 10, Paragraph A?

A   Yes, I believe that -- without looking -- well, here it is --

Q   And if you could put that document in front of you, I believe it's Defendant's Exhibit 3?

A   Yes, I see it.  Yes, it's 10-A.

Q   And that was the portion of the operating agreement that you were referring to?

A   Yes.

Q   And if you could turn to Defendant's Exhibit 1?

A   I see it.

Q   Were you aware that the capital cost -- excuse me, the capital balance calculations for Mike Hausfeld and Rich Lewis were sent to their counsel on February 20th by this transmittal letter in Defendant's Exhibit 1?

A   Yes, I was told this or received a copy of the e-mail.

Q   Okay.  And did you have an understanding that Stef Tucker's e-mail -- or, excuse me, that Stef Tucker's voice mail, which we started discussing at Defendant's Exhibit 4, was in response to what had been sent to the attorneys at Venable in DX-1?

A   I mean, it was clear to me that was their response, they did not agree with the number that we had given.

Q   I'd like to now turn your attention to Defendant's Exhibit 5.  Would you put that in front of you?

Toll - Direct                                    243

A    I see it.

Q    And, starting with the top e-mail, is this an e-mail that you received from Pat Drolet?

A    Yes.

Q    Okay.  Now, moving to the middle e-mail, is the middle e-mail an e-mail that Pat Drolet received from Stef Tucker?

A    Yes, the March 2nd e-mail, yes.

Q    You've read before today the e-mail to Pat Drolet from Stef Tucker, is that correct?

A    Yes, all of them, there were a couple of them.

Q    Okay.  And did you read before today the second paragraph of Stef Tucker's e-mail to Ms. Drolet of March 2nd, 2009?

A    I did.

Q    Okay.  And did you understand that Ms. Drolet was going to be preparing a response to Stef Tucker's e-mail?

A    Yes.

Q    And did you understand from this e-mail, which we have marked as Defendant's Exhibit 5, the top one, that she was seeking some information from you?

A    Yes.

Q    And did you subsequently have a discussion with Patricia Drolet about the information that she was requesting from you?

A    I did.

Q    And what do you recall about that discussion?

Toll - Direct                                    244

A    Uh, she asked me whether we had anything on retroactivity, whether it was of an agreement in writing, and I told her no.  And she said, well, what about this e-mail from Stef Tucker where he's raising retroactivity.  And I told her, we had discussed it at the very end of the Compensation Committee meeting that it would be retroactive, but it would have nothing to do with, you know, capital account determination or anything else, it was -- the retroactivity was put into place for an entirely different reason.

Q    When in her e-mail -- mark this Defendant's Exhibit 5 -- she asked about a writing, did you discuss in your conversation with her the type of writing that she was looking for?

A    Yes.  She was asking for -- she asked specifically whether we had amended the partnership agreement, because she thought that was -- she said, you know, if you change the capital account retroactive, did you change the partnership agreement?  I think that's the only way you can do it.  And I said, no, we didn't.

Q    Directing your attention now to the next e-mail, which would be Defendant's Exhibit 6, did you receive this e-mail from Patricia Drolet requesting a copy of the signed agreement with Michael Rich and any other partners who were left?

Toll - Direct                                                245

A    Yes, I did.

Q    And did you arrange to get that information to her?

A    Yes, I did.

Q    Directing your attention to Defendant's Exhibit 7, did you have an opportunity to review Patricia Drolet's March 6th, 2009 response to Stef Tucker before she sent it?

A    Yes, she sent it to me first.

Q    When you received it, did it reflect her words or your words?

A    It's completely her words.

Q    Did you suggest a cosmetic change?

A    There was one word in there, it was just not a substantive change and I just can't remember what it was, but the --

Q    Do you recall if she agreed with it?

A    She did agree with it.

Q    After Patricia Drolet received your comments, are you aware of whether she sent an e-mail on March 6th, 2009 to Stef Tucker?

A    Yes, I believe she did.

Q    And are you aware that in that e-mail she discussed his suggestion that the calculation should be pro rata?

A    Yes, I see the e-mail, it's part of Exhibit 8, and I remember reading that.

Q    And that's in Paragraph 3 of that e-mail, right?

Toll - Direct                                    246

A    Correct.

Q    And in Paragraph 3 of Pat Drolet's e-mail back to Stef Tucker did she agree or disagree with Stef Tucker that pro rata calculations should be used?

A    She disagreed.  And, again, it was my understanding under the agreement that's what was supposed to happen.  If you can't agree with them, it goes to the independent accountant and the determination of the accountant is final and binding, and that's what I thought she had just made.

Q    Okay.  Well, now let's focus on the fourth paragraph of her e-mail.  Did you understand that she was replying to Stef Tucker's objection with respect to retroactivity and the calculation of the 2008 percentage to be applied?

A    Yes.

Q    Did you understand whether she was agreeing or disagreeing with Stef Tucker's point?

A    Yes, she was disagreeing, I understood.

Q    And did you understand in what context she was disagreeing?

A    I'm not sure what you mean by what context.

Q    Why was she writing back to Stef Tucker at all?

A    Oh, again, it was my understanding that she was, you know, filling the role that the partnership agreement said she had to fill, that there was a disagreement; the balance we had forwarded them to February 20 they obviously disagreed

Toll - Direct                                    247

with, they voiced their objections through their counsel and it was going, and it was going to Pat for a determination and she disagreed with them.

Q    And because Pat disagreed with them, did you understand that no changes had to be made in the calculation?

        MR. ROSENTHAL:  Objection, your Honor, he's asking him what he understands based on what Ms. Drolet is doing.

        THE COURT:  All right, I'll sustain it.

        MR. KEENEY:  Okay.

        MR. ROSENTHAL:  In the whole line of questions, I've just kept my mouth shut.

BY MR. KEENEY:

Q    Based on your understanding of what Article 10th-A requires, was Cohen Milstein's accountant replying to objections by Michael Hausfeld's and Rich Lewis' attorney?

        MR. ROSENTHAL:  Objection.  His understanding is entirely irrelevant to what Ms. Drolet was doing or thinks she was doing.

        MR. KEENEY:  Except he's having the conversations with Ms. Drolet at the time.

        THE COURT:  All right, I'll allow it.

        THE WITNESS:  I'm trying to remember the question.

        MR. KEENEY:  Yes, you can answer.

        THE COURT:  Based on 10th-A, what did you understand her to be doing when she was talking to Tucker?

Toll - Direct                                    248

THE WITNESS:  Okay.  My understanding -- and just -- it was based on looking at the paragraph, you know, it said, we give the statement, the company gives the statement to the terminated member, that was done, since we were in a litigation mode, an almost-litigation mode, it was done through counsel on February 20.  Try to agree on it, there was obviously no agreement coming, all we got was an objection, and the next paragraph of -- the next sentence of Paragraph 10 says, if they cannot agree, which is where we were, within 30 days after the termination date -- obviously, it was late -- the amount of the balance should be determined by the independent accountant.  And it was clear as a bell to me that that's what Pat Drolet was now doing was she was making the determination based on the disagreement between the parties.

BY MR. KEENEY:

Q   And did you understand from Article 10th-A that there were certain restrictions on what information could be considered or corrected by the accountant in making her Article 10th-A decision on objections?

A   Well, I knew the -- again, the -- I don't know if limitations is the right word or maybe it is, the instructions of the partnership agreement, the last sentence of 10-A, which says, "The accountants shall accept as correct the financial statements prepared for the company prior to

Toll - Direct                                                    249

the termination date and shall make no audit of the books and records for the periods covered by such financial statements."

Q    You're aware there was a subsequent e-mail from Stef Tucker of March 6th back to Pat Drolet marked as Defendant's Exhibit 9?

A    Yes.

Q    And that was then sent to you by Pat Drolet also, right?

A    Yes, it was.

Q    Did you have any follow-up conversation with Pat Drolet after the transmittal to you of Stef Tucker's e-mail marked as Defendant's Exhibit 9?

A    I seem to remember she sent an e-mail to me, I think the next day, I'm sure it was referred to in testimony, basically saying, I got this e-mail, I don't think it needs a response, or something like that.  And I don't remember whether we -- she called me and she said the same thing and I said, if you don't feel you have to respond, don't respond -- or we didn't have a call, I'm not certain, but if we did, that was all it would have been.

Q    And did you have any understanding whether that concluded her role in the Article 10th-A process?

          MR. ROSENTHAL:  Same objection, your Honor.

          THE COURT:  Well, I'll let him testify about what he believed and you can challenge him on that.

Toll - Direct                               250

THE WITNESS:  No, I did understand that that -- you know, it was now finished, that she had made the final determination on the dispute that they had raised.

BY MR. KEENEY:

Q   May I ask you to speculate, if she had agreed with Stef Tucker and agreed with him on pro rata and recommended to Cohen Milstein that pro rata should be used, would Cohen Milstein have complied?

MR. ROSENTHAL:  Objection, it calls for speculation.

MR. KEENEY:  I think he can answer that one, your Honor.

THE COURT:  Yes, I'll allow it.  Go ahead.

THE WITNESS:  Well, it's not a question of whether we would have complied.  If she had said it was pro rata, then it's pro rata.  I mean, the partnership agreement says she makes the final decision whether we like it or not.  So, I think, I mean, in a roundabout way, the answer is yes, if she said pro rata, we would have complied, because that's what the agreement said.

BY MR. KEENEY:

Q   and would your answer be the same if she had decided that Mr. Tucker was right about retroactivity?

A   Yes.

Q   Could you turn to Defendant's Exhibit 39 in the Defendant's Exhibit binder?

Toll - Direct                                    251

A    I have it.

Q    Are you aware of the discovery process that was conducted in this matter that's now resulted in this hearing before this Court?

A    Yes, I'm familiar with it.

Q    Are you aware that documents that were produced by Cohen Milstein to Mr. Hausfeld or Mr. Lewis bore Bates stamp numbers?

A    That's my understanding.

Q    And are you aware that documents produced by Cohen Milstein that bore Bates stamp numbers bore Bates stamp numbers of the type CMST?

A    That's my understanding.

Q    Are you aware that Michael Hausfeld and Richard Lewis produced documents to Cohen Milstein in response to document requests?

          MR. ROSENTHAL:  Objection, it calls for hearsay.

          THE WITNESS:  I understood they did --

          THE COURT:  Hold on, hold on.  Whether he was aware that the documents were produced?

          MR. KEENEY:  Yes.

