IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| MICHAEL HAUSFELD, et al | : | CIVIL ACTION NO. 06-0826 |
| Plaintiffs | : | |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | August 11, 2009 |
| COHEN MILSTEIN SELLERS | : | 9:14 o'clock a.m. |
| & TOLL, PLLC | : | |
| Defendants | : | |

. . . . . . . . . . . . . . . .

SETTLEMENT HEARING
BEFORE THE HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For Plaintiffs:

          PATRICK KITTREDGE, ESQUIRE
          Thorp Reed & Armstrong
          400 Market Street, Suite 200
          Philadelphia, PA  19106-2535
                  -and-
          MICHAEL D. HAUSFELD, ESQUIRE
          RICHARD S. LEWIS, ESQUIRE
          Hausfeld LLP
          1700 K Street, NW
          Suite 650
          Washington, DC  20006
                  -and-
          SETH ROSENTHAL, ESQUIRE
          MOXILA UPADHYAYA, ESQUIRE
          Venable LLP
          575 75th Street, NW
          Washington, DC  20004
          -- for Plaintiffs Michael Hausfeld
             and Richard Lewis

- - -

2

APPEARANCES:   (Continued)

For the Defendants:

        STEVEN J. TOLL, ESQUIRE
        DANIEL A. SMALL, ESQUIRE
        Cohen Milstein Sellers &
        Toll PLLC
        1100 New York Avenue, NW
        Suite 500 West Tower
        Washington, DC  2005
              -and-
        JACK KEENEY, ESQUIRE
        LYNNE BAUM, ESQUIRE
        Hogan & Hartson LLP
        555 Thirteenth Street, NW
        Washington, DC  20004
        -- for Cohen Milstein Sellers
           & Toll, PLLC


                            - - -


Audio Operator:         Inna Goldshteyn

Transcribed by:         Grace Williams, CET
                        Tracey Williams, CET
                        Paula L. Curran, CET


        (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcribers.)


Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

3

(The following occurred in open court at 9:14 o'clock a.m.:)

THE COURT:  Good morning, everyone.

COUNSEL:  Good morning, your Honor.

THE COURT:  I hope you had a good evening.  Please be seated.  Hello, Inna.  We had earlier a visitor today, Peggy Riley is a law student at Temple.  She's going to be watching you folks today so welcome her.

Who's next witness-wise?

MR. KEENEY:  Oh, well, the good news, your Honor, is that we have Mr. Sellers pursuant to a request from the other side.  Because of his schedule our suggestion is we hear him because he came a long way to be heard.

THE COURT:  Is that all right with you, Mr. Rosenthal?

MR. ROSENTHAL:  Yeah, we'll accommodate him.

THE COURT:  Okay.

MR. ROSENTHAL:  So we call Joe Sellers.

THE COURT:  Okay, beautiful.  Thank you for doing that.  You know, I couldn't figure out how to turn your screen off or the stuff off so I just hit the power surge thing and turned it off.  Are you guys going to need that?  Because all you have to do is flip the switch.

MR. KEENEY:  Yeah, I know.  I don't think I need it.

THE COURT:  If anybody needs it, just the power

4

surge thing on the bottom, yeah, just turn that on and everything should come back.  When I was locking up the courtroom, I noticed that was still on.

JOSEPH M. SELLERS, Plaintiff's Witness, Sworn.

THE COURT CLERK:  Please be seated.  State your full name, spell your last name.

THE WITNESS:  My name is Joseph M. Sellers, last name is S-e-l-l-e-r-s.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Good morning, Mr. Sellers.  My name is Seth Rosenthal.  I have not had a chance to talk to you about the subject matter of this case yet, have I?

A   No.

Q   Have not had a chance to depose you, right?

A   No.

Q   Or otherwise talk to you?

A   Correct.

Q   Before we get started I just want to make sure you've got exhibit binders up there that we're going to be working with. Do you have an exhibit binder, sort of a really thick exhibit binder that says plaintiff's exhibits?

A   Yes.

Q   Okay.  I think that's the one we're going to be working out of.

Sellers - Direct                                    5

A    Okay.

Q    Mr. Sellers, you are currently a partner at Cohen Milstein Sellers and Toll, is that correct?

A    That's correct.

Q    Formerly known as Cohen Milstein Hausfeld and Toll?

A    That's correct.

Q    Okay.  And Mr. Hausfeld was involuntarily terminated from the firm back in November of 2008?

A    That's correct.

Q    And shortly thereafter the firm changed its name to include your name rather than Mr. Hausfeld's name in the firm's name, is that right?

A    Shortly afterwards, that's correct.

Q    And you've been with Cohen Milstein Sellers and Toll for about 12 years now, is that right?

A    That's, well, it was the firm, yes, it was originally called Milstein Hausfeld and Toll but I started in November of 1997.

Q    Okay.  If you would open up to plaintiff's exhibit binder to Exhibit 42, please?

        (Pause.)

Q    And I'll ask you to take a look at the second page of that e-mail string, the second page of Exhibit 42.

A    Does it have Bates No. CMST-01357?

Q    Yes, it has.

Sellers - Direct                    6

A    Okay.

Q    Take a look at the second e-mail on the page from Patrick Talu (ph.) dated Friday, February 22nd, to you, Daniel Summers, Daniel Small and Steve Toll, do you see that there?

A    I do.

Q    And it says "Allocation of expenses and fees," do you see that?

A    Yes.

Q    And the time on it is 2:29 in the afternoon, right?

A    Correct.

Q    And Mr. Talu writes to all of you, including yourself, "The eagle has landed, kind of," you see that?

A    I see it.

Q    And what he's referring to is the receipt of the fees in the OSB case, is that right?

A    I'd have to go back and look at the earlier part of the-- if that's your representation I have no reason to question it but if you want me to independently determine I have to look at the whole e-mail sheet.

Q    I'll ask you to take a look at the e-mail at the very bottom of Page 2.  From Emily Hare at SunTrust.com to Patrick Talu?

A    Yes, okay.

Q    You see that?

A    Yes.

Sellers - Direct                                    7

Q   It says "The wire has been sent and the checks have been mailed.  Will this OSB attorney fee account need to be used anymore or should I terminate," do you see that?

A   I do see that.

Q   So this is an e-mail chain involving the receipt of the OSB fee through Sun Trust Bank, is that right?

A   It appears to be, yes.

Q   Okay.  And if you take a look at the third e-mail from the bottom of the page from Hugh Diamond to Patrick Talu, do you see that?

A   Yes, with a number.

Q   Yes, and it indicates that the firm has received $2,840,662, is that right?

A   Yes.

Q   And actually that e-mail before down further on the page, an e-mail from Mr. Talu to Hugh Diamond is 11:29 a.m. where he asked Mr. Diamond "Did you receive a wire from Sun Trust this morning for our OSB fees," do you see that?

A   Yes.

Q   And then Mr. Diamond responds with that $2.84 million figure, right?

A   Yes, that's what appears.

Q   So this is what Mr. Talu is referring to in the 2:29 p.m. e-mail where he says the eagle has landed, right?

A   I think that's correct.

Sellers - Direct                                8

Q    And you understood him when you received this e-mail to
be intending to mean that the fee in the OSB case had been
received and in the possession of your firm, correct?

A    That's correct.

Q    I ask you to turn to Page -- I'm sorry -- Exhibit 41,
please.  And this is an e-mail from Steve Kaufman to me dated
Friday, February 27th -- 20th, 3:37 p.m., you see that?

A    Yes.

Q    Which is an hour and eight minutes after the eagle has
landed e-mail, correct?

A    Well, just a moment.

          (Pause.)

A    An hour and 18 but that's -- or 16, whatever, yes.  It's
shortly after it.

Q    Okay.  A little over an hour afterward, right?

A    Yeah.

Q    And the e-mail says "Seth, we are attaching the capital
account information from Cohen Milstein," do you see that?

A    I do see that.

Q    So it was only after, only after your firm confirmed
receipt of the fees in the OSB case that the capital account
information for Mr. Hausfeld and Mr. Lewis was provided to
us, isn't that right?

A    Well, if you're asking me to confirm the timing on the
two documents, I would agree that that's the case.  If you're

Sellers - Direct                                                9

asking me whether there's some relation between the two of them, not that I know of.

Q    Were you the one who authorized the release, the final release of the information to Mr. Hausfeld and Mr. Lewis' lawyers?

A    No.

Q    Who was?

A    I believe that that was Steve Toll.

Q    Did Mr. Toll tell you that he was the one who had ultimately authorized the release of that information?

A    Did he tell me that, I don't know that he told me, I think it was our understanding that as the managing partner that was part of his responsibility.  And as far as I know, what he did was transmit it to our counsel.  After that whenever, when the counsel chose to disclose it to you I don't know whether Mr. Toll had any control over that either.

Q    Do you know when Mr. Toll sent it to counsel?

A    I do not.

Q    Possible obviously that he sent it to counsel right after the receipt of the OSB fees, right?

A    It's possible or some time earlier, I don't know.

Q    Did Mr. Toll tell you at any point in time that he was awaiting the OSB fees prior to authorizing the release of the capital account information to my clients?

A    Absolutely not.

Sellers - Direct                              10

Q   Never told you anything like that?

A   No.

Q   But you have no reason to believe that that didn't happen either?

A   I don't have any reason to know one way or the other.

Q   I ask you to turn back to Exhibit 42, please, Mr. Sellers.

A   Sure.

Q   I'm actually going to put a blowup of this on the...

        (Pause.)

Q   Okay.  So if you take a look at actually and now take a look at the very first page of Exhibit 42?

A   Right.

Q   Okay.  And ask you to look at the e-mail in the middle of the page from Mr. Toll, Steve Toll, to you, Friday, February 20th at looks like 6:19 p.m., do you see that?

A   Where it begins "Okay, thanks"?

Q   Yes.

A   Yes, I see that.

Q   Okay.  And that is a few hours after the receipt of the OSB fees, correct?

A   Yes, it appears to be.

Q   And a few hours also after the capital account information was finally released to my clients, correct?

A   Yes, it appears to be.

Sellers - Direct                                    11

Q    And you write to Mr. Toll -- I'm sorry, if you'd take a look at the e-mail below that --

A    Toll what?

Q    I'm sorry, the e-mail on Page 1 of Exhibit 42.

A    Yes.

Q    Fourth e-mail down on the page from you to Mr. Toll on February 20th at 4:59 p.m., right?

A    Yes.

Q    And you say "Steve, I signed the check as Patrick assured me the amount sent to us was 100 percent of the amount payable to both firms," right?

A    Yes.

Q    Okay.  And then Mr. Toll responds to you a couple hours later with that "Okay, thanks" e-mail, right?

A    That's what it appears to be.

Q    Okay.  And Mr. Toll writes to you, "Okay, thanks, sounds fine," right?

A    Right.

Q    And he said "Now can't wait for the MDH explosion re the capital account," right?

A    I see that.

Q    MDH is Michael Hausfeld, right?

A    That would be correct.

Q    "We should be okay," he says, do you see that?

A    I see.

Sellers - Direct                    12

Q   "On that but I expect a repeat trip to Philadelphia to see the Magistrate," do you see that?

A   I do.

Q   In that e-mail you would agree that Mr. Toll almost sounds giddy about the fact that Mr. Hausfeld might explode over the capital accounts, wouldn't you?

A   No.

Q   You don't interpret it that way?

A   No, I don't.

Q   How do you interpret it?

A   Well, I'm not entirely sure.  I didn't, haven't discussed the e-mail with Steve but I think he believed that there may have been some --

Q   You're speculating now, right, Mr. Sellers?

A   I am speculating.

Q   Okay.

        THE COURT:  You can't speculate.

        THE WITNESS:  Okay, that's fine.

BY MR. ROSENTHAL:

Q   But you responded just a few minutes later, right?  6:56, 7:07, you responded about 11 minutes later, right?

A   Yeah, that looks like that's correct.

Q   And you say "I spoke with Pat Drolet today to fill her in on the rationale for the 14 v 28 percent distinction," right?

A   Correct.

Sellers - Direct                                    13

Q   "She fully supported us," right?

A   Correct.

Q   So when Mr. Hausfeld -- when Mr. Toll says he can't wait for the Hausfeld explosion your immediate reaction is to talk about your discussion with Ms. Drolet that day, right?

A   I don't think the two were related.  I think I was just using, it was responding to Steve Toll to let him know that I had spoken to Pat Drolet but it has nothing to do with an explosion.  I was simply filling him in with I had spoken with Pat Drolet as he and I had discussed I would.

Q   This 14 versus 28 distinction wasn't the first thing that came to mind when you wrote now can't wait -- when Mr. Toll wrote to you "Now can't wait for the MDH explosion"?

A   Well, what came to mind was the reference to capital account.  And I was letting Mr. Toll know that I had spoken to Pat Drolet earlier in the day as we agreed I would.

Q   You and Mr. Toll talked earlier that day, February 20th, about you calling Ms. Drolet?

A   I'm not sure it was that day, it may have been a day or two earlier, but we had agreed that I would, he had many other things on his plate, that I would follow up with Ms. Drolet.

Q   He indicated that he wanted you to call up Ms. Drolet about this 14 versus 28 distinction, correct?

A   He -- he and I discussed that we ought to check with Ms.

Sellers - Direct                                        14

Drolet to confirm whether what she was intending to use with respect to the computation of the capital accounts and whether we were -- she was going to use the 14 percent that had been Michael's allocation of points after the compensation committee or the 28 percent which had been the basis for it in place as of October of 2008.  And that was what I want -- I called her about.

Q    Had you ever called her before having anything to do with capital account calculations or Mr. Lewis?

A    I had not talked to Ms. Drolet about capital accounts for anybody before.

Q    This is the very first time?

A    Yes, I had very rare occasion to talk to Ms. Drolet.

Q    This is a pretty unique situation?

A    Well, if I haven't talked to her very much I guess you could say it's relatively not new but it was really because Mr. Toll had had a lot of other things to do and I agreed that I would call her as a routine matter.  It was a very routine call.

Q    And you called her again to talk specifically about the 14 versus 28 percent distinction?

A    That's correct.

Q    What did you tell her about the rationale for the 14 versus 28 distinction?

A    My recollection is that I said I felt that the

partnership agreement provided that the percentage that would be applied with respect to all the capital accounts but particularly Michael's was the percentage as of the end of the month before he left which would have been October 31st of 2008.  And at that time the percentage Michael had was 28 percent and that thereafter the compensation committee changed the allocation of points to Michael to 14 percent and it was our understanding that that 14 percent did not apply retroactively to the capital account calculations.

And she said "Oh, of course," and that was the end of the conversation.

Q   And you had that conversation with her on February 20th, you said?

A   I believe so.  I mean I don't have an independent recollection of a date but I don't doubt that when I say I spoke to her that day that that's the day I spoke to her.

Q   I'll ask you to turn to Plaintiff's Exhibit 48, please.

A   I have it.

Q   The very -- the e-mail at the very top of the page, the e-mail from Ms. Drolet to Mr. Toll, it's already in evidence, and it says "Steve, this is the reply I received from Stef Tucker below.  I have not responded yet.  He mentions that Michael's percentage was changed retroactively to 1/1/2008. Was that ever discussed with Michael or put into writing?" And that's dated March 2nd, 2009, ten days after your

conversation with her, right?

A    I presume so, that's appears what it says.

Q    But your testimony is that you had already talked to her about this.

A    I had talked, I had talked to her about the allocation between the points, 14 versus 28, back in February of 2008-- or 2009, sorry.

Q    So you think it just slipped your mind?

A    I don't now.  And at least as I read this it at least appears to me to be a question Ms. Drolet is asking Steve Toll as to whether this matter was ever discussed with Michael or put into writing.  That's different than the question of whether I have ever discussed it with her.

Q    Did she ever ask you whether you put it into writing?

A    She did not.

Q    I ask you to turn to Plaintiff's Exhibit 68.

A    I have it.

Q    Okay.  This is an e-mail from Mr. Toll to all the equity partners dated November 5th, 2008, right?

A    That's correct.

Q    And the e-mail says "Attached is a chart setting forth the final equity partners percentage interest in the firm for 2008 approved today by the compensation committee retroactive to the beginning of 2008 and effective immediately," right?

A    Well, that's what it says.  It is a memo, not an e-mail

Sellers - Direct                                17

but, yes, that's what it says.

Q    Okay.  And you told Ms. Drolet that as of October 31st Mr. Hausfeld's percentage interest was 28 percent even after the compensation committee's actions, right?

A    That's what it -- that's correct.

Q    This e-mail,  however, says that the percentage interest determinations are effective immediately and retroactive to the beginning of 2008, right?

A    That is correct but I need to explain.  As I said, I explained, discussed with Ms. Drolet, there was no -- I made perfectly clear to her that there had been a decision by the compensation committee to reduce Michael's points to 14 percent but that as we viewed it the percentage interest that should be applied and computed in his capital account as of the end of October 2008 was governed by the partnership, the operating agreement and that was 28 percent and she agreed. She said of course.  So I had made that clear to her that I understood that there had been a change of Michael's points to 14 percent by the compensation committee.

Q    Did you make it clear that it was effective immediately and retroactive to the beginning of the year?

A    I -- I made it clear but I don't recall that I said effective immediately, but I made it clear that I understood that it was effective to the beginning of 2008 and that that's the only reason why it mattered that I asked her about

this because our understanding was the operating agreement nonetheless required that the percentage points applied to computing Michael's account was 28 percent because that's what was in effect as of the end of October of 2008. And that's -- she said of course.

Q    But this memo says that the percentage in effect as of October 31st, 2008 is 14 percent, a new percent, correct?

A    That's what it says.

Q    And you didn't tell her about this memo, did you?

A    I don't think I mentioned this memo. I did discuss, as I said, the substance of it as it applied to Michael.

Q    Let's turn to Exhibit 2, Mr. Sellers.

     (Pause.)

A    Okay. I have Exhibit 2.

Q    This is the operating agreement for Cohen Milstein Hausfeld and Toll that you were just referring to, correct?

A    That is correct.

Q    I'll ask you to turn to Page 9, Article 10 at the bottom.

A    Okay.

Q    Read it to yourself and let me know whether there is anything in there that talks about the percentage to be applied as of -- the percentage to be applied to determine liquidating balance in a terminated partner's capital account.

A    The word "percentage" does not appear there. What does

appear there is the statement, a statement of the balance in the capital account of the terminating member and of the income or loss of the company for the fiscal year of the company to the last day of the last full month immediately preceding the termination date, which would have been October 31st, 2008.

Q    But that's simply a statement of income or loss as of that date, that's not a statement of percentage interest, correct?

A    No, it says a statement of the balance in the capital account of the terminating member and of the income or loss. The first statement is a statement of the balance of the capital account. That statement of balance in the capital account is based on the percentage that applied in October 31st, 2008.

Q    And, Mr. Sellers, let's turn back to Page 68 again, I mean Exhibit 68 again.

A    Okay. Can I have it in front of me?

Q    Isn't it true that the words "effective immediately and retroactive to the beginning of the year" mean that the percentage in effect for Mr. Hausfeld as of October 31st, 2008 is 14 percent?

A    No, not with respect to the computation of the capital accounts.

Q    What does it mean?

A    It means that as to the application of distribution of any profits and as to the allocation of voting interests that his interests were measured at 14 percent for that period going forward until the compensation committee next meant-- met.

Q    I'm very confused.  Are you saying that this determination is effective immediately for one purpose, to slash his voting strength to 14 percent, but not for another to reduce the allocable share of his income or loss to 14 percent, is that what you're saying, Mr. Sellers?

A    I'm saying that the operating agreement specifies that how you compute the capital account and that this was intended -- I didn't write this memo but what it certainly my understanding and it's always been the case at the firm. This is not the first time this kind of memo's been issued, it's issued every year -- is that its computation is to measure the interest for purposes of voting and distribution of profits going back to the beginning of the year and continuing then as to -- I'm sorry, the voting is going forward, the distribution of profits is for that year.  So for the next year until the compensation committee again meets the percentage interest every partner has is determined by this memo.  That is different than the computation of the capital account which has always been, as we've always dealt with it this way in connection with departing partners, Mr.

Hausfeld's not the first partner who's left the firm, we've always computed it based on the percentage in place as of the end of October -- sorry, the end of the month preceding the point where they left.

Q   Is it your testimony that this 14 percent reduction wasn't really effective for Mr. Hausfeld until the end of the year?  And by the year he was gone?

A    No, no.  Well, it was effective as of the day that the compensation committee voted.

Q    And that tracked it to the beginning of the year, the date the compensation committee voted, just like the memo says and just like you guys do every year with partners, right?

A    That's correct.  But, as I said, what we also do every year with respect to partners who are departing is measure the value of their capital accounts as of the percentage and the value that was in effect the month before they left.

Q    So in your view it is legitimate to slash Mr. Hausfeld's voting percentage to 14 percent in order to expel him from the firm but then to turn around and charge him with 28 percent of the loss that appeared on the books and records, the books and records of the -- is that what you're saying?

MR. KEENEY:  Objection.

THE WITNESS:  No, I'm --

THE COURT:  Hold on.

Sellers - Direct                          22

MR. KEENEY:  Argumentative, your Honor.

THE COURT:  Oh, I don't think it is.  Go ahead.

THE WITNESS:  I'm not -- I'm not going to agree with your characterization.  I don't understand first of all the compensation committee voted for the purpose of expelling Mr. Hausfeld.  And, second, I'm not saying that, we have a separate provision that governs the computation of the capital accounts, that's all I'm saying is that the operating agreement governs that.  That's how we've approached it with all the departing partners since I've been there and Mr. Hausfeld was treated no differently.

BY MR. ROSENTHAL:

Q   You just testified that it was not the purpose of the compensation committee to reduce his points in order to expel him from the company, is that correct?

A   I said that was not the purpose of the operation of the compensation committee.

Q   On November 5th in the afternoon the compensation committee voted to reduce his points to 14 percent, correct?

A   That's my understanding.  I wasn't on the compensation committee.

Q   And those points were re-allocated to eight members of the firm, the eight who were aligned against Mr. Hausfeld, correct?

A   If you show me I'm happy to look at it and see.

Sellers - Direct                                    23

Q   Take a look at Page 2 of Exhibit 68.

A   Okay.

Q   Let's take a look at Mr. Milstein.

A   All right.

Q   His percentage interest went up from XXXX percent to XXXX percent, correct?

A   Correct.

Q   So he got some of Mr. Hausfeld's points, right?

A   Well, he got some -- he got an increase in points.  I don't know they came all from Mr. Hausfeld.

Q   Mr. Toll, his points went up from XXXXX to XX percent, right?

A   That's correct.

Q   So he got an increase in points, right?

A   That's correct.

Q   Lisa Mosetti, she went up from XXXX percent to XXX percent, correct?

A   That's correct.

Q   She got an increase in points, right?

A   That's correct.

Q   Andy Friedman, he went up from XXXX percent to XXXX percent, he got an increase in points, right?

A   That is correct.

Q   Mr. Lewis and Mr. Lewis was not affiliated with the eight who ultimately voted to expel Mr. Hausfeld from the firm,

Sellers - Direct                    24

correct?

A    He did not participate, he did not vote to expel Mr. Hausfeld.

Q    And his percentage interests went down from 7.02 percent to 6.5 percent, right?

A    That's correct.

Q    So he obviously didn't get any of Mr. Hausfeld's points, right?

A    I guess so, I -- I mean his points went down.

Q    Dan Summers, next in line, up from XXXX percent to XXXX percent, right, Mr. Sellers?

A    That's correct.

Q    Dan Small, up from XXXX percent to XXXX percent, correct?

A    That's correct.

Q    Mark Lewis was gone from the firm, Nussbaum gone from the firm, correct?

A    Correct.

Q    Paul Gallagher gone from the firm?

A    Correct.

Q    Joe Sellers, that's you, next, right?

A    That's correct.

Q    You went up from XXXX to XXXX percent, right?

A    That's correct.

Q    Rich Kaufman, RAK, went from XXXX percent to XXXX percent, right?

Sellers - Direct                                    25

A    That's correct.  You missed Mark Machiz, by the way.

Q    Okay.  So Mark Machiz, well, he withdrew from the equity partnership but he still has two percent at the end of the year?

A    I believe he had two percent at the time because his -- it, his withdrawal had not gone into effect yet.

Q    Okay.  Next is Rich Kaufman from XXXX to XXXX percent, correct?

A    That's correct.

Q    Okay.  And then Bob Eisler, Robert Eisler is next, down from XXXX to XXX, right?

A    That's correct.

Q    So he obviously didn't get any of Mr. Hausfeld's points, right?

A    I can't tell you one way or the other, I can only tell you his points went down.

Q    Okay.  And Mike Leeman (ph.) goes down from XXXX percent to X percent, correct?

A    That's correct.

Q    Okay.  Now the partners who voted to expel Mr. Hausfeld from the firm was Mr. Milstein, one, right?

A    Correct.

Q    He got an increase in points, right?

A    Correct.

Q    Mr. Toll was another that voted to expel Mr. Hausfeld

from the firm, right?

A   Correct.

Q   He got an increase in points, right?

A   Correct.

Q   Ms. Mosetti, she was another, she got an increase in points, right?

A   Correct.

Q   Mr. Friedman, he was another, he got an increase in points, right?

A   Correct.

Q   Mr. Summers was another, he got an increase in points, right?

A   Correct.

Q   Mr. Small the same thing, right?

A   Correct.

Q   And Mr. Kaufman the same thing, right?

A   Correct.

Q   Those are the eight members who voted to expel Mr. Hausfeld from the firm and each of them got an increase in points, correct?

A   Each of them got an increase in points.

Q   So the points taken away from Mr. Hausfeld were re-allocated to those eight people, right?

A   I can't be sure of that.

        THE COURT:  Why don't you just look at the chart, do

Sellers - Direct                                27

the math, all right?

THE WITNESS:  Okay.  Your Honor, if I may, the reason I say this is because I wasn't present at the meeting. For all I know the --

THE COURT:  Just look at the chart.

THE WITNESS:  Okay.

THE COURT:  And tell me where the points that left Hausfeld ended up and I think it's a pretty simple deduction.

THE WITNESS:  Okay.  The people who were allocated points that went up, whose points went up, were the people who voted to expel Mr. Hausfeld, is that what you're getting me to say, want me to say?

BY MR. ROSENTHAL:

Q   That's right.

A   Okay.

Q   Right.  And that happened on the afternoon of November 5th, 2008, right?

A   That's correct.

Q   November 6th, the very next day, let me ask you on November 5th before the compensation committee took action those eight members of the firm did not have the two-thirds percentage interest necessary to expel anybody from the firm, right?

A   That's correct.

Q   And after the compensation committee suddenly those eight

Sellers - Direct                          28

members did have the two-thirds percentage interest necessary to expel somebody from the firm, correct?

A    That's correct.

Q    The very next day the eight of you signed a written document amending the partnership agreement, right?

A    November 6th, that's right.

Q    The very next day, right, November 6th.  Amending the partnership agreement, right?

A    Yes, I take your word for it the day but, yes, we did very--

Q    Well, let's let look at a document, Mr. Sellers.

A    Okay.

Q    Let's look at Plaintiff's Exhibit 93 in the binder.

A    Okay.

Q    Take a look at Page 3 and 4.

A    I see November 6th, you're correct.

Q    The day after the compensation committee met, right?

A    That's correct.  That's correct.

Q    And this is the document that first amended the partnership agreement to eliminate the 30-day wind-up period for partners who were involuntary -- were involuntarily terminated from the firm, correct?

A    That's correct.

Q    And that 30-day wind-up period had been in the operating agreement as long as you'd been with the firm, right?

Sellers - Direct                                29

A   That's correct.

Q   The idea behind the 30-day wind-up period was to let even those partners who chose to involuntarily terminate give them a chance to wind up their affairs before they left the firm, right?

A   That's correct.  There were extraordinary circumstances that caused us to do this.

Q   Okay.  But you amended the provision so that you could then expel Mr. Hausfeld immediately, right?

A   We amended the provision to permit us to expel Mr. Hausfeld upon service, yes.

Q   And the second thing that this consent form does is to expel Mr. Hausfeld from the firm, right?

A   That's correct.

Q   And that happened the day after the re-allocation of percentage interest by the compensation committee, right?

A   That's correct.

Q   It is your testimony that the compensation committee did not do what it did for the purpose of expelling Mr. Hausfeld from the firm the following day?

        MR. KEENEY:  Objection, lack of foundation, your Honor.

        THE COURT:  All right, why don't you rephrase it.  I don't know if it's a -- it's a bit argumentative so why don't you just rephrase that question.

Sellers - Direct                                    30

BY MR. ROSENTHAL:

Q    I'll do that.  Is it your testimony, Mr. Sellers, still that the compensation committee did not act for the purpose of expelling Mr. Hausfeld from the firm?

A    I don't know that, I certainly would not say that was its only purpose.  The compensation committee met, as I understood it met for hours and evaluated everybody's contribution to the firm that year.  I wasn't present at the meeting and I certainly didn't understand before the meeting that that was the intention of the compensation committee at its meeting.

THE COURT:  So you had no inkling before that meeting that there was going to be any movement to oust Mr. Hausfeld from the firm?  That just kind of happened, you were like --

THE WITNESS:  No.

THE COURT:  -- holy Moses, what happened here?

THE WITNESS:  Right.  Your Honor, we had discussed the concerns we had about Mr. Hausfeld and how much he was causing difficulty with managing the firm at that point and that by then he'd already gone to the bank and jeopardized our ability to retain our line of credit.  What I was responding to was that before the compensation committee met I was not -- I did not understand that the purpose of the compensation committee meeting was to vote to re-allocate the

Sellers - Direct                                    31

points to remove Mr. Hausfeld -- remove Mr. Hausfeld.

There's no question that we had an interest in removing Mr. Hausfeld before that meeting.

THE COURT:  So the results of the compensation committee were a surprise to you?

THE WITNESS:  Uhm --

THE COURT:  Mr. Hausfeld all of a sudden has a less, his interest is cut from 28 to 14?

THE WITNESS:  I wasn't sure whether we were going to get to that point.  I had every reason to think, based on what I knew people were thinking about Mr. Hausfeld and his impact on the firm at that point that his points were going to go down.  I didn't know they were going to go down to that level or some other level.  But I would have been surprised after the compensation committee meeting the points, his points had remained the same or gone up.

But I can't tell you that they were going to go to exactly that level.

THE COURT:  Okay, thank you.

BY MR. ROSENTHAL:

Q   But you did know that they would go to a level that would allow the eight of you to expel him from the firm?

A   I knew that we, as I said, that we -- that by that point we had been really unable to manage the firm because of his behavior and we had I think come to the conclusion and then

that he had been speaking to our bank, jeopardizing our line of credit that forced -- created the risk that the firm could become insolvent that I felt we had no choice but to find a way to have him leave.

We had tried negotiating with him but I, all I'm trying to tell you is I was not part of the compensation committee and I did not discuss with anybody before that meeting a plan amongst the compensation committee members to arrange for his points to come to a level that would permit us to expel him.

Q   In your view, Mr. Sellers, it's appropriate to reduce his percentage interest to 14 percent in order to facilitate or to facilitate his expulsion from the firm but then to turn around and charge him with 28 percent of the loss as of October 31st, 2009?

A   Well, the -- again, I'm sorry to be disagreeable with you but --

Q   The question is is it appropriate, is that appropriate?

A   I can't answer the question the way you framed it.  I'm sorry.  You've made an assumption that I don't agree with and so I need to explain it.

Q   What's the assumption?

A   The assumption is that the, again, that the whole purpose of re-allocating the points was for the purpose of expelling Mr. Hausfeld.  And then the second assumption you made is

Sellers - Direct                          33

that, that, as I said before, that the allocation of the points should apply to him retroactively as to the computation of his capital account. And we operate, we follow the operating agreement and my understanding of the operating agreement and the way it is operated with respect to departing partners before was that those re-allocation of points would not apply to the computation of his capital account or anybody else's would leave.

Q   Where in the operating agreement does it talk about the compensation committee slashing somebody's points in order to diminish their voting rights?

A   It doesn't.

Q   It doesn't, right?

A   Right.

