IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| MICHAEL HAUSFELD, et al | : CIVIL ACTION NO. 06-0826 |
| Plaintiffs | : |
| | : |
| v. | : Philadelphia, Pennsylvania |
| | : August 12, 2009 |
| COHEN MILSTEIN SELLERS | : 9:09 o'clock a.m. |
| & TOLL, PLLC | : |
| Defendants | : |

. . . . . . . . . . . . . . . .

SETTLEMENT HEARING
BEFORE THE HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For Plaintiffs:

PATRICK KITTREDGE, ESQUIRE
Thorp Reed & Armstrong
400 Market Street, Suite 200
Philadelphia, PA  19106-2535
        -and-
MICHAEL D. HAUSFELD, ESQUIRE
RICHARD S. LEWIS, ESQUIRE
Hausfeld LLP
1700 K Street, NW
Suite 650
Washington, DC  20006
        -and-
SETH ROSENTHAL, ESQUIRE
MOXILA UPADHYAYA, ESQUIRE
Venable LLP
575 75th Street, NW
Washington, DC  20004
-- for Plaintiffs Michael Hausfeld
   and Richard Lewis

- - -

APPEARANCES:   (Continued)

For the Defendants:

       STEVEN J. TOLL, ESQUIRE
       DANIEL A. SMALL, ESQUIRE
       Cohen Milstein Sellers &
       Toll PLLC
       1100 New York Avenue, NW
       Suite 500 West Tower
       Washington, DC  2005
           -and-
       JACK KEENEY, ESQUIRE
       LYNNE BAUM, ESQUIRE
       Hogan & Hartson LLP
       555 Thirteenth Street, NW
       Washington, DC  20004
      -- for Cohen Millstein Sellers
        & Toll, PLLC

                - - -

Audio Operator:        Inna Goldshteyn

Transcribed by:        Grace Williams, CET
                       Tracey Williams, CET
                       Paula L. Curran, CET

     (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcribers.)

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

3

(The following occurred in open court at 8:32 o'clock a.m.:)

THE COURT:  Good morning, everyone.

COUNSEL:  Good morning, your Honor.

THE COURT:  Please be seated.  I'm sure you've noticed by now Inna's not with us today, we have Dennis so welcome him.

All right, who's up to bat now?

MR. ROSENTHAL:  We have Mr. Hausfeld up first but we wanted to address the issues your Honor raised at the end of the day yesterday.

THE COURT:  Okay.

MR. ROSENTHAL:  The money that's currently being held in the Court's registry.

THE COURT:  All right.

MR. ROSENTHAL:  Conferred with my clients last night and they would agree, reserving all rights, to the money that's in the registry to release $1.3 million to Cohen Milstein Sellers and Toll with the idea that $1.3 million would also be released to Hausfeld LLP.

With respect to the $1.3 million dollars released Cohen Milstein Sellers and Toll, as we've advised the Court and I've advised Mr. Keeney on a number of occasions, there are a  number of outstanding invoices dating way, way back, in antitrust cases or a case that Mr. Lewis handled that are

4

owed.

And we would ask that -- that those amounts be taken out of the $1.3 million from Cohen Milstein Sellers and Toll and wired or paid directly to those vendors. And it's approximately $296,000 in outstanding invoices that are a year, year and a half old. There's about $253,500 payable, remaining payable to expert witnesses in the Vitamin C litigation.

There are approximately $36,000 in costs to the Court in what was known as the Milwaukee Lead case that was tried in 2008, I guess last year, summer of last year, and there's about $5,500 in process servicing -- process service invoices in another large antitrust case that my clients are handling, was formerly handled when they were at the firm.

So that's what my clients would agree to.

THE COURT: Have you talked to Mr. Keeney about that?

MR. ROSENTHAL: I have not talked to Mr. Keeney about that yet.

THE COURT: All right, well, why don't we do this: why don't you talk to your client at the break and let us know what your position is on that.

MR. KEENEY: Your Honor, that is totally unacceptable, so I'll give you a heads up.

THE COURT: Okay. All right.

5

MR. KEENEY:  That just doesn't work, period.

THE COURT:  Okay.  Let's have Mr. Hausfeld testify then.  Good morning, sir.

MICHAEL HAUSFELD, Plaintiff's Witness, Sworn.

THE COURT CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Michael Hausfeld, H-a-u-s-f-e-l-d.

THE COURT CLERK:  Thank you.

THE COURT:  All right, Mr. Rosenthal, you can proceed.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Good morning, Mr. Hausfeld.

A   Good morning.

Q   Where do you live?

A   In Virginia.

Q   Where do you work right now?

A   In Washington, DC.

Q   How are you employed?

A   I am the chairperson of Hausfeld LLP.

Q   How long has that been the case?

A   Since November 2008.

Q   Where were you before November of 2008?

A   I was chairman of Cohen Milstein Hausfeld and Toll.

Q   How long had you been chairman of Cohen Milstein Hausfeld

Hausfeld - Direct                                   6

and Toll before you left for Hausfeld LLP?

A    From 1986 to November 2008.

Q    Did you hold managerial positions at Cohen Milstein
Hausfeld and Toll during your entire tenure there?

A    Yes.

Q    What position, in what position or positions did you
hold?

A    In addition to chairman I was head of the antitrust
practice group.  Until Mr. Joe Sellers came on I was head of
the firm's civil rights practice.  I developed and was head
of the international human rights practice as well as the
firm's environmental and mass torts practice.

Q    Prior to joining Cohen Milstein Hausfeld and Toll or
forming Cohen Milstein Hausfeld and Toll in 1986 where were
you?

A    We started in approximately 1970 or '71, I believe, as
part of Dilworth Paxson.  Then that broke off, became the Law
Offices of Harold E. Cohen, then it became Cohen Savett
Marion and Graf and then I think we had two names, one for
the Philadelphia office and one for the Washington office.
The Philadelphia office was still Cohen Savett Marion and
Graf and the Washington Office was Cohen Cohen and Milstein.

Q    And what has your practice consisted of over the years,
generally speaking?

A    Antitrust, civil rights, international human rights,

Hausfeld - Direct 7

environmental, mass tort and every once in a while a rare securities case.

Q All on plaintiff's side?

A Yes.

Q Mr. Hausfeld, I want to turn your attention to January 3rd-- to January 23rd, 2009. Were you in this courthouse that day?

A Yes.

Q What were you doing here?

A We were here at the request of a Federal Judge to try to mediate a fee dispute in the OSB matter which was an antitrust case pending in this court.

Q Did you in fact enter mediation over the OSB matter that day?

A Yes.

Q Did the mediation over the OSB matter lead to try and resolve other disputes that you were having at the time?

A Yes.

Q Which disputes were those?

A There were disputes generally as to the split of the firm and the separation of myself and a number of others that came with me, some also terminated along with me.

Q That's the Hausfeld LLP?

A Yes.

Q Continue.

Hausfeld - Direct                              8

A    And there were outstanding cases in which I had the clients and we were moving for leadership positions.  And there were issues in all of those cases plus all of the cases that we weren't involved in as to how they would be allocated between the two different interests.

Q    Who was there with you on your side of the table for that mediation?

A    Oh, I believe it was Bob Eisler, Pat --

Q    Pat Kittredge?

A    Pat Kittredge and Rachael Rosenberg and maybe Bill Butterfield.

Q    Was Mr. Butterfield involved in actually litigating the OSB case?

A    Yes.

Q    How long did those negotiations last during the course of that day, January 23rd?

A    Many hours.

Q    When did you begin approximately, do you recall?

A    No.

Q    When did you break?

A    Late in the evening.

Q    Who did those negotiations take place with the assistance of?

A    Judge Rice.

Q    During the course of those negotiations did the subject

Hausfeld - Direct                                    9

of your capital account at Cohen Milstein come up?

A    Yes.

Q    What do you recall about how it came up, about the discussions (inaudible).

A    At first the Judge asked if we were here only to resolve the OSB fee allocation and whether we had any interest in resolving the greater differences.  We responded as to the greater differences and then the Judge asked what those were. We went through a listing of all the cases that we were handling, the other cases that we weren't handling and specifically mentioned the capital accounts and the termination provisions, if there's going to be a global resolution.

Q    That was at the beginning of the session, is that right?

A    Yes.

Q    Was that with everybody in the room or were you with Judge Rice alone?

A    I believe that was in the beginning with everyone so that everyone understood what the plate was.

Q    Did you say anything with respect to your capital account and the amount which you expected returned at that point in negotiation?

A    I don't believe so.

Q    At any point during the negotiation sessions on January 23rd did Judge Rice bring the parties back together where the

Hausfeld - Direct                          10

subject of the capital accounts was discussed?

A    Yes.

Q    How many times to the best of your recollection?

A    I think twice.

Q    What do you remember being discussed about the return of your capital and Mr. Lewis' capital during those additional joint sessions of the negotiation?

A    The Judge requested to know what was involved with the capital account and I told him at least for me it was $5 million, a million dollars a year for over five years.

Q    Did you indicate to the other side how quickly you would hope that would be paid out as part of a negotiated resolution?

A    My initial position was that I was requesting the money be paid immediately along with the termination allowance.

Q    The termination allowance was in the amount of what?

A    $500,000 also payable in installments, I believe.

Q    And do you recall whether it was during the first subsequent or second subsequent joint session of the negotiations where you advised Judge Rice as well as the other side what you hoped to get in terms of the capital account as a result of the negotiations?

A    I believe it was at the second session.  And, again, we had made substantial progress with regard to resolving other differences.  The capital account was one of the last issues.

Hausfeld - Direct                          11

The Court said that immediate payment was not acceptable to CMST.  He asked if I would accept an accelerated payment, you know, of the amount.  We discussed a year and a half.  And I asked if that amount then could be collateralized or a letter of credit and interest earned on it.  I believe the Judge said something like: get real, you know, we want to get this done.

He went back to CMST and reconvened everyone.  We talked about all of the terms that were resolved, including the capital account and the capital account at that time the judge said a year and a half.  I recall saying "Okay, that's June 1?"  He said "No, June 30."

I believe there was resistance and the date proposed was July 31st.

Q    This is for the second installment?

A    Yes.  I was hesitating.  The Judge looked at me and said "Let's get this done" and so I agreed to a year and eight months.

Q    At any point during any of these joint sessions did anyone from the other side indicate what the amount was, in your view?

A    No.  We kept repeating where appropriate that it was five million dollars over five years which was being reduced to a year now and eight months.

Q    At any point did anyone from the other side indicate that

Hausfeld - Direct                                    12

the amount of capital to be returned to you would be less

than five million dollars?

A    No.

Q    At any point during any of the joint sessions did you ask

to see the calculations or ask them to produce, the other

side to produce the calculations regarding the capital

account balance?

A    I asked to see the balance, yes.

Q    What happened as a result of that request?

A    The Judge asked Mr. Keeney and Mr. Toll to produce the

balance.

Q    Did Mr. Keeney or Mr. Toll respond?

A    They said yes.

Q    Is there anything else that you recall about that first

mediation session, January 23rd, 2009, in connection with the

capital account balance?

A    Not that I can recall.

Q    Turn your attention now to February 2nd, 2009.  Were you

in this courthouse again?

A    Yes.

Q    For what purpose?

A    There were -- there had arisen several differences

concerning two major aspects of what was believed to be the

agreement reached in January and we were here to see if those

differences could be resolved before we finalized any

Hausfeld - Direct                                          13

agreement.

Q   Let me go back to the first session again, January 23rd. What was resolved with respect to yours and Mr. Lewis' termination allowances, $500,000 termination allowances that you mentioned before?

A   The Judge requested we forego of in lieu of receiving our full capital accounts in a year and eight months now as opposed to spread out annually over five years.

Q   And did you and Mr. Lewis agree to that?

A   I called Mr. Lewis from the courthouse and explained it to him because he was very focused on that termination payment and I told him that this was a compromise I thought made sense.

Q   Did you agree to the compromise?

A   Yes.

Q   Going back to the February 2nd session was the capital account really a subject of continuing dispute as of February 2nd?

A   No.

Q   At any point during the negotiation on February 2nd did you request to see the capital account balances to be prepared or perhaps they were prepared -- let me withdraw that.  I'm going to rephrase the question.  At any point between January 23rd and February 2nd did you receive the capital account balances from Cohen Milstein?

Hausfeld - Direct                                    14

A    No.

Q    And on February 2nd did you request to see those capital account balance calculations again?

A    I requested to see the statement of the capital account, yes.

Q    What was the result of your request?

A    The Judge again requested, ordered that Mr. Keeney and Mr. Toll produce the numbers.  Mr. Keeney said "No problem."

Q    Anything else that you recall regarding discussion of the capital accounts during that mediation session?

A    No.

Q    If you would, open up to Exhibit 19, please, Exhibit 19, Mr. Hausfeld?

        (Pause.)

Q    And this is an e-mail from me to Mr. Keeney on Tuesday, February 3rd at 5:04 p.m., do you see that?

A    Yes.

Q    Okay.  And turning your attention to the bottom of the page can you read that second to last paragraph into the record where it says "One final thing"?

A    "One final thing.  As per yesterday's agreement please advise me as soon as possible and hopefully when you get back to me on the attached mockup exactly how much is in the capital accounts of Michael Hausfeld and Richard Lewis."

Q    And then, if you would, turn to the next exhibit page,

Hausfeld - Direct                    15

Exhibit 20.  And backing up to Exhibit 19, that request that I made of Mr. Keeney, did that come at your direction?

A    Yes.

Q    Going to Exhibit 20, this is an e-mail from me to Ms. Baum, Mr. Keeney and Mr. Kaufman on Thursday, February 5th, 2009, 3:20 p.m.  The second paragraph of the e-mail, well, actually read the first paragraph of the e-mail and the second paragraph, please.

A    "This final clean version looks fine.  I'm attaching my clients' signature pages.  Please put all of the signature pages together with this final version, PDF the whole package and send it to me.  We are still awaiting information on the exact amounts in the capital accounts of Richard Lewis and Michael Hausfeld.  Please provide that information promptly."

Q    Was this e-mail provided to you?  I should say this -- was this e-mail forwarded to you?

A    Yes.

Q    Okay.  And this is the e-mail that contains the, all the signatures to the finally executed settlement agreement that was hammered out in front of Judge Rice?

A    I believe so.

Q    And the second paragraph where I request the exact amounts in your capital accounts, did that -- was that request at your direction?

A    Yes.

Hausfeld - Direct                          16

Q   Did you make similar requests of me to ask Mr. Keeney for the amounts in the capital accounts after execution of the settlement agreement?

A   Yes.

Q   We won't go through those exhibits.  Why, Mr. Hausfeld, did you sign the settlement agreement before actually getting the calculations?

A   We were in a process under the auspices of the United States Federal Magistrate.  The Court had made it clear to everyone that there was going to be full transparency and openness with regard to that process.  We had drilled through a number of items with respect to resolution of allocations of moneys in different cases with degrees of definiteness which left everyone comfortable that they each understood what numbers were involved.  And the Court carefully requested each party at each stage and at the conclusion to say are you comfortable with this, are we all done?  You know, has everything been disclosed.

There was as well the nature of my knowledge of what was in the capital account as of the end of the fiscal -- end of the year 2007.  There were representations as to what was in the capital account made through agents of CMST during the year as late as September that indicated that the capital account balance for both me and Mr. Lewis was as it was stated at the end of 2007.

Hausfeld - Direct                          17

There was the fact that despite the financial situation of the firm it was fairly clear on a conservative cautious basis there would be sufficient moneys coming in to retire the line of credit to the bank and that at the time in January when we met it was clear that that had occurred, that moneys had come in and after my expulsion from the firm that paid down that line of credit.

There were meetings with the bank before I was -- before the notice compelling me to withdraw where equity partners of the firm, Ms. Mazzetti, Mr. Kaufman, Mr. Sellers and there may have been one other other, expressly represented to the bank days before my separation that there was no problem, that the firm almost guaranteed that there would be sufficient funds coming in from cases which had already been worked on and for which there were awards made by courts, it was just a matter of timing, before the end of the year that would retire the line of credit that year.

And there were the representations made during the process on both occasions that the only issue with regard to the capital account balances were that they would be accelerated from a payment of five years to a year and eight months and no indication to the contrary.

Q    When you referenced the bank, which bank are you referring to?

A    Sun Trust.

Hausfeld - Direct                                18

Q    Is that the bank with which Cohen Milstein Hausfeld and Toll had a line of credit?

A    Yes.  That's the only bank with which the firm had a line of credit.

Q    Okay.  And with respect to the OSB matter was that a subject of negotiation that took place?

A    Yes.