          MR. ROSENTHAL:  What's the basis of his --

          THE COURT:  Do you have any firsthand knowledge?

          THE WITNESS:  No.

          MR. KEENEY:  Let me ask a better question first.

Toll - Direct                                    252

THE COURT:  All right, I'll sustain it --

MR. ROSENTHAL:  The answer was no, your Honor.

THE COURT:  -- I'll sustain it then.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q    Let me ask this:  Were you aware that document requests were served on Michael Hausfeld and Richard Lewis?

A    Yes.

Q    Did you review drafts of those document requests before they were sent?

A    I likely did.

Q    Did you review the written responses -- not the attached documents, we're taking it step-by-step -- the written responses and objections filed by Michael Hausfeld and Richard Lewis to the document requests that were served on them by Cohen Milstein?

A    I was forwarded a copy, yes, I did look at them.

Q    Were you aware that they also had produced documents?

A    I understood that to be the case.

Q    Do you have an understanding that at all times Michael Hausfeld had received a copy of Defendant's Exhibit 39?

A    Uh, my understanding is yes, because I think we handed it out individually to all the partners that day, is my recollection, that were in DC.

Q    Right.  And just using their version, it's addressed to

Toll - Direct                                253

one, two, three, four, five, six, seven, eight, nine, ten, 11, 12 people, right?

(Pause.)

A    Yes.

Q    And it's from SJT, who is you, right?

A    Correct.

Q    And, turning to the top line, the people who were getting this, HEM is Herb Milstein, right?

A    Correct.

Q    MDH is Michael Hausfeld?

A    Yes.

Q    LMM is Lisa Mosaic (ph.)?

A    Yes.

Q    ANF is Andy Friedman (ph.)?

A    Yes.

Q    RSL is Rich Lewis?

A    Yes.

Q    Do you have any reason to believe that Mr. Hausfeld and Mr. Lewis did not receive their copies on or about November 5th?

MR. ROSENTHAL:  Objection, it calls for speculation, there's no foundation.

THE COURT:  Well, I don't know, is this even an issue in doubt?  Are you suggesting Mr. Hausfeld didn't have the document then?  Why are we going through this exercise?

Toll - Direct                                254

I'm not sure.

MR. KEENEY:  We're going through this exercise, your Honor, because we have gotten very evasive answers with respect to whether he had this document.  So, we are putting in a different form of --

THE COURT:  All right.  Well, not today you haven't.

MR. KEENEY:  Oh, no, no, no, through the entire discovery process, your Honor.

THE COURT:  What does this have to do with the issue of whether -- the only issue I'm hearing testimony on at this point in the proceeding is whether Ms. Drolet was functioning as an arbitrator under the DC Arbitration Act.

MR. KEENEY:  Exactly.  And the issue it goes to, your Honor, is Ms. Drolet's testimony with respect to whether she would be functioning as an arbitrator differently if she had been given this document and that goes to who had it and --

THE COURT:  Well, they both had it.

MR. KEENEY:  Exactly, your Honor, that's all I'm asking him to say --

THE COURT:  Okay, everybody had it.

MR. KEENEY:  -- I agree with that.


THE COURT:  We'll stipulate to that, right?

MR. KEENEY:  That's the point.

Toll - Direct                                255

MR. ROSENTHAL:  We will stipulate to that, your Honor --

MR. KEENEY:  Okay.

MR. ROSENTHAL:  -- everybody had it.

MR. KEENEY:  We have no further questions, your Honor.

THE COURT:  All right.  Any cross?

MR. ROSENTHAL:  Just a few, your Honor.

THE COURT:  Take your time.

CROSS-EXAMINATION

BY MR. ROSENTHAL:

Q   Mr. Toll, you never informed Pat Drolet that she was acting as a final decision maker with respect to the capital accounts matter, did you?

A   I didn't have that kind of discussion with her, no.

Q   You never told her that she was acting under Article 10 of the CMHT operating agreement, did you?

A   I don't -- in my conversations with her, I do believe we talked about Article 10, because --

THE COURT:  No, the question he asked you was -- Mr. Toll was, did you tell her that you are now functioning under Article 10 -- Article 10th of the operating agreement, 10th-A?  Did you say, Pat, you're now wearing a different hat, you're Article 10th-A?

THE WITNESS:  Yeah, I don't know if I had that

Toll - Cross                                256

conversation with her.

THE COURT:  Okay.

BY MR. ROSENTHAL:

Q    Take a look at Defendant's Exhibit 5.

(Pause.)

Q    The top e-mail is an e-mail from Ms. Drolet to you dated Monday, March 2nd, 2009, correct?

A    Yes.

Q    And Ms. Drolet asks specifically, "Was the retroactivity issue ever discussed with Michael or put into writing?" Correct?

A    Yes.

Q    You never provided her a written document, correct?

A    I did not provide her a written document.

Q    Please turn to Plaintiff's 68.

A    Plaintiff's 68.

(Pause.)

A    Yes.

Q    The blow-up of Plaintiff's 68 is right here in front of you on this easel, right?

A    Right.

Q    This document says, "Attached is a chart setting forth the final equity partners' percentage interest in the firm for 2008, approved by the Compensation Committee, retroactive to the beginning of 2008 and effective immediately," correct?

Toll - Cross                                    257

A    I see it, yes.

Q    You did not provide this document to Ms. Drolet when she asked you about it on March 2nd, did you?

A    I didn't ask her about this.  I told her -- she asked me if there was a document in writing that amended the partnership agreement and I told her no.  I told her we talked retroactivity and it didn't relate to the capital account calculation.  This document didn't even enter my mind when talking to Pat.  This was simply the document that told all the equity partners what we did on that day, it was not an amendment to the partnership agreement, it wasn't meant to change the capital account; it didn't even enter my mind when talking to Pat when she asked me is there some document amending the partnership agreement.

Q    My specific question to you relates to what is written in Defendant's Exhibit 5.  She asks for anything put --

        THE COURT:  Yes, let him get to it, let him get to it.

        THE WITNESS:  I see it, I see it.

BY MR. ROSENTHAL:

Q    She asks for anything put into writing --

A    Yeah, but you don't --

Q    -- regarding the retroactivity of the percentage interest of terminations by the Compensation Committee, right?

A    She asked that, but you have to understand she called me

Toll - Cross                                258

and we spoke about it, so I -- then she fleshed out what she was asking for. So, I was -- the phone call that we had was not, is there any memo anywhere in the file that said you did this. I told her on the phone call that we talked about retroactivity at the end of the meeting and it's probably in my notes of the meeting, which it is, and I said it wasn't relevant to the capital account issue. And she said, that's fine, I just wanted to see if you amended the partnership agreement.

Q    Did you mention this document to her?

A    No, it was not even in my head at the time. I didn't even remember, to tell the truth, what was in there.

Q    You forgot about the document?

A    Yes, I did.

Q    This is the document that memorialized the decision that facilitated Michael Hausfeld's expulsion from the firm, isn't it?

A    No. The document -- we had a meeting -- all that document did was say the same thing we had said orally at the meeting and the Compensation Committee, which is what I told Pat on the phone.

Q    Which is Michael's percentage interest is down 14 percent, right?

A    I don't know if I did the percentage number, but she was asking about retroactivity at this point, but, yes, that's

Toll - Cross                                    259

what happened.

Q   This document that memorialized the decision to reduce Michael's percentage interest, effective immediately and retroactively to the beginning of 2008, 14 percent, right?

A   That is correct.

Q   And you forgot about this document when you were talking to Ms. Drolet and she was asking for something in writing regarding retroactivity?

A   I forgot about it because she only asked me in the phone call about documents that amended the partnership agreement. I told her I had notes that said we talked about retroactivity, I didn't remember this memo that I had written three or four months ago that we actually had it, but I told her it's in writing in my notes, and she said, well, that's not what I need. I mean, is there something that amended the agreement? I said, no, there's nothing.

MR. ROSENTHAL:  We'll get back to this issue when we cross-examine --

THE COURT:  Okay.

MR. ROSENTHAL:  Thank you.

THE COURT:  Anything further?

MR. ROSENTHAL:  Nothing further.

THE COURT:  All right.  Any --

MR. KEENEY:  Not on this issue, your Honor.

THE COURT:  All right.  Thank you, Mr. Toll, you can

Toll - Cross                                     260

step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused.)

THE COURT:  All right.  I'm prepared to give you my thoughts on that arbitration issue, if you want to do that now?

MR. ROSENTHAL:  That's fine with us, your Honor.

MR. KEENEY:  Fine with us, your Honor.

THE COURT:  All right.  After hearing the testimony of Mr. Toll and Ms. Drolet, and in reviewing the documents, specifically the operating agreement, there's no doubt in my mind that the parties when they drafted this document contemplated that Ms. Drolet would be functioning as an arbitrator, that's what they agreed to.  And I read the cases you gave me; I read the Booker case from Mr. Rosenthal and the Bolten, Moran and 2200 M Street cases from Mr. Keeney.

The problem, as I hear the testimony, and I'm going to make a finding that the procedures and the process that was contemplated by Mr. Hausfeld and Mr. Lewis and the firm simply weren't followed; that Ms. Drolet did not function as an arbitrator under District of Columbia law which, as I understand it, requires some type of quasi-judicial dispute-resolution process.  In one of the cases, I forget which one, 2200 M Street, I believe, talks about the fact that they -- you even need a transcript, something for the appellate court

261

to review, the rationale for the arbitrator's decision and what the arbitrator actually did to reach the dispute-resolution process.  It contemplates someone who is neutral, someone who is independent.  Ms. Drolet, by her own testimony, acknowledged very candidly that she was functioning on behalf of her client, which was the law firm, and that she had ex parte conversations with Mr. Toll and that she was sharing with Mr. Toll Mr. Tucker's questions and Mr. Tucker's inquiries and asking Mr. Toll for guidance as to what the appropriate response she should make is.  In fact, before she gave Mr. Tucker a response, she checked with Mr. Toll; not that Mr. Toll did anything with it, but I don't think that's what an arbitrator would have done.

I think Ms. Drolet's testimony -- and I found her to be extremely credible and candid -- by her own testimony, she did not view herself as function in a decision-making role in this process.  And I think part of the problem may be, if you read Article 10th-A, it seems to contemplate a role pre-dispute and post-dispute, and I think those lines were merged here in this particular case.  Ms. Drolet, my recollection of her testimony was she was simply checking, making calculations and giving advice to her client.  She was specifically asked whether she perceived herself as acting in the role of an umpire or an arbitrator under Article 10th and my recollection of her testimony is that she said she never

262

contemplated that; I mean, she did not perceive herself as acting in that role.  Did she -- was aware of the existence of this, but I just don't think the process was followed through for her to have placed herself in that position.