Q   That was invented out of whole cloth so you could get him out of the firm, right?

        MR. KEENEY:  Excuse me.  I just object to "you."  I don't think the witness said he did anything as a "you," your Honor.

        THE COURT:  I'm sorry.

        MR. KEENEY:  The objection is he said "you did."

        THE COURT:  Oh, okay.  He wasn't on the committee so I guess you'll rephrase the question.

        MR. ROSENTHAL:  I'll withdraw it, your Honor.

        THE COURT:  All right.

BY MR. ROSENTHAL:

Q    Okay.  Mr. Sellers, thanks for your patience, let's move on to another topic.

A    Okay.

Q    That operating agreement, Exhibit 2.

A    You want me to get that in front of me?

Q    Sure.

        (Pause.)

A    Okay.  I have it in front of me.

Q    Okay.  This operating agreement was signed by all of the people who are members of the firm at the time it came into effect, correct?

A    That's correct.

Q    Each of you is lawyers, right?

A    I'm sorry, each of us are lawyers?

Q    Yes.

A    Yes.

Q    Okay.  And there was a lawyer who prepared this operating agreement?

A    I presume so.  I wasn't -- I don't know who prepared the operating agreement.

Q    You signed the operating agreement at the bottom of Page--

A    I did.

Q    -- right?

A    That's correct.

Q    Did you read the operating agreement before you signed it?

A    I imagine I did, yes.

Q    And, if you would, turn to Page 3, Article second D.

A    I'm sorry, Page 3 what?

Q    Page 3, Article second D.

A    D as in dog?

Q    Yes.

A    Okay.  I have it.

Q    The same books and records, do you see that?

A    I do.

Q    It says "There shall be kept at all times at the principal office of the company accurate books of account reflecting all moneys received, paid, advanced or expended by the company including salaries and distributions paid to the members.  The books of account shall be kept and continually maintained in accordance with generally accepted accounting principles," did you see that?

A    I see that language, yes.

Q    Okay.  And you knew that language was in there when you signed this document?

A    I assume I knew the language was in there.  I don't frankly recall thinking that I recognized the language as anything significant.

Sellers - Direct                                         36

Q   Okay.  You certainly affixed your signature to the document?

A   There's no question I signed the agreement and that's in the agreement, there's no question about that.

Q   Okay.  And at the time that you were considering this amended operating agreement you did not have a discussion among all of the partners who signed the agreement that you specifically wanted to maintain the books and records of the firm on an income tax basis, did you?

A   We didn't have any discussion about how we were going to maintain the books and records of the firm, by income tax or any other means.

Q   Right.  There was no discussion at all, right?

A   On that subject, that's correct.

Q   On that particular subject, right.  Do you know who was responsible for preparing the operating agreement, which law firm?

A   I don't.

Q   Do you know which of the partners at the time was responsible for interacting with the law firm who prepared it?

A   I don't.

Q   I ask you to turn to the first page of the operating agreement, Mr. Sellers.

A   All right.  I have it.

Q   It's your experience, isn't it, that any time the partnership amends the operating agreement it does so in writing, correct?

A   That's correct.

Q   If you'll take a look at Article second -- I'm sorry -- the third "whereas" clause on the first page?

A   Okay.  I have it.

Q   And I don't want to read it aloud and I'm not going to ask you to read it aloud but the very last, it ticks through a series of amendments to the old operating agreement?

A   Yes.

Q   And lists seven amendments, correct?

A   Yes.

Q   Okay.  And then Exhibit -- and these were all written amendments, correct?

A   Yes.  Some of them I wasn't part of it but I presume they're all written agreements.

Q   Right.  So and, well, did you join the firm as a partner?

A   I joined the firm as a non-equity partner.

Q   When did you become an equity partner?

A   I think it might have been 2002, somewhere in that neighborhood.

Q   Okay.  And then under this new operating agreement, we looked at Exhibit 93 when eight of the partners anyway amended the operating agreement to eliminate the 30-day

Sellers - Direct                    38

wind-up period for involuntarily terminated partners, right?

A    Yes, that's the document you were referring to before.

Q    And that was not in writing?

A    That's correct.

Q    And your experience as an equity partner has been that when the firm amends the operating agreement it's always done in writing, right?

A    That is my understanding.

Q    Mr. Sellers, I understand that you're joining us from afar, is that right?

A    Well, I was out of town, yes.

Q    Right.  And where were you?

        MR. KEENEY:  Objection, your Honor, I'm not sure that's relevant at all.

        MR. ROSENTHAL:  It's relevant, your Honor.

        THE WITNESS:  I don't mind saying if it --

        MR. KEENEY:  It's not relevant where he was.

        THE COURT:  How is that relevant to this stuff that I have to decide?

        MR. ROSENTHAL:  I think it's relevant because I think it goes to Mr. Sellers' willingness to be here.

        (Laughter.)

        THE COURT:  Well, I don't --

        MR. KEENEY:  I don't think so, your Honor, it's personal.

Sellers - Direct                          39

THE COURT:  I mean you wanted him here, he's here so I don't know what difference that makes.  I'll sustain the objection.  Just curious as we all may be, I don't know if there's any need --

MR. ROSENTHAL:  Well, I know why Mr. Keeney doesn't want him to testify about that but I think it --

THE COURT:  Does it have something to do with the case?

MR. ROSENTHAL:  Yeah, I think it potentially goes to credibility, your Honor.

MR. KEENEY:  It doesn't have anything to do with the case.

THE COURT:  All right.

MR. KEENEY:  I just don't think he's entitled to know where people go.

THE COURT:  Well, whether he is or he isn't, I don't see how it helps me decide the issues in the case so I'll sustain.

MR. ROSENTHAL:  If I can have just a moment, your Honor.

THE COURT:  Sure.

(Pause.)

BY MR. ROSENTHAL:

Q   Mr. Sellers, I want to make sure that I have your testimony right.  Did you testify that when you spoke to Ms.

Sellers - Direct                                          40

Drolet on the 20th you wanted to help her with her calculations, is that right?

A    No, I didn't say that.

Q    Okay.  What was your -- what exactly was the purpose of calling Ms. Drolet then?

A    We had the understanding amongst the partnership that the computation of Michael's capital account and Rich Lewis' would be based on the percentage of interest they had as of the end of October of 2008 when we thought the operating agreement called for evaluating the account and that there was subsequent to that a decision by the compensation committee to cut Michael's points.  And we wanted -- we were operating with the understanding that that change in points did not apply to the computation of the capital account but only to the computation of any profits, distribution of profits that would have been earned that year.

And I was calling to check and see if she, that was her understanding as well and she said of course.

Q    Did she indicate to you whether she had been told about this distinction, 14-28 distinction before?

A    She did not say one way or the other, only thing she said was of course other than hello.

Q    Okay.

MR. ROSENTHAL:  I have nothing further, your Honor.

THE COURT:  All right, thank you.

Any questions, Mr. Keeney?

MR. KEENEY:  Yes, your Honor.

MR. ROSENTHAL:  Your Honor, we have separate questions for Mr. Sellers on the air passenger issue but--

THE COURT:  Are we going to do that after?

MR. ROSENTHAL:  But we can do that after Mr. Keeney is finished.

THE COURT:  Okay.

MR. KEENEY:  Your Honor, I want to reserve to do that after, also.

THE COURT:  Okay.

MR. KEENEY:  But we've got to do it all this morning because we've got to get Mr. Sellers back out of here.

THE COURT:  To wherever it is he's going.

MR. KEENEY:  Right, exactly, your Honor.

(Laughter.)

CROSS-EXAMINATION

BY MR. KEENEY:

Q    Mr. Sellers --

A    Yes.

Q    -- in 2008 were you on the executive committee of Cohen Milstein?

A    Yes.

Q    And who were the members of the executive committee?

A    Well, there was originally, yeah, there was Michael,

Sellers - Cross                                          42

Steve, Dan Summers, Bob Eisler, there was a partner from London whose name I'm blanking on right now.  There were seven and myself so that's Dan Summers, myself, Michael, Steve, Bob Eisler is five, partner from London is six and, oh, Mike Leeman.

Q   Okay.  And then did there come a time in 2008, approximately June 2008, when the composition of the executive committee was reduced?

A   Yes.

Q   And how many were on it then?

A   Five.

Q   Who were they?

A   It was Michael, Steve, myself, Dan Summers and Bob Eisler.

Q   You were asked on direct when you joined Cohen Milstein and you recited you joined in November 1997.  What had you been doing immediately prior to joining Cohen Milstein?

A   I had been a head of the Equal Employment Project of the Washington Lawyers Committee for Civil Rights and Urban Affairs in Washington.

Q   And for how long had you been doing that job?

A   About 16 years.

Q   And what did that job involve?

A   I was in charge of developing and managing and litigating various employment discrimination and other civil rights

Sellers - Cross                                              43

cases, many of them class actions working with other lawyers. I also was involved in a good deal of legislative and policy work in training of various lawyers in the Government, the Justice Department and EEOC on trial practice and the like for civil rights and employment cases.

Q   And can you just give a sample of one or two of your most noteworthy cases in those years?

A   Well, I mean, I, for instance, I represented the African-American Special Agents at the FBI in a case alleging race discrimination at the FBI.  I represented the women, the women who were in the -- it was called the Director of Operations.  They were the undercover spies in a case against a gender discrimination case alleging gender discrimination at the CIA.  I represented the African-American foreign service officers in a case they brought against the State Department.  I've had, you know, tried cases involving discrimination charges against large companies and the first sexual harassment class action that was ever tried to a jury against a Government institution in Washington.

          THE COURT:  And how is this relevant?

          MR. KEENEY:  Here's the question.

          THE COURT:  Okay.

BY MR. KEENEY:

Q   And why did you leave the Washington Lawyers Committee to join Cohen Milstein?

A    I was originally approached by Steve.  I met with Steve and with Michael and the other main partners at the time and over a period of time I found that they were offering me an extraordinary opportunity to take the skills and knowledge I had developed in the public, the not-for-profit sector and develop a practice, a civil rights practice at the firm at the time there were virtually no other practices like that in the country.  And I thought it would be an extraordinary opportunity and they seemed to be very supportive and were, have been very supportive of that area of practice.

Q    Okay.  Let me turn to a document that you were shown by Mr. Rosenthal in the plaintiff's exhibit binder.  That's the big binder.

A    I have it.

Q    Can you put before you Plaintiff's Exhibit 68?  And do you have that in front of you?

A    Just give me a moment.

Q    Okay.

A    A lot of exhibits.

       (Pause.)

A    I have it in front of me.

Q    Okay.  I'd like to direct your attention specifically to partner RSL and my question that's Rich Lewis, right?

A    That's correct.

Q    Okay.

A    Are we looking at the second page?

Q    We're looking at the second page, that's correct.

A    Yes, okay.

Q    You're going to read right across.

A    Okay.

Q    Okay.  Starting from the far right, the final 2008 percentage for Richard Lewis is how much as determined by the compensation committee?

A    6.50 percent.

Q    Now moving back in the chart, at the end of 2007 what was the final percentage for Rich Lewis?

A    6.45 percent.

Q    So there's an increase from 6.5 percent to 6.5, is that correct?

A    An increase from 6.45 to 6.5 between 2007 and 2008.

Q    Okay.

        MR. ROSENTHAL:  Your Honor, I think it's a mischaracterization of what's going on there because there's a re-allocation of the interest for the members who left the firm.

        MR. KEENEY:  All right, I'll ask that.

        THE COURT:  And I'll let you follow up with it.

        MR. ROSENTHAL:  I'm sorry, your Honor.

        THE COURT:  That's all right.  I'll overrule the objection.  You can ask all the questions, if you want.

Sellers - Cross                               46

BY MR. KEENEY:

Q    And now moving from the column to the immediate right of the 6.5 percent, what is that next column?

A    I'm sorry, what column are you talking --

Q    Oh, I'm sorry.  As we're looking at partner RSL, Rich Lewis.

A    Yeah, I see it, yes.

Q    We have his 2008 percentage of 6.5 --

A    Right.

Q    -- we had his final 2007 percentage of 6.45.

A    Right.

Q    And right next to the 6.45, the next column over --

A    Right.  Moving to the left, sliding over to left.

Q    Okay.

A    This is my left.

Q    Okay.  Okay, got it.  You see the figure 7.02 percent?

A    Oh, I'm sorry, you are talking about the right.  7., yes, I see 7.02 percent.

Q    What is that?

A    That was my understanding at the point at which Mark Willis and Mark Machiz had at that point one had left, I think, the partnership effectively and one had announced an intention to leave and it had not become effective yet.  And their points were being re-distributed amongst all the other partners according to their preexisting points.  So I believe

Sellers - Cross                                                47

what that reflects is the share of the points that Mark

Willis and Mark Machiz had that were attributable to Rich

Lewis added to the 6.45.

Q    And as of the time that there's this automatic

re-allocation had there been a subsequent vote of the

compensation committee to change the 6.5 percent final 2007

figure?

A    I'm sorry, 6.5 percent is final 2008.  Isn't that what

you're talking?  Isn't that what --

        MR. KEENEY:  Could I just approach the witness, your

Honor?  I just want to --

        THE COURT:  Of course.  You don't have to ask, you

can go any time.

        THE WITNESS:  I'm sorry, I'm probably missing...

Yeah, the 6.5 is the 2008 number.  Yes.

BY MR. KEENEY:

Q    And directing your attention back into columns for the

2007 number for Rich Lewis --

A    Right.

Q    That's 6.5 percent?

A    No, it's 6.45 for 2007.

Q    I was looking to see if you had the same document that

I'm using.

A    Said 6.45, do you have a different?

        (Discussion off the record.)

Sellers - Cross                                    48

MR. KEENEY:  Can we just approach the witness together?

THE COURT:  Sure.

MR. KEENEY:  I just want to make sure we've got the same document.

THE COURT:  What I have is the same one Mr. Sellers is looking at.

THE WITNESS:  And, by the way, if it helps, it's Bates No. CMST-00071.

MR. KEENEY:  Oh, okay.  My reading, my mistake.

THE WITNESS:  Okay.

MR. KEENEY:  I apologize for confusing the record, didn't mean to do that.

BY MR. KEENEY:

Q   Okay.  The final 2007 number according to this exhibit for Rich Lewis is what?

A   6.45 percent.

Q   Okay.  And the final 2008 number for Rich Lewis is what?

A   6.50 percent.

Q   And the change between those two numbers reflecting 7.02 percent is an automatic change when other people leave, is that right?

A   Change from the 6.45 to 7.02 is the, is as I said an automatic re-allocation of points that's happened a number of times when partners leave.

Sellers - Cross                                    49

Q   And that did not require a separate vote of the compensation committee?

A   That's correct.

Q   Now looking across once again to Mr. Lewis' final 2008 percentage, that is 6.5, correct?

A   That's correct.

Q   I'd like you to turn in our exhibit binder which is Defendant's Exhibit 1, that's a smaller set of two binders.

A   I have Cohen Milstein exhibits.

Q   That's it.

A   Okay.

Q   And can you turn to Defendant's Exhibit 1?

A   Exhibit 1, you said?

Q   Right.

A   I have it.

Q   Okay.  In Defendant's Exhibit 1 can you turn to Page 4 which has at the top of the page an equity partner capital account calculation for Rich Lewis?

A   Not for Rich Lewis, this is CMST-00035?

Q   That is correct.

A   Okay.

Q   And you have that in front of you?

A   I do.

Q   And the partners percentage interest that's used in that calculation is what?

Sellers - Cross                                    50

A    6.78.

Q    And that is not the same as the number which appears on Plaintiff's Exhibit 68, right?

A    That's correct.

(Pause.)

Q    You were asked by Mr. Rosenthal about apportioning 28 percent of losses to Michael Hausfeld as of October 31, 2008. Do you recall that testimony?

A    Yes.

Q    And if there had been gains as of October 31st, 2008 would Michael Hausfeld have gotten 28 percent of the gains?

A    Yes, in computing his capital account, yes.

Q    Were you on the executive committee at the time when the February 2009 settlement agreement was entered into in the chambers of this Court?

A    Yes.

Q    And as a member of the executive committee did you approve?

A    Yes.

Q    And you signed the settlement agreement, right?

A    Yes.

Q    Was there fraud in the inducement by  you in this settlement?

MR. ROSENTHAL:  Objection, your Honor, it calls for a legal conclusion.

Sellers - Cross                              51

THE COURT:  Yeah, why don't you rephrase it.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q    Did you personally commit any act of fraud in connection with the settlement agreement?

A    No.

Q    Was there any known fraud by any member of the executive committee to your knowledge?

MR. ROSENTHAL:  Objection, your Honor, I don't even know what he means by fraud.

THE COURT:  Well, does he know of anybody on the committee defrauding --

MR. ROSENTHAL:  But what does fraud mean?

THE COURT:  That's the knowing and willful intent to cheat or deceive.

BY MR. KEENEY:

Q    Were you aware of anyone on the executive committee --

THE COURT:  How does that sound?  Sounds good to me.

MR. KEENEY:  With that, your Honor.

BY MR. KEENEY:

Q    With yourself?

A    No.

Q    Okay.  And are you aware of any fraud, willful or misstatement, anything with respect to Cohen Milstein's actions that would have induced wrongfully Michael Hausfeld

or anyone else to sign the settlement agreement?

A   No, I frankly thought it was a pretty good deal for him.

Q   Why did you think it was a good deal for him?

A   Well, the operating agreement provides for departing partners that they are limited to a termination allowance of $500,000 and no interest in any fees for cases that might generate revenue after, during -- after, I mean after their departure.  And this agreement provided for Michael to get percentages of fees in a number of cases that the operating agreement wouldn't have permitted.  It also provided for the accelerated repayment of his capital account and I thought that was a pretty good deal.  We have done that on at least one occasion I know about but we did it at a time when we were discounting there the value of the account and we weren't doing that this time.  So I thought, in my view, this looked like a pretty good deal for him.

Q   Okay.  I'd like to have you turn the exhibit binder, our exhibit binder, Defendant's Exhibit 18, that's in the Cohen Milstein binder?

A   Right, I've got it.  Okay.

Q   And is Defendant's Exhibit 18 the monthly financial statements of Cohen Milstein for September 2008?

A   Yes.

Q   And did you receive it at or around the time?

A   Yes, it probably would have come sometime in October.

Sellers - Cross                                53

Q   Okay.  Could you please turn to the fourth page which bears the Bates stamp No. CMST-649?

A   Yes, I have it.

Q   Now you see the caption "Capital" in the upper left?

A   Yes.

Q   And do you see a column of balances as of 12/31/07?

A   Yes.

Q   And then that's followed by a list of equity partners?

A   Yes.

Q   And do you see a total aggregate balance for starting capital as of December 31, 2007 of slightly over $17 million?

A   Yes, $17,467,070.

Q   And directing your attention down that page, that very same page of Defendant's Exhibit 18.

A   Yes.

Q   Is there a line about two lines above the footnote captioned "Net Income (Loss) Year to Date"?

A   Yes.

Q   And what does that show as of September 30th, 2008?

A   It shows a net loss of about 5.5 million.

Q   And does that net loss reduce everyone's capital?

A   Yes, that's my understanding.

Q   And if you compare the year-to-date loss of September 30th, 2008 of a little over five million to the beginning capital balance in the aggregate of a little over 17 million

what sort of percentage reduction in capital are we talking about in the aggregate?

A    Well, without a calculator I can just tell you how I'd do the division, I would not hazard a calculation.  But I would put the 5.5 million in the -- in numerator in the 17 million in the denominator and derive a percentage from that and apply that percentage to everybody's capital accounts as the percentage that is reduced -- by which it's reduced.  So what would remain is the -- is if this were a third, let's say, or something like that, what would remain is the two-thirds after you reduced it.

Q    And could every partner at Cohen Milstein do that calculation if they wanted to?

A    If I can do it, anybody can do it.

Q    Like to direct your attention to a document in the exhibit binder marked DX-47.

A    Okay.

Q    And this one's not in evidence yet so we have to lay the foundation questions first and we'll see what the answers are.

A    Make sure I have the right document, is it HAUS-0052 is the--

Q    That is correct.

A    Okay.  I've got it.

Q    And the opening question is could any equity partner at

Sellers - Cross                                            55

Cohen Milstein ask the Cohen Milstein accounting department to do a rough estimate as at any month end of what that particular partner's capital balance was as of that month end?

A    Yes.  I mean this appears to be as of June 2008 but you could have done this at any month.

MR. ROSENTHAL:  I'm sorry, which exhibit are we talking about?

MR. KEENEY:  DX-47.

MR. ROSENTHAL:  Okay.  I'm sorry, there's no -- I'm going to object again to this exhibit, no foundation, hearsay, same objection as yesterday.  And I'm sorry, I just didn't hear Mr. Keeney talk about -- they identified the exhibit, I was thinking about something else.

MR. KEENEY:  I didn't move it in, your Honor.

MR. ROSENTHAL:  It doesn't matter, he still has to lay a foundation.

MR. KEENEY:  He's laid it.

MR. ROSENTHAL:  Is he having -- he's having a witness read from it and asking him if he can make a calculation based on the hearsay that's in it.

MR. KEENEY:  No.

THE COURT:  No, that's not what he did.

MR. KEENEY:  That wasn't the question, your Honor.

THE COURT:  Have you ever seen something like this,

Sellers - Cross                    56

sir?

THE WITNESS:  I don't recall seeing this document, I've seen documents like this that compute capital balance, capital account balances for different time periods.

THE COURT:  Is this illustrative of a summary that you could obtain if you wanted to of a capital account balance?

THE WITNESS:  Absolutely.

THE COURT:  Right.  Have you ever done that yourself?

THE WITNESS:  I have not done it but I've had other people do it.  And I've seen other people do it and they've done it for me and others.

THE COURT:  Okay, all right.

MR. KEENEY:  We're moving on to another topic, your Honor.

THE COURT:  All right, I'm going to allow him just to say this is a sample of what you could get if you wanted it, even though he's never seen it.

BY MR. KEENEY:

Q   As a member of the executive committee, Mr. Sellers, was the firm having a bad year by the third quarter of 2008?

A   Bad in many ways.

Q   How so?

A   Well, the most immediate and concrete was it was bad

Sellers - Cross                                57

financially.  We were operating at considerable loss by then

and it was something that had been the subject of frequent

partner meetings, meetings of the executive committee.  We

were very concerned whether we were even going to break even

that year.  It was bad in other respects.  We, we had really

after what I had hoped during the early part of the year, we

reorganized the management of the firm and then I had spent a

good deal of the summer trying to broker some kind of

arrangement that would keep everybody together since I had

always hoped that they would all stay together.  It became

clear that things were declining very rapidly and by October

we were basically unable to make decisions about very

fundamental things about the firm.  And it was -- it was

awful.  So it was bad and a lot of sleepless nights.

Q   Did the firm in 2008 have to increase its line of credit

with the bank?

A   Yes.  It went from a normal XXXXXXXXXXX line of credit to

XX.

Q   And why did it have to increase its line of credit with

the bank?

A   Because we didn't have the funds to operate the firm

without drawing on an extended line of credit.

Q   And when was the extended line of credit offered to the

law firm?

A   Well, I don't remember exactly, I think it might have

Sellers - Cross                                 58

been September.

Q   And ultimately did Cohen Milstein incur additional draws against that extended line?  In other words, draws that were over the initial XXXXXXXXXX limit but--

A   Oh, absolutely, we exceeded the XXXXXXXXXX line very quickly.

Q   As a member of the executive committee do you have any factual basis to believe that any member -- other member of the executive committee could have believed that his or her capital account had increased by September 30th, 2008?

          MR. ROSENTHAL:  Objection, calls for speculation.

          THE COURT:  Yeah, I'll sustain it.  I mean he can't testify about what he thinks other people thought.

BY MR. KEENEY:

Q   Based on the information that was available to you as a partner at the firm and a member of the executive committee was there any factual basis in which you could have concluded that your capital account was increasing in value as of September 30th, 2008?

A   No, I thought it was declining.  I'd collect my account statement, I didn't want to look to see what the balance was.

Q   What about October 31, 2008, did you have any basis to conclude that your capital balance was increasing as of October 31, 2008?

A   No, I think it had probably declined even further since

Sellers - Cross                                    59

September.

Q    Okay.  Could you please turn to Defendant's Exhibit 19?  That's in the Cohen Milstein binder.

A    Yes.

          (Pause.)

A    Okay.  I have Exhibit 19.

Q    Okay.  And are those the monthly financial statements of Cohen Milstein for October 2008?

A    Yes, they appear to be.

Q    Okay.  Could you please turn to Bates stamp No. CMST-00061?  It's about four pages back.

A    Okay, I have it.

Q    Okay.  Directing your attention to the line two lines above the footnote, so go to the bottom of the page, two lines above the footnote, does that show a net year-to-date loss as of October 31, 2008?

A    Yes, it's a 6.5 million loss.

Q    If a partner were to contend that as of October 31, 2008, there was concealment of his or her capital balance are you aware of a factual basis on which that partner could have calculated his or her capital balance?

          MR. ROSENTHAL:  Objection, your Honor.

          THE COURT:  Yeah, I'm going to sustain that.  That is quite a journey you just took us on.  I don't know if you followed -- I'll sustain it.  I don't know if he could ever

answer that.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q   As of October 31, 2008 could any partner at Cohen Milstein based on the financial statements calculate an approximately capital account balance as of that date?

MR. ROSENTHAL:  Objection, talking about any partner.

THE COURT:  Well, why don't you just ask whether he could, I think you've asked whether he could.

MR. KEENEY:  Okay.

THE COURT:  And I think he said he could have.

BY MR. KEENEY:

Q   Yeah, you could, Mr. Sellers, right?

A   Yes.  As I explained, taking the same set of numbers here, it's a larger loss but it's -- I would take the 6.5 million number, divide it by the 17.4 million number, apply that percentage to my or anybody else's capital account balance and that would be the amount it was reduced.  Then what remained would be whatever's left.

THE COURT:  Were those numbers equally available to all your partners?

THE WITNESS:  Yes, the -- well, these were all available to all equity partners.  This was part of a standard statement distributed to equity partners.

Sellers - Cross                                             61

THE COURT:  Were they available to someone -- what date are we talking about, October --

MR. KEENEY:  October 31, we changed the question, October 31, 2008.

THE COURT:  Mr. Hausfeld was still there, right?

MR. KEENEY:  As of October 31 he was.

THE COURT:  He left on the 6th.

MR. KEENEY:  As of November 6th he is not.

THE COURT:  Got you.

BY MR. KEENEY:

Q   Mr. Sellers, are you aware that Cohen Milstein uses the cash based method of accounting?

A   I am aware, I'm sorry to answer it this way because I am not a -- my line of work is not in the accounting area.  But what I would say is the way we operated was that unless the fees were in the bank we didn't treat them as revenue.  And I'm assuming that's cash basis but that's clearly how we always operated.

Q   Are you the lead attorney at Cohen Milstein on a case called Bell South?

A   Yeah, we have a couple but you mean the Bell South discrimination case.

Q   As of October 31, 2008 were the fees in Bell South in the bank account of Cohen Milstein?

A   No, I wish they were or had been but they weren't.

Q    As of today, August of 2009, are the fees from Bell South in the bank account of Cohen Milstein?

A    No, I'm sorry to say they're not.

Q    Do you have any reasonable projection of when those fees might actually appear in the bank account of Cohen Milstein?

A    Well, we unfortunately had a bump in the road with the dispute over the allocation of fees amongst co-counsel.  We had an arbitration now almost a month ago and I'm hopeful that we'll get a decision within 30 days so perhaps later this month.  But I've come to recognize that nothing is certain in the schedule for recovering fees.

Q    I'd like to direct your attention in Defendant's Exhibit 11 to Page 27 of that report?

A    What page?  I'm sorry.  27?

Q    Page 27.  It's not a Bates stamp number, that's a real page number.

A    Yeah, but this is Bates No. 00553?

Q    Yes, it is.

A    Okay.  I have it, that's my account information.

Q    Okay.  And directing your attention to the all capped bold first three lines in the upper right-hand corner, can you read that into the record?

A    Yes.  It says "Cohen Milstein Sellers and Toll, PLLC, member income and equity information - income tax basis."

Q    As a member of the executive committee of Cohen Milstein

Sellers - Cross                            63

both the seven-member committee and the five-member committee, did any member of Cohen Milstein ever express any question to you with respect to whether the income tax basis method of accounting should be used?

A    No, there was no question about it.

Q    Okay.  And specifically with respect to Mr. Hausfeld did you ever hear anything mentioned by Mr. Hausfeld that GAAP should be used instead of income tax based method of accounting?

A    No, we never discussed this distinction at all.

Q    Okay.  How about Mr. Lewis.  I know you had conversations with him on other topics, did you ever have a conversation with him about GAAP or income tax based accounting?

A    No.

Q    I'd like to turn back to Plaintiff's Exhibit 68.  That was the November 5th chart from the compensation committee?

A    Yeah, just a second.  Okay.  I have that in front of me.

Q    Okay.  Directing your attention very specifically now to the entry for partner MDH, was MDH Michael Hausfeld?

A    Yes.

Q    The final 2008 percentage for Michael Hausfeld, the one that's in handwriting on the far right, is what?

A    14.00.

Q    And the final 2007 percentage for Michael Hausfeld was what?

Sellers - Cross                                                          64

A    26.61 percent.

Q    And when two partners left in 2008 was there an automatic adjustment upward of everybody else's shares?

A    Yes, including his.

Q    And as a result of that bump did that bump him to 28.95 percent?

A    Yes.

Q    Directing your attention back to Defendant's Exhibit 1, that's our binder.

A    Yeah.  Okay, I have that.

Q    Okay.  I had already asked you about the page with respect to Mr. Lewis and now I'm going to ask you about the page with respect to Mr. Hausfeld which is three pages back. Do you have that in front of you?

A    Yeah, that's 00034.

Q    That is correct.

A    Yes.

Q    And what is the partner's percentage interest which is used for Mr. Hausfeld's calculation?

Q    27.97 percent.

Q    Thank you.  You were shown by Mr. Rosenthal a written consent signed by you which had the effect of reducing the amount of notice that had to be given in the event of an involuntary termination.

A    Yes.

Q    Directing your attention just to that part of the written consent right now.

A    Right.

Q    Did your approval of that amendment have anything to do with the capital account balance of Michael Hausfeld?

A    None whatsoever.

Q    Are you sure of that?

A    Yes, we never discussed the capital account.  That was the furthest thing from our mind.  We were, as I said earlier, in a crisis at the time in the firm, notwithstanding my efforts during the summer to try to keep us together we got to a point where we, it was I think pretty clear we were going to separate in some fashion.  Michael had made a proposal to which we had responded in early September on terms in which he would be prepared to leave.  We didn't get any response from that and instead what ensued was really a period where he was the chairman of the firm and chaired the meetings of the executive committee and partnership and we would be regularly getting e-mails and memos about interpreting the organizational structure of the firm that divested us of authority, in his view, to make fundamental decisions about which cases we could bring and things of that sort.

        We had a partnership meeting where we couldn't even agree on whether we -- anybody had authority to have a vote,

whether we had to have a vote to have a vote.  We were tied up in knots.  And it got worse and worse.  It had -- there was a point when Michael called me to his office and I expressed again the view that I had held repeatedly and expressed that I really hoped we could all stay together.  And he said, oh, no, you don't realize it, you don't want me to stay at this point because if I stay, all I'm going to do is sow chaos in the firm.

That was, I think sometime in September, early September.  And what really followed I thought was an effectuation of that sentiment culminating in a meeting that several of us had to have with our bank with which we had the line of credit.  The bank had called us in because it had learned that from Michael over a period of time apparently that he had discussed with them his view that the firm was in great financial difficulty and that if he left, as it was recounted to us, he expressed the view that the firm would no longer be able to sustain its line of credit and the bank would call it.

Q    Let me ask you very specifically: did the bank call its line of credit?

A    It did not but we spent three hours at the bank that afternoon trying to persuade them that there were sufficient revenues expected that would justify our continued ability to retain a line of credit and the substantial balance on it.

Sellers - Cross                                        67

We had, when we were considering -- I'm sorry.