Q    And initially what was your side's position about the fees that the Hausfeld group ought to receive from the OSB case?

A    The OSB matter was one in which we had initially taken the position that we would want a 50-50 split of fees and then a separate arrangement with regard to expenses.

Q    Was this a case that you originated?

A    Yes.

Q    And what ultimately happened as part of the global resolution to the OSB case, what did the parties agree to do?

A    It was originally agreed that the, if I recall correctly, that OSB would be split 50-50 with a separate agreement with regard to expenses.  But at the end of the negotiations in the latter part of the evening it was requested by CMST that they get all of the OSB fees but we could still retain our portion of the expenses.

        The Court asked me if we would agree to that, I called Mr. Lewis, I believe, and we agreed to relinquish our

Hausfeld - Direct                19

interest in what was previously agreed to.

Q   I'll ask you to turn to Exhibit 41, Mr. Hausfeld.

A   Yes.

Q   Are you familiar with this document and its attachments?

A   Yes.

Q   What is it?

A   It is a letter from Mr. Steven Kaufman who I believe is at Hogan and Hartson to you containing the capital account information that had been requested for -- well, since January 23rd.

Q   And I'll ask you to turn to the third page in that exhibit, CMST-00034.

A   Yes.

Q   And is this the capital account balance calculation performed by CMST for your capital account?

A   Yes.

Q   And it indicates here that they are claiming that your capital account as of the effective date of your termination, October 31st, 2008, is $3,061,865.88, is that right?

A   Yes.

Q   Okay.  And that is down from the beginning balance as of December 31, 2007 of $4,994,901.30, is that correct?

A   Yes.

Q   What did you do after you received this document and looked at it?

Hausfeld - Direct                                        20

A    I called you or Stef Tucker.

Q    Why is that?

A    I was both outraged and disappointed at the information conveyed by Mr. Kaufman.

Q    Why is that?

A    It was totally inconsistent with everything I thought we had negotiated and compromised during the mediation.  It was a fiction.  The firm had no loss.  The day I was expelled Mr. Toll wrote to Sun Trust in an effort to convey to Sun Trust that the firm would be in a position to make all the payments to reduce, to retire the line by the end of the year.  We had always looked at capital account balances in terms of what the partners were entitled to at the end of the year.  And the capital account was my equity that I put into this firm since I joined it in 1970, almost 40 years, and I felt I was being cheated.

Q    Would you have agreed to sign the confidential agreement that Judge Rice helped hammer out in its present form had you know that your capital account was going to be calculated like this?

A    No.

Q    I want to turn to another subject now, Mr. Hausfeld.  I want to turn your attention now to 2002.  Do you remember Ann Yahaer?

A    Yes.

Hausfeld - Direct                                    21

Q   Did Ann Yahaer leave the firm in 2002?

A   Yes.

Q   Do you remember Gary Mason?

A   Yes.

Q   Did Gary Mason also leave the firm in 2002?

A   Yes.

Q   Shortly before Ann Yahaer?

A   I don't recall.

Q   Under the operating agreement in existence in 2002, the 1996 operating agreement, did Ann Yahaer get not only her capital account back, back with a termination allowance?

A   Yes.

Q   And Gary Mason?

A   Yes.

Q   Did that lead you to have any discussions with Mr. Toll about the termination allowance provisions in the old operating agreement?

A   Yes.

Q   Can you describe what took place during those discussions?

A   I was concerned if we were in a situation again where tow or more partners withdrew that the firm could be in a difficult economic situation of having to pay termination payments in the order of magnitude then reflected in the operating agreement.  We also discussed how we were operating

Hausfeld - Direct                22

our firm as compared to other plaintiffs contingency firms operated theirs.  We wanted to maintain an attractiveness financially to our partners and other firms' partners had interests in both accounts receivable as well as work in progress.  So we wanted to readjust the balance so the firm would not be presented with a financial condition that could impact it adversely but at the same time be fair to partners that withdrew.

Q    Did you discuss how that might be accomplished?

A    Yes.

Q    Describe what you discussed.

A    It was a package and the package was the capital account, the termination payment and then how to encompass that within the parameters of concerns about work in progress and accounts receivable.  And it was a matter of adjusting the provisions so that the termination allowance would be lower, there would be no access by a withdrawing, retiring partner to work in progress but they would get an interest in the accounts receivable, meaning work that they had done while at the firm which was completed before the time of withdrawal.

Q    Did the two of you agree that that's something that the firm should try and get done?

A    Yes.

Q    What happened as a result of yours and Mr. Toll's discussion about this issue?

Hausfeld - Direct                    23

A    Mr. Toll went to the firm's corporate or business counsel, a draft agreement was prepared.  I reviewed it.

Q    When you say draft agreement what do you mean?

A    A draft of an amended operating agreement for the firm. I reviewed it with Mr. Toll, we made possibly some corrections or revisions and then it was presented to the partnership for signature.

Q    Did you have an understanding about how exactly your idea, yours and Mr. Toll's idea of reducing the termination allowance but making sure that departing partners still had an interest in accounts receivable was accomplished in the operating agreement?

A    The termination provisions were modified and there was a provision put in regarding the accounting with respect to the books and records of the firm.

Q    At that time did you have an understanding of what generally accepted accounting principles were?

A    Only vaguely.

Q    What do you mean by only vaguely?

A    That they were just generally accepted accounting principles.  I didn't know their application nor how they would be carried out.

Q    Did you  have any idea at the time whether they differed or were the same as cash method or tax method accounting?

A    No.  I only knew that by doing that, that's what we were

Hausfeld - Direct                        24

told would implement what it is that Steven and I wished to do in terms of changing the partnership agreement for withdrawing partners.

Q   In the prior operating agreement, the 1996 operating agreement, had the partners agreed in writing to an accounting method to be used in the books and records of the firm?

A   I don't believe so.

Q   At the time -- and this, the operating agreement, let's turn to it, Exhibit 6 -- I'm sorry -- Exhibit 2, Plaintiff's Exhibit 2.  And this is the new operating agreement that came into effect after yours and Mr. Toll's discussion?

        (Pause.)

A   Yes.

Q   Okay.  It's fair to say that this operating agreement contains a number of changes from the old operating agreement, right?

A   Yes.

Q   Okay.  And if you look at the third "whereas" clause it says that the new operating agreement is incorporating seven amendments to the old operating agreement, right?

A   Yes.

Q   And there were other changes that were adopted as well?

A   Yes.

Q   All the partners, equity partners at the time signed this

Hausfeld - Direct                                   25

agreement on Page 13, is that right?

A   Yes.

Q   Okay.  At any point during the firm's or the partnership's discussions about adopting this new operating agreement did all the partners have a discussion about wanting to use the income tax basis method of accounting for the purpose of keeping the books and records?

A   No.

Q   Was there any discussion among the full partnership regarding the method of accounting for the firm's books and records?

A   No.

Q   Did you and Mr. Toll have a discussion specifically about method of accounting for the firm's books and records?

A   No, other than what was contained, you know, in the agreement as proposed to be amended.

Q   Did you have a discussion even about that?

A   Other than a provision was in the agreement that would cover the situation that we were trying to address.

Q   In your history with the firm has it been the firm's practice to amend partnership agreements in writing by vote of the partnership?

A   That's the only way.

Q   Has there ever been another way?

A   No.

Hausfeld - Direct                                    26

Q    I ask you to take a look at Page 13 of the operating agreement, Plaintiff's Exhibit 2.

A    Yes.

Q    Please read paragraph -- Paragraph G at the top of the page.

Q    "This agreement may be amended only with the written consent of members owning at least two-thirds of all percentage interest."

Q    Turn your attention to one last topic, Mr. Hausfeld. Prior to your compelled withdrawal from the firm had anybody else been voluntarily terminated?

A    No.

Q    Prior to --

A    Not -- not equity partners.

Q    Equity partners, okay.  Prior to your termination from the firm had any equity partners had their percentage interests cut in half in order to expel them from the firm?

A    No.

Q    Had any equity partner been made to leave the firm effective immediately?

A    No.

Q    Did any -- was any equity partner left without the choice of when to leave the firm?

A    No.

Q    We talked about Ann Yahaer before.  Did Ann Yahaer leave

Hausfeld - Direct                                    27

the firm at a point during the year prior to the compensation committee meeting during that year?

A    Yes.

Q    She left in September of 2002, correct?

A    Yes.

Q    Gary Mason, did he leave the firm at a point in time prior to the compensation committee meeting during the year of his departure?

A    Yes.

Q    Remember Paul -- Paul Gallagher?

A    Yes.

Q    He was an equity partner, too, is that right?

A    Yes.

Q    He left the beginning of 2007?

A    I believe so, yes.

Q    Did he leave at a point during the year prior to the compensation committee making its determinations for that year?

A    Yes.

Q    Do you remember Linda Nussbaum?

A    Yes.

Q    Was she also an equity partner?

A    Yes.

Q    Did she also leave during the beginning of 2007, around the same time as Mr. Gallagher?

Hausfeld - Direct                28

A    I believe so, yes.

Q    Did she also leave at a point during the year prior to the compensation committee meeting for that year?

A    Yes.

Q    Did you leave or were you expelled from the firm prior to the compensation committee meeting in 2008?

A    No.

Q    Were you expelled after the compensation committee met and made its determinations for 2008?

A    By reason of, yes.

Q    Mr. Lewis, was he expelled or did he leave the firm before or after the compensation committee met in 2008?

A    By reason of and after.

Q    I'm sorry, would you say again?

A    By reason of and after.

        MR. ROSENTHAL:  I have no further questions, your Honor, thank you.

        THE COURT:  Thank you.  You were three minutes ahead of your predicted time, how's that?

        MR. ROSENTHAL:  That's good.

        THE COURT:  Let's see if Mr. Keeney can live up to that.

        MR. KEENEY:  Yes, I predicted 45 minutes, your Honor, I think I can do that.

                    CROSS-EXAMINATION

Hausfeld - Cross                                                29

BY MR. KEENEY:

Q    Good morning, Mr. Hausfeld.

A    Good morning.

Q    I want to direct your attention to a particular day, October 31, 2008.  Do you agree with me that your capital account balance to be returned is to be calculated as of October 31, 2008?

A    Under the agreement, yes, if I were lawfully terminated.

Q    And irrespective of whether you were lawfully or unlawfully terminated, under the agreement that's what the date is, October 31, right?

A    I don't think the agreement specifies a date but that is the date that would be discernable or discerned from operation of the language or provisions of the agreement, yes.

Q    Right.  And the reason it's discerned from the language of the agreement is it's the last day of the last full month before the month of your termination, right?

A    Yes.

Q    And the calculation made as of October 31, 2008, is a different date than the calculation made on December 31, 2007, right?

A    I don't understand about the calculation.  October 31 is not December 31.

Q    Okay.  Let me rephrase the question.  If you're entitled

Hausfeld - Cross                                  30

to a calculation as of October 31, 2008, that date has to be
used, not the date of December 31, 2007, right?

A   No.

Q   Why did you say no?

A   Because the capital account balances were always
explained to the partners as being reflective of the
operation of the firm year end or for the full year.  And
it's clear at any point in time like a market it may
fluctuate, that the firm's finances may fluctuate, but that
doesn't give a picture of the firm's performance.  So even on
a particular date and time you may get one pixel but that
pixel doesn't tell you what the picture is.  And the picture
even on October 31st was that the firm was going to retire
its line of credit and at least come out in a neutral
position.

Q   And directing your attention to October 31, 2008, do you
calculate it as of that date or do you calculate it as of a
date in December?

A   I don't know how to further answer your question other
than I did without repeating myself.  I'm sorry.

Q   Okay.  Let me ask you this: is it your testimony that we
should wait until December 31st, 2008, and then calculate
your capital that's due as of October 31, 2008?

A   I'm saying that as of October 31st it was clear that the
firm would have sufficient revenue that had already been

Hausfeld - Cross                                                31

generated to basically put the firm in a neutral position, one in which it would totally retire the line of credit and emerge the firm as of December 31 without debt.

Q   Mr. Hausfeld, with all due respect that wasn't my question.  My question is are you contending that your calculation should have been done as of December 31, 2008?

A   Effectively I think it should have included the state of the firm as of October 31.

Q   And therefore the answer to my question was yes, is that correct?

A   My difficulty is with your term "calculation."  I was looking at what was the balance.

Q   And, Mr. Hausfeld, I'm looking at the date.  All I'm trying to do is just establish an agreement on a simple question.  The calculation is done as of October 31, 2008, right?

A   Yes.

Q   Is not done as of December 31, 2008, is it?

A   I don't discern a difference in reality if what you're trying to do is measure --

Q   No, I have a simple question.  I don't mean to interrupt the witness but it's a simple question, is it supposed to be calculated as of December 31st, 2008?

A   On technical terms, no.

Q   Okay.  And is it supposed to be calculated as of December

Hausfeld - Cross                                32

31, 2007?

A    In terms of the calculation, no.  In terms of the balance, there should have been no change.

Q    If the firm had losses between December 31 of 2007 and October 31st, 2008, would the capital balances have been affected?

A    It would depend upon what the losses were and whether they would be recovered by the end of the year.

Q    You mentioned that Sun Trust had been paid off by the end of the year, do you recall that testimony?

A    I said, I think, that the line of credit had been retired.

Q    And do you also recall your testimony that Sun Trust was the only bank for Cohen Milstein?

A    It was the only one in that extended a line of credit.

Q    Are you aware of the Eagle line of credit extended after your departure from the firm on November 6th, 2008?

A    No.

Q    And you don't have any knowledge about the XXXXXXXXXXXX dollars extended by Eagle to retire the debt to Sun Trust?

A    Since I wasn't there, no, if that happened.

Q    Now if you could please turn in the exhibit binder and if you could use ours, Defendant's Exhibit 2, that's the smaller binder.

          (Pause.)

Hausfeld - Cross                    33

Q   And do you have that document in front of you?

A   Is that the confidential agreement?

Q   Yes, it is.

A   Yes.

Q   And could you please turn to the signature page of that document?

A   There is no one signature page, sir.

Q   Okay.  Could you please turn to the signature page which has your signature?

A   Yes.

Q   And I would direct your attention to CMST-00015.

A   Yes.

Q   And is that your signature at the top of the page?

A   Twice, yes.

Q   Yes.  And it bears a date?

A   Yes.

Q   And the date is what?

A   February 5th.

Q   And the reason you signed it twice is you signed both for yourself personally and for Hausfeld LLP, is that correct?

A   Yes.

Q   I'd like to direct your attention to Paragraph 14 of the agreement.  Can you read it to yourself first?

        (Pause.)

A   Yes.

Hausfeld - Cross                          34

Q   Okay.  Direct your attention to the first line of Paragraph 14.  You agree with me that the return of capital owed to Michael Hausfeld as of November 6th, 2008, was to be accelerated, right?

A   Yes.

Q   And you agree with me that how you figure out what amount is owed as of November 6th, 2008, is you look at the amended and restated operating agreement of Cohen Milstein, right?

A   Yes.

Q   And in that first sentence there's an agreement that that amount will be returned on an accelerated basis, right?

A   Yes.

Q   Is the amount specified?

A   No.

Q   Is there any reference there to the return of capital owed as of December 31, 2007?

A   No.

Q   Is there any reference there to the return of capital owed as of December 31, 2008?

A   No.

Q   Directing your attention to the second sentence.  You agree with me that the very first 50 percent installation or installment you will get of your capital is first due on December 31, 2009, right?

A   Yes.

Q    So it isn't even due yet, right?

A    It's not December 31, 2009 yet.

Q    Okay.  Great.  Directing your attention to the last two sentences of Paragraph 14, you agree that no partner, member or shareholder of Hausfeld LLP other than you and Mr. Lewis were entitled to a return of capital from Cohen Milstein, right?

A    Based on what I'd been represented as of that time, yes.

Q    And indeed the last sentence of Paragraph 14 makes it clear that Robert Eisler and Michael Lehmann have no capital to be paid to them, right?

A    Based on what was represented, yes.

Q    And based on the agreement that is what you agreed to, right?

A    No.

Q    You signed this agreement.

A    You said based on the agreement.  I couldn't agree that Robert Eisler and Michael Lehmann have no capital to be paid to them as of February 5th when we hadn't received the balance calculated pursuant to the amended operating agreement.  That was done on the representation at that time that they had no capital account balance.

Q    You signed the agreement, Mr. Hausfeld, right?

A    Yes.

Q    And Mr. Eisler signed the agreement, right?

Hausfeld - Cross                    36

A    Yes.

Q    And Mr. Lehmann signed the agreement, right?

A    Yes.

Q    And Hausfeld LLP signed the agreement?

A    Yes.