And, finally, the fact that, although I know both parties had Exhibit 68, the fact that she was so troubled by the existence and the discovery of that document casts serious doubt on whether she was actually acting in some type of dispute-resolution rule, since she seemed very eager to punt the whole issue to me, which is fine, I'm perfectly willing to decide it when the time comes, but that suggests to me that Pat Drolet did not hear all the evidence, consider all the arguments, do her own kind of investigation and research and make a neutral decision.  I mean, she talked about this being confounding or -- what was the word she used?  She was confounded by it, she found it to be a difficult question whether this retroactivity provision which reduced the partnership interest came into play, and she couldn't really explain how that would have impacted the calculation, because I just don't think she dug into it enough, and that's something -- if this was a true arbitration-type process as contemplated by DC law that she would have done.

So, where does that leave us in terms of the law?  What law are we applying now, basic breach-of-contract

263

principles --

MR. ROSENTHAL:  Yes, your Honor, I think it's --

THE COURT:  -- under DC law?

MR. ROSENTHAL:  Correct, I think that's right, breach-of-contract principles and, to the extent that we've got other claims, it involves -- I guess breach of fiduciary duty of good faith and fair dealing is also a contract principle, that's also DC law.

THE COURT:  All right.  So --

MR. ROSENTHAL:  We're under DC law and I think, with respect to the accounting matters, I think that you're in the position of making a de novo determination about what the correct accounting is.

THE COURT:  All right.

MR. ROSENTHAL:  Which I know is not a position that you relish, but I think that's where we are, your Honor.

THE COURT:  Do you agree with that, Mr. Keeney?

MR. KEENEY:  I agree with the part -- I certainly agree we're under DC law, no question about that --

THE COURT:  Well, all right.

MR. KEENEY:  -- that's the easy part.  Second, we are under contract provisions, but I'm not sure we're dealing with bad faith, et cetera, et cetera.  I mean, to the extent that the independent accountant as called for in Article 10th-A does not do her job as she now looks back at it,

264

thinks she was doing something else, that's not anybody's bad faith or good faith, that's just a screw-up --

THE COURT: I agree with that. I don't think it was done in bad faith, I just -- I think nobody -- this had probably never been done before at the firm and nobody really knew --

MR. KEENEY: Right.

THE COURT: -- how to do it.

MR. KEENEY: Right. So, now the question is, what do we do? I'm not quite sure, your Honor, that substituting a de novo review by this Court, even pursuant to the settlement agreement, actually complies with the contracts. I do agree we're into contract interpretation now instead of administrative deference and --

THE COURT: Well, it seems like -- doesn't it seem as though, since Ms. Drolet didn't do Article 10th-A, that I have to do it?

MR. KEENEY: Not necessarily, your Honor.

THE COURT: So, who -- you guys can't agree on how the capital account was computed, so doesn't somebody have to make a finding -- a final and binding determination of whether the law firm accountants did it right?

MR. KEENEY: Yes, your Honor. And we would actually suggest that Petra Light is not the only law firm accountant there, she has other people, the process can be streamlined.

265

In other words, it's a remand situation, but it doesn't go to Petra Light, because she had her one chance and, you know, as this Court correctly observed, you were unpersuaded that she had acted correctly in the role or that she understood her role.  There are other people at her firm.  It doesn't limit in the contract to a particular person, it's the independent accountants, plural, and there are other people who can do it.  I don't --

THE COURT:  Well, I don't think I agree with that.  I don't think we're going to send this back to Petra Light's firm to have somebody in the office next door to do this.

MR. KEENEY:  Okay.  Well, then the next alternative, your Honor, is another independent accountant firm is hired by Cohen Milstein and the process is done correctly.

THE COURT:  But then -- so then we're going to have to bring all these witnesses in and do that again for them, if you're going to do --

MR. KEENEY:  Well, I think --

THE COURT:  Aren't we essentially -- what this has devolved into now is an arbitration --

MR. KEENEY:  No, your Honor --

THE COURT:  -- in one sense?

MR. KEENEY:  -- because I think that is inconsistent with the contract; I mean, I think that just breaches the contract.  This is not what the contract provides and,

266

therefore, I think what you try to do is, like you do in the trust-and-estates fields where, you know, the intent of the parties can't be met, you try to get as close as you can, and I think the closest way you get there is a remand to a different accountant who does it right and to do it according to the time frames.  And frankly, your Honor, the time frame that was being proposed with respect to the post-trial briefing is fairly leisurely.  Keep in mind, the real time frames that are in the contract were 30-day time frames, that can be -- that fairly reads reasonably and quickly, and then your Honor has a chance of hearing a second accountant, who probably will not make the same impression on your Honor that Ms. Drolet did.  But I throw that out just --

THE COURT:  Oh, I thought she made a very favorable impression --

MR. KEENEY:  Oh, absolutely, your Honor.

THE COURT:  -- I thought she was very earnest and very conscientious, she seems extremely competent and candid.

MR. KEENEY:  Right.  Yes, but your Honor rejected her conclusions, and I understand why, I heard what you said, your Honor, but --

THE COURT:  No, I didn't reject her conclusions, I just said that the conclusions she reached were not in the in the role as an arbitrator.

MR. KEENEY:  Right, and I heard that too, your

267

Honor, but, you know, it seems --

THE COURT:  So, it's just I'm not going to give her the deference that you wanted me to give her.

MR. KEENEY:  Understood, but you reached the conclusion.  So, I think we're in a breach-of-contract situation in which they're alleging there's a breach.  Of course, the breaches are late information getting to them and the fact that ultimately, by December 31, 2009, we have to have some sort of calculation of how much capital is due, so we can pay their half that's due then, but I don't see that it's an emergency that requires this Court's action to take upon itself the contract issues here without first inserting one more attempt to have an accountant do it from the get-go.

MR. ROSENTHAL:  I think the simple answer to that, your Honor, is take a look at Paragraph 18-C of our settlement agreement.  Our Paragraph -- I think it's 18-C of our settlement agreement which says that it is up to your Honor to decide disputes that arise under the settlement agreement between the parties.  There is now a dispute over the return of capital between the parties, you have decided under the operating agreement that Ms. Drolet is no longer somebody that must be deferred to.  And so I think this is squarely now in your Honor's lap to make a determination about what the correct numbers are.  That's one issue.  I mean, there's also an issue about, you know, whether or not

268

my clients were -- you know, whether CMST failed to provide my clients with the requisite information or the information they needed during the course of the settlement negotiations, which is a separate issue that's also before your Honor, and I think, for efficiency's sake, putting aside what the settlement agreement says, that's where we are, your Honor, I mean, the -- you know, we should have the issue decided here and now, and the settlement-dispute-resolution provision of -- I mean, the settlement-dispute-resolution provision of the operating agreement says that.  I don't think we're in any kind of remand position, even under Article 10 we're not under a remand position.  It talks about the independent accountants retained by the firm, Ms. Drolet is the independent accountant retained by the firm.  She's now gone, according to your Honor, and therefore, as a result, I think it, again, falls squarely in your Honor's lap to make a de novo determination about what the correct balance or balance is and Mr. Lewis' and Mr. Hausfeld's accounts ought to be.

MR. KEENEY:  And once again, your Honor, that violates the intent of the parties signed by everybody under Article 10th-A, it's supposed to be done by an accountant and, with all deference to the Court, your Honor is not an accountant and this was set forth to be done by an accountant.  So, if Accountant 1 didn't do the job satisfactory to your Honor, we have to get Accountant Number

269

2 in there, that's our position.

THE COURT:  Well, it does seem, Mr. Rosenthal, that Mr. Keeney is conceding, based on my ruling, that there was a breach.  Now, the question is, was the remedy for the breach.  You're suggesting that under the settlement agreement I decide all disputes, but I don't know -- like, I decided, for example, that the operating agreement was breached in terms of how the capital account was distributed just because the due process, for lack of a better word, wasn't present.  So, Mr. Keeney seems to be suggesting that we should find another accountant to fulfill that role; why is he wrong about that?

MR. ROSENTHAL:  Well, he's wrong about that, again, because Section 18(c), which is the dispute-resolution provision of the settlement agreement, says that these disputes ought to be resolved by your Honor, number one.  Number two, Article 10 talks about the independent accountants to be retained by the firm, which is Drolet & Associates and they are now out of the mix, so your Honor is left.  And then the third, your Honor, is that when there's been a breach of contract, as you know, the Court's equitable powers are triggered.  And so your Honor has it within your discretion to fashion a remedy, including a procedural remedy, for determining how to resolve the breach and, you know, in addition to what the settlement-dispute-provision resolution of the confidential agreement requires, we would

ask and we think it's appropriate that your Honor exercise those equitable powers that is fully within your grasp now that we've determined that there's been a breach of the settlement -- of the confidential agreement, which is -- I'm sorry, a breach of the operating agreement, which is a breach of the settlement agreement.

THE COURT:  Mr. Keeney, I guess the thing that troubles me is it doesn't seem to be that the issues that are left to be resolved, namely whether the right percentage was used and whether the right accounting method was used.  Those are not accounting matters, those seem to be questions of fact that it's more suitable for a judge to decide than for an accountant, than for an accountant to just go over Mr. Diamond's documents.  I mean, it seems like we have a factual dispute as to whether this document is controlling and whether the operating agreement is controlling or whether, as Ms. Drolet says, that was just an oversight that worked its way into the 2003 agreement.  I don't know bringing an accountant in and spending another 50 or $100,000 of your folks' money is going to help us, because those are legal and factual questions, not accounting questions.

So, I'm inclined -- I don't want to take out more work for myself and I don't want to violate DC law, but I think the proper remedy would be for me to hear any testimony you want on those two issues and just make the call, because

271

I don't think -- even if I were to decide to hire my own accountant and bill you for it, I don't think it would help us decide this, I think we're beyond that point now.  I mean, this all happened, you know, months ago and now we have a factual dispute as to what evidence should have been looked at and what impact it has.  So, I don't think, for example, an accountant is going to be able to help us and say, well, the '96 agreement says this, the 2000 agreement says this, and what does the significance of that mean.

So, I'm going to agree with Mr. Rosenthal on that. And so I guess we'll go forward and you can continue to present evidence on those two points; I mean, we already have a little evidence on both of them from Ms. Drolet and Mr. Toll and perhaps this ruling will help everybody kind of refocus on what we're going to be looking at for the next couple days.