Q   Oh, I'm sorry, I didn't mean to interrupt you if you were going on.  I was going to ask very specifically did the bank refuse any further advances on the line of credit?

A   Yes, it did.  It did at a time when, after Michael left he sent letters to our counsel in a number of cases, admonishing them that they should not distribute fees that were expected or in fact awardable because of a dispute over the ownership of those fees and it caused us to basically starve.  We had no sources of revenue and the bank was no longer willing to extend the line of credit beyond whatever the balance was and it wanted us to pay down the line of credit.  So we were, you know, we were -- we had days where we weren't sure how we were going to make payroll, that's how bad things had gotten.

Q   And did you personally have to take any extraordinary financial steps personally to keep the firm afloat?

A   Yes.  I and a number of other partners had to execute personal lines of loans secured by our personal assets and our homes to be able to fund the firm through various parts of the end of the year.

Q   So your testimony is you took your own personal assets in order to get a personal loan?

A   Yes.

Q   And the proceeds of that personal loan were used by the

firm to pay ordinary expenses?

A    Absolutely.

Q    You were asked a lot of questions about the compensation committee which you were not on.  You're on the executive committee.  Did the executive committee approve the criteria to be used by the compensation committee?

A    Yes.

Q    What were those criteria as you recall them?

A    I can't as I sit here, there were a lot of criteria that were used, there were several pages.  There was a, I mean I don't recall the details of them.

Q    Are there criteria that are non-economic?

A    Yes.  There are criteria that are -- some that are economic in terms of generating actual revenue and there are a number that go to valuing partners' contribution to the operation of the firm, to leadership in the firm, to things of that sort.  So those were not economic.

Q    Okay.  We have reference in several of the exhibit lists to something called "I love me memos."  Could you just explain for the Court --

A    Right.

Q    -- what "I love me memo" was?

A    Yes.  Those were, that was a term that we used, developed several years earlier, long before there was any of this trouble at the firm with the goal in mind of giving partners

who wished an opportunity to put in a memo that would be sent to the compensation committee an explanation of what they thought their contributions were to the firm that could be taken into account in -- by the committee in determining how to allocate points.

Q   Did most partners submit such a memo?

A   Yes.

Q   Did you submit such a memo?

A   Every year.

Q   And is it your understanding that in those memos you, when you wrote your memo, could emphasize not only the economic value that you brought to the firm but also non-economics?

A   Yes, I did repeatedly.  I talked about places where I gave noteworthy speeches or there was press that portrayed the firm in a positive light, ways in which I had managed practice or was developing cases that may not have as yet generated revenue that was received by the firm but was viewed as I hoped positively.  And I guess to the extent that my point allocations went up steadily each year the committee tended to think I contributed something additional in the firm each year.

Q   And just as a summary question: criteria applied by the compensation committee included both economics and the other criteria?

Sellers - Cross                          70

A    That's correct.

MR. KEENEY:  We have no further questions, your Honor.

THE COURT:  All right, thank you, Mr. Keeney.

Mr. Rosenthal, anything further?

MR. ROSENTHAL:  A few more things, Mr. Sellers.

REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q    A couple weeks before the firm expelled Mr. Hausfeld Mr. Lewis approached you to talk about settlement, right?

A    Settlement of what?

Q    The firm split.

A    Mr. Lewis, I wouldn't characterize it that way.  Mr. Lewis and I had had a number of conversations over the summer and the fall.  I don't remember whether he approached me or I approached him, I think we each approached the other from time to time.  But we did have discussions with expressing hope to each other that we could find ways of keeping the firm together and then finding an amicable way to separate the various groups.

Q    In the month of October you and Mr. Lewis had about an hour, hour and a half long talk where you tried to revive the idea of an amicable separation, right?

A    We talked about how we hoped that could happen.

Q    And you encouraged Mr. Lewis to encourage his counsel to

Sellers - Redirect                              71

call your counsel, right?

A    I think what I encouraged Mr. Lewis to do was to have --
at the time we had had no response to our settlement proposal
that we had made in early September.  And I think what I said
at the time was I urge you to have your counsel contact ours
for the purpose of getting us a settlement response.

Q    And you know, don't you, that our counsel, my client
counsel Rich Lewis' -- Stef Tucker did in fact contact your
counsel, Mr. Keeney, with just such an idea about restarting
settlement negotiations, right?

A    I don't recall whether there was with the goal of
restarting them.  I think, I know that there was a response.
I, my recollection, I was obviously not part of the
conversation but my understanding was that it was far from an
opening that we thought it, we hoped it would be.

Q    But had you known that Mr. Tucker called Mr. Keeney to
explore the idea of an amicable resolution about a week
before you decided to expel Mr. Hausfeld, right?

A    No, I don't know that.

Q    And you know that Mr. Keeney then called Mr. Tucker back
and said "My clients aren't interested," don't you?

A    No, I don't know that.

Q    Mr. Keeney never told you that?

A    I don't recall Mr. Keeney or I don't -- that's not my
understanding of what Mr. Keeney said.  I think my, at least

Sellers - Redirect                                72

my understanding was Mr. Keeney said: you've got to get us a response to our settlement proposal that has been outstanding for a couple months and then we'll talk about whether we can find some way to resolve this.

Q   This is the settlement proposal that he submitted on September 18th, is that right?

A   I guess.  They -- yes.  I mean it's the last exchange we had, I don't recall exactly the date.

Q   Would you take a look at Plaintiff's Exhibit 8?

THE COURT:  Is this the document we had an issue with yesterday?

MR. ROSENTHAL:  Yes, your Honor.

MR. KEENEY:  Yes, your Honor.

THE WITNESS:  Okay.

THE COURT:  What are we going to do about that?

THE WITNESS:  What ex--

MR. KEENEY:  Well, your Honor, we don't think we actually opened the door.  We asked about were there settlement discussions, he said yes.  Now we're getting into the content of the settlement discussions.  So far Mr. Sellers has not said specifically anything that's contained in that letter.  In other words, just saying there were settlement discussions does not open the door under 408 for the actual settlement proposal.

THE COURT:  Judge Rice, I mean we know what Mr.

Sellers - Redirect                           73

Keeney is trying to do.  Mr. Keeney has tried to suggest that this settlement proposal was an entirely reasonable proposal and that my clients were entirely unreasonable in the actions they took.

THE COURT:  But assume --

MR. ROSENTHAL:  And I --

THE COURT:  Assume that's true, so what?

MR. ROSENTHAL:  What's that?

THE COURT:  What's that got to do with anything?

MR. ROSENTHAL:  He's trying to suggest that my clients are being unreasonable and I'm trying to --

THE COURT:  What does that have to do with how the capital account was computed?

MR. ROSENTHAL:  Oh, no, he, Mr. Keeney got into it in his direct examination of Mr. Sellers.  And if your -- if your ruling is that you're not going to consider it at all, I will move on, your Honor.

THE COURT:  Yeah, I don't think this has anything to do with why we're here.  And I don't see how there's been any door opening to the bypassing Rule 408.

MR. ROSENTHAL:  Okay, I'll move on, your Honor

THE COURT:  All right.  So you can skip this Exhibit 8, put away Exhibit 8.

BY MR. ROSENTHAL:

Q   Mr. Sellers, that loan you took out to help the firm with

Sellers - Redirect                                              74

its operating expenses, that was repaid about a month, month and a half later, is that right?

A    That's right.

Q    You were repaid back in full with interest, right?

A    I have assumed so.  I know that we discharged the loan and I had no further obligation as to --

Q    And again you got interest on the loan?

A    You mean have a charged interest on the loan and we paid it.

Q    You earned interest for making a loan to the firm?

A    That could be.  I don't -- I really don't remember.  If it was, it wasn't very much.

Q    The end of the year you said that when you had a meeting with the bank to get them to forebear on closing the line, you remember that?

A    Mm-hmm, yes.

Q    That was early November, is that right?

A    Yes.

Q    A couple days before you expelled Mr. Hausfeld from the firm?

A    Yes.

Q    And you were trying to persuade the bank not to foreclose-- I'm sorry -- not to -- not to call the line, not to call the line because you had a number of revenue, a number of fees that you knew would be coming in by the end of

Sellers - Redirect                          75

the year, right?

A    I wouldn't characterize it as fees we knew were coming in.  I think what we assured the bank was we were expecting these fees but I couldn't guarantee you.  The "know" is too strong a term.

Q    But you provided the bank sufficient assurance that enough fees would be coming in to pay down the line that they didn't call it?

A    I would say that -- I don't want to speak for the bank. What I would say is we provided the bank with a list of cases in which we expected fees before the end of the year and the amounts.  And that along with a lot of discussion, frankly, about how we were a lot more rational than apparently we'd been portrayed by Michael to the bank led the bank, I gather, to forebear.

Q    If you take a look at Plaintiff's Exhibit 70, Mr. Sellers?

A    Seven zero?

Q    Seven zero, thank you.

      (Pause.)

A    Okay, I have 70.

Q    Okay.  This is an e-mail from Mr. Toll to Doug Cromwell and John Cannon at Sun Trust Bank, is that right?

A    Yes, he and somebody else, yes.

Q    Yes.  And it's CC'd to you, right?

Sellers - Redirect                          76

A   And Herb Milstein, yes.

Q   Yes and this is November 6, 2008, is that right?

A   That's correct.

Q   And this is the same day you expelled Mr. Hausfeld from the firm?

A   Yes.

Q   Take a look at the letter that's attached.

A   Okay.

Q   You've seen this letter before, right?

A   I'm sure I saw it at the time.  I haven't seen it in quite awhile.  If you have questions, I probably should look at some portion of it.

Q   Okay.  Well, this letter sort of goes chapter and verse through all of the revenue that the firm expects to come in within the next couple of months to help down the line, is that right?

A   I think that's correct.  It looks like that, yes, that's right.

Q   Okay.  In fact, enough revenues did come in by the end of the year to pay down the line, correct?

A   No.  We ended up taking out another loan, with another bank, that helped discharge the line.  We did discharge the line of credit with Sun Trust by the end of the year, yes.  But it did not come solely through revenue.

Q   And the firm actually turned a profit by the end of the

year, right?

A   I'm not sure how you mean that.  We, having taken out a new line of credit, we started the year with a deficit.  We did make some limited distributions, some limited bonuses to, I think, the staff, because we thought they ought to -- it would improve morale which was, by then, horrendous.  But I can't -- I wouldn't characterize this as ending the year with a profit.

Q   You, yourself, saw an increase in your capital account by the end of the year, right?

A   I'm sorry, I don't know, I guess that's right.

Q   Okay, let's take a look at Plaintiff's Exhibit 78, Mr. Sellers.

A   Okay.

Q   And this is the year-end reviewed financial statement for your firm?

A   Yes.

Q   Prepared by Ms. Drolet and her firm?

A   Yes.

Q   I'll ask you to take a look at page 5.

A   Okay, hold on.  Okay.

Q   And you see the net income figure under the 2008 column?

A   At the very top, you mean?

Q   At the very bottom.

A   I'm sorry, at the very bottom.  Net income, yes.

Sellers - Redirect                78

Q   And the net income for the firm --

A   $530,000.

Q   -- is $530,692, right?

A   That's what it appears to be.

Q   And that enable you, as well as the other equity partners at the firm, to get distribution that kicked up your capital account, right?

A   I'm assuming that's correct.  I'm just trying to turn to the page of my capital account.

Q   Okay, well, let's take a look at page 8 then and take a look at the top chart on page 8.  Just look at this, just look at your name for right now, Mr. Sellers.  Do you see about three-quarters of the way down where it says Joseph M. Sellers?

A   Right, I see it went up from XXX to XXX.

Q   Right.

A   Yes.

Q   So, you started at XXX, correct?

A   That's correct.

Q   Okay, you actually had net income of XXXXXXXX, correct?

A   Correct.

Q   But then you took out salary for yourself of XXXXXXXX?

A   Correct.

Q   And so you ended up with a capital account increase --

A   I see it.

Sellers - Redirect                                    79

Q    -- of about XXXXXXX?

A    You're correct.

Q    Right?

A    You're correct.

Q    And that's true of all the other partners who stayed at the firm, isn't it?

A    Yes, it looks like it.

Q    Mr. Hausfeld, however, is second in line, is second on the page, is reduced from nearly $5 million to nearly $3 million, correct?

A    Correct.

Q    And Mr. Lewis, about a third of the way down?

A    Yes, I see it.

Q    Was reduced from $1.163 million to $686,000, right?

A    Correct.

Q    So, the two of them actually saw a decline in their capital accounts for the year, correct?

A    Correct.

Q    And everybody else saw an increase in their capital accounts for the year, right?

A    Everybody else that was there at the end of the year.

Q    And the reason for that is because there's a lot of money that came into the firm in November and December of 2008, right?

A    I, yes, we eventually got money in the firm.

Sellers - Redirect                              80

Q    Let's take a look at Exhibit 12 -- Exhibit 11, I'm sorry, Mr. Sellers.

A    Your Exhibit 11?

Q    Plaintiff's Exhibit 11, correct.

A    Okay, I have it.

Q    Now take a look at Bates Number CMST00674.

A    Okay.

Q    The very first column, at the very top of the page, see where it says fee revenue for the month of $5,434,000?

A    Yes.

Q    That's a pretty good for the firm, right?

A    Yeah, I mean, it's --

Q    And approximately $4.7 of that came from the Hydrogen Peroxide case, correct?

A    I don't know the exact number.  It was a large fee.

Q    Okay, let's turn to page CMST679.  If you go near the bottom, see where it says Hydrogen Peroxide?

A    Right, I see it.

Q    And it says $4.411 million in fees, right?

A    Right.

Q    And $285,000 in expenses, right?

A    I see it.

Q    Okay.  And that makes up a pretty good chunk of that $5.4 million month total in fee revenue, right?

A    Correct.

Sellers - Redirect                               81

Q   And that Hydrogen Peroxide case was an antitrust case?

A   That's correct.

Q   A case originated by Mr. Hausfeld?

A   I don't know who originated it.

Q   Mr. Hausfeld was held of the antitrust group, right?

A   That is correct.

Q   Okay.  And do you know of any antitrust cases that weren't originated by Mr. Hausfeld?

A   Yes, I do.

Q   Okay, is the Hydrogen Peroxide case one of them?

A   I don't know.

Q   All right, so, that's November.  Let's take a look at Exhibit 12.

A   Okay.

Q   And if you would, take a look at CMST000687?

A   687, okay.

Q   Again, if we take a look at the first column.

A   Right.

Q   December, 2008, it shows $6.6 million in revenues that came in during December?

A   I see it.

Q   Another pretty good month for the firm, right?

A   Yes.

Q   Okay.  And if you add what is it, $5.4 million that came in in November and the $6.6 million that came in in December,

that's about $12 million in those two months, correct?

A    Whatever they add up together.

Q    Right.  In the year to date, end of December, if you take a look at the second column on the page you're at right now, CMST687?

A    Yes.

Q    It is perhaps $35,000?

A    $35 million.

Q    $35 million, thank you, right?

A    Yeah.

Q    Okay.  And so, the money that came in in November and December accounts for over a third, a whole third of the money that came in for the firm for the year, right?

A    Roughly, that's right.

Q    And if you turn back to Plaintiff's Exhibit 70.

A    Okay.

Q    The fact that that much money came in in November and December, is consistent with the representations that Mr. Toll was making in this letter to Mr. Cromwell, right?

A    I'd have to look at the specifics of the letter, but we certainly made -- I mean, there are some things we made representations about I know that we weren't able to deliver on and others that we were.

Q    Okay.  Well, maybe --

A    I mean, just an example, the Hydrogen Peroxide fee was

actually approved a good deal earlier and so, there was

questions about how to allocate and the like.  I mean, these

were different stages.

Q    Okay.  Well, let's take just a quick look at this.  I ask

you to open up to, if you can, either take one exhibit out or

kind of  have them both open at the same time.

A    Okay, yeah.

Q    Go to Plaintiff's Exhibit 12.

A    And also what else?

Q    And the one you've got --

A    70.

Q    Yeah, 70, yes.

A    Okay.

Q    And Plaintiff's Exhibit 12, if you go to CMST00692.

A    Okay, hold on.  692?

Q    Correct.

A    Okay, I have it.

Q    Okay, let's take a look at the letter from Mr. Toll

first.

A    Okay.

Q    And your Honor, this will save some time, if Mr. Toll

takes the stand, because I wanted to do this with Mr. Toll.

The first case that's mentioned in Plaintiff's Exhibit 70 is

the Leap Frog case, right?

A    Yes.

Q   And it says, "We received $400,000 yesterday."  Right?

A   Okay.

Q   So, that money was in, right?

A   Correct.

THE COURT:  Perhaps Mr. Keeney can read some stipulation that essentially the representations in Mr. Toll's letter were fulfilled.

MR. ROSENTHAL:  Well, I think the representations --

THE COURT:  In November and December.

MR. ROSENTHAL:  -- the stipulation would be --

MR. KEENEY:  On a case by case basis, your Honor, we can stipulate on a case by case basis.  There's no dispute which ones came in and which ones didn't.

THE COURT:  Right. I don't think we have to go through all that with Mr. Sellers.

THE WITNESS:  Thank you.

BY MR. ROSENTHAL:

Q   And I think if you would compare the one page from Exhibit 12 to the representations made in the letter, you would see which cases came in?

THE COURT:  All right and you can argue that.

Q   And you also received quite a bit of money from the Cochran firm in December, is that right?

A   December of 2008, yes.

Q   Yes.  And you knew that money was coming, as well, right?

Sellers - Redirect                               85

A    I did not, no, they also have contingent fee cases and we were hoping that it would come, but we weren't sure, at all.

Q    How much money did you end up receiving from them in sum total in 2008?

A    Again, I'd have to look.  If you want, I can look it up, but I can -- it's listed somewhere and I don't doubt the accuracy of the number.

Q    At about $2.3 million?

A    If you say so.  I know it was a million or more.  I don't remember the number.

Q    The idea, Mr. Sellers, is that you knew that there was a decent bit of money coming in in November and December of 2008, at the time that Mr. Hausfeld's expulsion, as reflected in Mr. Toll's letter, correct?

A    No.  We were hopeful that we would recover it.  But that doesn't mean we knew it was coming in.

Q    But the money did come in --

A    That is --

Q    -- sufficient to allow the firm to turn a profit for the year, correct?

A    -- that is correct.

Q    And the money did come in sufficient to allow you to see an increase in your own capital account balance for the year, correct?

A    Apparently, that's correct.

Sellers - Redirect                              86

Q   And that was consistent with what you hoped or forecast it would come in, as of the time of Mr. Hausfeld's expulsion?

A   Well, I mean, I don't know that I can say exactly.  I mean, we projected that we would have sufficient revenues so that the bank shouldn't foreclose or call the line of credit. But I can tell you that to say that it didn't do so and jump to the conclusion, therefore, everything was terrific, ignored some horrific realities that we endured during that time, because we couldn't get the fees delivered to us because of letters that Michael had sent to these counsel. We ended up striking a deal that the fees would be deposited with the bank to pay down the line of credit.  But none were used -- allowed to be used to pay for the operation of the firm.

Q   Let me ask you this.  You expelled Michael from the firm, Mr. Hausfeld from the firm on November 6th, right?

A   Correct.

Q   At that point, the firm had, as you say, quite a large outstanding balance on its line of credit with Sun Trust, right?

A   Correct.

Q   Mr. Hausfeld had a pretty big personal guarantee on that line of credit, right?

A   That's correct.

Q   In excess -- and approximately 30 percent of that line

Sellers - Redirect                                    87

was guaranteed by him, right?

A    Something in that neighborhood, that's correct.

Q    Well, when you expelled him from the firm, you didn't
relieve him of his personal guarantee for the line of credit?

A    Absolutely correct.  No question about it.

Q    You left him on the hook for that?

A    Well, the bank left him on the hook for that.

Q    Yes, but you could have re-negotiated with the bank and
said, we've now expelled him from the firm, it's up to us now
to substitute our backing or our money for that line of
credit, right?

A    Well, we could have done that and if we had been able to
receive the fees un-encumbered, that we were expecting,
perhaps that would have been something we could have
discussed.  But we weren't able to even, as I said, we
weren't able to pay payroll for those periods without
extending -- taking lines of credit of own, because of how
limited our billing was to use fees that were coming in to
the firm.

Q    All right, you wanted Mr. Hausfeld to give up his
interest in those fees, so that you can cover your operating
expenses, operating expenses for the firm that had just
expelled him, isn't that right?

A    Well, we thought the partnership agreement provided that
he had no continuing interest in those fees.

Sellers - Redirect                        88

Q   But that was your view, correct?

A   Well, I think that's what it says, so, I guess --

Q   So, I guess he had a competing view.

A   Well, apparently, he did.

Q   So, he was preserving his interest in that he believed to be his share of those fees, correct?

A   Well, there are other ways to have preserved it then to have denied us the chance to get access to the fees.

Q   You mean after you take them out of the firm?

A   Is that a question?

Q   Yes.

A   I'm sorry, can you rephrase it, I don't quite understand what you're asking.

Q   You're suggesting that there are other ways to handle his situation --

A   After he left the firm, yes.

Q   -- right?

A   Yes.

Q   You know there were communications between counsel about how to do this, right?  A lot of back and forth between counsel about how to do this right?

A   There was a lot of discussion about this, that's correct.

Q   And I don't want to go too far down this road to address, however, you know that Mr. Hausfeld and his lawyers said that all the money that comes into the firm ought to be -- ought

Sellers - Redirect                                89

to go towards paying down the line, because Michael

Hausfeld's a 30 percent guarantor and Rich Lewis, are a six

percent guarantor on line, correct?

A    That was what we negotiated after a point where the

original position was we'd get nothing and the bank was

coming to us, saying, you have to pay down the line of credit

yourselves.

Q    So, the original position, Mr. Sellers, wasn't it, that

any money that came into the firm, ought to go to pay down

the line and you took the position that, no, we need some of

that money to cover operating expenses?

A    I'm not sure whose original position you're talking

about.  The bank certainly wanted to be repaid.

Q    And Mr. Hausfeld and Mr. Lewis said, yeah, let's get the

bank repaid.  Let's have all of this money go to the bank to

repay the loan -- to pay down the line, right?

A    That was not their original position as I understood it.

Q    As you understood it?

A    That's correct.  I wasn't part of those discussions.

          THE COURT:  We're going to have to take a break at

some point this morning.

          MR. ROSENTHAL:  I've got about five minutes left,

your Honor.

          THE COURT:  All right.

          MR. ROSENTHAL:  But I'm happy to break, if you want.

Sellers - Redirect                                    90

MR. KEENEY:  And then, your Honor, I'm going to have about 20 months on London and then I don't know how long he's going to have on London.

MR. ROSENTHAL:  Actually, Ms. Upadhyaya is going to be doing London, but I guess it's probably going to be about the same.

THE COURT:  All right, since we're going to be here for another hour and London, we might as well take a break. Unless you have just one or two areas you want to finish up on now?

MR. ROSENTHAL:  No, your Honor.  We'll take a break, that's fine.

THE COURT:  Okay.

MR. ROSENTHAL:  Thank you for your patience.

THE COURT:  All right, thank you, sure.  We'll break until 11:15.

(Court in recess 11:01 to 11:23 o'clock a.m.)

THE COURT:  Sorry, we're a little late, folks. Please be seated, sir.  All right, Mr. Rosenthal, you may resume.

MR. ROSENTHAL:  Thank you.

BY MR. ROSENTHAL:

Q   Mr. Sellers, just a few more questions.  Thanks for your patience.

A   Yes, sir.

Sellers - Redirect                          91

Q   When you met with the bank at the beginning of November
to discuss the line of credit, the representations you made
to them, coupled with Mr. Toll's letter, were in fact,
sufficient to get the bank not to call the line, correct?

A   Correct.

Q   The bank never did call the line?

A   That is correct.

Q   If you would, turn to Plaintiff's Exhibit 10, Mr.
Sellers, which I know matches up with one of the defendant's
exhibits, I just can't remember which one.

A   This is the October, 2008 monthly statement?

Q   Yes, October, 2008 financial statement.

A   Yes.

Q   Statements like the October, 2008 financial statement,
Exhibit 10, are prepared by the firm's controller, right?

A   Yes.

Q   Okay.  And they are distributed to the equity partners,
correct?

A   Portions of them are distributed to all the partners and
then some portions only to the equity partners.

Q   But they obviously can't distributed as of the last day
of the month of the report, correct?

A   Correct.

Q   So, this report, October, 2008, was not distributed to
the equity partners on October 31, 2008, right?

A    That's -- I'm sure that's correct.

Q    Typically, they're distributed about three or four weeks after, is that right?

A    Sometime in the following month.  I can't tell you exactly when, it varied from month to month.

Q    By the time this report, the October, 2008 was distributed, it would have been after the date of Mr. Hausfeld's expulsion on November 6th, correct?

A    That's probably correct, but I don't know what day this was distributed.

Q    Has a financial statement like this ever been distributed within six days of the end of the prior month?

A    I don't know.

Q    If you would turn to CMST661, which, I think is a page that Mr. Keeney had you on before.

A    I'm sorry, which exhibit is this?

Q    It's Exhibit 10, CMST661.

A    I'm sorry.

Q    It's Plaintiff's Exhibit 10, I'm sorry.

A    661, I'm sorry, the same Exhibit 10, okay.

Q    Yes.

A    I got my books mixed up.  Okay, I've got it.

Q    And Mr. Keeney was pointing you to the net income or loss figure at the bottom of the page of $6.5 million, do you see that?

A    I see it.

Q    And he asked you whether you, taking a look at that loss figure, could make an easy calculation of what your capital account looked like, at the time, correct?

A    Correct.

Q    And you said if anybody can, you know, if I can do it, anybody can, right?

A    Correct.

Q    Okay. So, it's fair to say that just about as soon as this particular statement, the October, 2008 statement was distributed, it would have been quite easy to make capital account calculations for both Mr. Hausfeld and Mr. Lewis, right?

A    Well, it would have been easy with regard to these numbers. There were other numbers that had to be taken into account with respect to allocating losses, that I understood had to be accounted for, as well.  But --

Q    But just a percentage interest, it's just a simple multiplication, percentage interest times the loss and you come up with the amount by which the capital account has to be adjusted, right?

A    As a rough approximation, that's correct.

Q    That's right.  But the capital account balance figures for Mr. Lewis and Mr. Hausfeld's capital account were not provided to them in November, were they?

Sellers - Redirect                                    94

A    No.

Q    They weren't provided to them in December of 2008 --

A    Correct.

Q    -- were they?

A    Correct.

Q    They weren't provided to them in January of 2008, were they?

A    Correct.

Q    They were not provided them until February 20, 2008, correct?

A    That's correct.

Q    About three and a half months after Mr. Hausfeld left the firm, right?

A    Yeah, I guess that's right.

Q    And about three months after this financial statement was prepared and circulated to the equity partners, correct?

A    That's correct.

Q    Now, you also testified, Mr. Sellers, that had there been income on the books as of October 31, 2008, Mr. Hausfeld would have gotten 28 percent of that income, right?

A    You mean profit?

Q    Profit, yes, net income?

A    Yes, yes.

Q    Right.  But the firm knew, at the time, that it did Mr. Hausfeld's and Mr. Lewis' calculations, that there wasn't net

Sellers - Redirect                           95

income on the books, but there was a $6.9 million loss,
right?

A    Well, we certainly knew -- I'm not sure where you get the
$6.9 million loss, but we knew -- this says $6.5, but we
knew, we certainly knew that we were operating at a loss.

Q    You knew you were operating at quite a significant loss
at the time of calculations, right?

A    The calculations in the --

Q    With respect to Mr. Hausfeld and Mr. Lewis' capital
accounts?

A    The ones that were provided in February, you mean?

Q    Yes.

A    Yes.

Q    Okay, and you still applied the 28 percent figure, right?

A    That's correct.

            MR. ROSENTHAL:    I have no further questions, thank
you.

            THE COURT:  Anything further on that?

            MR. KEENEY:  Nothing on that, your Honor.

            THE COURT:  All right.  Why don't you move to the
Air Passenger area.

            MR. KEENEY:  Okay, I think I should try to do a
direct first.

            THE COURT:  Okay.

            MR. KEENEY:  This is our witness on Air Passenger.

Sellers - Direct                          96

THE COURT:  That makes sense.  We're going to switch gears now.

THE WITNESS:  Yes, I'm going to close these books, if that's okay.

THE COURT:  Okay.

(Pause.)

JOSEPH M. SELLERS, Recalled, continuing as follows:

DIRECT EXAMINATION

BY MR. KEENEY:

Q    Mr. Sellers, could you please turn in our exhibit binder, Cohen Milstein --

A    Okay.

Q    -- binder one, to Defendant's Exhibit 11.

A    Okay.

Q    It's a financial statements for the year end.

A    Okay, I have it.

Q    I'm going to direct your attention, first, to page 14, which has a Note L subsequent events.

A    I see it.

Q    And can you read the second paragraph to yourself in the subsequent events description, to yourself.

(Pause.)

A    Okay, I've read it.

Q    Okay  My question, were you personally involved in the negotiation of the matter described in that paragraph?

A    Yes.

Q    How did that come about?

A    Shortly after Michael left the firm, we thought we ought to speak with the lawyers in the London office, discuss with them not only the fact that he'd left, but begin a discussion of what we should with respect to that office.  And Steve Toll and I called them.  I think, by then, they may have already heard about this, but we had -- we began a series of discussions with them about the disposition of that office.

Q    What did they indicate to you they wanted to do?

A    After some initial discussions where they ascertained from us that we did not have at the firm anyone who was particularly active with respect to internationally trust matters.  They expressed the desire to be freed from associating with Cohen Milstein and so that they could associate with Mr. Hausfeld.

Q    And what was your response on behalf of Cohen Milstein?

A    Effectively and it took some time to get to that point, but our response was we may be amenable to that, but we would like to find a way to recover our investment in that office, which was, by then, fairly substantial.

Q    Was, ultimately, an agreement negotiated?

A    We did, ultimately, negotiate an agreement.

Q    Anything in that agreement deal with attorney's fees from U.S. case?

Sellers - Direct                                98

A    No.

Q    Was there any discussion in the negotiations with the
attorneys in the London office, about them keeping fees from
U.S. cases?

A    No.

Q    Can you tell me anything that you recall about
discussions about fee revenues with the London office?

A    Yes.  In connection with our desire to put into this
structured agreement, a provision for the repayment of some
of the investment that the firm had made in this office, the
partners there made it clear that they were very concerned
that they not be expected to repay the investment any time
soon.

Q    And why was that?

A    Because they didn't expect revenues to be received and if
they were received, they would be revenue --

          MS. UPADHYAYA:  Your Honor, I apologize.

          THE COURT:  You don't have to apologize.

          MS. UPADHYAYA:  I've kind of let the hearsay go on
for a little while, but I'm going to object now.

          MR. KEENEY:  It goes to what he was told.  It's a
conversation.  He's having the conversation, doesn't come in
for the truth of what he was told, it comes in for he was
told it.

          THE COURT:  Why does it matter that he was told it?

Sellers - Direct                                   99

What does that have to do with anything?

MR. KEENEY:  It ties in to, essentially, the intent of the parties negotiation.  Party one to the contract tells you X, you act on X.  These are the actual representations made in entering into the agreement.

MS. UPADHYAYA:  Your Honor, this isn't, this does not fall into the state of mind exception.

THE COURT:  Yes, I'm not sure why his state of mind is relevant to anything you do with Air Passenger.

MR. KEENEY:  Oh, it fits into the negotiations, your Honor.  What they have said when they kept our money back, is they said this is a separate law firm.  Now, we're working backwards here.  What we're starting from is, first, the agreement and then we're going to go back into what the situation was then.  They make the argument that because of the agreement, that somehow that means these fees go to the London office.  What we are dealing with now is what was the negotiation history with the London office with respect to the agreement that they say gives them the right to just unilaterally distribute them to attorneys in the Hausfeld office in London.

THE COURT:  It's still hearsay.

MR. KEENEY:  But your Honor, it's not hearsay as to what he is told.  It doesn't come in for the truth.  Your Honor, it's just a very simple --

Sellers - Direct                               100

THE COURT:  Yeah --

MR. KEENEY:  -- no, this one, I'm sorry, your Honor. I don't mean to be argumentative.