Q    Through you, right?

A    Yes.

Q    And Mr. Lewis signed the agreement?

A    Yes.

Q    And part of the agreement is that Eisler and Lehmann have no capital to be paid to them, right?

A    That's what it says based on the representations made at the time.

Q    And that's also just what it says, period, right?

A    Yes.

Q    Okay.  You understand that the reason that Mr. Eisler and Michael Lehmann weren't getting capital back is that their capital account had declined so it was negative, right?

A    I had no reason to understand that, other than the representations that were made during the mediation session.

Q    But you signed an agreement that said, quote, "No partner, member or shareholder of Hausfeld LLP other than Michael Hausfeld and Richard Lewis, including in particular but not limited to Robert Eisler and Michael Lehmann, has a positive capital account balance at CMHT."  That's what you

Hausfeld - Cross                           37

signed, right?

A    Based on the representations, yes.

Q    And you signed it, period, for whatever reason?

A    No.

Q    Okay.  Is this sentence in the agreement?

A    You asked me if I signed it for any reason and --

Q    I know and I just changed the question.  You said no and I asked you a different question.

A    I signed this agreement and that sentence is in this agreement based on the representations by you and representatives of CMST that as of February 5th no partner, member or shareholder of Hausfeld LLP other than Michael Hausfeld and Richard Lewis, including in particular but not limited to Robert Eisler and Michael Lehmann, has a positive capital account balance at CMHT.

Q    And are you telling us that you didn't check to see that that was correct with Mr. Eisler and Mr. Lehmann?

A    We took your word.  We took your word.

Q    Did you check with Mr. Eisler?

A    Yes.

Q    Did you check with Mr. Lehmann?

A    Yes.

Q    Could we please turn also in Defendant's Exhibit 2 to Paragraph 16?

A    Excuse me.

Hausfeld - Cross                                  38

Q   Could you please turn to Paragraph 16 of Defendant's
Exhibit 2.  It's two paragraphs below Paragraph 14.
A   Yes.
Q   Do you see it?  Could you read that to yourself?
        (Pause.)
A   Yes.
Q   Okay.  And Paragraph 16 is in the nature of a release,
right?
A   Yes.
Q   And it's a mutual release, right?
A   Yes.
Q   And in this release Hausfeld LLP, yourself and other
partners at Hausfeld LLP who were formerly at Cohen Milstein
released, let me move you to Page CMST-0008, Line 4,
discharged each other from any and all claims, complaints and
causes of action arising prior to January 1st, 2009, do you
see that language?
A   Correct.
Q   And that's in the agreement, right?
A   Correct.
Q   And that applies to claims, causes of action whether in
law or in equity, right?
A   That's what the agreement says, yes.
Q   And it applies to any claims prior to January 1st, 2009,
whether under the amended and restated operating agreement or

Hausfeld - Cross                    39

Q   under Federal, State, local or other law, right?

A   Yes.

Q   And moving down it also applies to claims that arose prior to January 1st, 2009, with respect to statutory claim, contract, tort or other basis.

A   Correct.

Q   I'd like to turn your attention to January in Philadelphia in the chambers of the Magistrate Judge Rice, o you recall that meeting?

A   Yes.

Q   I was there, right?

A   Yes.

Q   Mr. Toll was there, right?

A   Yes.

Q   What did you tell --

A   Were there others as well?  I think Mr. Kaufman.

Q   Mr. Hausfeld, if you'd let me ask the questions it goes a little faster.  I'm not trying to hide the information, I'll tell your counsel that.  I just want to make sure you remembered me and Mr. Toll.

A   I remember who was there.

Q   Okay.  You were testifying with respect to -- oh, as of the meeting, January in the Magistrate chambers, you had not received the capital account balance for your account from Cohen Milstein, right?

Hausfeld - Cross                                              40

A    Yes.

Q    And as of that time Mr. Lewis hadn't received the capital account balance?

A    Yes.

Q    And that capital account balance, as you understood it, was due under the operating agreement to be sent to you 30 days after termination, right?

A    Yes.

Q    And that would have been approximately December 6th?

A    Yes.

Q    And Cohen Milstein was late.

A    Yes.

Q    And it was late for you and it was late for Mr. Lewis, too, right?

A    Yes.

Q    And when you came to Philadelphia and met in chambers with Magistrate Judge Rice did you indicate to him what particular dollar figure in capital you were seeking?

A    Yes.

Q    What dollar amount was that?

A    Five million, approximately.

Q    And where was the five million derived from?

A    My knowledge of what was in my capital account and what I had invested in the firm over 40 years.

Q    And that was the exact figure, 4.9 plus some change, that

Hausfeld - Cross                                          41

was in your capital account as of December 31, 2007, right?

A    And, yes, and as represented during the year as well.

Q    And as represented?

A    During the year as well.

Q    And it was continually represented during the year that your capital account as of December 31, 2007, was that figure, right?

A    Expressly at one point in time it was represented that as of that point in time it was still approximately five million dollars.

Q    And by that representation you're referring to are you referring to a confidential settlement proposal received in writing by me to your counsel setting forth various things we'd be willing to settle?

A    There was a proposal made for me to purchase the London office.  That was the proposal.  There was a statement within that proposal to do so on capital account, to do so.

Q    Okay.  I actually prefer not to put before the Judge what the details of the settlement were, either our details or your details.  The question is --

            MR. ROSENTHAL:  Your Honor, I'd like him to let the witness finished.  I mean he asked a direct --

            MR. KEENEY:  That wasn't my question, your Honor.

            THE COURT:  Right, hold on one second.  Let's rewind the clock, ask another question.

Hausfeld - Cross                                    42

MR. KEENEY:  Okay.

MR. ROSENTHAL:  Thank you, Judge.

BY MR. KEENEY:

Q   When you say there was a representation made to you in September that your capital account was the same as it was on December 31, 2007, are you referring to a settlement proposal made on Hogan Hartson stationery signed by me?

A   No.  I'm referring to a statement about what was in my capital account that was presented along with other items to discuss with regard to a proposal.  But the statement was a statement and representation of my capital account as of that date.

THE COURT:  He's asking you though, sir, who made the statement and when was it made?

THE WITNESS:  The statement was made by Mr. Keeney in a letter by Mr. Keeney which sought to get our reaction to a proposal they were making to use my capital account to buy the London firm.

THE COURT:  So the answer to his question is yes, that's when you got it in the letter on September --

THE WITNESS:  That's when I got it, yes.

THE COURT:  Okay.  Next question.

BY MR. KEENEY:

Q   Next question.  January, the 5th of January, we're all here right before Magistrate Judge Rice.  Did you ask myself

Hausfeld - Cross                                                43

and Mr. Toll if the capital account calculation had been prepared yet?

A   No.  I wanted my statement of my balance.

Q   Right.  And what were you told at that point?

A   I would get it.

Q   And ultimately you got it on February 20th, right?

A   That's not when I wanted it but ultimately, yes, that's-- I got it on February 20th, yes.

Q   And at any time before Magistrate Judge Rice did you tell Magistrate Judge Rice that the capital account owed to you calculated as of October 31, 2008, was five million dollars?

A   I told Judge Rice that my capital account balance was five million dollars to be paid out a million dollars a year for five years.

Q   And you didn't tell him what date you were doing that calculation based on, did you?

A   No.

Q   Directing your attention to a second mediation session, do you recall we came up again before Magistrate Judge Rice about the next week?

A   Yes.

Q   And what had happened in the interim is at the request of the Magistrate Judge after the draft conclusion of the first session he requested me to do a first draft and send it to Rachael Rosenberg meeting with you over the weekend, right?

Hausfeld - Cross                                    44

A    I believe so.

Q    And in that first draft of what ultimately became Paragraph 14 the following words appear, right?  Let me just -- that the return of capital owed to Michael Hausfeld as of November 6th, 2008, and Richard Lewis as of November 10th, 2008, as provided for in the amended and restated operating agreement, Cohen Milstein Hausfeld and Toll PLLC will be accelerated, right?

A    I don't recall at this time precisely what was in that draft.

Q    And when you went back on February 3rd and you stood before Magistrate Judge Rice, you told Magistrate Judge Rice that you had problems with that language, right?

A    I don't recall.

Q    Do you recall, at that time, telling Magistrate Judge Rice that you had to have the exact amount of your capital calculations before you could sign?

A    I wanted the balance, yes.

Q    You didn't tell him that you wouldn't sign if you didn't get the balance, correct?

A    No,.

Q    I'm going to direct your attention to the letters that were shown to you, by your counsel, Mr. Rosenthal, if you could turn to the Plaintiff's Exhibit binder and the first one is Plaintiff's Exhibit 19.  Directing your attention to

Hausfeld - Cross                                        45

the penultimate paragraph, the one that begins one final thing. Could you read that to yourself?

A    Yes.

Q    And you testified on direct that you instructed Mr. Rosenthal to send this e-mail, is that correct?

A    Yes.

Q    And the e-mail requests exactly how much is in the capital account of you and Mr. Lewis, right?

A    Yes.

Q    And then, there is a follow-up e-mail. It's their next exhibit, if you can turn to Plaintiff's Exhibit 20, get that in front of you.

A    Yes.

Q    And directing your attention to the second paragraph?

A    Yes.

Q    It says, "We are still awaiting information on the exact amounts in the capital accounts of Rich Lewis and Michael Hausfeld", right?

A    Yes, that's what this says.

Q    Neither of those two letters ask Cohen Milstein to indicate whether the amounts, as of October 31, 2008, are greater or lesser than the amount as of December 31, 2007, do they?

A    At that point in time, we were trusting the representations that there was no dispute with regard to the

Hausfeld - Cross                                                    46

amount on the accelerated payment and that's why we're using the terms exact amount.  If it was $4,998,000 or $4,994,000.

Q   Yes.  And the key is you were using the terms exact amount, correct?

A   Yes.

Q   And if the exact amount was not of great significance to you, it was because you signed the agreement without knowing the exact amount, right?

A   No, we signed the agreement based on the trust and confidence we placed both in the process of the open mediation and that representations were being made that were consistent with the obligations of good faith and no material information was being withheld, yes.

Q   Did you ask, at any time, before Magistrate Judge Rice, either in the first session or the second session, whether your capital account balance had declined between December 31, 2007 and October 31, 2008?

A   I had not reason to, again, the only number discussed --

Q   But the question is, did you?

A   -- there was no reason to.

Q   Okay, the answer that then is no, you didn't, right?

        MR. ROSENTHAL:  Objection, argumentative.

        THE COURT:  Well, no, it's a pretty straightforward question.

        THE WITNESS:  No.

Hausfeld - Cross                                47

BY MR. KEENEY:

Q    In your meetings, in joint mediation sessions both in January and February, with Magistrate Judge Rice, was there a discussion about capital account balances declining from the beginning of the year?

A    No.

Q    You don't recall it, at all?

A    Not that I recall, no.

Q    Okay.  And you don't recall that in the first session?

A    No.

Q    And you don't recall it in the second session?

A    No.

Q    And directing your attention specifically, just to the joint sessions, where everyone is in the room with Magistrate Judge Rice, do you recall any discussion about capital account balances go up and down?

A    There may have been some discussion of going up and down, but there was never a discussion that deviated from the $5 million, no.

Q    Did you recall a discussion, before Magistrate Judge Rice, in the first session of January, 2009, with respect to what percentage should be applied to your capital account?

A    No, I was focused on the capital account balance.

Q    Directing your attention now to February 3rd, that's the second session back before Magistrate Judge Rice, do you

Hausfeld - Cross                                        48

recall making any statement or saying anything, at all, about
what percentage was to be used in the calculation of your
capital account balances?

A    I recall saying something of the words to the affect to
you and Mr. Toll, don't mess with my capital account.

Q    Okay.  Do you recall anything else?

A    No.

Q    Do you recall discussing use of a particular figure,
either 14 percent or 28 percent?

A    I don't recall discussing that, no.

Q    Do you recall discussing whether you wanted to have the
compensation committee figure applied to your capital account
or not?

A    I don't recall discussing anything regarding the
compensation committee.

Q    And you don't recall discussing whether the percentage
approved by the compensation committee was the percentage
that you wanted applied to your capital account?

A    No, I just didn't want my capital account messed with.

          MR. ROSENTHAL:  Your Honor, if I could just clarify
the record.  Mr. Keeney --

          MR. KEENEY:  Well, wait a minute, your Honor.  I
mean, this is cross-examination.

          MR. ROSENTHAL:  He was asking him whether --

          THE COURT:  Wait, your Honor.  Away from the

Hausfeld - Cross                              49

witness, your Honor.  I mean --

THE COURT:  All right, hold on, hold on --

MR. ROSENTHAL:  I'm making a --

MR. KEENEY:  No, away from the witness, your Honor. It's a request.

THE COURT:  All right, let's do it over here, whatever you want to say.  There's no question on the floor.

MR. KEENEY:  Right, there's not.

(Sidebar discussion as follows:)

MR. ROSENTHAL:  (Inaudible) whether distinguishing the capital accounts are touched on by two experts (inaudible).  Not to the capital account itself.

MR. KEENEY:  I'm asking about his stand that he may or may not remember.

THE COURT:  So, I think you can just ask him whether the top 14 claims that came up during the summer and he doesn't seem to recall that.  So, that's all.

MR. ROSENTHAL:  Okay.

THE COURT:  Okay, thanks.

MR. KEENEY:  And thank you, your Honor.

THE COURT:  Sure.

(End of sidebar discussion.)

THE COURT:  I just have to grab the document.  You guys can keep going.

MR. KEENEY:  Okay, thank you.

Hausfeld - Cross                                    50

BY MR. KEENEY:

Q   Could you please turn in the defendant's exhibit binder to what's been marked as Defendant's Exhibit 18?

A   Is that the September, 2008 monthly financial statements?

Q   Yes.  And do you recall being shown those at your deposition?

A   Yes.

Q   Do you recall saying you believed you had seen them before?

A   Yes.

Q   And do you recall being directed, very specifically, to the loss to date figure in that document?

A   I believe so.

Q   Wasn't the firm, as of the third quarter of 2008, the Cohen Milstein firm having a bad economic year?

A   Again, it depends upon the glass half full or half empty. We weren't having a good one.  If you come out flat, is that bad or good?  Depends upon, as well, the economic conditions surrounding the operation.

Q   And in the third quarter of 2008, is it correct that you were predicting probably another flat year like 2007?

A   I was, yes.

Q   And did you believe, in the third quarter of 2008, that Mr. Toll was overly projecting future fee recoveries?

A   I believe so.

Hausfeld - Cross                                                    51

Q   And did you also believe that in 2008, there was a far to aggressive projection of fee revenues?

A   Projections were made during the course of the year. Could you be more specific?

Q   Okay.  Directing your attention to Mr. Toll's projections, in particular, it's a topic we discussed at your deposition.  And the question is, did you believe that in 2008, there was a far too aggressive projection of fee recoveries?

A   Mr. Toll made projections at different points in the year.  At the beginning of the year, he projected we would have the best economic year ever and forecasted an $80 million revenue generation.  He made further predictions during the year, the last of which were the ones that he made on November 6th, which had -- which had a good, conservative core, but then went beyond.

Q   And do you characterize those as far too aggressive?

A   I think, as testified yesterday by Mr. Bavis, in their totality, Mr. Toll was projecting almost a $50 million recovery in November and December and I thought that was overly aggressive.

Q   Could you please turn to Exhibit 47 in the defendant's binder.

        MR. ROSENTHAL:  Your Honor, I'm going to ask him to lay a foundation with this before he starts questioning --

Hausfeld - Cross                                        52

MR. KEENEY:  That's my first question, your Honor.

THE COURT:  Is this the famous exhibit?

MR. KEENEY:  Yes.

THE COURT:  Oh, all right.  I know what this is all about.

BY MR. KEENEY:

Q   Question to the witness, was Defendant's Exhibit 47 prepared at your direction?

A   Not that I can recall, no.

Q   Isn't it a fact that you asked John Ferko (ph) to prepare for you a list, as of June 30, 2009 of the capital account balances of all partners?

A   No, I don't recall.

Q   Isn't it a fact that you asked Rachel Rosenberg to convey that request to John Ferko to prepare that document?

A   I don't recall.

Q   Excuse me, I'm correct by Ms. Baum that I said that you had asked in 2009.  Let me just rephrase the question.  Did you instruct Mr. Ferko in 2008, to prepare a document such as Plaintiff's Exhibit 47?

A   I don't recall.

THE COURT:  Who is Mr. Ferko?

MR. KEENEY:  He as in the financial management.

THE COURT:  Okay.

Q   Do you have any explanation how this came to be produced

Hausfeld - Cross                                     53

by your attorneys to us?