So, where does that leave us witness-wise, Mr. Rosenthal?

MR. ROSENTHAL:  We would call William Davis, our expert witness, next and --

THE COURT:  All right.

MR. ROSENTHAL:  -- I'll -- we're not going to finish him today, I don't think.

THE COURT:  Would it help Mr. Lewis if we took his testimony now and got him out of here, so -- because we may

272

not end up sitting on Wednesday.  How long is Mr. Lewis going to be?

MR. ROSENTHAL:  He's not going to be very long on my end, I just have no idea what Mr. Keeney has got planned for him.

THE COURT:  Well, Mr. Keeney is --

MR. KEENEY:  It's about ten minutes on my end.

THE COURT:  -- precise and surgically focused.

(Laughter.)

THE COURT:  So, I'm not anticipating much from Mr. Keeney in terms of that, he doesn't delay, nor do you.  So, why don't we have Mr. Lewis testify and that will help him out?

MR. ROSENTHAL:  Okay, we'll call Mr. Lewis.  Thank you.

THE COURT:  All right.  So, we'll start tomorrow morning with Mr. Davis?

MR. ROSENTHAL:  Mr. Davis, correct.

THE COURT:  What's his name?

MR. ROSENTHAL:  D-a-v-i-s, your Honor.

THE COURT:  Davis?

MR. ROSENTHAL:  Davis.

THE COURT:  Oh, okay, I'm sorry.  I'm sorry, Mr. Lewis.

RICHARD S. LEWIS, Defendant's Witness, Sworn.

273

THE DEPUTY CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Richard S. Lewis, L-e-w-i-s.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Mr. Lewis, where do you live?

A   I live in Bethesda, Maryland.

Q   How long have you lived there?

A   I have lived there since 1990.

Q   Where do you work?

A   I work at Hausfeld LLP in Washington.

Q   How long have you worked at Hausfeld LLP?

A   Since its formation early this year.

Q   What's your position there?

A   I am a partner at the firm.

Q   Were you a partner at any firm before you joined Hausfeld LLP?

A   Yes, I was partner at Cohen Milstein Hausfeld & Toll.

Q   Beginning when?

A   Approximately late 1996.

Q   Had you been with Cohen Milstein Hausfeld & Toll prior to that?

A   Yes, I had worked as an associate at Cohen Milstein Hausfeld & Toll for approximately eight and a half years.

Q   How long did you work at Cohen Milstein Hausfeld & Toll

Lewis - Direct                                    274

overall, which we'll call CMHT, prior to leaving to go to Hausfeld LLP?

A   Yeah, I started with them in 1987, so approximately 20 years.

Q   Did you hold any legal jobs prior to going to CMHT?

A   Yes.  I clerked for a Federal judge in the District of New Jersey and, after that, I went to CMHT.

Q   What does your practice consist of now at Hausfeld LLP?

A   I work primarily in the area of pharmaceutical torts and environmental torts, people who get hurt from exposure to chemicals.

Q   Have you always been working in that particular area of the law?

A   That's been my focus since the beginning.

Q   Have you done anything else or focused on any other area of the law?

A   On occasion, I was assigned to antitrust matters, one in particular, the Travel Agents case in the District of Minnesota, but other than that my work was primarily on environmental and pharmaceutical cases.

Q   I want to turn your attention now to the late summer of 2008; at that point, for lack of better terminology, had sort of CMHT divided into two factions?

A   In terms of the partnership, we had.

Q   Okay.  And who was in the faction that you were

Lewis - Direct                                          275

affiliated with?

A    Well, there were four of us; it was Mike Layman, Bob Iseler, Mike Hausfeld and myself.

Q    And were the remaining partners part of sort of the other faction?

A    Yes.  There were -- once Mark Maches resigned there were eight of them and they were part of the group that we were discussing these problems with.

Q    In the late summer of 2008, did the two factions begin to try to negotiate a split of the firm?

A    Yes.  We -- Michael Hausfeld in particular had proposed an arrangement --

         MR. KEENEY:  Objection, your Honor, just settlement privilege.  I mean, I just want to make sure we're having an intentional violation of settlement privilege here because, if they want to go there, we're prepared to go there too.

         MR. ROSENTHAL:  They're talking about a split of the firm; there's no threatened litigation or a possible litigation at the time, we're talking about a split of the firm; these are business negotiations.

         THE COURT:  All right, as long as whatever you ask him about, I'm going to let Mr. Keeney get into.

         MR. ROSENTHAL:  Okay, thank you.

         THE COURT:  I mean, everybody knew that was a risk of trying the case in a public courtroom that we're going to

Lewis - Direct                                    276

get into the family laundry.

MR. ROSENTHAL:  This is -- all right, okay.

THE COURT:  Go ahead.

MR. ROSENTHAL:  Sure.

BY MR. ROSENTHAL:

Q    And you said Mr. Hausfeld made an initial proposal regarding split of the firm, is that right?

A    He made a verbal proposal that we continue to practice under the same roof, but we separate ourselves administratively and financially.

Q    How was that proposal received by the other side?

A    It was rejected.

Q    And settlement negotiations and separation negotiations continued thereafter?

A    Yes, they did.

Q    What was the next thing that happened?

A    They continued on a more formal basis.  There was an agreement to try and resolve our dispute amicably and the four of us hired the Venable firm and the eight other partners hired the Hogan firm.  We made a written proposal, we had a meeting, and we got a counter proposal from the other group.

Q    I'll ask you to turn to Plaintiff's Exhibit 8 in the Plaintiff's Exhibit binder.

(Pause.)

Lewis - Direct                                                277

A    Yes, I have that.

Q    Do you recognize it?

A    Yes, I do.

Q    What is it?

A    This was the written counter proposal that we received from the Hogan law firm after we had made an opening written proposal and I believe we had had a face-to-face meeting.

Q    What's your --

          MR. KEENEY:  And, your Honor, here's where you have an objection.

          THE COURT:  All right.

          MR. KEENEY:  It's marked all over it, "Settlement Proposal."  This is the first exhibit that we have objected to, it may be the last one, but I want to make sure that if we're going to be opening up all the settlement proposals it goes both ways.  This is clearly inadmissible under the Federal Rules.

          MR. ROSENTHAL:  Your Honor, I disagree that it's inadmissible.  We're still talking about a split of the firm. Again, there's no litigation in anybody's mind at this point, as far as I can tell.  We're talking business negotiations about a split of the law firm.

          THE COURT:  But do you actually need -- what are we under 407?

          MR. ROSENTHAL:  I think it's 408, if I'm not

Lewis - Direct                                    278

mistaken, your Honor.

THE COURT:  Do you actually need the threat of litigation?

(Pause.)

MR. KEENEY:  The answer, your Honor, is no, you don't need the litigation.

THE COURT:  But are we -- it's not being offered to prove liability, is it, or the amount of the claim?

MR. KEENEY:  I think it is, your Honor, actually.

MR. ROSENTHAL:  Your Honor, here's where we're going --

THE COURT:  Okay.

MR. ROSENTHAL:  -- there are representations regarding the amount of capital owed to Mr. Hausfeld and Mr. Lewis in this letter.

THE COURT:  Oh.  So, I guess it is.

MR. KEENEY:  In the settlement context, your Honor.

THE COURT:  Yes.  Why isn't that covered by 408?  It seems like it should be.

MR. ROSENTHAL:  Your Honor, it says -- 408 -- it says, "First you're offered a promise in deference of valuable consideration comprising and conduct" -- what's that?  The claim, I mean, we're talking about the claim here. I mean, I'm sorry that I don't have case law handy, your Honor; if we need to do research on it tonight, we will, but

Lewis - Direct                                    279

my understanding of the case law is that Rule 408 pertains to litigation or threatened litigation, it does not pertain to business negotiations.

THE COURT:  Well, I don't know if you necessarily have to threaten litigation or you just have to make some type of claim or assertion of your rights, that's my understanding of it.

(Pause.)

THE COURT:  Let me just check the rule here.

(Pause.)

THE COURT:  "The exclusionary principle is inapplicable where a dispute does not exist as to liability or the amount of the claim."

So, it seems as though, at least at this point, there was some claim being made, wasn't there, about who owed who money?  Whether or not it was a legally filed claim?

MR. ROSENTHAL:  Well, they were negotiating a split of the firm, your Honor.  I mean, it's our view --

THE COURT:  I think as long as --

MR. ROSENTHAL:  -- that this letter represents a party admission about what's required by the operating agreement in terms of the return of capital.

MR. KEENEY:  And, your Honor, a settlement agreement can never be that.  It's a settlement agreement, it says, "We propose as follows," it couldn't be clearer.

Lewis - Direct                                      280

THE COURT:  Yeah, the fact that they're proposing something doesn't -- can't be offered as evidence to prove that's what the actual amount was.

MR. ROSENTHAL:  Well, I think if you read the contents of the letter, your Honor, which I know you can't do yet, because we're still --

THE COURT:  And I haven't done it.

MR. ROSENTHAL:  Right, and you haven't done it yet, but I think the contents of the letter make it pretty clear what their view of the basis of the proposal is.

THE COURT:  Well --

MR. ROSENTHAL:  And the portion of the letter that we're interested in is not actual an offer of compromise, it's a statement in their view regarding what the operating agreement requires in terms of the return of capital.

MR. KEENEY:  And, your Honor, we really object to that.  If you start at Page 1, it says, "We propose as follows," colon, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and a concluding paragraph.

THE COURT:  Well, I think, Mr. Rosenthal, my understanding of the rule is, as long as a dispute exists as to either liability or the amount of a claim, I think the rule applies and that we can't get into this, unless -- it looks like your crack legal team is searching the Advisory Committee Notes to tell me I'm wrong and I'm open to being

Lewis - Direct                                  281

corrected.

(Pause.)

MR. ROSENTHAL:  Well, your Honor, let me propose this --

THE COURT:  All right.  Is there something in the rule I'm missing?

MR. ROSENTHAL:  It's going to take us a little longer to research it.

THE COURT:  Okay, all right, because that's my reading of it.

MR. ROSENTHAL:  But what I'll propose is going past this particular area of examination right now, we'll do some research tonight.  If we have to -- if we feel like we can come back to the issue, in light of your Honor's ruling, then we would revisit it with you and perhaps recall Mr. Lewis to the stand when he returns to Philadelphia on Wednesday.  In the meantime, you know, Mr. Hausfeld would probably testify about it as well and I don't know that we need testimony from both of them on it, but we may.