THE COURT:  -- I know, but it doesn't come in for the truth is a very common attempt to get around hearsay. But you have to have another relevant purpose, it's not the truth, then what is that relevant purpose?

MR. KEENEY:  It's going to be what did Mr. Sellers say in response?  What did Mr. Sellers do in response.  So, I have to lay the foundation or Mr. Rosenthal will be objecting.

THE COURT:  All right, why don't you just ask --

MS. UPADHYAYA:  That's also hearsay, your Honor.

THE COURT:  Well, it's not if you're just getting in both halves of the conversation.  But I think the easier way to do this, because I think there is a fine line here.  Since we're not going to have any London people testifying and they don't have a chance to cross-examine the London people.

MR. KEENEY:  I'm not sure of that, your Honor.  I mean, we're here until Thursday.

THE COURT:  Well, why don't you just say as a result of my meeting with the London people, you know, what agreement did you negotiate?

MR. KEENEY:  Okay.

THE COURT:  Why don't we do it that way?

Sellers - Direct                    101

MR. KEENEY:  Let me ask that.

THE COURT:  So, I'll sustain the objection.

BY MR. KEENEY:

Q   As a result of the discussions that you had with the London attorneys, what agreement did you negotiate?

A   We reached an agreement that provides that over a period of years, they may repay from portions of revenues that they receive from European antitrust cases, toward -- as a partial reimbursement of expenses up to a certain cap on those -- on the repayment.

Q   And in the agreement, is there any provision about a revenue sharing of any fees from U.S. Antitrust cases?

A   No.

Q   Was that intentionally excluded by you?

A   We never -- by the time that we had this agreement, the Air Passenger fee, which is the one I assume we're talking about, had already been awarded to our firm and another firm. So, it was never a subject -- it was never my intention to include it in this agreement.  It was already a fee that was owed to our firm.

Q   Irrespective of your intention, is it included in the agreement?

A   No.

THE COURT:  Is there a copy of the agreement?  Did someone bring it?

Sellers - Direct                    102

MR. KEENEY:  Yes, your Honor, it was submitted to you by them.

THE COURT:  Oh, all right.

MR. KEENEY:  By them.

THE COURT:  In one of your letters?

MR. KEENEY:  In the Air Passenger letter submitted by Mr. Rosenthal.

THE COURT:  Okay, I didn't know.

MS. UPADHYAYA:  And we'll have a copy, your Honor.

THE COURT:  Okay, sorry.  I'm getting ahead of you.

MR. KEENEY:  Sorry, your Honor, I lost my --

THE COURT:  Oh, I apologize.  It's my fault.

BY MR. KEENEY:

Q   Who, in the London office, were you having these negotiations with?

A   Primarily with Anthony Maton (ph) and Vincent Smith.

Q   Okay.  And how many attorneys were there in the London office?

A   There was another partner there and then there may have been one or two junior lawyers.  It was either three or four or something like that.

Q   Were these discussions person or by other means?

A   Primarily by telephone.  As we got closer to concluding the agreement, one of their partners came to Washington and we met for an extended period over two days or so.

Sellers - Direct                          103

Q   And which partner was that?

A   I'm sorry, I don't remember.  I mean, I can describe him.
I think it was Anthony, but I'm not, well, I don't remember.

Q   Okay.  And the partner from London, who you met with in
Washington, in addition to you meeting with the partner, who
else from Cohen Milstein met with him?

A   Steve Toll met with him, as well.

Q   Anyone else from Cohen Milstein meet with him, at that
time?

A   With respect to negotiations, these negotiations, I don't
believe so.

Q   At Cohen Milstein, who were the most knowledgeable
persons about these negotiations?

A   I suspect it would have been Steve Toll and myself.

Q   Is there anything that Steve Toll is aware of that you
are not aware of, to your knowledge?

          MS. UPADHYAYA:  Objection.

          THE COURT:  I don't know if he can answer that.

          MR. KEENEY:  Okay, let me phrase that one a little
bit better.

          THE COURT:  That borders on the metaphysical.

          MR. KEENEY:  That was a little bit loose there.

BY MR. KEENEY:

Q   Are you aware of the facts that you believe Steve Toll is
not aware of?

Sellers - Direct                          104

MS. UPADHYAYA:  Objection.

THE COURT:  Well, it's kind of the same thing.  I'm not sure --

MR. KEENEY:  It's the flip side, is he aware.

THE COURT:  Yes, but how does he know what he's not aware of?

MR. KEENEY:  Okay, well, if you -- if you want to sustain the objection, that's fine.

THE COURT:  Yes, I'll sustain it.

MR. KEENEY:  I'm just trying to get the information out.

THE COURT:  Yes, okay, that's fine.

BY MR. KEENEY:

Q   Other than you and Steve Toll, there's no one else at Cohen Milstein who you believe would have any relevant information about this agreement, right?

A   There may be, for instance, people in accounting who might have collected information for us, but we were the ones who negotiated it.

Q   Okay.  Prior to the negotiation of this agreement, what was the status of the London office of Cohen Milstein?

A   It was a limited partnership that had been formed as a requirement of London or British Law, but which we regarded as effectively, another office of the firm.

Q   Why did you regard it as effectively another office of

Sellers - Direct                                105

the firm?

A    We called it the London office, because it functioned as another office of the firm.  It did not function as a separate entity.  Indeed, I'm blanking his name right now, but one of the partners of that firm, as I said earlier, was appointed as a member of the executive committee originally, when we had a seven member executive committee.  He was a full fledged member whenever we were talking about anything that had to do with antitrust or London activities.  So, he was privy to lots of discussion of the executive committee.  And we had, I mean, I don't practice in the antitrust area, but my impression is that there were frequent communications with that office about various kinds of efforts to develop business and the like.  So, we had a firm retreat off site and the partners in that office came to the retreat, as did the partners and lawyers from all the other offices.  So, we viewed it and I think treated it pretty much as another office of the firm.

Q    Did Cohen Milstein pay the rent for the London office?

A    Yes.

Q    Did Cohen Milstein pay all the expenses for the London office?

A    Yes.

Q    Did Cohen Milstein pay salaries for the attorneys working in the London office?

Sellers - Direct                106

A    Yes.

Q    How much of an investment did Cohen Milstein make in the London office?

A    Well, it was in the order of magnitude of several million dollars.  I don't know the exact amount, but it was over a period of time of what we regarded as a very substantial investment.

Q    Okay, I'm going to direct your attention back to what we marked as Defendant's Exhibit 11, this is the notes to the financial report.

A    Mm-hmm.

Q    We've been talking about the note on page 14.  I want to redirect your attention to the note on page 10.  If you could read to yourself Note E, which is captioned Investment in CMHT-NY LLP.

A    I see it.

Q    Can you read that to yourself?

A    Yes.

        (Pause.)

A    Okay, I've read it.

Q    Okay, is the information in Note E correct, to the best of your knowledge?

A    To the best of my knowledge, it's correct.

Q    What was the Cohen Milstein ownership interest in CMHT-NY LLP?

Sellers - Direct                    107

A    I believe that we owned 99 percent of that partnership.

Q    And why was it run as a 99 percent partnership rather than 100 partnership?

A    I believe that British Law required that some portion of it be owned by lawyers admitted to practice in Britain.

Q    Do you have any knowledge with respect to fee applications submitted in U.S. Courts for the time of Cohen Milstein attorneys who were working at the London office?

A    You know, I haven't seen -- I've seen those in connection with this dispute and the time that was spent, for which my lawyers in that office was included as a unified application by Cohen Milstein for an award of attorneys fees.

Q    In your conversations with the London attorneys, you did not mention Air Passenger.  Did they mention any other United States cases that they were working on?

        MS. UPADHYAYA:  Your Honor, I'm going to have to object again on hearsay.

        THE COURT:  Why isn't that hearsay, Mr. Keeney?

        MR. KEENEY:  I wanted to get what information was communicated to him and it goes to why things are or are not in the agreement.

        THE COURT:  I don't know how that gets you around the hearsay argument, because it is an out of court statement by somebody in London and offered to prove what, in fact, they were doing.  And that's the issue you want me to

Sellers - Direct                    108

consider it for, so, I think it's hearsay, I'll sustain the objection.

MR. KEENEY:  Okay.

MS. UPADHYAYA:  Thank you, your Honor.

BY MR. KEENEY:

Q   With respect to the agreement that you ultimately reached with the London attorneys, why is there no reference to fee revenues to be received from U.S. Court awards?

A   Well, there's -- we never discussed, but I never intended, we never intended to include U.S. fee revenues as any of the revenues that could be used to repay expenses in this case, in connection with the investment.

Q   And is that why the agreement clearly spells out, in your view, European cases?

A   Yes.  The discussions that -- my understanding is that the revenues --

MS. UPADHYAYA:  Objection, your Honor.

THE COURT:  Hold on, sir.

THE WITNESS:  I'm sorry.

THE COURT:  That was a leading question.  Why don't you rephrase that?

MR. KEENEY:  Yes.

THE COURT:  All right, thanks.

BY MR. KEENEY:

Q   Does the agreement spell out a fee revenue sharing with

respect to European cases?

A   It mentions, I believe, some possible sources of revenue that could come, I know Marine Hose is mentioned, that might provide a basis on which to help repay the investment in the office.

Q   And does it mention that Marine Hose proceeding it's referring to, is pending in London?

A   Yes.

Q   Is there anything in the agreement which deals with past fee awards as opposed to perspective fee awards?

A   No.

Q   Is there anything in the agreement that deals with prospective fee awards?

A   Again, it makes reference to anticipated revenues that may come in the future, be awarded in the future, as providing a body of revenue from which they can help them repay the firm's investment in that office.

Q   And at any time in the negotiations with the London office, did you, on behalf of Cohen Milstein, tell them that they could keep the Air Passenger fees?

A   No, we didn't.  I never discussed Air Passenger fees with them whatsoever.

Q   And to your knowledge, did you ever Steve Toll promise them that they could keep in the London office, the Air Passenger fees?

Sellers - Direct                          110

MS. UPADHYAYA:  Your Honor --

THE COURT:  Hold on, what's your objection?

MS. UPADHYAYA:  -- I have an objection on hearsay again.

MR. KEENEY:  I asked if he heard it, your Honor, that can't be hearsay.

MS. UPADHYAYA:  Notwithstanding the first four letters of the word hearsay?

THE COURT:  Right.  I'll allow it, I think I know the answer, but go ahead.

THE WITNESS:  Yes, I've never heard anything --

THE COURT:  Okay.

THE WITNESS:  -- about that.

BY MR. KEENEY:

Q   When was the first time you became aware that the London office was claiming that it had a right to the attorney's fees in the Air Passenger case?

A   It was, I think, sometime this summer, whenever I first became informed that moneys were -- may have been actually when I learned that moneys had been transferred to the London lawyers.

Q   And this is the summer of 2009?

A   Yeah, this summer, 2009.

Q   Has the Air Passenger fee been listed in various representations made by Mr. Toll to the banks back in

Sellers - Direct                    111

November 6, 2008?

A    Absolutely, it was one of the fees that we expected to recover, we had hoped, before the end of 2008, but certainly it was regarded as a firm asset.

Q    Okay.  At the time that it was listed in November 6, 2008, was that one of the larger or one of the smaller fees that was being expected by Cohen Milstein?

A    It was one of the larger.

Q    Compared to OSB, was it larger than OSB?

A    Well, I think certainly, at the time, when we had listed it, we expected it to be larger.  I don't -- yes, we thought it was larger.

Q    Okay.  With respect to the attorneys in the London office, back before the transaction in January of 2009, did Patricia Drolet, as accountant for Cohen Milstein, review the accounting records of the London office?

          THE COURT:  Do you know?

          THE WITNESS:  I don't know.

          THE COURT:  Okay.

Q    Okay, let me just direct you, then, to Defendant's Exhibit 11, once again.  We've been talking about the notes.

A    Yup.

Q    Directing your attention, first, to numbered page 5. That's CMST00531, do you have that in front of you?

A    I'm getting there, yes.

Sellers - Direct                                112

Q   Okay, directing your attention about four-fifths of the way down, do you see reference to a line item, income (loss) on investment in CMHT-NY LLP?

A   I do see that.

Q   And do you see an entry for 2008 of income of $192,848?

A   I see that.

Q   And do you see the entry for 2007, which is a loss?

A   I do see that.

Q   And how much was that loss in 2007?

A   About $2.6 million.

Q   And at the time that Cohen Milstein, in January of 2009, entered into a transaction with the London office attorneys, how much of a loss had Cohen Milstein incurred in the London office operation?

A   I'm sorry, as of what point?

Q   As of the time that you're negotiating what became the transaction of January of 2009, how much was Cohen Milstein out?

A   It was well in excess of $2 million.

Q   Okay.  If we could turn, also to the next page, in the very same exhibit.

A   Okay.

Q   This is page 6, Defendant's Exhibit 11.  Under net income?

A   Yes, I see it.

Sellers - Direct                                    113

Q   Okay, this is about halfway down and this essentially, is a different presentation on income tax basis of the income loss on investment in CMHT-NY LLP, is that right?

A   I see that, yes.

Q   Okay.  And in this calculation, which is the net income calculations, there is an adjustment of negative $192,848, which is a loss of the investment, is that correct?

A   A loss of the investment, yes.

Q   Right.

A   Repayment of part of the investment.

Q   Right.  And looking at 2007, there is a loss with respect to the investment of $2,609,309, right?

A   That's correct.

        MR. KEENEY:  No further questions of the witness, your Honor.

        THE COURT:  All right, thank you.  Ms. Upadhyaya, did I pronounce it right?

        MS. UPADHYAYA:  I'm sorry, I didn't hear your Honor. I'm going to make you do it again.

        THE COURT:  Upadhyaya?

        MS. UPADHYAYA:  Upadhyaya.

        THE COURT:  Upadhyaya, all right.

        MS. UPADHYAYA:  Thank you.  Your Honor, I'd just like to approach with a couple of documents we've talked about a lot.

Sellers - Direct                              114

THE COURT:  Okay.

(Pause.)

THE COURT:  She must have been a former law clerk, because she's very attentive to make sure the law clerks have all the paper.

MS. UPADHYAYA:  Guilty as charged.

CROSS-EXAMINATION

BY MS. UPADHYAYA:

Q   Mr. Sellers, Mr. Keeney spoke to you a lot about the agreement regarding the London office, right?

A   Yes.

Q   He didn't show you any of those agreements?

A   Not that -- no.

Q   All right, so, let's go through those agreements.  You said that you and Mr. Toll were the two most knowledgeable people at CMHT regarding the London office, right?

A   No, I said we were the two most knowledgeable with respect to the negotiations of the separation of the London office.

Q   For CMHT's transfer of its partnership interest in CMHT-NY LLC, right?

A   Again, I'm not sure I understand.  I thought, what I'm trying to say is he and I were the two involved in the negotiations there, undoubtedly.  I wasn't involved, for instance, in the preparation of the partnership agreement

that is Exhibit 110.

Q    I guess what I'm trying to ask you, Mr. Sellers, is that you were involved, intimately involved in the negotiation over CMHT, not CMST, transfer this partnership interest in the entity, which is formally known as CMST-NY LLP, but I think we'll all call it the London office for future reference --

A    Yes.

Q    -- right?

A    I was involved in that, yes.

Q    Okay.

        THE COURT:   I like that London office, it will save us a lot of tongue-twisting.

Q    Let me first start with the partnership agreement.

A    Okay.

Q    For the London office.

A    Okay.

Q    If you look at Plaintiff's Exhibit 110, please?

A    Yes, I have it.

Q    Now, this is the agreement that sets forth the partnership interest and the rules that will govern the operations at the London office, is that fair?

A    That's, yes.

Q    And this partnership agreement was entered into in 2007?

A    I'm looking for the date, but I'll accept your

representation that that's the case.

Q    You're an equity partner at Cohen Milstein as of 2007?

A    I was -- I was, that's correct.  I just don't remember exactly what year it was.

Q    Okay.

A    Yes, it appears it was 2007.

Q    And Cohen Milstein was an equity partner of the entity, correct?

A    Correct.

Q    And there were also other partners?

A    That's correct.

Q    There were -- Mr. Hausfeld was a partner?

A    Correct.

Q    Mr. Toll was a partner?

A    Correct.

Q    Mr. Freedman?

A    Correct.

Q    And then there were also fixed shared partners, Mr. Murray and Mr. Smith and Mr. Maton?

A    Correct.

Q    Let me direct your attention, first, to Section 5.1, please?  Actually, let me take you first to 5.3.

A    I see it, bottom of page 6?

Q    Yes, sir.  Now, 5.3 says that any income that a partner receives for legal services belongs to the LLP?

A    Just a moment, please.  Yes.

Q    Doesn't belong to any one of the partners?

A    It says it belongs to the LLP.

Q    And any income that comes in on behalf of the LLP has to be deposited in a bank account of the LLP?

A    I'm sorry, I'm just looking to see where it -- will you point to what you're referring to?

Q    Is it your understanding that any income that comes in on behalf of the LLP has to be deposited in an account maintained by the LLP?

A    I don't, I don't recall.

Q    Okay, well, let's go to Section 5.1.

A    Okay.

Q    Now, Section 5.1 says all funds, checks, notes and drafts received for or on behalf of the LLP shall be deposited promptly in the account or accounts maintained by the LLP in such a bank or banks as shall be determined by the managing partner?

A    Right.

Q    It also says the LLP shall, at all times, maintain a bank account or accounts at a United Kingdom clearing bank?

A    Yes.

Q    That's what CMHT agreed to?

A    Yes, that's what it says.

Q    And the agreement also says that it should not -- if you

go to the bottom of Section 5.3.

A    Mm-hmm.

Q    It says the agreement should not be deemed to require any partner to pay over to the LLP any amount received by him, if such payment would be in violation of the law.  That's what you agreed to?

A    That's what it says.

Q    Makes sense?

A    Yes, it makes sense, but it also is in the agreement.

Q    Now, it's true, is it not, that once you are no longer a partner of the LLP, you're not entitled to any distribution or income from the LLP?

A    Again, I'm sorry, I haven't looked at this document in quite awhile.  Is there some provision you want me to -- refer me to, I'm happy to look it.

Q    Of course.  Section 8.6, when you're there, just let me know.

A    I'm here.

Q    Okay.

A    I'm there.

Q    About halfway through 8.5, it says no former partner shall have any right to have LLP property distributed to him nor to have the value of his interests in the LLP ascertained and paid to him.

A    I see that.

Sellers - Cross                                119

Q    That's what you agreed to?

A    Yeah, that's what it says.

Q    Okay.  And a former partner is a partner that once was a member -- was a partner of the LLP, but now, no longer is a partner of the LLP?

A    I would agree with that interpretation.

Q    And in fact, former partners not only don't have any right to distributions or distributions of LLP property, former partners also have the obligation to cooperate with the LLP on a going basis after they've left the partnership?  Let me direct your attention to -- I can see you're not familiar with the provisions.

A    I'm sorry.  Yeah, I'm not, I told you that, I'm not familiar with them.

Q    Right, Section 8.7.  It says each former partner shall cooperate with the LLP to the extent reasonably requested by the LLP, from time to time in connection with LLP matters, which may arise as a result of legal services rendered by the LLP prior to the former partner's termination of his membership in the LLP, including, without limitation, LLP billing matters.  That's what you agreed to?

A    I see it's in the agreement.

Q    Now, you said there came a time when CMHT decided its investment in the LLP was no longer making sense, right?

A    No, I didn't say that.

Sellers - Cross                    120

Q   Or maybe, okay, there was a time when you decided that CMHT no longer should invest in London?

A   No, if you're asking me what I said, what I said was after Michael left the firm, we had a conversation with the London office lawyers, in which they expressed the view that they would prefer to associate with Michael.  And we --

Q   Mr. Sellers, you ultimately sold your partnership interests in London?

A   We transferred it, that's correct.

Q   Right.  And you decided that after a period of, I don't know how long, you were negotiating for about two months, right?

A   Roughly, yeah.

Q   Okay.  That it made sense to Cohen Milstein to sell its partnership interests?

A   It made -- if you're asking -- I mean, we certainly entered the agreement voluntarily and it made sense for us to transfer the ownership of the office to the London lawyers.

Q   That's what I was getting at.

A   Okay.

Q   Let's turn to Plaintiff's Exhibit 112, please.

A   Okay.

Q   This is the agreement reflecting CMHT's sale of its partnership interest in London?

A   It's the transfer agreement, yes.

Sellers - Cross                    121

Q    Now, as a result of the transfer or sale, I don't want to mince words, but the result of transfer or sale of CMHT's partnership interests in London, CMHT agreed that it would no longer have any right or title or claim to any income of the LLP?

A    Where are you --

Q    I'm sorry?

A    Is there a particular provision you're referring to?

          THE COURT:  Are you at 112 now?

          MS. UPADHYAYA:  Yes, your Honor.

          THE COURT:  Okay.

Q    Okay, well, if you look on page 1.

A    Right.

Q    Cohen Milstein Sellers & Toll, Steven Jeffrey Toll and Andrew Neil Freedman are listed as the transferrers --

A    Correct.

Q    -- in this agreement.  And about halfway down the page, it says now the transferor have agreed to transfer all of their rights, interests and entitlements in CMHT-NY LLP?

A    Right, right.

Q    Okay.

A    Correct.

Q    So, this document reflects the transfer or sale of all of CMST's rights, claims, title to any income of the LLP?

A    No, it says rights, interests and entitlements in, that

doesn't say income.  I'm just telling you what it says.

Q   Okay, well, let's go to Section 2.1.

A   Okay.

Q   Section 2.1, Cohen Milstein agreed that it would transfer to the transferees all of its rights, interests, entitlement in CMHT, which is the London office and in any or all of its business or practice, wheresoever and whatsoever as carried on at the agreement date.

A   I agree.

Q   And the agreement date is January 15, 2009?

A   Correct.

Q   And the sale of your interest was in exchange for a certain amount of the London office's gross profits over a period of years?

A   Yes, it's set forth in page 5, paragraph 3.1.4 and 3.1.5.

Q   The agreement does not entitled CMHT, it does not say that it entitled CMHT to any legal fees that the LLP generates or is awarded?

A   Well, there's nothing in there that says that, but these were fees that had already been awarded.  This was --

Q   I'm just asking what's in the agreement, since we've been talking --

A   Well, I think the agreement speaks for itself.  I mean, if you're asking what's in the agreement.

Q   I agree, okay.

Sellers - Cross                         123

A    It doesn't mention anything about --

        THE COURT:  Just go one at a time.  Ask a question, you answer it.

        MS. UPADHYAYA:  Okay.

        THE WITNESS:  I'm sorry.

        THE COURT:  That's all right, let's just slow down.

        MS. UPADHYAYA:  Okay.

        THE COURT:  All right, you can ask your question.

        MS. UPADHYAYA:  Thank you, your Honor.

Q    I believe you said that nowhere in the agreement does it entitle Cohen Milstein to any of the LLP's award of legal fees?

A    It does not mention award of attorney's fees, legal fees. The only, I mean, the mention of that is -- where is it -- with respect to legal fees that were awardable from European operations in the future.

Q    Well, you said on direct that the agreement entitled CMHT to a percentage of the LLP's awards in European antitrust cases?

A    That's my understanding.

Q    Okay, that's not in the agreement, is it?

A    That's what I'm looking for.  It may have been in representations made to us about the sources of revenue that the office was going to make or obtain and on the basis of that, we said we would agree to that.

Sellers - Cross                    124

Q    Okay, but it's not in the agreement?

A    Just a second.  I think that's correct, it's not specifically mentioned.

Q    And in fact, the only income that CMHT is entitled to, as a result of this transfer of its interests or sale of its interests, is pursuant to Article 3 and the formula that's set up for CMST recovering a portion of the London office's gross profits?

A    That is correct with respect to revenues that are owed to the London office.

Q    And that is determined at the end of every year pursuant to a very detailed, step by step, process?

A    Yes, that's correct.

Q    And in fact, even after gross profits are determined, Section 3.1.4 lays out the terms under which -- the only terms under which CMHT would have any claim to London's profit?

A    Profits owed to the London office, that's correct.

Q    Are you saying, sir, that there are profits that aren't owed to the London office that, pursuant to this agreement, you're entitled to?

A    What I'm saying is that the award of attorney's fees that was made prior to -- well before -- months before, at least, this was -- it was October of 2008, was not something that was contemplated to be covered by this agreement.

Sellers - Cross                               125

Q    Where is that in the agreement?

A    Well, as I said before, it's not mentioned -- no particular portion of this is mentioned in the agreement.  No -- that these were fees that had already been awarded to Cohen Milstein, to our firm.

Q    And in fact, the only mention in the agreement of Cohen Milstein's rights to the LLP property, is two places.  One is that you agree to transfer all of your rights, interests and entitlement in the London office and that any or all of its business or practice wheresoever and whatsoever, as carried on at the agreement date?

A    Correct.

Q    And the only other provision is the provision we just discussed about the recovery of gross profits based on both the process and the formula set out in Article 3?

A    Yes, as of the agreement date, that's correct.

Q    As of the agreement date, there have been no fees that had been disbursed in the Air Passenger case, has there?

A    No, but they've been awarded to our firm, in its name.

Q    Okay, well, I believe you said earlier that you don't count anything that's not in your bank as revenue?

A    No, I think what I said was, I'm sorry.  For purposes of our -- we don't count anything -- could you just ask the question again, please?

Q    I don't want to misstate what you said, but I believe you

told my colleague that you don't count anything that's not in the bank, you don't count as revenue anything that's not in the bank of CMHT?

A    Yes, we don't count this revenue earned in a particular year, any funds that are not received, actually received.

Q    Mr. Sellers, you said on your direct that as of October 31st, Cohen Milstein had been awarded fees from the Air Passenger case?

A    That's correct.

Q    The October 31st award said nothing about Cohen Milstein, did it?

A    Well, my understanding was we had submitted an application that was on behalf of Cohen Milstein, making no separate reference to a London office and the Court awarded fees to the plaintiff's counsel in the amount of x-dollars.

Q    Is it your testimony that on October 31st, the Judge awarded a specific fee to Cohen Milstein?

A    No, no.  As I thought I made it clear before, it had not been allocated amongst counsel, at that point.

Q    So, you didn't know how much you were going to get?

A    We didn't know how much we were going to get, at that point, that's correct.  But it was --

Q    And you didn't know when you were going to get it?

         THE COURT:  All right, let him finish his answer, I'm sorry.  Are you done?

Sellers - Cross                    127

THE WITNESS:  No, thank you, your Honor.  But what was clear was it was not something that had been awarded to Cohen Milstein-New York.  The award was not made to Cohen Milstein-New York.

Q    The award wasn't made to any particular counsel?

A    There was no mention of particular counsel, but there was no application on behalf of Cohen Milstein-New York.

Q    Okay.  And had the Air Passenger fees, I think you said on your direct testimony, had they come in as of January 15, 2009?

A    No, we know that, you mean, come into the bank of the firm?  You mean, had we received them yet?

A    Had you received an award, any specific award as of January 15, 2009 from the Air Passenger case.

A    We have not received to date any fees from the Air Passenger case.

Q    And your agreement for the transfer of your partnership interests says nothing about your entitled to any of the Air Passenger fees?

A    It doesn't specify anything about any fees, one way or the other.

Q    Now, you said earlier that you regarded the London office as effectively another office of Cohen Milstein?

A    That's correct.

Q    And that there was a partner, although you couldn't

remember his name.

A    Right.

Q    That sat on the executive committee?

A    Right, with apologies, my memory is refreshed, it was Rob Murray.

Q    But Rob Murray had not voting rights in CMHT, right?

A    Oh, yes, he did with respect to the things related to London.

Q    But he had no voting rights in the PLLC, which is now -- which was then known as Cohen Milstein Hausfeld & Toll, PLLC and which is now known as Cohen Milstein Sellers & Toll, PLLC?

A    My recollection is he had a voting right as to matters related to London.

Q    To the LLP?

A    No, insofar as we -- Cohen Milstein Hausfeld & Toll was dealing with the London office.

Q    I just want to make sure the record is clear.

A    Okay.

Q    With respect to any of the voting shares, what we've been talking about a lot this morning, of Cohen Milstein Sellers & Toll, did that partner have any voting right in that PLLC?

A    Oh, you've now -- I think you've changed the question -- but he had no voting -- he had no percent interests in the equity interest in Cohen Milstein Hausfeld & Toll.  That's

Sellers - Cross                    129

not what I was talking about, but that's correct.

Q   Okay.

        MS. UPADHYAYA:  May I have the Court's indulgence for a minute?

        THE COURT:  Take your time.

        (Pause.)

        THE COURT:  So, now you know what those football quarterbacks feeling like during the time outs, right?

        MS. UPADHYAYA:  Thank you for your Honor's patience.

        THE COURT:  Take your time, take your time.

Q   Mr. Sellers, you said that there had been no separate submission of the London office in the application for fees in Air Passenger?

A   That's my understanding, yes.

Q   Isn't it true that the London office, an entirely separate page listed its billing and its time and the work it had done in Air Passenger?

A   Well, listed the time, as we did with all the lawyers who had expended time on the case, in the fee application.  But we did not submit and did not expect to receive a separate award for the London office.

Q   The London office had a separate submission?  All the time that the London office sent was on a separate --

A   It was submitted to the Court, I understand that.

Q   It wasn't -- it wasn't included in the list of time and

Sellers - Cross                                    130

timekeepers of CMHT?

A    I don't recall that, but I can tell you that the description and certainly, the declaration that was submitted in support of it, referred to this is time submitted for Cohen Milstein Hausfeld & Toll.

Q    Now, earlier, you said Anthony Maton was a partner in the London office?

A    I believe that's correct.  He's a lawyer in the London office and I think he was a partner.

Q    And he was also a fixed-share partner?

A    That's correct.

Q    Of the LLP.  He was not an employee of CMHT.

A    By law, we could not employ him.

Q    He wasn't an agent of CMHT, PLLC?

A    An agent?  No, he was not.

Q    He wasn't a member of the PLLC?

A    Correct.

Q    It's true, Mr. Sellers, that the London office's books and records were kept in accordance with generally accepted accounting principles?

A    I have no idea.  I'm sorry, I don't know.

Q    Turn to Section 5.4, please, of Exhibit 110.

A    Okay.

Q    And Section 5.4 says there shall be kept, at all times, at the principle office of the LLP in the United Kingdom,

Sellers - Cross                    131

accurate books of account reflecting all funds received,

paid, advanced or expended by the LLP, including amounts paid

or payable to each partner.  The books of account shall be

kept and continually maintained in accordance with generally

accepted accounting principles.  That's what you agree to?

A    I see that in the agreement.

         MS. UPADHYAYA:  I have no further questions.  Thank

you, Mr. Sellers.

         THE COURT:  Thank you.

         THE WITNESS:  Thank you.

         THE COURT:  Any follow-up, Mr. Keeney?

         MR. KEENEY:  Yes, your Honor, very brief. I'm going

to show the witness a copy of the declaration submitted by

Charles Tompkins (ph), who was talking about the memory of --

it's already submitted to your Honor, it's attached in my

letters several times.

         THE COURT:  Okay.

         MR. KEENEY:  And this is records per your Honor, I

actually put a yellow sticker with no mark, it's easier to

find the page that I'm referring to.

         THE COURT:  Okay.  Yes, I don't have that up here.

All right, I'll get it later.  I'll just listen.

                    REDIRECT EXAMINATION

BY MR. KEENEY:

Q    Mr. Sellers, I've just shown you a document.  Is that, in

Sellers - Redirect                          132

fact, the fee application made by Cohen Milstein in the Air Passenger case?

THE COURT:  What number is this, sorry?

MR. KEENEY:  Unmarked so far, it would be our number next.

MR. ROSENTHAL:  We have no objection to it.

THE COURT:  Okay.

MR. KEENEY:  Well, we just don't know what our number next is.

THE COURT:  Your next number looks like it is 52, does that sound right?

MR. KEENEY:  We'll take it, we'll take it.