A   When I was separated from the firm, I was told to leave the building immediately.  I did so.  Subsequently, some 40 to 60 boxes were sent by CMST to our office.  I have no, I have no knowledge of what was in those boxes specifically or how they got in there.  I have no knowledge of this document.

Q   Okay.

MR. ROSENTHAL:  Your Honor, I can represent that as we were asked to do, in response to the discovery request, we combed through those 40 to 60 boxes and we came up with this, as well as a number of other documents and we produced them.

BY MR. KEENEY:

Q   And my question to the witness is, of these 40 to 60 boxes that were sent to you, were these boxes of your stuff?

A   I have no idea.

Q   Had you requested of Cohen Milstein that your stuff be sent to you?

A   I wouldn't make a request of just my stuff, no.

Q   Okay.  Had you requested of Cohen Milstein that all files, documents of any sort that related to you or your work or the work of any of the firm attorneys at Hausfeld LLP, that were in the possession of Cohen Milstein, be sent to Hausfeld LLP?

A   I don't believe so.  I believe that we requested specific information from specific cases in accordance with the Rules

Hausfeld - Cross                                54

of Ethics where clients retained us and we were continuing

representation in cases.

Q   You didn't ask for your own personal stuff your own

office back?

A   My own personal stuff, in the sense that I asked for my

pictures and my pens or whatever else, but yes, I asked for

that and I had some personal files, my will, my friends'

wills, yes, that I asked for.

Q   We've heard a lot of discussion about a meeting of the

compensation committee on November 5th.  You were a member of

that committee, right?

A   I was a member of something called the compensation

committee, yes.

Q   And you attended a meeting on November 5th, right?

A   I wouldn't call it a meeting, no.

Q   Okay.  Whatever you attended on November 5th, was Mr.

Toll present?

A   Yes.

Q   Was Herbert Milstein present?

A   Yes.

Q   Was anyone else present?

A   I believe Mr. Friedman and Mr. Small.

Q   And you knew, at that time, that Mr. Friedman was a

member of the compensation committee, right?

A   Yes.

Hausfeld - Cross                                      55

Q   And you knew that you were a member of the compensation committee, right?

A   Supposed to be, yes.

Q   Okay.  And you knew that Mr. Toll was a member of the compensation committee, right?

A   Yes.

Q   And you knew that Mr. Small was a member of the compensation committee, right?

A   Yes.

Q   And you had some question in your mind whether Mr. Herb Milstein could substitute for Mark Machiz, who had resigned from the committee, right?

A   Correct.

Q   But in the meeting, the five of you that you have just discussed were present, right?

A   It was an inquisition, not a meeting.

Q   Did you try to bring a court reporter into that meeting?

A   Yes.

Q   Was the court reporter refused admission?

A   Mr. Toll and the others essentially expelled her.

Q   Why did you bring a court reporter into a committee meeting of Cohen Milstein?

A   Because of the circumstances surrounding the gathering. It appeared that there might come a time when there was an issue as to what was said and how it was said.  And I thought

Hausfeld - Cross                                56

it would benefit everyone if we had an accurate record.

Q    You took notes at that meeting, right?

A    I tried.

Q    And we discussed this at your deposition.  Would you agree with me not a single word was mentioned about capital account balances during that gathering in that room, right?

A    There was no mention of capital accounts, among others, yes.

Q    Let me turn to a different topic.  The topic of GAAP.  In your role as Chairman of the firm, did you ever discuss with the equity partners of Cohen Milstein, that the firm was not using GAAP for the preparation of its books and records?

A    No.

Q    Did you ever raise with the Cohen Milstein partners a question whether the GAAP provision for books and records should have required that financial statements be prepared according to GAAP?

A    I believe that discussion was coming about --

        THE COURT:  No, just answer his question first, sir and then you can explain it.

        THE WITNESS:  Yes.

Q    Okay, when was that discussion with the partners?

A    After we retained a chief operating officer who reviewed the books and records and other conditions of the firm and concerns were brought to my attention concerning their

Hausfeld - Cross                                    57

maintenance.

Q    And it was at that time that, you, sir, sent a financial officer from Cohen Milstein on a mission to Minnesota to discuss how the Minnesota plaintiff's class action law firm was keeping its books and records?

A    No.

Q    Okay, do you recall sending someone, Mr. Ferko, to meet with the controller of Zell Hoffman in Minneapolis?

          MR. ROSENTHAL:  Objection, relevance.

          THE WITNESS:  It was the chief --

          THE COURT:  Hold on, hold on.

          MR. KEENEY:  It goes to credibility, your Honor.  I mean, he just -- I'm trying to refresh his recollection.  He just has to know.

          THE COURT:  All right, well, I'll allow it.

          THE WITNESS:  It was the chief operating officer of another firm, similar to ours and I had requested our chief operating officer to visit their chief operating officer to see, overall, what might be learned that we could benefit from in terms of how to better operate the firm.

          THE COURT:  What year are we talking about?

          MR. KEENEY:  2008, your Honor.  Right --

          THE COURT:  Okay.

          MR. KEENEY:  -- during the controversy.

          THE COURT:  Okay.

Hausfeld - Cross                          58

BY MR. KEENEY:

Q    And did you get a report from Mr. Ferko as to what he'd learned from Zell Hoffman?

A    I got a report from Mr. Ferko.  I don't know if it was just with regard to what he learned from Zell Hoffman or it was incorporated in his overall observations.

Q    Did Mr. Ferko ever make a report to the partners, as a whole, which used the word, GAAP?

A    I don't recall.

Q    Did you ever make a presentation to the partners about the use of the word?

A    It may have come up in the discussion at the time that the 2003 amendment was put to the partnership, because it did contain a GAAP provision.  Other than that, I don't recall.

Q    Okay.  And you actually recall it being discussed at the partnership in terms of GAAP in 2003, right?

A    I'm sorry, I didn't follow.

Q    Oh, I'm sorry.  You recall that it may have come up in 2003 in connection with the outgoing agreement was amended. My question to you is do you recall GAAP being discussed in the context of the document amendment?

A    It may have, that's what I'm saying, I don't recall.

        THE COURT:  Well, you can't guess.

        MR. KEENEY:  Right.

        THE COURT:  If he doesn't recall, he doesn't recall.

Hausfeld - Cross                                    59

So, you don't recall whether GAAP came up when the amendment was inserted for 2003?

THE WITNESS:  Right.

Q    But what you can recall is since 2003 and since that amendment's been effect, you have not had any discussion with anyone at Cohen Milstein about how the GAAP sentence, with respect to books and records, is applied to the firm, right?

A    I had a discussion with the representative of Sun Trust at one point, where he talked about the need for the firm to have accounting principles that were more in line with changing economic conditions and the increasing need for physical discipline within the firm.

Q    Okay.  And following that discussion with Sun Trust, did you then have a discussion with any partner at the firm, that Cohen Milstein should be following GAAP in the presentation of its books and records?

A    I don't recall whether I used the term specifically, GAAP, but I know we spoke with the COO and I believe we were raising, with the executive committee, the need to have accounting principles consistent with the accounting discipline that the bank was requiring.

Q    And that's a different question.  Let me ask this.  In addition to what the bank was telling you, did you have any discussion with the executive committee that the operating committee had -- about books and records being kept according

Hausfeld - Cross                                        60

to GAAP?

A    I don't think I tied in specifically, no.

THE COURT:  Did you ever go to Pat Drolet or Diamond and say, what are you guys doing here?  You're using a cash basis and you're supposed to be using accrual or GAAP?

THE WITNESS:  No --

THE COURT:  It's a simple question, did you ever do it?

THE WITNESS:  No.

THE COURT:  Okay.

Q    I'd like to direct your attention back to Defendant's Exhibit 2, that's the signed, confidential agreement before Magistrate Judge Rice.  And my question to you is, before the other partners at Hausfeld LLP signed Defendant's Exhibit 2, you made a presentation to them about what the settlement agreement was, right?

MR. ROSENTHAL:  I'm going to object to the extent that it intrudes on the attorney/client privilege.

MR. KEENEY:  I'm asking about the -- I'm not asking about anything counsel said.

THE COURT:  Well, he's not asking about the content. He's just saying did you make the presentation to your partners before you signed it?

THE WITNESS:  To the other partners --

THE COURT:  From your firm.

Hausfeld - Cross                                61

THE WITNESS:  -- in the agreement.  I think there were other partners in the firm.

THE COURT:  To the people who signed the agreement?

THE WITNESS:  Yes.

BY MR. KEENEY:

Q   And in that presentation, did you walk them through the pages of the agreement?

MR. ROSENTHAL:  I'll object again to the extent that it intrudes on attorney/client privilege, your Honor.  Venable represented all four of the signatories on the Hausfeld side here.

MR. KEENEY:  I'm asking about what he said to other persons.  That is not a privilege.

THE WITNESS:  The walk --

THE COURT:  Hold on, sir, hold on.

MR. ROSENTHAL:  If it's outside the presence of counsel, I'm fine.  But he didn't limit his question in that way.

THE COURT:  Oh, you mean outside the presence of the Venable counsel?

MR. ROSENTHAL:  Correct.

THE COURT:  All right, why don't you limit it that way.

MR. ROSENTHAL:  If he limits his question that way, I'm okay with it.

Hausfeld - Cross                                      62

BY MR. KEENEY:

Q   Outside the presence of Venable counsel, did you have meetings with Mr. Eisler with respect to discussion of what the contents of the Defendant's Exhibit 2 were?

A   No.

Q   What about your phone calls from your chambers down to Mr. Eisler?

A   We weren't walking through the agreement, because it wasn't finalized yet.

Q   Before you signed the agreement, did you have conversations with Mr. Eisler about the contents of the agreement?

A   He was present.

Q   He wasn't present the second time, on February 3rd.  So, the question again is did you have discussions with Mr. Eisler about the content of the agreement that ultimately got signed?

A   I don't believe that the second time, we knew what the issues were and I had authority.

Q   Did you have discussions with Mr. Lewis?

        MR. ROSENTHAL:  Again, outside the province of counsel, Mr. Keeney?

        MR. KEENEY:  We'll start outside the presence of counsel.

        THE WITNESS:  I don't believe so.

Hausfeld - Cross                                    63

BY MR. KEENEY:

Q   Do you recall holding a fairly large meeting at your firm in a conference room, to discuss the contents of this settlement?

A   I don't recall.

Q   Do you recall having a discussion with a group of attorneys at Hausfeld LLP, about the fee splitting provision with respect to a number of cases --

MR. ROSENTHAL:  Objection, relevancy, your Honor.

THE COURT:  What's the relevance of that?

MR. KEENEY:  I want to see what he discussed, your Honor.

THE COURT:  So what?  What did he -- why does that matter?

MR. KEENEY:  There's a fraudulent inducement claim, your Honor.

THE COURT:  Okay.

MR. KEENEY:  I want to make sure that we're dealing with other people who we never met, who were fully informed. I don't have a stipulation from the other side.

THE COURT:  No, but I think the fraudulent inducement claim only goes to disclosure of the amount in the capital accounts.

MR. ROSENTHAL:  Exact amount.

THE COURT:  It doesn't go to this fee-splitting

Hausfeld - Cross                                    64

stuff.

MR. KEENEY:  I think that's right, your Honor, but I'm not sure what the parties who aren't here, are going to say in terms of fraudulent inducement.  I mean, I just don't know, because we didn't make representations --

THE COURT:  Well, they're not -- the only party is Mr. Lewis --

MR. KEENEY:  Okay.

THE COURT:  -- and I don't think the other people are involved.  Eisler and Butterfield and all those people.

MR. KEENEY:  Okay, that's fine, your Honor.

THE COURT:  Okay.

MR. KEENEY:  I just wanted to make sure.

THE COURT:  So, I'll sustain.

MR. KEENEY:  Okay.

THE COURT:  You're coming up on your 45 minutes.  I know you're conscious of time, I'm just trying to help you.

MR. KEENEY:  Very conscious, your Honor.  Thank you, appreciate it.

BY MR. KEENEY:

Q   You testified on direct about Linda Nussbaum leaving the firm, do you recall that testimony?

A   Yes.

Q   And you recall Linda Nussbaum, right?

A   Yes.

Hausfeld - Cross                              65

Q    There were partner meetings at which her departure was discussed, right?

A    Yes.

Q    And at the time of her departure, it was discussed that her capital account balance was showing a loss from its high at the end of the previous year, right?

A    I don't recall.  The conversations were generally that there was discussions with Ms. Nussbaum's husband, who was acting as her lawyer.

Q    But you don't recall what the discussions were as they pertained to capital account balance, do you?

A    We were not told.

Q    You were not told by whom?

A    Mr. Toll.  He was handling the discussions on behalf of the firm.

Q    So, in the partners' meetings, discussing Linda Nussbaum leaving the firm, there was no discussion of what her capital account balance was?

A    What was discussed was Mr. Toll told us that Linda's husband had differences with regard of Linda's capital account and we authorized Mr. Toll, on behalf of the firm, to have those discussions and report back to the partners as to a proposed resolution.

Q    Are you aware that the objections raised by her husband are essentially objections that we have heard from you and

Hausfeld - Cross                                    66

your counsel here?

MR. ROSENTHAL:  Objection.  It assumes facts not in evidence, your Honor.

MR. KEENEY:  I'm asking the question.

THE COURT:  Well, he's just asking if he ever heard that, so, I'll overrule it.  Did you ever hear any of that?

THE WITNESS:  I've heard it now.  We did not hear it at the time.

THE COURT:  So, you just head if from Mr. Keeney?

THE WITNESS:  No, I've heard it in the course of these proceedings.

THE COURT:  Oh, okay.

BY MR. KEENEY:

Q    Did you understand that Linda Nussbaum was protesting that using the month end of the month immediately preceding her termination, in order to calculate her capital return, was unfair to her?

MR. ROSENTHAL:  Objection, ask for specifying the time period that he's asking about.

THE COURT:  All right, what time was this in?

MR. KEENEY:  She leaves in approximately February, 2007, your Honor.

THE COURT:  Okay.

THE WITNESS:  I did not know it then.  I know it now.

Hausfeld - Cross                              67

BY MR. KEENEY:

Q   And what do you know now?

A   That she had protested the method of calculation.

MR. KEENEY:  We have no further questions, your Honor.

THE COURT:  All right, thank you.  Anything further?

MR. ROSENTHAL:  Two questions, your Honor.

THE COURT:  Two, okay.

MR. ROSENTHAL:  A few.

THE COURT:  Oh, a few.  Oh, you're smart enough not to put a number on there.

MR. ROSENTHAL:  I don't want to try the case --

THE COURT:  No, that's all right.  Usually, if we have a jury trial, I'll have the jury count.  That puts pressure on the lawyers.  Take your time, I don't mean to rush you.

                    REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   With respect to Ms. Nussbaum, was her capital returned to her over the five-year period specified in the operating agreement?

A   No.

Q   How was it returned to her?

A   On an accelerated basis.

Q   Was it returned all in one lump sum?

Hausfeld - Redirect                              68

A    I believe so.

Q    Is that what Mr. Toll reported to you after he had these discussions with Ms. Nussbaum's husband?

A    To me and the other partners, yes.

Q    I ask you to turn to Plaintiff's Exhibit 79, Mr. Hausfeld.  And this is a memo from John Ferko to the equity partners, dated October 31, 2008, entitled State of the Firm, is that right?

A    Yes.

Q    Mr. Ferko was the COO of the firm, is that right?

A    Yes.

Q    Okay, can you please read the first paragraph into the record?

A    "I was hired as the COO to help the firm build its infrastructure and systems to support its rapid growth and size, complexity and locations.  When I arrived at the firm in March, 2008, the firm was significantly deficient in financial management, technology management, physical discipline and internal controls.  Based on my 20 years of financial experience in public accounting and as a controller and CFO, the firm was not employing the systems, structure or procedures that virtually all similarly situated firms routinely implement.  Without these systems in place, responsible financial management is nearly impossible."

Q    I'll ask you, also, to read the third paragraph until I

Hausfeld - Redirect                                          69

ask you to stop, please.

A    "Banks have begun enforcing covenants related to law firm loans and requiring that equity partners contribute additional capital.  Our bank, Sun Trust, will, for the first time, require audited financial statements for the year end 2008.  Our representative, Doug Cromwell, is aware of and concerned about the lack of any meaningful financial management in the past and is a strong proponent of the recommendations in this memo, including planning, budgeting, increased internal controls, improved cash and financial reporting and a formal industry standard expense and check approval process.  The financial reports distributed to partners have been inadequate.  As a result, partners are not aware of what practice groups, offices or cases are profitable or not at any given time.  This not only affects decisions regarding future firm investments, but risks over reliance on subjective factors in determining equity partner compensation.  A balance needs to be struck between a subjective system based on the objective data and an incentive basis and net rewards principally based on objective criteria."