THE COURT:  All right.  So, I'll sustain the objection and I'll -- do you want me to give this back to you, this Document 8, or --

MR. ROSENTHAL:  Well, it's in -- just don't look at it, your Honor, it's in the full binder.

THE COURT:  All right.  I won't look at it.  Do you

Lewis - Direct                                        282

have any objection to that, Mr. Keeney?

MR. KEENEY:  No objection to that, your Honor.

(Laughter.)

THE COURT:  All right.  That's my ruling that it's precluded by 408 because, even though -- because there was a dispute at the time these negotiations were ongoing about either the liability or the amount of the claim.

MR. ROSENTHAL:  All right.

BY MR. ROSENTHAL:

Q   Mr. Lewis, I want to turn your attention now to November 5th of 2008.

A   Yes.

Q   As of November 5th of 2008, had the negotiations over splitting the firm been successful?

A   No, they had not.

Q   Had they concluded?

A   Not in my view.

Q   Why not in your view?

A   I had spoke to Joe Sellers for approximately an hour within a few weeks of that date about how to get our counsel speaking to each other and restart the negotiations.

Q   I would ask you to turn to Exhibit 68, Mr. Lewis.

(Pause.)

A   Yes.

Q   Do you recognize that document?

Lewis - Direct                                                    283

A    Yes, I do.

Q    Did you receive a copy of this document on or about
November 5th, 2008?

A    Yes, I did receive it; I don't remember the precise date.

Q    What is it?

A    This is a memorandum from Steve Toll indicating his view
of the equity partners' percentage interest in the firm
approved by the Compensation Committee retroactive to the
beginning of 2008 and effective immediately.

Q    I would ask you to turn to the second page of the
document.

A    Yes.

Q    If you take a look at the second row where it says MDH,
do you see that?

A    Yes.

Q    What is MDH?

A    That would be Mike Hausfeld.

Q    Based on this document, what did the Compensation
Committee vote to do to Mr. Hausfeld's percentage interests
in the firm retroactive immediately and effective -- that is,
retroactive at the beginning of the year and effective
immediately?

A    To cut them in half down to 14 points.

Q    And with respect to the 14 points that were taken away
from Mr. Hausfeld, how did the Compensation Committee

Lewis - Direct                                            284

reallocate those points?

A    They reallocated them to the group of eight partners who were aligned against the four of us and they excluded the four of us.

Q    Did you receive any of Mr. Hausfeld's, I guess, reduced points?

A    No, I did not.

Q    Did Mr. Iseler?

     (Pause.)

A    I don't -- no, he did not.

Q    Did Mr. Layman?

A    No, he did not.

Q    Now, what does the partnership agreement or what did the partnership agreement say with respect to involuntarily terminating or expelling somebody from the firm based on a vote of the partnership?

A    The partnership agreement said that two thirds -- a two-thirds interest of the partnership was necessary in order to do that.

Q    Did the eight partners who received these reallocated points for Mr. Hausfeld have the necessary two-thirds percentage interests prior to the Compensation Committee's actions?

A    Absolutely not.  There was 44 percent was allocated to the four of us and 56 to the group of eight.

Lewis - Direct                                        285

Q   Did what you refer to as the group of eight require the necessary two-thirds-percentage interests to expel somebody from the firm as a result of the Compensation Committee's actions?

A   That's what Mr. Toll's memo is indicating he believes, yes.

Q   I'll ask you to take a look at Exhibit 93.

         (Pause.)

A   Yes, I have it.

Q   I'll ask if you recognize not the first page, but Pages 2 and 3 of that exhibit --

A   I do.

Q   -- and 4 and 5?

A   I do.

Q   What is it?

A   This is a document titled, "Written consent of members holding no less than two thirds of all percentage interest of Cohen Milstein Hausfeld & Toll."

Q   And is it signed?

A   It is signed by eight of the partners.

Q   What's the date of the signatures?

A   November 6th, 2008.

Q   Is that the date after the Compensation Committee met?

A   It is.

Q   Were you given an opportunity to sign this document?

Lewis - Direct                                    286

A    No, I was not.  I didn't see this document until it was delivered to me as a signed document, I wasn't aware of this discussion or any meeting discussing this topic.

Q    Did you see this coming?

A    No, I did not.

Q    What does this document purport to do?

A    It purports to change the partnership agreement to give those eight partners the authority to change the 30-day notice for involuntary termination to give them the ability to fire someone immediately and --

Q    What do you mean by that, 30-day notice?

A    Well, the partnership agreement that was in place required a 30-day notice for a person who was involuntarily terminated and this document purported to change that.

Q    And what is the other thing that it purports to do?

A    To fire Mike Hausfeld, to involuntarily terminate him.

Q    Do you have personal knowledge of what Mr. Hausfeld did -- well, do you have personal knowledge of when Mr. Hausfeld received this document?

A    I have personal knowledge, I know what he told me.

Q    Okay.  Well, we'll skip --

        THE COURT:  Well, I'm sure that's not going to be in dispute anyway, but you can ask Mr. Hausfeld --

BY MR. ROSENTHAL:

Q    What did Mr. Hausfeld do after receiving this document?

Lewis - Direct                                    287

A    As far as I know, he was out to lunch and, when he came back from lunch, he was escorted by some type of personnel out of the building and told that he would be trespassing if he returned.

Q    I'm going to ask you to turn to Exhibit 94.

A    Yes, I have that.

Q    Do you recognize it?

A    Yes, I do.

Q    What is it?

A    This is a letter I wrote to my partners telling them that I would be leaving the firm, that I had been involuntarily terminated.

Q    Why do you say you had been involuntarily terminated?

A    Well, at this point, at our firm, I was being excluded by my fellow partners on important decisions about the firm's future, I was excluded on any discussion of terminating Mike Hausfeld.  In addition, there was a dispute about reconstituting the Compensation Committee.  There was a vote on that, there were objections to that vote.  I was not told the result of the vote until after the Compensation Committee got together and cut my points.  So, I wasn't being included in the discussions of the partnership about the partnership. I had also had points taken away from me by this Compensation Committee in a year when the Phen-Fen case that I was working on brought a fee in excess of $5 million and we had a policy

Lewis - Direct                    288

at our firm that when that happened the partners were eligible for a special bonus and I had asked for one in a memo that we were asked to write to the Compensation Committee and, not only did I not receive that, but I was docked some points by this Compensation Committee. Hausfeld told me that what was mentioned was that my association with Hausfeld was going to be held against me by the Compensation Committee. And in my day-to-day work at the firm, in addition to the partners not discussing these matters with me, I was told by my staff that I couldn't request photocopies of documents to work on my cases unless Bonnie Keller or Joe Sellers agreed with that request. I put all this together and I found that I was in a hostile environment and I couldn't possibly practice law in that environment.

Q    I'll ask you to turn now, Mr. Lewis, to Exhibit -- Plaintiff's Exhibit 1.

        (Pause.)

A    Yes.

Q    Do you recognize it?

A    I do.

Q    Is this the confidential agreement that you signed with Cohen Milstein Sellers & Toll several months after meeting Cohen Milstein and going to Hausfeld LLP?

A    Yes, it is.

Q    Is your signature on this document?

Lewis - Direct                                                     289

A    Yes.

Q    When you signed this document, what expectations did you have regarding the return of your capital from the firm?

A    I had an expectation that my capital account would be returned to me in full and I knew that the amount was roughly over a million dollars, I didn't know the exact amount.

Q    Okay.  What were those expectations based on?

A    Well, really a number of factors.  In late 2008, we knew that the line of credit had been paid down completely and there was no loss at the firm, and I had never been told that a loss could be allocated against me if there was no loss and I had no reason to think that that was possible.  I had also reviewed a document in our prior negotiations which indicated that there would be no loss calculation made against me in the offer made by the other side in trying to resolve our dispute.  And that had never been changed and nobody had ever suggested anything different than that.  In our negotiations, I also had agreed to waive my right to have a half-million-dollar termination payment in order to get my full capital account on an expedited basis.

            THE COURT:  This was your negotiations previously or your negotiations with -- involving Exhibit 1?

            THE WITNESS:  Your Honor, these were the negotiations involving Exhibit 1.

            THE COURT:  All right.  Excuse me one second.

Lewis - Direct                                    290

Inna tells me that, to get your daily copy, she has to get the log notes to the transcriber by 4:45.

Is that something somebody can come up and get, Inna?

(Discussion held off the record.)

THE COURT:  All right, so we're going to stop at 4:45 apparently, if you want daily copy.  Can they get two-day copy maybe?  Can we switch to two-day copy if you want to finish Mr. Lewis?

MR. ROSENTHAL:  Yes, your Honor, we can.

MR. KEENEY:  Yes, your Honor.

THE COURT:  Okay, let's do that.  Thanks, Inna.

BY MR. ROSENTHAL:

Q   So, you're saying that these items were negotiated as part of Exhibit 1?

THE COURT:  That's the document that resulted from the stuff you did before me?

THE WITNESS:  What I'm saying, your Honor, is that I received a phone call from Mike Hausfeld, from chambers, I wasn't present.

THE COURT:  Oh, well, you can only testify what you know, but you were involved in it.

MR. ROSENTHAL:  Right, and he's testifying about what informed his expectations, your Honor.

THE COURT:  Yeah, but he's talking, I thought, about

Lewis - Direct                                      291

things that happened in the --

MR. ROSENTHAL:  Oh, no, no, he's talking about what happened --

THE COURT:  -- prior negotiations with --

MR. ROSENTHAL:  -- with respect to the negotiations in front of your Honor.

THE COURT:  Okay.  All right.

MR. ROSENTHAL:  Do I need to go back over that?

THE COURT:  No.

MR. ROSENTHAL:  Okay.

THE COURT:  I just sensed there was a (indiscernible) of things, but maybe I'm wrong.

MR. ROSENTHAL:  I didn't sense that, your Honor.

THE COURT:  Okay.

MR. ROSENTHAL:  Okay.

THE COURT:  I'll let Mr. Keeney clear that up.

MR. ROSENTHAL:  Well, let me ask this again to make sure, okay?

BY MR. ROSENTHAL:

Q   When you signed this confidential agreement, the agreement that was negotiated in front of Judge Rice, what informed your expectations about the amount of capital that you expected to get?

A   There was --

THE COURT:  There was then Mr. Hausfeld told you?