THE COURT:  Let's call it 52, unless Ms. Bonn tells us otherwise.

MR. KEENEY:  Okay, thank you, your Honor.

(Discussion off the record.)

THE WITNESS:  Your question, again, that you just asked me?

BY MR. KEENEY:

Q    Is this a declaration submitted on behalf of Cohen Milstein for an award of attorney's fees in the Air Passenger case?

A    That's correct.

Q    And directing your attention to Exhibit 1, could you turn to that?

A    Yes.

Q    Exhibit 1 is comprised of how many pages?

A    It appears to be three.

Q    Okay.  And is the first page captioned, Cohen Milstein Hausfeld & Toll, PLLC (U.S. offices)?

A    Correct.

Q    Okay. And then does it then list attorneys and non-attorneys on that page?

A    That's correct.

Q    Turning to the next page, does that page have a continuation of those U.S. attorneys and non-attorneys?

A    Yes.

Q    Now, turning to page three, does that page have a caption, Cohen Milstein Hausfeld & Toll LLP (U.K. office)?

A    Yes, it does.

Q    And does that list approximately four attorneys with offices in the U.K.?

A    Yes.

Q    And does that list the times for those attorneys?

A    Yes.

Q    Directing your attention now back to the actual declaration?

A    Yes.

Q    Which accompanied the fee application?

A    Yes.

Sellers - Redirect                                134

Q    I'd like to direct your attention to paragraph 7, could you read that to yourself?

A    Yes.

Q    Is it fair to say that the first two lines of Schedule 7 say, "The schedule attached hereto as Exhibit 1, is a summary indicated the amount of time spend by the partners, attorneys and other professional support staff of my firm?"

A    Yes.  It's a paragraph in his declaration.

Q    Right.  And that's paragraph 7, is that right?

A    That is correct.

Q    And this declaration was submitted by whom?

A    Charles Tompkins.

Q    At what entity?

A    Charles Tompkins was then a partner at Cohen Milstein Hausfeld & Toll.

Q    Does it list an address at page 5?

A    Yes, it lists the address of Cohen Milstein Hausfeld & Toll and the name, Cohen Milstein Hausfeld & Toll.

Q    And the date of the declaration is when?

A    September 5, 2008.

Q    Okay.  In addition to the reference you're already referred to in paragraph 7, directing your attention to paragraph 8.

A    Yes.  And again, it makes reference to my firm.

Q    Okay, how about paragraph 9, is there a reference to my

Sellers - Redirect                          135

firm?

A    Yes.

Q    And in paragraph 9, is there a reference to the total lodestar firm, my firm?

A    Yes.

Q    And in paragraph 10, is there another reference to my firm?

A    Yes.

Q    And in paragraph 11, is there another reference to my firm?

A    Yes.

Q    And paragraph 12, is there another reference to my firm?

A    Yes.

        MR. KEENEY:  I have no further questions, your Honor.

        THE COURT:  What was the date that application was submitted?

        MR. KEENEY:  September 5, 2008, your Honor.  You have our copy.

        THE COURT:  Oh, I think I have one in chambers, thank you.

        MS. UPADHYAYA:  Your Honor, may I ask just one question of the witness?

        THE COURT:  Do you want to see this?

        MS. UPADHYAYA:  Yes.

Sellers - Redirect                                    136

THE COURT:  Does he need this?

MS. UPADHYAYA:  No, he doesn't need that.

THE COURT:  Okay.  If you need it, let me know.

RECROSS-EXAMINATION

BY MS. UPADHYAYA:

Q   Mr. Sellers, with respect to Exhibit 110?

A   Okay.

Q   Which is the partnership agreement?

A   Yes.

Q   I'm going to read partnership agreement starting at Section 5.3, entitled LLP Income.

A   Okay.

Q   "Except for amounts earned by a partner on behalf of an example, to CMHT-DC, all fees, salaries, proceeds, commission and other compensation earned or received by any partner for legal services" and some other provisions.  If you go to the next page, it says -- followed on to say, "any income earned by any partner, for legal services shall belong to the LLP and shall be deposited for and paid over to the LLP as and when received in exactly in the form received."  That's what you agreed to?

A   It's in the agreement.

Q   And we know from my earlier questioning, that any of that income has to be deposited in accounts maintained by the LLP at a United Kingdom clearing house?

Sellers - Recross                    137

A   No, I wouldn't agree with that reading.  Paragraph 5.1 is what you're referring to.

Q   Where it says, "All funds, checks, notes and drafts received for or on behalf of the LLP shall be deposited promptly in the account or accounts maintained by the LLP."

A   In such bank or banks as shall be determined by the managing partner is the rest of that sentence.  The reference to banks in the U.K. is in the next sentence.

Q   Right, so --

A   Okay.

Q   -- the bank is -- has to be the United Kingdom clearing bank?

A   I don't see how you come to that conclusion from that reading.  The managing partner can determine where the funds should be deposited.

Q   So, even when CMHT was the managing partner, this provision in the partnership agreement that CMHT agreed to, required that any income obtained by the LLP belongs to the LLP and has to be deposited in the accounts of the LLP?

A   Has to be deposited in a bank or banks as determined by the managing partner, is what it says.

Q   Thank you.

        MS. UPADHYAYA:  I have no further questions.  Thank you, Judge.

        THE COURT:  Okay, thank you.  Anything further for

138

Mr. Sellers?

MR. KEENEY: No, your Honor. And we would like to now have Mr. Sellers excused so he can make his plane.

THE COURT: All right, very well.

THE WITNESS: Undisclosed location.

THE COURT: To an undisclosed location.

MR. KEENEY: Thank you, your Honor.

THE COURT: Okay, thanks for coming in.

THE WITNESS: Thank you, your Honor, thank you.

THE COURT: Have a good day, sir. All right, we'll take a lunch break. How much time do you want for lunch? You can leave, sir, I'm sorry.

MR. ROSENTHAL: How much time do you want?

THE COURT: You guys are doing all the work. Do you want an hour or do you want longer?

MR. ROSENTHAL: An hour is fine by us, sir.

THE COURT: All right, we'll resume -- what is it, 12:30, how about if we resume at 1:30 and then we're going to go with Mr. Bavis, is that it?

MR. ROSENTHAL: Yes.

THE COURT: Okay, is he going to take us all afternoon? Mr. Kittredge, I guess you're the quarterback for that.

MR. KITTREDGE: An hour and a half, your Honor.

THE COURT: Okay.

139

MR. KEENEY:  Maybe 45 minutes under cross, your Honor.  I'll try to be short.

THE COURT:  Okay.  All right.  Sounds good.  Let me just, Mr. Keeney, Mr. Rosenthal, I just need to ask you one quick question.

(Court in recess 12:30 to 1:39 o'clock p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated, everyone.  All right, Mr. Kittredge, are you ready to go?

MR. KITTREDGE:  I believe so.

THE COURT:  All right, the floor is yours.  Good afternoon, sir.

THE WITNESS:  Good afternoon.

WILLIAM BAVIS, Plaintiff's Witness, Sworn.

THE CLERK:  State your full and spell your last name.

THE WITNESS:  That's William Joseph Bavis, B-as in boy, A-V as in Victor, I-S.

THE COURT:  Go ahead, Mr. Kittredge.

DIRECT EXAMINATION

BY MR. KITTREDGE:

Q    Mr. Bavis, by whom are you employed?

A    I was retained by the law firm of Venable in this matter.

Q    Where do you work?

A    Well, I'm sorry.

Bavis - Direct                                    140

Q   Where is your employment?

A   I'm a managing director of a consulting firm, Indotex (ph), we're located at 1637 Thames Street in Baltimore, Maryland.

Q   You were retained by Venable to give expert testimony in this proceeding?

A   Well, I certainly was retained to evaluate materials and potentially to give expert testimony.

Q   Have you given expert testimony before?

A   Yes, yes, sir, I have.

Q   Did you supply counsel with a report of your undertaking?

A   I did.

Q   And attached to the first report, as Appendix 2, is that a correct description of your curriculum vitae?

A   Yes, sir, it is.

Q   Okay.  And Appendix 2, the second page of Appendix 2, is all your previous testimony as an expert?

A   For a period of about five years.

Q   Okay.

        MR. KITTREDGE:  Your Honor, I offer Mr. Bavis as an expert witness in accounting.

        THE COURT:  Any objection?

        MR. KEENEY:  So stipulated.

        THE COURT:  All right, wonderful.  So, you're an expert in accounting.

Bavis - Direct                                    141

THE WITNESS:  Thank you, your Honor.

THE COURT:  I don't think we ever told you that, but you are now.

MR. KITTREDGE:  Well, we save a little time rather than going through this.

THE COURT:  Very well, I appreciate it.

BY MR. KITTREDGE:

Q   Now, would you also look at your expert report.  I'm talking about your report dated July 6, 2009.

A   Yes, sir.

Q   And then you have attached to that report, which is described as -- if I can get my hands on it here -- Appendix 1, would you look at that, please, sir?

A   I have that.

Q   And does that set forth the information which you reviewed in order to come up with your expert report?

A   For the most part, it does.  This list, actually represents most of the documents that I relied upon in my report.  There were other documents that I may have been provided with, as well.

Q   Okay.  Now, could you summarize for us and then we'll go back and take it step by step, but will you summarize for us what, in your expert opinion, was incorrect in how Cohen Milstein calculated the capital accounts for Mr. Hausfeld and Mr. Lewis?

Bavis - Direct                                    142

A    Certainly.  Your Honor, basically, I concluded that the capital account calculations were not accurate for two principal reasons.  One being that the firm did not utilize financial statements prepared in accordance with generally accepted accounting principles.  And the, secondly, they did not utilize the percentage interest as determined by the compensation committee.

Q    Now, going to your first thought, would you please look at Plaintiff's Exhibit Number 2 and if you don't have a copy on your own, I believe --

THE COURT:  It's in the big book, sir.

Q    -- it's in the big book.  Is this one of the documents that you reviewed in order to give your expert opinion?

A    Yes, sir.  I did review, this is the 2003 operating agreement.

Q    Okay.  And is there anything in that agreement reflect on your opinion vis-a-vis the use of an accounting method that was not used by the Cohen Milstein firm?

A    Yes, certainly, when I first reviewed the materials provided to me in this case, I immediately noticed that there was a requirement in the operating agreement, specifically on page 3, that the books of account shall be kept and continually maintained in accordance with generally accepted accounting principles, which is a term of art for which I'm very familiar.

Bavis - Direct                                              143

Q    And would you explain to the Judge what that is?

A    Yes, certainly.  Your Honor, I understand at this point, you've heard that term quite frequently, as a matter of fact, in the time I've been in the courtroom.  But generally accepted accounting principles is a body of knowledge accepted by the accounting profession accountants generally, as to principles that should be applied for profit or non-profit organizations, as the case may be, in order to determine their financial position or results of operation.

Q    Now, can you tell us whether or not you have reviewed the calculation performed by Cohen Milstein for the capital accounts of Mr. Hausfeld and Mr. Lewis as of October 31, 2008?

A    Yes, sir, I have.  I actually have seen several different calculations.  One of which, I understood was the final calculation that was provided in this matter.

Q    Do you have a copy of that with you?

A    I'm sorry, a copy of the calculations that were provided, yes, I do.

Q    That they made?

A    Yes, I have a series of documents that were produced which there is handwritten on the first page of that document, final calculations.

          MR. KITTREDGE:  And your Honor -- I think your Honor could look at 21 --

Bavis - Direct                                    144

THE COURT:  Okay.

MR. KITTREDGE:  -- your Honor.

THE COURT:  Very well.

MR. ROSENTHAL:  Could you tell me what the Bates number is of the document you're looking at?

THE WITNESS:  Yes, CMST000236 is the first page.

THE COURT:  Not 21?

THE WITNESS:  No, your Honor, I was answering --

THE COURT:  Oh, I'm sorry.

THE WITNESS:  -- the question as to what I was looking at.

BY MR. KITTREDGE:

Q   In the big book, would you go to Exhibit 21, please?

A   I'm there.

Q   And would you look at page CMST01439?

A   Yes, sir, I have that.

Q   And is that the same calculation that you're referring to?

A   Yes, sir, it is.

Q   Okay.  Now, what method of accounting was used to come up with the calculation for Mr. Hausfeld's capital account?

A   This, your Honor, was a calculation that was based on what's been referred to as the tax method or the cash method, interchangeably, I believe, of accounting.

Q   Okay.  And how about for Mr. Lewis?  Would you look at

Bavis - Direct                                    145

the next page?

A    I did and that also was prepared using a tax method of accounting.

Q    And that would be in violation of the operating agreement?

A    Certainly, that was my interpretation.

Q    Now, in reaching your conclusions and making your calculations, which we'll get to, what assumptions did you make?

A    Well, several.  First, your Honor, I accepted the books and records as presented to me, by the law firm, as being true and accurate records, maintained in the ordinary course of business by the firm.  In addition to that, relative to calculations that I would be making, I, also, your Honor, relied upon a letter that had been prepared by Mr. Toll, addressed to Sun Trust or officers of the Sun Trust Bank, as to the status of various cases.  I relied upon that document in my calculations.

THE COURT:  That's the November 6th letter?

THE WITNESS:  Yes, sir.  Yes, sir.

And then also I relied upon the fact that the Comp Committee had made a determination that the capital account percentages to Mr. Hausfeld and to Mr. Lewis were as provided effective January 1, 2008.  And then I also relied upon the fact that these documents that we're talking about right now,

Bavis - Direct                    146

which is CMST-01469 and CMST-01470, in fact do represent the company's determination of the capital accounts as of October 31, 2008.

BY MR. KITTREDGE:

Q    Any other assumptions?

A    Those would be the four assumptions that would be fundamental to the analysis I performed.

Q    And what was the reason that you assumed the efficacy of Mr. Toll's letter of November 6th, 2008?

A    Well, it was a document that I understood was prepared by a responsible person of the firm communicating to a third party, not a party to this litigation, that was specifically stating the status of various cases as of a point in time that was very close to the date of interest to me, which was October 31.  So, it was comprehensive data that was provided independent of this litigation and that carried a lot of weight for me.

Q    And why did you need that information, what -- how did you utilize it?

A    Well, ultimately, your Honor, the issue, as I saw it, was whether or not financial statements could be prepared in accordance with generally accepted accounting principles and to understand that, your Honor, the fundamental difference between GAAP-compliant financial statements, if you will, and income-tax-basis financial statements, especially in this

Bavis - Direct                                    147

instance, would have to do with the most part for revenues
that had been earned but not yet realized or expenses that
had been incurred but not yet realized for periods prior to
November 1, 2008.

Q   And when you say realized, do you mean paid, received?

A   No.  The accounting concept is that income is -- income
and expenses are matched within the accounting period
consistent with when the services or products, whatever
you're dealing with, had been provided.  So, in other words,
you've met the requirement of fulfilling an obligation so
that you would be due payment.  And, in regards to expenses,
whether or not you've incurred expenses for which you have an
obligation.

Q   To pay?

A   To pay.  So, whether or not the actual receipt or payment
has taken place in accordance with GAAP is simply not the
issue.

Q   Is that the same as the accrual method of accounting?

A   That's generally how it's referred to.  The accrual
concept, your Honor, is a matching concept of recognizing
those revenues, even if not received and, likewise,
recognizing liabilities, even if not paid.

Q   And did you make such an analysis of the information
contained in Mr. Toll's letter?

A   Well, I certainly did.  I used that letter, your Honor,

Bavis - Direct                                      148

as a basis to determine, in accordance with generally

accepted accounting principles, whether or not any of the

case revenues described in that letter would be recognizable

in accordance with GAAP.

Q   Now, your Exhibit 1 attached to your report, would you

tell us what that is?

          (Pause.)

          MR. KITTREDGE:  For your Honor's purposes, it's 62,

Plaintiff's --

          THE COURT:  Oh, okay.  Thank you.

          THE WITNESS:  Okay.  My Exhibit 1, Trial Exhibit, I

understood you to say, 62, your Honor, is a calculation that

I have made based upon the data available to me to determine

what a GAAP-basis financial statement for the firm would look

like as of 10/31 -- I'm sorry, October 31, 2008.  So, your

Honor, if you have that in front of you, the left-hand

column, which has a caption, "Tax Method," is information

that I simply have taken from the Cohen Milstein's financial

statements.  And, as I mentioned previously, I simply have

accepted that data, as provided by the firm, as being true

and accurate representations.

          The middle column, your Honor, which is the

adjustments, would be the adjustments which would be

appropriate in accordance with generally accepted accounting

principles to convert from a cash method or a tax method, in

Bavis - Direct                                        149

this case, to an accrual method of accounting.  And, in particular, I've made really two adjustments; one is, based upon the Toll letter which we've been discussing, I determined the amount of revenues which would be recognized and in an accrual financial statement would refer to that as an accounts receivable.  So, I determined the accounts receivable to be $7,845,720.

And the bookkeeping, your Honor, for that would be the journal entry, a term accountants use as to how we recognize these things, is we would debit an asset account, which the debits would be -- when I went to college, we used to say debits were to the windows and credits were to the doors -- well, in this case the debits are to the left and the credits are to the right.  So, I debited the asset account and I also on the income statement credit the sales account for that same amount of money.  The effect of those journal entries is it increases each of those respective categories; credits increase sales, debits increase accounts receivable.

And then the second adjustment that I was able to determine was, based upon data that had been produced in this case, I was able to identify $490,191 of referral fees.  Now, I discovered this through reviewing documents, which were expenses that the firm would recognize or realize in conjunction with these revenues that we were anticipating.

Bavis - Direct                                          150

So, I recorded that in these middle columns by increasing the

liability -- in this sense, the liability, your Honor, would

be what's referred to as accrued expenses -- with a credit

and then I debited operating expenses or total expenses, in

this case, in a summary income statement for that same

amount.

         The end result is, by carrying those calculations

over to the column on the right, the GAAP basis, that would

give you what the financial statements would have looked

like, prepared in accordance with generally accepted

accounting principles, as of October 31, 2008.

BY MR. KITTREDGE:

Q    And is that a loss or a gain?

A    Well, the result in this particular instance is the tax

method, which starts with a loss of $6,925,152, actually

results in a modest gain of $430,377.

Q    Right.  And this blowup over here to my right is a copy

of what you are reviewing there?

A    Yes, sir, it is.

Q    Now, the figure $7,845,000, where did that number come

from?

A    That's based upon the analysis of Mr. Toll's letter.  In

regards to my report, it's Exhibit 2.0 is the source for that

calculation.

         MR. KITTREDGE:  And that for you, your Honor, is 63.

Bavis - Direct                                    151

THE COURT:  All right.  Thank you.

BY MR. KITTREDGE:

Q   And I'm going to show you a blowup, is that a blowup of Exhibit 63?

A   Yes, that appears to be.

Q   And down here at the bottom right-hand corner, $7,845,720, is that the figure that I just pointed to on the other one?

A   Yes, sir, it is.

Q   Now, would you step down, please, for a minute?

A   Sure.

THE WITNESS:  Is that okay, your Honor?

THE COURT:  Oh, sure.

BY MR. KITTREDGE:

Q   And, for his Honor, would you please go through each one of the columns, explain what it is you're doing and why?

A   Certainly.

THE WITNESS:  Your Honor, if I can move to this side?  That's easier on me.

THE COURT:  Wherever you're comfortable.

THE WITNESS:  If I could explain it this way as far as the worksheet, the first four columns actually represent the information that I was able to obtain from Mr. Toll's letter.  So, Mr. Toll described for the bank, for Sun Trust, a number of cases that the firm expected to realize cash on

Bavis - Direct                         152

in the near future and, based upon the discussion in Mr. Toll's letter, he oftentimes referred to a range of amounts. So, as an example, in regards to the Leap Frog case, he talks about an amount between 400,000 and $420,000 to be realized.

And then the fourth column over, your Honor, is a description and that simply is, if you would, my shorthand to the comments that were made in Mr. Toll's letter. So, they're not necessarily exact quotes, but it was an explanation.

So, from that part of the analysis, your Honor, what Mr. Toll is representing to the bank is that the firm expected to realize somewhere between $43,145,000 and $46,965,000.

Then from that point on -- so, that really is simply taken from the letter and it's my summary of that information. The relevance then for me, your Honor, was to consider, in accordance with generally accepted accounting principles, whether or not any of this income represented in Mr. Toll's letter, whether any of this would be reflected on an accrual basis, in accordance with generally accepted accounting principles.

BY MR. KITTREDGE:

Q    And explain to the Judge what those criteria are.

A    I will.  Your Honor, the SAD-104, Staff Accountant 104, that's just a technical reference, but the technical

Bavis - Direct                                          153

reference that I rely upon in this instance lists four criteria which generally should be considered in order to determine whether or not revenues should be recognized in accordance with GAAP. And the way this works, your Honor, is all four of those criteria should be met as of the date that the decision is being made. So, in our case, October 31, 2008.

So, the first category of that is simply whether or not there is an arrangement that exists. So, if there is an understanding between, in this case, the law firm and a client or clients for compensation to be made.

The second category is whether or not the services in fact had been rendered. So, as of October 31, 2008, have the services been provided by the law firm, so that they would have been entitled to receive those fees.

The third category, your Honor, is whether or not the amount is fixed or determinable. So, in other words, do we have the ability to determine what that revenue amount should be.

And then the fourth category would be whether or not collectability is reasonably assured, you would have a basis to anticipate that the customer or the client, in this case, would be able to pay the fees.

So, utilizing the information in Mr. Toll's letter, I then went about determining on a yes-or-no basis whether or

Bavis - Direct                                     154

not each of these four criteria was met, and that's the analysis that I performed here.

Now, for my own benefit, your Honor, in understanding this, I also had the ability to some extent of 20/20 hindsight. So, in other words, I was aware of collections that had occurred in November and December and some subsequent periods as well. So, for my purposes, I also indicated whether or not the amounts had been collected and, if so, the amounts that were collected. And, specifically, what I'm looking for here, your Honor, is I'm looking for the fees that were collected, because, as an example, Mr. Toll may have estimated that $400,000 would be collected, but to the degree that that includes reimbursable expenses, I'm not interested in the reimbursable expenses for this purpose. So, I want to know what the fees were.

So, I have those two columns, your Honor, just from the standpoint of information. So, I was able to determine then, just based upon data available, that there was a total of $10,619,206 that the firm in fact actually collected subsequent to October 31, 2008 for these cases represented in Mr. Toll's letter.

And then the final column, your Honor, is my determination, based upon these facts and this criteria, as to the amount of revenue, in accordance with generally accepted accounting principles, that would be recognized

Bavis - Direct                                    155

under the accrual method as of 10/31 and that, your Honor, is the $7,845,725.

Q    Did you thereafter calculate the correct, by GAAP-standard accountant, what Mr. Hausfeld and Mr. Lewis' capital accounts should have looked like as of October 31st, 2008?

A    I did.

Q    And which exhibits are they on your...

A    Well, the calculations actually are my Exhibits 4.0 in regards to Mr. Hausfeld and 5.0 in regards to Mr. Lewis.

        MR. KITTREDGE:  And, for your Honor's purposes, it's Exhibits 66 and 67.

        THE COURT:  Okay, thank you so much.

BY MR. KITTREDGE:

Q    Now, would you go through those calculations and explain them to the Court?  Take first Mr. Hausfeld.

A    Okay.  Your Honor, if I could explain my exhibit?  The left-hand portion of the exhibit, there's a -- there are two columns for which I have the classification as reported by CMST.  That calculation as presented on 4.0 is simply taking what the firm has provided, as we previously discussed.  So, I don't do anything but replicate their calculation here in the format in which it was provided.  The work that I did actually on this exhibit, your Honor, would be the as-corrected.  And, to be clear, that's as corrected by me, as I view the calculations should have been made.

Bavis - Direct                                        156

The starting point on this, your Honor, is the capital account as of December 31, 2007 and, to my understanding, there's no real debate on that issue, that being in regards to Mr. Hausfeld, at the end of 2007, he had a capital account of $4,994,901.30 and, therefore, that amount is reported in both as-reported and as-corrected columns, no changes have been made to that.  The changes, however, take place after that point.

To begin, the next line item is, "Net Income Loss Through October 31, 2008 To Be Allocated."  And, as originally reported, the firm reported a loss of $6,912,175.39.  The amount that I calculated, which actually began on Exhibit 1.0, but in my report there are some adjustments consistent with the firm's policy that are made, to arrive at an income of $443,353.61.

The next point of departure, your Honor, has to do with the partners' percentage interests and the effective rate that the firm used in this calculation was 27.97 percent.  And the effective rate, based upon the understanding that the Compensation Committee changed the rate effective January 1, 2008, would be in effect a rate of 13.31 percent.  The result of that -- applying that percentage to the income or loss would be in regards to the amount reported by the firm a loss allocated to Mr. Hausfeld of $1,933,035.42, whereas it would be my view, your Honor,

that the correct allocation would be a profit of $59,029.37.

The remaining calculations other than the subtotals as to the treatment of the guaranteed payments and the insurance premiums, I'm not aware any dispute, I have no issues that I have taken with those calculations.  So, I simply have replicated what the firm has done in those instances.  But the result of the calculations, your Honor, would be that the capital account, after consideration of a subsequent payment of $8,750, would be, based upon the firm's presentation, $3,053,115.88, whereas I believe the amount would correctly $5,045,180.67.

Q    You said his interest rate was 13.31 percent?

A    His effective rate, yes.

Q    Explain to the Judge what the effective rate is.

A    Yes.  Your Honor, the firm has a provision in its operating agreement that allows for a pro rata share of the first ten percent of the firm's earnings.  So, regardless of the individual member's interest in the firm, they would share pro rata -- on a pro rata basis in that first ten percent.  The effective rate then for each of the members can be slightly different than their allocable shares provided for in the firm's agreement, because you've taken ten percent of the earnings, allocated it on a pro rata share, you've taken the other 90 percent and allocated it based upon whatever the percentage interest is.  The simple math of that

Bavis - Direct                                    158

calculation  is that those members that have a higher percentage interest will see their interest reduced and those members that have a lower interest will actually see their interests increase.

Q   And would you look at your Exhibit 3.2?

        MR. KITTREDGE:  Which, your Honor, I think is 65.

BY MR. KITTREDGE:

Q   Would you look at 65 and tell me whether or not I'm correct?

A   You are correct.

Q   Would you explain to the Court, please, what Exhibit -- your Exhibit 3.2 and Exhibit 65 is?

A   Yes.  Your Honor, all I'm doing on 3.2, once again, I'm following the firm's methodology.  So, as originally reported, that is the way that the firm calculated effective rates as originally produced.  And in this particular case the firm's position, as I understand it, is that if there is a loss there is no pro rata distribution; so, in other words, everybody doesn't share pro rata in the first ten percent of loss, it only applies if there's income.

        So, in this calculation, the effective rate and the members' interest or allocable share actually are going to be the same numbers, nothing changes.  It simply is, in the column, "As-Corrected" -- and, once again, the distinction here is that now my starting point is net income, as opposed

Bavis - Direct                                          159

to loss.  So, because I have income, it's my understanding that, consistent with the firm's policies, they would allocate ten percent of those earnings on a pro rata basis and then the remaining 90 percent would be allocated based upon the allocable share of each member.  That results -- and, from there, it simply is math.  The net income which is allocated to each member calculated against a total of 443,353.61 is a mathematical-derived percentage.

Q    When you look at this exhibit, Exhibit 65, you have one calculation on the left that the firm had done and you have your calculation as adjusted for GAAP, correct?

A    Well, these calculations I don't think are GAAP, but the change -- and, just to be clear, the --

        THE COURT:  These just involve the ten percent being effective, right?

        THE WITNESS:  Yes.  And it's based upon utilizing the income determined in accordance with GAAP --

BY MR. KITTREDGE:

Q    In accordance with GAAP?

A    -- if that's clear.

Q    Which way, which methodology more accurately reflects the true financial situation of the firm?

A    Well, I believe that in accordance with generally accepted accounting principles.

Q    And why is that?

Bavis - Direct                                     160

A    Well, first off, the -- just as a general concept, your Honor, it's pretty well accepted that generally accepted accounting principles are in fact generally accepted accounting principles based upon the fact that the accounting professional, at any rate, believes that the result represents more clearly the financial position and results of operation of an enterprise, that really is what GAAP is all about.  So, when I restate the balance sheet and income statement to account for differences between the tax method and GAAP, what I'm producing is what is universally agreed within the accounting profession would be a truer representation of the financial position of the firm.

Q    Now, would you go to Exhibit 5 on your...

        MR. KITTREDGE:  ... for your Honor, that's 67.

        THE COURT:  Okay.

BY MR. KITTREDGE:

Q    Is this the calculation that you made utilizing the GAAP method of income to obtain Mr. Lewis' correct capital account as of October 31st, 2008?

A    It is.  Your Honor, once again I simply, for comparison purposes, show what the firm calculated and then, by substituting the net income as determined in accordance with generally accepted accounting principles and also changing the partner's interest to reflect that percentage assigned by the Comp Committee and as affected by the schedule that we

Bavis - Direct                                      161

just discussed a moment ago.  Making those two changes and those two changes only, I recalculate Mr. Lewis' ending capital account balance as determined by the firm to be $686,194.32 to in fact be $1,183,911.97.

Q   Now, having made these calculations and gone through and utilizing the methodology that you did, are you aware of how much revenue was in fact received by Cohen Milstein in November and December of 2008?

A   I am.  In round numbers, it was approximately $12 million.

Q   Okay.  Would you look at Exhibit 11, please?

A   I'm sorry, your Exhibit 11?

Q   Yes, the big book.

        (Pause.)

A   I have that.

Q   That's the November, 2008 Cohen Milstein monthly financial statement prepared by their internal controller. Can you tell me where it reflects -- and I would suggest you go to Page 674 at the bottom.

A   I have that.

Q   And what was the revenue for November, 2008, according to their records?

A   That's $5,434,028 for November.

Q   And go to Exhibit 12, please?  I'll ask you the same question for the month of December.

Bavis - Direct                                    162

A    That would be found at CMST-00687 and the revenues would be $6,620,842.

Q    And a combination of those two?

A    My math was pretty close, it's about 12 million --

Q    Right.

A    -- $12 million.

Q    Now, in your review of the various documents that were provided to you, sir, did you have an opportunity to review the earlier operating statement or agreement for Cohen Milstein?

A    I did.  I reviewed the 1990 -- 1990 --

         THE COURT:   6.

BY MR. KITTREDGE:

Q    6.

A    -- 1996 -- thank you, your Honor -- operating agreement.

Q    And in that operating agreement it does not require GAAP, does it not?

A    Well, that is one of the differences that I noted.  In particular, I had heard testimony, your Honor, I had attended Ms. Drolet's deposition testimony, and when I attended her testimony I heard for the first time that there was a representation that the insertion of the requirement for generally accepted accounting principles was I believe referred to as a typographical error.  Because of that, that, quite frankly, is what led me to my review of the 1996

Bavis - Direct                                    163

operating agreement.

Q    And what was it about that review of the 1996 agreement in connection with your review of the 2003 agreement as to why that change was there?

A    Well, I don't know that I can interpret the drafters of the agreement, but I can certainly give you my analysis from an economic perspective.  Your Honor, what struck me first off was, generally accepted accounting principles is a term of art and I think it's a term of art that is widely understood within the business world.  So, it's not often in my experience used without some meaning being attached to it, which is generally understood.  So, when the representation was suggested, at any rate, that this was something other than the intended purpose, I looked back at the 1996 agreement, first off to determine whether or not the same terminology was there, and it was at that point in time that I saw there is no reference in that agreement to generally accepted accounting principles.  So, it appears in 2003, it wasn't there in 1996.