Q    I'll ask you to stop, Mr. Hausfeld.  The page before, which is HAUS165 refers to the bank's -- your representative or the CMHT representative at Sun Trust Bank, Doug Cromwell, do you see that?

Hausfeld - Redirect                                    70

A    Yes.

Q    When Mr. Keeney was asking you whether you had discussions with Sun Trust about the manner in which the firm does its accounting, was Mr. Cromwell the person you were referring to?

A    Yes.

Q    And are the concerns expressed by Mr. Ferko in this memo, the concerns that Mr. Cromwell expressed to you?

A    Yes.

MR. ROSENTHAL:  I have no further questions, your Honor.

THE COURT:  All right.

MR. KEENEY:  Nothing, your Honor.

THE COURT:  All right, thank you.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Okay, thank you, Mr. Hausfeld.  It's 10:11, how about if we break until 10:25?

MR. ROSENTHAL:  That's fine, we just have one more exhibit that we want to move into evidence before we rest.

THE COURT:  Okay.  All right, do you want to do that now?

MR. ROSENTHAL:  Sure.  What we'd like to do is move Plaintiff's Exhibit 106 into evidence, which is a summary, your Honor, of representations made by lawyers for Cohen Milstein Sellers & Toll, at the end of 2008 -- November and

71

December, 2008, regarding the financial condition of the firm. And this is a summary of, again, briefs and affidavits supplemented to briefs in a number of large antitrust class actions around the country, where Cohen Milstein lawyers are representing what the financial condition of the firm is, at the time.

MR. KEENEY: Your Honor, two objections. One goes to relevance. Number two goes to this is not a fair summary. What they did is they went through numerous pleadings of various cases. They take out of context a particular sentence. So, I think it violates the summary rules under the Federal Rules of Evidence. But, in addition, it's all irrelevant.

THE COURT: How is it relevant?

MR. ROSENTHAL: It's relevant, your Honor, because this shows precisely why the GAAP method of accounting should have been the appropriate method of accounting here. We have a firm representing in November and December of 2008, how financially strong it is and why it should be retained as a co-lead counsel in a number of these antitrust cases, because of its financial strength. And here we have, in this case, the firm saying, on the other side, no, it was in an anemic position and as a result, Mr. Hausfeld and Mr. Lewis' capital account balances ought to reflect that anemic position.

MR. KEENEY: Your Honor, just quickly, it doesn't

72

refer to GAAP anywhere and it is very attenuated for the purposes for which it's being offered.

THE COURT:  All right, well, it's marginally relevant, at best.  But I'll allow it in and if you want to supplement it with anything to fill out the context of this, Mr. Keeney, I'll let you do that.  I mean, the accounting issue, in my mind, at least, seems to be governed more on what the accounts say and what the experts say.  And based on what the firm's PR department was pumping out at the time about it.

MR. ROSENTHAL:  Well, that this is effectively a party admission that supports what Mr. Bavis was saying yesterday.

THE COURT:  I understand it and I'll admit it for that purpose.

(Plaintiff's Exhibit 106 admitted in evidence.)

THE COURT:  All right, it's admitted.  We'll break until 10:25 and we'll sit until 12:00.  Thank you.

(Court in recess 10:13 to 10:25 o'clock a.m.)

THE COURT:  We're here, Mr. Sommers.  Do you have everybody you need?

MR. ROSENTHAL:  Yes.

THE COURT:  Okay.

MR. ROSENTHAL:  Are we back on the record?

THE COURT:  Yes.

73

MR. ROSENTHAL:  I know this is still sort of an informal proceeding, but I can tell you for now, at least on capital accounts, we rest.

THE COURT:  All right, very well.  And I'll admit all the exhibits that you have shown.

MR. ROSENTHAL:  Mr. Keeney and I will work together after the close of evidence to --

MR. KEENEY:  Except for the settlement agreement, which we kept out.

MR. ROSENTHAL:  Yes.

THE COURT:  Number -- that was 8?

MR. KEENEY:  Yes, your Honor.

THE COURT:  All right, now, Mr. Sommers, I'm going to ask you to stand and take the oath.  Thank you, sir.

DANIEL SOMMERS, Defendant's Witness, Sworn.

THE CLERK:  Please state your name and spell your last name, sir, for the record.

THE WITNESS:  Daniel Stephen Sommers, S-O-M-M-E-R-S and the Stephen is a with a p-h.

THE COURT:  All right, Ms. Baum, you can proceed.

MS. BAUM:  Okay, thank you.

                    DIRECT EXAMINATION

BY MS. BAUM:

Q   Mr. Sommers, are you an equity partner at Cohen Milstein?

A   I am.

Sommers - Direct                                    74

Q    Are you also on its executive committee?

A    I am.

Q    How long have you been on the executive committee?

A    Since the fall of 2007.

Q    And when did you graduate from law school?

A    1986.

Q    When did you join Cohen Milstein?

A    In April of 1988.

Q    And what type of law do you practice?

A    Securities fraud litigation, class action litigation and mostly focused on the Securities Exchange Act and Securities Act litigation.

Q    Were you on the executive committee at Cohen Milstein when the February, 2009 settlement agreement was entered into?

A    Yes, I was.

Q    Did the executive committee approve the settlement?

A    It did.

Q    Can you please turn to Exhibit 2 in the Cohen Milstein Exhibit Binder Number 1?  You should have several different binders.

        THE COURT:  The small book.  You can put that large one aside for now.

        THE WITNESS:  Okay.  Which exhibit?

Q    Exhibit 2.

Sommers - Direct                                        75

A    I have it in front of me.

Q    Okay.  And this is the settlement agreement between Cohen Milstein and Hausfeld LLP?

A    It is.

Q    And you signed this agreement?

A    I did.

Q    All the equity partners signed it, correct?

A    They did.

Q    Did you intentionally conceal any material information from Mr. Hausfeld to induce him to sign this agreement?

A    Absolutely not.

Q    Are you aware of any equity partner intentionally concealing any material information from Mr. Hausfeld to induce him to sign it?

A    Absolutely not.

          MS. UPADHYAYA:  Objection, your Honor.

          THE COURT:  Hold on, what's the objection?

          MS. UPADHYAYA:  Calls for speculation.

          MS. BAUM:  Is he aware?

          THE COURT:  Well, I guess you'd have to be more precise.  Did somebody tell him or did somebody advise him, because he can't read somebody's mind.

          MS. BAUM:  Well, he could be aware of conduct and he could be aware of --

          THE COURT:  All right, ask the question that way

Sommers - Direct                                            76

then.

BY MS. BAUM:

Q    Are you aware of any conduct on the part of any equity partner intentionally concealing material information from Mr. Hausfeld to induce him to sign the agreement?

A    No, I'm not.

Q    Why did you sign the agreement?

A    I signed the agreement because I believed it was in the best interest of Cohen Milstein and that it would bring a complete and final resolution to the disputes we were having with Mr. Hausfeld and his firm.

Q    Why did you think it would bring a final resolution to the dispute with Mr. Hausfeld and his firm?

A    Well, for a couple of reasons.  One, I thought that the agreement was not only a good agreement for Cohen Milstein, but a good one for Mr. Hausfeld.  It provided him with payments that he, otherwise, would not be entitled to under our operating agreement.  And additionally, the confidential agreement provided for mutual releases which would bring the issues, in my view, to a complete and final resolution.

Q    Can you please turn to numbered paragraph 14 in the settlement agreement?  Page CMST00007.

A    Yes.

Q    Is there anything in this paragraph that let you to believe the return of capital to Michael Hausfeld and Richard

Lewis would be based on their year-end 2007 capital account balances?

A    No.

Q    Why not?

A    Because it provides that the return of capital would be made pursuant to our operating agreement.

Q    And what in the operating agreement is inconsistent with capital being returned based on their December, 2007 year end capital account?  If you want, we can turn to Defendant's Exhibit 3, which is the operating agreement.

A    Yes.  I can answer it without that.  The operating agreement provides that the capital account is returned pursuant to a calculation based on the month preceding the termination of the departing partner, not the year end.

Q    Was the firm having a bad year in 2008?

A    Yes.

Q    How would you know that?

A    In lots of ways, confining the answer to the financial aspects.  I received monthly financial statements prepared by our firm, which reflected the financial status of the firm. There were also multiple discussions throughout the year at executive committee meetings, at equity partner meetings and otherwise, outside of those meetings, talking about the financial issues that were confronting the firm in 2008.

Q    In 2008, for example, are you aware of any month where

Sommers - Direct                                78

expenses exceeded revenue?

A    Yes.

Q    Were there more than one month like that?

A    Many months.  I don't know if there were any that weren't, but there were many months where that was the case.

Q    Did the firm also exceed its line of credit with the bank?

A    It did.

Q    What did you have to do after that happened?

A    On two occasions in 2008, we needed to obtain additional financing from our bank to extend the limit on our line of credit.  First from, I believe, XXXXXXXXXXXXXXXXX and thereafter, up to XXXXXXXXXXX.

Q    Do you recall when that happened?

A    I don't specifically.

Q    Was it in the first half of the year?

A    I think the first extension was.

Q    And the second extension?

A    Again, I don't recall that.

Q    Can you turn briefly, please, to Defendant's Exhibit 18 and then 19.

A    I have 18 in front of me.

Q    And just briefly, is this the type of monthly financial statement you referred to, that you received on a monthly basis?

Sommers - Direct                                    79

A    Yes, it is.

Q    And can you look at 19, as well?

A    Okay, I've got it in front of me.

Q    And is that also?

A    Yes, it is.

Q    Okay.  Staying with Defendant's Exhibit 19, can you please turn to the page that's been marked with Bates label CMST00661?

A    Yes.

Q    And at the lower part of the page where -- two lines up from the bottom, net income loss year to date, it shows a net loss of $6,560,000 as of October 31, 2008?

A    Yes, it does.

Q    And can you turn back to Defendant's Exhibit 18 and turn to the page Bates label CMST00649?

A    Okay.

Q    And this page shows a net loss, as of the end of September, 2008, year to date, of $5.5 million, correct?

A    Approximately, yes.

Q    So, the loss increased from September to October by about $1 million, correct?

A    That's correct.

Q    Why were the losses increasing from September to October?

A    Because our expenses in running the firm were exceeding our revenue that was coming in.

Sommers - Direct                                      80

Q    And now, turning back to Defendant's Exhibit 19, please turn to page CMST00667.

A    I have it in front of me.

Q    Can you explain what this page is?

A    This is a page which lists fees received by the firm and expense reimbursements and this particular page, it starts in August and goes through October.

Q    And can you see those fees that came in in October, roughly what do they total?

A    Looks like maybe $1.6 million, $1.7 million --

Q    Okay.

A    -- something like that.  I can read the numbers out, but that's roughly what it is.

Q    And then turn to, in the same exhibit, CMST00663.  On the second to last line in the left-hand side of the page, the figure on the bottom under the first column for October, 2008?

A    Yes.

Q    Shows total expenses were over $2 million, correct?

A    That's correct.

Q    Now, how long after the end of the month would monthly statements typically go out to the equity partners?

A    Typically, it would be a couple of weeks, maybe two weeks, three weeks.  I didn't calendar it, but that was sort of a routine.

Q   Okay.  So, even though a partner had not yet received the October, 2008 monthly statement, was there any way of knowing the financial condition of the firm in October, 2008?

A   Well, yes, the financial condition of the firm in 2008 and especially around this time of the year, October, was a major subject of discussion, again, at executive committee meetings, equity partner meetings.  And outside of that context, partners discussing where we were in the line of credit, this was a big issue and it was discussed frequently was something I, personally, was concerned about.

Q   So, it would be pretty unbelievable for the chairman of the firm not to know the financial condition of the firm as of that date, correct?

            MS. UPADHYAYA:  Objection, your Honor.

            THE COURT:  I'll sustain that.  I don't know if he can comment on that.

BY MS. BAUM:

Q   Okay, can you please turn to binder number two, which is Defendant's Exhibit 46?  And can you just take a minute to look at this binder.  Have you seen these documents before?

A   I have.

Q   And what are they?

A   They are records from our firm relating to partners who have left or departed Cohen Milstein.

Q   And are these kept in the ordinary course of Cohen

Sommers - Direct                              82

Milstein's business?

A    Yes, they are.

Q    Are these records pertaining to departed partners made at or near the time of the event described in this record?

A    Yes, they would have been.

          MS. BAUM:  Your Honor, we move to admit Exhibit 46 as a business record.

          THE COURT:  Any objection?

          MS. UPADHYAYA:  We'll stipulate to it.

          THE COURT:  All right, I'll admit it.

          (Defendant's Exhibit 46 admitted in evidence.)

          MS. BAUM:  Thank you.

BY MS. BAUM:

Q    All right, now, could you, please turn in the first binder to Exhibit 39, Defendant's Exhibit 39.

A    Okay, I have that in front of me.

Q    Did you receive a copy of this memorandum from Steve Toll at or about the date that it bears?

A    Yes, I did.

Q    Okay.  And it is addressed to the equity partners of Cohen Milstein, at that time, correct?

A    It is.

Q    And this included Michael Hausfeld and Rich Lewis?

A    They are listed on the to line, yes.

Q    Okay.  Are you a member of the compensation committee?

A    No.

Q    Do you know what the purpose of the compensation committee's meetings are?

A    Yes, I do.

Q    And what is that?

A    The compensation committee is intended to make an allocation typically, towards the end of the year and an evaluation of each partner to determine a percentage interest in the firm for purposes of sharing any profits that may be left over, at the end of the year and for voting power purposes.

Q    Can the compensation committee increase or decrease a departing partner's share of the firm's profits or losses in their capital accounts?

A    No.

Q    Why not?

            THE COURT:  Hold on, sir.  What's your objection?

            MS. UPADHYAYA:  It's fine, thank you.

            THE COURT:  All right, just stretching.  Go ahead, you can ask your question again.

            THE WITNESS:  Yes, if you would, thank you.

BY MS. BAUM:

Q    The question was why can't the compensation committee decrease or increase a departing partner's share of firm profits or losses in their capital account?

Sommers - Direct                                84

A   The compensation committee -- it's not the purpose of the compensation committee.  It is not empowered to do that. It's a committee of the firm that's never been delegated that authority.  So, it's just, it's not the role of the compensation committee.  It never has been, in my experience, as an equity partner in the firm.

Q   So, to your knowledge, the compensation committee has never done that before?

A   That's correct.

THE COURT:  Then what, reduce the capital account?

MS. BAUM:  Of a departing partner.

MR. ROSENTHAL:  Your Honor, let's be clear, on November 5th, nobody was departed.  It was only on November 6th Mr. Hausfeld was expelled.

MS. BAUM:  This is argumentative.  I don't know why he's objecting.

THE COURT:  Well, I guess he's to figure out the time frame of when the answer applies to.  Is that what your objection is?

MR. ROSENTHAL:  Yes, it is, your Honor.

THE COURT:  All right, so, why don't you just specify a time frame, as of November 6th, is that what you are asking, did the compensation committee have authority to reduce someone's capital account if they were leaving the firm?

MS. BAUM:  Ever.

THE COURT:  Okay.

THE WITNESS:  Never.

BY MS. BAUM:

Q   Did the executive committee approve the calculation of the October 31, 2008 capital account balances of Michael Hausfeld and Rich Lewis?

A   Yes, we did.

Q   Did you, personally, vote in favor?

A   I did.

Q   Why was this an executive committee decision?

A   It was a decision that related to our agreement with Mr. Hausfeld and his firm, which was handled by the executive committee.  It was an executive committee function.

Q   And why didn't Cohen Milstein simply send Hugh Diamond's initial draft calculation to Michael Hausfeld and Rich Lewis?

A   We wanted to make sure that the calculations were correct and accurate before we sent it off.

Q   At the time that the executive committee considered and approved the calculation of Michael Hausfeld and Rich Lewis' capital account balances, did the executive committee consider a suggestion by Pat Drolet that the capital account calculations were actually too high?

A   We did, yes.

Q   And what was your understanding of the issue involved?

A    This issue had initially been raised with me prior to an executive committee meeting.  I think it was by Mr. Toll and as I understood, the issue was that Ms. Drolet was recommending that there were some additional, approximately, $5 million of expenses which should have appropriately been written down earlier in 2008.  And so, the issue before us was whether to implement that and factor that into the calculations of the capital account balances of Mr. Hausfeld and Mr. Lewis.