Lewis - Direct                                292

THE WITNESS:  There were a number of factors, your Honor.

THE COURT:  But they all came from Mr. Hausfeld?

THE WITNESS:  No, your Honor, one of them did.

THE COURT:  All right.  Well, with respect to the negotiations in front of me, that's what I want you to answer, not based on what you were trying to work out earlier, that exhibit we didn't let in.

MR. ROSENTHAL:  That's fine.  And, your Honor --

THE COURT:  Okay.

MR. ROSENTHAL:  -- he's testified about other things, but I'll have him repeat his testimony.

THE COURT:  All right, go ahead.

BY MR. ROSENTHAL:

Q    So, putting aside the exhibit that's been excluded, okay?

A    Yes.

Q    What informed your expectations regarding the amount of capital to be returned?

A    Well, first of all, we had given up in the negotiations before Judge Rice any claim to the half-million-dollar termination payment, and I understood that was part of an agreement that would lead to me receiving my full capital account on an expedited basis, that being 18 months.  So, that's what occurred before Judge Rice.  I also knew from reviewing the documents with the bank at the end of the year,

Lewis - Direct                                                    293

because I was on the line of credit, that the line of credit was paid down in full and in fact there was no loss suffered by the firm.

THE COURT:  When was that?

THE WITNESS:  That was in December of 2008, your Honor.

THE COURT:  All right.

BY MR. ROSENTHAL:

Q    And why did the fact that you knew the firm had suffered no loss inform your expectations regarding return of capital?

A    Well, I knew there was over a million dollars in my capital account, and I knew if there was no loss to deduct from my capital account I would receive something over a million dollars as my payment.  I didn't know the exact amount.

Q    I'll ask you to turn to Plaintiff's Exhibit 19 now, please.

A    I have that.

Q    This is an e-mail from me to Mr. Keeney with the red line of the settlement agreement that we were negotiating before Judge Rice; is that correct?

A    Yes.

Q    Dated February 3rd, 2009?

A    Yes.

Q    I'll ask you to read just the second to the last

Lewis - Direct                                    294

paragraph there.

A    "One final thing as per yesterday's agreement:  Please advise me as soon as possible, and hopefully when you get back to me on the attached markup exactly how much is in the capital accounts of Michael Hausfeld and Richard Lewis."

Q    Were you aware that that request had been made of Mr. Keeney?

A    I was, and I was aware of prior requests that had been made before Judge Rice for this information.

Q    Did you direct counsel to make that request?

A    I did.

Q    Why?

A    Because I wanted to know exactly what amount I would be receiving.

Q    Did you have any concerns that you wouldn't be receiving what you expected to be the full amount?

A    No, I did not.

Q    Why not?

A    As I said, this was negotiated.  We gave up the termination payment.  I know when Mr. Hausfeld called me from chambers, we talked about the terms of the agreement that were being negotiated.  He told me about return of capital. He mentioned his amount is $5 million, talked about the full amounts and I had no reason to think that in spite of the fact that the firm was arguing over cases and fees that there

would ever be a problem with the capital accounts.

Q   I'd ask you to turn to Plaintiff's Exhibit 20, please.

A   Yes.

Q   Which is an e-mail from me to Ms. Baum, Mr. Keeney and Mr. Kaufman, all of Hogan and Hartson, two days later on February 5th, do you see that?

A   Yes, I do.

Q   Did you receive a copy of this e-mail?

A   I did.

Q   Can you read the second paragraph of this e-mail, please.

A   We are still awaiting information on the exact amounts in capital accounts of Rich Lewis and Michael Hausfeld.  Please provide that information promptly.

Q   Is that something that you also directed counsel to do?

A   Yes.

Q   I'd ask you to take a look at Exhibit 24.

A   Yes.

Q   Look at the second e-mail on the page, an e-mail from me to Ms. Baum, Mr. Keeney and Mr. Kaufman dated the following day, Friday, February 6th, 2009, do you see that?

A   Yes, I do.

Q   Can you read what I wrote to them?

A   Still awaiting on cap account information.  Please provide.

Q   What is the response that you get from Mr. Kaufman?

Lewis - Direct                                    296

A    If I'm reading it right, reading up the page, the response is checking again with the client.

Q    And this is on Friday the 6th, is that right?

A    That's right.

Q    Please turn to Exhibit 26.

A    Yes.

Q    Take a look at the e-mail at the bottom of the page which is an e-mail from Mr. Kaufman to Daniel Small, Steve Toll, Dan Summers, Joe Sellers, Mr. Keeney and Ms. Baum; do you see that?

A    I do.

Q    And can you read what it says?

A    It says "All:  Do we have an update on capital account info for Seth?"

Q    And that was sent on February 6th?

A    Yes.

Q    Take a look at the next e-mail up.

A    Yes.

Q    Which is an e-mail from Mr. Toll to Mr. Kaufman, Mr. Small, Mr. Summers, Mr. Sellers, cc'ing Mr. Keeney and Ms. Baum; do you see that?

A    I'm sorry, on the top of the page an e-mail from Kaufman --

Q    No.

A    I'm sorry.

Lewis - Direct                                          297

Q    The second e-mail on the page.

A    I do see it, yes.

Q    By Mr. Toll responding to Mr. Kaufman's e-mail, do we have an update.  Do you see that?

A    Yes.

Q    And what does Mr. Toll tell Mr. Kaufman?

A    Likely in the next day or so.

Q    This is on February 9th?

A    Yes.

Q    I'd ask you to look at Exhibit 36.

A    Yes.

Q    This is an e-mail from me to Mr. Keeney and Mr. Kaufman dated February 15th, six days later.  Do you see that?

A    I do.

Q    Can you read the e-mail, please?

A    "It has been nearly two weeks now since we have requested that your clients provide us with the amounts in the capital accounts of Rich Lewis and Michael Hausfeld as of the dates of their respective departures from CMHT, and we still have not received the information.  What is the holdup?  Please provide the requested information as per our prior agreements."

Q    This is an e-mail that you're aware of; is that right?

A    Yes.

Q    Did you direct me, counsel, to send this e-mail?

Lewis - Direct                        298

A    Yes.  We had been directing counsel throughout this period to obtain the information.

Q    Turn to Exhibit 37.

A    Yes.

Q    This is an e-mail response to me from Mr. Kaufman also dated February 15th; is that right?

A    Yes.

Q    Can you read the e-mail, please?

A    "Seth, apologies on behalf of our clients.  We have seen draft numbers prepared by our clients, an early set about a week ago and a revised set on Friday.  We understand that the review will be complete and that the numbers will be sent to you and your clients in a few more days."

Q    Exhibit 39, please.

A    I have it.

Q    This is an e-mail several days later on Thursday, February 19th, from me to Ms. Baum, Mr. Keeney, Mr. Kaufman and my partner, Stef Tucker.  Do you see that?

A    Yes.

Q    In the second paragraph of that e-mail it reads what?

A    It says "On another issue we are still awaiting information regarding Hausfeld's and Lewis's capital accounts.  I fail to see the reason for more than two-week delay here, especially given the cooperation my clients have shown your clients in carrying out the provisions of the

agreement.  Your last e-mail, Steve, indicated that there were drafts and revisions.  I'm not sure why, but if that's the case, we'd like to know what revisions were made to any drafts and why those revisions were made, and we'd like to get a statement from the firm's accountant regarding the balances in the accounts.  Many thanks."

Q   I would ask you to turn to Exhibit 40.  This is a response from Mr. Kaufman to me dated February 19th, the same day.  Is that right?

A   Yes.

Q   What does Mr. Kaufman say?

A   "My apologies again.  We had expected that the numbers would be to you by now.  I will follow up."

Q   And I'll ask you to turn to Exhibit 41.

A   Yes.

Q   It's an e-mail from Mr. Kaufman to me cc'ing Mr. Keeney the following day, February 20th, do you see that?

A   I do.

Q   At 3:37 p.m.?

A   Yes.

Q   And this is the e-mail attaching the firm's capital account balance calculations for you and Mr. Hausfeld; is that right?

A   That's right.

Q   Let me ask you this:  Did you look at this document that

Lewis - Direct                                    300

day?

A    I looked at this document as soon as I could.  I believe it was that day unless I was traveling.

Q    What did you do after you looked at it?

A    Well, after I looked at it I went in to speak to my partner, Mike Hausfeld about this, and we called counsel and advised them that there was a problem with this.

Q    And why did you believe here was a problem with this?

A    Well, as I said earlier, I knew that the firm had not suffered a loss, and one was being attributed to me.  I had believed in the negotiation we had given up certain rights in order to retain full payment of the capital accounts on an expedited basis, and I had understood that those amounts at least for Michael had been clearly mentioned in the discussion.

Q    Would you have agreed to enter into the confidential agreement in its present form had you known that they were going to claim that the capital account balance owing to you was as reflected in Exhibit 41?

        MR. KEENEY:  Objection, calls for speculation.

        MR. ROSENTHAL:  Your Honor, I think it's an element of one of the commonlaw claims that we're trying to prove.

        THE COURT:  The fraudulent inducement claim?

        MR. ROSENTHAL:  Or material omission which doesn't require evidence of deliberateness.

Lewis - Direct                                    301

THE COURT:  What about damages?

MR. KEENEY:  I'm having a problem with the call for speculation on a question which is limiting the fact to one fact and isn't incorporating the entire document.  I just don't think --

THE COURT:  Which document?

MR. KEENEY:  The entire settlement agreement document which is what he has in front of him.  That calls for speculation.  I have a problem, he's calling for speculation.  Is there one thing, and if this one thing, then would everything else have been off.  I don't think that that's proper speculation and I don't think that's a proper question.

THE COURT:  Well, given the nature of the claims he's asserting I think he's entitled to ask what impact this would have had on his decision.  If he had known X, how would that have impacted his decision to settle.

MR. KEENEY:  I'm not sure, your Honor, because when we went around the table, we were all in your chambers.  It's sort of like what we do when you take a guilty plea, and you have all the counsel and everybody say, you know, they agree.

THE COURT:  Right.

MR. KEENEY:  I don't think it's a proper question to be asking him to speculate, if something else had happened would he have done something differently.

Lewis - Direct                                        302

THE COURT:  All right, well, I'm going to allow it just because it's relevant to those claims you've asserted, the omission and the inducement.

Go ahead.

THE WITNESS:  I would not have entered into the agreement.  The full payment on my capital account on an expedited basis was very important to me personally.

BY MR. ROSENTHAL:

Q    Why is that?