So, I then was concerned about my assumptions and how I was applying here.  So, I simply went through and look at the differences between the agreements.  I'm not an attorney, don't profess to be, so I'm really looking at it from the standpoint of an accountant who has some experience in looking at these matters, and considered whether or not

Bavis - Direct                                      164

there were any differences between the two agreements that would explain whether or not generally accepted accounting principles simply made sense.  And it was my conclusion, after reviewing the 1996 agreement and the terms there, that there really were meaningful differences between the two agreements in economic terms, as opposed to somebody copying some form document and leaving in a phrase unintentionally. And it was my view that the adoption of generally accepted accounting principles, especially if you focus on the fact that for the most part what you're dealing with for a firm such as this is accounts receivable, I mean, that's the big issue, you know, that's out there.  And generally accepted accounting principles would call for recognizing those accounts receivable that met those criteria I discussed, whereas the cash method, which is a permitted method under the Internal Revenue Code, does not include that.  So, you have that disconnect.  But, in my view, the disconnect was explained by the fact that in the 1996 agreement the departing member would be compensated in the firm of a termination allowance which, in my reading, specifically was associated in part with giving up the rights to account receivable.  I look at the 2003 agreement and I don't have that same consideration.  And I do see in that agreement there's a connection between the departing member giving up their rights to the accounts receivable, but now they're

Bavis - Direct                                   165

giving it up in exchange for their interest in their capital account.

It makes sense to me if you're utilizing generally accepted accounting principles in that you effectively would be picking up an interest in the accounts receivable that would be reflected on the books and records in accordance with GAAP. It would flow throw to your capital account and, therefore, you're being compensated in your capital account.

So, whatever the representation may be, it was my view in an analysis of the two agreements there was a substantial economic change that had occurred from the 1996 agreement to the 2003 agreement and the parties agreeing to utilize GAAP for a departing member was consistent with that, in my view.

Q   Mr. Bavis, as a result of your deposition and the issue that you're just now talking about, did you supplement your report of July 6th?

A   I did.

Q   And is that your supplemental report of August the 7th, 2009?

A   I did.

(Pause.)

MR. KITTREDGE:  Your Honor, if you look at Exhibit Book 108?

THE COURT:  All right.

Bavis - Direct                    166

BY MR. KITTREDGE:

Q    Mr. Bavis, do you recognize that?

A    I do.  If you don't mind, I have a copy, if I can look at my copy, it's easier --

Q    As long as it's the same .

A    -- to look at.

Q    As long as it's the same.

A    It is.

Q    And what do you understand this to be?

A    Uh, this, your Honor, actually is a copy of Page 7 of the Drolet firm's adjusting journal entries.  So, this actually is a document that I found in the work papers produced in discovery by the Drolet firm.  And, in particular, this is identified as Adjusting Journal Entry Number 27, which the caption reads, "To Allocate Income to Partners' Capital Accounts."

Q    And the income they're referring to is what?

A    Well, the income that's specifically being allocated begins with the income per the reviewed financial statements of $530,692.23.

Q    That's this number up here?

A    Yes, sir, it is.  And what that represents is the tax-method income that was reported on the financial statements as of -- or for the year 2008, calendar year 2008.  So that's the starting point.  From there, the balance of that journal

Bavis - Direct                                    167

entry is how that $530,000 is allocated among all the members of the firm.

Q   The second column over here on the right, what is this?

A   Okay.  The -- well, once again, your Honor, it's the debits and credits.  So, any accountant will tell you that debits have to equal credit.  So, whenever you have a debit, you have to have a credit.  So, in this case the debit -- in regards to the earnings, which is called the rounding account for purposes of this journal entry, that debit simply closes the earnings out for the year, so you now begin a new year accumulating new earnings or losses for the year.

The balance of the three entries or three debits in that column, your Honor, represent the losses that were allocated to three departing members.  So that the result of that is we have four debits, which in my work paper I have totaled those by the way, the four debits equal $2,754,097.23.

Q   That's the addition of these four numbers?

A   That's correct.

Q   And if you add up the last column, which are capital accounts for the attorneys who have remained at the firm, correct?

A   Correct.

Q   And what do they add up to?

A   Well, they also add up to $2,754,097.23.

Bavis - Direct                                    168

Q   So, the bump-ups in these capital accounts for these partners is the result of Mr. Hausfeld's loss, Mr. Lewis' loss, Mr. Willis' loss and the net income for the year?

A   Well, what you've done, your Honor, is you've allocated $2,754,000 to the remaining partners, the only way that you've done that is by taking the losses that were allocated to departing members as well as the current year's income, that's the bookkeeping, if you will.

Q   Now, is it possible to do financial statements on a monthly basis or on a yearly basis on a cash basis and also keep your books according to GAAP?

A   Certainly.  Your Honor, it's not uncommon at all, in my experience.  Some people talk about making two sets of books, but that's really not the case, and it doesn't have the implication that I think we --

Q   Could I (inaudible)?

A   Yes.

     (Laughter.)

A   There is no criminal intent, to my knowledge, your Honor.

Q   As a former Federal prosecutor.

A   But the simple fact of the matter is that many -- about the only reason that businesses choose to use the cash method, in my experience, is because it's an acceptable method in accordance with the Internal Revenue Code and it usually for most businesses results in paying less income

Bavis - Direct                                    169

tax. So that's the practical consideration. But, as I said before, it doesn't generally truly represent the economic performance of an enterprise. So, from a business-management perspective, the cash method is not necessarily what's most helpful. Now, that doesn't mean you don't use it and it isn't necessarily inappropriate, and I don't suggest that it's inappropriate, for a firm such as the Cohen Milstein firm to do this because, quite frankly, the partners receiving the financial statements probably are more concerned about what's the taxable income and what am I going to be taxes on perhaps than some other component, especially if they're supplementing that, or at least the managing members of the firm substitute that with their understanding of what's really going on, you know, what's the revenue that's anticipated to come in, what are the expenses, how much do we owe the bank, all those factors from a management perspective.

In my personal background, your Honor, I was a partner in a national accounting firm up to about a year or so ago and our firm, for internal management purposes -- of course, we're accountants, but we kept all of our books and records on the accrual method, but we paid taxes on the cash method, because we were also accountants and we recognized we could do that. And, similar to the process that I went through that we discussed earlier, you can keep your books,

Bavis - Direct                                    170

quite frankly, on either method and convert from one to the other. So, as I started out saying, it's not really maintaining two sets of books, it's really a conversion process to get from one result to another.

Q   Mr. Bavis, did you determine whether or not GAAP in this case more accurately reflects the firm's financial condition and Mr. Hausfeld and Mr. Lewis' true interest in the firm, did you determine that?

A   I did. As a matter of fact, this firm, this case could almost be a poster child for, you know, why you should use generally accepted accounting principles, if you will. When you look at what's taken place from one period of time to the other, this firm has operated for ten months in 2008 and, in accordance with a tax method of accounting, is generating for a firm of this size a pretty significant loss at that point, almost $7 million, then by the end of the year we end up with a profit. So, we have a swing of somewhere in excess of $7 million that presumably has occurred in two months. Now, that is, I think, particularly interesting given the facts in this case, your Honor, because what's happened is -- and this is where the real disconnect comes into place, in my view -- in those two months, November and December of 2008, as we previously discussed, the firm realized -- or recognized, rather, recognized, $12 million in revenue. Approximately 45 percent of that revenue was from cases managed by Mr.

Bavis - Direct                                      171

Hausfeld, who is no longer with the firm.  So, we have a situation where revenue is being generated and being recognized under the cash method even though all the expenses and all the effort necessary to generate those revenues was occurred in prior periods.  So, that's this disconnect which occurs with the cash method of accounting.  So, I think it becomes abundantly clear when you look at the numbers here that that's -- that's the problem, it doesn't represent the economic reality of the firm.

          MR. KITTREDGE:  May I have a second, your Honor?

          THE COURT:  Sure, take your time.

          (Pause.)

BY MR. KITTREDGE:

Q   Would you please answer Mr. Keeney's questions?

A   Certainly.

          MR. KEENEY:  Thank you.

                    CROSS-EXAMINATION

BY MR. KEENEY:

Q   Good afternoon, Mr. Bavis.

A   Good afternoon, sir.

Q   You can have your drink of water, if you want to pour your water right now.

          (Laughter.)

          THE COURT:  Just watch the pitcher there, sometimes that top just comes loose, so... we've had several soakings

this summer.

(Laughter.)

THE WITNESS:  Thank you for the warning.

THE COURT:  Sure.

THE WITNESS:  Thank you, sir.

THE COURT:  It's hard enough being cross-examined without having to do it with wet pants.

(Laughter.)

BY MR. KEENEY:

Q   Mr. Bavis, let's start out with some areas where we agree.

A   Yes, sir.

Q   You agree that in your analysis you have done a calculation of the capital accounts as of October 31, 2008, right?

A   I do.

Q   And you and I both agree, October 31, 2008 is the right date for the calculation, right?

A   To my understanding it is, yes, sir.

Q   And that's derived from Article 10-A of the operating agreement, right?

A   I could check, I don't recall; I think you're right.  If you want, I can look at it, I believe that you're right.

Q   Oh, no, that's all right.

A   I don't -- I can't quote the operating agreement that

Bavis - Cross                                    173

specifically.

Q   Okay.  A second area of agreement, you agree that Cohen Milstein has never used GAAP to prepare its financial statements, right?

A   I've heard testimony from Ms. Drolet, who I understand has been with the firm for 20 years, she certainly -- I would take that at face value that no.

Q   It's your opinion that you expressed today that, at least starting in 2003, it is your opinion that Cohen Milstein should have been using GAAP, is that right?

A   To be clear, that the books and records should be maintained in accordance with GAAP, yes.

Q   Starting in 2003, right?

A   Yes.

Q   And you also agree that it hasn't, either in 2003 or right up until today?

A   To the best of my knowledge, yes, I agree.

Q   I'd like to have you turn to Plaintiff's Exhibit 64, that's one of your exhibits and it's in their big binder.

        (Pause.)

A   I have that.  This would be my Exhibit 3.1 from my report.

Q   Yes, that is correct.

        You prepared this, right?

A   Yes.

Bavis - Cross                                    174

Q    Directing your attention to the first line, that says, "Net income for October financials," is that correct?

A    Correct.

Q    And the first column then has a column captioned as, "As Originally Reported," correct?

A    Yes, sir.

Q    And that's as originally reported by Cohen Milstein, right?

A    Yes, sir.

Q    And the next column, "As-Corrected," is as corrected by you, right?

A    Yes, sir, it is.

Q    Okay.  I just want to avoid any inference that this was corrected by Cohen Milstein, it was corrected by you?

A    Correct.

Q    You agree that with respect to the second figure, the third figure and the fourth figure, the reverse draws paid to Mark Willis, the add-backs, the less depreciation, you're using the same figure used by Cohen Milstein, right?

A    I am.

Q    Okay.  You're accepting them as correct for purposes of this chart, right?

A    I am.

Q    And you made no GAAP correction to those changes?

A    That's correct, I have not.

Q   Is that because you lack the information or you believe that this is how it should be calculated according to GAAP on those three items?

A   I am not aware of any difference between the tax method and GAAP for those three items.

Q   And is your understanding of the operating agreement that an accountant is allowed to correct the figures in the net income for the October financials as originally reported?

A   I'm sorry, could you run that by me again?  I don't think I understood.

Q   Okay, great.  Directing your attention -- and let's be really clear about this --

A   Sure.

Q   -- let's turn to the operating agreement.  If you look in our exhibit binder, Defendant's Exhibit 2.

(Pause.)

Q   Ours is the smaller binder -- or you can use their exhibit, if you can find the operating agreement.

A   Yes, what I'm looking at behind Tab 2 is a confidential agreement.

Q   Oh, I'm sorry, that was my fault.  I apologize.  Defendant's Exhibit 3.

A   This is the 2003 operating agreement.

Q   Operating agreement, correct.  And directing your attention to Article 10th, capital A, beginning at the bottom

Bavis - Cross                                    176

of Page 9, running over to Page 10.

(Pause.)

A   "The Determination of Capital Account Balance"?

Q   Right.

A   I have that.

Q   Okay.  Directing your attention to the last sentence, you agree the sentence says, "The accountant shall accept as correct the financial statements prepared for the company prior to the date of the member-termination event"?

A   I do read that.

Q   And that phrase actually is quoted in your report, right?

A   I do, because it was my view that that is what the operating agreement provides for and it would be my understanding that, as an example, the Drolet firm would not, your Honor, be required to do an audit or anything else, they could accept it at face value.  However, it was also my view that there was information available to the Drolet firm that on its face would have enabled them to understand that the information that they were working on was not correct.

Q   Okay.  And that may be an answer to my question, which is, in light of the language, "accept as correct," why do you believe it's appropriate on your Plaintiff's Exhibit 64 to have figures, quote, "as corrected," as opposed to those that were originally reported?

A   Because I believe that the information as originally

reported was incorrect.  And, by the way, I should point out to you, that's not necessarily inconsistent with Ms. Drolet's interpretation, because I understand that she has suggested a number of corrections to the information provided to the firm.

Q    My question to you is, when you changed the numbers originally reported by Cohen Milstein, are you accepting those numbers as correct?

A    I am accepting those but for the changes that are necessary in order to make the determination in accordance with the operating agreement, which, in my view, requires GAAP.

Q    You are correcting the numbers, right?

A    I'm correcting the income, but I'm not -- excuse me, but I'm not correcting -- as an example, if the firm reports an amount for cash, I accepted that as being correct.  There is nothing that I have done to verify that it is correct, I accept it at face value.  To the degree that the firm represents in their statements that they owed the bank $13,700,000, I accept that as correct.

Q    You've mentioned in your testimony that you believed that the use of the GAAP method would, in your words, more accurately reflect actual economic interests; do you recall that testimony?

A    I'm sure I said something to that effect, I don't recall

Bavis - Cross                           178

my exact words.

Q   Okay.  My question to you, does Article 10th, capital A, refer to actual economic interests?

A   I don't believe it does.

Q   I would like you to turn now to Plaintiff's Exhibit 62. That's in the big binder, it's one of your charts, I think it's your Exhibit 1.0.

          (Pause.)

A   Do you mind if I use my copy?

Q   Oh, that's perfectly fine.

A   It's just easier to find and be faster.

Q   Absolutely.  And you now have it in front of you, right?

A   I do, sir.

Q   Okay.  Directing your attention to the figures that you did not change, let me just walk down.  Cohen Milstein reported total fixed assets of a little bit over $1,100,000 and you accepted the Cohen Milstein figure, right?

A   I do.

Q   You did not recalculate that figure on a GAAP basis?

A   I did not.

Q   Turning to the next line.  With respect to the line, "Marketable Securities," Cohen Milstein reported $123,120 and you accepted that figure, right?

A   I did.

Q   You did not recalculate that on a GAAP basis?

Bavis - Cross                                     179

A    I did not.

Q    Turning to the next line, "Other Assets," Cohen Milstein reported a figure of $23,202,260 and you accepted that figure?

A    I did.

Q    You did not recalculate that figure on the basis of GAAP?

A    I did not.

Q    Turning now a little bit farther on the page, we have, "Capital at the Beginning of the Year."  Cohen Milstein reports $17,832,185 and you accepted that figure?

A    I did.

Q    And do you understand that Cohen Milstein did not calculate that figure on the basis of GAAP?

A    I would understand that, yes.

Q    Okay.  Turning to the next -- well, I'm going to skip the next one, because that's where you do make a change.  Moving down one to, "Change in the Value of the Stocks," Cohen Milstein reports $23,664 and you accept that figure, right?

A    I do, there would be no difference between the tax and cash.

Q    Okay.  In that particular instance, applying your GAAP basis, would you have exactly the same figure that Cohen Milstein had for that item, is that your testimony?

A    Once again, I'm assuming that's correct, but, yes.

Q    Okay.  Turning to the next -- well, we're moving down the

Bavis - Cross                                180

page now, now we're going to be down under the income statement.  Do you see the reference to the net income from the Cochran firm, DC?

A    I do.

Q    And the Cohen Milstein reported a figure of $303,029 and you accepted that figure, right?

A    Well, I did with some reservations.  I actually stated in my report I had some concern about that and, if I became aware of any information that would enable me to correct that, I might, but I have not as of this point in time.  So, I accepted it.

Q    So, that figure, when it's in chart under GAAP basis, that's not a figure that you did a GAAP analysis on, is it?

A    It's a figure that I had no information to change it. The reason I was concerned about it was similar to the concerns that I had with other areas in that, whereas the firm was showing, your Honor, $300,000 worth of income for ten months, by the time that you look at the year-end statements the income was 2,300,000, that would imply that there was a $2 million -- there was $2 million that was earned and realized in those two months.

Q    Okay.  Mr. Bavis --

A    I was concerned as to whether or not that made sense, so I just put a footnote in my report to reserve the fact that, if I received more information, I may change that.

Case 2:06-cv-00826-TR    Document 1033    Filed 01/08/10    Page 181 of 259

Bavis - Cross                                                181

Q    Mr. Bavis, my concern is that on Plaintiff's Exhibit 62 you use a GAAP analysis to essentially make two changes, you leave everything else unchanged, you put it under a column saying, "GAAP Basis," but you didn't recalculate any of that except for the two items under the GAAP basis, did you?

A    Well, first off, there isn't a change in every instance. So, we should be clear for that.  As an example, the total current assets -- and we could go down line-by-line, but there's no difference between cash in accordance with a tax method and cash in accordance with GAAP.  In regards to fixed assets, there is not necessarily, although there could be, but oftentimes there is not a difference between fixed assets, tax method, and fixed assets, GAAP.  So --

Q    What about other assets?  Oh, excuse me.

A    -- marketable security, same thing, there's not a fundamental difference between the two and that's -- that would be true if I went down and said the same thing, your Honor, for each of the items where I didn't make a change, but not --

Q    Well, let me ask you --

A    -- a fundamental difference between the two.

Q    Let me ask you about one specific.  Do you know what comprises, "Other Assets"?

A    I know what the major component of the other assets is.

Q    And it's essentially reimbursed client expenses that have

Bavis - Cross                                182

been advanced, right?

A    That's correct.

Q    And did you in your GAAP analysis look and see whether under GAAP any of those were so uncertain of being recovered that they should have been written off as of October 31, 2008 under GAAP?

A    No.  As you and I discussed in my deposition, if there was information to indicate that that might be an appropriate adjustment, I didn't have any information to that effect.

Q    So, you didn't do the analysis because you didn't have the information, right?

A    Correct, I saw no information that indicated that that should be adjusted one way or the other.

Q    So, when on your chart, which is marked as Plaintiff's Exhibit 62, you have on the right-hand side under GAAP basis other assets of $23,202,360, which is -- or $260 -- which is the exact figure used by Cohen Milstein, you are not using the GAAP basis to do that calculation, are you?

A    Well, that's not actually true, Mr. Keeney, I need to disagree with you.  Your Honor, I did state one of my assumptions is that the books and records that were provided by the law firm were maintained and were accurate, so I assumed that.  Now, that being the case, there really wouldn't be a difference between GAAP and tax.

Q    Were you here in the courtroom when Ms. Drolet testified

Bavis - Cross                                    183

just yesterday?

A    I was.

Q    You heard her talk about an additional write-off of $5 million taken at year end December 31, right?

A    I did hear that, yes.

Q    Did you do any GAAP analysis as to whether that additional $5 million under GAAP should have been deducted as of October 31, 2008?

A    Well, that information relative to that $5 million, your Honor, I have never been provided with any information on that, it was --

THE COURT:  Oh, I know that, but he's asking if you heard what Ms. Drolet said.

THE WITNESS:  Oh, since yesterday and today?

THE COURT:  Yes.

THE WITNESS:  Oh, I made no -- no -- I have done nothing to my report from yesterday to today.

THE COURT:  No, I know.

Ask your question again.

BY MR. KEENEY:

Q    And the question is, did you take into account as of October 31, 2008 whether any of the $5 million recommended to be written off by Pat Drolet and written off on December 31 should have under GAAP been applied and written off as of October 31?

Bavis - Cross                                          184

A    No.  Once again, that information has never been provided.  I did not hear that at Ms. Drolet's deposition that I attended, I didn't see this information; until she testified to it yesterday, I was not aware of that concern.

Q    In your GAAP analysis, did you take into account as of October 31, 2008 accrued payroll?

A    I considered it.  It's my understanding that the firm pays employees twice a month, on the 15th and on the last day of the month; if that understanding is correct, there would not be any accrued payroll.

Q    And with respect to the Cochran firm under GAAP, did you have any information at all with respect to write-offs for the Cochran firm under GAAP as of October 31, 2008?

A    No, nothing that I'm aware of.  I expressed my concerns previously.

Q    Okay.  Jumping back to the chart, which is Plaintiff's Exhibit 62, we had just talked about the Cochran firm, the next item under that is, "Net Income Loss From London."  Do you see that?

A    I do.

Q    And do you accepted as correct the Cohen Milstein loss figure of $2,482,580, right?

A    Correct.  Once again, there presumably would be no difference between tax and GAAP.

Q    Did you do a GAAP analysis to see if there was a

Bavis - Cross                                        185

difference with respect to the London office?

A    Whether there is -- if the information is being reported and recorded correctly by the firm, it's not of a nature that there should be a difference.

Q    Let me turn to the next item.  You accepted the Cohen Milstein figure of "Other Income" of $166,727, is that right?

A    Yes, for the same reasons.

Q    Did you do a GAAP analysis of that figure?

A    Once again, there's no reason there should be a difference between the two.

            THE COURT:  Can I just go back to London?

            THE WITNESS:  Yes, sir.

            THE COURT:  Isn't it possible if London had accrued the right to collect legal fees as of October 31st, shouldn't that have altered this number?  Let's say they had accrued the right to collect, like under Mr. Toll's letter, you know, another $5 million from somebody but they just didn't put it in their bank account yet, wouldn't that have changed that number there?  Because you just said to Mr. Keeney that there's no difference under accrual --

            THE WITNESS:  Well, the -- I'm trying to see how best to explain this, your Honor -- the --

            THE COURT:  Let me ask it a different way.  Wouldn't the London firm, assuming they kept their books, this number is based on a tax-based method, wouldn't the London firm's

Bavis - Cross                                              186

books also have potential discrepancies just like the Cohen Milstein DC firm's books would?

THE WITNESS:  They could conceivably.  The firm, your Honor, the -- when we talk about GAAP versus cash basis, under either method what you're doing is you're reporting your pro rata share of the earnings of the investment, of the entity in which you have the investment.

THE COURT:  Mm-hmm.

THE WITNESS:  So, there's no difference between GAAP and cash method, you're doing the same thing in both instances.  Now --

THE COURT:  But couldn't the pro rata share be different depending on how much they're -- they collected?

THE WITNESS:  Well, now that question really goes to whether or not the London firm completes -- maintains its books and records under --

THE COURT:  Right.

THE WITNESS:  -- a cash or accrual method and I have no knowledge as to how they maintain their books.

THE COURT:  Okay.

BY MR. KEENEY:

Q   And if you had been doing a complete analysis under GAAP would you have wanted to have that information with respect to how the London office keeps its books?

A   If I were the accounting firm, I would ask that question,

sure.

Q    Okay.  Jumping back to your chart, this is Plaintiff's Exhibit 62, you see the category of, "Other Expenses."  You accepted the Cohen Milstein figure of $16,898 for other expenses, right?

A    I do.

Q    You did not do an independent GAAP analysis of that figure either, right?

A    Once again, it should be the same.

Q    Okay.  "Partner Guaranteed Shares," you have accepted the Cohen Milstein figure of a loss of $2,316,666, right?

A    I did; once again, it shouldn't be different.

Q    Did you look to see if it was different?

A    Well, once again, I'm not looking beyond any of these numbers, your Honor.  If the firm reported those numbers, I accepted those as being correct.  What I was looking for would be differences.  So, there shouldn't be a difference. If the underlying information is wrong, if draws are not 2,316,000, then the number is wrong.

THE COURT:  No, but I think what he's getting at is, with respect to the income, you kind of did look beyond the numbers, you looked at Mr. Toll's November 6th letter --

THE WITNESS:  I --

THE COURT:  -- to try to figure out what income had been accrued.

Bavis - Cross                                    188

THE WITNESS:  I did, your Honor, because there is a difference between GAAP and tax basis for accounts receivable.  The --

THE COURT:  So, partner guaranteed draws, there's no difference?

THE WITNESS:  There's no difference.

THE COURT:  Okay.

THE WITNESS:  So, unless the numbers are wrong, I should get the same result.

THE COURT:  Okay, I understand.

BY MR. KEENEY:

Q   But on other assets, in terms of client capitalization costs, there is a difference and you didn't look?

A   Well, there's not a difference under GAAP per se.  Now, the representation that I heard yesterday was that under either method, by the way -- see, I don't think Ms. Drolet was saying there was a difference, I think what she was saying is the firm should have done something that they didn't do --

Q   Oh, absolutely, and --

A   -- in writing that off.  So, now what you're talking about is a factual change in the numbers.

Q   And what I'm telling you is that Ms. Drolet would have written this off under net income as of October 31 and you didn't even look to see if you would write it off under GAAP

as of October 31?

A   Well, that's where I'm not sure we're communicating well. What I was adjusting for is differences between tax method and GAAP, there should not be a difference.  Whatever that number is, if it's 23 million or if it's 50 cents, it should be the same under GAAP and the tax method.  If the position is now being raised that that number is wrong, then I haven't accounted for it, I have no information about that number being wrong other than the analysis that I performed looking at the data after hearing the testimony.

Q   But in addition to the $5 million as to which you did recall Ms. Drolet's testimony correctly, that that would be written off as of October 31, you didn't look at what would be the remaining other assets to see if there was anything else that if you were applying GAAP you would have written off at October 31 and Ms. Drolet would not have applying the income method?

A   Once again, there is no fundamental difference between the other accounts within other assets between cash and accrual.  If the numbers are wrong, then I'm going -- then they're going to be wrong under GAAP and they're going to be wrong under the tax method; if the numbers are correct, they're going to be correct under GAAP or the tax method, but they're not going to be different, they're going to be the same number.

Bavis - Cross                                                          190

Q    Well, but let me ask you this:  How do you know that the number is the same under GAAP with respect to capitalized costs if you didn't do the GAAP analysis in the first place on the capitalized costs, you accept it as correct?

A    There's no difference in the requirement.  Your Honor, basically, relative to the client advances, the issue is that it's considered to be an asset, and it's considered to be an asset under GAAP and it's considered to be an asset under the tax method.  If -- and the dollar amount that's recorded is the dollar amount that's spent, no difference.  If there was an amount that was incurred but not yet paid and, therefore, under the cash method was not included, it would not make a difference if it was not recorded under GAAP.  It makes a difference in the calculation, but because what you're doing is recording an additional liability and an additional asset, the impact on the partner's capital account is zero.

THE COURT:  But could it have an impact as to timing of when that happens?  For example, depending on the circumstances, could it have hit the books before the end of October or before the end of November depending on which method you -- or December depending on which method you use?

THE WITNESS:  That was the point I was trying to make, your Honor, to that.  You could have a different number.  If there was another million dollars which the firm had incurred the liability for and had not paid for client

Bavis - Cross                                              191

advances, the bookkeeping entry under GAAP would be to increase the asset account by a million dollars and show accrued liabilities for $1 million, but it doesn't impact the member's capital account balance.  You've added an asset, you've added liability, the two of those equal zero relative to the capital account.  So, there could be a difference in the number, but not for the purposes of calculating the capital account.  And the point that I thought Mr. Keeney was going to, whether or not those assets meet the requirements to be written off should be the same under GAAP as it would be under the tax method.  So, if the -- if costs had been advanced on a case and that --

THE COURT:  Let's use the five million.

THE WITNESS:  Five million, yes, if $5 million had been advanced on cases, and all those cases settle and there were no proceeds, no attorney fees, no recovery, those assets are now worthless.

THE COURT:  Right.

THE WITNESS:  Under the tax method, they should be written off; under GAAP, they should be written off.  The determination as to when you write them off is also the same.

So, similar to what I went through with the revenue recognition, the same thing is true with liabilities, you look at -- you know, at what point in time a determination could be made that those amounts were not collectable and, if

Bavis - Cross                                    192

it's GAAP and if it's tax method, the result is the same. So, whatever the answer might be to that $5 million concern, the answer is the same under either method.

BY MR. KEENEY:

Q   And my question to you is, when you did your GAAP analysis as of October 31, 2008, you didn't look at whether these write-offs on December 31, 2008 should have been taken as of October 31, 2008 under GAAP, right?

A   I did not because I accepted the firm's representation that they're maintaining accurate books and records.

Q   Okay.  Let's turn to another one of your exhibits. Plaintiff's Exhibit 63, could you put that in front of you?

        THE COURT:  Mr. Keeney, would this be a good time to take our break?  About how much longer do you have?

        MR. KEENEY:  An outstanding time, your Honor.  Maybe 20 minutes?

        THE COURT:  Okay.  Yes, let's break then rather than -- do you mind?

        THE WITNESS:  No, I'm fine, your Honor.

        THE COURT:  Okay.  Let's come back at, it's 3:07, how about around 3:20?  Does that give everybody enough time?

        Okay.  Thank you.

        (Court in recess; 3:07 to 3:25 o'clock p.m.)

        THE COURT:  Please be seated, everyone.  I'm sorry.

        We get a little better air circulation with the door

open, I think.  Are you guys warm?

MR. KEENEY:  Thank you, your Honor.

THE COURT:  Yes.  All right.  Mr. Bavis, thanks for coming back.

THE WITNESS:  Certainly, sir.

THE COURT:  All right, Mr. Keeney.

BY MR. KEENEY:

Q   Mr. Bavis, please turn to Plaintiff's Exhibit 63, I believe that was your Exhibit Number -- actually, I think this sticker is on top of your exhibit number -- that's Plaintiff's Exhibit 63.

A   I have that, that's my Exhibit 2.0.

Q   Yes.  And that's the analysis of unrecognized revenue as of October 31, 2008?

A   It is.

Q   And you took this list of cases from Mr. Toll's letter of November 6th, 2008, right?

A   I did.

Q   Directing your attention on the first page to the second one from the bottom, do you see the reference to Bell South?

A   I do.

Q   And you took into revenue as of October 31, 2008 $1,800,000 for Bell South, right?

A   I did.

Q   You don't have any idea whether Bell South fees have even

Bavis - Cross                                          194

been received today, do you?

A    Well, I don't know, but once again, in accordance with the criteria for GAAP, the -- if it's received, when it is received doesn't matter.

Q    And if an earlier witness today testified that he was the lead attorney for Bell South and as of today not a single penny of these fees had been received, would that change your opinion that you should have been taking this into revenue way back on October 31, 2008?

A    No, your Honor, it would not.  The way the accounting works, it's the information that's available as of the end of the accounting period, as I stated earlier this afternoon.  So, it's what was known October -- as of October 31, 2008 and, as of that point in time, according to Mr. Toll's letter, all the court proceedings needed to ensure release of the fees have occurred and he said, at worst, we will receive $1.8 million.  So, quite frankly, I think I was conservative in estimating his minimum amount.

Q    And when you were relying on Mr. Toll's of November 6th, 2008, you were relying on a letter written approximately seven days after October 31, 2008, right?

A    Well, that's one of the reasons why it was helpful, because it was close in time.  Once again, the objective is, what did we know on October 31, 2008, so that was -- it was extremely convenient to have something dated at that point in

Bavis - Cross                                195

time.

Q   So, as I understand it, you used 20/20 hindsight seven days after October 31 to base projections on what should have been known on October 31, according to your analysis of GAAP, is that right?

A   Well, no, I don't -- and I don't know that that's accurate.  I mean, I believe that that's certainly reasonably close in time.  And also keep in mind, I happened to look at a calendar, I think November the 6th, when the letter was written, was a Thursday and October 31, I believe, was a Friday.  So, you know, it was less than a week afterwards, pretty close.

Q   Okay.  I'd like to turn your attention to Plaintiff's Exhibit 66, which is your Exhibit 4.0, if you would put that before you?

A   Yes, sir, I have that.

Q   Okay.  You calculate net income at Cohen Milstein using GAAP method through October 31 to be $443,353.61, right?

A   Yes, sir.

Q   And if you were wrong on Bell South you would have to deduct $1.8 million from that net income, right?