Q    What did Cohen Milstein decide to do in terms of including or excluding the additional $5 million dollars in losses?

A    Notwithstanding Ms. Drolet's advice to include it, that it would be appropriate, we made a decision that in light of the fact that we've just reached an agreement with Mr. Hausfeld and his firm, that for practical pragmatic reasons, that we would not include those $5 million in expenses in this calculation, essentially, to avoid any further conflict or litigation.  Kind of what we're -- we've got here in front of us right now.  So, that was the purpose.  They were pragmatic reasons we decided not to do it and in fact, to pay both Mr. Hausfeld and Mr. Lewis more than we believed they were entitled to get.

Q    Is there any suggestion that you're aware of from Ms. Drolet or anyone else that it wouldn't have been proper

Sommers - Direct                                87

accounting to include those right off in factoring the capital account calculation?

A   No, just the opposite. I was told it would have been completely proper and defensible in all respects.

Q   And did Cohen Milstein gain financial from not taking those write downs on October 31st?

A   No, we did not.

Q   Now, can you please turn to Defendant's Exhibit 2 and turn the page to CMST00024?

A   I think I have the wrong exhibit.

Q   Defendant's Exhibit 3, actually.

A   Yes, I have it in front of me.

Q   Could you please read Article 6-B, entitled involuntary termination?

A   I read it.

Q   Oh, can you read it out loud, I'm sorry.

A   "Voluntary withdrawal" --

Q   No, I'm sorry, B, involuntary termination.

A   I'm sorry, my mistake.  "Involuntary termination, members may compel the withdrawal of any member by delivering to such member written notice of termination signed by members owning, at least, two-thirds of all percentage interests."

Q   Okay, now, could you please turn to Defendant's Exhibit 40?

A   Yes.

Q    Is this a written consent by the partners holding two-thirds interest in Cohen Milstein?

A    Yes, it is.

Q    And did you sign this?

A    I did.

Q    Could you please tell me what this document does?

A    First, the document amended our operating agreement to eliminate the provision giving 30 days for an involuntary withdrawal for a partner to leave the firm.  And it also amended the operating agreement to provide for a different method of delivery of the written consent.  And finally, it provided for the expulsion of Michael Hausfeld from Cohen Milstein.

Q    Was your signature on this document motivated in whole or in part by the desire to increase your capital account or your percentage interest in the firm?

A    Absolutely not.

Q    Now, your capital account increased slightly by December 31, 2008, correct?

A    It did.

Q    Did you receive that amount of increase as a disbursement to you?

A    I did not receive no distribution whatsoever in 2008.

Q    Did your reasoning for signing this document have anything to do with Michael Hausfeld's capital account?

Sommers - Direct                                89

A    It had absolutely nothing to do with Mr. Hausfeld's capital account.

Q    And can you tell me why not?

A    It had to do with other factors relating to events in 2008.

MS. UPADHYAYA:  Just anticipating, Judge.

THE COURT:  She's just stretching again.  Go ahead and ask your questions.

BY MS. BAUM:

Q    Okay, the witness was asked to explain his reason -- whether his reasons for signing the document had anything to do with Michael Hausfeld's capital account.  He said no and the question was why not?

A    My reasons for signing this written consent is the question?

Q    Yes.

A    Okay, in 2008 and at this time in 2008, the firm was in an absolutely critical situation, in my opinion.  We had months and months of acrimony and strife.  Morale at the firm was extremely --

MS. UPADHYAYA:  Your Honor, this is irrelevant.  There is no claim that -- I mean, we're not talking Mr. Hausfeld and Mr. Lewis' termination from the firm or challenging that in this proceeding.

MS. BAUM:  Mr. Rosenthal made a big deal about how

Sommers - Direct                                90

this written consent was shortened from 30 days to one day and how this was terrible and I think we have a right to give our version of the story.

MS. UPADHYAYA:  Well, the 30 days, your Honor, goes to when the, you know, when the operating agreement, pursuant to the date on the operating agreement, when the capital account should be calculated.

THE COURT:  I understand.  I don't think the issue is really in dispute.  I mean, the document says there was acrimony and continuous disputes.  I don't think any of that's in dispute, so, I don't know if we need to waste time on that.

MS. BAUM:  Okay, as long we can get a stipulation there was no bad faith involved on the part of Cohen Milstein in shortening the time?

THE COURT:  Well, I don't know if it's anything I have to decide today.  Whether there as bad faith or good faith doesn't matter.  The fact is, it happened and this document says why it happened, so, let's just leave it at that.

MS. BAUM:  Okay.

THE COURT:  All right, so, I'll sustain the objection.

MS. BAUM:  Well, then I have no further questions.

THE COURT:  All right, well, very good, thank you.

Sommers - Direct                                    91

Ms. Upadhyaya.

          MS. UPADHYAYA:  Upadhyaya.

          THE COURT:  Upadhyaya, got it.

          MS. UPADHYAYA:  May I just have a quick --

          THE COURT:  Take your time.

          (Pause.)

          THE COURT:  You may proceed.

                    CROSS-EXAMINATION

BY MS. UPADHYAYA:

Q    Good morning, Mr. Sommers.

A    Good morning.

Q    Mr. Sommers, you testified on direct that the executive
committee made the decision not to take a $5 million write
down prior to Mr. Hausfeld and -- effective prior to Mr.
Hausfeld and Mr. Lewis' termination?

          MS. BAUM:  Objection, mischaracterizes it.

          THE COURT:  All right, well, I understand what she's
getting at, so, they decided not to write it down before
October 31st, is that right?

          THE WITNESS:  Maybe I can clarify.  Yes, we decided
not to do that, yeah.

BY MS. UPADHYAYA:

Q    The executive committee rejected Ms. Drolet's
recommendation to take a $5 million write down effective
prior to October 31, 2008?

A   That's not exactly correct.

Q   You said that -- well, why don't you explain what you mean?

A   We didn't reject Ms. Drolet's recommendation to take a $5 million write-down, we rejected the recommendation to apply it to Mr. Hausfeld and to Mr. Lewis --

Q   Right.

A   -- that's the distinction.

Q   And you did it because you thought it was a practical and pragmatic decision?

A   Correct.

Q   And that you made the decision to avoid further conflict with Mr. Hausfeld and Mr. Lewis regarding the capital accounts?

A   Yes.

Q   Please turn to Exhibit 42 in Plaintiff's Exhibit binder, which is the large binder.

(Pause.)

Q   Do you have it?

A   I do.

Q   Do you recognize this e-mail?

A   Which e-mail?

Q   This is an e-mail string, February 20th -- let me just direct your attention to the bottom of the first page.

A   Okay.

Sellers - Cross                                    93

Q   Now, this is an e-mail, the bottom e-mail, February 20th at 4:47, is an e-mail that you received from Patrick Tillou, correct?

A   That's correct.

Q   And this is an e-mail string confirming that the fees from the OSB case had been received by Cohen Milstein Sellers & Toll?

MS. BAUM:  Objection, your Honor, I don't -- I think this exceeds the scope of direct.

MS. UPADHYAYA:  Well, your Honor, he testified that...

(Discussion held off the record.)

THE COURT:  Go ahead.

MS. UPADHYAYA:  I'm sorry, may I consult?

(Discussion held off the record.)

MS. UPADHYAYA:  Mr. Sommers is an equity partner of CMST, he's a party.

THE COURT:  No, but her objection is she didn't ask about these e-mails of the OSB fees.

MS. UPADHYAYA:  She didn't ask about the e-mails about the OSB fees, your Honor, but Mr. Sommers did testify that the decision to not take the -- not apply the $5 million write-down to Mr. Hausfeld and Mr. Toll's capital account calculations were to avoid further conflict, I just want to ask him a couple pointed questions on that issue.

Sellers - Cross                                94

THE COURT:  All right, I'll allow it.

BY MS. UPADHYAYA:

Q   Mr. Sommers, I was asking you whether or not this was an e-mail confirming that the OSB fees had come in.

A   It appears to be.

Q   Okay.  And you didn't release Mr. Hausfeld and Mr. Lewis' capital account calculations to them until after the OSB fees came in, did you?

MS. BAUM:  Your Honor, he did not testify to when he released the --

BY MS. UPADHYAYA:

Q   You're on the Executive Committee, right, Mr. Sommers?

THE COURT:  All right.  Well, hold on, let's just go one at a time.

I'm going to allow her to ask it because it goes to whether or not he intended to avoid acrimony conflict and all that, so --

MS. BAUM:  Can she ask the predecessor question, did he authorize the release?

THE COURT:  Well, you've established he was on the Executive Committee, so he was involved in those decisions, so he can explain.  So, I'll overrule the objection.

MS. UPADHYAYA:  Thank you, Judge.

BY MS. UPADHYAYA:

Q   Mr. Sommers, I asked you whether or not you -- I'm sorry,

I asked you whether you waited until the OSB fees came in to release the capital account calculations to Mr. Hausfeld and Mr. Lewis?

A    I did not.

Q    You were on the Executive Committee at that time, right?

A    I was on the Executive Committee in February, 2009, yes.

Q    And your name is on the e-mail confirming -- from Patrick Tillou confirming that the OSB fees had come in, correct?

A    My name is on the e-mail at the bottom of the page on Plaintiff's Exhibit 42, on the first page.

Q    Okay.  And if you look a couple of e-mails up, in response to Mr. Tillou's confirmation that the OSB fees came in, Mr. Toll says, "Now can't wait for MDH explosion re the capital account.  I expect a repeat trip to Philadelphia to see the Magistrate."  Do you see that?

A    I do.

Q    Now, are those words that you think CMST -- are those words that reflect --

THE COURT:  Well, that's argument.

MS. UPADHYAYA:  Okay.

THE COURT:  And I don't know if he was involved in that transaction.  So, you have to lay a foundation that he had some connection with that.

MS. UPADHYAYA:  Okay.

BY MS. UPADHYAYA:

Q    Did you have any discussions with Mr. Toll about releasing the capital account calculations on February 20th?

A    I did not.

Q    Now, Mr. Sommers, when did the Executive Committee vote to release the capital account calculations to Mr. Hausfeld and Mr. Lewis?

A    I don't recall the precise date, I believe it was some time in mid-February of 2009.

Q    Was it prior to February 20th, 2009?

A    Again, I don't recall the precise date; it may have been, I just don't recall.

Q    But the fees weren't actually released to Mr. Hausfeld and Mr. Toll until February 20th, 2009?

A    Your question is confusing.  First of all, they weren't fees and --

Q    I mean, I'm sorry, the calculations.

THE COURT:  Hold on, hold on.  Don't argue with her, all right?

THE WITNESS:  Okay.

THE COURT:  Just ask another question.

MS. UPADHYAYA:  Okay.

THE COURT:  All right.  Everybody take your time. Go ahead.

MS. UPADHYAYA:  Thank you, Judge.

THE COURT:  Sure.

Sellers - Cross                    97

BY MS. UPADHYAYA:

Q   The account -- I misspoke -- the capital account calculations for Mr. Hausfeld and Mr. Lewis weren't actually released to them until after the OSB fees came in?

A   I believe that's correct.

Q   On February 20th?

A   Yes.

Q   But you can't recall when the Executive Committee voted to release those to them?

        MS. BAUM:  Objection.  I don't think he ever testified they voted to release them, he testified to something different.

        THE COURT:  All right.  Well, why don't you lay the foundation about how that happened?  I'll sustain the objection.

BY MS. UPADHYAYA:

Q   Mr. Sommers, as a member of the Executive Committee, there was a vote or an authorization to release the capital account calculations to Mr. Hausfeld and Mr. Lewis, right?

A   That's correct.

Q   And you're saying that you can't recall when -- what date the Executive Committee decided to release those to them?

A   I don't recall the specific date that we approved the calculations.  We did not have a vote to authorize the release of them, we simply approved the calculation.

Q   Okay, but the approval of the calculation was prior to February 20th, right?

A   I believe it was; I don't recall the exact date, but I believe --

Q   Okay, and the --

A   -- the meeting took place before the 20th of February.

Q   Okay.  So, the approval of Mr. Hausfeld and Mr. Lewis' capital account calculations were before February 20th?

A   I believe so, yes.

Q   By the Executive Committee?

A   That's correct.

Q   And they weren't given to Mr. Hausfeld and Mr. Lewis until February 20th?

A   I've seen correspondence to that effect, but -- I mean, the communication will speak for itself on the date that it was transmitted.

Q   You were on the e-mail string talking about the OSB fees coming in, right?

A   I am on the e-mail string up to a point on Plaintiff's Exhibit 42.

Q   Okay.  You're on the e-mail string that encompasses the communications for Patrick Tillou to confirm the OSB fees had come in, correct?

A   That's correct, yes.

Q   Who is designated to release the capital account

calculations to Mr. Hausfeld and Mr. Lewis?

A   Who was designated by the Executive Committee?  I don't recall us discussing an individual who was going to take care of that.

Q   Was it Mr. Toll?

A   I just want to be clear, who was designated to release the data to Mr. Hausfeld and Mr. Lewis?

Q   Who was in charge of releasing the capital account calculations to Mr. Hausfeld and Mr. Lewis?

A   I don't know who was in charge of releasing it, I think ultimately it was being dealt with between counsel.

Q   Okay.  So, who at the firm was handling the release of the capital account calculations to Mr. Hausfeld and Mr. Lewis?

A   Well, the person most involved in that would have been Mr. Toll.

Q   Okay.  Now, Mr. Sommers, if you could please turn to Plaintiff's Exhibit 68?

        (Pause.)

Q   Do you have it before you?

A   I do.

Q   This is a November 5th, 2008 memorandum from Mr. Toll to the equity partners, is that right?

A   Yes.

Q   And Mr. Toll's memo states that attached to the memo is

"a chart setting forth the final equity partners' percentage interest in the firm for 2008, approved today by the Compensation Committee, retroactive to the beginning of 2008 and effective immediately."  Right?

A    That's what it says, yes.

Q    Okay.  Now, turn to the next page.  Your initials are DSS, Mr. Sommers?

A    That's correct.

Q    Okay.  Now, if you look at the fourth column, it reflects that your percentage interest in the firm was XXXX percent prior to November 5th, 2008, correct?

A    Yes.

Q    And after November 5th, 2008 your final percentage for 2008 was XXXX, is that right?

A    Yes, that's what it says.

Q    Now, the increase in your percentage interest as of November 5th, 2008 was the result of the Compensation Committee slashing Mr. Hausfeld's percentage interest from 28 percent to 14 percent, correct?

A    It was a result of the decision of the Compensation Committee.

Q    Right, to reallocate the 14 percent that was -- that Mr. Hausfeld's percentage interest was reduced by amongst equity partners?

A    Yes, those points came -- there's only a hundred points

and those points came from points that were reduced from Mr. Hausfeld.

Q    Now, turn for me -- turn, please, to Exhibit 78.

(Pause.)

A    Okay, I have the exhibit in front of me.

Q    Now, you said that the firm was having a bad year in 2008?

A    Financially, among other things, but, yes.

Q    Okay, but you saw an increase in your capital account balance by the end of the year?

A    In 2008 there was an increase, yes.

Q    I just want to ask you another question about the Executive Committee's decision not to apply the $5 million write-down to Mr. Hausfeld and Mr. Lewis' capital accounts. Did the Executive Committee think it was doing Mr. Hausfeld and Mr. Lewis some kind of favor by not completely wiping out their capital account?

MS. BAUM:  Objection, argumentative.

THE COURT:  Yes, I'll sustain it.  You can rephrase it.  He can only speak for what was said at the meeting or what he thought and I don't know -- I mean, the question does invite some argument.  So, just rephrase it.

BY MS. UPADHYAYA:

Q    Mr. Sommers, you testified that you wanted to avoid further conflict by not taking -- not applying the $5 million

Sellers - Cross                                    102

write-down to Mr. Hausfeld and Mr. Lewis' capital account balances?

A    Yes.

Q    But Mr. Hausfeld's capital account balance had already been reduced by two million and you thought that there was some conflict about that?

A    I don't understand your question.

Q    Well, you said you wanted to avoid further conflict by applying a $5 million write-down, so you apparently believed that there would be some conflict about the calculation?

A    No, that's absolutely not correct.  I can clarify, if that would be helpful, your Honor.

            THE COURT:  Well, I'll let her ask another question.

            THE WITNESS:  Okay, that's fine.

            MS. UPADHYAYA:  I have no further questions.  Thank you.

            THE COURT:  Okay, thank you.

            Any follow-up?

            MS. BAUM:  Nothing.

            THE COURT:  All right.  Thank you, sir, thank you for coming.

            THE WITNESS:  Thank you, your Honor.

            (Witness excused.)