A    Well, there was a lot of uncertainty about the future with the firm splitting up, and the one thing I told my family is that I was going to receive this payment, and it was something that we could count on.  It was important to me personally.

Q    A couple more questions, Mr. Lewis.  I'll ask you to take a look at Exhibit 2, please.

Do you recognize this document?

A    I do.

Q    What is it?

A    This is the partnership agreement that was in place at the firm when the firm split up.

Q    When did this document come into effect to the best of your recollection?

A    I believe --

THE COURT:  We must have an agreement on that,

right?

COUNSEL:  Yes, your Honor.

THE COURT:  2003?

COUNSEL:  Beginning of 2003.

THE COURT:  Yes, okay.

BY MR. ROSENTHAL:

Q    I'm turning your attention now to the beginning of 2003.

A    Yes.

Q    When this document had been prepared.  Do you recall any discussions among the partners about using the tax basis method of accounting to keep the books and records of the firm?

A    I do not.

Q    Do you recall any discussion among all the partners regarding any method of accounting be used to keep the books and records of the firm?

A    I don't.

Q    Did you yourself specifically intend to use the tax basis method of accounting for the books and records of the firm?

A    I had no intention one way or the other about the accounting methods of the firm.

Q    In your experience, what was the practice of the firm with respect to amending the partnership agreement or the operating agreement here?

A    In my experience it required a meeting and it required a

Lewis - Direct                                    304

writing.

Q    Is that consistent with the plain terms of the operating agreement?

A    I believe it is.

Q    Please turn to page 13 of Exhibit 2.

A    I have that.

Q    Would you read paragraph 2, please?

A    It says "Amendment:  Disagreement may be amended only with the written consent of members owning at least two-thirds of all percentage interests."

Q    I've just got a couple more questions for you.  Can you turn back to Exhibit 41, please.

A    Yes.

Q    To the best of your recollection, anytime the partnership agreement was amended when you were with the firm, was it amended in writing or not?

A    I believe that all amendments had to be in writing and were in writing.

Q    Is that the practice of the firm when you were there?

A    Yes.

Q    I'll ask you to take a look at the third page of Exhibit 41, CMST0035.

A    035?

Q    Yes.

A    Yes.

Lewis - Direct                                    305

Q    Do you see the capital account balance figure appearing at the top of the page?

A    Yes.

Q    $1.163 million dollars approximately?

A    Yes.

Q    Is that roughly the amount that you expected to receive as a return of the capital?

A    Roughly.  I knew it was about $1.1 million.

Q    Why do you say roughly?

A    Because I didn't know the intricacies of the calculation. I knew what was in my account.  I knew there hadn't been a loss, and for other reasons I mentioned I was expecting full return of my capital.

Q    This amount here, $1.163 million, had you paid taxes on that amount?

A    Yes, I had.

          MR. ROSENTHAL:  Pass the witness, your Honor.

          THE COURT:  All right, thank you.  Mr. Keeney?

          MR. KEENEY:  Yes, thank you, your Honor.

          THE COURT:  The last question, I'm sorry, was did he pay taxes on the $1.1 million?

          MR. ROSENTHAL:  Yes.

          THE COURT:  Okay.

                    CROSS-EXAMINATION

BY MR. KEENEY:

Q    And Mr. Lewis, if you could turn in the defendant's
exhibit binder, those are the two small binders, to
Defendant's Exhibit 18.

A    In binder one?

Q    Yes, Defendant's Exhibit 18.

A    I have that.

Q    Okay.  And is Defendant's Exhibit 18 the monthly
financial statements at Cohen Milstein for the month of
September, 2008?

A    It is.

Q    Do you recall receiving it at or about that time?

A    I don't have a specific recollection of that, but I did
receive these reports on a regular basis.

Q    Okay.  Would you please turn to the fourth page, Bates
stamp number at the bottom of that is CMST649, the fourth
page.

A    I'm there.

Q    Okay.  I'd like to direct your attention to a very
specific item there.  I apologize, my page is stuck together.
It's hard to open.  And this is page marked on the left-hand
side, capital, near the top?

A    Yes, 000649?

Q    Yes.

A    Yes.

Q    And it shows a beginning capital balance of you for

Lewis - Cross                                                    307

December 31, 2007 of how much?

A    It says, "Balance at 12/31/07, $1,163,142.

Q    Okay.  And I notice as you move down, they have a figure beginning capital count balance with a $17 million and some change figure, do you see that?

A    I do.

Q    And do you understand that that's the beginning capital account balance in aggregate for everybody?

A    I don't specifically understand that, but I have no reason to disagree with you.

Q    Okay.  Directing your attention now toward the bottom of the page, this will be two lines up, not including the footnote.  Do you see the reference to net income (loss) year to date?

A    Yes.

Q    And that shows a loss year to date, of $5,562,209, is that how you read it?

A    That's what the number says.

Q    Okay.  And did you have an understanding that when there is a loss to date as of September 30, 2008, that loss is shared among all the partners' capital accounts?

A    No, I, in fact, knew there would not be a loss for this year, based on --

          THE COURT:  That's not what he asked you, sir.  He was asking you if there was a loss of that amount, do you

Lewis - Cross                                              308

understand that would be shared by all of the partners

through their capital accounts?

THE WITNESS:  If there was a loss at the end of the

year, I understood it would be shared.

THE COURT:  Okay.

Q   And my question to the witness, as of September 30, 2008,

when there was a loss of $5,562,209 in 2008 year to date, did

you understand that that would, as of September 30th, be

coming out of your capital, too?

A   I didn't have an understanding as to anything but the end

of the year.

Q   I'd like to direct your attention to the operating

agreement of Cohen Milstein, which is in our exhibit binder,

marked as Defendant's Exhibit 3.  Could you put that in front

of you?

A   Yes.

Q   Could you turn to Article 10-A, which begins at the

bottom of page 9 and runs over to page 10?

A   Yes.

Q   Do you agree with me that under Article 10-A, the

calculation of your capital balance is determined not at the

end of the year, but at an earlier point in time?

A   No.

Q   Okay.  I'll direct your attention to the first sentence

of capital -- of 10, Article 10-A, could you please read the

Lewis - Cross                                          309

first sentence beginning with the word "promptly"?

A    "Promptly after the termination date, the company shall furnish to the terminated member, a statement of the balance in the capital account of the terminated member and of the income or loss of the company for the fiscal year of the company, to the last day of the last full month immediately preceding the termination date."

Q    And doesn't that mean that you, as a member who terminated in November, get a statement of your capital account balance as of October 31, 2008?

A    I think it does mean that, but it doesn't exclude fees that we knew we would receive after that date.

THE COURT:  Where does it say that?

THE WITNESS:  It doesn't, your Honor.  He asked me what I knew and I'm trying to explain.

Q    In your testimony, you said that by December of 2008, it was your understanding that the line of credit at Sun Trust Bank had been paid off, do you recall that testimony?

A    I do.

Q    Isn't it a fact that the line of credit at Sun Trust Bank was paid off December 31, 2008 after 5:00 o'clock, about the latest you can possibly do it?

A    I didn't recall the time.  I knew it had been paid off.

Q    And you were one of the guarantors on that loan, right?

A    Yes.

Lewis - Cross                                    310

Q   Were you worried that it wouldn't be paid off?

A   I was concerned, I wouldn't say I was worried.

THE COURT:  How much was it for, $15 million?

MR. KEENEY:  It was a max of $15 million.  It was being paid down, your Honor, over time.  It was about $12 million in November and then just made, December 31, 2008, got all the millions paid. Everything came in like between December 25th.

THE WITNESS:  We had been advised of the payments and the fact that the loan was going down as it happened.

Q   Right.  Directing your attention --

THE COURT:  So, let me just go back.  So, what was your testimony, you weren't worried about that, but you were what?

THE WITNESS:  I was concerned that we would pay down the line.  I expected we would.  Mr. Toll had told the bank we would.  They had shared the documents with us, identifying the cases that would allow the line to be paid down and that's exactly what happened.

Q   Are you aware, as someone who was a guarantor on the Sun Trust Bank loan, that the Sun Trust loan was paid off because partners at Cohen Milstein, those who remained, put up an additional $4 million of their own money to do it?

A   The bank had told us that the partners had paid some money.  They didn't tell us the amount.

Lewis - Cross                                        311

Q   I'd like to direct your attention to Defendant's Exhibit 47 in the exhibit binder.

A   I have it.

Q   Okay.  As a partner at Cohen Milstein since approximately 1996, were you aware that any partner at Cohen Milstein could request an interim calculation of his or her capital account balance as of the end of any month?

A   I didn't have a specific awareness of that, but I would have a belief that if I requested information, I would receive it.

Q   Did you ever request such information for your own capital account?

A   No.

Q   Directing your attention to what's been marked as Defendant's Exhibit 47 and directing attention specifically to your capital account calculation.  What does this capital account balance, as of June 30, 2008 show as to your capital account balance?

A   691,211 --

        MR. ROSENTHAL:  Your Honor, I'm going to actually object to this document.

        THE COURT:  Okay.

        MR. ROSENTHAL:  Both on foundation and hearsay grounds.

        THE COURT:  All right.  Why don't you lay a

Lewis - Cross                                        312

foundation, Mr. Keeney.

MR. KEENEY:  Okay.  The foundation was that these documents can be requested by any partner, at any time.  I did not lay the foundation of which partner requested it and I'm not suggesting that this partner requested it.  I'm just saying that you could have requested it and if you had requested it, you would have gotten something in this form.

THE COURT:  Yes, but he --

MR. KEENEY:  It's as simple as that, your Honor.

THE COURT:  -- but he didn't and he said he didn't know any of this.

MR. KEENEY:  Right, no, that's the point.  It's know or could have known, your Honor and all we're doing is we're pointing out he could have requested and somebody obviously did, because we got this document from Mr. Hausfeld because it bears the Hausfeld, HAUS00052 Bates stamp number.

THE COURT:  All right, I think what Mr. Rosenthal's objection is, you're going to have to get this in through Mr. Hausfeld, because he's never seen this before.  so, I don't know if you can ask him questions about it.

MR. KEENEY: Or your Honor, we can get it in through the people who prepared it?

THE COURT:  Yes, exactly.

MR. KEENEY:  Yes.  No, I wasn't moving this one in.

THE COURT:  All right.

Lewis - Cross                                   313

MR. KEENEY:  I was just asking --

THE COURT:  Oh, okay.

MR. KEENEY:  -- I'm just showing how easy it is.