A   I'm not sure what you mean by wrong.  If you're posing a hypothetical that that amount should not be recognized, then I would agree with you, but if you're posing it from the standpoint of the fact that it hasn't been collected today,

no, because that's not really how accounting works. Accounting -- once -- accounting estimates are made all the time, first off.  So, we understand one another, estimates in accounting is part of GAAP, it's part of what's accepted. So, you base your estimate based upon all the information that was available to you at that time.  To the degree that it turns out in subsequent events that that's wrong, you don't go back and change the accounting.  As a matter of fact, your Honor, the accounting rules specifically do not allow you to go back, you can't go back and change financial statements because of a change in an estimate.  The simple practicality of that is financial statements would never end.

Q   And the net effect of this, the arithmetic, is that you deduct $1.8 million from your net income figure of $443,000 you end up with a negative number, right?  It's a matter of arithmetic.

A   As a matter of arithmetic, I can't disagree with that, sure.

Q   And, as a matter of arithmetic, when you calculate Mr. Hausfeld and Mr. Lewis' capital accounts as of October 31, 2008 under GAAP, the effect of your calculation is to give them a percentage share of Bell South fees that have still not been received, right?

A   Sure, yeah, I wouldn't disagree with that, that's effectively in there.

Q   I'd like to talk to you about the assumptions of relying on Mr. Toll's letter.  Prior to your preparation of your written opinion and your testimony today, did you have any discussion with Mr. Hausfeld about his views on Mr. Toll's projections of fee recoveries?

A   Let's see.  I participated in a conference call and it was my understanding that at the other end of that conference call Mr. Hausfeld was among the parties in attendance.

Q   And did you hear him speak about Mr. Toll's projections into the future of fee recoveries, particularly in the 2008 period?

A   I have no recollection of any statement one way or the other, I mean, I don't recall.

Q   Okay.  At any time were you told by Mr. Hausfeld, as he testified at his deposition at Page 49, that in 2008 Mr. Toll was, quote, "overly projecting future fee recoveries"?

MR. ROSENTHAL:  That's not a full statement of Mr. Hausfeld's deposition testimony.

MR. KEENEY:  I'm asking him what he was told.

THE COURT:  Well, I guess he's just trying to see if he heard that, whatever the statement is, I'll let you follow up or Mr. Kittredge will follow up.

Did you ever hear anything like that?

THE WITNESS:  I'm not familiar with it.

THE COURT:  Okay.

Bavis - Cross                                198

BY MR. KEENEY:

Q    In the course of your GAAP accounting for other clients, do you rely solely on the client's own projections of when it could receive future income?

A    I'm not sure if I understand the question.  In working with clients in the preparation of GAAP-based financial statements, the companies normally recognize revenue, which I assume is what we're talking about, in accordance with whatever methodology they use.  I wouldn't consider that to be necessarily a projection, it's the facts and circumstances as they know it.

Q    Okay, let me rephrase the question this way:  In your work for any other client when you're making a calculation of GAAP revenues as of October 31, 2008, do you do anything more than just ask the client what it thinks it's going to be getting in as of October 31, 2008?

A    Well, I guess that depends on the circumstances.  Your Honor, the most common example I think I can give to you, which you might be familiar with, is construction contractors.  Construction contractors use what's called a percentage-of-completion accounting by and large and what that means is, if they were building -- if Whiting Turner was building this building and at the end of their fiscal period this building was partially completed but not fully completed, they estimate how complete it is and the amount of

revenue that's recognized is whatever the contract calls for

for them to be compensated times their estimate.  So, yes, we

routinely use information like that, it's not uncommon at

all.

Q   Okay.  Is that the only information that you use?

A   That really varies with the circumstance.  You know, we

would -- in that example, if I were auditing Whiting Turner's

books and records, if you will, using that as an example,

because it's an audit as opposed to a review, I would

probably have come up here and walked around the site and had

a physical observation.  Quite honestly, though, to be clear,

even when I do that, I'm not an engineer, so I'm still

relying upon what they represent to me.  For the most part,

all I can say is, yes, something is being built.

Q   But you actually check it, right?

A   In an audit situation, I would.  So, it depends -- you

know, I was trying to be clear, it depends on the

circumstances.

Q   Have you ever actually done an audit for a plaintiff's

class action practice where it's totally contingent and they

billed nothing which is sent out as a regular bill?

A   Have I audited a firm?  No.

Q   Okay.  Have you done any analysis of trying to apply GAAP

to a plaintiff's class action firm that is solely dependent

on fees that are awarded by courts if they win?

Bavis - Cross                                     200

A    Well, I have in other circumstances.  Your Honor, as an example, one of the things I do in my practice is value businesses, I'm credentialed to do that, and I have appraised contingency-fee law firms where, in valuing the firm, you look at things such as what their track record is, you know, what their lodestar may be, there are factors that I'm familiar with that you look at from a valuation perspective, not from an audit perspective.

Q    Shifting gears now.  You were asked about this chart here.  I actually don't see the Plaintiff's Exhibit Number on it, but --

THE COURT:  I think it's 60-something, let me see which one it is -- oh, no, is that 108?

THE WITNESS:  It is, it's 108.

THE COURT:  It's 108,

BY MR. KEENEY:

Q    My question to you is, as I understood your testimony on direct, you included that part of what's being redistributed on this chart is $530,682 and some cents, which you said was income for year, right?

A    That's correct, that's off the income statement.

Q    Right.  And do you know whether that income was before the application of guaranteed payments or after the application of guaranteed payments?

A    I am not certain.  I was here for Ms. Drolet's testimony,

I think she said she thought but was not sure that it was before, if I recall correctly.  I don't -- I'm not sure.

Q   So, when you refer to profits, you're assuming that that the $530,000 figure is before the application of the guaranteed payments?

A   I'm not assuming anything, I'm just -- it is off of the statements.  As I said, Ms. Drolet had testified, I heard her testimony, I think she said that it was before guaranteed payments.

Q   I'm getting at the definition of profit.  In order for you to testify that there was a profit did you believe that the income was before the subtraction of the guaranteed payments?

A   Well, I don't know, I guess, because once -- it wouldn't be my view that for purposes of this analysis profit is in fact the tax-basis profit.  So, in responding to the questioning on this exhibit, it is what it -- what the accounting firm and the law firm calls it, I'm accepting their terminology.

Q   And on the other part of the reallocation, to the extent that capital accounts, the loss of the capital accounts for the departed partners, it reallocated among the partners who remained, you understand that's the second category that we're talking about with Ms. Drolet, right?

A   Well, we might be confusing something, your Honor, which

Bavis - Cross                                                      202

I'd like to be clear on.  I don't think we are reallocating partners' capital accounts and, if that is what you thought I was testifying to, then I need to clarify something.

Q    Please clarify.

A    What we're really doing here is we're allocating the income for the year, which is something that goes into the member's capital account, but capital accounts are an accumulation over the members life or term of employment with the term.  So that is not an allocation of anything other than current year's earnings.

Q    And my question to you, as I thought we talked about both current-year earnings in your direct testimony and a reallocation of the fact that there are fewer partners sharing in the capital pool, so therefore a portion of the capital gets reallocated to the remaining partners?

A    And that's why I think we may have a disconnect.  What's actually being allocated here is the current year's earnings. Once a partner's capital account is established, to my understanding the only way it's going to change is by either contributing additional capital, withdrawing capital or sharing in the current year and future year's earnings or profits.  There's nothing that really allocates it.  If at the end of 2007 my capital account is $5 million and I leave the firm, I would assume I would get my $5 million, I would not assume that the other partners get to keep it.

Bavis - Cross                                               203

Q   What if when you leave the firm, according to the partnership agreement, payment of your capital account has required a deduction due to the date that you were leaving and ultimately, afterwards, more money comes into the firm that doesn't get allocated to the departing partners, doesn't that bump up the capital accounts of the remaining partners?

A   I'm trying to follow your question.  Is the question based on an assumption that you've terminated your relationship with the firm and then there's subsequent events that occur?

Q   Yes.

A   And the subsequent events belong to those partners?

Q   Yes.

A   Yes, I would think that's what takes place.

Q   You were asked on direct about whether it was possible to do essentially two sets of books, the non-pejorative way, doing GAAP and income account, do you recall that discussion?

A   I do.

Q   And you said you could, right?

A   Yes.  And I was trying to be clear, there's nothing illegal or immoral or anything about it.

Q   Absolutely.  My question to you, were you here when Pat Drolet said that's a lot of work?

A   I heard that testimony, it's --

Q   Do you agree with it?

A    No, I don't.  It's something that we do in our practice, it's something that I did in my prior firm, I can tell you we do it in my current firm, it's something that I have done for clients for too many years.

Q    And in those firms is the revenue base dependent upon contingent recoveries in plaintiff's class-action lawsuits which can go on for years and years and years?

A    Well, not specifically that, but they are contingent upon all kinds of other things.  As an example, you know, I mentioned construction contractors before, construction contractors' ultimate realization of earnings is based upon completing the project.

Q    I'd like to turn your attention to Plaintiff's Exhibit 67, which is the capital calculation that you directed to Mr. Lewis.

A    Yes, sir, I have that.

Q    Okay.  Directing your attention to the partner's percentage interest, do you agree that as reported by Cohen Milstein it's 6.78 percent for Rich Lewis?

A    Correct.

Q    And you corrected to 6.56 percent?

A    I did.

Q    I take it that the major difference that drives the distinction between the calculation done by Cohen Milstein and the calculation done by you under GAAP is not the

relatively modest percentage difference here but your calculation that there's supposed to be income as of October 31, 2008?

A    Relative to why the dollars are different?

Q    Yes.

A    Yes, I would agree.

Q    If you could turn to Plaintiff's Exhibit 65?

        (Pause.)

A    Yes, sir, I have that.

Q    You discussed on direct that because there was a loss reported by Cohen Milstein using its accounting figures the ten percent distributed equally was not applied by Cohen Milstein using the income-tax basis for accounting, right?

A    That was my understanding.

Q    Because you calculated a profit under GAAP; therefore, you did apply the ten percent distributed equally as an adjustment to your GAAP figure, right?

A    I did.

Q    And if in fact your net income figure was wrong and if in fact there was a loss of any sort, the net income figure becomes negative and you would not be using the ten percent distributed equally, right?

A    Correct.

        (Pause.)

Q    In your analysis, did you do a GAAP correction of a

capital account balance owed to Partner Mark Machiz who left the equity partnership, also with an effective date of October 31, 2008?

A    I'm sorry.  What's the name again?

Q    Mark Machiz, M-A-C-H-I-Z.

A    Yes, he's on the schedule, so -- well, no, I didn't take it all the way through to calculate his -- his capital account, but I did calculate -- he is on the schedule, I believe, if his initials are MIM.

Q    That's correct.  And did you take into account, when you did the calculations of capital owed to withdrawing partners, what payment was owed to Mark Willis, who left earlier in the year, whose payment was calculated as of the date July 30th, 2009?

A    No.

Q    If you had done a GAAP calculation for Mr. Willis as of July 30th, 2009, were some of the cases that were discussed in your October 31, 2008, GAAP calculation have been backed farther into time, into July 30th of 2008?

A    I --

        MR. KITTREDGE:  Objection, your Honor, relevance.

        THE COURT:  Why is that relevant, Mr. Keeney?

        MR. KEENEY:  I want to see if it affects the calculation.  If you're taking somebody out of the GAAP calculation as of October 31, and moving it back into time as

Bavis - Cross                                    207

of July 30th, what impact does it have on the October 30th

calculation?

        THE COURT:  All right.  We'll, I'll allow it as a

hypothetical.  If you were to do that, what would have

happened?

        THE WITNESS:  It would -- it may have, your Honor,

depending upon the facts and circumstances.  I don't recall

any of the cases that we had discussed --

        THE COURT:  Let's assume hypothetically --

        THE WITNESS:  -- that go back that far.

        THE COURT:  Let's take Bell South.  Let's say you

found out that a million eight from Bell South should have

been accrued as income in July.

        THE WITNESS:  If that would be the case, and if the

calculation had been made in accordance with GAAP, the

allocation to that partner member would have been different.

And as a result of that being different, it would have had

some impact on the remaining capital accounts.

        THE COURT:  So that could affect Mr. Hausfeld and

Mr. Willis's calculations in October?

        THE WITNESS:  It could affect --

        THE COURT:  Assuming all that's true?

        THE WITNESS:  It would affect everybody's --

        THE COURT:  Okay.

        THE WITNESS:  -- calculation to some degree.

Bavis - Cross                          208

THE COURT:  Okay.

BY MR. KEENEY:

Q   Changing topics again, would you please return to Plaintiff's Exhibit 63?  That's the list of cases.

(Pause.)

Do you have that in front of you?

A   I do.

Q   Would you please turn to Page 2 on the list of cases?

A   I have.

Q   I'd like to direct your attention to the last case listed there, Air Passenger.

A   Yes, sir.

Q   And you did not take into revenue, as of October 31, 2008, any revenue from Air Passenger?

A   I did not.

Q   Did you have any discussions with Michael Hausfeld as to whether you should take into revenue any amount of Air Passenger as of October 31, 2008?

A   Once again, there was a conference call.  Whether or not there was a specific discussion, I don't recall one, but I can't tell you with certainly that it wasn't discussed.  I don't know.

Q   Do you recall anything Mr. Hausfeld told you about Air Passenger?

A   No, sir, I do not.

Bavis - Cross                                         209

Q    Did you ever hear from Mr. Hausfeld, or anyone else, that Mr. Hausfeld planned to send $3 million to former Cohen Milstein attorneys in London out of those Air Passenger fees?

          MR. ROSENTHAL:  Objection, your Honor.

          THE COURT:  What's the relevance of that?

          MR. KEENEY:  That's --

          THE COURT:  Are we getting into Air Passenger stuff now, too --

          MR. KEENEY:  No, I actually just --

          THE COURT:  -- or does that deal with --

          MR. KEENEY:  -- wanted to see if you heard anything, your Honor.  I thought we should close it, before we lose the witness.

          THE COURT:  All right.  Well, I'm going to sustain. It doesn't seem -- at least it's not within the scope of the direct, unless we're going to question him about Air Passenger stuff, I don't think we should get into it.

          MR. KEENEY:  Okay.  Great.  Different question.

          THE COURT:  All right.

          MR. KEENEY:  This is within the scope of the direct.

BY MR. KEENEY:

Q    In the description of the Air Passenger status, is there any description of a court order entered October 31, 2008?

A    No.

Q    Were you even aware that there was a court order entered

Bavis - Cross                                      210

October 31, 2008?

MR. KITTREDGE:  Objection, your Honor.

THE COURT:  Well, I'll overrule that.  That might have an impact on his analysis, since he does have little notations about what facts he knew.

MR. KITTREDGE:  Your Honor, that order does not direct any income or revenue to Cohen Milstein.

THE COURT:  All right.  Where is the order?  Is this the order from Judge Briar?

MR. KEENEY:  It's the order from Judge Briar, October 31, 2008.  I'm just asking him what he had before him.

THE COURT:  But does that have any impact on whether the fees were awarded and approved and to whom?

MR. KEENEY:  I think it could, your Honor, but we'd have to ask the witness, because he's the expert on GAAP.

THE COURT:  All right.  I'll overrule it.

Did you ever see the order from Judge Briar of October 31, '08?

THE WITNESS:  Your Honor, I don't recall.  In the course --

THE COURT:  Okay.  That's all.  He doesn't recall.

MR. KEENEY:  That's all.  We have no further questions, your Honor.

THE COURT:  Okay.  Any follow-up, Mr. Kittredge?

Bavis - Redirect                           211

MR. KITTREDGE: A few, your Honor.

THE COURT:  Take your time.

REDIRECT EXAMINATION

BY MR. KITTREDGE:

Q   Mr. Bavis, we've had testimony, and a document introduced which --

MR. KITTREDGE:  Plaintiff's Exhibit 110, your Honor.

THE COURT:  Very well.

BY MR. KITTREDGE:

Q   And that document, I will tell you, Mr. Bavis, is the partnership agreement of Cohen Milstein Hausfeld & Toll-N.Y., L.L.P., the New York "London Office."

A   Okay.

Q   Will you accept that, please?

A   Yes, sir.

Q   And Paragraph 5.4 of that partnership agreement, the books and records of the London Office were to be kept, according to generally-accepted accounting principles.

Now, having been told that, does that change any of your information or any of your determinations?

A   Well, that, in regards to I think your Honor's question earlier, what that does is confirm the fact that there would be no difference between the GAAP basis financial statement for this firm, and a tax basis.  It would be the same.

Q   Mr. Keeney was talking to you about Exhibit 63, which is

the last, and he asked you about Bell South?

A    He did.

Q    Bell South you included, yet that money, in fact, did not come in, and even not there today, understood?

A    If you say so.  I don't know that.

Q    All right.  Would you look at the next to the last column of that exhibit?

         (Pause.)

A    Yes, sir.

Q    You used the number for your purposes of GAAP accounting for revenue that should be recognized in accordance with Mr. Toll's letter of $7,845,000 and change, correct?

A    Yes, sir, that's correct.

Q    How much actually came in from things that were on that list of Mr. Toll's up to the end of December?

A    $10,619,206.

Q    So if you subtract out the one million eight from Bell South, and you count the ones that you failed to include in your GAAP accounting, would you come ahead or behind?

A    Well, you'd -- you'd come out ahead with those assumptions.

Q    With more income --

A    Yes.

Q    -- attributable to October 31st?

A    That would be correct, presumably.

Bavis - Redirect                                    213

Q    And would you please tell the Judge why you did not include Passenger in your quote, "projected and assumed accrual of the fees in Air Passenger"?

A    Well, your Honor, simply going off of my chart, my notations are that the approval of the fees was pending, and as I suggested, the determination under GAAP is as of October 31, 2008, were all four of these criteria met?  And to the degree that the fee was not fixed or determinable, because the hearing was pending, it would not be recognizable.

Q    And what Air Passenger?  What status was that in?

A    I'm -- oh, it -- I had that the approval of the fee was pending, so, therefore, the amount wasn't determinable.

Q    And go back to the first two columns of your exhibit, and your chart, what amount was Mr. Toll telling the bank a possible anticipated revenue for the next two months?

A    Your Honor, he -- he estimated $16 to $18 million.

Q    And did you take a conservative view of that or did you take a liberal view?

A    Well, I didn't pick up any of it, because in accordance with generally-accepted accounting principles, the criteria was not met, and when you say "conservative," accounting is conservative, and one of the guiding principles, your Honor, if you will, is to be conservative.

Q    And what was the total amount that Mr. Toll was telling the bank are possible revenues in the next two months for

Bavis - Redirect                                           214

Cohen Milstein?

A    Between 43 million and $47 million, your Honor.

Q    Now, would you also look, please, at Exhibit 2, which is the operating agreement?

A    Yes, sir.  Can I look at my copy?

Q    Sure.  And go to 10... Page 9.

A    Yes, sir, I'm there.

Q    Mr. Keeney asked you whether or not there's anything in here about an economic interest or an economic value of the partners' interest in the firm, and you said that is not there, that terminology, correct?

A    I did not see that terminology there.

Q    If, Mr. Bavis, the departing partner was given a quote, "capital account," here's your capital account, and do you see this on the first page down there under 9, and the income and loss of the company for the fiscal year of the company to the last day or the last month prior to termination.

        If he had been given that, in accordance with GAAP, would he have a better idea or what his economic interest in the firm was?

A    Yes, your Honor, as I've suggested, GAAP is more closely aligned with the economic realities.  So if that would be the case, then that would be correct.

Q    So if the income and the loss statement for that period of time had been provided in accordance with GAAP, it would

Bavis - Redirect                          215

be the numbers that you put up on the board?

A    Correct.

MR. KITTREDGE:  That's all I have, your Honor.

THE COURT:  Okay.  Thank you.

All right.  Thank you, Mr. Bavis.

THE WITNESS:  Thank you, your Honor.

THE COURT:  I appreciate you're coming down.

THE WITNESS:  I'm sorry?

THE COURT:  I appreciate you're coming down.

I have one question for you --

THE WITNESS:  Yes.

THE COURT:  -- before you leave.

Exhibit 66 and 67.  These are the --

THE WITNESS:  Well --

THE COURT:  -- corrected capital account calculations you did?

THE WITNESS:  Yes, sir.

THE COURT:  What would be the change, for example, if you were to use the 13.31 and the use the $6.9 million loss figure then vice versa, can you compute those, and then if you use the 27 percent at 443.  Because your projections assume that both of those numbers are going to change.

THE WITNESS:  Correct.

THE COURT:  And can you do it in the alternative if one changed but not the other?

THE WITNESS:  I can if you can give me the --

THE COURT:  I'm not going to ask you to do it now. Maybe you could give it to the lawyers.  Or do you want a calculator?

THE WITNESS:  I could step -- take the calculator, step to the back, so I don't hold up your proceedings.

THE COURT:  You can just do that and give the numbers to the lawyers.  I'm just curious.

THE WITNESS:  Yes, sir, I can do that.

THE COURT:  All right.  Thanks so much.

Thanks for coming down.

THE WITNESS:  Yes, your Honor.

(Witness excused.)

THE COURT:  All right.  Mr. Rosenthal, it's 4:00 o'clock.  We've got about, let's say 45 minutes left or so.

MR. ROSENTHAL:  Okay.  And what we plan to do, your Honor, is call one very quick witness, and then we've got some deposition transcript designations which shouldn't take that long to read into the record, and then I thought we might be able to wrap up.  That may well take us to 4:45.

THE COURT:  Okay.

MR. KEENEY:  We can stipulate to the deposition transcripts, your Honor.

THE COURT:  All right.

MR. ROSENTHAL:  We'd like to read them into the

Eisler - Direct                                          217

record.

MR. KEENEY:  She can just type them, your Honor.

MR. ROSENTHAL:  We'd like to read them into the record, your Honor.

THE COURT:  Okay.  All right.  It's your case.  I'm not going to tell you how to try it.

MR. ROSENTHAL:  Thank you, your Honor.

THE COURT:  Okay.

MR. ROSENTHAL:  Let me go grab our -- witness Robert Eisler is the next witness.

THE COURT:  Mr. Bavis, thank you.

Who's the next witness?

MR. ROSENTHAL:  Eisler.

THE COURT:  Eisler.

(Pause.)

Right here, sir.

ROBERT EISLER, ESQUIRE, after having been first duly sworn as a witness, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q    Good afternoon, Mr. Eisler.

A    Good afternoon.

Q    Where do you live?

A    In Philadelphia.

Q    Where do you work right now?

Eisler - Direct                                 218

A    The Hausfeld, L.L.P Building, Philadelphia, at 16th and Locust Streets, and in Washington, 1700 K.

Q    How long have you been with Hausfeld, L.L.P.?

A    Since November of last year.

Q    Where were you before that?

A    Cohen Milstein Hausfeld and Toll.

Q    You're a lawyer; is that right?

A    I am.

Q    What kind of law do you practice?

A    Plaintiff's contingency fee.  Anti-Trust cases for the most part.

Q    How long were you at Cohen Milstein before you joined Hausfeld, L.L.P.?

A    I had started Cohen Milstein I believe in June of 2007, and I started with Hausfeld, L.L.P. in November of 2008.

Q    All right.  And prior to 2007, when you joined Cohen Milstein, did you also practice law?

A    I did.  I had been a partner at Leif, Kabrazerheim & Bernstein (ph) in New York since 1999.  I was a partner in my own firm here in Philadelphia prior to that.

Q    Were you always doing plaintiff's contingency fee work?

A    Over the course of my career, I would say 80, 85 percent, yes.

Q    When you went over to Hausfeld, L.L.P., did you go with Mr. Hausfeld?

Eisler - Direct                                    219

A    Shortly thereafter, yes.  Within days.

Q    Did any other partners from Cohen Milstein join you and Mr. Hausfeld?

A    Richard Lewis and Michael Layman.  I believe Charles Tomkins and Brian Radnor (ph) who were also partners -- not equity partners at Cohen Milstein.

Q    Were there any associates that joined the six of you?

A    Yes.

Q    Approximately how many?

A    Approximately 15 to 18.

Q    You have a plaintiff's exhibit binder in front of you -- well, let me ask you this:  I want to turn your attention now to January 23rd, 2009.

A    Yes.

Q    Were you in this courthouse?

A    I was.

Q    For what purpose?

A    To discuss, along with Mr. Hausfeld, Ms. Rosenthal, Mr. Kittredge, Mr. Toll and his counsel were here, Mr. Small was here, to discuss with Judge Rice the possibility of resolving a fee dispute over the OSB litigation fee.

Q    Did you actually engage in settlement negotiations regarding the OSB fee that day?

A    We did.

Q    Did you engage in settlement negotiations over other

Eisler - Direct                          220

things as well?

A    We did.  The discussions progressed relatively early into settlement discussions regarding all of our -- all of the disputes between the two firms.

Q    Okay.  How long approximately did these negotiations last on May 23rd?

A    My recollection is in the neighborhood of six to seven hours.

Q    Okay.  Drawing your attention to the dispute over the OSB fee, what was your side's opening position regarding that fee?

A    Our opening position on that day, if memory serves, was 50 percent for Hausfeld, L.L.P., and 50 percent for Cohen Milstein.

Q    All right.  And just so the record's clear, what kind of case was OSB?

A    OSB was a price fixing case, a cartel case.

Q    Who originated that case?

A    For Cohen Milstein it was originated by Michael Hausfeld.

Q    Okay.  Did you work on that case?

A    I did not.

Q    Who else at Cohen Milstein worked on that case with Mr. Hausfeld?

A    My recollection is that William Butterfield worked on that case, as well as Patrick Tollu (ph), and there were

Eisler - Direct                                221

probably some junior associates that worked on the case, but I don't recall who did.

Q   Did Mr. Butterfield --

THE WITNESS:  Your Honor, may I have a glass of water?

THE COURT:  Yes, just be careful of the pitcher.

(Discussion held off the record.)

BY MR. ROSENTHAL:

Q   Did Mr. Butterfield come with you to Hausfeld, L.L.P.?

A   He did.  I apologize.  He was another partner that went with us.

Q   And did Mr. Tollu stay at Cohen Milstein?

A   He did.

Q   Okay.  How did the negotiations over the OSB in particular end up that day?

A   Oh, it ended up that day as part of an entire package settlement that we hammered out that day, and the OSB fee, in its entirety, pursuant to that settlement, would go to Cohen Milstein Hausfeld & Toll.

Q   Okay. Approximately --

A   I'm sorry.  Cohen Milstein Sellers & Toll.

Q   Approximately how much was the OSB fee estimated to be at that time?

A   Just north of 3 million.  I want to say 3.1, 3.2.

Q   Okay.  I'm turning your attention to another issue.  Was

Eisler - Direct                              222

there any discussion that day regarding the capital accounts
to be returned -- the capital account balances to be returned
to Mr. Hausfeld and Mr. Lewis?

A    There were throughout the day both with our group,
Michael, Rachel, Mr. Kittredge and myself, and Judge Rice,
and also with a broader including the lawyers from Cohen
Milstein Sellers & Toll and their counsel, yes.

Q    Okay.  Drawing your attention to the discussions that
occurred with the entire group, both sides and Judge Rice,
what, if anything, do you recall about the discussions
regarding capital to be returned to Mr. Hausfeld and Mr.
Lewis?

A    My recollection is that throughout the day, most of the
day was spent with Judge Rice shuttling between the parties.
And we were in Judge Rice's office.  Our talk was at a
conference table.  And throughout the course of the day, we
had discussed how we might be willing to divide fees, how we
-- and one of the issues that we had certainly discussed with
Judge Rice was an accelerated return of the capital accounts
for Mr. Hausfeld and Mr. Lewis.  At the end of the day,
probably around 6:00, 7:00 o'clock in the evening, Judge Rice
brought all the parties back together into his office at the
conference table we had been sitting at all day, and
essentially wanted to sit down with the parties and hammer
out the deal points for a settlement.

Eisler - Direct                                    223

And at that point we had been discussing divisions of cases, fees for cases, and an accelerated payment of the capital accounts, and when the Cohen Milstein attorneys and their counsel came back into the room, Mr. Hausfeld said, I want my $5 million, and I want it right away. And we also threw -- we also mentioned a desire to get Mr. Lewis's capital account returned immediately.

Q    And what, if any, response was there from the other side?

A    My recollection is that immediately Mr. Keeney said, We just don't have that -- my client doesn't have the money to pay you right away, you know what the situation's been like with Sun Trust, and Mr. Toll said, Oh, we can't pay that money right away.

Q    Okay.

A    Then we discussed various accelerated payment schedules.

Q    Okay. Did the parties ultimately come together and reach a resolution on an accelerated payment schedule?

A    We did. My recollection is that we agreed to a payment of half of Mr. Lewis and Mr. Hausfeld's capital return by the end of 2009, and the rest of it returned the middle of 2010.

Q    Okay. What, if any suggestion, was there during the course of that last session during the day, that the capital account figures for Mr. Lewis and Mr. Hausfeld would be provided to them?

A    As I recall at the very end of the day, when we were

Eisler - Keeney                          224

going through some housekeeping, Judge Rice asked Mr. Keeney

to provide the exact numbers to our counsel, and Mr. Keeney

said that he would do so.

Q    Thank you, Mr. Eisler.

          MR. ROSENTHAL:  I pass the witness.

                         CROSS-EXAMINATION

BY MR. KEENEY:

Q    Good to you see again, Mr. Eisler.

A    Good to see you, Mr. Keeney.

Q    Were you at the February 3rd mediation session before

Judge Rice?

A    I was not.

          MR. KEENEY:  No further questions.

          THE COURT:  That's it?

          MR. ROSENTHAL:  He may be excused.

          THE COURT:  All right.  Thank you, sir.

          (Witness excused.)

          MR. ROSENTHAL:  Okay.  Your Honor, the next thing

we'd like to do is read excerpts from Mr. Toll's deposition

into the record, and I'd like to seat somebody on the witness

stand, and we would --

          THE COURT:  Who's that lucky person?

          MR. ROSENTHAL:  Counsel seated behind me.

          COUNSEL:  I am, your Honor.

          MR. ROSENTHAL:  And there are exhibits that were

225

used in the deposition, that are also now trial exhibits, and we rekeyed what were deposition exhibits to the trial exhibits now, so we can all be working of the --

THE COURT:  Okay.

MR. ROSENTHAL:  -- same number as this.

THE COURT:  Very good idea.

MR. KEENEY:  We have absolutely no objections, your Honor.

THE COURT:  Good.

MR. ROSENTHAL:  And I just want to make sure that we've got copies for everybody to follow along.

(Discussion held off the record.)

THE COURT:  How are you today?

COUNSEL:  Fine, your Honor.  And you?

THE COURT:  Good.  Thank you.

SPEAKER:  Judge, may I?

THE COURT:  Oh, sure.  Thanks.  Thank you so much.

MR. ROSENTHAL:  Just let the record reflect that we're reading from the deposition of Steven J. Toll taken in Washington, D.C., on Monday, July 20th, 2009, at 1:33 p.m., and the witness, Mr. Toll, was sworn by the court reporter.

THE COURT:  Does Mr. Toll have any saying in the selection of the actor to play him?

(Laughter.)

Just kidding.

MR. TOLL:  No, your Honor.

MR. LANDAU:  Thank you, Mr. Toll.

MR. ROSENTHAL:  Mr. Landau plays it straight.

Mr. Landau or Mr. Toll, turning your attention to Page 8, Line 12.

(Pause.)

"I show you what's been previously marked at least in our deposition as Trial Exhibit 15.  Please take a look at the e-mail at the bottom of Page 1, which is an e-mail from you to Hugh Diamond dated 3:11 p.m. on January 8th.  Do you see that?

A    I do.

Q    It says, You need to start doing capital account analysis for MDH.  That's Michael Hausfeld, correct?

A    Yes.

Q    And other departing equity partners, as I think we need to send them our analysis of the balance as adjusted as required by the operating agreement.  Do you see that?

A    I do."

MR. ROSENTHAL:  Moving to Line 12 on Page 9.

"Q  Had you had any prior discussions with Mr. Diamond about getting this information together about the capital accounts?

A    I don't believe so.

Q    Had you had any prior discussions with Ms. Drolet about getting this information together?

Toll - Deposition                          227

A    I don't believe so, not prior to January 8th.

Q    Is it fair to say that the information needed to come up with those capital account calculations was available to the firm at that time, correct?

A    I'm not entirely sure.  It -- it should have been, I believe.