            MR. KEENEY:  Our next witness is Herbert Milstein.

            THE COURT:  All right.

Case 2:06-cv-00826-TR   Document 1034   Filed 01/08/10   Page 103 of 139

(Discussion held off the record.)

MR. KEENEY:  Your Honor, we have Mr. Rosenthal's permission, now that Mr. Sommers is done, to sit in the back and he is.

THE COURT:  All right.

MR. KEENEY:  So, I just want to let you know we're not violating our agreement.

THE COURT:  All right.

(Pause.)

THE COURT:  Good morning.

THE WITNESS:  Good morning, your Honor.

HERBERT E. MILSTEIN, Defendant's Witness, Sworn.

THE DEPUTY CLERK:  Please state your name and spell your last name, sir, for the record.

THE WITNESS:  Herbert E. Milstein, M-i-l-s-t-e-i-n.

THE DEPUTY CLERK:  Thank you, sir.

THE COURT:  Okay, Mr. Keeney.

<u>DIRECT EXAMINATION</u>

BY MR. KEENEY:

Q   Mr. Milstein, are you an equity partner of the Cohen Milstein firm?

A   Yes.

Q   Are you one of the founding partners?

A   Yes.

Q   You're one of the named partners too, right?

Milstein - Direct                    104

A    Yes, sir.

Q    You are the Milstein in Cohen Milstein?

A    That is me.

Q    Okay.  Prior to joining Cohen Milstein, had you practiced in other firms?

A    Well, I practiced with predecessors of Cohen Milstein.

Q    And what were those predecessors?

A    I was -- for a short term, I was with Dilworth Paxson Kalish Cohen & Levy here in Philadelphia -- or not in Philadelphia, but their Washington office, and then a number of us withdrew, including the named partner Harold Cohen, and we organized a new firm with an office in Philadelphia and an office in Washington, and I was associated with that firm for approximately 16 years.  Then, after approximately 16 years, a number of us, basically the Washington office, left what was then known as Cohen Milstein & Cohen, C-o-h-e-n, and formed a firm in Washington, DC, that was in March of '86 and that firm, under different names, exists today.

Q    And in those predecessor firms was Michael Hausfeld practicing with you?

A    Yes.

Q    In those predecessor firms, do you have any information as to whether the books and records were kept on the basis of GAAP or not?

A    I do not believe that they were kept on GAAP.

Milstein - Direct                    105

Q    Why don't you believe that?

A    That's my memory with Dilworth, although it's not a strong memory, but once we left Dilworth the books were kept on -- not kept on a GAAP basis, I know that.

Q    Directing your attention now to joining Cohen Milstein in the year 1986, from 1986 to the present, has Cohen Milstein ever kept its books of account on a GAAP basis?

A    No.

Q    During that same time period, from 1986 to the present, has Cohen Milstein ever prepared its financial statements on the basis of GAAP?

A    No.

Q    Do you know why not?

A    Well, the various levels of answer to that.  In the first place, we never chose to; in the second place, I personally believed it would be inappropriate, and we never asked anybody to do that.  I don't recall any discussions at any time ever of keeping our books in GAAP; it wasn't a choice we made, we just kept them on a cash tax basis.

Q    And do you have an understanding of what changes would have been required if you had been using GAAP for all purposes as opposed to the income tax method that you were using?

A    Yeah, I certainly have some ideas of what the changes would be.

Milstein - Direct                    106

Q    And could you just tell us a couple of them?

A    Well, we would have had to have kept estimates of revenues, estimates of cost, we would have required an outside auditor who would be capable and willing to do that, and it would have been a very costly audit or a costly review, I guess an audit without opinion.  We only needed, in my view, an annual statement reporting for two functions, one was to function ourselves, so we could control ourselves and make sure we had good internal controls, and the second reason would be to comply with any financial institution whom we were borrowing money from, and no financial institution ever required us to keep GAAP --

Q    And in the --

A    -- and we certainly didn't need to, in my view.

Q    In the law firm context, is Cohen Milstein different from other law firms?

A    We're different from most law firms --

Q    How is that?

A    -- not all law firms.

Q    How is that?

A    Well, most of our hours are not collected -- most of our time is not collected on an hourly basis where we bill monthly or on some periodic basis; some of it is, but the vast bulk of it is contingent work; not all of it, but largely we earn that after either settling the case or

winning it by trial, and applying for a fee and having a hearing and the court awarding us that fee. So, it is largely very unpredictable when revenues would come in. The second thing is, there are income tax requirements which have been in existence for not that entire time but for many, many years, which doesn't allow us to expense expenses that most firms think they can expense, because we're advancing costs for firms -- advancing costs for cases and the cost advances are very substantial, millions of dollars a year. The IRS views that as a capital expense, not an expense that can be expensed on the income tax; not all case advances, but some of them, and there are rules and which I can't -- I wouldn't dare try to quote, but -- so that we have enormous amounts of capitalized expenses, usually in the many millions of dollars, sometimes and more recently over $10 million, and you can't -- you expend the money, but you can't expense it for income tax purposes. So, the result is a very strange financial statement and a very strange experience. You know, you may take in -- let's say you take in $10 million one year, you may spend $9 million and you'll have a million left over, but not really, that's for income tax purposes, because you'll have all these capitalized expenses which you have spent; court reporters' fees, experts, travel, among others; and you can't recognize those until you collect them, if you collect them; you may write them off or you may collect them,

Milstein - Direct                                          108

depending on the case.  That's a strange and unique experience that most law firms don't do; if you're in the plaintiff's business, you do it, but otherwise you don't.

Q    Have you considered during your time at Cohen Milstein from 1986 to the present whether you believe it would be appropriate for Cohen Milstein to use instead of a cash-based method of accounting a GAAP method of accounting with respect to the books of account.

A    Well, I have some familiarity with GAAP, I have never personally considered it.

Q    Why not?

A    I think it would just be inappropriate, expensive, it doesn't help us, we've never talked to an accountant about doing that.  We've had other accountants besides Pat Drolet's firm.  Nobody has ever suggested it, we've never asked for it, no bank we've ever dealt with has ever requested us. There is no reason for it.

Q    Okay.  Shifting topics.  Directing your attention to November 5th, 2008, did you attend a meeting of the Compensation Committee of Cohen Milstein?

A    Yes.

Q    Were you a member of the Compensation Committee when you attended?

A    Yes.

Q    Did you cast a vote at that meeting?

Milstein - Direct                    109

A    Yes.

Q    I would like you to turn in your exhibit binder to Exhibit 39, that's Defendant's Exhibit 39 --

A    Okay.

Q    -- that's the smaller binders.

A    Right.  Let me get rid of this one.

            (Pause.)

A    Mr. Keeney, you said 39?

Q    Defendant's Exhibit 39, yes.

A    Okay.

Q    It should be two pages.

A    Yes.  I've got it.

Q    Okay.  And the first question is, did you receive a copy of this memorandum from Steve Toll at or about November 5th, 2008?

A    I'm sure I did; I have no memory of receiving it, the date I received it, but I remember the memo.

Q    Turning to the second page, is that your recollection of what the Compensation Committee did at its meeting of November 5th, 2008?

A    Yes.

Q    In the meeting of November 5th, 2008, was the subject of capital account balances mentioned at all?

A    No.

Q    As a member of the Compensation Committee, do you believe

Milstein - Direct                110

that the action taken by the Compensation Committee in Defendant's Exhibit 39 affects the capital account balances as of October 31, 2008 of any withdrawn partner?

A    No.

Q    Why not?

A    Well, for a few reasons.  One, the actions of the Compensation Committee have never, to my knowledge, affected the capital account.  Secondly, the capital account has been handled through whatever that clause is in the partnership agreement.

Q    And, when you refer to the partnership agreement, you're referring to the operating agreement?

A    Correct.

Q    And that is marked as Defendant's Exhibit 3, I believe, if you could put that in front of you?

          (Pause.)

A    Yes, that's the most recent version of it, yes.

Q    Okay.  Now, I interrupted your answer, I just --

A    No, no --

Q    -- wanted to clarify what the agreement was.

A    -- that's fine.

Q    You gave two reasons, I just want to make sure that I give you the opportunity to give a full answer.

A    Right.  And the other reason is it just doesn't make any sense from various points of view --

Milstein - Direct                          111

Q    And why is that?

A    -- for the Compensation Committee to -- I don't think they have the power to -- the Compensation Committee to act on a partner's capital, I think that's something that has to be acted upon by the partnership, equity partnership.  And the experience was -- and I may be repeating myself and I apologize, but the experience was that the Compensation Committee decided the compensation for the year you were in, retroactively, I guess, backwards from the beginning of the year, but the capital account was not affected.  And, in addition, that's how it had been handled for other partners who had left the firm, including two had left fairly recently.

Q    And the two that you're referring to left fairly recently, are you referring to Linda Nussbaum as one of the two?

A    Yes.

Q    And are you referring to either Mark Willis or Paul Gallagher as the other one?

A    I was thinking of Mark Willis.

Q    Okay.

A    Paul Gallagher had left too, that's correct, I had forgotten --

Q    Okay.

A    -- I had forgotten that in my answer.

Milstein - Direct                    112

Q    Okay.  Could you please turn in the exhibit binder to Defendant's Exhibit 11?

A    Yes.

Q    And is Defendant's Exhibit 11 the Cohen Milstein Sellers & Toll financial statements at year end?

A    Well, if I've got the right one, it looks like November, 2008.

Q    I'm not sure you have the right one.

A    Okay.

Q    If you could turn to Defendant's Exhibit 11?

A    I'm sorry, did you say Defendant's?  I'm sorry --

Q    Yes.

A    -- I thought you said Plaintiff's.  Okay, okay.  Thank you.  Got it, I got it.

Q    And you have in front of you now the Cohen Milstein Sellers & Toll reviewed financial statements, December 31, 2008 and 2007?

A    Yes.

Q    And it's your understanding these were prepared by Drolet & Associates, right?

A    Yes.

Q    Could you please turn to Page 3?

A    Yes.

Q    Does Page 3 show a comparison of the ending capital accounts of members as of December 31, 2008 compared to the

Milstein - Direct                                113

ending capital accounts of December 31, 2007?

A    Yes.

Q    Directing your attention specifically to your capital account --

A    Yes.

Q    -- can you explain to the Court what happened to your capital account between 2008 and 2007?

A    My capital account increased by XXXXXXXXXXXXXXXXXXX XXXXXXX dollars from the end of 2007 to the end of 2008.

Q    And I notice the next partner down is Michael Hausfeld --

A    Yes.

Q    -- what happened to his capital account?

A    His capital account went from roughly 4,994,000, roughly five million, to 3,052,000, again, rounding off.

Q    And Michael Hausfeld had left the firm prior to December 31, 2008, is your understanding?

A    Yes.

Q    Do you know why your account went up a little bit and his account went down a lot?

A    I think so.

Q    What's that?

A    His account went down a lot because, in doing the calculations pursuant to the operating agreement, his account was --  his capital account was valued as at month-end, October, 2008.  My account went up very slightly because my

Milstein - Direct                    114

account was valued as year-end, December 31st, 2008.

Q   Directing your attention to the bottom of the page, do you see a reference to total members' equity at year end 2008?

A   Yes.

Q   And can you read that total figure?

A   XXXXXXXXXXXXXXXXXXXXXXXXXXX dollars.

Q   Was that an increase in 2008 or a decline in 2008 from the 2007 aggregate capital balances?

A   A decline, a very substantial decline.

Q   Looking at that same exhibit, looking at the partners whose capital increased, can you do a ball-park calculation in your head -- and you might be able to, so -- okay, how much of the partners who stayed had increases in the aggregate in their capital accounts?

A   Roughly XXXXXXX, it looks like; I may be off a little bit, but it was roughly XXXXXXX.

Q   Okay.  And that was XXXXXXXX, right?

A   That was XXXXXXXX for all of them.

Q   Okay.  And could you turn in your exhibit binder to Defendant's Exhibit 40?

A   Yes.

Q   Did you sign Defendant's Exhibit 40?

A   Yes, that's my signature on Page 3.

Q   Okay.  I want to direct you just to Section 1 of the

Milstein - Direct                         115

written consent.  And I realize there are three sections, I want to talk to you about Section 1 of the written consent.

A    Is that Roman numeral one?

Q    Exactly.

A    Yes.

Q    And by your signature did you approve the amendment to shorten the 30-day notice time?

A    Yes.

Q    Did your reason for shortening the 30-day notice time for Michael Hausfeld have anything to do with his capital account?

A    No.

Q    And you're sure of that?

A    Yes.

Q    Directing your attention back to the actions of the Compensation Committee, which would have been the day before, did you vote to reduce Michael Hausfeld's percentage interest in the firm?

A    Yes.

Q    And in doing so did you apply the criteria that the Compensation Committee has, as approved by the Executive Committee, to adjust compensation for partners up and down?

A    Yes.

Q    And, with respect to the criteria, were you emphasizing non-economic criteria or economic criteria in your reduction

Milstein - Direct                                    116

of Michael Hausfeld?

A    In the reduction, non-economic criteria, although it had
an economic impact that was very substantial.

Q    And, by economic impact, you mean there was an economic
impact on the firm?

A    Yes.

Q    You've been practicing with Michael Hausfeld a long
time --

A    Yes.

Q    -- starting from 1986 to 2009 at Cohen Milstein, have you
ever had a discussion with Michael Hausfeld in which Michael
Hausfeld told you as one of the founding partners that he
thought Cohen Milstein should be using a GAAP basis of
accounting?

A    No, sir.

Q    After Michael Hausfeld's departure from the firm on or
about November 6th, 2008, did you have to take what I will
call extraordinary personal measures to take out a loan to
keep the firm going?

A    Yes.

Q    Can you tell us about that?

A    Well, we had had for a number of years a line of credit
and the line of credit was I believe as large as -- had been
drawn down to a point where it was -- the draw-down was as
large as I had ever experienced.  As of, I don't know, the

Milstein - Direct                    117

end of October, beginning of November, we owed Sun Trust more than XXXXXXXXXXX.  And Sun Trust informed us that they would no longer extend credit to us and they had called the loan, which we couldn't pay.

Q   You mean by call the loan, you mean they were not going to give any further advances on the loan?

A   Well, they were not only not going to give any further advances, they wanted it paid down immediately, and we had insufficient funds to carry on the business of the firm.

Q   So, what did you then do personally?

A   I personally signed loan documents with another bank in the Washington area who loaned us various sums of money.  By year end 2008, that's December 31st, 2008, I was a signatory on a loan that had reached almost XXXXXXXXXX.

Q   And, in addition to being a signatory on that loan, did you also have to take out a personal loan and then pump those proceeds into Cohen Milstein?

A   Yes.

Q   And, ultimately, you did get paid back by Cohen Milstein for your personal loan to Cohen Milstein, right?

A   Yes, I got paid back some time in 2009; I don't remember when, but I did get paid back, yes.

          MR. KEENEY:  No further questions, your Honor.

          THE COURT:  All right.  Thank you, Mr. Keeney.

          Any questions, Mr. Kittredge?

Milstein - Direct                         118

MR. KITTREDGE:  Yes, sir.

CROSS-EXAMINATION

BY MR. KITTREDGE:

Q   Mr. Milstein --

A   Yes, sir.

Q   -- my name is Pat Kittredge, I'm one of the attorneys representing Mike Hausfeld and Rick Lewis.

You just said that there was an economic impact in reducing Michael's percentage, do you remember that just a couple minutes ago?

A   No.  If I said that, then I misspoke.  I voted to reduce his percentage because his conduct was having an economic impact on the firm.

Q   It was having an adverse economic impact?

A   Yes, thank you.

Q   When you reduced, you were a member of the committee, right?

A   The Compensation Committee, I was.

Q   The Compensation Committee.  Mr. Hausfeld attempted to bring in a court reporter to that meeting?

A   Yes.

Q   Why wouldn't you allow Mr. Hausfeld to have a court reporter to take accurately down what was being said at that meeting?

A   I didn't think it was appropriate.

Q   Well, if one member of the committee wishes to have a court reporter take down accurately what the members of the committee are saying, like you just said, an economic interest or a subjective reason for reducing Mr. Hausfeld, why would you object?

A   I objected because I didn't think it was appropriate.  My understanding was, though I had never served on the Compensation Committee before this, that a court reporter had never been there before and I didn't think it was appropriate.

Q   Had there ever been a time before in the Compensation Committee to your knowledge when someone's compensation was cut in half?

A   I doubt it, I just don't have any memory of it, I can't --

Q   Of that ever happening?

A   I don't think so.

Q   Okay.  At the time of that meeting, prior to the meeting, it would take two thirds of the voting members of the firm in order to expel Michael Hausfeld, is that correct?