THE COURT:  We have this unorthodox procedure where if you're showing to --

MR. KEENEY:  And I heard the objection, yes.

THE COURT:  All right.

MR. KEENEY:  It's not in.  I heard the objection.

THE COURT:  All right.

MR. KEENEY:  Understood.

MR. ROSENTHAL:  If it's not in, your Honor, then I don't think he should be asking questions.

THE COURT:  So, he hasn't seen it, so, you can't ask him about it.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q    Then let me ask you this.  Were you aware, in the third quarter of 2008, that the firm was not doing too well?

A    Yes.

Q    And was that part of your motivation for considering with Michael Hausfeld and others, that perhaps you should split the firm and go elsewhere?

A    No.

Q    Okay.  What was your motivation?

A    The motivation was that there were severe disagreements

on how to manage the firm, how to run practice groups, where
to put our resources and how to go forward as a firm.

Q    Directing your attention back to one of the early
exhibits I showed you, which was Defendant's Exhibit 18,
could you put that before you?

A    Yes.

Q    And directing your attention, once again, to the capital
page, about four pages back, CMST649, do you have that in
front of you?

A    I do.

Q    And that's where there's the net loss, two lines from the
bottom of $5,562,209, right?

A    I see that.

Q    And from that figure, if you multiplied that by your
percentage interest in the firm, you would know, if you
wanted to, what your share of the reduced capital would be,
right?

A    I had an understanding that that figure reflected out
obligation to the bank.

Q    Mm-hmm.

A    And I had an understanding that our firm would be able to
pay down that obligation before the end of the year.  I
didn't do a calculation such as the one you suggest.

Q    I want to see how easy it would be.  Assume, for example,
that an equity partner had a ten percent share and the

Lewis - Cross                          315

September 30th loss was $5,562,509.  That ten percent equity partner, who could probably do this in his head, although I can't and conclude that his capital account would suffer a loss of $556,000 and some change, right?

A    Yes, as of that date.

Q    Right, exactly.  I'd like to turn back to the settlement agreement that entered into before Judge Rice in this court, either our copy of it or your copy of it.

THE COURT:  Let's go with your copy, the book's smaller, it's easier on his wrists.

MR. KEENEY:  Yes, fine.

Q    Yes, we are on Defendant's Exhibit 2, if you could turn to that?

A    I have that.

Q    And first of all, you agree with me that this is an agreement of 11 pages, right?

A    Mine is Bates stamp 1 through 18.

Q    Okay, that includes the signature pages.  In substantive provisions, it's 1 through 11, right?

A    Yes.

Q    Okay.  And directing your attention, very specifically, to paragraph 14, that deals with the return of capital owed to you and Michael Hausfeld, right?

A    Yes.

Q    Does it specify an amount in paragraph 14?

Lewis - Cross                                    316

A     No.

Q     Does it say, "As provided for in the amended and re-stated operating agreement of Cohen Milstein Hausfeld and Toll, PLLC?

A     If you could just tell me what sentence you're --

Q     Oh, I'm sorry.  I was looking at the first sentence.  I'm just reading the last half of the first sentence.

A     Yes, I see those words.

Q     Okay.  At any time, did you tell Cohen Milstein that you expected a number to be put in paragraph 14 that reflected a return of capital to you as of December 31, 2007?

A     No, I did not.

Q     And you understand now, after reviewing the amended and re-stated operating agreement of Cohen Milstein, Hausfeld & Toll, PLLC, that the operative date there is October 31, 2008 for your capital account, right?

A     As I said earlier, I understand that that's the date identified there, but it would include looking at fees that we knew we would receive before the end of the year.

Q     You're not suggesting that the operative date is December 31, 2008 for the return of your capital, are you?

A     No, I'm just suggesting what I just said.  I could repeat it.

Q     Oh, no, I heard it.  I just wanted to make sure I understood what you were saying and I understand it.  I'd

Lewis - Cross                                    317

like you to now turn to Defendant's Exhibit 11 in the exhibit binder.

A   I have it.

Q   And could you please turn to page 21?

MR. ROSENTHAL:  Would you identify the document, Mr. Keeney?

MR. KEENEY:  Yes.

THE COURT:  This is D-11, Ms. Drolet's report.

MR. KEENEY:  Yes.

MR. ROSENTHAL:  Year end review report?

MR. KEENEY:  Yes, exactly from Drolet Financial Associates, yes.

BY MR. KEENEY:

Q   Let me ask the witness, as an equity partner at Cohen Milstein, did you from time to time, receive reviewed financial statements from Drolet & Associates?

A   I did.  I don't know if I received this one, looking at it.

Q   That's fine.  Looking at page 21, does that purport to be a statement of your equity balance as of the year ended December 31, 2008?

A   That's what it says.

Q   Had you, in previous years, received similar statements from Drolet & Associates?

A   I assume so, but I don't have a specific recollection if

Lewis - Cross                                                318

I had or not.

Q   And directing your attention to the all caps on the right hand side, up at the top of the document, do you see the reference to Cohen Milstein Sellers and Toll, PLLC member income and equity information income tax basis?

A   I do.

Q   Based on your testimony, it's true, isn't it, that there was no partnership vote to expel you from the partnership?

A   That's correct.

          MR. KEENEY:  We have no further questions, your Honor.

          THE COURT:  All right, thank you.  You have five minutes, Mr. Rosenthal.

          MR. ROSENTHAL:  It should take no longer than that, your Honor.

          THE COURT:  All right.

                    REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Mr. Lewis, if you would, open up Plaintiff's Exhibit 85, please?

A   I have that.

Q   And this is an e-mail from Mr. Keeney to me, dated December 31, 2008, do you see that?

A   Yes.

Q   And it reads, "the attached should contain the

Lewis - Redirect                                    319

information showing the pay-down of the LOC in November and December as you asked for, excluding Exxon-Valdez?"

A    Yes.

Q    Take a look at the second page.

A    Yes.

Q    Did you receive a copy of this document, by the way?

A    I can't say as I sit here today.  I was aware that these payments were being made.

Q    When you say these payments, what do you mean?

A    That cases were coming in and money was being paid to Sun Trust to pay down the line.

Q    At the time that you left the firm, did you believe these fees would be coming in?

A    Yes, not -- I don't know if this was the precise list of cases.  I knew there were a group of cases where we expected fees.

Q    Okay.  Mr. Keeney asked whether you knew at some point during 2008, that the firm was doing so well, do you remember that?

A    I do.

Q    Did you expect that the firm would be doing better as the year progressed?

A    I knew we were expecting significant fees to come in at the end of the year and into the beginning of the next year.

Q    Just so we know, on the very first page of this Exhibit

Lewis - Redirect                                    320

85, LOC refers to line of credit, is that right?

A    I've seen that before and I believe that's correct.

Q    If you take a look at Defendant's Exhibit 11.

A    I have that.

Q    And ask you take a look at the fourth page of it.

A    528?

Q    527.

A    527, yes.

Q    Do you see the date in the lower left-hand corner?

A    March 23, 2009.

Q    Were you still with Cohen Milstein at that point?

A    No, I had left in early November, 2008.

Q    At any point during the year 2008, before you left the firm, did you actually have to come out of pocket to make up for any purported loss the firm was suffering?

A    No.

Q    Why not?

A    I was never asked to do that.  We had been in this position before, where we had owed the bank significant amounts of money and we had been able to bring in the fees to pay it down.  So, I had never been asked to do that in the past and nobody had mentioned it to me that I would be asked to do it this year.

Q    Was what happened with respect to paying down the line of credit near the end of the year in 2008, different from what

Lewis - Redirect                                         321

had happened in years past?

A    During those years when we were having a bad year, we were able to pay the line down by the end of the year and I was never asked to make a out-of-pocket contribution.

MR. ROSENTHAL:  I don't have any further questions, your Honor.

THE COURT:  All right.

MR. KEENEY:  No questions.

THE COURT:  All right, we'll adjourn for the day. We're going to start tomorrow at 9:00 with Mr. --

MR. ROSENTHAL:  With Mr. Davis.

THE COURT:  -- Davis and then what else?

MR. ROSENTHAL:  Again, Mr. Davis, we've got Mr. Hausfeld, We've got Mr. Eisler.  Mr. Sellers, I guess, is going to be here tomorrow.

MR. KEENEY:  Yes, Mr. Sellers is here really only in the morning, your Honor.  I don't mean to disrupt the call of witnesses, but our suggestion would be if you could just call Mr. Sellers in your case right up front.  We'll be with him for 20 minutes on cross and then send Mr. Sellers back.

MR. ROSENTHAL:  You mean direct, don't you?

MR. KEENEY:  Direct, yes, sorry.

THE COURT:  Well, I'll let you guys work out those logistics.

MR. ROSENTHAL:  We can work out those logistics,

322

yes.

THE COURT: Yes.

MR. KEENEY: Yes. And I didn't mean to upset your order, it's just I have a scheduling problem with Mr. Sellers.

THE COURT: That's fine, it's better than the remote feed from Fiji or wherever he was --

MR. ROSENTHAL: Yes.

THE COURT: -- that we were talking about. All right, you want to start at 9:00 again tomorrow?

MR. ROSENTHAL: Yes, your Honor.

MR. KEENEY: Yes, your Honor.

THE COURT: All right, I'll see you at 9:00 and we'll lock the room so you can leave your papers and things here, if you want.

MR. KEENEY: Thank you very much.

MR. ROSENTHAL: Have a good day.

THE COURT: Thank you, Mr. Lewis.

THE WITNESS: Thank you.

(Court adjourned 5:18 o'clock p.m.)

- - -

323

I N D E X

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Patricia Drolet | | | | |
| By Mr. Rosenthal | 44 | | 202 | |
| By Mr. Keeney | | 139 | | |
| Steven Toll | | | | |
| By Mr. Keeney | 240 | | | |
| By Mr. Rosenthal | | 255 | | |
| Richard S. Lewis | | | | |
| By Mr. Rosenthal | 273 | | 318 | |
| By Mr. Keeney | | 305 | | |

- - -

I certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court on September 11, 2009, incorporating redactions of personal identifiers requested by the following attorneys of record:  John C. Keeney, Jr., Esquire, Hogan & Hartson, LLP, and Seth A. Rosenthal, Esquire, Venable, LLP, in accordance with Judicial Conference policy.  Redacted characters appear as an X in the transcript.


Geraldine C. Laws, CET                    Dated 12/23/09
Laws Transcription Service