Q    What you needed was the income statement from October of 2008, in order to properly calculate those capital account balances in your view, correct?

A    I believe so.  I'm not sure if there's anything else required, but I believe that's correct.

Q    And those October financial statements were prepared in November of 2008, correct?

A    Yes, more than likely they were.

Q    And distributed to the equity partners in November of 2008 as well?

A    More than likely."

        MR. ROSENTHAL:  Turning your attention now to Page 10, Line 19.

"Q    Thank you.  Going to the e-mail at the top of the page, which is an e-mail from Hugh Diamond to you dated January 10th at 1:20 p.m.  Do you see that?

A    Yes.

Q    It says, Attached are files calculating capital account balance for equity partners who have left the firm in 2008.

Toll - Deposition                               228

Do you see that?

A    Yes."

        MR. ROSENTHAL:  Moving to Page 11, Line 16.

"Q   Did you have a discussion with Mr. Diamond on or around January 10th about the information that was attached to the e-mail?

A    I don't recall.

Q    Do you recall when you reviewed the information that was attached to the e-mail?

A    I -- I can't be sure whether I skimmed it at the time or as often I do, I put it in my briefcase and get to it when I get to a lot of other things, so I just don't recall with regard to this document."

        MR. ROSENTHAL:  Turning to Page 14, Line 8.

"Q   So according to Mr. Diamond's calculations as of January 10th, 2009, the firm knew that Mr. Hausfeld would be getting more than $1 million less than he had in the beginning of January -- at the beginning of January 2008; is that right?

A    Well, when you say the firm knew, clearly this was Mr. Diamond's calculation.  I'm not sure I looked at this at that time, so I don't know if I knew this number at that period of time.

Q    Mr. Diamond knew the number, correct?

A    He certainly calculated this.

Q    He provided the number to you as of January 10th, 2009,

correct?

A    Correct.

Q    Did you pass along to anybody else this information that Mr. Diamond sent to you on January 20th, 2009?

A    I don't believe so, no.

Q    You've kept it to yourself?

A    I just -- the e-mail came to me.  I probably put it in my briefcase to read it at some point, and I don't -- I didn't forward it to anyone."

MR. ROSENTHAL:  Moving to Page 16, Line 20.

"Q    Fair to say that as of this date, January 15th, you knew, based on that e-mail you sent on January 8th, that the firm was under an obligation to provide Mr. Hausfeld and Mr. Lewis, as well as the other departing partners, with their capital account balance information, correct?

A    I knew that, yes."

MR. ROSENTHAL:  Moving to Page 27, Line 15.

"Q    And what about the $5 million figure for Mr. Hausfeld? That was discussed during the first mediation session with Judge Rice, wasn't it?

A    It may have been.  I don't recall right now, but it may have been.

Q    Mr. Hausfeld also specifically asked for those capital account balance calculations during the first mediation session, didn't he?

Toll - Deposition                              230

A    I certainly remember it being asked for.  I don't know if it was the first one or the second one, but I certainly remember it being asked for.

Q    It's true also that Judge Rice asked you all to provide those figures to Mr. Hausfeld, correct?

A    He may have.  I don't recall.  He may have.

Q    And that Mr. Keeney said that that wouldn't be a problem?

A    He may have said that.

Q    Did you ever provide Mr. Hausfeld any indication during the first mediation session that the capital owed to him, in your eyes, or in the firm's eyes, would be substantially less than $5 million?

A    I don't recall discussing that, no.

Q    Or that the capital, in your eyes, to be returned to Mr. Lewis would be substantially less than 1.1 million?

A    I don't know.  I don't think it was a topic of discussion, no."

MR. ROSENTHAL:  Okay.  Moving to Page 33, Line 5.
"Q    I show you what's been marked as Exhibit or Trial Exhibit 21.  Take a look at it.  This is an e-mail that was sent from Mr. Diamond to you, cc'ing Pat Drolet on February 6th, the date after final execution of the settlement agreement, attaching the capital account balance calculations for the departing partners.  Do you see that?

A    I do.

Toll - Deposition                    231

Q    Do you see the last lane of it that says, Pat will be giving you a call this afternoon to discuss changes made in this calculation versus the schedule you previously received?

A    I see that."

         MR. ROSENTHAL:  Please move to Page 34, Line 1.

"Q    At some point you authorized Mr. Diamond to send those calculations from January 10th over to Ms. Drolet for her review, correct?

A    Correct.

Q    When did that occur?

A    I think it occurred shortly before this e-mail.

Q    Fair to say that it occurred on February 5th?

A    I'm not sure of the precise date, but I think it was shortly before.

Q    You were present for Ms. Drolet's deposition, correct?

A    I was, most of it.

Q    Do you recall her testifying that it was on February 5th, and not until February 5th, that she received preliminary calculations from Mr. Diamond?

A    Yes.

Q    Do you have any reason to doubt that?

A    No.

Q    And it would have been before then, immediately prior to then, that you authorized Mr. Diamond to send those calculations over to Ms. Drolet?

A    What I'm saying is I can't recall when.  I don't know if I told him on February 5th or 4th or 3rd or 2nd or I don't recall when, but it was somewhere in that time frame right before he sent them over.

Q    Is it true that you waited until the settlement agreement was done to authorize Mr. Diamond to send Ms. Drolet those calculations?

A    I don't recall, because I'm just not sure when -- which day I told him to send it over, or when I, you know, authorized him to send it.

Q    Putting aside your recollection of the exact date, isn't it true that you waited until the settlement agreement was done before authorizing Mr. Diamond to send over those calculations to Ms. Drolet?

A    I'm not sure.  It may have been or it may have been right before.  I just don't know.

Q    Why did it take you so long to authorize Mr. Diamond to send those -- send those calculations over to Ms. Drolet, nearly a month?

A    Mm, there was no specific reasons, other than it was kind -- it kind of was I had a million other things going on, and this was not at, you know, I guess it got -- I don't want to say it got -- let's just say it got backlogged with a lot of things that were going on that were being delayed."

                MR. ROSENTHAL:  Please turn to Page 43, Line 18.

Toll - Deposition                                    233

"Q   Were there any more drafts of the calculations done following the calculations that were provided to you by Hugh on February 6th?

A   I don't believe so.

Q   Any more revisions?

A   I don't believe so."

MR. ROSENTHAL:  Please move to page 45, Line 15.

"Q   Now, the actual calculations were not provided to Hausfeld and Lewis to me and my partner, Stef Tucker, until February 20th, correct?

A   I think that's right."

MR. ROSENTHAL:  Moving to Page 49, Line 2, please.

THE COURT:   49?

MR. ROSENTHAL:   49, Page 2, your Honor.

"Q   Now, in this period, between February 6th and February 20th, you knew that Michael and Rich, through us, through, Venable, repeatedly asked for those capital account balances, don't you?

A    I don't know if I knew that.  I certainly knew we were supposed to get them to you and I knew that."

MR. ROSENTHAL:  I marked Trial Exhibit 36 here.

"Q   I show you what's been marked as Exhibit 36.  This is an e-mail chain involving Steve Kaufman who is your counsel, correct?

A   He's one of them, yes.

Toll - Deposition                                      234

Q    Okay.  If you take a look at the e-mail at the very bottom of Page 1, running over to Page 2, that's an e-mail from me to Lynne Baum and Jack Keeney and Steve Kaufman on February 6th at 5:47 saying, Still awaiting on cap account information.  Please provide.  Do you see that?

A    I do.

Q    And then the same day, just eight minutes later, Mr. Kaufman forwards to you and Mr. Small and Mr. Summers and Mr. Sellers, an e-mail saying, Do we have an update on capital account info for Seth?  Do you see that?

A    Yes.

Q    And you responded three days later.  Let me ask you this: Why did it take you three days to respond to that?

A    I can't tell you right now.  I don't know.

Q    And that was the response from you to Mr. Kaufman on February 9th at 1:14 saying, Likely in the next day or so we'll get that capital account information, right?

A    I see that.

Q    But it was still another 11 days after that before Hausfeld and Lewis received their capital account information, correct?

A    Yes."

       MR. ROSENTHAL:  Please turn to Page 56, Line 21.

"Q    I show you what's been marked as Exhibit 38, Trial Exhibit 38, this is a letter from Hugh Diamond to Mark

Toll - Deposition                                    235

Willis, indicating to him what his capital account balance as of the termination date, right?

A    Appears to be.

Q    Provided to him on February 18th, correct?

A    Correct.

Q    Why did it take an additional two days to provide Hausfeld and Lewis with their capital account balance calculations?

A    I -- I can't answer that.  I don't know.

Q    All these calculations for Willis, Hausfeld and Lewis, they were done at the same time, correct?

A    I believe so, yes.

Q    And you don't know why it took an additional two days to provide Hausfeld and Lewis their calculations?

A    No, it was -- you have to ask our counsel.  They -- we had -- they had the numbers.  We didn't send it to Hausfeld."

          MR. ROSENTHAL:  Turning to Page 59, Line 18.

"Q    I show you what's been marked as Exhibit 42.  This is an e-mail chain on February 20th and 22nd between certain members of CMST, including you and Joe Sellers.  I want you to take a look at the second page, which is Bates stamped CMST1357.

A    I see it.

Q    Which is the e-mail, the first full e-mail on the top is from Patrick Tollu to you and Dan Small and Joe Summers and

Toll - Deposition                                    236

Dan Summers.  Do you see that?

A    Yes."

MR. ROSENTHAL:  Please move down to Line 15 on the same page.

"Q  And what he's saying is that as of February 20th, around 2:00 o'clock in the afternoon, he's confirming that the fees from the OSB case have been wired to CMST and received by CMST; is that correct?

A    It -- it appears to be, yes.

Q    And if you take a look at CMST1356, the first page of this exhibit, if you take a look" --

MR. ROSENTHAL:  I'm sorry.

"If you look at the --

A    Okay.

Q    -- third e-mail down from you to Joe Sellers on February 20th?

A    Yes.

Q    It says, Okay, thanks.  Sounds fine.  Now can't wait for the MDH explosion, re:  the capital account.  Do you see that?

A    I do.

Q    MDH is Michael Hausfeld?

A    Yes.

Q    Why did you think that there would be an explosion by Hausfeld over the capital account?

Toll - Deposition                                    237

A    Let's just say I know Michael pretty well, because I know how he reacts to things.

Q    It's true, isn't it, that you believe that Michael was expecting to receive more than the figures he was provided, correct?

A    I didn't know what Michael was expecting.

Q    So why did you think he would be -- knew he would explode?

A    I didn't know what he was expecting, but I knew I expected, when he saw a number that's less than the 5 million, he would not be happy.

Q    So you knew that, that by seeing a number less than 5 million, he would not be happy?

A    I expect that he would not be.

Q    So you --

A    And I --

Q    Continue.  I'm sorry.

A    -- I had the impression that he may not have realized what was in the partnership agreement.

Q    You had the impression that he was expecting 5 million, correct?

A    I didn't know.  No, I didn't know what he was expecting, but I -- again, I know Michael, and he's not as detailed as I am when it comes to accounting matters, and he may not have looked at the partnership agreement closely."

Toll - Deposition                                        238

MR. ROSENTHAL:  Please move to Page 63, Line 15.

"Q  This is the e-mail -- this is, okay, this is Trial

Exhibit 41.  This is the e-mail from Mr. Kaufman to me at

3:37 on February 20th attaching the capital account balance

information for Hausfeld and Lewis, that Hausfeld and Lewis

had been asking for for some time, correct?

A    Yes.

Q    And this was done at 3:37 p.m., right?

A    Yes.

Q    If you look back at 37?

A    Yes.

Q    The second page, 1357."

THE COURT:  Is Exhibit 37 right or is that another

exhibit?

MR. ROSENTHAL:  I'm sorry.  It's actually Exhibit

41.

THE COURT:  41, okay.

MR. ROSENTHAL:  Trial Exhibit 41.

"Q  The second page, 1357.  Patrick Tollu is informing you

that the OSB fees have come in, and been physically received

as of 2:29, about an hour earlier, correct?

A    I see that.

Q    So it's true, isn't it, that the capital account

information was not provided to Hausfeld and Lewis until

after the OSB fees were confirmed to have come in?

Toll - Deposition                                  239

A    It appears that way from this."

        MR. ROSENTHAL:  Please turn to Page 100, Line 2.
"Q  If you would, take a look at Page 2.  This should be
Exhibit 2, the operating agreement.

A    Okay.

Q    I'm sorry, Page 3.  Look at Article 2nd D where it says
Books and Records.

A    I see that.

Q    The second sentence says, The books of account shall be
kept and continually maintained in accordance with generally-
accepted accounting principles.  Do you see that?

A    I do.

Q    Was that in any prior version of any operating agreement
or partnership agreement of the firm?

A    I don't believe it was."

        MR. ROSENTHAL:  Please turn to Page 101, Line 16.
"Q  Well, prior to the adoption of this operating agreement
in 2003, the books and records had been kept on an income tax
basis accounting method, correct?

A    Both prior and after.

Q    And then this operating agreement makes a change and says
that the books and records are to be kept in accordance with
generally-accepted accounting principles, right?

A    Well, the document says that, the document says that."

        MR. ROSENTHAL:  Moving to Line 14 on Page 102.

Toll - Deposition                                    240

"Q  Is there a written document that says we don't generally, to use a generally-accepted accounting principles, to do the accounting of the firm somewhere?

A  No, I can't imagine there is.  We have been doing it another way for 20 years.  We would never even think of doing it by GAAP.

Q  Is there a written document signed by all the partners that says the firm ought to use an income tax basis method of accounting to keep the books and records of the firm?

A  I doubt it, except for the engagement letter with the accounting.

Q  Which is not something that's signed by all the partners?

A  Correct.

Q  That's only signed by you?

A  Correct."

MR. ROSENTHAL:  Turning to Page 104, Line 3.

"Q  Let's turn to Article 10, which is on Page 9, very bottom.  This provision requires that promptly after the termination date, the firm is supposed to furnish the terminated member with both a statement of the balance in the capital account, and the income statement for the month ending the last full day or the last day of the last full month prior to termination, correct?

A  Yes.

Q  And then it says that the terminated partner and the firm

Toll - Deposition                                          241

are supposed to engage in good faith negotiations on the amount actually due to the terminated partner, correct?

A    If there's a disagreement.

Q    Right.  And then that process is supposed to wrap up within 30 days, correct?

A    I think that's what was hoped for by this provision, yes."

MR. ROSENTHAL:  Turn to the next page, 105, at Line 5.

"Q    Is it fair to say that the provision requires that the prompt provision of the information to the terminated partners should be within 30 days, correct, 30 days of the termination date?

A    Yeah.  No, it says that.  It says promptly.

Q    And that didn't happen here in Michael and Richard's case, did it, providing the capital account information within 30 days after the termination, did it?

A    It did not happen in -- with them or with a lot of other departed.  I think every departed partner we've been late."

MR. ROSENTHAL:  Please turn to Page 108, Line 19.

"Q    Fair to say that the determination of income, whatever it was, provided to Hausfeld and Lewis on February 20th, was not a determination of income made in accordance with GAAP?

A    That's correct.

Q    And to the extent that the firm's operating agreement by

Toll - Deposition                                         242

its plain terms requires the books of account to be
maintained in accordance with GAAP, the firm did not comply,
and has not been complying with that provision of the
operating agreement since 2003?

A    We certainly have not been keeping our books of account
in accordance with GAAP, ever, not just 2003.

Q    Well, 2003 is when this amendment was made, right?

A    That's when this amendment was done, correct."

MR. ROSENTHAL:  And then turning to Page 136, Line 19.  We can skip this last designation, your Honor.

THE COURT:  Okay.

MR. ROSENTHAL:  Thank you, Mr. Landau.

THE COURT:  Nice job.

MR. LANDAU:  Thank you.

THE COURT:  Thank you.  What do you think, Mr. Toll?

MR. TOLL:  That's okay.

(Laughter.)

THE COURT:  All righty.  Where does that bring us?

MR. ROSENTHAL:  Well, your Honor, we have one more witness, Mr. Hausfeld.

THE COURT:  Okay.  He's going to take a little bit, I take it?

MR. ROSENTHAL:  Yes, frankly I don't know how long he's going to take on direct, but he may take quite a while on cross is my guess, but I don't know what Mr. Keeney's

243

plans are.

THE COURT:  Do you want to do him in the morning?

MR. ROSENTHAL:  That would be -- I think that would be the easiest, your Honor.

Let me ask you:  I know you are out of clock after noon; is that right?

THE COURT:  Yes, I've got to start doing criminal cases probably from 2:00 to 7:00, so if you factor in a lunch break, it makes it essentially after lunch, so from 12:00 on I'm out.  So we'd have three hours tomorrow.

MR. ROSENTHAL:  Three hours.

That's our intentions is to call Mr. Hausfeld in the morning and I don't know what Mr. Keeney's intentions are tomorrow.

MR. KEENEY:  Well, your Honor, we have barely begun our case.  I mean, we've gone two full days.  We still have four witnesses who've been on our witness list, who we do intend to call, and, you know, we're getting squeezed out of time here, your Honor.  They've used two full days, and I realize that we got some of our licks in there, too, but, you know, I don't know that we're in a position where we can break early and let them, you know, use up tomorrow morning, too.  That's going to leave us only Thursday to put on four witnesses, keeping in mind they've already --

THE COURT:  Well, we'll just have to come back

244

another day.

MR. KEENEY:  Well, I don't think so, your Honor.

THE COURT:  No?

MR. KEENEY:  I think what we really have to in fairness is they've taken two fulls days already, and they're now going to try to take the half day tomorrow.  At some point, your Honor, we have to actually get some of our witnesses on.

THE COURT:  What are you suggesting?

MR. KEENEY:  I'm suggesting we go late tonight, I'm suggesting we go early tomorrow.  I think we really have to be in a position that we are putting on some of our witnesses tomorrow morning.

THE COURT:  Well, do you want to say something to your lawyer?

(Discussion held off the record.)

MR. KEENEY:  Oh, and, your Honor, also, if we go late Thursday, and go early Thursday.  In other words, we really have now a scheduling crunch that we think, you know, borders on the unfairness, due to nobody's fault, but --

THE COURT:  No, I understand, but there's only, you know, theoretically we could sit here until midnight, but I don't think that would be a proper use of our time, because, I mean, I actually have to pay attention.

(Laughter.)

And I don't know if I can give you the attention you deserve if we go that late.

MR. KEENEY:  Oh, no, I wasn't suggesting that.

THE COURT:  Plus I have other cases I have to do, you know, after hours, so...

MR. KEENEY:  Yes.

THE COURT:  Do you have a suggestion, Mr. Kittredge?

MR. KITTREDGE:  I just want to point out, your Honor, that what Mr. Rosenthal was trying to tell you on Monday, about splitting the Air Passenger matter different from the capital account.

THE COURT:  Well, I mean, the fact that --

MR. KITTREDGE:  And I believe your Honor that if we can't get it all done, we'll come back.

THE COURT:  The fact that -- I think that's the fact.  I mean, even if sat late tonight and late Thursday, I mean, I can start -- I'm here at 7:15 in the morning, so I can start at 7:30, 8:00 o'clock if that's what you want to do.  I don't know if we can get a court reporter and law clerks and all that.

So, I mean --

MR. KITTREDGE:  Well, your Honor, let me be clear. We are going to put on our Air Passenger case before you.

THE COURT:  I know, but the question is whether -- how much more do you have on the capital account case?

246

MR. KEENEY: Well, your Honor, you haven't really heard our witnesses. We have experts -- we have three witnesses --

THE COURT: Okay.

MR. KEENEY: -- and an expert.

MR. ROSENTHAL: You've got an expert?

MR. KEENEY: Yes, we've got an expert. You got an expert report from him.

MR. ROSENTHAL: Yes, but his expert report was to rebut the other expert who we're not calling.

MR. KEENEY: Yes, but, you know, that was because you decided not to call your expert.

MR. ROSENTHAL: The expert report specifically says that your expert was designated to rebut Mr. Stevens --

MR. KEENEY: Right.

MR. ROSENTHAL: -- because his report was produced a while ago.

MR. KEENEY: Right.

MR. ROSENTHAL: Our expert produced his report on July 6th. You produced your expert report at 4:43 last Friday.

MR. KEENEY: You gave -- excuse me, your Honor.

THE COURT: All right. Well, maybe you guys can work this out. We're now on the record. I don't know if you want this on the record, because you can talk about this

247

privately.

All right.

MR. ROSENTHAL:  We're going to try to work it out privately.

THE COURT:  Here's what we're going to do.

MR. KEENEY:  We submitted our expert on July 27th --

THE COURT:  Here's what we're going to do.

MR. KEENEY:  -- your Honor.

THE COURT:  We'll sit from -- do you want to start tomorrow at 8:30?

MR. KEENEY:  Yes, your Honor.

THE COURT:  Can you guys start at 8:30?

MR. ROSENTHAL:  We can start at 8:30, your Honor.

THE COURT:  Patrick?

MR. KITTREDGE:  Your Honor?

THE COURT:  Yes?

MR. KITTREDGE:  That's a yes, your Honor.

THE COURT:  All right.  We'll start tomorrow at 8:30.  We'll still until 12:00 or 12:30, somewhere in that range.  Whatever we can get done.  We'll start Thursday -- can you be here at 8:30 -- can we get a court reporter at 8:30?

THE COURT REPORTER:  I'm not sure.

THE COURT:  We're not sure if we can get a court reporter.

248

MR. ROSENTHAL:  And, your Honor, because of the passenger schedule, I mean, we do have witnesses that are coming in that we need to put those witnesses as well, and --

COUNSEL:  And our expert's only available tomorrow. He's out on Thursday.

THE COURT:  Well, let's talk about practicalities. How many more witnesses do you have?

MR. ROSENTHAL:  Mr. Hausfeld.  Oh, in the Passenger case?

THE COURT:  Yes.

MR. ROSENTHAL:  Three.

THE COURT:  All right.  How many witnesses do you have -- let's put Air Passenger aside for a minute -- how many more witnesses on the capital account case do we have collectively?

MR. ROSENTHAL:  Mr. Hausfeld's one on our side.

THE COURT:  There's one.

Do you have any capital account witnesses?

COUNSEL:  Yes.

MR. KEENEY:  Yes, three, four.

THE COURT:  All right.  I mean, it seems like practically speaking, that's all we're going to get done by the end of the day Thursday, no matter what time we start.

Do you see --

MR. KEENEY:  Well, I don't think so, your Honor, and

249

I'm a little concerned that people are going slow, not intentionally. I mean, I understand everybody has to put on their case, but, you know, our only Air Passenger witness is actually here. It's Mr. Toll. He is going to be able to testify on Thursday on capital accounts and Air Passenger, period.

THE COURT: Well, I mean, let's just do what we can, and do as much time as we can, and then we might have to find another day to come back and finish it. I don't know what to do. I don't... you guys seemed confident we could do the whole case in three-and-a-half days, but I don't think that's going to happen.

I can't wave a magic wand and put more time in a day.

MR. KEENEY: Understood, your Honor. 8:30 tomorrow in a step in the right direction, and 8:30 Thursday is a step in the right direction, you know, frankly if we could finish up their case today, that would be a step in the right direction.

THE COURT: With Mr. Hausfeld, how long are you going to cross-examine him?

MR. KEENEY: Probably 45 minutes, your Honor.

THE COURT: And you're going to have at least that?

MR. ROSENTHAL: Honestly, your Honor, I'm not sure. I mean, I'm thinking a half an hour. But --

250

THE COURT:  We can start at 8:30 then we'll be done by 10:00 --

MR. KITTREDGE:  There you go.

THE COURT:  -- tomorrow.  I mean, I don't think it's in anyone's best interest, the witnesses, the lawyers, or mine to sit here until 7:00 o'clock at night.  I know some judges do that, but, I mean, I'm trying to pay attention here, and give you what you want, and I don't know if I'll be sharp at 7:30 tonight as I will be tomorrow morning.

MR. KEENEY:  I hear you, your Honor.

THE COURT:  That's the only thing I have.

MR. KEENEY:  I hear your Honor, and I'm just mentioning that you have to hear our witnesses, too.

THE COURT:  Oh, yes.  Well, I have a totally open mind.  I haven't -- that's not the question.  Of course I'm going to hear your witnesses.  I was just trying to figure out if there's a dividing line among the witnesses where we could close out one portion of the case and maybe we can have argument on that, and I can give you some idea of which way I'm headed before we get into Air Passenger.  I don't know if that would help.

MR. ROSENTHAL:  And, your Honor, one other -- well, I think we should just take it as it comes.  I mean, with respect to closing arguments, yes, ideally we'd like to have closings on everything and wrap it up by the end of close of

251

business Thursday, but it --

THE COURT:  It doesn't look like that's going to happen.

MR. ROSENTHAL:  I'm just saying if that doesn't happen, it seems to me that a premium should be placed on getting all the witnesses in and out, so we can get them --

THE COURT:  Sure.

MR. ROSENTHAL:  -- so we can get them on their way.

THE COURT:  Sure.

MR. KEENEY:  The second premium, your Honor, is we have an emergency motion on Air Passenger that has to be heard on an emergency basis.  And I know you're trying everything you can to get everybody here on Thursday to do that.  We have our witnesses here who will be able to testify on Thursday, Mr. Toll.

THE COURT:  Well, the emergency, I mean, the money is frozen, right?

COUNSEL:  Yes, your Honor, that's the emergency actually, in the sense that there is payroll at our client's firm that has to be paid.

THE COURT:  Well, let's talk about that for a minute.  Is there some portion of that money, Mr. Rosenthal or Mr. Kittredge -- I don't know who's going to tackle this -- that's kind of no matter what happens and however I rule on that issue, it's definitely going to Cohen Milstein that's

252

not in dispute?  Isn't there like a million bucks or something like that?

MR. ROSENTHAL:  Well, the way it was, there was, I think, approximately $7 million I think --

THE COURT:  That's frozen.

MR. ROSENTHAL:  Yes, that under the order, our position is, is to be split.  We asked that it be frozen because we don't know what the results of the capital account litigation is, and your Honor might find that some of that money ought to go to Mr. Hausfeld and Mr. Lewis, and that that amount of money is to be put aside for Mr. Hausfeld or Mr. Lewis, or it needs to go to the invoices that they've committed to repaying under the settlement agreement, and hasn't been paid yet, the anti-trust cases.

That's where we are.  I think I need to talk to Mr. Hausfeld about what, if any, portion of the 3-1/2 million that is arguably theirs clearly under the settlement agreement, might be able to go that, and I can talk to Mr. Hausfeld about that tonight, and we can try to let your Honor know tomorrow morning whether there might be some resolution, but my client does want to I guess maintain the position that some of that -- at least a portion if not all of that money needs to be held back, pending a decision by your Honor on the capital accounts matter.

MR. KEENEY:  And, your Honor, if I can reply?

253

What's happened to us is the equivalent of a prejudgment attachment. There's been no finding that their fraudulent inducement claim is so probable of success that justifies that extraordinary remedy with respect to what I would call the --

THE COURT: Well, that's kind of what we're doing now. I'm hearing evidence on that, right?

MR. KEENEY: Exactly. And by Thursday, certainly, your Honor is going to have heard a lot more than you've heard so far, but you've heard a lot so far.

And there is no problem in my view -- and I think you clearly have the authority on an emergency basis -- to conclude whether a prejudgment attachment should be dissolved for amounts that you do not think need to be kept in the escrow in order to deal with any ultimate relief. It's not a final judgment, obviously, on the merits of their case.

It's just a determination like you do every day, frankly, and it's a prejudgment attachment, probability of success, irreparable harm, all of those factors, but it's frozen without any of those factors having even been looked at.

In other words, they have gotten the equivalent of a TRO, freezing our assets in your court -- they're in your court -- but it's time to let some of them out of your court and at some point between now and Thursday we are going to be

254

pressing quite strongly that this Court, on an interim basis, has to make an order recognizing that there is no continuing justification in terms of the probability of success and the irreparable harm that requires keeping all of the amounts in controversy.

Know this, your Honor, this is a medium ground position. We're talking about the 3 million that is not in controversy, except for them saying that they were fraudulently induced into the settlement agreement. We think your Honor can make preliminary findings with respect to that, as one does on all emergency injunctions.

THE COURT: And then what happens if they prevail on the fraudulent inducement theory.

MR. KEENEY: They get that from us. They go against us.

THE COURT: And then what happens to everything else in the settlement?

MR. KEENEY: We're back to square one. If they prevail on fraudulent inducement, we are totally back to square one.

MR. ROSENTHAL: Well, that's not entirely true, your Honor. There are, first of all, a couple of things. It's not just a matter of whether we prevail on a fraudulent inducement or material omission theory. It's also whether we prevail on a breach of contract theory. To the extent that

255

you find there's been a breach of the settlement and operating agreements, not on the fraudulent inducement theory, but on the accounting theories, you know, your equitable powers are triggered and you might say, you know, I'm not going to require the capital to be returned to these guys at the end of December and the end of July.  The penalty, the equitable penalty for having breached the contract is an immediate return of capital.

That's one possibility.  I'm not saying your Honor is going to go that way, but that's certainly a possibility, so it's not just limited to -- to where we're going there.

THE COURT:  Okay.

MR. KEENEY:  And, your Honor, just very briefly?

THE COURT:  Sure.

MR. KEENEY:  The fact that a claimant has a possibility of getting relief is insufficient to justify the continuance of what is, in effect, a prejudgment attachment of the full amount of the assets.  We think there's been no finding.  If those monies were put in your court, and we appreciate that --

THE COURT:  Mm-hmm.

MR. KEENEY:  -- as an emergency basis, because I was on vacation, we want to get it before your court so we could freeze the status quo.  The status quo has now been frozen.  Our view is it's time to unfreeze the status quo.

256

THE COURT:  All right.  Well, hopefully we'll get -- why don't you make sure you put enough witnesses on so I can decide that issue at least --

MR. KEENEY:  Yes.

THE COURT:  -- by the end of the day Thursday.

MR. KEENEY:  We will.

THE COURT:  And then, in the meantime, you're going to talk to your client about seeing if there's any of that money that's really definitely theirs, and you can give them something, so they can keep their lights on.  Is that agreeable?

MR. KEENEY:  That's a good way of proceeding, your Honor.

THE COURT:  All right.

MR. ROSENTHAL:  I'll talk to my client tonight, your Honor.

THE COURT:  All right.  So we're starting at 8:30. Enid, do we have a court reporter at 8:30?

(Discussion held off the record.)

THE COURT:  All right.  I'll ask for a court reporter at 8:30.  Why don't you just get in here at 8:30. At the very least, we'll start at 9:00, but let's hope to start at 8:30 if we can get a court reporter.

MR. KITTREDGE:  Is there any way to let us know that we can't have a court reporter at 8:30?

257

(Discussion held off the record.)

THE COURT:  Okay.  8:30 it is.

MR. KEENEY:  Thank you, your Honor.

(Discussion held off the record.)

THE COURT:  Okay.  We're off the record, right?

THE ESR:  Yes, your Honor.

(Court adjourned at 4:46 o'clock p.m.)

                          * * *

258

I N D E X

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Joseph M. Sellers | | | | |
| By Mr. Rosenthal | 3 | | 69 | |
| By Mr. Keeney | | 40 | | |
| Joseph M. Sellers | | | | |
| By Mr. Keeney | 96 | | 131 | |
| By Ms. Upadhyaya | | 114 | | 136 |
| William Joseph Bavis | | | | |
| By Mr. Kittredge | 139 | | 211 | |
| By Mr. Keeney | | 171 | | |
| Robert Eisler | | | | |
| By Mr. Rosenthal | 217 | | | |
| By Mr. Keeney | | 224 | | |

Deposition of Steven Toll - Page 226

- - -

I certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court on September 11, 2009, incorporating redactions of personal identifiers requested by the following attorneys of record: John C. Keeney, Jr., Esquire, Hogan & Hartson, LLP, and Seth A. Rosenthal, Esquire, Venable, LLP, in accordance with Judicial Conference policy.  Redacted characters appear as an X in the transcript.


Geraldine C. Laws, CET                    Dated 12/23/09
Laws Transcription Service