A   I think that's right, yes.

Q   What percentage interest did Michael Hausfeld and those partners who were affiliated with him, what percentage of the firm did they own?

A   I don't remember the exact -- I knew they owned more than

Milstein - Cross                                    120

a third, but I can't tell you the exact percentage.

Q   All right.

A   I could, you know, do it by adding it up, but --

Q   By adding it up, would 44 percent sound correct?

A   I just don't remember; I know it was more than a third, I just don't remember that.

Q   Okay.  Assume for a moment, Mr. Milstein, it was 44 percent and if you take 14 percent away from Mr. Hausfeld, how much does that group now have?

A   30 percent.

Q   Less than a third?

A   Yes.

Q   Which now permits the firm to expel Michael Hausfeld?

A   Yes.

Q   Was that the purpose, one of the purposes of reducing his compensation and --

A   I certainly have that in my head.

Q   You did?  And did you realize at the time that you needed to reduce him sufficiently to have the group have less than a third?

A   I realized that.

Q   Is that one of the reasons you voted in favor of reducing him from 28 to 14?

A   It may have been a reason, the --

Q   I asked a reason, one of the reasons?

A    It may have been a reason, it may have been a reason, yes.

Q    To permit the Executive Committee --

A    That wasn't what I was thinking about, but that was a reason, it may have been a reason, yes.

Q    Are you on the Executive Committee?

A    No.  You're talking about was I on the Executive Committee at that time?

Q    On November the 6th --

A    Yes, no --

Q    -- 2008?

A    -- no, no.

Q    You were not?

A    No.

Q    Exhibit...

     (Pause.)

Q    Would you look at Plaintiff's Exhibit 2?

A    Yes, just give me a second so I can close this book.

Q    Certainly.

A    2, did you say, sir?

Q    Yes.

     (Pause.)

A    Yes.

Q    Is that a correct copy of the 2003 restated operating agreement for Cohen Milstein?

Milstein - Cross                                        122

A    It appears to be.

Q    Did you sign it?

A    Yes, sir.

Q    Did you read it before you signed it?

A    Yes, sir.

Q    Are you aware that it requires GAAP to be used on the books and records of the company?

A    In the last few days, I think I'm aware of that.

Q    Were you aware of it when you read it in 2003?

A    I didn't see it.

Q    You didn't see it?

A    No, sir.

Q    Was it somehow hidden?

A    I didn't say that, sir; I didn't see it.

Q    I asked you if you read it.

A    I did.

Q    When you read it, did you read that sentence about GAAP?

A    I have no memory of that sentence.

Q    You have no memory?  It's not that you didn't see it, you just don't remember today whether or not you saw it, is that correct?

A    That's correct.

Q    Pardon me?

A    Yes.

Q    Thank you.  Now, you said you are somewhat familiar with

Milstein - Cross                                123

GAAP?

A    Yes.

Q    Are you aware that a company can keep their books and records both in accordance with generally accepted accounting principles and report the financial statements on a tax basis?

A    Yes.

Q    You are aware of that?

A    Yes.

Q    Is it inappropriate for a firm to do that?

A    No.

Q    With all the signatures of the equity partners on that exhibit and that amendment, is that not the firm deciding to use the books and records by using GAAP?

A    No.

Q    It's not?

A    It wasn't -- it's a mistake, it shouldn't have been in there and nobody ever discussed it, nobody ever -- I mean, that is a major change from many years of history, that's a major change in the 39 years I've been with this firm and it's predecessors.  We've never kept GAAP books, it was never discussed, we've never hired anybody.  It had to be a mistake, it is a mistake, nobody ever followed it for any reason whatsoever.

Q    Did any partner, to your knowledge, in 2003, prior to or

Milstein - Cross                              124

after they signed this document, raise that question?

A    No.

Q    When you said that the -- Mr. Keeney asked you about the Compensation Committee affecting the capital account, the Compensation Committee doesn't affect capital accounts, correct?

A    That's correct.

Q    The capital account -- or, excuse me, the Compensation Committee merely allocates the, quote, "percentage interests," the equity of the firm, which is 100 percent, correct?

A    Could I hear that again?  I just -- I --

Q    All the Compensation Committee's job is to allocate percentage interests to the equity partners up to and equal to 100 percent?

A    I think they do more than that, because they talk about compensation of non-equity partners and --

Q    No, I'm sorry --

A    -- of-counsel, that's why I --

Q    I'm sure you're right and I apologize, but I meant with respect to, quote, "ownership interest" --

A    Equity --

Q    -- "in the firm" --

A    -- yes.

Q    -- the Compensation Committee's only job, their only role

is to allocate the 100 percent among the partners?

A   For the year in which they're in.

Q   For the year in which they -- and they could change that at any time, can they not?

A   Yes, although I don't they've ever changed it, no, I think they --

Q   All right.  Once a year?

A   Once a year, usually the last two months of the year, something like that.

Q   They'll take a look at how everything is going, who's done what, and you make your adjustments?

A   Yes.

Q   You said it would take the equity partners to change a capital account?

A   Yes.

Q   How could an equity partner change a capital account?  Is a capital account not a vested ownership interest in that individual equity partner?

A   Yes, it's an ownership interest, but it changes from year to year, according to how the firm performs and when people leave or die or are separated for some other reason.

Q   Well, when someone leaves, they take their capital account with them, right?

A   They take their capital account pursuant to the section in the operating agreement.

Milstein - Cross                              126

Q   Right, but whatever dollars those are they take them, right?

A   Well, they take them -- they're paid out over a period of five years --

Q   Fine.

A   -- beginning --

Q   But the other equity partners do not get that equity partner's, the departing equity partner's equity interest or capital account?

A   Could you say that again?

Q   The money that's in the capital account --

A   Yes.

Q   -- can't be taken away by the equity partners of another equity partner, is that correct?

A   I think that's correct, yes.

Q   But you said they could?

A   Well, if that's what it sounded like, then I misspoke.

Q   You misspoke again?

A   Pardon me?

Q   You misspoke again?

A   Did I misspeak before?

Q   You said you did.

A   Well, I said I might have, because I'm being polite, it also may be that you're asking questions in different ways, but leave that as -- we'll let the record speak for itself,

Milstein - Cross                    127

yes, sir.

Q    The record will, of course.

A    Yes.

Q    Now, are you aware that if the firm had kept their books and records in accordance with GAAP that the capital account of the departing partners on October 31st, 2008 would be different than what you and your firm have said that the capital account is?

A    I just don't know what it would have been.

Q    You don't know?

A    No, I don't know, because you would have done a GAAP violation -- a GAAP computation, excuse me, I misspoke, which you can count against me too --

        THE COURT:  All right.  Well, that's --

        THE WITNESS:  Oh, I'm sorry.

        THE COURT:  -- that's not helpful.  All right?

        THE WITNESS:  Yes, sir.

        THE COURT:  Let's just try to answer the questions. Thanks.

        THE WITNESS:  I will.  And we don't know a number of things.

BY MR. KITTREDGE:

Q    What don't we know?

A    We don't know what the write-offs would have been, we don't know -- we would not know at this time, we would not

Milstein - Cross                128

have schedules of expenses, we would not have schedules of revenue, which would have to have been estimated.  I don't know what they would have been and I don't even know how to begin doing that.

Q    Would you look at Exhibit 70 in the big book?

A    I'm sorry, Defendant's or --

Q    Plaintiff's --

A    Plaintiff's, I'm sorry.  Thank you.

Q    -- the big book?

A    Yes, sir.

(Pause.)

A    Yes, sir.

Q    Have you seen that before?

(Pause.)

A    I haven't looked at this recently.  I see I'm copied on it and in fact I don't -- I don't have a clear memory of this, I would have to read it, if you want me to.  I mean, I'm sure I got it.  It says, "Courtesy Copy, Herb Milstein," so I must have gotten it.

Q    Do you remember that?

A    No.

Q    Do you remember reading it at one time?

A    I think I would have to read it again to remind myself.

Q    Why don't you take --

A    Sure.

Q    -- a quick look?

A    It will take me a few minutes.

Q    Take your time.

        (Pause.)

A    Yes, I've looked at it; I haven't read every paragraph, but I've looked at it, I now understand what the letter is, yes.

Q    This is a blowup --

A    Yeah, I can't see it, if you want me to.

Q    You cannot see it?

A    No.

Q    Tell me when you can see it.

A    I'm sorry.  Yes, good, all right.

Q    Now, what you're looking at, the document is a letter dated, what, November the 5th?

A    November 6th.

Q    November the 6th, the day that Michael Hausfeld was expelled from the firm?

A    Yes.

Q    By your vote, along with others?

A    Yes.

Q    This document that I'm showing you here is a summary of what's contained in that letter?

A    Yes.

Q    And on the left-hand side, the left-hand column, it

Milstein - Cross                          130

references all the cases that Mr. Toll is telling the bank

about in that document, correct?

A    Yes.

Q    And what is Mr. Toll suggesting to the bank as a possible

income point in the next two months referencing those cases?

And here is your addition at the bottom.

A    Yes.

Q    How much?

A    The exhibit, the blowup here, which says Exhibit 2, shows

that Mr. Toll suggests that we may collect, the firm may

collect somewhere between 43,145,000 and 46,900,000.

Q    In the next two months?

A    Yes.

Q    Of those cases -- and you look at the document, if it

helps -- how many of those cases that he refers to on that --

that I've put up on that bulletin board were originated and

worked on and controlled by Mr. Hausfeld?

A    I don't know.

Q    Pardon me?

A    I don't know.  I mean, I'd have to go through them one-

by-one and I'm not sure I would know all of that, but --

Q    You wouldn't know most; would you know any of them?

A    Oh, sure.  Just give me a few minutes and I'll go through

it.

Q    Okay.

Milstein - Cross                          131

(Pause.)

A    I believe plastics Mr. Hausfeld had a role in.  You asked me whether he originated or controlled and I don't remember which one, but I think he did.

Q    Let me just go through a couple of these.

A    Sure.

Q    How about hydrogen peroxide, do you see them?

(Pause.)

A    I just don't know; I'm not saying he didn't, I just don't know.  I can't remember whether it was he who did that, who originated it, or whether it was somebody else and I don't know who worked the case --

Q    How about --

A    -- I just don't know.

Q    -- how about Converium (ph.)?

A    I'm sorry, say it again.  Converium?

Q    Right.

A    I don't think he had any role in that at all, I think that's a securities case in which I don't think he had any role in.

Q    How about the last one, Air Passenger?

A    I think Air Passenger was something I think Michael originated and worked on, yes.

Q    And is that the largest single item that's on there?

A    I just don't know.  Do you want to bring that -- pull

that -- yes.  I mean, I just don't remember that kind of detail; I'm not telling you it isn't, I just don't remember. Yes, it looks like it is.  I don't think Air Passenger came in last year at all, but, you know.

Q    Now, getting back to the Compensation Committee, the percentage interest in the firm the Compensation Committee relegates to an equity partner, that is, what, his voting interest in the firm?

A    Yes.

Q    It's also his interest in the either profit or loss of the firm?

A    Yes.

Q    They're not separate pieces of right, are they?

A    No.

Q    They're the same?

A    Yes.

Q    So, when the Compensation Committee says, here are the new percentage interests effective immediately and retroactive to January the 1st, on October 31st, what was the percentage interest of the partners?

A    I'm sorry, I'm just not following the question.  Do you want to try and ask it again?

Q    The Compensation Committee meets on November the 5th?

A    Yes.

Q    And to compensate for the equity interest of the partners

had previously been in existence on certain numbers, correct?

A    Yes.

Q    Michael Hausfeld's number was 28 percent, right?

A    I don't remember; I know it was in the high 20s, I just don't remember what it was, yes.

Q    The Compensation Committee met on November the 5th, reducing some partners, increasing other partners, and coming up with new percentages?

A    Yes.

Q    Effective immediately and retroactive to January the 1st. What was Michael Hausfeld's equity interest in the partnership on October 31st, 2008?

A    I'm having difficulty -- can I describe to you what my difficulty with the question is?

Q    No.  Can you tell me what his --

A    I can't answer it that way.

Q    You cannot answer it?

A    No.

Q    What does effective immediately and retroactive to January the 1st, 2008 mean, Mr. Milstein, when you voted on that at the Compensation Committee meeting of November the 5th, what did that mean?

A    It meant that his compensation for the entire year would be 14 percent of whatever earnings or losses we incurred for the year.

Milstein - Cross                                134

Q   So, what was his percentage interest in losses or profits as of October 31st --

A   After November 5th?

Q   Yes, sir.

A   14 percent.

Q   As of October the 31st, 2008?

A   Yes.

Q   Thank you.  By the way, the firm paid you back your personal loan, did it not?

A   Yes.

Q   In January, 2009?

A   I don't remember.

Q   You don't remember?  With interest?

A   I have no memory whether I collected interest or not; I may have, I just don't remember.

Q   And Sun Trust Bank was totally paid off by the end of the year?

A   December 31st, in the evening of that day, yes.

Q   All right.  It was entirely paid off?

A   Yes.

Q   Thank you.

        MR. KITTREDGE:  I have nothing further.

        THE COURT:  Thank you.

        Mr. Keeney?

        MR. KEENEY:  Nothing further, your Honor.

Milstein - Cross                           135

THE COURT:  All right.  Mr. Milstein --

THE WITNESS:  Thank you, sir.

THE COURT:  -- thank you for coming.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Have a good day.

(Witness excused.)

MR. KEENEY:  Our next witness is Mr. Toll, your Honor, but he is going to take more than the five minutes that you have given us.

(Laughter.)

MR. KEENEY:  He will be our concluding witness on the capital account balance, he is also our witness on the Air Passenger dispute.  So, I suggest -- and I'll discuss it with Mr. Rosenthal, just scheduling-wise, but starting with Mr. Toll on Thursday morning and I really want to get in all the witnesses that Mr. Rosenthal wants to put on in Air Passenger also.

THE COURT:  Okay.  What about that?

MR. ROSENTHAL:  Yes, that's fine.  If Mr. Toll is there only remaining witness on Air Passenger, we anticipate having three witnesses on Air Passenger and I think we'll be able to wrap up, I hope.

THE COURT:  So, how long are they expected to be, your witnesses?

MR. ROSENTHAL:  Well, one witness is not going to be here, I know, until early afternoon --

THE COURT:  Okay.

MR. ROSENTHAL:  -- but the other two witnesses --

THE COURT:  I'm just -- I know you both have vacations --

MR. ROSENTHAL:  I don't know what Mr. Keeney's cross is going to be like, I'm thinking --

THE COURT:  Mr. Keeney will be surgical and precise, as always.

MR. ROSENTHAL:  As he always is.  My guess is that each of them would probably take 45 minutes on direct, that's my estimate.

THE COURT:  Okay.  So, we should get all the testimony in on Thursday, that was your fear?

MR. KEENEY:  I think so, your Honor.  I still think starting at 8:30 is a great idea, you know, I'm sorry to bring your Honor in --

THE COURT:  I'm here anyway, it doesn't matter to me.  I'm here at 7:15, I told you that.  So, it's not a problem for me.

So, we'll start Thursday at 8:30.

MR. KEENEY:  That would be great.

THE COURT:  And if you would just push your papers to the side of the table, just so they don't get disrupted

137

and -- because somebody will be in the courtroom tonight.

Anything else we have to do today?

MR. KEENEY:  No, your Honor.

MR. ROSENTHAL:   No.

THE COURT:  All right.  Thank you for your patience and your flexibility on scheduling.  I'll see everyone Thursday at 8:30.  Have a great day.

(Court adjourned at 11:58 o'clock a.m.)

* * *

138

I N D E X

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael Hausfeld | | | | |
|   By Mr. Rosenthal | 4 | | 67 | |
|   By Mr. Keeney | | 27 | | |
| Daniel Sommers | | | | |
|   By Ms. Baum | 73 | | | |
|   By Ms. Upadhyaya | | 91 | | |
| Herbert E. Milstein | | | | |
|   By Mr. Keeney | 103 | | | |
|   By Mr. Kittredge | | 118 | | |

| EXHIBITS | ADMITTED |
|---|---|
| P-106 | 72 |
| D-46 | 82 |

- - -

I certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court on September 11, 2009, incorporating redactions of personal identifiers requested by the following attorneys of record:  John C. Keeney, Jr., Esquire, Hogan & Hartson, LLP, and Seth A. Rosenthal, Esquire, Venable, LLP, in accordance with Judicial Conference policy.  Redacted characters appear as an X in the transcript.

Geraldine C. Laws, CET                    Dated 12/23/09
Laws Transcription Service