```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

MICHAEL HAUSFELD, et al      :  CIVIL ACTION NO. 06-0826
          Plaintiffs         :
                             :
          v.                 :  Philadelphia, Pennsylvania
                             :  August 13, 2009
COHEN MILSTEIN SELLERS       :  8:38 o'clock a.m.
& TOLL, PLLC                 :
          Defendants         :
. . . . . . . . . . . . . . . . .
```

```
                     SETTLEMENT HEARING
            BEFORE THE HONORABLE TIMOTHY R. RICE
               UNITED STATES MAGISTRATE JUDGE
```

```
                          - - -
```

APPEARANCES:


For Plaintiffs:


        PATRICK KITTREDGE, ESQUIRE
        Thorp Reed & Armstrong
        400 Market Street, Suite 200
        Philadelphia, PA  19106-2535
               -and-
        MICHAEL D. HAUSFELD, ESQUIRE
        RICHARD S. LEWIS, ESQUIRE
        Hausfeld LLP
        1700 K Street, NW
        Suite 650
        Washington, DC  20006
                -and-
        SETH ROSENTHAL, ESQUIRE
        MOXILA UPADHYAYA, ESQUIRE
        Venable LLP
        575 75th Street, NW
        Washington, DC  20004
        -- for Plaintiffs Michael Hausfeld
           and Richard Lewis


                          - - -
```

APPEARANCES:    (Continued)

For the Defendants:

          STEVEN J. TOLL, ESQUIRE
          DANIEL A. SMALL, ESQUIRE
          Cohen Milstein Sellers &
          Toll PLLC
          1100 New York Avenue, NW
          Suite 500 West Tower
          Washington, DC  2005
                  -and-
          JACK KEENEY, ESQUIRE
          LYNNE BAUM, ESQUIRE
          Hogan & Hartson LLP
          555 Thirteenth Street, NW
          Washington, DC  20004
         -- for Cohen Millstein Sellers
             & Toll, PLLC


                              - - -


Audio Operator:          Inna Goldshteyn

Transcribed by:          Grace Williams, CET
                         Tracey Williams, CET
                         Paula L. Curran, CET


        (Proceedings recorded by The Record Player digital
sound recording; transcript provided by AAERT-certified
transcribers.)

3

(The following occurred in open court at 8:38 o'clock a.m.:)

THE COURT:  Good morning.

COUNSEL:  Good morning, your Honor.

THE COURT:  Please be seated.  Hi, Inna.  Hope everyone had a good evening yesterday.  Thanks for your indulgence.

All right, where do we stand, who's up to bat now?

MR. KEENEY:  We're calling Mr. Toll, your Honor.

THE COURT:  All right, Mr. Toll, welcome back.  Good morning.  You're still under oath.   He doesn't have to be sworn again, Inna.

STEVEN TOLL, Defendant's Witness, Previously Sworn, Resumed.

### DIRECT EXAMINATION

BY MR. KEENEY:

Q   And, Mr. Toll, could you once again state your full name for the record?

A   Steven Jeffrey Toll, T-o-l-l.

Q   Are you an equity partner at Cohen Milstein?

A   Yes, I am.

Q   And are you also a member of the executive committee?

A   Yes, I am.

Q   On November 5th, 2008, were you a member of the compensation committee?

Toll - Direct                                4

A    Yes, I was.

Q    In addition to a law degree, do you also have a degree in accounting?

A    Well, I graduated from the University of Pennsylvania Wharton School undergrad with an accounting major.  I don't know if it's called accounting degree or it's just a Bachelor of Science with a major in accounting.

Q    Okay.  There was testimony yesterday about the exact balances in the Michael Hausfeld and Richard Lewis capital accounts as of October 31, 2008.  My question to you: at the time of the first meeting where you met Magistrate Judge Rice for the first time here in the chambers in Philadelphia did you know the exact capital balance in Michael Hausfeld's capital account as of October 31, 2008?

A    No.

Q    And is that the same answer or a different answer for Rich Lewis' capital account balance?

A    No, the same answer, I didn't know what they were precisely.

Q    Now moving the point in time to slightly later, when you returned to Philadelphia and we were once again in Magistrate Judge Rice's chambers on February -- about February 3rd did you at that time know the exact balance of Michael Hausfeld's capital account as of October 31, 2008?

A    No, I did not.

Q    And is your answer the same with respect to the exact balance in Rich Lewis' capital account?

A    The same answer, I didn't know the precise amount.

Q    And why on those two dates did you not know the exact balance in those accounts as of October 31, 2008?

A    Well, we hadn't completed the calculations.  I mean there was no -- well, let me just put it that way.

Q    Well, what was involved in completing the calculations?

A    Well, you had to look at the loss in effect as of October, you had to multiply it by the percentage.  You then, many times there are small adjustments that have to be made. And then in addition you had to consider, you know, writeoffs that would be taken and I just -- we hadn't done it yet.  And it's just commonplace that since the payment is not going to be for a year we, with every partner who's left we've been late under that 30-day provision, we just hadn't done it yet.

I had gotten a draft from Hugh Diamond in January so I did have a draft, I testified at my deposition, I wasn't even sure I looked at it yet because often I just put it in my briefcase with a million other things and I would get to it which I did eventually over the next couple of weeks but there wasn't any pressing need with the millions of other things that were happening.

Q    May I direct your attention to Defendant's Exhibit 2 which is the confidential settlement agreement reached in

Toll - Direct                                                     6

this case.  That's in the defendant's exhibit, that's the smaller binder.

A   I see it.

Q   And could I direct your attention very specifically to Paragraph 14 with respect to capital accounts?

A   Yes, I see it.

Q   And the question is under the settlement agreement when is the date that Michael Hausfeld is entitled under the settlement agreement to the first one-half installation or installment of his capital account balance as of October 31?

A   Under the settlement agreement it was December 31, 2009.

Q   And is that the same for Rich Lewis as it is for Michael Hausfeld?

A   Yes.

Q   Okay.  Turning back -- well, actually, you have it in front of you, Exhibit 2.  Did you personally sign that settlement agreement which is marked as Defendant's Exhibit 2?

A   Yes.

Q   And at the time that you signed the settlement agreement did you know the exact balance in Michael Hausfeld's capital account as of October 31, 2008?

A   No.

Q   And is that the same answer for Rich Lewis' capital account as of October 31, 2008?

Toll - Direct                                                      7

A    It's the same answer.

Q    And why did you not know the exact balances in the Hausfeld capital account and the Lewis capital account as of October 31, 2008 at the time you signed Defendant's Exhibit 2?

A    Because we hadn't finished the calculations.  It hadn't even gone to Pat Drolet yet to see Hugh Diamond's draft was correct or not, what kind of adjustments might be necessary nor had we taken into account writeoffs that might be made.

Q    Was there fraud in the inducement by you in your not knowing and not telling Michael Hausfeld and Richard Lewis what the exact capital account balance was as of October 31, 2008?

          MR. ROSENTHAL:  Objection, your Honor, calls for a legal conclusion.

          THE COURT:  All right, just rephrase the question.

BY MR. KEENEY:

Q    Did you mislead in any way Mr. Hausfeld or Mr. Lewis by not conveying to them the exact capital balance in their account as of October 31, 2008 before they signed the settlement agreement?

A    No, I did not.

Q    And why do you say that?

A    Well, this was part of the, as the Judge knows, a two days of negotiations with a lot of give and take about a lot

Toll - Direct                                    8

of money going back and forth.  And going into the mediation, you know, it was our position a hundred percent that under our partnership agreement Michael had no right to fees, or Richard, in cases that were in progress.  That's the partnership agreement, that's the way it reads.  Yet we went into this mediation and demands were made for excessive sums of money.  And we were very resistant to a number of provisions, I'm sure he was, the Magistrate was shuttling back and forth, and at the end of the day there was give and take on a lot of issues.

And it was obvious to me that Michael, you know, gave on this issue, gave.  He didn't really give, I mean he had, you know, apparently been talking to the Judge, certainly didn't talk to us about five million but he'd apparently been talking to the Judge about five million and it was clear from the settlement agreement that we had gotten some give and take here, that we had this provision in there that he would not be getting five million. It doesn't say that but that's the intent and meaning of it, that it would have to be, that five million from '07 would have to be adjusted as our operating agreement provides.

So I knew it would go down and as a result though we gave up, like we agreed to this 50 percent split on eight cases which is going to give Michael's firm many, many millions of dollars that they weren't entitled to, in our

Toll - Direct                                              9

view.

So, you know, we gave on that, he gave on this, there was no fraud anywhere.

Q   Without knowing the exact capital balance in Michael Hausfeld's account as of October 31, 2008 what information did you have available to you that that account balance had declined from December 31, 2007?

A   Oh, it was simple.  I mean, again, as a rough estimate Michael's percentage when he left or not when he left but the October 31 date was 28 percent, the loss was significant in the fall.  You know, I didn't know or remember, you know, it was five, six million dollars on our books, we actually were out about $13 million to the bank but our actual loss for cash basis purposes was about five, six, seven and so I knew his capital account would, under this provision, would go down.  And he should have known it, everybody should have known it --

Q   Could you please turn to Defendant's Exhibit 18?  That's in our exhibit binder.

A   I see it.

Q   Is Defendant's Exhibit 18 the monthly financial statements of the Cohen Milstein firm for September 2008?

A   Yes.

Q   And was it sent to the equity partners at Cohen Milstein?

A   Yes.

Toll - Direct                                    10

Q   I'd like to direct your attention to the fourth page.   I believe the Bates stamp number in the lower right is 00649.

A   I see it.

Q   Is that a page which at the upper left has a caption, capital?

A   Yes.

Q   And directing your attention toward the bottom of the page, start at the footnote, count up two lines, do you see a figure which is a figure that reads "Net income (loss) year to date"?

A   I see that.

Q   Does that figure show a year-to-date loss as of September 30th, 2008?

A   Yes.

Q   How much was that loss?

A   5.56 million, rounding it up or just approximating.

Q   From that figure were you able to determine that your own capital balance had declined from December 31, 2007, to September 30th, 2008?

A   Sure.

Q   And how did you do that?

A   I just take my percentage interest in the firm which was, I don't remember, low XXXX or something, and then just go XX percent of 5.5 million.   So it's -- my capital account would have been down about XXXXXXXXX dollars at that time.

Toll - Direct                                    11

Q    Does one need to have an accounting major from the Wharton School in order to do that calculation?

MR. ROSENTHAL:  Objection, your Honor.

THE COURT:  All right, I think you know what that is, right?

MR. KEENEY:  I do know that.

THE COURT:  All right.

(Laughter.)

THE COURT:  I'll sustain it.  I got the point.

BY MR. KEENEY:

Q    Directing your attention to the month of October 2008 how was the firm doing financially?

A    Well, we were -- we were really struggling in this time period, actually for much of the year but clearly in this time period.

Q    And in October 2008 you were on the executive committee that night?

A    Yes.

Q    Was Michael Hausfeld on the executive committee then?

A    Yes.

Q    Did you as a member of the executive committee in October 2008 have access to the same or greater information than Michael Hausfeld as another member of the executive committee?

MR. ROSENTHAL:  Objection.  How does he know what

Toll - Direct                                          12

Mr. Hausfeld had access to?

THE COURT: Well, why don't you just rephrase it as to what the members of the executive committee could access?

MR. KEENEY: Okay.

BY MR. KEENEY:

Q   What information did a member of the executive committee in October 2008 have access to?

A   I don't think there are any limitations. I can't -- I mean we have access to everything. Anyone could ask and look at anything. In fact Michael did that frequently in the year, he went to the controller and asked for dozens of financial calculations about the firm and how we were doing and how the cases were. Anyone could do that.

Q   Well, directing your attention specifically to October 2008 did the subject of fee collections in October 2008 come up in executive committee meetings?

A   Yes, it did.

Q   And what was discussed in those executive committee meetings about fee collections in 2008, October?

A   Well, we discussed and it was not just October, I mean it was all the time. We discussed on an ongoing basis our likely projections for the year. I mean our practice, it is -- it is so unpredictable to know when the money is going to come in. It changes throughout the year constantly. So that's early in a year it's almost -- almost not even worth

Toll - Direct                                    13

the effort to make projections for the year because you don't know, so many things can happen.

Here, again, it was a constant where we were in June when we talked about it is a lot different than where we were in October, where we were in November.  And I know there's been a lot of discussion about my November 16th projection to the bank but even there shows, you know, we're already in November and we still had no clue how the year was going to end up.  So the point is we were talking about the likely fees  to come in.

Q   Did a member of the executive committee have access to the fee collection as fee revenues came in in the month of October 2008?

A   Yes.

Q   Do you recall how the fee collections were going in October 2008?

A   Very little came in, only two or three cases, a million and a half dollars or so.

Q   If a million and a half dollars came in, which is your recollection, is that greater or less or the same as the revenues to keep your office running that are needed for that month?

A   I presume you meant the expenses.

Q   The expenses, I'm sorry, yes.  I deferred --

laughter.)  That was the accounting major...

Toll - Direct                                    14

A    This does get a little complicated, your Honor, but to make it simple for now, if the one and a half million is less than the expenses, the expenses on an accounting tax basis were about two and a half million a month and the actual cash outlay was about three million a month and I can explain that, if necessary, later because it gets into capitalized costs and how it affects our numbers.  But it was, the one and a half was less.  The cash out the door was actually three million.

Q    And my question, I've already asked you about did the members of the executive committee have access to the data about the fee revenue coming in.  My next question is did a member of the executive committee have access to the data about the expenses that were paid in the month of October?

A    Access was available to everyone on the executive committee.

Q    Were the expenses in 2008 in the month of September the same or different than those expenses in the month of September 2008?

A    Again I don't want to get too technical about the term "expenses" but because there's a difference between, but they were generally in the same order of magnitude.

Q    Okay.

A    It was about two and a -- three million total cash, two and a half of which showed up as an expense, the other

Toll - Direct                                    15

500,000 was capitalized case advances but that was money going out the door.

Q   Okay.  Directing your attention in the exhibit binder to Defendant's Exhibit 19, can you put that in front of you?

A   I have it.

Q   Can you please turn to, I believe the Bates stamp number is CMST-00661, do you see that?

A   Yes.

Q   Okay.  And just stepping back, is DX-19 the monthly financial statements of Cohen Milstein for the month of October 2008?

A   Yes.

Q   And directing your attention now to the page I asked you to take a look at, is that the page that in the upper left is marked "capital"?

A   Yes, I see that.

Q   Directing your attention to the bottom of the page, starting at the footnote, working up two lines, do you see a figure with respect to gain or loss as of year to date at October 31, 2008?

A   I see that.

Q   And was it a gain or was it a loss?

A   It's a loss of $6.56 million.

Q   Did you have any understanding how that figure impacted your capital account?

Toll - Direct                                      16

A    Yes, it's the same as I said before, I just use my equity percentage and multiply it by that number.

Q    So starting with your capital balance account did you have an understanding that your capital balance account had declined as of October 31, 2008?

A    Yeah, on a monthly basis it was, you know, year to date it was down about XXXXXXXXXXXXXX from the XXXXXXXXXXXX so it was about XXX, give or take.

Q    And did you have to wait for an exact calculation of your capital account balance as of October 31, 2008 to know that as of October 31, 2008 your capital account balance had gone down?

A    Oh, I -- no, I knew it's gone down, they fluctuate month to month.  I mean that's the way it works.

Q    Directing your attention now if you could turn to DX-1, that's Defendant's Exhibit 1 in our exhibit binder?

A    I see it.

Q    And is Defendant's Exhibit 1 a transmittal by Hogan and Hartzen to attorneys at Venable of the exact capital account balances as of October 31, 2008 of Michael Hausfeld and Rich Lewis?

A    That's what it appears to be, yes.

Q    And when is it dated?

A    February 20.

Q    And in the same February time period was there another

                              Toll - Direct                    17

partner who was receiving notification of his exact capital

account balance as of a particular month end?

A    Yeah, there was an equity partner, Mark Willis, who had

left I think it was like August or September and his last

month was, for calculating, this was July 31 and we hadn't

gotten around to that one either.  And so we did all them

together so his went out around the same time.

Q    And please turn to Defendant's Exhibit 16 in our

defendant's exhibit binder?

A    I see it.

Q    Is that a copy of a letter addressed to Mark Willis?

A    Yes.

Q    Can you tell me what date is on that letter?

A    February 18th.

Q    And can you tell me what the letter's about?

A    It was our controller, Hugh Diamond, sending it.  I guess

he sent it by regular mail to Mark, the statement showing his

capital account balance as of the end of July 2008.

Q    Directing your attention now back to Defendant's Exhibit

1, this is the transmittal as of February 20th, 2009 to the

attorneys for Mr. Hausfeld and Mr. Lewis, do you have that in

front of you?

A    Yes.

Q    Prior to its transmittal had the attachments been

reviewed and approved by the executive committee of Cohen

Toll - Direct                                    18

Milstein?

A    Yes.

Q    And why was this an executive committee decision?

A    I think often it is not, you know, and I do it as the managing partner.  But --

Q    What was different about this one if often it is not?

A    Well, it's because of knowing the possibility of contentiousness from Michael, we wanted to be extra careful how we did it.  And there was another issue that had arisen as well with regard to the writeoffs of five million dollars.

Q    Can you explain what that other issue with respect to the writeoffs was?

A    Well, we write down in case costs periodically throughout the year and year end, sometime in January, I think, mid January give or take, the controller came to me and said we're trying to finalize the numbers for '08 and we want to, you know, what are the writedowns for all the cases.

        And we gave him that number was about five million dollars and when Pat Drolet was -- then received the draft from Hugh Diamond she then, you know, came to me and said: look, you've got five million dollars writedown, you know, when where those cases really should have been written off. And I said, well, earlier in the year.  She said: well, you have to take them as, you know, losses as of October 31.  And we had to discuss it because we knew that that would knock

Toll - Direct                                    19

down Michael's capital account and Rich's capital account further and, you know, I didn't want to do that on my own without calling a meeting of the executive committee to discuss all the ramifications.

Q   Okay.  And you said "we had to discuss."  My next question to you is did the executive committee discuss?

A   Yes, we did.

Q   And what was that discussion?

A   Well, we discussed the fact that we thought they ought to be written down, we made a phone call to counsel, I will not get into the discussion.

Q   Don't get into that.

A   But we discussed the matter and we subsequently made a judgment that we would not do it to avoid litigation with Michael because he would be upset his capital account was lower than he might have expected it to be, as he would.  I know him long enough that --

Q   That you're no longer -- Mr. Toll, I'm sorry, I didn't mean to interrupt you there but you would no longer respond to (inaudible).

     Let me ask you this: what was your reason for not including the approximately $5 million of writeoffs into capital account balances as of October 31, 2008?

A   Well, I had two reasons, principally, because I had felt strongly they should have been included because it would have

Toll - Direct                                                  20

been the right thing to do from an accounting standpoint but, again, I was convinced at the end that the best thing to do was try to keep temperature down and not, you know, cause potential problems if we could avoid them.

And, number two, there was a consistency in, you know, not retroactively doing something with capital accounts because we had not taken the writeoffs.  You know, I didn't-- we don't do these every month, you know, I don't do them periodically during the year.  And, you know, someone might say, well, you took them in December but you didn't take them when you could have taken them earlier so you're retroactively taking them.  And, you know, we felt retroactive application to capital accounts as, you know, by this other issue that's been discussed on Michael's equity percentage was not appropriate under the partnership agreement and there was a certain amount of consistency her in not being retroactive in a sense with these because I hadn't written them down at the firm when I could have earlier or we could have.

Q   Was that consistency view that was held by you expressed in the meeting of the executive committee to discuss the capital account balances as of October 31, 2008?

A   I think it was but I'm not a hundred percent sure.

Q   When the actual vote comes at the executive committee to approve it is this the type of vote where everyone raises

Toll - Direct                                    21

their hands and it passes by a majority?

A    It's -- let me just orally say I agree, I agree or I disagree, so it's just oral.

Q    Okay.  Are minutes kept of your executive committee meetings?

A    It really depends on time.  I don't believe minutes were kept at this time.

Q    Okay.

A    But I'm not a hundred percent sure.

Q    Okay.

A    I didn't keep them.

Q    Okay.  Did you conceal from Michael Hausfeld that his capital account balance had declined from its 2007 ending balance to the capital account balance as of October 31, 2008?

A    No, I did not.

Q    Are you sure of that?

A    I thought it was obvious from the language of the agreement that it was obvious anyone reading it that it would have gone down, knowing the financial information of the firm as of October and knowing your equity percentage.

Q    And assuming that Mr. Hausfeld had not actually received yet the October 31, 2008 financial statements because he left on November 6th, how -- what was available, what was available to Mr. Hausfeld to know that his capital account

Toll - Direct                                          22

balance had declined from December 31, 2007?

A    Well, because, again, he received the September statement while he was still at the firm, it showed a five and a half million dollar loss.  It was, we all knew from discussions, that little money came in in October.  Well, again, he wouldn't have known, I didn't know the exact amount of the loss in October as of October 31.  You knew it was in the same general area or actually a little bit more probably, but, you know, regardless, you knew it was in the same general area so you had to know that your capital account, you know, would go down under the partnership agreement.

Q    So is it your testimony that without knowing the exact capital balance you as a partner knew that your capital account balance had gone down by the end of October when compared to where it started at December 31, 2007?

A    Yes.

Q    And is it your testimony that every equity partner at Cohen Milstein who was on the executive committee had access to that same information during the month of October?

          MR. ROSENTHAL:  I'll object to leading, your Honor.

          THE COURT:  It is leading.

          MR. KEENEY:  It is leading, yes, your Honor, let me rephrase that.

BY MR. KEENEY:

Q    Did every member of the executive committee in October

Toll - Direct                                              23

2008 have the same access to information that you did?

A    Yes.

MR. ROSENTHAL:  And how does he know what other members of the executive committee had access to?

THE COURT:  Well, I think I understand the question. I think he's just talking about what general information was available to anyone on the executive committee.

BY MR. KEENEY:

Q    Now I'm going to change topics, I'm going to move to the first meeting before Magistrate Judge Rice in his chambers in January.  Do you recall that meeting, Mr. Toll?

A    Yes, I do.

Q    Do you recall about how long that went?

A    Six, seven hours, I think.

Q    Did it go into the early evening hours?

A    I don't remember the exact time frame but it was long.

THE COURT:  I think we can stipulate to that.

(Laughter.)

BY MR. KEENEY:

Q    There's been testimony about what was said or not said with respect to a five million dollar figure in joint sessions.  What is your recollection of what was said in joint sessions about the capital account balances of Michael Hausfeld?

A    There was no five million dollar figure mentioned in

Toll - Direct                                          24

joint session, absolutely not, and just that there would be an acceleration of the capital account that was due and owing.

Q   Do you recall in joint sessions any discussion about capital account balances in the January meeting?

A   I really don't, just that it was going to be accelerated and we were negotiating over the time period of the acceleration.

Q   Were there any negotiations over the amount?

A   No.

Q   Were there negotiations over the date as to which the calculation was to be made?

A   No.

Q   Ultimately directing your attention to Paragraph 14 of the settlement agreement as signed, that's in Defendant's Exhibit 2, could you read into the record the first sentence of Defendant's Exhibit -- of Paragraph 14 of Defendant's Exhibit 2?

A   "The return of capital owed to Michael Hausfeld as of November 6th, 2008, and Richard Lewis as of November 10, 2008, as provided for in the amended and restated operating agreement of Cohen Milstein Hausfeld and Toll will be accelerated."

Q   And do you recall at the conclusion of that long session before Magistrate Judge Rice whether there was an oral

agreement that with respect to capital account balances that was going to be the operative word?

A   I don't remember if we talked about the exact words that would be in the agreement but, I mean, this reflected my understanding but I don't remember we talked about the words. I don't think we did.

Q   Okay.  And at the end of the long session was there an agreement in principle that still had to be reduced to writing?

A   Yes.

Q   And did that agreement in principle include what became Paragraph 14 of the settlement agreement and its first sentence?

A   Yes.

Q   Directing your attention now to the second trip to Magistrate Judge Rice's chambers in early February, do you recall that?

A   Very well.

Q   And you were there, right?

A   Yes, I was.

Q   Who else was there on behalf of Cohen Milstein?

A   I believe Dan Small and you were just on behalf of the firm, yes.

Q   Do you recall who was there on behalf of Michael Hausfeld and Richard Lewis?

Toll - Direct                                    26

A    I'm pretty sure it was Mr. Rosenthal, Michael and Rachael Rosenberg.

Q    And just a small point going backward in time, at the first meeting in January do you recall who was at that meeting besides yourself and the Magistrate Judge?

A    Well, it was broader.  First of all, I don't think Mr. Rosenthal was there.  On our side I think it was myself, Dan Small, for a while Richard Kauffman, you, I think that was it for us.  For them, I think Rich Lewis was there, I think.  I think Rachael was there, I think Mr. Kittredge was there though I'm not totally recall if there was anyone -- Eisler may have been there, I think.

Q    And was Mr. Hausfeld there?

A    Oh, of course, Mr. Hausfeld, yes.

Q    Okay.  Now jumping back in time to the February 3rd meeting you're appearing before Magistrate Judge Rice for the second occasion, what was said in joint session about capital accounts by Michael?

A    Remember this very clearly, we were in the Judge's chambers.  Judge said "Okay, what are the issues" because we thought it was a done deal and Michael said there were about five or six issues troubling them and --

Q    And what were those five or six issues?

A    Oh, I don't -- you know, one had to do with the Luftansa settlement and whether you would have a multiplier on the

                              Toll - Direct                    27

whole fee or just part of the fee.  One was a municipal --
municipal derivatives case and how that was going to be
interpreted.  Then we got into discussions with Viox and HRT
and Vextra and, you know, we thought we had a done deal and
we walked out of that paying them another million dollars, I
think, with it because Michael argued there were ambiguities
on these things and --

Q   Okay.  And I interrupted you.

A   -- there were about five or six things and those are some
of them.

Q   And I interrupted your answer earlier.  In the five or
six things was one of them capital account balance
calculations?

A   Absolutely.

Q   And during that meeting was there a request for the exact
capital account balance information as of October 31, 2008
for Michael Hausfeld?

A   They did make a request, I think both in the beginning
and at the end, you know, that they did want to see a
statement of the capital account balance and we said we'd get
it to them.

Q   Okay.  Do you recall any other discussion about capital
account balances at the joint session before Magistrate Judge
Rice in February?

A   Yes.

Toll - Direct                                    28

Q    What do you recall?

A    As Michael ticked off his bullet points he made a specific comment about capital.  And he said: I want to make sure that, you know, there's no confusion about the capital owed to me.  And the Judge said, well, okay, what do you need?  And he goes: well, I want to make sure they don't try to knock down my capital by going, you know, to the lower percentage, you know, meaning 28 to 14, they don't use the lower percentage in calculating what I get.  And I said "Absolutely not."  The Judge said "Okay, let's move on."

Q    Shifting topics now.  Has Cohen Milstein ever used the GAAP method of accounting for its books of account?

A    Never.

Q    Has Cohen Milstein ever used the GAAP-based method of accounting for its financial statements?

A    Never.

Q    And how long has Cohen Milstein been in existence as a firm?

A    On our own, 1986, March of '86.

Q    And since March of 1986, which would be the first question, have you at any time heard any complaint from Michael Hausfeld that GAAP should be used for the Cohen Milstein books of account?

A    No.

Q    And now changing the date frame, from 2003, the adoption

Toll - Direct                                        29

of the restated operating agreement, to 2009 did Michael Hausfeld ever raise any question about whether the books of account should be maintained on the GAAP basis?

A    Never.

Q    Is your answer the same or different for Rich Lewis?

A    The same.

Q    Like to direct your attention very specifically now to the operating agreement that's been marked as DX-3, Defendant's Exhibit 3.  Could you please put that in front of you?

A    I have it.

Q    And could you first turn to Page 3?

A    I see it.

Q    And in Article second capital D do you see a sentence with a reference to generally accepted accounting principles?

A    I do.

Q    Could you read that entire sentence into the record?

A    That is the second sentence.  "The books of account shall be kept and continually maintained in accordance with generally accepted accounting principles."

Q    Is there any sentence in Article second D which refers to maintaining financial statements?

A    No.

Q    Directing your attention to Article tenth capital A with respect to a departing partner.

Toll - Direct                                    30

A    I see it.

Q    Can you read into the record the first sentence of Article tenth A?

A    First sentence.  "Promptly after the termination date the company shall furnish to the terminated member a statement of the balance in the capital account of the terminated member and of the income or loss of the company for the fiscal year of the company to the last day of the last full month immediately preceding the termination date."

Q    Is there any reference in Article tenth A to books of account?

A    No.

Q    Directing your attention to the last sentence of Article tenth A, could you please read that into the record?

A    "The accountant shall accept as correct the financial statements prepared for the company prior to the date of the member termination event and shall make no audit of the books and records for the periods covered by such financial statements."

Q    Were you present in the court the other day when their expert witness, William Davis, was asked on direct by Mr. Kittredge the following question which is found in the transcript at Page 168, beginning at Line 9.

Question: "Now is it possible to do the financial statements on a monthly basis or on a yearly basis on a cash

Toll - Direct                                                    31

basis and also keep your books according to GAAP?"  Were you

present for that question?

A    Yes.

Q    Were you present for the answer at Transcript 168, Lines

12 through 15, Answer: "Certainly, your Honor.  It's not

uncommon at all in my experience.  Some people talk about

making two sets of books but that's not really the case and

it doesn't have the implication that I think we."

     You heard that answer?

A    Yes, I did.

Q    If Cohen Milstein were to switch its policy and keep the

books of account on a GAAP basis does that mean Cohen

Milstein has to have its financial statements on a GAAP

basis?

A    No.

Q    Were you here in the court when Mr Davis was asked on

cross-examination, and this is at Page 203, beginning at Line

15.  "You were asked on direct about whether it's possible to

do essentially two sets of books, the non-pejorative way,

doing GAAP and income account, do you recall that

discussion?"

     Answer:  "I do."

     You recall that discussion on cross-examination?

A    Yes.

Q    Do you recall that he was then asked "And you said you

could, right?"  You recall him being asked that again on cross-examination, do you?

A   Yes.

Q   And do you recall the answer: "Yes, and I was trying to be clear.  There's nothing illegal or immoral or anything about it."  Were you present for that answer?

A   Yes.

Q   And turning your attention to the very next question, Question:  "Absolutely.  My question to you, were you here when Pat Drolet said that's a lot of work," were you here in the courtroom when I asked that question?

A   Yes.

Q   And did you hear the answer "I heard that testimony, yes."

A   Yes.

Q   Did you hear the next question:  "Do you agree with it?"

A   Yes.

Q   Did you hear it?

A   Yes.

Q   And did you hear this answer on cross-examination which is at the top of Page 2, Lines 1 through 4:  "No, I don't. It's something we do in our practice.  It's something I did in my prior firm.  I can tell you we do it in my current firm.  It's something that I have done for clients for too many years."  Did you hear that answer?

Toll - Direct                                33

A    Yes.

Q    Were you here in the courtroom yesterday when your partner, Herbert Milstein, was asked by Mr. Kittredge essentially the same question?

MR. ROSENTHAL:  Your Honor, I'm going to object. He's just repeating testimony and having -- asking whether he's heard it.

THE COURT:  Fine.

MR. KEENEY:  I've got to see if he's going to agree with it, your Honor.

THE COURT:  I understand but you don't have to read all the -- read all the testimony, I heard it.

MR. KEENEY:  Okay.

THE COURT:  All right?

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q    Did you agree with the answer of Mr. Milstein yesterday when he was asked by Mr. Kittredge whether it was possible to do the financial statements on a monthly basis on an income tax basis and keep the books of account on a GAAP basis?

MR. ROSENTHAL:  Objection, relevance.  What does it matter whether he agrees with what another witness says, especially his own partner?

THE COURT:  Well, I guess he's asking him if that's his understanding also as a member of the executive committee

Toll - Direct                                                    34

and is the chairman of the firm now or --

MR. KEENEY:  No, managing partner.

THE COURT:  Managing partner of the firm.  So I'll allow it for that purpose.

THE WITNESS:  Yes, that's my understanding, you can keep the books of account one way and the financial statements another way, if you desire.  I mean you can do them both the same or you can do it different.

BY MR. KEENEY:

Q   And just so the record's clear right now Cohen Milstein keeps its book of account on the income tax basis, right?

A   Yes.

Q   And it keeps its financial statements on the income tax basis, right?

A   Correct.

Q   And if it switched to keep its books of account on GAAP you were present when the expert witness testified that you could certainly continue to prepare the financial statements on the basis of the income tax based method, right?

MR. ROSENTHAL:  Objection, asked and answered.

THE COURT:  Yeah, I think you've been over that.

MR. KEENEY:  Okay.

BY MR. KEENEY:

Q   And do you agree with that testimony of the expert witness?

Toll - Direct                                         35

MR. ROSENTHAL:  Same objection, your Honor.

THE COURT:  All right.  Well, I'll allow one more question on it, go ahead.

THE WITNESS:  Well, I would agree that you could do your financial statements on income tax method even if you do the books of accounts on GAAP.

BY MR. KEENEY:

Q   Could you please turn in your binder to Exhibit 39?

MR. ROSENTHAL:  I'm sorry, Mr. Keeney, what exhibit?

MR. KEENEY:  Oh, it's Exhibit 39.

THE COURT:  39 which is your 68, I think.

THE WITNESS:  Yes, I see it.

BY MR. KEENEY:

Q   Okay.  Did you attend a November 5th, 2008 meeting of the compensation committee?

A   Yes.

Q   Did you prepare this memorandum marked as Exhibit 39 about the results of that meeting of the compensation committee?

A   Yes.

Q   At that meeting did you personally as a member of the compensation committee apply criteria that had been adopted by the executive committee to be applied by the compensation committee?

A   Yes, I did.

Toll - Direct                                        36

Q   And did those criteria include both economic and non-economic criteria?

A   Yes.

Q   And at the meeting of the compensation committee did you vote to reduce Mr. Hausfeld's shares?

A   I did.

Q   And when you voted to reduce his shares were you applying non-economic criteria, economic criteria or both?

A   Both.

Q   And just very briefly without going into a whole lot of detail can you in two or three sentences explain your reasons?

A   My reasons for?

Q   For voting the way you did to reduce Mr. Hausfeld's shares.

            THE COURT:   Why does that matter here?

            MR. KEENEY:   Okay, actually, I withdraw that question.  Let me phrase it this way.

BY MR. KEENEY:

Q   Did your vote to reduce Mr. Hausfeld's shares have anything to do with his capital account balance?

A   No.

Q   Did your vote to reduce Mr. Hausfeld's shares have anything to do with any desire of yours to increase your shares?

Toll - Direct                                    37

A    No.

Q    Directing your attention now very specifically to Mr. Lewis can you tell me what happened to Mr. Lewis' shares at that compensation committee meeting based on the attachment to DX-39?

A    Well, they were slightly lower than -- they were slightly higher than he had been at the end of '07 and they were slightly lower than where he had been after some partners left in mid '08 and the points got reallocated.

Q    What was your understanding as a member of the compensation committee whether a vote to reduce Michael Hausfeld's shares meant a retroactive application to the October 31, 2008 calculation of his capital account balance?

A    It would have no application.

Q    And why is that?

A    Because when we make -- we do this every year near the end of the year and we make percentage determinations of how we're going to divide profits in a particular year.  And we'd decided -- and there's been some debate whether you should do it earlier in the year and then prospectively apply that percentage when the firm has a good year but we thought it would be best to wait to see how the whole year ends up.  And so we've always kept it at the end of the year.

     And when we do it we always make it retroactive for purposes of dividing the profits because how it works, your

Honor, is just let's say you have $5 million of profits.  If you have 20 percent is your share up until the vote and then at the vote it's made 25 percent we don't want to say, well, for ten months you get 20 percent of the profits and then for two months you get 25 because we're really evaluating the whole year's performance.  And we're saying you're going to get 25.  So we say it's retroactive, I mean just for that purpose only which is to divide profits when you have profits to give out.

But when someone leaves the firm it's an entirely different thing.  One --

Q   Why is that?

A   Well, because you can't retroactively change -- first of all, we have something in the partnership agreement that makes termination completely different than people staying to the end of the year.  And we've got, for instance, we've had other people have left, you know, non-equity partners, for instance, who have said, well, I worked eight months, I want to get my pro rata share of the profits when the year ends.  And we said, well, you're not entitled to them, you're not here anymore.  When someone leaves you have no longer any rights.

And so here we set up in our partnership agreement, and this provision was in here before the 2003 amendment, this goes way back, this provision on terminating partners'

Toll - Direct                                              39

capital accounts and what they get paid, and it's kind of sacrosanct that you can't then kind of make a decision at a compensation committee meeting which we didn't even think had the power to change capital account calculations of any kind, adjustments.

But you can't then change what happens to a departing partner because if you do it, if you open the door and allow that, we absolutely have the right then when a departing -- next time to cut someone down to zero. And if the firm had a gain of $10 million when they left, instead of them getting maybe $2 million added to their capital account we could say sorry, you get zero because we're retroactively applying this percentage. It's just totally unfair as a partnership to departing partners.

So we have a provision, we could have done it different ways, we could have done pro rata, that was Mr. Tucker made -- your Honor will remember Mr. Tucker's argument that you guys should do it pro rata for the whole year, but we made a decision 15, 20 years ago not to do pro rata, it was a choice made by the partnership to do it this way and it's definitely a difference between someone staying to the end of the year and getting a profit percentage versus kind of changing around how their capital is calculated.

Q   I'd like to now move your attention to the capital accounts as of the end of the year. Could you put in front

Toll - Direct                                          40

of you Defendant's Exhibit 11 which are the year-end

financial statements as reviewed by Drolet and Associates.

A    I have it.

Q    And can you turn to Page 3 of Exhibit 11?

A    I have it.

Q    And can you explain to me what Page 3 is?

A    It's a statement of assets, well, actually the assets are

on the prior page so this is the liabilities and members

equity page.

Q    And is there a chart with respect to partners' capital?

A    Yes.

Q    Take a step back.  What is a partner's capital account at

Cohen Milstein?

A    Yeah, make it clear, your Honor, because it's -- there's

been some confusion in some of the testimony.  There is no

set account somewhere in a bank where this money is.  What

capital basically is, it's a bookkeeping entries that

basically is in effect undistributed profits.  And this gets

back to the issue I was raising before about the difference

between what's allowed to be an expense and what is a cash

outlay for case advances.

          The best way to explain this is an example.  If we

had revenue of $35 million and we have expenses on the books

of $30 million, we have a $5 million taxable profit.  But the

way our firm works is we have all these capitalized expenses

Toll - Direct                                                41

that are not allowed to be deducted for tax purposes.

So my hypothetical, if you have $5 million in capitalized expenses that are not deducted in this 35-30, you've actually paid out $35 million in cash during the year so you've used some of your existing revenue to pay out these expenses on future cases. So at the end of the year you have a $5 million profit that you are taxed on but you get no money except for your salary during the year.

But that $5 million goes into your capital account. Not cash goes into it but a bookkeeping entry is then made based on your percentage and that's how your capital account grows or, if you have losses, reduces. But that's what capital account is, in effect it's like undistributed profits based in part on these capitalized expenses that we have to pay.

Q   And now I'd like to specifically direct your attention to your capital account balance as shown on Plaintiff's -- or, excuse me, Defendant's Exhibit 11 at Page 3. Do you see the entry next to your name?

A   Yes, I see it.

Q   What was the impact on your capital as of December 31, 2008, compared to earlier?

A   It just it went up slightly, like almost XXXXXXX, XXXXXXX.

Q   Could you just read into the record what it ended up as

Toll - Direct                                                42

and where it started and then we can do the math, too.

A    It started at XXXXXXXXX and ended at XXXXXXXXX.

Q    And the starting capital balance of yours reflected contributions that you had made to the firm in previous years as well as the results of this year, is that correct?

A    Well, again, I just -- contributions leaves an impression that that's a cash I put in.  I did not put in cash in that amount, that is in effect undistributed profits.

Q    And directing your attention to the bottom line, the aggregate total, what was the aggregate total capital at Cohen Milstein on December 31, 2008?

A    $14,628,076.

Q    And was that up or down from the previous year?

A    It was down about 4.35 million.

Q    Okay.  There was a lot of testimony the last two days about Plaintiff's Exhibit 108.  Could you turn in the big, big binder to Plaintiff's Exhibit 108?

A    Yes, I see it.

Q    Okay.  And my question to you is after you view Plaintiff's Exhibit 108 can you try to compare what is on the journal entry in Plaintiff's Exhibit 108 with what is in the actual capital account balances in the financial statements at page 3 of Defendant's Exhibit 11?

A    Well, it's a little complicated but the impression left was somehow all this capital for Michael and others went down

Toll - Direct                                                43

that it like went into our capital accounts.  That did not happen.  We actually got taxed on that money.  And we never got that money because we have no money at the end of the year to give out so we did not like get any kind of benefit.

The numbers on here are --

Q    When you say here --

A    I'm sorry, sorry.

Q    -- which exhibit are you referring to?

A    I'm looking at 108.  These are like journal adjusting entries.  And what they show is, you know, this is the amount basically of taxable impact on the partners, both for us and for the partners who left.  So we were all taxed on amounts here, we didn't get this money, we were taxed on this money, you know, most of the remaining partners it's a XXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXX figure.

And my understanding is is that Michael Hausfeld and Rich Lewis got a tax benefit or tax loss of the amounts listed there.  I'm not a hundred percent sure of that.

MR. ROSENTHAL:  Objection, move to strike.  I don't think he has any basis of knowledge for that.

THE COURT:  All right, I'll sustain it.  I think I understand.  Go ahead.

BY MR. KEENEY:

Q    My question to you, Mr. Toll, and I just want to make sure the record's clear here.  Directing your attention to

                              Toll - Direct                    44

Plaintiff's Exhibit 108 and particularly what happened on the
SJ Toll line.

A    Yes.

Q    During 2008 did your capital by the end of 2008 increase
by XXXXXXXX as suggested by this journal entry?

A    No, it did not.

Q    And turning back to Defendant's Exhibit 3 how much did
your capital increase from December 31, 2007 to December 31,
2008?

A    It looks like about XXXXXXX.

Q    Do you have any other testimony as to how we should try
to reconcile these numbers on Plaintiff's Exhibit 108 with
the numbers that are in Defendant's Exhibit 11 at Page 3 on
the capital accounts?

A    Well, again I'm not a practicing accountant so I can't
tell you for sure these adjusting journal entries but I can
tell you my understanding of while they use the word
"capital" they don't reflect the year-end change of my
capital.  They may be part of the component that led to a
XXXXXXX increase for the year but this is not, this credit
column does not show the increase for the year.

Q    Okay.  Is it your understanding that Plaintiff's Exhibit
108 is one page in multi-page workpapers used by Pat Drolet
to calculate the capital account balances?

A    I'm not even -- I presume it is.  I don't really know.

Toll - Direct                                          45

THE COURT:  Well, since it was a leading question I think the answer should be yes.

(Laughter.)

BY MR. KEENEY:

Q   Let me ask -- let me change topics now.  Linda Nussbaum, she was a former partner of yours, right?

A   Yes, she was.

Q   At the time that she left Cohen Milstein were you involved in the exact calculation of the exact capital balance that was due her upon her withdrawal from Cohen Milstein?

THE COURT:  When did she leave, Ms. Nussbaum?

THE WITNESS:  I believe it was February '07, something like that.  January, Feb-- yeah, February '07.

BY MR. KEENEY:

Q   And were you involved in the calculation of her exact capital balance that was to be returned to her upon her withdrawal?

A   Oh, I reviewed it, you know, it was done by Hugh Diamond and looked at by Pat Drolet and then I reviewed it.

Q   Okay.  Was it then discussed by you with any other partner at the Cohen Milstein firm at that time?

A   Yes.

Q   What other partners?

A   Well, we had meetings, a number of meetings about Linda

Toll - Direct                                    46

Nussbaum where this was discussed so --

THE COURT:  Well, he just wants you to list the people that you discussed it with.

THE WITNESS:  Oh, you know, all the equity partners at the time, you know, it's --

THE COURT:  Does that include Mr. Hausfeld?

THE WITNESS:  Yes, yes.

MR. KEENEY:  Let me follow up very specifically.

BY MR. KEENEY:

Q   Did there come a time when you and Mr. Hausfeld actually sat down with Linda Nussbaum to discuss her capital account balance as of the month end preceding her withdrawal?

A   I don't think we sat down to discuss that with her.  We did have meetings with her very -- we did have meetings with her.

Q   Okay.  And the "we," it's you and Mr. Hausfeld?

A   Mr. Hausfeld, we brought in an outside consultant as well to help us through some difficult discussions.

Q   And was there anyone else from the Cohen Milstein side other than you, Mr. Hausfeld and the consultant in these meetings?

A   No, no.

Q   Okay.  Who was there for Linda Nussbaum?

A   No, it just -- it was just Linda.

Q   Okay.  And what was discussed during these meetings that

Toll - Direct                                          47

Mr. Hausfeld was there?

A    Well, I want to separate the meetings.  There were partner meetings where we discussed this and then there was the meeting with the consultant and Linda Nussbaum.

Q    Let's start with the meeting with the consultant and Linda Nussbaum at which you were present and Michael Hausfeld was present, what happened?

A    Well, there were discussions about difficulties Linda was having with Michael and Michael was having with Linda --

Q    I'm really not interested in that.  I am interested in any discussions about capital account or the terms on which she'd be withdrawing from the firm.

A    Not in that meeting, no.

Q    Okay.  Now moving to the partners meeting what was discussed in the partners meeting?

A    Well, we had multiple partner meetings about Linda and her departure.

Q    Was Michael Hausfeld in attendance at any of those partner meetings?

A    I'm certain he was.  Was he at every single one, I would expect, yes, because usually we wouldn't have a meeting without Michael and I there.

Q    Okay.  And what was discussed at these partner meetings?

A    Well, we discussed the difficulties with Linda, you know, with the potential litigation that might arise, should we

Toll - Direct                                                48

make a deal or not.  And ultimately, you know, whether she was going to leave the firm or not and then ultimately we talked about her capital account and how it was going to be-- what it was going to be.

Q   And was it discussed at those meetings that for a partner who was leaving in February 2007 the capital account calculation is done with respect to the exact balance as of January 31 which would be the last full month preceding the termination date?

A   Yes, it was because we, you know, these were difficult discussions and the numbers on January 31 showed a loss, meaning Linda's capital account was going to go down when she left.  And we discussed that at a couple of different partner meetings, you know, because we expected she wouldn't be happy about that but that's the way the partnership agreement reads.

Q   Let me shift topics.  You were in court the other day when at the conclusion of expert witness Davis' testimony the Judge in the exercise of sound discretion asked to be presented certain alternatives and Mr. Davis went out and did some handwritten calculations.  Do you recall that?

A   I do.

Q   And did you have a chance to review his handwritten calculations?

A   I did.

Toll - Direct                    49

Q   Do you have any comments about it?

          MR. ROSENTHAL:  Objection, your Honor.

          THE COURT:  Well, I think he's entitled to ask him if he agrees with them.  It's a kind of a vague question but why don't you ask a more precise question.

          MR. ROSENTHAL:  Is he an expert witness?

          THE COURT:  No, but he's the managing partner of the firm, he's involved in computing capital accounts so I'll allow it.

BY MR. KEENEY:

Q   Do you agree with them?

A   I'm sorry.

Q   Do you agree with Mr. Davis' handwritten calculations?

A   Well, some of them, I think he only did two or three pursuant to the Judge's request and I have to look at them. But I know one didn't make any sense to me, you know, not a big deal but on one of the assumptions, you know, he used a 13.31 percent effective rate --

Q   Excuse me, not to interrupt you, Mr. Toll.

A   Oh, I'm sorry.

Q   But I thought it might actually be helpful if I put before you -- and we have a copy of what Mr. Davis did.

A   Sure.

          MR. ROSENTHAL:  And if we go back and review the record, your Honor, I think it's clear that Mr. Davis did

Toll - Direct                                    50

exactly what you asked him to do.  Mr. Toll may disagree with him but he used the exact figures you told him -- you told him to use.

THE COURT:  I understand, I understand.

What's your question?

BY MR. KEENEY:

Q   The question is now that you have the exact handwritten calculations in front of you can you point to specific handwritten calculations that you agree with and then the next question will be those that you disagree with but I'll split it into two, first, those you agree with.

(Pause.)

A   Well, the first one he did and it's very confusing because he kind of reversed the side of the page that was consistent with the numbers because he put the as reported by Cohen Milstein number from the cash basis, I think he went to his accrual number.

THE COURT:  That's what I asked him to do.

THE WITNESS:  And I think -- and he used 28 percent and I think that one I agree with, that first one.  And then the second one he used the cash basis number.  And the only thing again I disagree with him in is that it made no sense if he used that to use 13.31 because you only --

MR. KITTREDGE:  Excuse me, your Honor, that was my witness.  13.31 is not a handwritten number by Mr. Davis.

Toll - Direct                                              51

THE WITNESS:  I didn't say it was.

THE COURT:  Hold on, hold on, don't argue with him.

THE WITNESS:  Okay.

THE COURT:  I under--

MR. KITTREDGE:  I believe the question was what handwritten notes by Mr. Davis does he agree with and what handwritten notes does he disagree with.

THE COURT:  I understand.  I'll sustain the objection.  It looks to me as though Mr. Davis did exactly what I asked him to do.  Now do you have a problem with the math or what's the question?

MR. KEENEY:  The question is we're just trying to establish where the agreements are on the math and where the disagreements are on the math.  There might be a math issue here, your Honor.  I'm bending over backwards not to do anything --

THE COURT:  I understand but if his answer is not responsive to your question --

MR. KEENEY:  I -- I totally realize that.  What I'm going to do, I'm going to --

THE COURT:  So I'll strike it, let's start again.

MR. KEENEY:  -- I'm going to go leaving now.

THE COURT:  What's the mistake Mr. Davis made?

THE WITNESS:  You're asking me?

THE COURT:  Yes, I certainly am.

Toll - Direct                                    52

THE WITNESS:  It doesn't make sense if you use the GAAP method to use 13.31 percent because you only use a percent like that, an effective rate, if you have a gain. That's the ten percent profit distribution where the partners all pro rata get ten percent first.

THE COURT:  So what should that be, 14 percent?

THE WITNESS:  That should be 14.  And in kind of the things you wanted to see that would be a 14 or it should have been anyway.

THE COURT:  Okay.

BY MR. KEENEY:

Q   Any other mistake, Mr. Toll?

A   No, that was --

MR. KEENEY:  Okay.  And we have no further questions, your Honor.

THE COURT:  All right, thank you.

Any questions?  Who's going to question this witness, Mr. Rosenthal?

CROSS-EXAMINATION

BY MR. ROSENTHAL:

Q   Mr. Toll, you're considered to be the financial partner at Cohen Milstein, isn't that right?

A   I don't think we have a term for that but I would, I guess, consider myself to be that because I'm the one who really is the person involved with the finances with the

Toll - Cross                                          53

banks, with the accounting, you know, the outside accounting, the controller.

Q    And specifically with regard to the accounting you're the one designated to handle those matters, right?

A    Yes.

Q    And so you're the primary point of contact with the firm's controller, Hugh Diamond?

A    Yes.

Q    And you're the primary point of contact with the firm's outside accountant, Pat Drolet?

A    Yes.

Q    And when it comes to dealing with departing partners and their liquidating capital account balances you are the equity partner who has primary responsibility for that, right?

A    That's what I've been doing, yes.

Q    And Hugh Diamond is the, I suppose, employee who is not a partner who had the primary responsibility of doing that, correct?

A    Yes, he's the controller.

Q    And so Ann Yonner left the partnership in 2002, right?

A    Yes.

Q    And all the communication regarding her liquidating capital account balance was with her was either with you or Mr. Diamond, right?

A    I believe so.  I mean it's possible other partners got

Toll - Cross                                      54

involved but I believe so, that's correct.

Q    The same is true with Gary Mason who left the partnership in 2002?

A    The same answer.

Q    Same is true with Paul Gallagher who left the partnership in 2002 or 2007?

A    Yes.

Q    And with respect to your communications or the firm's communications with Linda Nussbaum about the capital account specifically you were the point of contact at the firm, right?

A    Yes, I was the principal point of contact, yes.

Q    And these discussions that you referred to on direct examination with Mr. Keeney regarding Ms. Nussbaum's capital account with the other equity partners, you never actually discussed the method of calculation of her liquidating capital account balance, did you?

A    Sure we did.

Q    With respect to Paul Gallagher, if you could turn to Plaintiff's Exhibit 91, please?  And turn to the second page of that exhibit, CMST-369?

A    91 I think is Linda Nussbaum.

Q    I'm sorry, 90.

A    Okay.

Q    Okay.  You see right there where it says "Effective

Toll - Cross                                55

percentage interest"?

A    Yes.

Q    Okay.  And it says that Mr. Gallagher's percentage interest at the time he left was 4.5, correct?

A    Yes.

Q    Percent.  And then it was adjusted by ten percent to, well, it was adjusted by ten percent to get it the effective rate of 4.8193, you see that?

A    I see it.

Q    Even though the firm was suffering a loss at the point of his departure, right?

A    Correct.

Q    Which means that the amount that was calculated is actually less than he was actually owed, right?

A    Well, let's calculate...

Q    You used a higher percentage, the effective rate than the actual rate even though the firm was suffering a loss at the time, right?

A    Yeah, this was a mistake.

Q    It was a mistake, right?

A    Yes, this was a mistake.

Q    The same mistake you said Mr. Davis made with respect to the calculations that the Judge had him do, correct?

A    Yeah, although again I'm not saying Mr. Davis made a mistake, he -- he calculated correctly.  I'm just saying

logically you shouldn't use an effective rate when you have a loss.

Q   Okay.  But this was what was done with Mr. Gallagher, correct?

A   Yeah, that was, I think Ms. Drolet testified there was a mistake with Mr. Gallagher and one other person, I think Ann Yonner, maybe.

Q   And as a result Mr. Gallagher actually was calculated to have less in his capital account than he actually had because you used a higher effective rate, right?

A   Used a higher rate so a lower rate would have been less of a loss.  I think it worked out better for him.

Q   No, actually, because there was a loss at the time, right?

A   Yeah.

Q   And you had a higher percentage, right?

A   We used a higher percentage, should have used the lower one.

Q   You used a higher percentage than his actual rate, right?

A   Right.

Q   So his share of the loss was actually greater because you used a higher percentage, right?

A   Yeah, that's what I'm saying.  The share of loss was greater meaning he got impacted worse than he --

Q   Yes, exactly, he got impacted worse, right?

Toll - Cross                                    57

A    Okay.

Q    Right.  Have you called Mr. Gallagher and said you made a mistake and we owe you more money?

A    No, I didn't know this until just very recently.

Q    Well, you learned it July 13th at Pat Drolet's deposition, right?

A    That's pretty recent.

Q    Yes.  You haven't called Mr. Gallagher in the last month to let him know that?

A    No.

Q    Now Ann Yonner left the partnership in approximately September of 2002, isn't that right?

A    I don't recall the date but I'll take your word for it.

Q    And August 31st is the effective date of her departure under Article 10 of the partnership agreement?

A    Again I don't recall the precise month but I'll take your word for it.

          MR. ROSENTHAL:  Give me a second, your Honor.

          THE COURT:  Take your time.

          (Pause.)

          MR. ROSENTHAL:  Approach the witness, your Honor?

          THE COURT:  Of course.

BY MR. ROSENTHAL:

Q    Mr. Toll, please take a look at the top of the page where I'm showing you right now, let me know when you're done with

Toll - Cross                    58

that.

A    I see Ann Yonner retirement date, yes.

Q    Okay.  And her retirement date was August 31st, 2002, her effective retirement date?

A    I don't know.  That's what -- I'm not sure what that means right now.  I don't know if that's the termination departure date or that's the day she actually left so I don't know.

THE COURT:  Perhaps you and Mr. Keeney can get a stipulation.

MR. ROSENTHAL:  Can we stipulation that her retirement was effective, the date for the purpose of calculating her capital account balance is August 31st, 2002?

MR. KEENEY:  So stipulated.

MR. ROSENTHAL:  Okay.

THE COURT:  Very good, thank you.

BY MR. ROSENTHAL:

Q    And August 31st, 2002 would have been prior to the compensation committee meeting that year, correct?

A    Correct.

Q    So you would have used the prior year's percentage interest in order to calculate her liquidating capital account balance, right?

A    The interest that was in effect at that time was the decision that was made the prior year.

Toll - Cross                        59

Q   Right.  Gary Mason, can we get a stipulation that his effective date of departure was April 31st, 2002?

        MR. KEENEY:  So stipulate.

        MR. ROSENTHAL:  Okay.  And obviously --

        THE WITNESS:  It can't be April 31st.  I don't think there is an April 31st, I thought you said.

        MR. KEENEY:  We'll still stipulate.

        (Laughter.)

BY MR. ROSENTHAL:

Q   How about April -- how about April 30th?  How about April 30th, 2002?

        MR. KEENEY:  We'll stipulate to that one, too.

BY MR. ROSENTHAL:

Q   Okay.  And fair to say obviously that April 30th, 2002 was also before the compensation committee met in 2002?

A   Yes.

Q   So you would have used the prior year's percentage interest?

A   Again, unless there had been a modification early in the year which you only get from departing, someone leaving and we reallocate.

Q   Right.  Paul Gallagher left in February 2007 with an effective rate of January 2007.

        MR. ROSENTHAL:  Can we get a stipulation to that?

        MR. KEENEY:  So stipulate.

Toll - Cross                                  60

BY MR. ROSENTHAL:

Q   That was also at a point during the year prior to the compensation committee meeting, right?

A   Correct.

Q   And the same is true with Linda Nussbaum, isn't that right?

A   Yes.

Q   So when Mr. Hausfeld was expelled from the firm he was expelled after the compensation committee met during that year, correct?

A   That is correct.

Q   And when Mr. Lewis left the firm that was also after the compensation committee met for that year, correct?

A   Yes, it was after they met.

Q   Let's turn to another topic right now.  It's true, isn't it, that the operating agreement requires that the information regarding a terminating partner's liquidating capital account balance be provided to that partner promptly, right?

A   I don't know if it says promptly or 30 days but I think it does, yeah.

Q   Right.  And it requires effectively that it be done within 30 days, right?

A   That's, I mean I'd look at the words but that's my memory.

Toll - Cross                                61

Q    If you would turn to Plaintiff's Exhibit 2?

A    Yes.  Oh, Plaintiff's 2.

        THE COURT:  Or Defendant's 3, either one, whichever is easier to get to.

BY MR. ROSENTHAL:

Q    Whichever is easier for you now.

A    I see it.

Q    And we're turning to Article 9 -- Article 10 on Page 9. It says "Promptly after the termination date," do you see that?

A    Yes.

Q    And then it says on the next page "If the parties can't reach agreement within 30 days it goes to the firm's outside accountants for a determination," right?

A    Yes, I see it.

Q    So this basically says that the information, the capital account balance calculation and the income statement for the last month prior to departure should be provided to departing partner within 30 days, right?

A    Yeah, I think that's the intent of it is that, you know, you should try to get it done within 30 days.

Q    Right.  And that didn't happen in Mr. Hausfeld's case, right?

A    It did not happen with any of the departing partners.

Q    He was expelled on November 6th, correct?

Toll - Cross                                               62

A    Yes.

Q    And he received his capital account balance calculation on February 20th, about three and a half months later, right?

A    Correct.

Q    Same is true with Mr. Lewis, right?

A    Correct.

Q    And just as an aside, if you stay with Article 10 there Mr. Keeney had you read the very last sentence of Article 10--

A    Yes.

Q    -- where it says "The accountant shall accept as correct the financial statements prepared for the company prior to the date of member termination event," do you see that?

A    I read that, yes.

Q    And that of course is only in connection with dispute resolution provision mechanism of Article 10, right?

         (Pause.)

A    Well, it appears to say that but if you can't agree then it goes to the accountants and the accountants shall accept as correct.

Q    So it's only in connection with the dispute resolution mechanism in Article 10 which is entitled "Determination of capital balance for a terminating member" that that applies, right?

A    It appears to say that.

Toll - Cross                                          63

Q   Now on January 8th, 2009 you wrote an e-mail to Hugh Diamond saying that you needed the capital account balance calculations for the partners who left in 2008 in a few days, right?

A   I think  it said something like that, yes.

Q   "Must have in a few days," right?  Isn't that right?

A   Yes.

Q   And you recognized the information was due to Mr. Hausfeld and Mr. Lewis as of that date, January 8th, under the partnership agreement, right?

A   Oh, yeah, oh, I knew it was -- we had to get it to them at some point, yes.

Q   Right.  And Mr. Diamond dutifully complied with your request and sent you the figures on January 10th, right?

A   I think so.

Q   And then fast forward 13 days to the mediation session in front of Judge Rice, correct, remember that?

A   Yes, I do.

Q   All right.  And you had not provided Pat Drolet with the information by that point in time, had you?

A   No.

Q   And that's the first step in the process because you want Ms. Drolet to review these figures before you provide them to a departing partner, right?

A   Yeah, I mean we're not required to do that.  I think

that's been our practice.  I think Pat has looked at every one before we provided them.

Q   And you wanted her to look at these before they went out to Mr. Hausfeld and Mr. Lewis and the other partners who left in 2008, right?

A   Yes.

Q   So 13 days elapsed between the time that Mr. Diamond sent you the e-mail on January 10th and the first mediation session, right?

A   Yes.

Q   And as you've testified on direct examination the subject of the capital accounts came up during the first mediation session, right?

A   It only came up in terms of the accelerated payment.

Q   But the subject of the capital account came up and that was one of the subjects of negotiation, right?

A   That was an item as part of the deal, yes.

Q   Right.  And so you obviously knew as of January 23rd or it was reinforced for you as of January 23rd that that information under the operating agreement was due to Mr. Hausfeld and Mr. Lewis, right?

A   I knew it was due but the payment is not due for a year and like none -- I didn't think about the timing of it.  I mean the numbers are what they are and, you know, he never asked for them in December or January like I need them, I

Toll - Cross                                    65

want them.  I mean it was -- this was normal.  We always were late because a payment's not due for a year so it wasn't like even on our mind like this is a crisis, we've got to get these numbers done.

Q   Well, the figures were asked for at that first mediation session on January 23rd?

A   They were not.  They were not asked for and that is wrong.  I've checked my notes of both mediation sessions, they were not asked for, my memory says they were not asked for, I'm clear as a bell on that.

Q   But you knew they were still due?

A   I knew they were due, of course.

Q   Judge Rice asked you to provide them in that first mediation session, too, didn't he?

A   No, he did not.  Judge Rice asked us in the second mediation session, it didn't come up in the first mediation session that he wanted the numbers.

Q   Okay.

A   There were no -- there was no request made, there were no requests made by your firm between January 23rd and February 2nd, the second mediation, for those capital accounts statements which reinforces my memory, it was not asked for.

Q   Well, let's fast forward ten days from January 23rd to February 2nd.

A   Okay.

Toll - Cross                                    66

Q   You didn't provide the capital account balances or you didn't authorize Mr. Diamond to provide Ms. Drolet the capital account balances in that ten-day period, right?

A   I did not.  I hadn't probably even thought about it in detail yet to look at them.

Q   So we had 23 days elapsing from January 10th to February 22nd -- I'm sorry, January 10th to February 2nd from the time that Mr. Diamond first provided the draft calculations and the time of the second mediation session, right?

A   That, that is correct.

Q   And then as you've testified the calculations were asked for at that second mediation session, right?

A   Yes, they were.

Q   And Judge Diamond -- I'm sorry -- Judge Rice did ask you or your counsel to make sure that they were provided to Mr. Hausfeld and Mr. Lewis, right?

A   Yes, I think it was asked for early in the session when Michael raised the issue about, you know, not wanting the lower percentage used in the calculation.  He said "I'd like to see them."  We all said yes and then at the end it was said again by either you or the Judge said we should get them to them quickly and Mr. Keeney says we will.

Q   But you didn't call Mr. Diamond that day on February 2nd and authorize him to send the calculations over to Ms. Drolet, did you?

Toll - Cross                                    67

A   I prob-- truthfully is that may have been the first time I really studied them myself was after this meeting because I had them since January.  Again, probably in my briefcase with a lot of things to do, hadn't gotten to it.  And, you know, obviously we had the second mediation session, you've got to do it, so then I looked at them.

Q   You didn't authorize Ms. Drolet -- I mean Mr. Diamond to send it over to Ms. Drolet on February 3rd either, did you?

A   It was somewhere in that two or three-day period where I looked at them and said send them over to Pat.

Q   Or on February 4th, right?

A   I don't know if I told him the 3rd or 4th or 5th, whether he was in that day, whether I was in that day but it was right after the second mediation session where the Judge said get them.  And I made sure I looked at them and made sure I said okay, Hugh, send them over.

Q   Well, you heard Ms. Drolet's testimony here at trial that she did not receive the figures from Mr. Diamond until late in the afternoon on February 5th, right?

A   Correct.

Q   Which was just as the settlement agreement was being finalized and executed, right?

A   I don't connect the two.  It may have been, I mean I think we may have -- I think we signed on the 4th, actually, to tell the truth.  But I don't know.  People signed

different times.  Michael was the last one to sign.  I remember because we were all, everyone was like anxious, like what's going on, he's not signing and everybody signed.  So, I don't know, I didn't connect the two at all.

Q   So it was just a coincidence then that the figures were provided to Ms. Drolet by Mr. Diamond at the time or right after the time the settlement agreement was executed, is that right, just a coincidence?

A   It's not a coincidence.  It's we had an agreement reached on the 23rd, it had to be modified.  It then was modified, all the changes were made.  It was circulated for signature in those two days after the meeting, the second meeting.  It was at the second meeting when we were first said, hey, we really want to see it.  And in that time frame I looked at them and said to Hugh send them over.  It wasn't connected to the signing or anything.

Q   And then you heard Ms. Drolet's testimony that once she received them it only took her and her associates five hours to review the calculations, talk to Mr. Diamond about the suggested corrections, talk to you about the suggested corrections and finalize it all, right?

A   Correct.

Q   So everything was done and finalized on February 6th, right?

A   I think she testified at her deposition that --

Toll - Cross                                  69

Q   No, I'm asking you wasn't everything on your end finalized as of February 6th?

A   No, I'm saying I don't think so because -- and this is not a big deal -- but as I recall Pat's testimony --

THE COURT:  Excuse me one second.

Ms. Baum, could you help this gentleman here?  I think he has something for you.

Go ahead, I'm sorry.

THE WITNESS:  And, again, this was not something I knew about, I mean I just, you know -- but Pat testified that she -- I mean she had sent back to me and I spoke to her on the 6th so I understood they were finalized but I think she said she'd double check with other people in her office over the next two or three days like Winnie Yang who hadn't been there on Friday.

But, yes, I think I got them back from her on the 6th and I talked to her about them on the 6th.  She called me to explain the mistakes Hugh Diamond had made that she corrected.

BY MR. ROSENTHAL:

Q   And there were no more revisions after February 6th to the calculations, correct?

A   Well, there were -- we didn't change them but we had discussions about it over the next, you know, two weeks.

Q   There were no more drafts after February 6th?

A    No, no more drafts.

Q    And this executive committee meeting that you referred to was on February 13th, right?

A    I think it was the 13th.  I'm not certain --

Q    So it was on the 13th --

A    -- it was right in that time frame.

Q    It was on the 13th --

A    Yeah.

Q    -- that the executive committee signed off on these calculations, right?

A    I think so.  I'm not a hundred percent sure but I think we had a meeting on the 13th and we agreed what we would do. I can't remember whether there was any followup, whether one executive committee member wasn't there and we had to follow up with him but it was right in that time frame.

Q    Calculations were not provided to our clients on the 14th, right?

A    No.

Q    On the 15th?

A    That's my understanding.

Q    On the 16th?

A    That's my understanding.

Q    On the 17th?

A    That's my understanding.

Q    Or the 18th?

Toll - Cross                              71

A   I think that's right.

Q   Or the 19th?

A   I think that's right.

Q   They weren't provided to my client until February 20th, correct?

A   I think that's right.

Q   Which was a month and ten days after you first got the calculations from Mr. Diamond, right?

A   It sounds, from the first draft I got, it is.

Q   And the OSB money came in, the OSB fees came in around in the morning on February 20th, right?

A   Yes, I think so, or the afternoon.  I don't remember.  I know you have a series of e-mails from Mr. Talud (ph.) so on the 20th, I remember.

Q   Right.  And it was just a couple hours, just a couple hours after that OSB money came in that the figures were released finally after a month and a half of Mr. Diamond's initial calculations to my clients, Mr. Hausfeld and Mr. Lewis, right?

A   Uhm, actually, that is correct.  I'll wait for the next question.

Q   All right.

A   I didn't hold them up, okay, if that's what you're asking.

Q   Also just a coincidence that it was just after the OSB

Toll - Cross                                    72

fees came in --

A   It's out of --

Q   -- that the figures got provided to my clients?

A   It's out of my control.  We gave it to our counsel, a few days, I had nothing to do with holding it up.

Q   Just like it was a coincidence that you waited until the settlement agreement was finalized to authorize Mr. Diamond to provide the figures to Ms. Drolet?

A   Mr. Rosenthal, you're using the word "coincidence."  I didn't say coincidence, I said that's the wrong term.  The facts are the facts.  We didn't hold them up, we passed on them around the 13th, 14th, whenever it was, and then we gave them to our -- we told our counsel it's okay.  I didn't tell them not to release it or anything, you're trying to tie it into the OSB money like that means something.  I don't follow.

Q   So is it your testimony -- is it your testimony that you told -- you gave them to your counsel shortly after February 13th?

A   I am not sure if it was the 13th, it could have been later because I noticed that we have -- and, again, maybe there were just some final, you know, maybe I was out of the office, Hugh Diamond was out of the office.  What I do remember, Mark Willis' was mailed on the 18th.  So clearly they were all done at the same time, they were done at the

18th.  So we may have gotten them to Hogan on the 18th, you know, I don't know because I didn't, that was Hugh Diamond who did it but it was right in that time frame.  It could have been maybe he was out a day or I was out a day and it slipped a day or two.

Q   So Willis' were provided to him on the --

A   On the 18th.

Q   -- on the 18th.  And it's your testimony that you would have provided that to your counsel also on the 18th or before?

A   Well, again, I didn't do it but clearly because Hugh Diamond was the one who did it.  But, no, no, I shouldn't say that, maybe I did it, I'm not sure.  But whatever it was, it probably was around the 18th.  And I'm saying that because that's when Willis' went out so I suspect they were all finally done at the same time.

        MR. ROSENTHAL:  Give me a second, please.

        THE COURT:  Take your time.

BY MR. ROSENTHAL:

Q   I ask you to turn to Plaintiff's Exhibit 40.  This is an e-mail, Mr. Toll?

A   I see it.

Q   It's an e-mail from Mr. Kauffman to me dated February 19th at 2:16 p.m.  Do you see that?

A   Yes, I see it.

Toll - Cross                          74

Q   It is a response to one of the many e-mails that I sent to your counsel asking for the calculations, right?

A   I see it.

Q   And Mr. Kauffman says "My apologies again. We had expected that the numbers would be to you by now. I will follow up," you see that?

A   I see it.

Q   Are you suggesting me -- are you suggesting to me that on February 19th at 2:16 p.m. your counsel is being coy with me, that he has the numbers and he's not telling me that he has them?

A   I don't know. I mean, you know, maybe Jack Keeney had them and then Jack saw this and Jack hadn't spoken to Kauffman, I don't know.

Q   You know that we'd been asking for them for the last 17 days prior to this, right?

A   Yes, you had and there was, you know, we really had a lot of discussion about what to do with this extra $5 million in writeoff, there was no intention to hold it up. We just wanted to make sure we had I believe a couple of days of discussion with counsel about it and before we made a final decision what we'd do.

Q   And it was just a coincidence that it came in right after the OSB fee was received, right?

A   I don't know that, Mr. Rosenthal. A coincidence is -- it

Toll - Cross                                        75

was not my doing when it went to you.

Q   It was the doing of your counsel?

A   They transmitted it to you, I don't know when they got it from us.  It was somewhere in between that time frame a few days before and I don't know when.  Could they have gotten it on the 19th after your e-mail?  I don't know, I can't recall but it was right in that time frame.

Q   I want to turn your attention back to the January 23rd mediation session, Mr. Toll.

A   Okay.

Q   It's true that at that point you never disclosed that the firm's calculations would be at a lower figure for Mr. Hausfeld than $5 million, right?

A   It didn't come up, it was obvious but it didn't come up.

Q   You never disclosed that the firm's calculations for Mr. Lewis would be at a figure lower than $1.1 million at that first mediation session, right?

A   The same answer, Mr. Rosenthal, it was obvious but it wasn't a subject of discussion.

Q   And there was no discussion about Article 10 of the operating agreement in that joint session, that first mediation session, was there?

A   There was not.

Q   You testified on direct examination that you are crystal clear that there was no mention of the $5 million figure at

Toll - Cross                                    76

that January 23rd mediation session, right?

MR. KEENEY:  Objection, that was not the testimony.

THE WITNESS:  I --

THE COURT:  Well, rephrase your question.  I'll sustain it.

BY MR. ROSENTHAL:

Q    On direct examination your testimony was that there was no mention of the $5 million figure in any joint session at that first mediation session, right?

A    That is my recollection, there was no mention of, in a joint session.  Now what you guys told the Judge separately back and forth, I don't know.  And whether the Judge, you know, but there was no discussion of it.  That's to my recollection with us in joint session of a $5 million number because we wouldn't -- I mean that wasn't the deal.  So if it was discussed we would have said that's nonsense because that wasn't the deal.

Q    You had your deposition taken in this case on July 20th, right?

A    I don't remember the date.

Q    At your lawyer's offices?

A    Yes.

Q    Hogan Hartzen?

A    Yes.

Q    Downtown DC?

Toll - Cross                               77

A    Yes.

Q    There was a court reporter there?

A    Yes.

Q    Prior to your testimony you raised your hand, right?

A    Yes.

Q    Swore on an oath to tell the truth?

A    Yeah.

Q    And you did tell the truth there, right?

A    The best of my recollection.

MR. ROSENTHAL:  May I approach, your Honor?

THE COURT:  Of course.  Is this in this binder?

MR. ROSENTHAL:  Your Honor, this from...

THE COURT:  Okay.

BY MR. ROSENTHAL:

Q    Line 26.

MR. KEENEY:  Do you have a page number?

MR. ROSENTHAL:  Yes, I'm sorry, Page 26.

BY MR. ROSENTHAL:

Q    I'm sorry, Page 27, Line 15.  Mr. Toll, isn't it true
that at your deposition on July 20th I asked you the
following question and you gave the following answer:

"And what about the $5 million figure for Mr.
Hausfeld, that was discussed during the first mediation
session with Judge Rice, wasn't it?"

Answer:  "It may have been. I don't recall now but

Toll - Cross                                                78

it may have been."  Do you see that?

A    I see it but I don't know what you're pointing to, that's not inconsistent with what I'm saying.  If it -- I don't believe it was said.  I said it may have been if it was said.  It was not said in any kind of joint session.  We knew the $5 million number was the number in the capital account.  The Judge may even have come in to us and that's like consistent with this discussion and said: look, Michael's got $5 million in a capital account from, you know, we -- I don't remember if the Judge said that but I'm saying I'm not sure.  But all I'm saying is there was no discussion and if it was, it was just like initial negotiations.  It wasn't part of the deal that if it was mentioned he wanted five million and maybe it was, it was rejected.  I mean there was give and take on a lot of money in this thing and if he said he wanted five million and the Judge told us that, well, we didn't accept it.

So when we got in the joint session there was no statement that, oh, we got a deal, Michael gets five million, that's what I said, that's clear to me as a bell.

Q    So it may have been mentioned during that first session, correct?

A    I said it might have been mentioned at some point but not in the joint session of what the deal was.  It could have been mentioned at some point in the day that Michael says

Toll - Cross                                               79

he's got five million in his capital account and, you know,

we knew that that was no the accurate figure but it wasn't

part of the deal.  That's what we negotiated for and he

wasn't going to get the five million.

Q   That's what happened, if the $5 million was mentioned,

perhaps in a separate session with Judge Rice.  You never

told Judge Rice that you believed that there would be less

than $5 million on capital account, did you?

A   I don't know if we discussed it with Judge Rice.  I don't

think that was discussed there.  We just, you know,

negotiated a deal where it was what it was is the number that

the partnership agreement says it was, regardless if it was

five million back in '07.

Q   Turning your attention to the February 2nd mediation

session?

A   Yes.

Q   Your testimony on direct examination was that Mr.

Hausfeld said he didn't want a lower percentage applied to

reduce his capital account, right?

A   Well, I don't know what I said unless you show it to me

but I have my notes of the meeting and I looked at them last

night.  I have tried to say what they said this morning and

he talked about us not using the lower percentage to revise

his capital account.

Q   To knock down his capital account, that's what he was

talking about, right?  To knock it down.

A   He said to revise or adjust his cap while using the lower percentage and I said "No, we will not."

Q   And he was talking about don't use a percentage to knock down my capital account?

A   It's not, Mr. Rosenthal, I don't know if he said -- he did not say "don't use it to knock down," those were not his words.  But he was saying don't use the lower percentage. What he was thinking about I don't know.  Maybe he was thinking about that.  He was obviously wrong because that's not what the partnership agreement says, that's not what we negotiated for.  So maybe he was thinking that, I don't know what he was thinking.

MR. KEENEY:  Objection.  He can't speak to what Mr. Hausfeld was thinking, your Honor.

THE COURT:  I understand.

MR. KEENEY:  Sorry to interrupt my own witness.

THE COURT:  All right, I'll sustain it.

BY MR. ROSENTHAL:

Q   But what you recall, Mr. Toll, is that Mr. Hausfeld said don't use a lower percentage to lower, to reduce my capital account or words to that effect?

A   I don't know if he used the words "lower" or "reduce." He said don't use the lower percentage with regard to, you know, the capital account.

Toll - Cross                                    81

Q    "To lower my capital account," is that he said, correct?

A    He -- I don't know, I don't recall exactly.

Q    Okay.  Please open up your deposition transcript again to Page 22, Line 20 -- Line 14.  Is it true I asked you this question and you gave me this answer:

          "What do you recall about that conversation?"

          Answer:  "I recall and I believe it occurred at the second meeting in early February when Michael had raised the issues about some of the points we thought were agreed to in the first mediation then we had a second session and somewhere in that discussion of the second session going through the points at the very end he made a comment about capital accounts and that he did not want, you know, the fact that he went down to 28 --  from 28 to 14 percent that we should not be using 14 percent to lower his capital account payment."  Isn't that what you said?

A    That's what I said.  I've since checked my notes of that meeting and it's he did not use the word "lower," according to my notes, he said affect.

Q    But what he was asking was that you not use the wrong percentage to tag him with a greater percentage of the loss, right?

A    I don't know what he meant when you say wrong percentage, all our hope was we just decided as a matter of what is proper for the firm and for the protection of all departing

Toll - Cross                                    82

partners in the future and the past that when someone leaves the firm, whether the firm has a gain or a loss at the time, they get the benefit or they are impacted negatively by what was happening at that time. And so whether he gained or lost, that was it. It wasn't like, you know, we were trying to get him to lose, it was what it was. And we could not set a precedent where you can retroactively change things because if someone leaves with a gain then, you know, we're going to be accused of taking money out of their pocket. So you just have to use what's in effect at the time and that's what we do all the time.

Q   Your testimony on direct examination was that the executive committee meeting, what you discussed doing and the reason you decided not to take the writedown in October 31st, 2008, rather the December 31st, 2008 was because you wanted to, quote, "keep the temperature down," right?

A   I, you know, I may have used those words. I've described it slightly different words this morning. We were trying to see if we would -- that's -- I may have said that.

Q   You wanted to try to avoid further conflict with Mr. Hausfeld was your testimony, right?

A   Well, that was one of the factors we discussed, yes.

Q   Please open Plaintiff's Exhibit binder Exhibit 42?

A   I'm sorry, this is?

        THE COURT:  42 in the big thick book.

BY MR. ROSENTHAL:

Q   The e-mail in the middle of the page.  Isn't it true that right after the OSB fees were confirmed received you say to Mr. Sellers in an e-mail: "Now can't wait for the MBH explosion re the capital account.  We should be okay on that but I expect a repeat trip to Philadelphia to see the Magistrate."  Do you see that?

A   I see it.

Q   "Can't wait for the MBH explosion."  That's intended to reduce the temperature, bring down the temperature, avoid further conflict?

A   Just imagine if we had added $5 million to it.

Q   So he should be grateful that the loss, that what was done didn't totally wipe out his capital account, that you only knocked him down $2 million, is that what you're saying?

        MR. KEENEY:  Objection, a little bit too argumentative, your Honor.

        THE COURT:  All right, I agree, sustained.

BY MR. ROSENTHAL:

Q   When you said you can't wait for the MBH explosion in the e-mail you thought Mr. Hausfeld would explode because you knew that when he saw a number less than five million he wouldn't be happy, right?

A   As I've testified before, I didn't know what he knew but I certainly expected he didn't get it or was ignoring the

Toll - Cross                                                    84

agreement.  And I don't know what he was doing.

Q   You knew that when he saw a number less than five million, five million, he wouldn't be happy, right?

A   I didn't know that, I expected that.  I didn't know what he was thinking.

Q   But you knew, I'm not asking what he expected, you knew that when he saw a number less than five million he wouldn't be happy, right?

A   No.  I knew when he -- how could I know what he knows or what he's going to do.  I expected that he would not like the fact that it was a number that had been reduced.

Q   All right.  Please turn in your deposition transcript to Page 61, Line 21, Mr. Toll.

          (Pause.)

Q   Are you there?

A   I see it.

Q   Isn't it true that I asked you the following question and you gave me the following answer:

          "So why did you think he would be -- knew he would explode?"

          Answer:  "I didn't know what he was expecting but I knew I expected when he saw a number less than five million, five million, he would not be happy."  Isn't that what you said?

A   Yeah, that's what I said.

Q    Next question:  "So you knew that by seeing a number less than five million he would less -- he would not be happy?"

Answer:  "I expected he would be."  That was your testimony then, right?

A    That's what I just said today, Mr. Rosenthal.  You're not--

MR. KEENEY:  Excuse me, I think the "not" was dropped out in reading of the answer.

MR. ROSENTHAL:  "I expected he would not be."

THE WITNESS:  Okay.  That's what I just said this morning, Mr. Rosenthal.

BY MR. ROSENTHAL:

Q    That he would not be happy when he saw a number less than five million?

A    I -- I didn't know what he knew but I expected that he would not be happy, yes.

Q    With a number less than five million, correct, Mr. Toll?

A    Yes, yes.

Q    And you also thought he would explode because he's not as detailed as you when it comes to accounting matters, right?

A    I certainly said he's not as detailed as me when it comes to accounting matters and I said that in my testimony right below what you have.  And he just may not have looked at the partnership agreement closely.

Q    Right.  And you thought when he got the numbers you think

Toll - Cross                                                    86

he'd recognize that you outsmarted him, right?

A   I think he'd recognize that he and you made a mistake in negotiating this deal or mis-- you know, not realizing what was, you know, the ultimate -- when to us it was clear as a bell.  There was no confusion, there was no misunderstanding. It says exactly what it says in the settlement agreement, we negotiated for that.  We gave up millions of dollars on other fees and we knew his capital account would go down from this.

Q   And you thought that, well, you knew that you had information which you hadn't provided him and that's why you thought you outsmarted him?

A   No, we had the -- he knew what -- he knew the capital account is what he knew, how could he not know?  We just went through this on direct.  Everybody knew, we had a big loss, he knew you calculated the month before you leave.  We had the situation Linda Nussbaum had a loss, other partners had losses, Michael knew we had a loss.  He knew the capital account should have gone down.  If he didn't know it's -- I can't even explain how he couldn't, how he wouldn't know.

Q   But you thought he would explode because he's not as detailed as you when it comes to accounting and may not have looked at the operating agreement, right?

A   I didn't know, I couldn't figure out why, you know, he would do what he did.  I mean I just, you know, sometimes I can't understand what he does but -- so I didn't know except

I know of him enough to know when he doesn't get what he wants and if he wanted five million somewhere in his head then, you know, he wouldn't be happy.

Q   Let's move back in this e-mail.  You say can't wait, can't wait for the MBH explosion, do you see that?

A   I saw it.

Q   And you said can't wait because you take great pleasure in ticking Mr. Hausfeld off, don't you, Mr. Toll?

MR. KEENEY:  Objection, argumentative, your Honor.

THE COURT:  Well, I'm going to allow it because I think he's entitled to ask him what he meant by that phrase.

THE WITNESS:  Well, I don't take great pleasure but I will tell you and if you will look at Exhibit 40-- I don't really want to get into this.

BY MR. ROSENTHAL:

Q   Are you directing me around the exhibits now, Mr. Toll?

A   No, I'm trying to finish my answer.

THE COURT:  Why don't you just -- just answer your question, then --

THE WITNESS:  Okay.

THE COURT:  -- if you want to explain it, you can.

THE WITNESS:  If you look at one of the exhibits and that is my notes of the compensation committee meeting.  And Michael Hausfeld said --

BY MR. ROSENTHAL:

Q    It's not in evidence, by the way, but go ahead.

A    Okay.  So get the exhibit but he had literally brought this firm to its knees in destroying it, saying false things to our bank, false things to other lawyers, trying to recruit lawyers out of firm during the year, telling them that the firm, it's going downhill, it's not going to survive, he had done a lot of evil things, Mr. Rosenthal.

Q    This is payback, this is payback knocking down his capital account, right?  Payback for doing all those evil things that --

A    No, it's not payback.  In fact all it is is us trying to do the right thing and honor what our partnership agreement says and going out of our way to not try to take payback and get $5 million more of a loss into his capital account which would affected him another million four, and we decided not to do that because we were saying let's do the right thing. This is the way we operate.  Michael did a lot of bad things to us, that's not our character and we're going to do the right thing and we go by the partnership agreement and that's the way it works.  And we follow it all the time.

        THE COURT:  All right, I'll let you ask the question again, go ahead.

        MR. ROSENTHAL:  I'll move on, your Honor.  Thank you.

        THE COURT:  Well, I'm curious.  What were you

referring to when you said you couldn't wait?

THE WITNESS:  Oh, your Honor, it was probably a, you know, wrong choice of words but I think what I was saying is Michael's going to make a big stink of it and it's absurd. It's a ridiculous argument, he's going to look like an idiot because we did what we're supposed to do and he's going to try to paint all kinds of picture.  And I, you know, he's going to explode on this, I know the way he is.  And I -- I think because I've seen and experienced as it happened and there are other things going on.  I mean,  you know, look at (inaudible) ...it's another example of things he's doing. And there are many others.

So I, you know, expected he would explode and get upset and I can't wait because I think we're right and he's going to lose.

BY MR. ROSENTHAL:

Q   You said that Mr. Hausfeld was evil, is that right?

A   He's done a lot of evil things to the firm in the last year.

Q   He had about 20 people come with him to his new firm, right?

A   Well, in fact, Mr. Rosenthal, I heard Mr. Eisler's testimony which was wrong.  I think he had -- we have about 65 lawyers, about 16 left, all of them who worked with Mr. Hausfeld in antitrust except for Rich Lewis who had been very

Toll - Cross                                90

close with him.  Everybody else in the firm stayed.

He had told us half the firm, more than half the firm was going to leave, there was going to be a big split and of course that did not happen.  Most of the firm stayed, they did not like what he was doing all year and everyone enjoyed the kind of firm we had.  So people who worked closely with Michael left, many of them stayed, almost half the antitrust division stayed and a little more than half left and the rest of the firm stayed intact.

Q   I want to move back in this e-mail, Exhibit 42.  You start off by saying "Okay, thanks.  Sounds fine," right?

A   Yes, I said that.

Q   Right.  And what you're referring to is okay, I'm satisfied now that the OSB money is fully in and that everything is taken care of, right?

A   No, not at all.

Q   Well --

A   I'm referring to Joe Sellers' e-mail that Pat Drolet, you know, he spoke to her briefly I guess about the 28-14 and she said --

Q   That's a subsequent e-mail.  I'm talking about --

A   I'm sorry.

Q   -- the prior e-mail, Mr. Toll, the prior e-mail was Steve from Joe Sellers, "I signed the check as Patrick," meaning Patrick Talud, right?  "Assured me the amount sent to us was

a hundred percent of the amount payable to both firms,"
right?  You see that?

A    Okay, I see that, sorry.

Q    Yes.  And so you're saying "Okay, thanks, sounds fine,"
meaning that --

A    Sounds fine.  We --

Q    Everything seems fine with the OSB thing, right?

A    Yeah, right, sounds fine, we have -- the money came in on
OSB, that's what it says, yes.

Q    And then the next word is "Now."

A    Yeah.

Q    Now, right, now that the OSB money comes in can't wait to
see Hausfeld's explosion over the capital account, right?

A    Boy, I don't know.  I didn't kind of tie this into the
OSB money, it's just now knowing, you know, I knew it was
going to be coming.

Q    Well, the OSB money had just come in, right?

A    Yes.

Q    About an hour before this e-mail your counsel had finally
released the capital account balance figures to Mr. Hausfeld
and Mr. Lewis' counsel, right?

A    Yes.

Q    And there you're saying okay, now that the OSB fee's in
and now that the capital account balance figures have finally
been provided to counsel now I can't wait to see this

explosion from Hausfeld, right?

A    Mr. Rosenthal, you're emphasizing the word "now" and I don't, you know, put a lot of meaning into what I -- I don't know what, you know, what I wrote.  That's just that I used the word now or I just didn't use the word "now can't wait," I don't connect it to anything.  I knew that this was going to be a likely issue that he would make a big deal out of. And I knew we were -- did the right thing.

Q    And the fact that this e-mail was sent a couple hours after figures were finally provided to Mr. Hausfeld and Mr. Lewis, that was just a coincidence, too, right, Mr. Toll?

A    You keep using the word "coincidence" and I never said that.  I don't -- there's no like tie-in here between the OSB money or anything.  I mean the OSB money was something we were going to get under the agreement no matter what.  There were like eight, nine, ten cases that were -- we negotiated with Judge Rice we would get 50-50 on, OSB we're getting a hundred percent on and this, you know, this capital account thing has nothing to do with the OSB money.  I don't like see the connection.  The capital account is a confined dispute that I knew Michael would raise.  It has nothing to do with the OSB or anything else.

Q    Let's move on to another subject, Mr. Toll.

        THE COURT:  We have to take a break at some point so what would be a logical point?

Toll - Cross                                    93

MR. ROSENTHAL:  Now is a fine time, your Honor, we can break for as long as you need.

THE COURT:  Well, how much do you guys need?

MR. ROSENTHAL:  But my guess is I probably have another half an hour.

THE COURT:  All right, why don't we break until 10:45, does that work for everyone?

MR. ROSENTHAL:  Yes, thank you.

THE COURT:  All right.

(Court in recess; 10:32 to 10:47 o'clock a.m.)

THE COURT:  All right.  Welcome back, everyone.

Are you ready to go?

MR. ROSENTHAL:  Yes, your Honor.

THE COURT:  Mr. Toll, you can return.

How are you today, Ina?

THE CLERK:  Good.  How are you doing, Judge?

THE COURT:  Good.  Thanks.

All right.  Mr. Rosenthal.

BY MR. ROSENTHAL:

Q   Yes, Mr. Toll, turn to Plaintiff's Exhibit 2, which is the 2003 operating agreement on Page 3, Article 2nd D.

(Pause.)

A   Operating agreement, page what?

Q   On Page 3, sir.

A   Okay.  About this operating agreement, this operating

Toll - Cross                                            94

agreement was amended in around early 2003; is that right?

A    Yes.

Q    Okay.  And what prompted the amendment?

A    Well, it could have been a number of things.  I mean, obviously when we get new partners, equity partners, we always amend the agreement, and sometimes we do it timely and sometimes it's six months or a year from the time they're admitted until we amend it.  So my suspicion is that we might have -- one reason could have been just the partners, but obviously there were substantive changes, and the biggest one that I remember that I was advocating is that the termination payments under the old agreement had gotten too large potentially.

We had first set them up, I think it was a million, and then we had plus the living increases, and base salary earnings it was based on, and I said I thought this was just getting way too high, and I discussed it with Michael, and probably Herb Milstein, and said that we really should make changes, so we would limit the termination payment.

Q    Okay.  And it's fair to say, isn't it, that every time Cohen Milstein has amended the operating agreement, whichever operating agreement it is, during your tenure there, it's done so in writing, correct?

A    Yes.

Q    And that's always been the practice, right?

A    Yes, and not always timely, but it is the practice.

Q    This particular operating agreement was prepared by Shulman Rogers, a law firm up in Rockville, Maryland; is that right?

A    They -- they were the drafts person who made the changes that I told them to make the changes.  I was the one dealing with them, yes.

Q    You were the one dealing with them; is that right?

A    Yes.

Q    Okay.  You have a very good friend there; is that right?

A    Yes, one of my good friends is the managing partner of the firm.  He was not involved in this, but I know Pete, you know, know him.

Q    All right.  But you gave them this business basically, to amend this operating agreement, right?

A    I mean, they were corporate lawyers, so they may, at some point, you know, they did, you know, our lease negotiation as well, because they did a lot of real estate stuff, and they had a corporate department, so they were cheaper than a downtown firm --

Q    Mm-hmm.

A    -- so we used them.

Q    Article 2nd D is the article we've been talking about that requires the books and records of the company to be kept in accordance with generally-accepted accounting principles,

Toll - Cross                                    96

right?

A    Yes.

Q    Okay.  You were here when Ms. Drolet testified the other day; is that right?

A    Yes.

Q    Okay.  And do you remember when I asked her, Well, to the extent that the books and records of the firm had been kept in accordance with GAAP, the income statements would have been kept in accordance with GAAP, too?

And she said, Had the books been kept in a GAAP basis?  Yes, the income statement would be GAAP.

Did you hear her say that?

A    I don't recall, but if she said it, she said it.

Q    The income statement we're talking about here is the income statement required to be provided to departing partners under Article 10 of the operating agreement, right?

A    Yeah, except that decision is ours, not hers, how to keep the financial statements.  So what she said, you know, I don't think really matters.

Q    You disagree?  I mean, do you disagree with her that had the books been kept on a GAAP basis, the income statement would be on a GAAP basis?

A    Well, it's a hypothetical, because -- do you want me to answer?

Q    Sure.

A   Okay.  We never wanted GAAP.  It was never in anyone's mind.  No one wants GAAP.  It makes no sense for our firm to do GAAP.

So ask me a question, If we had kept the books of account in GAAP, I can't even envision that, and then saying, If we did that --

Q   I'm just asking you to answer the question.

A   -- what would we do with the financial statements?

Q   Had you actually kept the books and records in compliance with the plain terms of Article 2nd D --

A   Right.

Q   -- that income statement provided to Mr. Hausfeld and Mr. Lewis would have been in accordance with GAAP, just like Ms. Drolet testified, right?

A   No, it would not have been.  We don't do our financial statements by GAAP.  So if some reason we kept books of accounts by GAAP, which it says here, but we never did, but if we did, we wouldn't do the financial statements by GAAP, because it makes no sense to do so for our firm.

MR. ROSENTHAL:  Give me just a moment, please?

(Pause.)

The Court's indulgence.

THE COURT:  Take your time.

MR. ROSENTHAL:  Thank you.

(Pause.)

Toll - Cross                          98

BY MR. ROSENTHAL:

Q   Turn to Page 13 of Article 2 -- let me turn that around -- Plaintiff's 2.

A   I see it.

Q   And up at the top Subparagraph G, the amendment says, This agreement may be amended only with the written consent of members owning at least two-thirds of the percent of all percentages, right?

A   I see it.

Q   And as you testified, that is the practice of the firm, to amend operating agreements with a vote of at least two-thirds of all percentage interests, right?

A   That is correct.

Q   This is Plaintiff's Exhibit 108, which you talked about briefly with Mr. Keeney on direct examination.  Do you remember that?

A   Yes.

Q   And he was asking you about this right-hand column, credits figures, right?

A   Correct.

Q   And he was asking you what explains, for instance, for you the difference between this XXXXXXXX in credits for the year as compared to your approximately XXXXXXX or so in increased capital in your account.  Do you remember that?

A   Yeah, but mine is XXX, not XXX.

Toll - Cross                                99

Q    Oh, I'm sorry.  I'm misreading it.

A    Okay.

Q    He was asking you to explain what is the difference between XXXXXXX up here --

A    Yes.

Q    -- and the approximate XXXXXXX that your capital account was increased by.  Do you remember that?

A    I do.

Q    Isn't it true that the difference is simply your salary for the year, your guaranteed draw?

A    No, no, my guaranteed draw is not XXX, so it's not the difference.

Q    Your guaranteed draw is what, XXX?

A    I think it was XXX last year.

Q    XXX?  So it was approximately --

A    XXX.

Q    -- the difference between -- your guaranteed draw is approximately the difference between the credit number up here, and the actual increase you saw in your capital account, right?

A    Yes, approximately.

Q    And if we take a look at Exhibit 78, Plaintiff's Exhibit 78, Mr. Toll.

A    Yes.

Q    On Page 8?

A    Yes.

Q    Okay.  I'm looking at the third one down from the top right?

A    Yup.

Q    It shows your beginning balance for the year at XXXXXXXXX, right?

A    Yes.

Q    And it shows your net income or loss at XXXXXXXX, right?

A    It does.

Q    And that's the exact figure up here on Exhibit 108, right?

A    Actually, that's exactly what I testified.  That this figure here was a net income figure.  That's what I'm saying. It was not a capital account figure.  This is a net income figure on 108, that's correct.

Q    That's right.  And then take a look at Page 8 again on Exhibit 78.

A    Yes, I see it.

Q    Do you see the withdrawals you have for the year?

A    Yes, I do.

Q    XXXXXXXX?

A    I see it, yes.

Q    And if you take -- if you take the difference between two of them, the net income or loss at XXXXXXXXX, and you subtract that from withdrawals.  Do you see that?

Toll - Cross                                          101

A    I do.

Q    That reflects the amount by which your capital account balance increased for the year, right?

A    Yes.  Mr. Rosenthal, if you look at Page 18 --

Q    Is that a yes or a no?

A    Yes, look at Page 18 of this exhibit.  It lays it right out there.  It says what the share of net income is, and it says what the withdrawals are, the XXX, and there are other items, the medical insurance, disability insurance, and it adds up to XXX --

Q    Okay.

A    -- and that's correct.

Q    So it's the other things that you were paid for the year, was backed out of this net income figure of XXXXXXXX or so?

A    I'm not following your question.  When you say "backed out," the XXX is my --

Q    I'm not an accountant, you are.

A    Well --

Q    XXXXXXXX is your net income for the year, right?

A    My net taxable income for the year, correct>

Q    Net taxable income, right.

A    Right.

Q    You take our your salary, right?

A    Well, when you say take it out, I'm not sure what you mean?

Toll - Cross                          102

Q   Subtract the salary?

A   Okay.

Q   All right.  Subtract what, medical insurance, right?

A   Correct.

Q   Other kinds of insurance, disability insurance?

A   Correct, right.

Q   And whatever else, and then you end up with the amount by which your capital account increased for the year.  That's all that's going on, right?

A   No, that's absolutely correct.

Q   Okay.  And I'm sorry if I misunderstood your testimony. I just didn't know that was clear.

A   Okay.

Q   If you would turn to Plaintiff's 70, please?

        (Pause.)

A   Okay.

Q   And this is the November 6th, 2008, letter you wrote to Sun Trust Bank, correct?

A   Yes.

Q   And you wrote to Sun Trust Bank, you wrote this letter to Sun Trust Bank, in an effort to get them not to call the line of credit, right?

A   That was one of the principal reasons, yes.

Q   And certainly you did not misrepresent anything in this letter to the bank, did you?

Toll - Cross                      103

A    No, I did not.

Q    You stand by everything you said in this letter, right?

A    Yes, I do.

Q    And, so, you told the bank that you thought, according to Mr. Bavis's calculations, somewhere between 43 and $46 million was going to come in by the end of the year, right?

A    I did not. I noticed that testimony with interest, but I didn't say that.

Q    Well, that's certainly the amount that you forecasted for the bank you hoped would come in, right?

A    That is the amount I referenced, but I made very clear that a bunch of those matters, including the biggest one of 15 to $18 million, may not come in this year. So to say that I told the bank we were getting 43 to $46 million in two months is not accurate.

Q    And I'm not suggesting you misrepresented anything.

A    All right.

Q    My question actually is: You didn't misrepresent anything to the bank, right?

A    I don't believe I did, no.

Q    Okay. And, in fact, about $12 million in revenues came in in November and December, right?

A    I've heard that testimony, you know, I believe that's about right. I have to check, but that sounds right.

Q    And it's not at all inconsistent with what you

represented to the bank on November 6th, is it?

A    It's not inconsistent.  It's exactly the point I made before.  The revenue -- predicting revenue coming into this firm, and when we'll receive it, is the most imprecise task one could have in this business, and I've been doing it for 20 years.  In some years I'm close, in some years I'm wildly off, and I get -- and a lot of the information I get, I get from other partners on what's going on in their cases, when is the settlement going to be done, when is the hearing going to be, is there going to be objection, is there going to be appeal, and you just don't know.  I mean, you just don't know.  Even here I didn't know in November how we were going to end up for the year.

Q    You heard Mr. Bavis's testimony, right?

A    Yes.

Q    And he would not recognize revenues unless the settlement hearing had taken place, the settlement had been approved, and the objections were done, right?

A    I'm not sure.  I don't remember which ones he did or didn't do.  I mean, I don't recall the details of which ones he included or not, but it -- even when the settlement's done, there can be an appeal on an objection, and you don't know when that's going to be resolved.

Q    That's what I'm saying.  The objection, after the objection period has run, it's a done deal, it's just a

Toll - Cross                                      105

matter of time before the money comes in, and it may be a while, but it's just a matter of time, right?

A   In most of our cases when the settlement's done it's a matter of time, but the matter of time is a big deal, because if it doesn't come in one year when you're expecting to make a $15 million profit, and then a $15 million fee doesn't come in, then all of a sudden you're a flat year.

And someone would say, you know, what are you doing? And that's the nature of our business.

Q   Okay.  You told the bank that the Leap Frog money would come in, right?

A   Yes.

Q   And, in fact, it did come in, right?

A   Yes.

Q   You told the bank that the Booka money (ph) would come in because it settled a number of months ago, and the attorneys fees were approved in mid-October, right?

A   Okay.

Q   And Booka came in, right?

A   I don't remember, but if you say it did, it did.  It says there -- I'm going by the description -- money was distributed, so I expect it to be distributed on the 19th.

Q   Right.  Ureem (ph), it says settlement -- settlement attorneys fees approved 10/23 --

A   Yes.

Toll - Cross                                    106

Q    -- but the fees still need to be determined by lead counsel, I expect to be paid before Thanksgiving, right?

A    That was our understanding.

Q    And Mr. Bavis did -- and took it into account, right?

A    He did.

Q    And you did receive Ureem money about early February, right?

A    Yeah, it was later than we thought.  It was in the next year.

Q    So you received the money in February, right?

A    I knew we were going to receive the money.  The question was when, and we understood it might be Thanksgiving, but it ended up not being Thanksgiving.  It ended up being February.

Q    All right.  Gear I 2 (ph) --

A    Yes.

Q    -- was going to be held actually on the very day that you read the letter, and there were no objections, right?

A    Right.

Q    And you were expecting payment 30 days from the hearing, right?

A    It looks that way.  I don't know the case well, but it looks that way.  It's a small case, but it sounds right.

Q    Well, you see that Mr. Bavis took a pretty conservative view here, because he said, No, the hearing's pending, so I can't recognize the revenue, right?

Toll - Cross                    107

A    Yeah, I'm not saying he took a conservative or not conservative view.  It's just the -- you're correct.  I don't have any dispute that didn't come in.  He didn't recognize it.  I'm just --

Q    You're not disagreeing with the way in which he applied GAAP, are you?

A    Well, he can't possibly, not knowing our business, you can't -- GAAP makes no sense in our business, because you have no evidence of assurability of when money is going to come in and be received.  That's why we don't use GAAP.

Q    You know that are other plaintiff's firms in the country that continue to use GAAP, don't you?

A    No, I don't.

Q    You don't know one?

A    No, I don't.

Q    Okay.  Well, let's just take another example.  The Camarian (ph) case, that was one of your cases, right?

A    Yes.

Q    It's a securities case?

A    Yup?

Q    And you say, final hearing to approve settlement before December 12th, right?

A    Right.

Q    And that money actually did come in in December, right?

A    No, only part of it came in in December.  Well, that part

Toll - Cross                                    108

of it --

Q    3.7 million came in --

A    Yes.

Q    -- in December, right?

A    Yeah, we had to go to court.  Hausfeld tried to block it.
We had to go to court and the court entered an order helping
us, because we said we needed our bank line paid down, and we
got it.

Q    Okay.

A    If we didn't go to court, we would have never gotten it.

Q    Right.  Well, Hausfeld actually wanted that money to be
used to pay down the line, and he made that very clear from
the beginning, didn't he?

A    He opposed our efforts to get the money into the firm.

Q    Not the bank, though?  He wanted the bank paid, right?

A    He eventually -- well, actually he opposed our efforts.
We went into court to try to get it down to the bank, and he
wouldn't agree.

Q    All right.  This money went to the bank because Mr.
Hausfeld agreed, right?

A    We went to the court with an order to try to make sure it
would go to the bank, and Hausfeld would not agree, which is
why we had to go to the court.  We tried to get them to agree
to get us this money.  He wouldn't.  And we had to go to
court and file an emergency motion with Judge Cote (ph).

Toll - Cross                                        109

Q    Actually, that's not what happened, Mr. Toll, is it?

A    You tell me.  I think it did happen.  Can you tell me?

Q    What happened is that you, without notifying Hausfeld, without notifying his counsel, went to the Court ex parte telling the court that the money had come in, right?

A    We did tell the court the money came in, because our counsel was trying to get the money through -- can I finish, Mr. Rosenthal?

Q    Yes.

A    -- through you guys, and you guys would not let us get the money, and we had to go to the court.

Q    And co-lead counsel then wrote a letter to you and me saying there's a dispute over this money, and I think that Mr. Hausfeld and his counsel ought to know about it, because Mr. Toll didn't tell them about it; isn't that right?

A    One of the co-lead counsel wrote a letter to the court and said you should have served Mr. Hausfeld and --

          THE COURT:  Well, this is a very interesting debate, but I think we're getting a little far afield from why we're here.

          MR. ROSENTHAL:  Fair enough, your Honor.

          THE COURT:  All right.

BY MR. ROSENTHAL:

Q    Is it fair to say that the representations that you made to Sun Trust Bank were sufficient to get them to back down to

calling the money, right?

A    I think it was very important they -- yeah, Michael had told them a lot of bad things --

THE COURT:  Okay.  So the answer's yes.

THE WITNESS:  I'm not going to go -- sorry, your Honor.

THE COURT:  That's okay.

THE WITNESS:  I wasn't going to go there, but I --

THE COURT:  Next question.

THE WITNESS:  -- we had to do this.

BY MR. ROSENTHAL:

Q    Well, one more question about this.

MR. ROSENTHAL:  I'm sorry, your Honor.

THE COURT:  That's all right.

BY MR. ROSENTHAL:

Q    Actually, let's go to Exhibit 70.  And would you please turn to Page 3 --

A    This same exhibit, 70?

THE COURT:  Yes.

BY MR. ROSENTHAL:

Q    Yes, sir.

A    Okay.

THE COURT:  Your letter to the bank.

THE WITNESS:  Yes.

BY MR. ROSENTHAL:

                              Toll - Cross                        111

Q    The last full paragraph --

A    Yes.

Q    -- on the page.

          There's some testimony about the Bell South case
here, right?

A    Yes.

Q    And this paragraph says:  "There is a fee dispute among
counsel with regard to a very small portion of the fees" --

A    Yes.

Q    -- "$125,000, which impacts the precise amount we will
receive."

A    Yes.

Q    "At worst, we will receive $1.8 million.  Joe is trying
to resolve the dispute at this time."

A    Correct.

Q    Do you see that?

A    I see.

Q    So the dispute is only over $125,000, not over the entire
$1.925 million that the firm might receive, right?

A    That is correct.

Q    All right.  And Mr. Bavis, on his calculation, he doesn't
recognize the entire $1.925 million, does he?

A    He did not.

Q    He only recognized the $1.8 million that wasn't in
dispute, and that Cohen Milstein was going to receive?

Toll - Cross                                112

A   Yeah, but that's -- he didn't know the facts of what was going on, and we never got the $1.8 million, because it couldn't be released, because of the dispute over the 125,000.  We thought we might be able to get it, but the counsel and the defendant's lawyer wouldn't release the remaining funds.

Q   But there's no question that you are going to get at least $1.8 million, right?

A   We should, yes, that's why I put it in the projection, but there was no certainty of the timing.  All of these things we were going to get paid.  It's a question of timing.

Q   But which based on your knowledge of GAAP, would be inappropriate to include in revenue recognition, right?

A   No, because GAAP makes it all about timing, and so under GAAP, he's included it in '08, and it wasn't reasonably assured that we were going to get it in '08, because of this dispute.  So that's the problem with using GAAP in our business.  It doesn't make any sense.  There are too many contingencies and delays and objections and appeals that you can't tell when you're going to get money.  Even when the case is over, you can't be certain when it's coming.

Q   Let's move on to another topic, Mr. Toll.  Thanks.

November 5th, 2008, was the compensation meeting, right?

A   Yes.

Toll - Cross                     113

Q    You were on compensation committee, right?

A    I was.

Q    Okay.  And you, along with three of your colleagues on the compensation committee, voted to reduce Mr. Hausfeld's share from 28 to 14 percent, right?

A    Collectively we did.  I think everyone had a different percentage that they thought was the percentage that Michael should be reduced to, and then we agreed on looking at what everyone said, we went with 14, but they were all in that range somewhere.

Q    Okay.  And one of the reasons that you, yourself, voted to cut his points in half, or approximately in half, was because you wanted to reallocate the money to the eight partners who ultimately to expel him the next day, right?

A    Absolutely not.

Q    Are you saying that you did not go into the compensation committee meeting with the purpose of trying to expel Mr. Hausfeld from the firm as a result of a reduction in his points?

A    That wasn't the question you just asked.  You talked about trying to get more money to be another partner with more interests, I'm sorry.

Q    I wasn't asking you that.  I'm sorry if I'm confused.

A    Okay.

Q    When you went into the compensation committee meeting and

Toll - Cross                                    114

voted to reduce Mr. Hausfeld's shares --

A    Right.

Q    -- one of your purposes in doing so, was so that you could expel him -- vote to expel him from the firm, right?

A    It was certainly one of my thoughts, and unfortunately hopes that that's where we had to go as a firm.  Yeah, I definitely thought of that.

Q    Okay.  And, in fact, you had meetings among the seven others who voted to expel Mr. Hausfeld the next day, about the compensation committee to do just that, reducing his points, reallocating his points to those who were opposed to him, and then voting to expel him from the firm, right?

A    We had meetings, and we were very careful, I must say I discussed with counsel, which I'm not getting into, but we were very careful that the decision of the compensation committee was to be made individually by the members.  I know a number of us, including myself, and --

Q    Sir, please answer my question.

A    Sorry.

Q    Did you have meetings where you discussed reducing Mr. Hausfeld's percentage interests, reallocating those shares to those opposed to him, and then using those reallocations to expel him from the firm?

A    No, we had meetings where we discussed the notion that we thought might Michael had to be expelled from the firm.

Q   Okay.  You never, not once in those meetings, discussed the idea that the compensation committee reduce his shares in order to effect that?

A   No, of course we discussed the notion that how do you do it, and that we don't have two-thirds, and depending what the compensation committee does, we might get two-thirds.  And if we got two-thirds, then people said, some people said, you know, hopefully that's where we'll end up, but there was no guarantee the compensation committee was going to do it.  We had --

Q   You said depending on what the compensation committee does, then --

A   Yes.

Q   -- maybe we can expel; is that right?

A   Yeah, because there were -- there were lots of talks months earlier about the issue with regard to Mr. Hausfeld, and the things he was doing, and the impact on the firm.  And we said, look, and we -- there were certain people who said despite, you know, Michael's behavior, we want to try to keep together, and people knew that Michael was a business-generator, a terrific lawyer, you know, extremely bright, was an important lawyer in the firm.  So there were a lot of people, despite his behavior, was -- who were saying, Well, you know, can't we figure out a way to, you know, make him stay, change things, make him understand?

Toll - Cross                                116

And so it was no guarantee at the end of the day we were going to get the vote, but clearly a number of us felt that if we did, it would be the best thing for the firm if we would expel him, if the comp. committee did reduce his points.

Q   Mr. Milstein's on the compensation committee with you, right?

A   Yes.

Q   And you had discussions with him before November 5th about reducing his points so that you could expel him, right?

A   We had discussions.  We didn't talk about a percentage, what we would do, but we had discussions about the concept that if, the compensation committee voted to reduce his points, and we had more than two-thirds among the partners who felt he was becoming problematic for the firm, that -- that we hoped that that would happen.

Q   Dan Small is on the compensation committee, right?

A   Yes, he was.

Q   You had discussions with him prior to November 5th about reducing Michael's points in order to expel him from the firm, right?

A   Well, I would say it's kind of the same thing with Mr. Hausfeld.  I didn't have separate discussions with him.  We had a number of partner meetings, and we discussed the concept that Michael, you know, the best interest of the firm

Toll - Cross                                    117

required him to leave.  We had tried to negotiating amicably

with him for months, and it just wasn't working, and he was

trying to bring --

THE COURT:  He's just asking you who you talked

about reducing the points, that's all.

THE WITNESS:  Sorry, I did not have separate

conversations with the compensation committee.

THE COURT:  Okay.  So there were --

BY MR. ROSENTHAL:

Q   These were meetings among the eight partners who

ultimately voted to expel him?

A   Eight or --

Q   And then Mark Maches who stepped down, was it not?

A   Yeah, eight or some -- let's say six attended one

meeting, if not everyone was there, but, yeah, you know,

meetings of the eight or nine partners who were concerned

about the future of the firm.

Q   Mr. Lewis was never invited to any of those meetings,

right?

A   Mr. Lewis was not, because of things, you know, he had

done and shown with regard to what his support was.

Q   Right.  And when the compensation committee decided to

reallocate the shares taken away from Michael --

A   Yes.

Q   -- Mr. Lewis was not a beneficiary of that, right?

Toll - Cross                                118

A    Well, we didn't.  I can only speak to myself.  I did not think of it that way, okay?  I looked at every one on the compensation committee to do the same thing.  It's the way we do it every year.  We each go into that meeting with our own thoughts about what each partner should get --

Q    Were Mr. Lewis's shares reduced from what they had been mid-year as the result of the resignation of two partners?

A    I said ultimately, yes.  On the chart you or Mr. Keeney showed me that they were reduced from where he was mid-year slightly.

Q    The same is true with Robert Eisler, correct?  His shares were reduced as well?

A    By 100th of a percent I think or something.  I mean, it was basically the same.

Q    And Mr. Eisler wasn't invited to any those meetings where you talked about expelling Mr. Hausfeld, was he?

A    No, for the same reasons as Mr. Lewis, because it was clear that he was, you know, supporting Michael.

Q    The same with Mike Lehmann, right?  He wasn't involved in any of these meetings, right?

A    And for the same reasons.

Q    And his percentage interest also went down, correct?

A    Again, slightly or about the same.  It was just a slight diminution.

Q    Well, with the exception of four of those individuals,

Toll - Cross                              119

every other equity partner's percentage interest went up, right?

A    Yes, when points are taken away from a partner, you have to have 100 percent, they have to go elsewhere.  And the feeling of the compensation committee was the individual members, but certainly my feeling was that, you know, Leeman, and Eisler, and Richard did not deserve to go up based on their behavior and their performance, and so that Michael's points had to go somewhere, and they had to go other people, whether it was me or others.

Q    And Mr. Lewis's behavior in bringing in a $5.8 million fee that year?

A    No, Mr. Lewis had been compensated.  Again, getting to the nature of our business, that fee had been in process for many, many, many years.  We had compensated -- increased Mr. Lewis substantially over the years based on the fact that we knew we would get that fee in the future.

          So there's this double-dip issue.  Just because the money came in in that year, you don't boost the percentage, because we've been boosting him all along knowing that it's coming.  So Mr. Lewis was a respected lawyer in the firm, but it was clear that --

Q    He was affiliated with Michael, and therefore his percentage couldn't go up?

A    No, he was affiliated with Michael so we didn't include

Toll - Cross                                    120

him in the meetings, but Richard's performance, and this is not anything against Richard, his portion of the firm was a real loser for us.  I mean, it was a major adverse -- so for --

Q    Herb Milstein --

A    Can I finish?

Q    -- and Lisa Rosetti (ph) both saw --

THE COURT:  Just let him finish, and then you can answer.

MR. ROSENTHAL:  Okay.

THE WITNESS:  My point is we were analyzing people on a lot of criteria, and it was our view, and my view that Richard's performance did not justify an increase, because his practice had been losing us a lot of money.  And, you know, I just tried to keep him around the same, and not reduce him, because we liked him, he's a nice guy, and that was it, I mean --

BY MR. ROSENTHAL:

Q    There were other practices that were losing money, too, right?

A    No, practices go up and down.  His had been really bad for many, many years.  I'm not saying they weren't -- at times brought in a big fee, and it did, and Richard had been compensated and increased dramatically.  And he was, you know, up in the same level as a lot of other partners.  But

Toll - Cross                    121

it wasn't felt at that time, his practice had been
consistently down, just because he got the Fen-Fen money that
happened to come in '08, didn't change that fact.  We had
drained millions of dollars in these cases, this Milwaukee
lead case, and lost millions, and millions in those cases.
I'm not blaming him.  It just happened.  But the practice
wasn't that good, so we didn't think he -- I didn't think he
deserved an increase.

Q   Are you saying that the reason, and the only reason that
Lewis, Eisler, and Leeman's shares went down was because they
were poor lawyers, and were not having -- they were not poor
lawyers, they were having bad years, whereas all the eight,
the rest of you, were having great years, and therefore your
percentages deserved to go up?

A   No, I wouldn't phrase it that way.

Q   How would you phrase it?

A   I would phrase it that we didn't think that they had --
that their overall value to the firm had really increased.
Anything they had done in '08 -- and Leeman and Eisler were
like brand new, they had just started in '07, Michael brought
them in, and, you know, Richard had been with us a long time,
and Richard was just slightly reduced because his practice
group was not going well.  The other guys really hadn't shown
anything spectacular, so we kind of kept them around the
same, and we --

Toll - Cross                                    122

Q    Did Mr. Milstein --

A    Can I finish again?  And so I felt that when Michael's points, that I thought he should go down, they should go to the other partners in the firm who were, you know, kind of the core of making this firm continue to grow, besides Michael.

Q    Herb Milstein and Lisa Rosetti were both equity partners in the firm last year, right?

A    They were equity partners for a long time.

Q    Mm-hmm.  And there was actually a verdict of legal malpractice rendered against them last year, correct?

          MR. KALINER:  Objection.  Relevance, your Honor.

          THE COURT:  Well, I take it that he's going to argue it's relevant because their interest in the firm went up.

          MR. ROSENTHAL:  Absolutely, your Honor.

          THE COURT:  All right.  I'll allow it.

          THE WITNESS:  What's the question?

          THE COURT:  Was there a verdict for medical --

BY MR. ROSENTHAL:

Q    Was there a verdict for medical malpractice against Mr. Milstein and Ms. Rosetti last year?

A    I -- I think that is correct.

Q    And their percentage interest went up, correct?

A    Yeah, and I can certainly explain that, Mr. Rosenthal.

Q    Mr. Keeney can have you explain it.

Toll - Cross                           123

The compensation committee's determination, let's turn to Plaintiff's Exhibit 68, please?

(Pause.)

A    68, I have it.

Q    Yes.  Take a look at the very first page of that document, which is the memo from you to the equity partners regarding the compensation committee's determinations on November 5th, 2008?

A    Yes.

Q    Okay.  You say these decisions are effective immediately, right?

A    Yes.

Q    Effectively immediately means right now, yes?

A    Yes.

Q    And that they're retroactive to the beginning of 2008, right?

A    Correct.

Q    Which means that they go into effect as of January 1st, 2008, right?

A    Only for certain purposes.

Q    Wait a minute.  You heard Mr. Milstein's testimony yesterday, didn't you?

A    Yes.

Q    Percentage interest is one thing, right?  It applies both to voting strength and -- and allocution of profit or loss,

Toll - Cross                                    124

right?

A    Profit --

Q    The two are not divisible?

A    You didn't complete the question with this, it's the profit and loss at year end, yes.

Q    The two are not divisible, are they?

A    I'm not sure I understand your question.  I said it applies to profit and loss at year end.

Q    Okay.  Well, there are some firms you know that drive distinctions between voting percentages and allocation of profit or loss, right?

A    I really don't know, actually.

Q    That's certainly not the case at Cohen Milstein, is it?

A    Voting --

Q    The percentage interest applies to both allocation of profit or loss, and -- and to voting strength, right?

A    Yes.

Q    And, so, if the determination is effective immediately, and retroactive from the beginning of 2008, it's got to be for both purposes, doesn't it?

A    It's retroactive to 2008, for the purposes of computing profit bonuses or bonuses that we paid out at the end of the year.  As I explained earlier, if someone stays until the end of the year, this new percentage would apply to the whole year.  It would be retroactive to the whole year.  We would

Toll - Cross                                    125

not calculate their bonus in two parts.  One based on a percentage for ten months and one based on a percentage for two months.  That's what I meant.

Q   By the very plain terms of this memo, the very plain terms, the percentage interest is to be applied effective immediately and retroactively to the beginning of the year, correct?  And it doesn't draw distinctions between voting strength and allocation of profit or loss, does it?

A   Mr. Rosenthal --

Q   The memo by its terms.

A   -- I wrote the memo.  I used the words in the compensation committee.  I know what I meant.  I meant exactly what we've been doing in 20 years of history at the firm, and I've just explained it.  That's what it meant.

       Now, your correct it does not --

Q   You heard Mr. --

A   -- have the words in there "retroactive to the beginning of 2008, only for profit and loss distributions," but everybody knew that.  That's how we do it.

Q   You made it effective immediately, so that you could expel Mr. Hausfeld the following day, correct?

A   I certainly had it in mind to -- to do that if we got the vote from the compensation committee that we would move to expel him.  I was in favor of that.

Q   Which is why you made it effectively immediately for

voting strength purposes, right?

A   That is correct.

Q   And then you made it retroactive to the beginning of the year because you wanted to make sure the company decisions, prior to the compensation committee vote, were less subject to challenge by Mr. Hausfeld, right?

A   One of the concerns we had was Michael, you know, and litigation, and so we didn't want him to, you know, start bringing up old votes, and that -- I had that in mind, yeah.

Q   So, in your view, on October 31st, Mr. Hausfeld's percentage interest for voting strength purposes was 14 percent, but for allocation of profit or loss purposes, was 28 percent on the very same day; isn't that right?

A   For profit and loss purposes for a departing partner, yes.  In other words, the departing partner is -- it's a different concept than if someone, you know, stays with the firm.

Q   You're saying that a partner's percentage interest on the very, very same day is one thing for one person and another one for another purpose?

A   It's not even that I say it.  We have a partnership agreement.  That's what the partnership agreement means to us.  In other words, when someone departs, it's different than if someone stays at the firm, in terms of calculating interest, and I explained the reason for that before.  That

Toll - Cross                                    127

if a partner has a game, you can't go back and change that calculation and try to hurt them. You have to be consistent. You can't change the percentage in effect at the time they leave, when it comes to a departing partner's capital account calculation.

Q   According to that memo, the percentage in effect at the time Mr. Hausfeld and Mr. Mr. Lewis left, was 14 percent according to the plain terms of that memo, right?

A   I don't want to debate the words. I told you I did not use the words, you know, it's retroactive only for that purpose, and I told you it was the clear intent. I'm the one who wrote it. I'm the one who said it.

Q   On November 5th --

A   Yes.

Q   -- when the compensation committee met --

A   Yes.

Q   -- Mr. Hausfeld hadn't departed yet, right?

A   He had not. That's exactly right. That's why --

Q   Mr. Lewis hadn't departed yet, right?

A   Exactly right.

Q   So at the time you were making those compensation committee decisions, those were not yet departing partners, were they?

A   Absolutely right. That's why if they had stayed to the end of the year, and they had not been expelled --

Toll - Cross                128

Q    Did you --

A    -- or they had not left on their own, they would have gotten this 14 percent and 6 for the whole year as their distribution or their equityship, that's what it intended. We didn't know for sure if he was going to be gone or not, we were going to expel him or not, he would leave or not.

Q    Where in the partnership agreement does it say that the compensation committee can't reduce a partner's percentage interest, for voting strength purposes, in order to expel him from the firm, but then turn around and tag him with a higher percentage, in terms of allocating his loss --

A    Sir --

Q    -- when you calculate his departing capital account funds?  Where does it say that in the operating agreement, Mr. Toll?

A    Mr. Rosenthal, the partnership agreement does -- I don't think it uses the word "compensation committee."  It's not -- I don't even think it's in the partnership agreement.  The powers of the compensation committee would develop, I guess elevated in a sense by the partners, but it developed over years of practice.  It's not in the partnership agreement.

Q    And just so we're clear, if you were to apply the 14 percent figure rather than the 28 percent figure --

A    Yes.

Q    -- you would not be retroactive in changing Mr. Hausfeld

and Mr. Lewis -- Mr. Hausfeld's capital account as of December 31st, 2007, would you be?

A    Correct, it doesn't change the balance and effect at 12/31/07.  It does not effect that.

Q    It simply allocates a share, or allocates the income or less as of effective date of this departure, right?

A    That is correct.

Q    So it doesn't actually -- the percentage -- whatever percentage you use is not effecting directly the capital account as of the beginning of the year?

A    No, it does not effect as a year, but it effects the amount that the departing partner gets.

Q    You agree, Mr. Toll, that acting fairly towards partners, including partners who leave the firm, is the standard thing the firm tries to do, right?

A    Absolutely.

Q    And your contention is that's how you treated Mr. Hausfeld?

A    I do, but you have to understand, there's a partnership agreement, and the partnership agreement sometimes produces, you know, bizarre results, that someone can say is not fair. You know, we could have used a pro rata method.  That would have produced a different result and someone would say that's fair or unfair.  So it kind of, you know, we try to be fair in the sense that if we have a partnership agreement that

Toll - Cross                          130

says something, if it has negative consequences or positive consequences to a partner or departing partner, that's what it is.  So we try to be fair to enforce, you know, the terms of the agreement.

Q   Mm-hmm.  Mr. Hausfeld was kicked out of the firm on November 6th, 2008, right?

A   Correct.

Q   Okay.  At the time there was a large outstanding line of credit with Sun Trust Bank, right?

A   Yes.

Q   And Mr. Hausfeld was approximately a 30 percent personal guarantor on that line, right?

A   Correct.

Q   You didn't approach the bank and say, Well, Mr. Hausfeld's out of the firm now, the remaining partners really should take up his personal guarantee, did you?

A   No, it wouldn't make sense to do that.

Q   All right.  Leave him on the hook, right?

A   It's not leaving him on the hook.  All the liabilities we had accrued that put us in debt were under his reign.  It was only fair that he -- that he's responsible for that.  It's not leaving him on the hook.  We had all that debt while he was there.  I'm not saying that's his fault, but he was part of it while we were there, and so was his responsibility.

Q   When you amended the operating agreement, you did so --

Toll - Cross                                131

well, I should say when you voted to expel him on November 6th, you actually amended the operating agreement, correct?

A    We did.

Q    And you amended the operating agreement to change the provision that allowed involuntarily terminated partners 30 days to wind up their affairs before they left, right?

A    We did.

Q    And had you not amended that provision, Mr. Hausfeld's effective date of departure, wouldn't have been October 31st, it would have been November 30th, correct?

A    Absolutely right.

Q    And we talked about Linda Nussbaum (ph) before, right?

A    Yes.

Q    And with her, she actually negotiated a withdraw date that was different from the effective date of her departure, didn't she?

A    I don't recall that.  I don't think so, but maybe.  I don't think so.

Q    Isn't it true --

A    You'll have to show me --

Q    -- that you negotiated with her a departure date -- meaning she had to get out of the firm --

A    Yeah.

Q    -- on February 16th, but she didn't have to actually withdraw from the firm until February 23rd, 2007?

A   We had some negotiation, that I don't recall real well, that she wanted to leave, and go to another firm.  She had given her notice I think on the 30th of January, and I think she wanted to leave before 30 says, so we said you could leave before 30 days, but we did the capital account, you know, we used the last day of the month before termination, so I think we used a January 30 or 31 --

Q   Right.

A   -- date.

Q   But you negotiated a withdraw date, or a get out of the firm date --

A   Sure.

Q   -- that preceded the effective date of her termination, right?

A   Yes, yes.  We did, yeah.

Q   And in theory, that's something you could have done with Mr. Hausfeld, too, right?  You could have said, Michael, we're voting to expel you from the firm today.  You really need to leave, but we're not going to make your effective termination date until some time later?  You could have done that with him, right?

A   I think you're mixing apples and oranges, unless I'm confused.  The termination --

Q   Or his retirement date.

A   Yeah, I don't think we renegotiated her retirement date.

Toll - Cross                                  133

I think we just negotiated the date she physically left the premises.  We didn't -- we didn't change the day of the termination for the capital account calculation.

Q   I'm not suggesting that that's what I'm talking about here.  I'm saying that you actually negotiated with her a date that she had to get out of the firm, but you put her termination date later, right?

A   I'm not sure I follow.  When you say "the termination date," the termination date -- the termination date we used for the --

Q   The capital account.

A   -- calculation?

        THE COURT:  The effective date when her employment ended.

BY MR. ROSENTHAL:

Q   The effective date when her employment ends, it would be after the date that she had to leave the firm?

        THE COURT:  They paid her for an extra week.

        THE WITNESS:  Yeah, maybe.  I don't know.  Maybe we did, but I don't...

BY MR. ROSENTHAL:

Q   Would you take a look at the e-mail on this page going over to -- jumping now to this page?

        (Pause.)

A   I mean, I -- I think she was supposed to leave February

Toll - Cross                                          134

23rd.  She had an opportunity to go to another firm.  She wanted to start February 16th and we said fine.  I don't --

Q   Okay.  So she left the firm prior to her effective resignation from the firm, right?

A   Yeah, she --

Q   What I'm trying to get at is --

A   I'm --

Q   -- that something you could have done with Mr. Hausfeld.  You could have just said that you're expelled from the firm as of November 6th, Mr. Hausfeld, but we're not going to make your actual effective termination date until some time later?

A   No, I don't -- the effective --

        THE COURT:  Could you have done that if you wanted to?

        THE WITNESS:  Could we have changed the effective date of the termination?

        THE COURT:  Could you have let him stayed longer even though he was out.  That's what he's trying to get at.

BY MR. ROSENTHAL:

Q   Yes, he's out of the office, physically out of the office --

A   Right.

Q   -- but he's still employed with the firm for a short while longer.  You could have done that, right?

A   I suppose you could do anything by contract.

Toll - Cross                          135

THE COURT:  That's what he's asking.

BY MR. ROSENTHAL:

Q   Okay.  If you would please turn to Plaintiff's Exhibit 11, which is the November of 2008 financial statement for the firm.

(Pause.)

And turn to Bates CMST00673.

A   I have it.

Q   Okay.  Now, the loss year to date at the bottom of the page, 2,193 -- $2,193,143.  Do you see that?

A   I see it, yes.

Q   And that was the loss the firm was running as of the end of November, correct?

A   Yes.

Q   And that was the loss, a portion of which Mr. Hausfeld and Mr. Lewis would have been tagged with, had their effective dates of termination been November 30th rather than October 31st, 2008, right?

A   Yes, we didn't terminate Mr. Lewis, though --

Q   All right.

A   -- but, yes.

Q   Let's talk about Mr. Hausfeld, okay?

A   Okay.

Q   Had you not amended the partnership agreement to eliminate the 30-day wind-up period, this would have been the

loss figure used to calculate his liquidating capital account

balance, right?

A    Absolutely correct.

Q    Okay.

        MR. ROSENTHAL:  May I get the calculator, your

Honor?

        THE COURT:  Sure.

BY MR. ROSENTHAL:

Q    I'm going to ask you to do some calculations, Mr. Toll.

        THE COURT:  He's going to test your --

        THE WITNESS:  I can do it in my head, your Honor.

        THE COURT:  -- Wharton skills.

        THE WITNESS:  I'll do it without the calculator and

give approximations.

BY MR. ROSENTHAL:

Q    Okay.  So let's assume we're using a tax basis method of

accounting here, so we have this loss figure?

A    Yup.

Q    What is it, 2 million --

A    $2.1 million 3.

Q    What's the exact figure?

A    2,103,143.

Q    2,13 million, okay?

        All right.  Okay.  And then if you're using the

figure that you guys used to allocate the loss, then you

Toll - Cross                                    137

would use 27.97 percent, right?

A    Yup.

Q    Okay.  So if you would, multiply that figure by .2797?

A    It's about 600,000.

Q    About 600,000?

A    Give or take.

Q    Okay.  The beginning balance in the capital account as of December 31?

A    4.9 --

Q    About 4.994 million?

A    Yup.

Q    Which is -- actually, let's do -- are you actually doing the calculations up there?

A    Nope.

Q    Okay.  Can you do this calculation for me exactly here. I know you're better with numbers than I am.

A    I'm better in my head than with a machine, but 2.1 million 3 --

Q    3, 143 times .2797.

A    2797?

Q    Yes.

A    613,422.

Q    Okay.

        THE COURT:  That's pretty close.

        THE WITNESS:  That's approximating.

Toll - Cross                        138

BY MR. ROSENTHAL:

Q   Okay.   And then what we would do if the figure we're calculating as of November 30th, would be subtract that from $4,994,901, which is his beginning balance, right?

A   Right.

Q   Okay.

A   4385, 4383, give or take.

Q   So we've got -- what do you come up with, 4 million --

A   383.

Q   380 --

A   Give or take.   Just round it off.

Q   4 million.   We'll round it off.

         4,383,000, right?

A   Correct.

Q   And that would have been his ending capital account balance, $4,383,000, had you not amended the partnership agreement to make his termination effective immediately, right?

A   Absolutely correct.

Q   Okay.   Now, let's actually apply a 14 percent figure instead.

A   Okay.

Q   All right.

A   You can almost cut it in half.

Q   I guess you would cut this in half, right?

Toll - Cross                                          139

A    Yeah, give or take

Q    So that's 305, $306,000?

A    Well, you take off -- that's okay -- so you'd get about 46 --

Q    You'd take half of this figure, right?

A    Yeah, so you'd take that off the 4994, and you'd get 4, whatever, 688 or something.  4,688,000.

Q    It would be $4,689,000, had you not voted to amend the partnership agreement to make effective -- his expulsion effective immediately and had you used the 14 percent figure, right?

A    Correct.

Q    That's reducing him about $300,000, right?

A    Correct.

Q    That's the difference that 30 days made?

A    Well, it ended up that way.  It wasn't in our mind, thoughts, or anything, but that's what happened.

Q    I'm not suggesting in your minds or thoughts.  I'm just saying that that's the result, right?

A    That -- those are the numbers, yes.

Q    Okay.  Let's do Mr. Lewis.  Let's do the percentage that you all used, which was 6.78.  You multiply it by the $2,193,143.  And you multiply it by what, .0678?

A    Well, that's about 140,000, give or take.

Q    You said it's about 140,000, give or take?

Toll - Cross                                    140

A    Yeah.

MR. KEENEY:  Your Honor, I'm objecting with respect to Mr. Lewis.  He has to lay a foundation that the 30-day notice period somehow applied to him.

MR. ROSENTHAL:  Okay.

THE COURT:  Because he resigned, right?

MR. ROSENTHAL:  Huh?

THE WITNESS:  Yes.

THE COURT:  He resigned, so he wasn't subject to that?

MR. KEENEY:  That's correct.

THE COURT:  That seems like a valid objection, doesn't it?

MR. ROSENTHAL:  Except, your Honor, he -- we claim that he was actually involuntarily terminated.  He was constructively discharged by the actions that were taken against him by the other members of the firm.

THE COURT:  But that's not an issue that we need to resolve here?  Isn't there some employment discrimination suit?

MR. ROSENTHAL:  No, it's not employment discrimination suit, but he also would not have left the firm immediately had Mr. Hausfeld not been required to leave.

THE COURT:  Well, yes, but I don't know whether that's true or not true.  I know he was aligned with Mr.

Toll - Cross                                    141

Hausfeld, and he didn't like the way Mr. Hausfeld was treated, but he didn't have to leave. They didn't do anything other than minor reduction to his percentage interest in the firm to him.

MR. ROSENTHAL: Well, I would suggest that -- not that this is closing argument, your Honor, but he did talk about -- Mr. Toll just talked about how he was excluded from all these partnership meetings, and they reduced his percentage interest when they increased everybody else's, how they told him that if he wanted to make a copy, he had to get approval from one of the administrators in the firm.

MR. KEENEY: Just really quick, your Honor. There was no testimony he was excluded from partnership meetings. The testimony is, as your Honor recalls, is certain partners got together and he wasn't --

THE COURT: He was only excluded from the secret partnership meetings.

(Laughter.)

I understand the point.

MR. ROSENTHAL: Thank you for understanding the point, your Honor.

THE COURT: All right. Thank you.

I'll sustain the objection.

BY MR. ROSENTHAL:

Q   All right.

(Pause.)

You agree, don't you, that Mr. Hausfeld had been the driver and leading force in the firm for decades at the point of his expulsion, correct?

A   He was definitely a major force in the firm, without a doubt.

Q   Mm-hmm.  There's no question in your mind that success, growth, reputation, and stature of the firm was due mostly to him, right?

A   I thought he was the principal person who had gotten us where we were.

Q   Okay.  Can you open up to Plaintiff's Exhibit 105?

(Pause.)

This is a note that you wrote to Mr. -- oh, you're not there yet?

A   I have it.

Q   This is a note that you wrote to Mr. Hausfeld on April 9th, 2008; is that right?

A   Yes.

Q   Which was about six months prior to his expulsion or seven months prior to his expulsion; is that right?

A   That is correct.

Q   Okay.  And you write in it, looking at the middle of the page, "You have been the driver and leading force in this firm for decades," right?

Toll - Cross                                 143

A    Where's that, in the beginning?

Q    The very --

A    The middle?

Q    -- middle of the page.

A    Okay.  Yes.

Q    Isn't that what you wrote?

A    Yes.

Q    And then moving towards the end, the second to the last sentence, you say, "There's no question in my mind the success, growth, reputation, and stature of the firm is due mostly to you."  Do you see that?

A    Yes.

Q    And those things were true, right?

A    They were true.  We were a great team together.  Michael had amazing strengths in certain things, I had tremendous strengths in other things, and it was a great combination.  His was more out front in terms of reputation or publicity.  He was terrific with the media and so on, so his -- and he was the one who drove some of the high-profile cases the firm had gotten, and so there was a -- a great balance between the different forces we both had, but I gave him the credit moreso.  I was content to -- and I believed that he was the principal guy that drove the growth of the firm.

Q    Okay.  Even though you felt like you had to have him out of the firm on November 6th, you couldn't push back his

Toll - Cross                                        144

effective termination date, for all the things he did to build the firm?

A    Mr. Rosenthal, you don't -- I don't want to go there -- have any idea of what went on at the firm throughout those next six months, and even prior to this letter.  This was me also trying to keep the firm together when Michael was at the beginning of doing some very unusual things, and I was desperately -- the partners were desperately trying to, you know, keep us all together, and I was hoping something like this would help him see the wrong direction he was heading, and that's the reason I wrote it in part, but what happened over the next six months, is just beyond the pail, and so it was an extremely horrible situation at the end.

Q    My question to you is:  Don't you think it would have been fairer to him had you said, Michael, you've got to get out of the firm today.  It's not happening any more.  The firm is going to expel you, but we're not going to make your termination date effective until a month or two months later?

A    Mr. Rosenthal, Michael and I stopped talking at some point.  We were not talking to each other.  We had a conversation where I called him a couple of things he did that were wrong, and he rambled -- started screaming at me, yelled out and slammed the door.  We were not on speaking terms.

Q    You could have designated somebody else to have that

Toll - Cross                                    145

conversation with him, couldn't you have?

A    It did not enter my mind.  He was barely -- you can't imagine the meeting.  We couldn't even have a meeting with him in the room with him -- without him, whatever, doing things.  And so there was no like dialogue.

There were efforts behind the scenes.  Actually, there was testimony about this between Joe Sellers and Rich Lewis to try and do something, and Rich had no ability to control Michael and get him to act in a reasonable way with us, so it was -- it didn't enter our minds.  It was kind of hopeless.

Q    Well, it's true, isn't it, that after that conversation with Mr. Lewis and Mr. Sellers, we at Venebill called your counsel, to restart settlement negotiations, and your counsel said, It's over, no settlement negotiations would go on anymore?

A    Mr. Rosenthal, you're --

Q    Isn't that what happened?

A    No, as I remember it, you guys -- we had a meeting in early September, you said we've got to get this done quickly, we have to wrap it up quickly within 30 days hopefully.  Within a week we gave you an offer and we never heard a word.  And we back a million times and there was no response.  We went to Rich Lewis, get to Michael, give us response.  There was no response.

Toll - Cross                                146

In the meantime, Michael was going to some partners, as Mr. Milstein --

Q   I'm asking about a specific period in time.  About two weeks prior, or a week prior --

A   Right.

Q   -- to your decision to expel Mr. Hausfeld, we at Venebill called Mr. Keeney?  You know that, don't you?

A   I don't recall it, but refresh my recollection.  I don't know what, you know, I didn't have every --

Q   To restart settlement negotiations, right?

A   I don't remember that.  I mean, you only --

Q   You instructed Mr. Keeney, No, settlement negotiations are done?

A   No, I don't recall that at all.  The only settlement negotiations we heard from you was Michael saying the firm is splitting, where it was not a firm split, and that Michael deserved 44 percent of all the money, and we said he's entitled to zero under the agreement.  So you guys are not negotiating with us, and that was your consistent position throughout the whole time of '08.  That's what I remember.

Q   And it's your testimony that we didn't call Mr. Keeney about a week before you decided to expel Michael --

A   I don't know if --

Q   -- to see if there was a possibility of negotiation again?

Toll - Cross                         147

A    I do not know that.  You may have.  I don't know what was said to him and I don't know what he said to you.

Q    All right.  And your position was that Michael was entitled to zero under the operating agreement, that was your hard-line position at the settlement negotiations, right?

A    No, in fact, not.  Let me -- Judge, I don't know if it's appropriate on this September 18th --

          MR. ROSENTHAL:  Your Honor, I can withdraw it.

          THE WITNESS:  -- letter?

          THE COURT:  All right.  He'll withdraw it.

          THE WITNESS:  Okay.

          MR. ROSENTHAL:  Thank you for your patience, Judge.

          THE COURT:  Sure.

          MR. ROSENTHAL:  Mr. Toll, thank you for your patience.

          THE WITNESS:  Thank you.

          THE COURT:  Anything further, Mr. Keeney?

          MR. KALINER:  Yes, your Honor, just real quick on two topics.

                    REDIRECT EXAMINATION

BY MR. KEENEY:

Q    If you could turn in the exhibit binder to Defendant's Exhibit 40?  I'm going to direct your attention specifically when you get there to Section 1 of the written consent which shortened the 30-day notice period, which is exactly what Mr.

Toll - Redirect                                    148

Rosenthal was asking you about on cross-examination.

(Pause.)

Do you have that?

A    I do.

Q    Okay.  Did your reason for shortening the 30-day time period have anything to do with Michael Hausfeld's capital account balance?

A    Nothing at all.

Q    Did you have other reasons?

A    Yes.

Q    And without asking you what the other reasons are, are you absolutely sure that those reasons did not include his capital account balance calculation?

A    Absolutely did not include anything to do with the capital account.

Q    Okay.

MR. ROSENTHAL:  Your Honor, we will stipulate to that.  We will stipulate to that wiping out the 30-day provision had nothing to do directly with his capital account balance.

MR. MR. KEENEY:  We'll accept that stipulation, your Honor.

THE COURT:  All right.

BY MR. KEENEY:

Q    Okay.  The second topic.  You were cut off when you

Toll - Redirect                                    149

wanted to explain a rather pejorative reference to a legal malpractice verdict against two of your lawyers. Could you explain what you would have said if you hadn't been cut off?

A    Well, it was a most unusual case, and obviously we don't -- we didn't believe our partners had done anything wrong. They had, as the Court knows from the discussion, 99. or whatever percent of our practice is contingent fee litigation, class actions, and one case we represented an individual broker, and during the course of the representation, he just stopped listening to us, and was misrepresenting things, and was impossible, and we finally had to withdraw from representation.

He was indicted, convicted of multiple fraudulent securities transactions, but yet years later he sued us for malpractice for withdrawing from representing him, and it was the most ridiculous thing I had ever heard, the lawsuit. And we had a defendant, and I think he lost his case, but because he owned something with his wife, his wife got this small verdict because she didn't know anything, and I guess the -- the court or jury -- I don't know -- found that she was like some person caught in the middle, and our insurance company paid for it, and it was just kind of a non-event, other than it happened, but it was not looked on as anything bad.

MR. KEENEY: Your Honor, at this point we have no further questions. I just want to double-check on redirect

Toll - Redirect                              150

and make sure the exhibits that I have checked are still the exhibits that came in, so that if we have any dispute about foundation, and still have the witness here.

THE COURT:  Oh, you can do that at the lunch hour.

MR. KEENEY:  Okay.

THE COURT:  I don't want to rush you, you know --

MR. ROSENTHAL:  I'd be happy to do that with Mr. Keeney.

MR. KEENEY:  Sure.

THE COURT:  We can recall a witness to do that if that's --

MR. KEENEY:  Okay.

THE COURT:  -- an issue.

MR. KEENEY:  That would be fine.

THE COURT:  I have one question for Mr. Toll.  Are you done?

MR. KEENEY:  Yes, I am, your Honor.

BY THE COURT:

Q   Let's go back to January 23rd --

A   Yes, your Honor.

Q   -- when we hit the settlement conference.

A   Yes.

Q   The issues seem to be whether you would agree to an accelerated disbursement of Mr. Hausfeld and Mr. Lewis's capital account.

                              Toll - Redirect                    151

A    Yes, yes, and we did, yes.

Q    Now, my question is:  How could you have known at that time whether they would agree to an accelerated distribution if you didn't have a figure in mind as to what amount was involved?

A    Oh, I have a general idea, your Honor.

Q    And what was the general idea?

A    Well, the general idea that it would be less than his -- the 4.99 it was on January, you know, December 31, '07.

Q    Even so, there's a big difference --

A    So I knew --

Q    -- between the 5 million and 3 million?

A    No, correct, but I didn't know at that time exactly what it would be, and I knew it was definitely less than 5 million, and I presumed he knew it, too, because the discussion we had -- and not the discussion that day -- but the agreement we entered says, you know, the capital account gets adjusted based on the October 31 results.

Q    Well, what number did you think it was, because you must have had a number in mind, it seems, if you were able to make a decision that instead of paying this amount over five years, we're going to pay it over 18 months, because you seem to be very concerned about the financial viability of the firm?

A    Well, I -- really, your Honor, I didn't -- I hate to

Toll - Redirect                                            152

sound this way -- but, you know, a million or two dollars here or there, when you're looking at the -- the deal we were making involving fees of, you know, 10 million or more to his firm, you know, and as I testified before at the February 2nd mediation, you know, I felt we gave up another $1 million.

Now, you think I wanted to do that?  But, again, it was like the big picture, we were that close to a deal.  So on this day in January, you know, this capital account, I knew would probably be somewhere between 3 and 5 million.  I didn't know what it was over two years.  So it's like whatever.  It is what it is.  It doesn't matter.  We were agreeing to pay that money on an accelerated basis and --

Q   But didn't you have the e-mail from Mr. Diamond in your briefcase, and it didn't dawn on you to look at it?

A   No, it didn't dawn on me to look at it, but, again, I probably knew in general that it was going to be a significant -- not significant -- not insubstantial decline.  And, again, even if, you know, so paying 3 million over two years or 5 million, you know, we had to make either a 1-1/2 million dollar payment the first time, and 1-1/2 the second, or 2-1/2 the first time, and 2-1/2 the second.

And so to me that wasn't -- I mean, I knew the number was going to be whatever it is, but it wasn't such a material things one way or the other when we were talking about tens of millions of dollars of fees.  It was another

                    Toll - Redirect                    153

million or two one way or the other that we might save, but we gave up, you'll remember, we did not want to accept the 50/50 split on those fees, and as well some other terms that got in there.

And, you know, by -- we wanted a different percentage, and so I knew effectively by giving up and agreeing to 50 percent, which you pushed very hard on, we were giving up a couple million bucks or many millions of dollars, and I was thinking, Okay, well, we saved a million or two in the capital account, as part of the deal. And by giving him, that's -- we'll agree to the 50 percent, because we're getting the capital account as adjusted, that's the way the partnership agreement reads.

So...

THE COURT: Anybody have any follow-up?

MR. KEENEY: Not on this, your Honor.

THE COURT: Okay.

MR. KEENEY: There's one request, though, just of a stipulation. I think it's important for the record, so I'm going to ask Mr. Rosenthal if he agrees to stipulate that the malpractice verdict that he referred to in his cross-examination was, in fact, expunged?

MR. ROSENTHAL: I don't have any reason to know that. If you can show me that that's what happened, then I will stipulate to it.

Toll - Redirect                         154

MR. KEENEY:  Okay.  I'll him the letter, your Honor.

THE COURT:  Okay.  All right.  Thank you, sir.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Where does that leave us?

MR. ROSENTHAL:  I'm sorry, Mr. Keeney.  I will not stipulate to that if it was not expunged by the time of the compensation committee's meeting.

MR. KEENEY:  Well, that's fair enough.  I understand that.

THE COURT:  Okay.  All right.  Thank you, sir.


Where does that leave us, folks?

MR. KEENEY:  The next witness will be opening up Air Passenger, your Honor.  That will be Mr. Toll.  We have one witness on Air Passenger.  I believe Mr. Rosenthal has three.

THE COURT:  Okay.  And --

MR. KEENEY:  I think we're doing okay on time, your Honor.

THE COURT:  We're going to finish --

MR. KEENEY:  I think so, your Honor.

THE COURT:  Okay.

MR. ROSENTHAL:  I'm not sure.  I mean, I'm ready. I'm not sure we're going to get to closings today, but I think we'll --

155

THE COURT:  Okay.

MR. ROSENTHAL:  -- finish the witnesses today, your Honor.

THE COURT:  Well, okay.  We an adjust for that.

MR. ROSENTHAL:  You may not want to hear closings at this point.

(Laughter.)

THE COURT:  I think I've heard him little-by-little during the trial.

MR. ROSENTHAL:  You think so?

(Laughter.)

THE COURT:  All right.  Well, why don't we break until 1:00 o'clock, and we'll start the second phase then.

MR. ROSENTHAL:  Mr. Keeney, you've rested on the Capital accounts now at this point?

MR. KEENEY:  Oh, yes, yes, we've rested.

THE COURT:  Okay.  All right.  Subject to moving your exhibits in, you're going to go over those over lunch --

MR. KEENEY:  Right.

THE COURT:  -- so I'll see you at 1:00 o'clock. Have a nice lunch.  Did I give everyone enough time?

MR. KEENEY:  Yes.

THE COURT:  Okay.  Thank you.

MR. ROSENTHAL:  Thank you.

(A luncheon recess was taken from 11:55 o'clock p.m.

156

until 1:06 o'clock p.m.)

THE COURT: All right, Mr. Rosenthal, where are we headed?

MR. ROSENTHAL: Mr. Keeney is allowing us to take two witnesses out of order, because they have traveled. So, we are going to call our first two witnesses on the passenger issue. He is going to call I think Mr. Toll and then we will call our final witness on the passenger issue.

THE COURT: All right, very well.

MR. ROSENTHAL: So, we'll call Kenneth Feinberg.

THE COURT: All right.

KENNETH R. FEINBERG, Plaintiff's Witness, Sworn.

THE DEPUTY CLERK: Thank you, sir. Could you please state your name and spell your last name for the record?

THE WITNESS: Kenneth R. Feinberg, F, as in Frank, -e-i-n-b-e-r-g.

THE DEPUTY CLERK: Thank you.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Good afternoon, Mr. Feinberg.

A   Good afternoon.

Q   Where do you live?

A   Bethesda, Maryland.

Q   How are you currently employed?

A   A lawyer in my own law firm.

Feinberg - Direct                          157

Q    Where is your law firm?

A    In Washington, DC with an office in New York City.

Q    What kind of law do you practice?

A    Alternative dispute resolution; mediation, arbitration, settlement negotiation.

          THE COURT:  Where were you last January?

          (Laughter.)

BY MR. ROSENTHAL:

Q    Are you currently doing work on behalf of the Federal Government?

A    Yes, I am.

Q    What's that work?

A    I'm the Special Master for Executive Compensation, Department of the Treasury.

Q    What do you do in that position?

A    Under the law, I'm required 60 days from tomorrow to set the compensation for the 25 top officials in the seven largest top-recipient companies.

Q    Is that taking up a decent amount of your time right now?

A    All of it.

Q    You said that you're a mediator, that's what you do, alternative dispute resolution, is that right?

A    Yes.

Q    Have you ever mediated settlements in large class-action

Feinberg - Direct                                   158

cases?

A    Many.

Q    Including antitrust class-action cases?

A    Many.

Q    Can you give the Court some examples of these settlements that you've mediated?

A    Aside from this private antitrust case involving Virgin Atlantic and British Airways, there have been other commercial cases involving Fortune 500 companies, both antitrust, commercial disputes, contract disputes and mass tort complex litigation.

Q    Have some of the mediations that you've conducted involved decisions or negotiations over awards of attorneys' fees to the plaintiffs' counsel who litigates these cases?

A    Most of them.

Q    I want to turn your attention now to the one case that you mentioned, which I guess we'll call -- you called it the VABA case or the Air Passenger case?

A    I call it VABA, it's shorter.

Q    That's Virgin Airways, British Airways?

A    Yes.

Q    Then we'll call it the VABA case.  You were the mediator in that case, is that right?

A    Yes.

Q    Were you appointed by a Federal District Court judge?

Feinberg - Direct                          159

A    No, I ultimately was.  I was appointed by the consent of the parties and then the judge ratified that consent.

Q    Okay.  When was it that you were appointed by consent of the parties?

A    I don't recall, it was at the outset of the case or some time in 2007, I believe.

Q    How long after did the judge ratify that consent?

A    Immediately, I would say within a couple of weeks after I was appointed.

Q    Where was the case pending?

A    San Francisco, Northern District.

Q    Who was the judge?

A    Judge Charles Breyer.

Q    Did the mediation in that case include negotiations over the amount of the attorneys' fees to be awarded to the class?

A    Yes.

Q    Describe how the negotiations over that particular issue progressed.

A    The negotiation was very heated, because the defendants were reluctant to provide substantial fees, making the argument in that case that substantial fees being awarded in a case which involved as one aspect English law would have an adverse impact on English law going forward.  Also, they felt that the fees should not be too high, because they felt that there was only limited merit, as you would expect, to the

Feinberg - Direct                                     160

underlying claims.  But ultimately we did mediate a successful resolution of the fee issue.

Q    And what was that successful resolution?

A    $23 million for class lawyers in that case.

Q    Okay.  Did that final negotiation -- well, tell us what Lodestar is.

A    Lodestar is time value, it's hourly -- hourly billing rates times the number of hours you're involved in the case, and then perhaps a multiple based on merit or the challenge in getting the case resolved.

Q    Did the negotiated fee in the VABA reflect the amount of Lodestar had put in?

A    Absolutely not.  Lodestar was never a factor in the fee mediation and in fact the defendants absolutely insisted that Lodestar not be a variable in the negotiations.

Q    Why was that, why did the defendants insist on that?

A    The defendants felt that Lodestar, first of all, would not result -- cynically, they felt, wouldn't result in an adequate fee award because there wasn't sufficient Lodestar that they felt was legitimate and meritorious.  But, besides that, the defendants felt that any Lodestar discussion would pose serious problems in England where the Lodestar is not favorably looked upon and they were adamant that Lodestar could not be a factor in the negotiations because it would be an adverse precedent in the United Kingdom.

Feinberg - Direct                              161

Q    Did the final agreement on the fees, this $23 million, did that reflect time that attorneys would spend on a case after the settlement was approved or only the time they spent on a case before the settlement was approved?

A    After, all in.  The amount of time negotiated, the fee negotiated based upon the work performed up to the date of the settlement, but the defendants also wanted to make it very clear that this was an all-in fee and that any amounts that would be earned by plaintiff-class counsel post-settlement had to be included in that number because the defendants had no intention of coming back and replenishing the pot.  Plaintiff-class counsel would have to take the chance that there would be sufficient funds to cover post-settlement expense.

Q    Is that consistent with your experience in mediating other large antitrust cases?

A    It is; it's my experience in mediating other large, complex litigation.

Q    And why is that, why do the parties do it that way?

A    The defendants want total peace, they don't want to be nickeled and dimed by coming up with a fee and then next month or in six months or in a year being asked again to cut a check to pay for fees and expenses post-settlement.  So, the defendants, in my experience, consistently want global peace, we are walking away from this with a settlement, do

Feinberg - Direct                    162

not come back to us seeking additional compensation.

Q    Was it anticipated in the VABA case that attorneys would have to spend time after the approval of the award continuing to work on the case?

A    Yes.

Q    For what purposes?

A    The English settlement, which was the critical innovative part of this settlement, remains open to this day, I think it remains open for a number of years, maybe four -- I think five years from the date of the settlement.  And it was anticipated not only that lawyers would have to do supplemental work during this five-year period -- I don't think it would be very much, but there would be some supplemental work -- but also in the settlement agreement discussions about a second notice, a subsequent effort to reach passengers who might not have filed a claim in the initial batch, and there was some concern, especially among plaintiff-class counsel, that work be performed post-settlement to limit the likelihood under the English part of the settlement that the corpus of the settlement in England would revert back to Virgin Atlantic and British Air.  So, plaintiff-class counsel made it clear to me and made it clear to the court that the five-year open period for claim processing and filing, that plaintiffs would make a real effort post-settlement to try and encourage future filings,

Feinberg - Direct                                   163

thereby limiting the amount of the corpus settlement that would go back to the companies.

Q   Was it anticipated which of the class counsel would be handling this U.K. portion of the settlement process?

A   Michael Hausfeld.

Q   Now, did you recommend to Judge Breyer, once the final fee and settlement agreement had been negotiated, did he accept that negotiated agreement?

A   I recommended to Judge Breyer that we had worked out a consensual fee of 23 million; I didn't urge Judge Breyer to do anything, I just recommended -- I just told him that we had resolved this consensually that he would ultimately be asked to pass upon the 23 million, which I felt was the result of good-faith mediation.

Q   Did Judge Breyer ultimately accept your suggestion?

A   Yes.

        MR. ROSENTHAL:  May I approach, your Honor?

        THE COURT:  Yes.

        (Pause.)

BY MR. ROSENTHAL:

Q   Let me show you Plaintiff's Exhibit 113.  If you would open it up to Exhibit 1?

        (Pause.)

Q   And I'll ask you to take a look at Page 3 at the very bottom.  Now, does the award of fees in this particular order

Feinberg - Direct                                  164

reflect Lodestar?

A    No.

Q    Can you read the paragraph beginning at the bottom of Page 3?

A    Quote:  "The Court has discretion to award fees based on a Lodestar or percentage-of-the-fund method, see Viscayno (ph.), 290 F.3d at 1047.  The only requirement is that the fee be reasonable under the circumstances, see Powers v. Ichen, 229 F.3d 1249-1256, Ninth Circuit, 2000.  The Court believes that the percentage of the fund method is appropriate here and that the $22.2 million fee is fair and reasonable in light of the nature of the recovery, expertise of counsel, the extraordinary notice procedures, the long claims period and the claims process," unquote.

Q    This long claims period, did that take place before this award or would it take place after the award?

A    After the award.

Q    And the claims process, before or after the award?

A    After the award.

Q    And the extraordinary notice procedures, before or after the award?

A    After the award.

Q    Are these all things that class counsel would have to handle after the award?

A    Yes.

Feinberg - Direct                              165

Q    Is there an award of any particular amount to any one of the class counsel in this October 31st order?

A    No.

Q    Why not?

A    I don't think -- I don't know why not, I would surmise that Judge Breyer was simply issuing an award resolving the fee issue as between, inter se, the defendants and the plaintiff-class counsel.

Q    And how were determinations of who was to get what, which counsel was to get how much money, to be made after the issuance of this order?

A    The court anticipated that plaintiff-class counsel would work out, inter se, allocation among various class counsel.

Q    Meaning amongst themselves?

A    Among themselves.

Q    Is that typically the way it works in these big antitrust cases?

A    Yes.

Q    That's been your experience?

A    Yes.

Q    And did this fee award here adopting your recommendation reflect only time for work done prior to the award or also time for work done after the award?

A    All-in, time prior, time pending, time future.

Q    Which is -- which you had recommended, right?

Feinberg - Direct                          166

A    Correct.

Q    And, again, is this particular award, which includes a lump sum, what Judge Breyer calls a percentage-of-the-fund sum, consistent with your experience in other large class action cases?

A    Yes.

Q    I'll ask you to take a look at the letter to which that October 31st order is appended and ask you to turn to Page 3, Paragraph 6.

A    Yes.

Q    And I'll represent that this is a letter to Judge Rice from Mr. Keeney dated August 3rd, 2009 --

        MR. KEENEY:  So stipulated, your Honor.

        THE COURT:  All right, thank you.

BY MR. ROSENTHAL:

Q    If you take a look at the second clause in the very first sentence, it says, "The fee award involved a submission of time in September of 2008 that was awarded on October 31st, 2008."  Do you see that?

A    Yes.

Q    Is that so?

A    I think that's so.  I think that the parties, if I recall it, submitted their time... I think they did, but maybe they didn't, I don't know.

Q    Does the ultimate award on October 31st reflect that time

Feinberg - Direct                                    167

submitted, the Lodestar submitted?

A    No, but I think this time was submitted; I think the judge didn't rely on Lodestar, but I thought the time was submitted; maybe not, Mr. Keeney may be right, I don't recall.

Q    So, you're not sure.  The time may have been submitted, but the ultimate award did not actually reflect the time?

A    Clearly, the ultimate award did not reflect Lodestar time.

Q    I'll ask you to turn to the middle of that Paragraph 6 on Page 3.  Do you see where it says, "The general rule is the class counsel either eats the time, the post-award time, or if it wants to get paid for that post-award time, it submits a supplemental fee petition at a later date."  Do you see that?

A    Yes.

Q    Is that consistent with your experience?

         THE COURT:  Well, let's talk about this case.

         MR. ROSENTHAL:  Okay.

BY MR. ROSENTHAL:

Q    Is that what happened here in the VABA case --

A    Well --

Q    -- that class counsel eats the time or, if it wants to get paid for post-award time, it has to submit a supplemental fee petition?

Feinberg - Direct                               168

A     That's actually correct.  If the all-in number is exhausted, in VABA the plaintiffs and the defendants negotiated a fee that included anticipated post-settlement work; if that post-settlement work resulted in a fee, an amount in excess of that awarded by the court, yes, the plaintiff would have to eat that time, that is correct; there would be no supplemental submission to the defendants for fees and costs.

Q     Right.  Okay.

The next sentence says, "Estimates by Hausfeld, LLP of future work after the fee petition has been submitted and granted on October 31, 2008 is not part of the fee award or considered as such."  Do you see that?

A     Yes.

Q     Is that true?

A     No.

Q     Why not?

A     Because, expressly, at the time this $23 million fee was negotiated, the defendants made it very, very clear as part of this mediated fee that this was a one all-in number, do not come back to us the second year or the third year of the English reversion process and ask for additional claims processing fees.  It's the 23 million global piece, we're walking away once this settlement and the fees are approved, and that was the express understanding of the parties in

negotiating this fee.

Q   Okay.  So, if class counsel were to submit Lodestar for records reflecting time worked after the fee award, the October 31st fee award, but prior to the ultimate distribution of the attorneys' fees, could that time, that post-award time, be compensated?

A   No, no.  The 23 million that was negotiated was the total fee for past work, work involving the preparation of the settlement with the mediator and all future work during the five-year period that the claims process was open in England. It was an all-in, one number, demanded by the defendants and perfectly accepted to plaintiff-class counsel, as long as the aggregate number was right.

Q   Okay.  May I just have a second, Mr. Feinberg?

        (Pause.)

Q   Is it true or is it not true that fees for work done after the October 31st award comes out of the October 31st award?

A   That is correct.

Q   It does or it does not?

A   Fees that are incurred at post-fee award would be included in the $23 million that is set aside for all class fees.

Q   So, is it appropriate for the co-lead counsel, those who are making distribution decisions, to take into account post-

Feinberg - Direct                                170

award time in making their distributions?

A    Yes.

MR. ROSENTHAL:  No further questions.  Thank you.

THE COURT:  Any questions, Mr. Keeney?

MR. KEENEY:  Yes, your Honor, but I'm going to be extremely brief.  And I wanted to thank Mr. Feinberg for his time in coming here, this is another extraordinary public service and thank you.

(Laughter.)

THE WITNESS:  Actually, Mr. Keeney, it's -- and with the Court's acquiescence, it's a pleasure to not be in Washington, DC today, I'm glad to be here.

(Laughter.)

THE COURT:  We won't tell the President that.

CROSS-EXAMINATION

BY MR. KEENEY:

Q    A quick question.  When you were mediating the dispute between the plaintiffs' class-action counsel and the counsel for the defendant airlines, the plaintiffs' class-action counsel were the law firm of Cohen Milstein and the Kotchett Law Firm, is that correct?

A    Correct.

Q    And on October 31, 2008, when Judge Breyer entered the order at your recommendation with respect to the award of attorneys' fees, those fees were being awarded to the Cohen

Feinberg - Cross                                171

Milstein firm and the Kotchett firm, right?

A    Well, I guess so, although the order didn't say that. The order said, plaintiff-class counsel are awarded X in satisfaction of their work.  I don't believe that the order itself spelled out the names of the firms or anything like that, it was a generic order approving the 23 million.

Q    And, from your point of view, though, the generic order approving it meant that Cohen Milstein and the Kotchett firm were going to get proceeds, right?

A    Yes.

Q    And during the period from, starting in mid-2008 to the present, you had some conversations with Steven Toll and Cohen Milstein about the Air Passenger fee, right?

A    Yes.

        MR. KEENEY:  The reason why I'm going into this, your Honor, we took all sorts of briefs for Mr. Toll having conversations with people that weren't disclosed, so we wanted to just get this out.

BY MR. KEENEY:

Q    And what was a summary of the substance of those discussions?

A    Mr. Toll --

        MR. ROSENTHAL:  Objection, hearsay, your Honor, and relevance.

        MR. KEENEY:  I'm trying to shorten it, your Honor.

Feinberg - Cross                          172

THE COURT:  No, I understand, but why isn't it hearsay?

BY MR. KEENEY:

Q   What did you tell Mr. Toll?

THE COURT:  And why is that relevant?

MR. KEENEY:  We have to hear what he says, your Honor.  Your Honor, we went through three days of Mr. Toll said this to somebody else --

THE COURT:  No, I understand --

MR. KEENEY:  -- and I want to get it out right now.

THE COURT:  -- but why is what he told Mr. Toll relevant to what I have to decide?  That's my question.

MR. KEENEY:  I think you're going to hear it, your Honor, as to what -- and perhaps --

MR. ROSENTHAL:  I mean, I also object to what he said insofar as it's being offered for its truth as hearsay.

MR. KEENEY:  Wait a minute, your Honor, I'm asking this witness what he said, period.

MR. ROSENTHAL:  It's an out-of-court statement being offered --

THE COURT:  Concerning the division of the fees and his role as the mediator?

MR. KEENEY:  Yes, how much Cohen Milstein would get.  Let me ask very specifically.

THE COURT:  All right, I'll allow it.

Feinberg - Cross                                    173

BY MR. KEENEY:

Q    Did you discuss specifically and make statements to Steven Toll and Cohen Milstein how much Cohen Milstein would be getting from this settlement?

A    I told Mr. Toll that I believed that Cohen Milstein deserved, I forget what the number was, 16 million, 17 million of the 23 million, I forget exactly, but I told Mr. Toll that I thought Cohen Milstein was deserving of X amount and that I thought that the court would likely issue an order concerning the fees within three months or some period of time.  Mr. Toll was inquiring as to the likely timing of that order.

Q    Okay.  And I'd like to direct your attention to a Defendant's Exhibit, which is in the Defendant's Exhibit binder, that's the small binder in front of you, it's marked Cohen Milstein Exhibits and it's Exhibit 2.

A    Exhibit --

Q    2.

A    -- Binder 1, Exhibit --

Q    Binder 1, Exhibit 2.  And the document you're looking at should bear a caption, "Confidential Agreement."  Does it?

A    Yes.

Q    My question to you, usual foundation question, have you ever seen this document before?

A    No.

Feinberg - Cross                          174

MR. KEENEY:  We have no further questions, your Honor.

MR. ROSENTHAL:  Just one clean-up question, your Honor?

THE COURT:  All right, sure.

REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q    The $23 million, is that going only to the Kotchett firm and Cohen Milstein, or was it to compensate all class counsel?

A    Global peace, all lawyers, plaintiff lead counsel, associate counsel, assistant counsel; it was an all-in number to be allocated among all plaintiff-class counsel.

Q    Last question:  Approximately when was Mr. Toll inquiring about the amount that Cohen Milstein might get out of that 23 million?

A    I think -- again, I'm not sure -- I would say probably the early part of 2008.

Q    The early part of 2008?

A    Or 2009.

Q    2009, okay.

A    The early part of 2009.

Q    Thank you very much, Mr. Feinberg.

A    Thank you.

MR. ROSENTHAL:  No further questions.

Feinberg - Redirect                         175

THE COURT:  I have a question for you, sir.  Do you have a minute?

THE WITNESS:  Yes.

THE COURT:  All right.  You said it was appropriate to take into account post-award time in deciding how to divide the fees, just explain to me what you mean by that.

THE WITNESS:  What I mean by that is, when the defendants sat down to mediate the fee with plaintiff-class counsel, they were concerned that they would get whipsawed, that we would --

THE COURT:  I understand that part.

THE WITNESS:  They were concerned that since the English portion of the settlement would go on for five more years --

THE COURT:  I understand that part.

THE WITNESS:  -- that the defendants were worried that in the second year, third year, fourth year and fifth year there would be a demand made by plaintiff-class counsel for supplemental payment of fees and costs.

THE COURT:  I understand that.  Let me move you ahead to where I'm focusing on.

THE WITNESS:  I'm sorry.

THE COURT:  That's all right.  I understand why the defendants do what they do, believe me.  My question concerns at this stage now where the class counsel are now fighting

Feinberg - Redirect                                        176

about the pie, how do you decide -- let's assume class counsel did equal work up until that point, how do you decide how much additional money the person who is going to do the future work is going to get, because you don't know how much work that is?

THE WITNESS:  I think in this particular case Mr. Hausfeld was urging Mr. Kotchett that in dividing up the 23 million, since he would be the lion's share of the English work, he should get an additional amount of the 23 million percentage-wise to take into account the fact that it would be Mr. Hausfeld and Mr. Hausfeld alone that would be responsible for implementing the English settlement over the five-year period.

THE COURT:  And that's something that's usually worked out by consent among all the people?

THE WITNESS:  Usually; it wasn't worked out by consent in this case.  As you know, your Honor, the parties, the class counsel were unable to work out an allocation formula and ultimately went to Judge Breyer, who had jurisdiction over the settlement, and Judge Breyer ruled in a written opinion that Mr. Hausfeld should get X percent and Mr. Kotchett should get Y percent, after all the other counsel had already been paid.

THE COURT:  So, Judge Breyer has already addressed how much more Mr. Hausfeld should get?

Feinberg - Redirect                    177

THE WITNESS:  Yes, in a written opinion.

THE COURT:  Okay.  Any follow-up to that?

RECROSS-EXAMINATION

BY MR. KEENEY:

Q    In the follow-up written opinion, did Judge Breyer make any reference to specific awards to the London office and the attorneys in the London office of Hausfeld, LLP?

A    I do not believe so.

Q    Thank you.

THE COURT:  Let me see if Mr. Rosenthal has a question.

MR. ROSENTHAL:  One more question.

THE COURT:  Sure.

FURTHER REDIRECT EXAMINATION

BY MR. ROSENTHAL:

Q    Did the judge make any reference to Cohen Milstein Sellers & Toll in the final order?

A    Not in the final order; he made reference to Mr. Hausfeld.

THE COURT:  Okay.  Anything further?

MR. ROSENTHAL:  No, your Honor.

THE COURT:  All right, Mr. Feinberg, thank you for coming out.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Have a great day.

Feinberg - Redirect                          178

THE WITNESS:  Thank you.

(Witness excused.)

MR. ROSENTHAL:  We're going to call Anthony Maton.

THE COURT:  Come right up here, sir.

Mr. Fryman, how are you?

MR. FRYMAN:  I am well, sir.  I have the privilege --

THE COURT:  I saw you sitting here patiently --

MR. FRYMAN:  Patiently, very patiently, but the time has arrived.

THE COURT:  Go ahead.

ANTHONY J. MATON, Plaintiff's Witness, Sworn.

THE DEPUTY CLERK:  Please state your name and spell your last name for the record, please.

THE WITNESS:  Anthony John Maton, M-a-t-o-n.

THE DEPUTY CLERK:  Thank you, sir.

THE COURT:  All right, Mr. Maton, thank you.

Go ahead, Mr. Fryman.

MR. FRYMAN:  If the Court please?

THE COURT:  Yes.

MR. FRYMAN:  I have the privilege of representing Mr. Maton, who is here as a voluntary witness from London; he has not been served with process, he is not a defendant in this case, he is not subject to any matter of this case, he is not looking for any affirmative relief in this case and,

179

therefore, aside from his testimony today as a fact witness, I don't believe any jurisdiction would attach to him for any further or different proceedings. And it is my only request that that be noted for the record and I would hand up a short memorandum of law which satisfies the information I just gave to the Court.

THE COURT: Very well. Anyone have any disagreement with Mr. Fryman's representation? Mr. Keeney?

MR. KEENEY: No, your Honor.

THE COURT: Mr. Rosenthal?

MR. ROSENTHAL: No, your Honor.

THE COURT: All right. Thank you, Mr. Fryman.

MR. FRYMAN: Thank you, sir.

THE COURT: Anything further?

MR. FRYMAN: Nothing further.

THE COURT: All right, Mr. Maton, thank you for coming over.

THE WITNESS: Thank you.

THE COURT: Welcome to Philadelphia.

THE WITNESS: Thank you very much.

                     DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q   Good afternoon, Mr. Maton.

A   Good afternoon.

Q   Where do you live?

Maton - Direct                                        180

A    I live in Urchfront (ph.) in Wiltshire in England.

Q    What do you do there?

A    Well, I work in London as a solicitor.

Q    What's a solicitor?

A    A solicitor is a lawyer who is certified and regulated to practice in law except to appear in some of the higher courts, which is something that is reserved for the other side of our profession England, which is called barristers.

Q    And barristers appear in court?

A    Barristers are allowed to appear in court, but aren't allowed to do other types of legal work.

Q    How long have you been a solicitor?

A    Since 1992, so 17 years.

Q    What kind of law do you practice?

A    Commercial litigation.

Q    Has that always been the case?

A    That's always been the case, yes.

Q    Have you focused on a particular kind of commercial litigation?

A    For the last two years, I've focused on cartel litigation.

Q    Which we in the States call antitrust work, is that right?

A    Yes, you would know it here as antitrust work, we know it in Europe as cartel litigation.

Maton - Direct                                181

Q   What other kinds of commercial litigation have you done or do you do?

A   A wide variety; insurance fraud, banking, financial services.

Q   Are you presently the owner of an entity called CMHT-NY, LLP?

A   I am the joint owner of that with Vincent Smith, who is my partner.

Q   Are you the only two owners?

A   We are the only two owners.

Q   Does anybody else have an ownership interest in it?

A   No one else has an ownership interest.

Q   How long have you been an owner or a partner in, let's just call it the London firm, okay?

A   I've been a partner in CMHT-NY, LLP since September, 2007; I have been the joint sole owner of that business since the 15th of January, 2009.

Q   When you say you were a partner between September, 2007 and January 15th, 2009, what kind of partner were you?

A   I was what's called a fixed-share partner.  CMHT-NY, LLP, as set up, had four equity partners and three fixed-share partners.  The four partners were Cohen Milstein Hausfeld Toll, PLLC and three of its partners, and the three fixed-share partners were myself and Mr. Murray and Vincent Smith, who I have already referred to.

Maton - Direct                          182

Q    At the time you joined the London firm, was it affiliated with Cohen Milstein Hausfeld & Toll?

A    Yes, it was.

Q    How so?

A    It -- as I just described, it was owned by, as to 99 percent of the equity interest, Cohen Milstein Hausfeld & Toll, PLLC; as to the other one percent of the equity interest, by the three named partners who were partners in the LLC.

Q    You referred before to the fact that you became an owner, an equity partner in the London firm on January 15th, 2009; who did you and your partner buy the London firm from?

A    We bought it from Cohen Milstein Hausfeld & Toll, PLLC and the three partners.  So, all of those who owned the equity interest in CMHT-NY, LLP sold that equitable interest to myself, Mr. Smith and Mr. Murray on the 15th of January, 2009.

Q    At the time you bought that equitable interest, had Cohen Milstein Hausfeld & Toll been renamed as Cohen Milstein Sellers & Toll?

A    I believe so, yes.

Q    Now, at the time that the London firm was affiliated with Cohen Milstein Hausfeld & Toll or Cohen Milstein Sellers & Toll, was London a separate legal entity from, we'll call it the Cohen Milstein firm?

Maton - Direct                                    183

A    Absolutely.

Q    Was there a requirement of some sort that it be separate?

A    Yes.  In England, solicitors are regulated by something called the Solicitors Regulatory Authority, there are very strict rules as to what entities will be recognized and, therefore, regulated by the SRA, and basic rules as to what solicitors can be within those entities that are regulated by the SRA.  And in order for Cohen Milstein Hausfeld & Toll, PLLC as was to set up a London operation it had to set up a separate legal entity that was capable of and was recognized by the SRA in London, and that entity was CMHT-NY, LLP.  So, it is a separate legal entity and had to be a separate legal entity.

Q    Apart from SRA or -- what did you call the SRA again?

A    It's the Solicitors Regulatory Authority, we refer to it as the SRA.

Q    Apart from SRA requirements, were there any tax law requirements in the U.K. --

A    Yes, the --

Q    -- that required the London firm to be separate from Cohen Milstein?

A    There were also tax reasons why you have to have a separate legal entity.  The England revenue in Britain taxes partnerships on income, so it requires separate partnerships, legal partnerships within England, so it can regulate the

Maton - Direct                                    184

taxation position.  So, that was a subsidiary reason why a separate legal entity was required.

Q    At the time that the London firm was affiliated with Cohen Milstein, what was the nature of your work?

A    Mainly seeking to develop a European, particularly a London cartel-litigation practice, but also seeing whether we could develop a European, particularly London, securities as you would know it, financial services as I would know it, litigation practice.

Q    Were U.S. lawyers or American lawyers capable of or allowed to do that?

A    No, absolutely not.

Q    Why not?

A    Because in order to practice in London and in order to litigate in London one has to be regulated and recognized by the SRA and you have to be an entity that's capable of doing that.  So, a lawyer who is authorized to practice here cannot simply come to our jurisdiction, nor can a firm that's recognized here come to our jurisdiction and practice and, in particular, they cannot litigate, because the court rules proscribe it.  So, in order for someone to operate as a lawyer within England and Wales, they need to be recognized by and regulated by the SRA.

Q    Did you consider the London firm to be a service provider --

Maton - Direct                                        185

A    No.

Q    -- on U.S. cases for Cohen Milstein?

A    Absolutely not.

Q    Why not?

A    Because the reason we were set up was to develop and run cartel litigation, particularly securities litigation, to some extent cases in London.  We were not set up and I'm not sure whether, as a matter of practice, we would be allowed to, in any event, work on U.S. cases.  The thrust of what we were doing was to run litigation in London.

Q    Were you a Cohen Milstein lawyer?

A    As in for the PLLC?

Q    Yes.

A    No, absolutely not.

Q    Why not?

A    Well, first of all, I'm not sure I would be allowed to be, I'm not qualified to practice in the United States, I'm only qualified to practice in England and Wales.  I was a partner in a legal entity that was regulated by the SRA in England and Wales.

Q    I think you have in front of you what's been admitted as Plaintiff's Exhibit 13, which is a letter dated August 3rd, 2009 to Judge Rice; do you see that?

A    I have that.

Q    I want you to turn to the second page, Paragraph 3.

Maton - Direct                    186

A    Yes.

Q    Do you see where it says that the London firm is a fictitious third law firm, which is in fact simply the London office of Cohen Milstein, now the London office of Hausfeld, LLP?

A    Yeah, I find that comment extraordinary.

Q    Why is that?

A    It's difficult for me to begin to explain that, but let me try and start.  I've already explained to you that this was a legal entity in its own right that was registered by and recognized by the SRA; as such, it had to enter into its own insurance arrangements, which it did; it had to enter into its own banking arrangements, which it did through the Royal Bank of Scotland in London; it had to have its own accountant and submit its own accounts; it was regulated and recognized by the Union of Revenue in England and Wales; it employed people under employment contracts, which had to be regulated as a matter of European law; it had clients who engaged it and I spent the first four months of my practice in the firm being engaged by my former firm to finish off the rump of a very large gas contract dispute action for British Petroleum and Chevron/Texaco, and there's actually no way that they would have allowed that to take place if this was some sort of fictitious entity.  And, lastly, it is an entity which litigated and, as such, has a duty to the court in

Maton - Direct                                            187

London and I myself have, through that entity, duties to clients and duties to the court.  So, the suggestion that that entity is somehow fictitious I find actually deeply insulting.

Q    Was that deeply...

A    Insulting.

Q    Were the books and records of the London firm kept separately from the books and records of Cohen Milstein when the two entities were affiliated?

A    Yes, they were required, and they're required to be by the Law Society, the Solicitors Regulatory Authority.

Q    Is there anything in British tax law that also requires that?

A    Yes.  Well, the LLP has to account for its own income and expenses, so the Revenue can see what it's profit is.

Q    Did the LLP, the London firm which we have been calling it, pay taxes separately in the U.K.?

A    It would do if it made a profit; it hasn't to date made a profit, so to date it hasn't.

Q    Did the London firm, the LLP, take in any revenue at the time that it was affiliated with Cohen Milstein?

A    Yes.

Q    And were there any particular matters in which it took in revenue?

A    Yes.  Well, I have already made reference to an

Maton - Direct                                              188

instruction I took in my first four months from my old firm, McGrugers (ph.), they instructed me on behalf of BP and Chevron to finish this case. As you would expect, we recorded time as LLP; as you would expect, we billed that time; and, as you would expect, we were paid that time. In addition to that --

Q   How much money did you -- how much in fees did you earn off that petroleum case?

A   Approximately 150,000 pounds.

Q   And what happened -- where did those fees go once they came into the firm, your firm, the London firm?

A   They came into the office account of the LLP, which they are required to do by the SRA, and would be expected to do by the Union of Revenue.

Q   What about other fees that the firm, the London firm generated while it was affiliated with Cohen Milstein?

A   We acted for an African government for a period of time; again, as you would expect, we recorded time, we billed that time by way of invoice, we were paid, those monies came into our office account. We also did some work in a consultancy capacity on a cartel case that was being run by another London firm; again, we invoiced them; again, we were paid into our office account. And, lastly, we did some work for a wealthy individual in relation to a financial services matter where, again, we invoiced, we were paid, the monies went into

Maton - Direct                                189

the office account.

Q   Was the fact that these revenues came into the London firm and into the operating account of the London firm consistent with the partnership agreement that the London firm had?

A   Absolutely.  Would it be helpful if I described how that worked?

Q   Please describe how it works and then we can look at the document, but go ahead and describe how that works first.

A   The way in which it works is a concept of distributable profits and, if there are distributable profits, then those profits are at the discretion of the managing partner to be given to the equity partners.  Now, in order for there to be distributable profits, one has to look at the income and expenses of the LLP over the period in question and, in broad terms, one takes the income and one takes the expenses and, if one has a positive balance at the end of the period, then there's the potential to make a distribution to the equity partners, a completely normal procedure that you would expect in those circumstances.

Q   The managing partner of the London firm was Cohen Milstein, is that correct?

A   Correct.

Q   Okay.  At any point during Cohen Milstein's affiliation with the London firm, did the managing partners of Cohen

Maton - Direct                                    190

Milstein make the distributions that you referred to?

A    Well, as I said earlier, the LLP, the London firm, never made a profit.  So, there was never anything that triggered the clause that allowed a distribution back to the equity partners; I mean, it was simply impossible under the agreement.

Q    And let's take a look at the exhibit, which is Exhibit 110, it should be just to your right --

A    Thank you.

Q    -- which is the partnership agreement of CMHT-NY, LLP, and look specifically at Page 6, Section 5.3, which describes how the income of the LLP or the London firm should be treated.  And, if you would, please read into the record Section 5.3.

A    It says, "LLP Income," underlined.  "Except for amounts earned by a partner on behalf of and payable to CMHT-DC, all fees, summaries, proceeds, commissions and other compensation earned or received by any partner for; A, legal services, but excluding any amounts earned or received by any partner for legal services rendered before the partner became affiliated with the LLP; B, as a corporate officer or director, trustee, receiver, executor, guardian, administrator, commissioner, master, referee, arbitrator; C, as an author, editor, lecturer or teacher on legal matters; or, D, from similar or related professional activities, shall belong to the LLP and

shall be deposited for and paid over to the LLP as and when received, in exactly in the form received, except for endorsement by required."

Q   You can stop there.  And the idea that the fees earned or received by any partner -- and that includes fixed-share partners like yourself, right?

A   Yes.

Q   The idea that the fees earned by any partner shall belong to the LLP and shall be deposited for and paid over to the LLP, as and when received in exactly the form received, is that in fact how income was treated when it was brought in by the London firm at the time the London firm was affiliated with Cohen Milstein?

A   Absolutely.  As I've described, when we did and recorded work on behalf of the LLP, we then billed that work and that work was paid to the LLP; I mean, it's axiomatic.

Q   Why wasn't it simply paid directly to Cohen Milstein?

A   First of all, it did not have the right of entitlement to be paid; second, if we had done that, that would have been a fraud on our creditors; and, third, if we would have done that, it would have arguably been a fraud on the Revenue in the United Kingdom.

Q   I want you to turn to Paragraph 5.1, just above it, and ask you to read the very first sentence, please, entitled, "Bank Accounts."

Maton - Direct                                    192

A    "All funds, checks, notes and drafts received for or on behalf of the LLP shall be deposited promptly in the account or accounts maintained by the LLP in such bank or banks as shall be determined by the managing partner."

Q    Is that what happened with the revenue that the London firm received during its affiliation with Cohen Milstein?

A    It is.  The money was paid into our office account with the Royal Bank of Scotland in London.

Q    With respect to your compensation as a fixed-share partner --

A    Yes.

Q    -- how did that salary come to you, how did that money come to you?

A    I was paid on a monthly basis, actually the office account of the LLP in London, i.e. the Royal Bank of Scotland London account.

Q    You were paid by the London firm's account?

A    Yes, absolutely.

Q    And how did money come into the London firm's account apart from the revenues from those cases that you described earlier?

A    Money was put into that account by Cohen Milstein Hausfeld & Toll, PLLC, I think on a regular monthly basis, but certainly on a regular basis, in order that the LLP had sufficient funds to meet its liability, as it was obliged to

Maton - Direct                                    193

do under the partnership agreement.

Q   Why didn't Cohen Milstein just pay you and the other fixed-share partners directly?

A   Because that was not the relationship we had.  We were -- I was a partner in LLP, I had, as a matter of regulation tax and probity, to be paid by the LLP.

Q   Okay.  Were there other expenses incurred by the London firm, was your reference -- was you were talking about, the LLP, during the London firm's affiliation with Cohen Milstein?

A   Yes.

Q   And how did those expenses get paid?

A   They were all paid, as they were required to be paid by the SRA, out of our office account.

Q   Why didn't they come directly from Cohen Milstein?

A   Because, again, that would have been improper, it would have been improper as a matter of regulatory conduct, it would have been improper as a matter of our taxation law and it would have been improper as a matter of general probity.

Q   With respect to the London firm's relationship with Cohen Milstein, was the London firm obligated to repay Cohen Milstein fees and expenses it was advancing through the operating account?

A   No, it wasn't.

Q   Were any of the fixed-share partners like yourself

obligated to repay any such advanced expenses?

A    Absolutely not or I would have never signed up for the enterprise in the first place.

Q    Taking the reverse situation, was Cohen Milstein under any obligation to fund the operations of the London firm?

A    Yes, I mean, in two reads:  First of all, all of the fixed-share partners who had joined the LLP had only done so on the basis of a three-year commitment, which was contained in the addenda to the partnership agreement each of them signed; and, secondly, Clauses 4.4 and 5.1, which were insisted upon by us --

Q    Of Exhibit 110, the partnership agreement?

A    -- of the partnership agreement, made it clear and present an obligation on CMST that it had to keep the LLP solvent and meet the financial liabilities of the LLP.

Q    If you would turn to Paragraph 4.4 at Page 5 of Exhibit 110, which is the partnership agreement?

A    Yes.

Q    Entitled, "Funding of the LLP."  Please read that into the record.

A    "The managing partner shall provide the LLP with all funding and other support that may be needed by the LLP to remain solvent and comply with the terms of its banking arrangements and other financial obligations.  As it deems appropriate, the LLP may provide funding to the LLP either as

Maton - Direct                                    195

loans or capital contributions."

Q   That's what you were talking about before with respect to Cohen Milstein's obligations to fund the LLP?

A   Correct, that and Clause 5.1.

Q   I'm going to approach with Plaintiff's Exhibit 111, Mr. Maton, which is Addendum A to the partnership agreement, called, "Terms of Retention of Anthony Maton as Fixed-Share Partner in CMHT-NY, LLP."

A   Thank you.

Q   And, if you would, please turn to the faxed version of the addendum, which is I guess the second version stapled to this --

A   Yes.

Q   -- at the back, and take a look at Page 3, Paragraph 4, please?

A   Yes.

Q   And I asked you before whether you as a fixed-share partner was an employee of the Cohen Milstein firm, do you remember that?

A   I do.

Q   Would you please read this Section 4.1 of the addendum to the partnership agreement into the record?

A   It's headed, underlined, "Not a member of CMHT-DC.  Maton shall not be a member of, employed by or an agent of CMHT-DC. Maton shall not have any authority to enter into any

Maton - Direct                                    196

contracts on behalf or otherwise bind CMHT-DC in any manner."

Q    Thank you.  You can put that aside.

Now, you testified earlier that the London firm was sold to you and Mr. Smith on January 15th, 2009, is that correct?

A    Yes.  I think I testified, but if I didn't, I should make it clear that it was sold to Mr. Murray, Mr. Smith and myself on the 15th of January, 2009.

Q    And who is Mr. Murray?

A    Mr. Murray was the third fixed-share partner.

Q    Is Mr. Murray still a partner --

A    No, Mr. --

Q    -- of -- I'm sorry, go ahead.

A    Mr. Murray is no longer a partner and no longer an owner, the entity is entirely owned by Mr. Smith and myself 50-50.

Q    Okay.  If you would, please take a look at Plaintiff's Exhibit 112.

A    I have that.

Q    Which is the agreement transfer of CMHT, New York, LLP; have you seen this document before?

A    I have.

Q    What is it?

A    It's the agreement we eventually signed on the 15th of January by which the ownership in the London office of the LLP was transferred to us.

Maton - Direct                                    197

Q    And did you sign this agreement?

A    I did.  I signed it -- from memory, I haven't looked at the clause, I think I signed it twice or three times, because I had power of authority to sign it on behalf of the other fixed-share partners.

Q    Okay.  Did you negotiate this agreement?

A    I did, alongside Mr. Smith and Mr. Murray, yes.

Q    And who on Cohen Milstein's side negotiated it?

A    Mr. Sellers and Mr. Toll.

Q    How long did the negotiations take?

A    They took, in broad terms, from early November onwards, i.e. from the time that Mr. Hausfeld was dismissed, expelled, however you want to characterize it, from CMHT, PLLC, but they were particularly frantic in the period after the new year in 2009 and for the last week before we signed this I in fact was in D.C. attending the offices of CMHT, PLLC daily in order to negotiate and finalize this document.

Q    Why was it that you undertook to negotiate for the purchase of this entity, the CMHT, New York, LLP entity?

A    Because once Mr. Hausfeld was expelled or dismissed from CMHT, PLLC, we then had to ask and did ask the question to CMST, PLLC whether they intended to continue to carry on an international antitrust practice and whether they continued to -- whether they intended to continue to finance us in the way that they had promised to do so under the partnership

Maton - Direct                                198

agreement.  After two to three weeks, the answer came back to that broadly that they did not intend to continue to run an international antitrust practice and they did not intend on a long-term basis to fund the LLP.  At that point, we had to consider what we would do and one option for us was to purchase that practice from CMST, PLLC, and that is why we embarked on the negotiations to see whether it was possible to do that on a set of terms that were agreeable to us.

Q   When you and Mr. Smith and Mr. Murray bought the London firm from Cohen Milstein, what did you personally think you were buying?

A   Well, we bought out the equity ownership, so we owned the vehicle and, therefore, we owned every asset that that vehicle had, because we became the owners of the vehicle.  I mean, as night follows day, once one takes the equity ownership of the vehicle, one has everything that is in the vehicle, whether it be asset or liability.

Q   Did you believe that you were buying the fees that the LLP or the London firm had earned to date?

A   Of course.  I mean, that is, if I may so, axiomatic, because we had the -- once we bought the equity ownership of the business, we owned the business, the business owned the work-in-progress; that was, therefore, ours as owners.

Q   What, if anything, in the sale agreement reflects your understanding?

Maton - Direct                          199

A    Well, Clause 2.1, which is --

Q    Okay.  If you would turn to Clause 2.1 on Page 3 of Exhibit 112, please?

A    I have that.

Q    And if you would please read the first sentence into the record?

A    "In consideration of payment of the," capital C, "Consideration and the execution by each of the," capital T, "Transferees of the," capital T, "Transferee," capital R, "Releases, the," capital T, "Transferrors each individually and jointly agree to transfer to the," capital T, "Transferrees all of their right, interest and entitlement in CMHT and in any or all of its business or practice wheresoever and whatsoever as carried on at the agreement date."

Q    And the transferrees here were you, Mr. Smith and Mr. Murray, is that right?

A    Correct.

Q    And the transferrors were Cohen Milstein, is that right?

A    Plus Mr. Friedman and Mr. Toll, who had a small portion of the equity interest.

Q    And the capital C Consideration is spelled out in another part of the agreement, is that right?

A    Correct, I think it's a defined term.

Q    Okay.  And, broadly speaking, the Consideration reflects

up to $2 million payable to Cohen Milstein in gross profits over approximately the six years following the signing of the agreement, is that right?

A    You -- can I just answer with a clarification?  I mean, you're talking about capital C Consideration as defined or are you talking about small C consideration as I would understand it as a matter of English law?

Q    I'm talking about the capital C Consideration for starters.

A    Okay, in which case I agree.

Q    Okay.  And how about the small C consideration?

A    Well, there were -- I think this clause makes it clear that on the small C consideration there were three elements, the first of them is the one you have alighted on, which is the large C Consider, i.e. the deferred payments that might be made at some future stage, but to my mind, more important and reflected in 2.1 by reference to Appendix 3, are the releases that the three of us gave to CMST, PLLC and there were two important strands to that:  The first of those is you refer to the addenda by which I was a fixed-share partner, that gave me a three-year fixed term.  Now, each Mr. Murray and Mr. Smith had exactly the same arrangement and, therefore, at the time I signed this agreement in January of 2009, I had about 400,000 pounds that remained owing to me as a result of that; Mr. Smith and Mr. Murray had about 500,000

Maton - Direct                                    201

pounds a piece.  So, there was a 1.4 million pound liability owed by LLP and guaranteed, explicitly guaranteed by PLLC, payable to the three of us.

Q    That they're able to get out from under as a result of this agreement?

A    Well, the result of this agreement is that we each of us took a four-month payment, in my case 80,000 of the 400,000, a very substantial reduction as part of this agreement, that was one element.  The other element, of course, is the partnership agreement to the LLP had a clause that meant that the LLP could not be dissolved until May, 2010.  Now, you have already pointed me to the clauses that say that the LLP and PLLC were obliged to fund the -- I'm sorry, the PLLC was obliged to fund the LLP and, absent this agreement, the PLLC would have had to have continued to fund the LLP until May, 2010.  Now, as part of the negotiation we were asked by PLLC what we thought the annual cost of that would be.  From memory, the figure we put to them was a figure of $5.5 million per annum.

Q    Okay.  Turning to Section 9.1 of Exhibit 110, which is the partnership agreement --

A    I'm sorry, the partnership agreement?

Q    Correct, Exhibit 110.

A    Yes, yes, 9.1.

Q    9.1, correct, which you referred to earlier.

Maton - Direct                                202

A    Yes.

Q    Can you read that into the record, please?

A    It's headed, underlined, "Dissolution.  The LLP shall be dissolved at such time as the managing partner determines it to be appropriate; provided, however, that the LLP may not be dissolved prior to May 31st, 2010 without the consent of all the partners."

Q    And what was the significance of this in connection with the sale agreement?

A    Well, the significance of that is there's -- as this agreement stood, the LLP could not be dissolved until May, 2010.  The agreement we came to in January 15th, 2009, because it transferred the ownership and got rid of this partnership agreement, took that obligation away from PLLC, so they no longer had that obligation to fund the entity until May, 2010, thereby allowing them to make an extremely significant expense saving.

Q    I'm going to ask you to turn to Page 8, Paragraph 6.3 of Plaintiff's Exhibit 112, which is the transfer agreement.

A    I'm sorry, 6.3?

Q    Paragraph 6.3, Page 8, of the transfer agreement.

A    Yes, I have it.

Q    And can you read, it's called -- it's entitled, "Law and Jurisdiction"?

A    "This," capital A, "Agreement shall be governed by, and

interpreted in accordance with, English law."

Q   Okay.  Under English law, what's your understanding of what all right, interest and entitlement in any or all business or practice wheresoever and whatsoever means?

A   That means, if I can use a common parlance, the whole shooting match; I mean, it means everything that is owned by and belongs to.

Q   Okay.  Is there anything in this agreement that excludes any asset of the London firm from the whole shooting match?

A   Absolutely not.

Q   Is there anything in this agreement that excludes fees in any case --

A   Absolutely not.

Q   -- from the agreement?

A   Absolutely not.

Q   Anything in this agreement that excludes fees from the Air Passenger or the VABA case in this agreement?

A   Absolutely not.

Q   If you would please turn to Paragraph 6.9 of Exhibit 112?

A   Yes, I have it.

Q   I'm sorry, 6.7.

A   Yes.

Q   Entitled, "Whole Agreement"?

A   Correct.

Q   Can you read that into the record, please?

A    "This," capital A, "Agreement represents the whole agreement between the," capital P, "Parties as to its subject matter and may not be varied except by agreement of all of the," capital P, "Parties in writing.  The," capital P, "Parties acknowledge and agree that in entering into this," capital A, "Agreement they do not rely on and shall have no remedy in respect of any statement, representation, warranty or understanding, whether negligently or innocently made, of any person, whether party to this," capital A, "Agreement or not.  Nothing in this clause shall, however, operate to limit or exclude any liability for fraud."

Q    Thank you.  You can put it aside.

A    Thank you.

Q    Now, at the time of this sale, did the London firm, the LLP, have any obligation to pay Cohen Milstein back for expenses advanced?

A    No, absolutely not.

Q    At the time of this sale agreement did you have any obligation to pay back expenses advanced by the Cohen Milstein firm to the LLP?

A    No, absolutely not.

Q    Did any of your other fixed-share partners, Mr. Smith or Mr. Murray?

A    No, they did not.

Q    Was the money that Cohen Milstein advanced to the London

Maton - Direct                              205

office or the London firm in loan?

A    No, it wasn't.

Q    Is it fair to characterize it as an investment?

A    It was characterized in the accounts that were submitted to the Solicitors Regulation Authority and in the accounts that were submitted to the Union of Revenue as a capital contribution.

Q    And if there are any disputes arising under this agreement, Plaintiff's Exhibit 112, how are they to be resolved?

A    I can't recall that, you'll have to show me the clause.

Q    Sure.  Let's look at Paragraph 6.3, if you would take a look at the second sentence and read that into the record, please?

A    Sir, which exhibit number?

Q    I'm sorry, Exhibit 112.

A    And it's 6.3?

Q    Paragraph 6.3 at Page 8.

A    I'm sorry, so you're back to the --

Q    Back to the "Law and Jurisdiction" paragraph, yes, sir.

A    Sorry, yes.  No, absolutely, the result under English law is arbitration in London.

Q    And can you read the second sentence into the record, please?

A    "In the event of a dispute, the dispute shall, except as

Maton - Direct                                    206

provided in this Paragraph 6.3 below, be referred to arbitration by a single qualified arbitrator chosen in the absence of prompt agreement between the parties by the President to the Law Society of England and Wales."

Q    And the last thing I want you to turn to in terms of these documents, at least for now, Mr. Maton, is back to the partnership agreement, which is Exhibit 110, please?

A    Yep.

Q    And if you would turn to Page 9, Paragraph 8.6?

A    Okay, I have that.

Q    And can you read into the record, I think it's the third sentence of that paragraph that begins, "No former partner..."?

A    "No former partner shall have any right to have LLP property distributed to him, nor to have the value of his interest in the LLP ascertained and paid to him."

Q    After Cohen Milstein sold the London firm to you and your partners did they become a former partner under that definition in this agreement?

A    Absolutely.

Q    So, what's your understanding of what right they have to the LLP's property?

A    They had no right at all; whether you characterize it as under this agreement or under the agreement that we have looked at previously, whereby there is an assignment of all

Maton - Direct                                     207

the interests, it was very clear that PLLC had no right at all post the 15th of January, 2009.

Q   I want to turn your attention now to what we're colloquially the Air Passenger and the VABA case.

A   Right.

Q   Were you involved in the U.K. portion of that case?

A   Yes, I was.

Q   What was that case all about?

A   The -- excuse me if the Court has heard this already, if I could just start by -- the case was a cartel case, the case is a case in which British Airways and Virgin Atlantic, I should say, allegedly conspired to overcharge its passengers flying on aircraft into and out of America, but also into and out of London.  So, there were a large number of claimants, both in the United States and the United Kingdom, who potentially had claims against British Airways and Virgin in respect to the overcharge allegedly levied on them.

Q   Okay.  And was the London firm or the LLP involved in that part of the litigation -- well, in that part of the case?

A   Well, perhaps I can explain --

Q   How did it become --

A   -- perhaps I could explain our involvement?

Q   Please do.

A   I mean, explain that what happened here is there's an

Maton - Direct                                      208

effect on not only U.S. passengers but, to a majority, on U.K. passengers.  The strategy here was to seek restitution on behalf of not only U.S. customers, but on behalf of U.K. passengers as well and, ideally, to bring British Airways and Virgin to the negotiating table in order to undertake a settlement.  Now, one stem of that strategy, one plank of that strategy, was to begin receivings in California on behalf of a passenger class, initially a U.S. passenger class, but then arguably a wider jurisdiction or class, that included U.K. passengers.  That, however, was always going to be open to attack and it was always going to be critical that we persuaded British Airways and Virgin that we had the capacity and the capability to start receivings in London in order to bring receivings on behalf of the U.K. passengers.

Now, the establishment of the firm in London in June to September, 2007 proved we had the capacity to do so.  One of the most important things we were then working on was the capability, i.e. working up the litigation and the strategy by which we would have started proceedings in the London court to sit alongside the proceedings in the California court, and that is an exercise that can only be conducted as a matter of sense and practicality, but also a matter of regulatory law, by an English registered and recognized firm.

Q   So, was the London office, the London firm, involved in the U.S. part of the litigation at the outset?

Maton - Direct                                              209

A    If you mean by that, did we work on the U.S. case in the sense of me being the third partner and an associate being the third associate on the U.S. case, no, absolutely not. The U.S. case was clearly a case to be conducted by U.S. attorneys.  We were working, as I say, on the development and, if necessary, deployment of the case in the United Kingdom.  Now, when we came to the settlement stage, the picture became a little different.

Q    Okay.  At any point in time did the U.K. case actually get filed?

A    No, we didn't need to.

Q    Okay.  Let me just back you up for one minute.  Why was it necessary to get London solicitors involved in the U.K. portion of this case?

A    Because you cannot begin proceedings in a London court unless you are a firm registered and recognized in England and Wales, it is simply not allowed either as a matter of regulation or court process.

Q    And you were beginning to describe how you became involved in the settlement process and if you could tell us a little bit more about that, please?

A    Yes.  In the settlement process, without going on too long about this, there were two critical elements from the English-law perspective once BA and Virgin came to the settlement table, the first of these was the jurisdictional

Maton - Direct                          210

aspect of the case.  Now, once the settlement -- it was intended the settlement would be and that it was eventually put before the California court, the California court does not have jurisdiction to bind U.K. purchases of air passenger tickets.  Even with the blessing of the court in California, there is nothing to prevent someone in England and Wales starting proceedings against BA and Virgin and proceeding with those and the court will not prevent that happening.  So, we had to come up with a methodology by which we could have a settlement approach that would give a private contractual binding nature, as a matter of English law, to the settlements being offered to the English purchasers of passenger tickets, and that was the first large element upon which we worked to come up with a mechanism that would work in a manner that would give British Airways and Virgin the comfort that they required to go through the settlement.

        The second major portion of this was around the publication and notice program that was to be put into effect.  Without any disrespect to anyone in this court, the procedures and processes used in U.S. class actions are manifestly completely unsuitable for a European audience.  There had never been a settlement of this type in England before, there had never been a notice program of any type to the estimated two million purchasers of passenger tickets in England and Wales before.  It was absolutely critical that,

Maton - Direct                                        211

from an English perspective, we came up with a publication and notice program that hit the mark and got to the people it got to, and allowed people to understand and make claims, and we spent a lot of time working on that. And, again, it would have been completely, in my view, inappropriate and not possible for U.S. lawyers to have worked on and devised either the settlement methodology in the way we did or the notice and publication program that we did.

Q   Was there a jurisdictional challenge to the effort to join the U.K. portion of the case to the U.S. part of the case for the purposes of resolving it?

A   Yes, three objectors opposed approval of the settlement on jurisdictional grounds.

Q   And what happened with that, those objections?

A   Judge Breyer in San Francisco dismissed those objections and approved it, but there was then an appeal by those objectors from that approval by Judge Breyer, which appeal was eventually settled.

Q   Now, did you yourself work on this case?

A   Sorry, can you -- I'm not sure I understand that question.

Q   Did you yourself, Anthony Maton, actually work on the U.K. portion of this matter?

A   Oh, absolutely, yes, absolutely.

Q   Did anybody else in the London firm work on it?

Maton - Direct                                    212

A    Yes, Rob Murray, who I have also made mention of, and Ingrid Govay (ph.), who is a consumer law expert.

Q    Did you, the three of you, record the time that you spent on this case?

A    Yes.  As is standard in English law practices, we had a time-recording system and on a daily or weekly basis we would record our time on the matters we had done, and on Air Passenger we recorded the time that we had undertaken on the Air Passenger matter.

Q    Okay.  And did you ultimately submit time in connection with this matter once it was settled in front of Judge Breyer?

A    Yes.  The timing is a little hazy, as I sit here today, but what I do remember is at some point we were asked to put together our time records, so that our time could properly be submitted to the court in California, approved and agreed, and then paid.

Q    And, as with the four cases you described before, if payment were to come, did you expect payment to come to the LLP or the London firm?

A    Absolutely; I mean, there was no other result that was possible.

Q    Is that consistent with the partnership agreement?

A    It's consistent with the partnership agreement, it's consistent with regulation in England and Wales, it's

Maton - Direct                                              213

consistent with taxation law, it's -- yes.

Q   Did you prepare -- well, let me say, after -- and Judge

Breyer entered a fee award in this case on October 31st,

2008, that's in the record?

A   Right.

Q   Did you record or the LLP record any time subsequent to

that award?

A   Yes, we would have, I am sure.

Q   And did you submit a subsequent -- did you prepare a

subsequent submission for the fees that you had or the time

that you put in?

A   That I can't remember.

Q   You can't remember?

A   I can't remember, no.

Q   Now --

        THE COURT:  What was the question he can't remember?

I'm sorry.

        MR. ROSENTHAL:  He can't remember whether the London

firm submitted post-October 31st time in the Air Passenger

matter.

        THE COURT:  Okay.

BY MR. ROSENTHAL:

Q   Do you recall when you sent -- when you most recently

sent time records in for the fees earned by the LLP?

A   I don't, because I didn't deal with that, so --

Maton - Direct                                214

Q   Who dealt with that?

A   I'm pretty sure it was dealt with by Vincent -- under the supervision of Vincent Smith, but the person who actually did it was Rita Labin, who is -- works with us in London and who deals with our expenses and billing and financial matters.

Q   Let me ask you this:  Did you work on the U.K. portion of the VABA or Air Passenger matter on behalf of the Cohen Milstein firm?

A   In the sense of was I instructed by class counsel to work on the English aspects of it, yes, if that's the question.

Q   What do you mean by instructed by class counsel to work on the British aspects of it?

A   Well, we as a firm were given what in England we term as an instruction, i.e. an instruction to undertake work by Cohen Milstein Hausfeld & Toll, PLLC, who were at that point the class counsel in the carrier case.

Q   With respect to the time that the LLP recorded in the passenger case, is there a provision in the original partnership agreement, Exhibit 110, which indicates where those fees should be paid to?

A   Well, it's the clause we referred to earlier, I can't remember the number of it, but the one you made me read into the record.  But, underlying that, it's also axiomatic, as an LLP practicing under English law, that where that practice conducts the work that it is that practice which bills the

Maton - Direct                                    215

work and must receive it.

Q   And do you remember that no-former-partner provision in Section 8.6 of the partnership agreement?

A   Yes.

Q   Exhibit 110, Paragraph 8.6 --

A   Yes.

Q   -- where it says no former partner shall have any right to have LLP property distributed to him?

A   Yes.

Q   What was your understanding of what that paragraph -- or what that sentence means for Cohen Milstein's right to come after the fees that were earned from the time recorded by the LLP, by the London firm?

A   Well, it has no entitlement to those fees.  I mean, it never had any entitlement to those fees, the only people that ever had any entitlement to the fee was the LLP.

Q   And when you and your partners bought the LLP in January of 2009 did you believe that you were buying all right, interest and entitlement to the fees in the passenger case?

A   Absolutely.

Q   Is that based on the language of the sales agreement?

A   That's what the agreement says, as a matter of English law, under Clause 2.1.

Q   Now, since the January 15th sale, have you formed a new law practice?

Maton - Direct                                216

A    Yes.

Q    You remain an owner of the LLP or the London firm, correct?

A    Correct.

Q    What's the name of the new law practice?

A    Hausfeld & Co., LLP.

Q    Hausfeld & Co., LLP?

A    Correct.

Q    And what's its relationship to Hausfeld, LLP in the United States?

A    It is partially owned by Hausfeld in the United States.

Q    Was it formed right away after your purchase of the London firm, the CMHT, New York, LLP?

A    No, it was formed in I think June, late June, 2007 -- 2009, sorry.

Q    And do you have essentially -- or does Hausfeld & Company, LLP have essentially the same setup with Hausfeld, LLP that the London firm or CMHT, New York, LLP, with the Cohen Milstein firm?

         MR. KEENEY:  Objection, too vague and ambiguous, your Honor.

         THE COURT:  Yes, it is, I'll sustain that.

BY MR. ROSENTHAL:

Q    In connection with Hausfeld & Company, LLP's relationship with Hausfeld, LLP, United States, are the fees that Hausfeld

& Company, LLP earns, do those belong to it or do those belong to Hausfeld, LLP?

A    No, they belong to Hausfeld & Co., LLP.  As I have been trying to explain, they must belong to Hausfeld & Co., LLP as a matter of English law on a number of fronts.

Q    And the CMHT, New York, LLP entity still exists, right?

A    Yes, correct.

Q    Does it still have money in its operating account at the Royal Bank of Scotland that you referred to before?

A    Yes, it does.

Q    Does Hausfeld, LLP in the United States have any ownership interest in CMHT, New York, LLP?

A    None at all.

Q    Does it have any right or agreement to share in its assets?

A    Absolutely not.

Q    Does it have any right or agreement to share in the Air Passenger fees that the LLP, CMHT, New York, LLP, earned?

A    Absolutely not.

Q    Do you and your partner in CMHT, New York, LLP have absolute and sole authority or power over what occurs with the fees earned by CMHT, New York, LLP?

A    We do, within the boundaries of the law.

Q    When you were negotiating the arrangement that Hausfeld & Company, LLP now has with Hausfeld, LLP, did anyone with

Maton - Direct                                   218

Hausfeld, LLP entice you by promising that CMHT, New York, LLP would get paid the fees for the work it earned -- I'm sorry, for the work it did in the U.K. part of the Air Passenger case?

A   No, absolutely not.

Q   Did anyone affiliated with Hausfeld, LLP in the United States make any representations to you at all about what it would do as co-lead counsel in the Air Passenger case with the money that CMHT, New York, LLP earned working on the Air Passenger case?

A   Absolutely not.

        MR. ROSENTHAL:  May I have one moment, your Honor?

        (Pause.)

        MR. ROSENTHAL:  Thank you, Mr. Maton.  Pass the witness.

        THE COURT:  All right.  We're going to take a break until -- it's 2:30, we'll take a break until 2:45.  How do we stand on time, folks?  Because I think we're running out of time and I don't know how we're going to finish today if we continue at this pace.

        MR. KEENEY:  The cross is going to be less than 35 minutes.  Mr. Toll's direct will probably be approximately 30 minutes, I don't know how long his cross is going to be, at which point then it goes back to their side of the table, they have one more witness they're going to call.

219

THE COURT:  Who is our last witness?

MR. ROSENTHAL:  Michael Lehmann.  And Mr. Kittredge is taking him and maybe he can give the Court an idea.

MR. KITTREDGE:  He could be, your Honor, 20 minutes to half an hour.

THE COURT:  All right.  Well, let's try to stick to those time tables, because that will take us pretty close to 5:00 o'clock and I think everybody, including me, starts to run out of gas around that time.  I don't know about you guys, but...

MR. ROSENTHAL:  I'm almost there, your Honor.

THE COURT:  All right.  Thank you, sir.  We're going to take a brief, all right?

THE WITNESS:  Yes, sir.  Thank you.

THE COURT:  Thank you.

(Court in recess; 2:29 to 2:50 o'clock p.m.)

THE COURT:  All right, Mr. Keeney, you have a few questions, I presume?

MR. KEENEY:  Yes.  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. KEENEY:

Q   Mr. Maton, could you turn to the small binder on your desk to what's marked as Defendant's Exhibit 2?

MR. KEENEY:  If I could approach the witness to make sure --

Maton - Cross                                          220

THE COURT:  Yes, sure, go ahead, any time, you don't have to ask.

THE WITNESS:  That is Binder 1?

MR. KEENEY:  Yes, it is, and Tab Number 2.

BY MR. KEENEY:

Q   And are you looking at a document that on top is captioned, "Confidential Agreement"?

A   I am.

Q   Have you ever seen that before?

A   No, I have never seen that before.

Q   I'm showing you a document which has already been marked yesterday as Plaintiff's Exhibit 52, which is a declaration of Charles Tompkins --

MR. KITTREDGE:  Defendant's Exhibit?

MR. KEENEY:  Oh, excuse me, Defendant's Exhibit 52.

THE COURT:  I have a copy I think from the other day.  This is from Kotchett?

MR. KEENEY:  Yes.

THE COURT:  Yes.

MR. KEENEY:  Declaration of Charles Tompkins.

(Discussion held off the record.)

THE COURT:  I only have up to Page -- there's a Page 5 plus Exhibit 1, is what I have.

MR. KEENEY:  Okay.  Let me try again then, your Honor.

Maton - Cross                                      221

THE COURT:  I think we showed this to somebody before and I think I labeled it 52, so --

MR. KEENEY:  Yes.

THE COURT:  -- I don't know, does that mean you're on 53?

MR. KEENEY:  No, this is 52, it's just that this will be --

THE COURT:  Should I give this back to you then?

MR. KEENEY:  Yes, thank you.

THE COURT:  I think I took that from someone.

MR. KEENEY:  Yes.

(Discussion held off the record.)

THE COURT:  So, does everybody have the same thing?

COUNSEL:  No, because I don't -- does the witness have a complete copy of 52?

MR. KEENEY:  We think so, your Honor.  In the meantime, I have asked Ms. Baum just to take a look and see if she can find the missing exhibit, the missing Number 14, which someone says the don't have.

THE COURT:  Oh, Page 13, 15 -- yes, there's no Page 14 or 15 in the upper-right corner, that's what --

MR. KEENEY:  That is what someone has said, so we're looking.

THE COURT:  Okay.

MR. KEENEY:  But, in the meantime, let's just focus

Maton - Cross                                            222

on Pages 1 through 13.

THE COURT:  Okay.

BY MR. KEENEY:

Q    If you could direct your attention to Exhibit 1 to what has been marked as Plaintiff's Exhibit 52?  At the top of Exhibit 1 do you see a caption, "Cohen Milstein Hausfeld & Toll, PLLC, U.S. Offices"?

A    I do, yes.

Q    And turning to the next page, that's a continuation of that chart, is that right?

A    It appears so, yes.

Q    And then turning to the next page, the caption says, "Cohen Milstein Hausfeld & Toll, LLP," paren, "(U.K. Office)," close paren, right?

A    Correct.

Q    And it lists time for you, Mr. Maton, in Line Number 2, is that correct?

A    Correct.

Q     And approximately how much time had you put in in this submission?

A    If I assume Column 5 is the hours, plus Column 6 seems to be hours, and it seems to be -- the cumulative hours seem to be 360.

Q    And is your understanding that this was time of yours that was submitted to the court in San Francisco by this

declaration of Charles Tompkins, is that right?

A    Yes.  What happened is the time, as I recall it, on our time system from the LLP was then put into a document which I checked, and I excised some of the time that I thought it was not appropriate that the LLP should charge for, and I then submitted that document, I think directly to Mr. Tompkins, it was certainly submitted to Mr. Tompkins in Washington, D.C.

Q    And, directing your attention to Page 5, the date of the document is September 5th, 2008, is that correct?

A    That's correct.

Q    And, working backwards one page, if you could turn to Paragraph 7, which is at Page 4?

A    Yes.

Q    Do you agree that the schedule attached as Exhibit 1 is a summary indicating the time of partners, attorneys and other support staff of, and the words there used are, quote, "my firm," end quote, who were involved in this litigation, right?

A    I can see that's what Mr. Tompkins has said, yes.

Q    Right.  Were you involved in the U.S. litigation?

A    No.

Q    Directing your attention to the other attorneys from the London office who are on Exhibit 1, Page 3 of Exhibit 1, Mr. Murray, Ms. Govay and -- or Mr. Campbell, were they involved in the U.S. litigation?

Maton - Cross                                    224

A    No.

Q    You were asked several questions about the partnership agreement of the former CMHT-NY, LLP, which was marked as Plaintiff's Exhibit 110 in loose form; do you have that in front of you?

A    I have this here.

Q    Okay.  Let's start by turning to Paragraph 5.3.

A    Yes.

Q    And you were asked several questions by Mr. Rosenthal about Section 5.3.  Could you read for me the first two lines of Section 5.3?

A    "Except for amounts earned by a partner on behalf of and payable to CMHT-DC, all fees, salaries, proceeds, commissions and other compensation earned or received by any partner" -- do you want me to go on?

Q    No, that's it.  My question to you, did you understand that except for amounts earned by a partner on behalf and payable to CMHT-DC means that those amounts don't come in to the LLP, right?

A    Well, my understanding of that is that clause is in there as protection for the PLLC to ensure that where you have those partners who are partners of PLLC and partners of the LLP, that when they work on behalf of PLLC there is no question of LLP asserting a right somehow to the money.  So, it's the flip side of the LLP situation, so that --

Maton - Cross                                                 225

Q    Okay.

A    -- the LLP can't try and get its dibs into PLLC's work in the same way that PLLC can't get its dibs into LLP's work, there's a separation of powers.

Q    That's exactly right.  And when PLLC is filing a fee application in a California court for U.S. work, that money is the property of the PLLC, right?

A    Sir, can you just give me that question again?

Q    Sure.  And if CMHT-DC is filing a fee application with a United States court in California, the fees that are earned there go to CMHT-DC, right?

A    No.  To the extent that they are fees that have been incurred by and earned by PLLC, yes; to the extent they are fees that have been incurred by LLP and are payable to LLP, no, because they are fees payable to the LLP.

Q    Exactly.  Let me now move you to another section of this same agreement.  Could you please take a look at Section 5.1?

A    I have that.

Q    Okay.  And could you please read the first sentence of Section 5.1?

A    "Bank Accounts," underlined, "all funds, checks, notes and drafts received for and on behalf of the LLP shall be deposited promptly in the account or accounts maintained by the LLP in such bank or banks as shall be determined by the managing partner."

Maton - Cross                                      226

Q    And focusing on the words in the first and second line, "received for or on behalf of the LLP," you agree with me that if the funds are received for or on behalf of the Washington, D.C. office of Cohen Milstein, they belong to Cohen Milstein and do not have to be deposited in the LLP account, right?

A    Again, I'm not sure I understand that question.  Can you just --

Q    Oh, sure --

A    -- rephrase that?  I'm sorry.

Q    -- I'll split it up for you.

        Obviously, if a fee comes in as owed to the LLP, they put it into the LLP account, right?

A    Yes, agreed.

Q    If a fee comes in which is not for or on behalf of the LLP, you do put it in the LLP account, right?

A    Yes.  I mean, I agree -- if what you're saying is, if we as the LLP were somehow paid a fee that's payable to the PLLC, if for example, by some mistake, we had been sent a check that was attributable to a U.S. action in which we had no involvement, that clearly wouldn't be a fee that was attributable to LLP, it wouldn't be money that was held by LLP.  I mean, there would clearly be a banking issue as to what we would then do with the check, et cetera, but clearly we, as LLP, cannot take money that belongs to PLLC and vice

Maton - Cross                                              227

versa, it's the same principle.

Q   And if you could turn next in the document to 4.4?

A   Yes, I have that.

Q   Would you agree with me that the managing partner referred to there was Cohen Milstein in the U.S., right?

A   Correct.

Q   And you agree that this required Cohen Milstein to provide the LLP with all funding and other support that may be needed, right?

A   Correct.

Q   I'd like to direct your attention to Paragraph 4.1.

A   I have that.

Q   Do you see the second sentence of 4.1?

A   "Except as" -- is that -- do you want me to read --

Q   Please read the second sentence into the record.

A   "Except as specifically provided otherwise in this agreement, the managing partner shall have full power and authority to make all decisions for the LLP."

Q   And the managing partner at the time this was entered into was the law firm of Cohen Milstein, right?

A   Sorry, please --

Q   Oh, the managing partner at the time was Cohen Milstein?

A   Yes, yes.

Q   I think the record is already clear on this, but let me just confirm it.  The London office had no clients who were

Maton - Cross                                      228

involved in the California litigation, right?

A    Our client was the class counsel.

Q    And the class counsel, in your view, was whom or what?

A    It was Cohen Milstein Hausfeld & Toll, PLLC, that is the firm that instructed us to undertake the work.

Q    I would like to direct your attention to what was marked by the plaintiffs as Plaintiff's Exhibit 111, that is the terms of retention of you?

A    Yes, I have that.

Q    And I would like to turn you to the back of the document, this is the last two pages of the document, it has CMHT up top; do you see that?

A    Is this the guaranty?

Q    Yes, it is, that's exactly what we're going to be talking about.

A    Yes.

Q    And you agree that, under Paragraph A, CMHT-DC guarantees payment of any amount due to you during the currency of or after termination of the addendum, right?

A    Correct.

Q    And, moving down to B, do you agree that CMHT-DC guarantees the payments of all the indemnities under Clause 6.2 of the addendum on the same basis as in A?

A    Correct.

Q    And you agree that, under C, CMHT-DC guarantees payment

of professional indemnity insurance, including appropriate

runoff insurance, set out in Clause 6.3 of the addendum on

the same basis as in A, right?

A    Correct.

Q    And you agree, under D, CMHT-DC guarantees the tax

indemnity set out in Clause 7.4 of the agreement on the same

basis as set forth in A?

A    Agreed.

Q    If you could put before you Plaintiff's Exhibit 113?

A    Is that the Hogan Hartson letter?

Q    Yes, it is.

A    Yes, okay.  Yes, I have that.

Q    Okay.  And, first of all, I apologize if anything I said

in that letter insulted you.  Let me focus your attention to

not Paragraph 3, which you were asked about, but Paragraph 8.

A    I have Paragraph 8.

Q    Do you agree with me that in the initial fee submission

of September, 2008, that was the Tompkins declaration you and

I discussed, that there was no request that the London

lawyers be treated separately and treated as a separate law

firm?

A    Can I just clarify that the document we looked at

earlier, which I hadn't seen before with the exhibits, is

that the initial fee submission that was made to the court?

Q    Yes.

A    From what I have seen today, that appears to be so on the face, yes.

Q    Okay.  And, moving down a sentence or two, do you agree with me that at least you have never seen any court order from Judge Breyer saying that any amount of money goes to the London office, right?

A    I haven't, but, in my view, that's irrelevant.

Q    Oh, and that's perfectly fine.  I just want to make sure, you haven't seen any such order, right?

A    No, I haven't.

Q    And, with respect to the dispute which brings you to this Court, which doesn't involve you --

A    Yes.

Q    -- you don't have any view one way or the other as to whether the amount that the London office received should come out of Hausfeld, LLP or come out of Cohen Milstein, do you?

A    No, I have no view.

Q    I want to talk to you about the transfer agreement entered into January 15th, that's Plaintiff's Exhibit 112; can you put that before you?

A    I have that.

Q    And, as a matter of English law, it was your testimony on direct that when there's a reference under English law to the rights, interests and entitlements, that is, to put it in

Maton - Cross                                                231

your words, the whole shooting match, right?

A    Correct.

Q    But that's the whole shooting match with respect to what belongs to CMHT-NY, LLP, right?

A    Correct.

Q    And, therefore, you're not saying it's the whole shooting match, you're entitled to any fee that's ever awarded to Cohen Milstein, right?

A    If by Cohen Milstein you're defining Cohen Milstein as PLLC in regard of work undertaken by PLLC, then I agree with you.

        MR. KEENEY:  If I could consult for one minute, your Honor?

        THE COURT:  Take your time.

        (Discussion held off the record.)

        MR. KEENEY:  No further questions, your Honor.

        THE COURT:  Thank you.

        MR. ROSENTHAL:  No redirect, your Honor.  May the witness be excused, sir?

        MR. KEENEY:  With our consent, yes.

        THE COURT:  Okay, very well.  Thank you, sir, thank you for coming.

        THE WITNESS:  Thank you, your Honor.

        (Witness excused.)

        MR. KEENEY:  The next witness -- we're now back in

232

our part of the case, your Honor -- we call Mr. Toll.

THE COURT:  All right, very well.

(Pause.)

THE COURT:  Before we get to Mr. Toll, I have a question for Mr. Rosenthal, I guess.  Mr. Maton's firm got like $3 million and change, is that right?

MR. ROSENTHAL:  I think approximately $3.1 million, your Honor.

THE COURT:  How was that figure arrived at?

MR. ROSENTHAL:  That figure was arrived at --

THE COURT:  Because I look at --

MR. ROSENTHAL:  -- I believe, I would have to consult my -- but by the time they recorded --

THE COURT:  Yes, I looked at --

MR. ROSENTHAL:  -- times the multiplier.

THE COURT:  -- I looked at 52 -- oh, there's a multiplier of --

MR. ROSENTHAL:  There's a multiplier of approximately four that, I believe, and Mr. Hausfeld -- there will be testimony about that from Mr. Lehmann --

THE COURT:  Okay.

MR. ROSENTHAL:  -- about the multiplier.

THE COURT:  All right.  I'm getting ahead of you then, I'm sorry.

MR. KITTREDGE:  I'll have that explained, your

233

Honor.

THE COURT:  You're anticipating everything, as always.

MR. KITTREDGE:  Yes, sir.

THE COURT:  Mr. Toll, I have seen you here before, I think this is your third trip.

(Laughter.)

MR. TOLL:  I think this will do it, your Honor.

THE COURT:  You're still under oath, so...

STEVEN TOLL, Defendant's Witness, Previously Sworn.

DIRECT EXAMINATION

BY MR. KEENEY:

Q   Mr. Toll, could you please turn in the Defendant's Exhibit binder to Defendant's Exhibit 2?

A   I have it.

Q   And is this the confidential agreement that was reached by the Cohen Milstein firm with the Hausfeld, LLP firm?

A   Yes.

Q   Directing your attention to numbered Paragraph 1 at Pages 1 and 2, what is your understanding of the agreement with respect to fees to be received in the Air Passenger case?

A   Well, at the time this was entered into and signed, we knew there was a $23 million fee award, we knew it had to be allocated between -- among counsel, we knew that there were a few other firms that would get a small amount of money, and I

Toll - Direct                                    234

-- again, I didn't have firsthand involvement in the case, so I didn't know the exact amount other firms would get, but I expected that our firm would hopefully get -- and, when I say our firm, I meant Cohen Milstein would get $15 million or so -- maybe less, depending on what happened -- that we would then share 50-50 with the Hausfeld, LLP.

Q    And is there another reference to the Air Passenger case in Paragraph 12 of that agreement?

A    Yes, there's a reference there about the leadership issue.

Q    Can you just read into the record what that reference is? It's very short.

A    It says, "With respect to pending motions with respect to leadership in the Air Passenger, TransPacific and Railroad cases, the judges in each action will decide the appointment of co-lead counsel."

Q    And, ultimately, did Judge Breyer decide that Hausfeld, LLP would be appointed co-lead counsel rather than Cohen Milstein?

A    That's correct.

Q    And do you know when that happened?

A    No, but it was... I don't know, it wasn't that long after this, I don't know.

Q    Okay.  And after Hausfeld, LLP was appointed co-lead counsel did Cohen Milstein continue to serve in any way as a

Toll - Direct                                          235

co-co-lead counsel?

A    No, we were excluded from everything.

Q    By being excluded from everything, what do you mean by that?

A    Well, we didn't know what was going -- we knew there had been an appeal, we were hoping -- you know, there were efforts made to resolve the appeal so everybody could get paid, but we really had no knowledge of whether they were trying to do that or not.  We ultimately learned, because it became public, that they did resolve the objection, I think it was a few months later, I can't recall, because I wasn't that close to it, but it was somewhere in the -- I think the spring that the objection was resolved, and then we knew that the fees would be allocated between the co-lead counsel and, you know, whatever Hausfeld arranged with Kotchett, that we would get half of it.  And, ultimately, they didn't reach agreement, the judge had to decide it.

Q    Directing your attention back to numbered Paragraph 1 in Defendant's Exhibit 2 --

A    Yes.

Q    -- did you have -- excuse me, strike that -- was that provision negotiated before Magistrate Judge Rice with his assistance?

A    Yes.  This was, you know, clearly in the long day on January 23rd, this was a major issue, how money was going to

Toll - Direct                                236

be split up in not only these cases, but a lot of cases, but these cases specifically, because here, you know, we were agreeing to split them 50-50, so this --

Q   And when you say, these cases, just so the record is clear, are you referring to the cases that are in Paragraph Number 1?

A   Yes.  I'm sorry, the bullet point, I remember there being eight of them, let me see if there are eight, although -- one, two, three, four, five -- I don't know, maybe it's not eight.  There were different cases at different percentages in this whole document, but those cases in Paragraph 1, as I recall it, are 50-50 on the cases.

Q   And prior to this settlement agreement in Defendant's Exhibit 2 did Hausfeld, LLP have any colorable right to the fees that were incurred by Cohen Milstein prior to Michael Hausfeld's separation on November 6th, 2008?

          MR. ROSENTHAL:  Objection, your Honor --

          THE COURT:  Sustained.

          MR. ROSENTHAL:  -- it's obviously a question of law.

          THE COURT:  Sustained.

          MR. KEENEY:  Okay.

BY MR. KEENEY:

Q   Prior to the entry of this Paragraph 1, sharing fees on a 50-50 basis, did you -- were you aware of any piece of paper that allowed Mr. Hausfeld to keep fees for cases he worked on

Toll - Direct                                           237

at Cohen Milstein?

MR. ROSENTHAL:  Same objection, your Honor.

THE COURT:  Sustained.

MR. KEENEY:  Okay, let me try it this way.

BY MR. KEENEY:

Q   Were you aware during the course of the negotiations before Magistrate Judge Rice that Mr. Hausfeld was taking the position that he was entitled to all the fees on any case he had worked on as a partner at Cohen Milstein?

MR. ROSENTHAL:  Objection, your Honor, that's not even a fact and there's no foundation for it.  Mr. Hausfeld's position was it was 56-44, consistent with their equity interest, the equity in the two groups, that was always his position.

THE COURT:  I don't remember his position, but I don't know why it's relevant.

MR. KEENEY:  Okay, that's fine.

BY MR. KEENEY:

Q   All I'm trying to do is just establish that what we have is a negotiated resolution, is that right?

THE COURT:  I think we can stipulate to that, we were all there.

MR. ROSENTHAL:  We can stipulate to that, your Honor.

MR. KEENEY:  Okay.

Toll - Direct                238

THE COURT:  So, we had a negotiated resolution that seems to have broken down.

MR. KEENEY:  Great.

BY MR. KEENEY:

Q   Let me turn now to Paragraph 13 of Defendant's Exhibit 2.

A   Okay.

Q   Can you read into the record the first sentence of Paragraph 13?

A   "Hausfeld, LLP and each of the individual attorneys at Hausfeld, LLP unconditionally waive any claim to a share of fees and expense reimbursements for all cases and matters handled by CMHT prior to November 6th, 2008 other than as specified in Paragraphs 1 through 6 and 8 through 11."

THE COURT:  Just hold on one second.

Mr. Maton, I think Mr. Fryman was looking for you, did you find him?

MR. MATON:  I didn't, no, but thank you, your Honor.

THE COURT:  I don't know where he went, he might be in the lobby, maybe somebody can help you.

(Discussion held off the record.)

BY MR. KEENEY:

Q   And, Mr. Toll, directing your attention back to Paragraph 13 of Defendant's Exhibit 2, of the cases specified, Paragraph 1, one of those cases is the Air Passenger case, right?

Toll - Direct                                          239

A    Yes.

Q    Different topic.  Mr. Toll, I'm going to explore what amount you believe Cohen Milstein is entitled to from the Air Passenger fees and, in this connection, I'm going to show you a letter written by my worthy opponent, Mr. Rosenthal.

(Pause.)

Q    And this is Mr. Rosenthal's letter of July 24th to the Court.

MR. ROSENTHAL:  Are you putting this in as an exhibit, Mr. Keeney?

MR. KEENEY:  Yes, we're going to put this in as Exhibit 53.

(Pause.)

THE COURT:  I'm just trying to make sure I have the letter.  I have your letter about Mr. Diamond on the 24th...

MR. KEENEY:  Judge, this is what it looks like, two pages.

THE COURT:  You don't happen to have an extra copy, do you, Mr. Keeney?

MR. KEENEY:  Uh... no, your Honor, I apologize.

THE COURT:  All right.  Were you guys prolific letter writers before this case or did this just suddenly happen?

(Laughter.)

(Pause.)

Toll - Direct                               240

THE COURT:  Let me just make a copy of yours, we have a copier right here.

(Pause.)

THE COURT:  If you want to go ahead while, Mr. Keeney --

MR. KEENEY:  I actually need to have the letter in front of the witness, your Honor, I just want to get the dollar figures right.

THE COURT:  Well, you can stand there and ask him. Do you have your own copy?

MR. KEENEY:  Does he have a copy?

THE COURT:  No, I took his copy to get a copy.  You don't have one?

MR. KEENEY:  No.  We had one --

THE COURT:  Oh, you only had one?  Ah, okay.  All right, it will only take ten seconds.

MR. KEENEY:  I apologize for that.

(Pause.)

THE COURT:  Do you have a copy, Mr. Rosenthal?

MR. ROSENTHAL:  Yes, I do.  Thank you.

THE COURT:  Okay.

(Discussion held off the record.)

BY MR. KEENEY:

Q    Mr. Toll, I want to take you down to just the dollar figures there.  Do you see reference to a $6,793,580 item?

Toll - Direct                                    241

A    6,793,579, yes.

Q    Okay.  And what is that item?

A    Uh... it appears that that's the amount Mr. Rosenthal said they were going to put it in an escrow, that amount.

Q    Yes.  I'm directing your attention very specifically to the last paragraph of the letter on Page 2.

A    Yes, I see that.

Q    Okay.  Now, what is the $3,075,868 figure?

A    That's the money that apparently they sent to London.

Q    What's the $1,090,777 figure?

A    That's the money that Hausfeld, LLP apparently deposited in its bank account.

Q    And, totaling those three figures, do you get a total of money received by the Hausfeld firm in the first instance in Air Passenger of $10,960,225?

A    Well, I said I was good without a calculator -- it looks like it's very close to $11 million --

Q    Okay.

A    -- a little under.

Q    And is that the number that the 50-50 share for Cohen Milstein should be applied to, in your view?

A    Absolutely.

Q    And if you apply 50 percent to $10,960,225, do you get $5,480,112.50?

A    You know, it sounds about right.  I've always been using

Toll - Direct                                242

11 million and five and a half, it's a lot easier as a rough number.

Q   Okay.  I'd like to direct your attention to the Tompkins declaration, which has already been put into evidence as our Defendant's Exhibit 52.  I think there's a copy --

THE COURT:  This is, what, 53, this Rosenthal letter?

MR. KEENEY:  That was 53, your Honor, yes.

THE COURT:  Okay.

THE WITNESS:  Yes, I see it here.

BY MR. KEENEY:

Q   I'd like to direct your attention in the Tompkins declaration to the fourth page.

A   I see it.

Q   And Paragraph 7.

A   Yes, I see it.

Q   Based on Paragraph 7, do you have an understanding of whose time is being submitted by this application?

A   Well, it's --

MR. ROSENTHAL:  Objection, your Honor, to his understanding.  I'm not sure why his understanding is relevant here.

THE COURT:  Was he involved in this document?

MR. KEENEY:  No.

THE COURT:  All right, I'll sustain the objection.

Toll - Direct                                     243

You can rephrase it.

MR. KEENEY:  Let me ask a different question.

THE COURT:  Okay.

BY MR. KEENEY:

Q    In Paragraph 7, is there a reference to, quote, "my firm's current billing rates"?

A    Well, it's got "my firm" throughout the paragraph in a number of different -- my firm's time records, my firm's billing rates and personnel's employment by my firm, and so on.

Q    And, turning to Page 5, is it submitted by a law firm?

A    Yes.

Q    What law firm is identified on Page 5?

A    Well, it's our law firm, Cohen Milstein -- at the time, Cohen Milstein Hausfeld & Toll, PLLC submitted this.

Q    And is it signed by someone who was at your law firm at the time?

A    Yes, Mr. Tompkins was a partner in the firm who submitted this on behalf of the firm.

Q    And it also has two other partners -- or it has two other attorneys identified, a Michael Hausfeld and an Andrea Hertzfeld; were they both at Cohen Milstein at the time?

A    Yes.

Q    And do you see the designation, "Co-lead plaintiff's counsel"?

Toll - Direct                             244

A    Yes.

Q    Does that mean that Cohen Milstein as a firm was the co-lead plaintiff's counsel at that time?

A    Yes, that's my understanding.

Q    And, directing your attention to Exhibit 1, do you have an understanding that the time referred there is Cohen Milstein Hausfeld & Toll, LLP time of those attorneys?

            MR. ROSENTHAL:  Your Honor, I'm going to object. The document speaks for itself and, again, I'm not sure what his understanding has anything -- why his understanding is relevant.

            THE COURT:  How about that, Mr. Keeney?

            MR. KEENEY:  Okay, let me rephrase that question.

            THE COURT:  Okay.

BY MR. KEENEY:

Q    Directing your attention to Exhibit 1, that's a three-page exhibit, is that correct?

            (Pause.)

            MR. ROSENTHAL:  Your Honor, we can stipulate that the document says what it says.

            THE COURT:  Yes.  Where are we heading?

            MR. KEENEY:  Yes, that would be great, your Honor --

            THE COURT:  All right.

            MR. KEENEY:  -- we accept that.

Toll - Direct                                            245

THE COURT:  Okay, all right.

BY MR. KEENEY:

Q   I would like now to turn to the partnership agreement of the London office of Hausfeld -- excuse me, the London office of Cohen Milstein, excuse me, and we have that as a document that has marked and is sitting up there at your desk; do you see it?  It's Plaintiff's Exhibit 110.

A   Yes.

Q   Can you explain what Plaintiff's Exhibit 110 is?

A   It's the agreement that was set up when we first established the London office.

Q   And what was the nature of the relationship between Cohen Milstein in the United States and the London office?

A   Well, we were the, as was stated before, managing partner, we were the 99-percent owner of the London office, and the other one percent was owned -- myself and Mr. Hausfeld each owned 0.45 percent, I think, and Mr. Friedman had 0.10 percent, if I remember correctly.

Q   Did Cohen Milstein supply the funding for the office?

A   The London office, yes, we did.

Q   Did Cohen Milstein supply all the funding for the London office?

A   Uh, yes.  I'm trying to think if there's any -- yes, it spent millions and millions of dollars, yes.

Q   I'm going to show you an order awarding attorneys' fees

Toll - Direct                                   246

and costs, which was actually attached to Plaintiff's Exhibit 113; do you have that in front of you?

A    I see 113.

            (Pause.)

            THE COURT:  It's an August 3rd letter from Mr. Keeney.

            THE WITNESS:  I see the order here, yes.

BY MR. KEENEY:

Q    You see the order?

A    Yes.

Q    And the order is dated what date?

A    Let's see, it says -- well, it's dated October 31, 2008.

Q    And do you understand what that order means to the law firm of Cohen Milstein on October 31, 2008?

            MR. ROSENTHAL:  Objection, your Honor.  Again, I'm not sure what his understanding --

            THE WITNESS:  Yes.

            MR. ROSENTHAL:  -- has to do with what's going on here.  I mean, the document is the document.

            MR. KEENEY:  Okay, let me rephrase that question.

            THE COURT:  All right.

BY MR. KEENEY:

Q    In the order dated October 31, 2008, is Cohen Milstein still the co-lead counsel for the class?

            MR. ROSENTHAL:  Objection, your Honor.  The document

Toll - Direct                          247

speaks for itself, there's no mention of Cohen Milstein in this document.

THE COURT:  Well, I guess he's asking him as of that time --

MR. KEENEY:  Exactly.

THE COURT:  -- that the order was issued who was co-lead counsel.

MR. ROSENTHAL:  Okay, fair enough.

THE WITNESS:  Yes, Cohen Milstein was one of the co-lead counsel.

BY MR. KEENEY:

Q   Were there other co-lead counsel?

A   I believe just the Kotchett firm was the other one.

Q   And, with respect to this judge's order, it awards attorneys' fees to the co-lead counsel for the class, right?

A   Yes.

Q   Directing your attention now to... now back to the partnership agreement of Cohen Milstein, New York, LLP, Exhibit 110; can you put that in front of you?

A   I have it.

Q   Is there any provision of Plaintiff's Exhibit 110 which gives CMHT-NY, LLP any right to the attorneys' fees in the Air Passenger case as of October 31, 2008?

A   No.  I mean, the --

Q   And why do you conclude that?

Toll - Direct                            248

A    Well, the whole notion of our agreement with the London office is all the fees earned in U.S. litigation belonged to Cohen Milstein.  The London lawyers, you know, they're not licensed in the U.S., as Mr. Maton said, we're not licensed to practice in the U.K., they're not licensed to practice in the U.S.  We can't go into a court in the U.K. and get fees, even if we did something to help them, and they couldn't come into a court in the U.S. and get fees.

THE COURT:  Do you think the case could have been settled before Judge Breyer if the U.K. plaintiffs had not been wrapped into it?

THE WITNESS:  The U.K. plaintiffs were wrapped into it --

THE COURT:  Well, there was no U.K. case, so I misspoke.

THE WITNESS:  Yes.

THE COURT:  The potential for claims by U.K. passengers could -- if there wasn't some provision to resolve that, do you think the case before Judge Breyer would have been settled?

THE WITNESS:  Well, your Honor, I would say this, these were debates like at the firm.  We could, Cohen Milstein, could settle a case before Judge Breyer globally, whether we had a London office or not.

THE COURT:  No, but would the defendants have

Toll - Direct                                    249

settled the case without getting some comfort level that they weren't going to get sued again in the U.K.?

THE WITNESS:  You're absolutely right, no.  But we could have done that with any, you didn't need a London office to do that.

THE COURT:  But did Mr. Maton's firm do $800,000 worth of work on that, according to the billing under Exhibit 52?

THE WITNESS:  The did work on it, but he said they did no work on it with regard to the U.S.  What they were doing was investigating possible claims in the U.K.

THE COURT:  Yes, but weren't the two cases, I guess for lack of better words, inextricably intertwined, for settlement purposes?

THE WITNESS:  No, your Honor.  Well, yes and no. Let me explain, because I've being this, the same thing now, we discussed this convarient case.  A defendant typically wants --

MR. ROSENTHAL:  Your Honor, if I could just object. I mean, I don't want to object to your question.

THE COURT:  Sorry, that's okay, I'm not offended.

MR. ROSENTHAL:  I understand, I mean, we've not laid a foundation for Mr. Toll's personal knowledge about this. He did not work on the case, at all.  I'm not sure how he has personal knowledge of anything.

Toll - Direct                          250

THE COURT:  Well, I guess I'm asking -- let me rephrase my question here.  It was a good objection.

MR. ROSENTHAL:  Thank you, your Honor.

THE COURT:  Based on your experience as a class action lawyer, do you believe that it would be an impediment to settling Judge Breyer's case if there hadn't been some comfort level given of the defendants, they wouldn't be sued separately in the U.K.?

THE WITNESS:  You try, let me -- your Honor, I've done this exactly now, the same thing.  We have settled the case globally in the U.S. Court, where the issue is the defendant wants to get global resolution, if they can.  There is a real question whether the U.S. Court can give that global resolution.

THE COURT:  Well, they didn't, but apparently --

THE WITNESS:  Right.

THE COURT:  -- at least, according to Mr. Maton, there was something that he did over there to help give British Airways some comfort level, isn't there?

MR. ROSENTHAL:  And I believe that Mr. Feinberg's testimony was that there was a jurisdictional challenge and Judge Breyer overruled that jurisdictional challenge and took in the U.K. case in order to settle the thing globally.  That was Mr. Feinberg's testimony.

MR. KEENEY:  That was not Mr. Feinberg's testimony.

Toll - Direct                                    251

THE COURT:  All right, I didn't mean to get us sidetracked here.

THE WITNESS:  I'll explain this easy on it.  The point is, when you try to settle a case globally like that, you want the defendants to know that if they don't settle globally, we may sue them in Europe.

THE COURT:  Right.

THE WITNESS:  Okay, so, if they refuse to do it globally, then you just settle in the U.S. and then you have to separately sue them in Europe.  So, the threat of litigation in Europe is a factor that weighs into their mind and makes them settle globally.  But, you know, you don't -- as Mr. Kacheck (ph) did not, you don't have to have a London office to do that.  You could hire any London solicitor who could be your London lawyer if you carry out your threat, in case they don't settle.  So, I'm not saying they didn't do work that was helpful on the notion that they understood we could bring a case in the U.K. because we had someone, but we could have just as easily gotten someone else.  And not putting them down, at all, I'm just saying it wasn't necessary.

THE COURT:  Okay.

BY MR. KEENEY:

Q   Mr. Toll, you were in the court when Mr. Feinberg testified earlier, right?

Toll - Direct                                    252

A    Yes.

Q    And if this was not a lodestar award by Judge Breyer, how can Hausfeld LLP pay the New York based LLP lawyers in London, based on their time multiplied by a multiplier?

MR. ROSENTHAL:  Objection, foundation.

THE COURT:  How can he answer that?

MR. KEENEY:  I don't know, your Honor, that's why I'm asking him the question to see if he can.

THE COURT:  Well, doesn't it -- he wasn't involved with that, was he?  So --

MR. KEENEY:  Well, the question is more general, which is, in a case in which the testimony is that the fee award is not based on the lodestar, should a multiplier, in your experience, be applied -- strike that -- is a multiplier, in your experience, applied to post fee award work?

MR. ROSENTHAL:  Objection, in what kind of cases, your Honor, antitrust cases, securities cases?

THE COURT:  You know, let's say in a case like this.

MR. ROSENTHAL:  Antitrust case.

THE COURT:  An antitrust case.  Do you know the answer to it?

THE WITNESS:  Well, yes.

THE COURT:  What's the answer?  Can it or can't it?

THE WITNESS:  This was a very different situation

Toll - Direct                    253

than 99 percent of settlements, your Honor.

THE COURT:  I know, but just answer the question, then you can explain it.

THE WITNESS:  Okay.

THE COURT:  Yes or no, can a lodestar be applied in a case like this where the fee award did not include a lodestar?

THE WITNESS:  Can a lodestar be applied or --

THE COURT:  Or a multiplier or whatever the terms are.  Can a multiplier be applied when the judge didn't include a lodestar in fee award?

THE WITNESS:  The multiplier, your Honor, is implicit --

THE COURT:  Why don't you ask him another question.

BY MR. KEENEY:

Q   Let me rephrase this.  If a fee award is based not on time, but on a fixed amount of recovery --

THE COURT:  Such as this case.

Q   -- such as this case, is a multiplier ordinarily applied to post-award time, essentially finalizing the fee award after the fees have been awarded?

MR. ROSENTHAL:  Objection, your Honor, foundation and what kind of case is he talking about.

THE COURT:  Well, he's asking --

MR. ROSENTHAL:  Is he talking about securities

Toll - Direct                                254

cases, is he talking --

THE COURT:  In an antitrust case.

MR. ROSENTHAL:  In an antitrust case.

THE COURT:  So, I'll overrule the objection.  Yes or no and then you can explain.

THE WITNESS:  Generally, the answer is no.

THE COURT:  Okay.

BY MR. KEENEY:

Q    And why is the answer no?

A    Well, because part of when you get a fee award in a case, whether it's done on percentage or a lodestar multiplier, if you end up with -- part of it is the risk involved in litigation.  It's one of the many factors the courts have to look under the Gersh (ph) factors.  And obviously, when a settlement's done and over and all the work you do after in settlement administration, you know, we go in and apply for settlement administration times in some cases, we never ask for multiplier, because there is no risk, the case is over. You're just doing clean-up work.

Q    Now, I'm going to direct you forward in time to January 15, 2009.  Were you involved in the negotiation and the signing a transfer agreement between Cohen Milstein and the London lawyers?

A    Yes, I remember very well.

Q    And if you could put in front of you what's been marked

Toll - Direct                                    255

as Plaintiff's Exhibit 112.

A    I see it.

Q    Is that the transfer agreement, as finally agreed to, between Cohen Milstein and the London lawyers?

A    Yes.

Q    And directing your attention to the now paragraph on page one, the reference to transfer all of their rights, interests and entitlements in CMHT-NY, LLP, did you have an understanding of what that term meant?

A    Yes.

Q    What was that understanding?

A    Well, that they basically, the London office operations, we were transferring to them all their work on European matters, everything that they were going to make in the future, we were selling that to them.

Q    Were you selling them Cohen Milstein, fee awards that Cohen Milstein had already been awarded but had not yet collected?

A    Absolutely not.

Q    Would that have made any economic sense for Cohen Milstein to do that?

A    Well, zero economic sense.  You have to -- this deal was done and Mr. Maton described some of the background to it, you know, very accurately.  Mr. Hausfeld was gone.  They were very concerned because they were doing, you know,

Toll - Direct                                 256

international cartel work with him.  We told them we didn't want to continue that work and they wanted to free themselves up, either to join Mr. Hausfeld or do something else.  And we said, Gentlemen, we've put out like $6 million, $5 to $6 million to run this office for a year and a half.  We've gotten zero and they said, well, but we have an employment agreement with you and you know, you've got to pay us for the next year and a half.  And we basically said yes, you're right, we can't break that, but we don't really want to continue.  We negotiated and we said, look, we'll pay you for four months.  Instead of us getting $6 million back over future income, you'll give us $2 million.  And if you notice, it as negotiated strongly, because they were basically telling us they were broke.  They weren't going to get money for years.  We gave them six years to pay it off.  There were wall kinds of things in here about limited amounts of gross profits.  They said they had no money coming for years.  Why would -- we wouldn't even think the idea that we're going to give them $3 million in the <u>Air Passenger</u> case in another couple of months?  It was ludicrous.  It wasn't even thought of.  It's not conceivable that that was part of the deal.

Q   Prior to the transfer, so, this is prior to January 15, 2009, did the London office of Cohen Milstein have any separate interest in the fees awarded by a U.S. Court to Cohen Milstein?

Toll - Direct                    257

A    No, none.  I think they have no legal right.  I mean, I've been involved in a case that exactly and you know, not a member of the bar of the court.  You're not admitted to practice in the court, you can't collect a fee in the court, is my understanding, legally, without --

        MR. ROSENTHAL:  I'm going to move to strike that answer, your Honor.  He's offering a legal opinion.

        THE WITNESS:  That's my understanding, your Honor.

        THE COURT:  I'm going to overrule it.

BY MR. KEENEY:

Q    And after January 15, 2009, did this transfer agreement give them any greater right than they would have had before in any fee recovery by Cohen Milstein from a United States Court?

A    No, none.  It was all foreign, all the foreign work they were doing.  The cases they were investigating -- pursuing in London in the cartel area, we were basically saying, those are yours.  You know, that's it.  But they never had any rights before this or after it to U.S. cases.

Q    Okay, did you see a letter that was filed by this Court, as an attachment by Mr. Rosenthal?  It was a letter that was signed by the former London partners asserting an interest in the Air Passenger case?

A    I did see that, yes.

Q    Do you agree or disagree?

Toll - Direct                                    258

A    I vehemently disagree with what they wrote.

Q    Why?

A    It is totally illogical that any money on the <u>Air Passenger</u> case, that we worked on and Mr. Maton now says they didn't even work on the U.S. case that settled.  They were working on potential London litigation that never came about because they wrapped up a global settlement in the U.S.  And we were paying them their salaries and fees.  We paid them billions of dollars for that work.

Q    And when you said they wrapped a global settlement in the U.S. --

A    Yeah.

Q    -- who is they?

A    Yeah, Mr. Hausfeld, our firm wrapped up a U.S. settlement without the need to have to file in Europe.  If we ended up filing in Europe, we would have used the London office and they would have earned fees on that matter.

Q    In the October 31, 2008 order from Judge Breyer, awarding the $23 million in fees to class counsel came in before or after Mr. Hausfeld departed from Cohen Milstein?

A    Well, it came in before as was shown by Mr. Rosenthal, your Honor, by projection letter of November 6th that was based on the $23 millions, based on discussions with Mr. Feinberg I had in '08 and '09, based on discussions with Mr. Hausfeld and Mr. Eisler at executive committee meeting about

Toll - Direct                                     259

what could the firm expect in the Air Passenger case, but we had these discussions in the summer of 2008.  As we were having executive committee meetings, we knew this hearing was coming up and the submission was going to be in September. So, we expected this fee, hopefully, if there was no objections, maybe come in this year.  We kept saying how much is our firm going to get.  I was led to believe $16 to $18, although that was probably a little aggressive, but that was the hope, because we did more of the work.

Q    In your view, did Hausfeld LLP have any right to deduct from your 50 percent share of Air Passenger fees, this payment that it sent overseas to the London lawyers?

          MR. ROSENTHAL:  Objection, your Honor.

          THE COURT:  What's the objection?

          MR. ROSENTHAL:  I'll withdraw it, right.

          THE WITNESS:  I believe they had absolutely no right to do so.

BY MR. KEENEY:

Q    Why is that?

A    It is absolutely, in my opinion, prohibited and in conflict with the settlement agreement we reached and you know, hammered out before the judge, about these specific cases, that we would split those fees 50/50.  There was no other firms getting any part of that money.  It was never discussed, never raised.  At the mediation, it was never

                              Toll - Direct                    260

raised while Michael was at our firm all summer and fall,

when we talked about this case, that any money goes to the

London lawyers.  It was inconceivable.

Q    Are you aware that an escrow of certain moneys from Air

Passenger was entered into by this Court, by Magistrate Judge

Rice?

A    I understand the Judge, I believe, entered an order about

a certain amount of escrow -- an escrow account being set up,

I thought, for $8 million or so.

Q    And is the amount in the escrow account more than enough

to pay a 50 percent share to Cohen Milstein that you are

claiming?

A    Yes, we are owed, you know, a little under -- slightly

under $5.5 million.

        MR. KEENEY:  We have no further questions.

        THE COURT:  All right, thank you.  Any questions,

Mr. Rosenthal?

        MR. ROSENTHAL:  Very briefly, your Honor.

        THE COURT:  All right.

                        CROSS-EXAMINATION

BY MR. ROSENTHAL:

Q    The settlement agreement in -- the settlement agreement

between Cohen Milstein Sellers & Toll or the partners of

Cohen Milstein Sellers & Toll, Mr. Hausfeld, Mr. Lewis, Mr.

Eisler and Mr. Lehmann was entered on February 2 -- I mean,

Toll - Cross                                    261

February 5, 2009, correct?

A    It was signed by different people on different days, but right in that time frame, yes.

Q    Right.  And your sale, CMST's sale of CMHT New York, LLP was on January 15, 2009, right?

A    Correct.

Q    Which was a few weeks before, before the settlement agreement in this case -- the settlement agreement before Judge Rice was entered, right?

A    I agree with you on that, Mr. Rosenthal.

Q    Now, you agree, don't you -- well, let me ask you this. Did you personally work on the Air Passenger case?

A    I did not.

Q    Do you have your own personal knowledge of how the settlement agreement was actually -- the settlement in the Air Passenger case was arrived at?

A    The actual settlement, I don't have firsthand knowledge, no, just secondhand.

Q    Do you have any firsthand knowledge about, you know, how the parties ended up negotiating the fee awards?

A    Just from talking to Ken Feinberg.  I don't have personal knowledge.

Q    Now, you know that October 31, 2008 award of $23 million is not only to the co-lead counsel, but to all class counsel, right?

Toll - Cross                                                262

A    I think I said that, yes.

Q    And you certainly expected that there would be time spend on the case by class counsel after the entry of the award, didn't you?

A    There's usually always time spent.  I didn't know the depth of what would have to be spent, but there's always time spent in the settlement post settlement by class counsel.

Q    In fact, in June of this year, your own firm CMST, submitted a claim of additional time to the co-lead counsel for post-November 6th recorded time by CMST, itself, didn't it?

A    I suppose.  The Hausfeld firm asked if we had any time after November 6th and I'm sure the people in my firm, who were familiar with the matter, gave them what they asked.

Q    For work done post-November 6th, your firm submitted it.

A    Okay.  I don't know.  I told you, I expect there's always post-settlement work done.

Q    If you would, turn to Defendant's Exhibit 2, please?

A    I have it.

Q    And if you would, please read paragraph 11 on, I guess there are no numbered pages, but it's CMST00006.  Please read that into the record.

A    Okay.

Q    Please read it into the record, Mr. Toll, I'm sorry.

A    "As to any and cases in which CMHT was involved prior to

Toll - Cross                                     263

November 6, 2008 and in which Hausfeld LLP is or will become involved as counsel, Hausfeld LLP shall receive 100 percent of any fees and expense reimbursements awarded for work done by Hausfeld LLP on or after November 6, 2008. And CMST and each of the individual attorneys at CMST unconditionally waive any claim to any share of fees and expense reimbursement awarded in such cases for work done by Hausfeld LLP on or after November 6, 2008.

Q   Okay, so, you agree, don't you, the fees and expense reimbursements made to Hausfeld LLP for work done after November 6th, on cases that began at CMHT before November 6th, belong exclusively to Hausfeld LLP under this paragraph, right?

A   No, no.

Q   Hausfeld LLP has no entitlement to its own work after November 6th, is that what you're saying?

A   Not in this case. I'm saying in a lot of cases it does.

        THE COURT:  He's asking you under that paragraph.

        THE WITNESS:  Yes, that's my understanding.

Q   So, the Air Passenger case is excluded from this paragraph?

A   Well, the Air Passenger case, the fee is different. In other words, Mr. Feinberg talked about this, your Honor, just so you know, because this is the same. This was very unusual what happened here. In 99 percent of antitrust and

Toll - Cross                                        264

securities cases, you do not have a negotiated fee with the defendant.  What happens is, you reach a settlement amount.  You do not discuss fees.  And then the lawyers make a submission to the Court for a fee out of the settlement.  That's 99 percent of the cases.  So, this was very unusual.  In those cases, Mr. Hausfeld, if there was work done and the case was over now, under the settlement agreement.  And then Hausfeld did work done after that and there was a -- they could make a new fee application that it would be theirs.  But this was not such a case as Mr. Feinberg said.  This was a case that was going to be no fee submission later.  That the money that was awarded was $23 million was, you know, whether you did, you know, 50 hours or 5,000 hours over the next year or two.  And so, that was the understanding.  It was not going to be for work done later.  It was all subsumed in the original amount.

Q    To be included -- to include work done later.

A    Yeah, and that's --

Q    That's exactly Mr. Feinberg's testimony, right?

A    Yeah, and that's why Hausfeld's getting five and a half million dollars, that it's going to include their work done before and after, that's part of the deal we struck, was the after and as Feinberg said, it covers all the time, before and after.  That was the deal.

Q    Is it your testimony that, well, CMHT-New York LLP,

Toll - Cross                                    265

clearly was a separate entity from Cohen Milstein, wasn't it?

A    It was definitely a separate legal entity, there's no dispute.

Q    And under the partnership agreement, which is Plaintiff's Exhibit 110, they have a right to keep all of the fees earned by partners on behalf of the LLP, Cohen Milstein-New York LLP, correct?

A    On behalf of which partners?

Q    The partners of CMHT-New York LLP.

A    You mean including Cohen Milstein?

            THE COURT:    No.

Q    The work done on behalf of CMHT-New York LLP.

A    Yeah, but Cohen Milstein doesn't do work on behalf of CMHT LLP.  The -- okay, I think I follow your question.  Yes, the partners of CMHT LLP, who do work for CMHT LLP, work that is European based work that they can be compensated for as an LLP, belongs to them.  It does not belong to Cohen Milstein PLLC.  That's different than --

Q    Plaintiff's Exhibit 110, the partnership agreement?

A    110 is the partnership agreement, yes.

Q    You didn't submit this to Judge Rice in the several letters that you wrote to him, did you?

A    I didn't submit anything to Judge Rice.  My counsel submits things to Judge Rice.

Q    Well, why wasn't it submitted to Judge Rice by you?

Toll - Cross                                    266

THE COURT:  I think he said he -- all right, he didn't do it.

THE WITNESS:  I could answer that, your Honor.

Q   Okay, it's your testimony that the lawyers, the fixed chair partners and any associate in CMHT-New York LLP, who did work on the Air Passenger case, were doing work exclusively, exclusively, on a U.S. case is that what you're saying?

A   Well, they said they did not work on the U.S. case and so, that's what they said.  I don't know what they did, personally, working on the matter.  But from what I heard, they did not work on the U.S. case but they were doing a lot of business development type work in London.

Q   Isn't it true that claims on behalf of the U.K. passengers were wrapped into the settlement of the case before Judge Breyer?

A   Sure, yeah.

Q   Right.  And there's a settlement claims process that was set up in the U.K., correct?

A   I think that's right, yeah.

Q   And a notice in the claims process, set up in the U.K., correct?

A   Yeah, yeah.

Q   That only British lawyers could administer, right?

A   Yes.

Toll - Cross                          267

Q   I'll ask you a couple of more questions.  If you would, take a look at the order which is appended as Exhibit 1 to Plaintiff's Exhibit 113.

A   Yes.

Q   Please read, under paragraph one, where it says dollar amounts?

A   Yes.

Q   It says British Airways will pay $46.3 million plus $1 million to resolve U.S. purchaser claims and up to $45,539,000 pounds to settle the U.K. purchaser claims, right?

A   Yes, I see it.

Q   And the next sentence says, Virgin Atlantic will pay approximately $12.6 million to resolve U.S. purchaser claims and up to $27.9 million pounds, roughly, for the U.K. purchaser claims, right?

A   Yes.

Q   So, the U.K. purchaser claims were clearly contemplated by Judge Breyer's October 31st award, correct?

A   Yes, we do this all the time, Mr. Rosenthal, we have cases that I settle for both the U.S. and foreign purchasers in U.S. Courts.  That's what we do all the time.  I've done it numerous times in cases and it's done by U.S. lawyers.  And if you remember Ms. Drolet's testimony about this, she talked about this.  That the London lawyers were basically,

Toll - Cross                                                    268

the way the accounting is set up, it's almost like they're contract lawyers.  Actually, Mr. Maton said it, as well, that we were their client.  We hired them out to do the work.  Now, does it make any logical sense that we're going to pay them a couple of millions in salaries.  They could put in lodestar and then they'd get the lodestar, too and we get nothing.  So, we're out millions in expenses and then they get the fees.  It's incomprehensible.  The fees belong to us.  We're paying the salaries and revenue -- that's their revenue under British Law -- that's what they get, the millions of dollars that we pay them as Ms. Drolet said.  That's how it's accounted for, that's their revenue and then the fees is ours.  It's not theirs.  Then we get nothing if they get the fees.  We pay them and they get the fees, it's crazy.

THE COURT:  Where does it say that in the agreement that you get to keep 50?

THE WITNESS:  It doesn't say it.  There are not their fees, your Honor, that's the point.  This application to the Court is a Cohen Milstein Hausfeld & Toll, PLLC applications.  That's not in the agreement.

MR. ROSENTHAL:  I have no further questions.

MR. KEENEY:  No further questions.

THE COURT:  All right, thank you.

THE WITNESS:  Thank you.

THE COURT:  Any other witnesses?

Toll - Cross                          269

MR. KITTREDGE: Yes, your Honor.

THE COURT:  Mr. Lehmann, is that who it is?

MR. KITTREDGE:  Lehmann, yes.

THE COURT:  Lehmann.

MICHAEL LEHMANN, Defense Witness, Sworn.

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Michael Lehmann, L-E-H-M-A-N-N.

THE COURT:   All right, Mr. Kittredge.

MR. KITTREDGE:  Thank you, your Honor.

<u>DIRECT EXAMINATION</u>

BY MR. KITTREDGE:

Q   Mr. Lehmann, would you state your office address, please?

A   My office address is the San Francisco offices of Hausfeld, LLP.  44 Montgomery Street, Suite 3400, San Francisco.

Q   Were you, at one time, an equity partner with Cohen Milstein Hausfeld & Toll?

A   Yes, I was.

Q   And same office?

A   Yes.  Actually, I was at the -- in the San Francisco office, but at a diferent address at One Embarcadero Center.

Q   And what was your tenure at Cohen Milstein Hausfeld & Toll?

A   I joined CMHT in August, 2007.  I left it on November 12,

Lehmann - Direct                                    270

2008.

Q   And why did you leave?

A   I viewed myself as having been constructively evicted from the partnership.

Q   You weren't invited to any of the secret meetings?

A   I was not.  I learned about the departure of Michael Hausfeld at the hands of his partners, from a firm-wide meeting at a period after the fact.

Q   When did you join Hausfeld, LLP?

A   I joined it on August 1, 2007.

Q   Excuse me, when did you join Hausfeld, LLP?

A   Oh, sorry, I joined that on November 12, 2008.

Q   The same date you left Cohen Milstein?

A   Yes.

Q   Now, during your time at Cohen Milstein, did you work on the Air Passenger case?

A   Yes, I did.  I worked on it a little in 2007 and ramped up my work in 2008 and did a lot in 2009.  I attended all of the major court hearings in 2008.  Did a lot of work on the fee briefing and responses to the objectors.  Did work responding to the efforts of CMST, to substitute itself as lead counsel in the case.  Did work on the appeal briefs and on the 9th Circuit mediation with the objectors who appealed the fee award and the settlement approval award.  And also did work in connection with the fee allocation mediation.

Lehmann - Direct                                    271

Q    Was the settlement award -- settlement opinion by Judge Breyer separate from the "awarding of fees"?

A    Yes, he had a separate order dealing with the fees and a separate one dealing with the settlements.

Q    And do you have before you -- does he have Plaintiff's Exhibit 113, I think it is.  It should be up there.  It's not in the book.

THE COURT:  It's an August 3rd letter from Mr. Keeney.  It's an attachment to that.

THE WITNESS:  Yes, I do.

Q    And is that attachment the Judge's "fee award"?

A    Yes, it is.

Q    October 31st?

A    Correct.

Q    And you said it was appealed?

A    Yes, the objectors, there were three of them, three British individuals appealed separately both the order, final order approving the settlements and this order awarding attorney's fees and costs.

Q    Okay.  When did Hausfeld, LLP become co-lead counsel?

A    Hausfeld, LLP was appointed as co-lead counsel in the Air Passenger case by the court, I believe, on November 14, 2008, about a week after it was created.

Q    All right.  Had it, by that time, had Cohen Milstein Sellers & Toll also requested Judge Breyer to permit them to

Lehmann - Direct                           272

continue as co-lead counsel?

A    Well, what happened was after the administrative order replacing CMHT as lead counsel and appointing Hausfeld, LLP, CMST made a motion for reconsideration and the Court entertained full briefing on that, held a hearing in January, 2009 and rejected CMST's motion.

Q    Did the Court indicate its reasons for rejecting that motion?

A    Yes, it considered the fact that, you know, the expertise and all of the work that had been built up in the case resided in attorneys now at Hausfeld LLp and that the attorneys at CMST, who sought to be substituted in, knew nothing about the case and would add no value to it.

Q    Now, were you involved in the discussions among counsel with regard to the allocation of the fee award?

A    Yes, I was.

Q    And would you explain that process to the Judge?

A    Certainly.  The appeal by the objectors was resolved on April 1, 2000 -- 2009, sorry.  And at that point, the two co-leads, Hausfeld LLP and the Kachet (ph) Petrie law firm met myself and Steve Williams of Kachet Petrie.  And first, we decided to deal with all the other counsel, other than the co-leads, who had put in time and fee requests in the case.

What happened there was that, at the end of April, 2009, Steve Williams sent a letter to most of those counsel,

Lehmann - Direct                          273

inviting --

THE COURT:  That's not in dispute here.

THE WITNESS:  Okay.

THE COURT:  And I read Judge Breyer's orders.

THE WITNESS:  Okay, well --

THE COURT:  Go ahead, you can ask another question.

MR. KITTREDGE:  Well, I believe, your Honor, we're getting to the basis for the allocation and how that took place.

THE COURT:  All right.

THE WITNESS:  What basically happened is we invited all the other counsel to supplement their time with whatever additional time they wanted to have considered for compensation.  That request was made at the end of April. Among those who submitted additional time were CMST.  There was an e-mail provided by Dan Small, a partner a CMST, to Mr. Williams on June 2, 2009.

Q   I'll show you what I'm going to mark as -- I think the next number is 114, your Honor.

THE COURT:  That's correct.

Q   Plaintiff's Exhibit 114.  Is that the e-mail that Mr. Small, partner in Cohen Milstein Sellers & Toll, sent to Mr. Williams?

A   Yes.  And then Mr. Williams forwarded it -- forwarded it to me.

Lehmann - Direct                                274

Q   And does that include the time spent by the Cohen Milstein Sellers & Toll subsequent to August of 2008, up to June of 2009?

A   Yes, it does and is so indicated at the top of the second page.

Q   And does Mr. Toll have time put in subsequent --

A   Yes --

Q   -- that it's put in there?

A   -- Mr. Toll is one of the timekeepers listed.

Q   You were saying, you -- now, the co-lead counsel has requested class counsel to submit post-October 31 or excuse me, post-September time for anything that they might have done during that period, correct?

A   That's correct.  So, submissions were received from other counsel and the other firms, for the most part, were paid out by mid-June.  That left the two co-leads to consider the allocation among themselves.  An informal discussion session was held on May 20th, an impasse was reached.  This was brought to the attention of Judge Breyer.  On the 8th of June.  He referred the matter to Magistrate Judge Edward Chin (ph).  Judge Chin set a mediation hearing on June 29th.  The mediation hearing was unsuccessful and at the end of the mediation hearing, Judge Chin said that the matter would have to be referred back to Judge Breyer and that Judge Breyer would want to see the actual timesheets of the various firms,

Lehmann - Direct                                275

because in order to explain, up to that point in time, what had been placed on the record for time summaries as opposed to the actual underlying timesheets.  So --

Q    Excuse me, go ahead.

A    -- so, on July 7th, Hausfeld LLP submitted various sets of timesheets to Judge Breyer and he issued an order making an allocation on July 10th.

Q    I'm going to show you what's been marked as Plaintiff's Exhibit -- the next -- 115, your Honor.  I have an extra one this time.

         THE COURT:  Oh, it's all right.  Thank you so much.

Q    Is this the July, 2009 order of Judge Breyer?

A    Yes, it is.

Q    Splitting the remainder of the $23 million between the two co-lead counsel?

A    That is correct, that's what this is.

Q    Did Judge Breyer use a lodestar in coming to his decision on how to split it?

A    He made reference to the fact, in this order, that --

         THE COURT:  That's not what he asked you.

         THE WITNESS:  Okay.

         THE COURT:  Did he use a lodestar?

         THE WITNESS:  He considered a lodestar, yes.

         THE COURT:  Did he use a lodestar?

         THE WITNESS:  I believe he did.

Lehmann - Direct                                      276

THE COURT:  He did?

THE WITNESS:  I believe he did in the sense that he was examining the percentages and whether they were fair in relation to the multiplier on the underlying lodestar.

Q   I direct your Honor's attention to the last paragraph on the first page.

A   Yes, I see it.  So, in essence, he used a hybrid approach.

THE COURT:  Oh, go ahead, I'm sorry.

MR. KITTREDGE:  All right.

Q   Now, you said that the co-lead counsel submitted timesheets to Judge Breyer.  I'm going to show you what has been marked the next number, your Honor, Plaintiff's Exhibit 116 and ask you whether or nor, attached to that letter are the timesheets that Mr. Hausfeld submitted to Judge Breyer?

A   Yes, they --

Q   As exhibits?

A   Yes, they are attached as exhibits to this letter.  They are Exhibits B, C, and D.

Q   And would you just tell the Judge, by the way, your Honor, this is a letter of July 28th and these documents were submitted in camera to Judge Breyer, is that correct, Mr. Lehmann?

A   That is correct.

Q   And I think, your Honor, to keep the confidentiality, I

Lehmann - Direct                          277

submit that they should be kept in camera for this Court.

MR. ROSENTHAL:  We agree with that, your Honor.

THE COURT:  All right, very well.

BY MR. KITTREDGE:

Q   Do the timesheets contain timesheets on behalf of Cohen
Milstein Hausfeld & Toll LLP up to and including --

A   Yes, they do.

Q   -- the time of the submission.

A   What was the date again?

Q   In early July, July 7th, I think.

A   July 7th is when these were submitted to Judge Breyer.

THE COURT:  2008?

THE WITNESS:  Right.

MR. KITTREDGE:  2009.

THE COURT:  Nine, sorry.

THE WITNESS:  If you take a look at Exhibit D.

BY MR. KITTREDGE:

Q   D, did you say?

A   D as in dog.

Q   Right.

A   That contains time records under the label Hausfeld &
Company LLP, London.  But the time that is reflected here is,
for the most part, time from CMHT-New York, LLP and it goes
from April of 2007 all the way up through April of 2009.
There are some time entries here that occurred after the sale

Lehmann - Direct                                    278

of CMHT-New York.

Q    Right.  And how about the time submissions for CMST, which I think is Exhibit B?

A    It's Exhibit B and it includes, actually, time submissions from June of 2006 through November 5th of 2008, so, these would be time submissions for CMHT PLLC.

Q    Was the time submitted in those documents from CMST after the submission of August of 2008, the fee petition, which was, I think marked as Defendant's Exhibit 52, the declaration of Mr. Tompkins?

A    There is time submitted for the period following August 15, 2008 up to November 5, 2008.

Q    Now, was there also a timesheet submitted on behalf of anyone else to Judge Breyer?

A    Yes, Exhibit C consists of the timesheets for Hausfeld LLP, from the period of November 7, 2008 through April 30, 2009.

Q    Okay.  Was the fee award by Judge Breyer and I'm talking now about the aggregate fee award by Judge Breyer on October 31, 2008, to cover all counsel fees both before and after?

A    Yes, it was.

Q    And is that the reason that the co-lead counsel asked all other class counsel to submit post-fee petition time?

A    That was one of the reasons, because if time was going to compensated, it had to come out of the pot of the $23 million

Lehmann - Direct                              279

in fees and costs that were awarded by the judge.

Q    The Tompkins pre-petition which is at Exhibit --
Defendant's Exhibit 52, it keeps referring to my firm, my
firm, my firm.  Is that an accurate characterization?

A    I don't believe that it is completely accurate.

Q    Explain to the Judge why it should be a separate -- one
of the separate ones.

A    This was one of 57 declarations submitted in connection
with the joint fee petition of the plaintiffs, that was filed
on September 5th.  Mr. Tompkins does, at various points,
refer to my firm.  But in the exhibit that is an attachment
to this declaration, he breaks out the time of Cohen Milstein
Hausfeld & Toll PLLC, U.S. offices.

            MR. KEENEY:  Objection, your Honor.  We had a
stipulations that the document spoke for itself and Mr.
Rosenthal objected when I wanted to ask my witness about the
document.  I think the document still speaks for itself or
the stipulation speaks for itself.

            THE COURT:  Well --

            MR. KEENEY:  It was that exact exhibit.

            THE COURT:  All right, well, he's already said that
he thinks it was an error to say that.  So, what else do we
need to ask him about it?

            MR. KITTREDGE:  I'd like him to explain why.

            THE COURT:  Well, was he involved in preparing it or

Lehmann - Direct                              280

soliciting it or what knowledge does he have of the document? He didn't write it.

MR. KITTREDGE:  No, but it was part of the 57 declarations that were filed with the joint fee petition filed by the Kachet firm as one of the co-lead counsel, in which he was involved.

THE COURT:  Well, Mr. Rosenthal wouldn't let the Cohen Milstein talk about it.

MR. KITTREDGE:  Your Honor, he asked all of the witnesses about my firm, my firm, my firm and I'm asking this witness, is that a correct characterization of what is in that document.

THE COURT:  He said it's not.  All right, I'll rule. Answer, just tell us why briefly.

THE WITNESS:  Briefly, Mr. Tompkins was not a partner in the Cohen Milstein Hausfeld & Toll, New York.

THE COURT:  Okay.

BY MR. KITTREDGE:

Q    In the LLP, is that correct?

A    That's correct.

Q    The appeal, did you handle the appeal on behalf the class?

A    There was a motion to dismiss the appeal that was worked on by, initially, by the Kacheck firm.  I did edits on it. It never got filed because we settled the appeal.

Lehmann - Direct                                281

Q   And tell the Judge about the process of settling that case?

A   The 9th Circuit has a mediation program.  We met with a 9th Circuit mediator and the three objectors counsel and during the course of the day we settled April 1st.

Q   Were you involved in that process?

A   I was the person representing Hausfeld LLP in that process.

Q   And after those timesheets were sent in and given to Judge Breyer, he then entered this order, which is dated July 10th, awarding the Hausfeld, $11 million and the Kachet $6 million-some dollars, correct?

A   That is correct.

Q   And that was the spread on a percentage basis, having at least utilized the information contained in the timesheets?

A   That's how I view the order.

Q   Now, was there an allocation thereafter entered into with fees allocated to the one co-lead counsel, Hausfeld?

A   Yes, there was.

Q   Next number, your Honor.

        THE COURT:  Okay, 17.

        MR. KITTREDGE:  17 or 16?

        THE COURT:  17, 16 was the timesheets that went to Judge Breyer.

Q   I show you what has been marked Plaintiff's Exhibits 117.

Lehmann - Direct                    282

Could you identify that, please, for the record?

A    This is a chart that basically summarizes the process of allocation that I think was explained to your Honor in Venable's July 23rd letter to the Court, transmitting Hausfeld LLP's pre-trial brief.  I can explain it, if you wish.

Q    Please.

A    We basically took the lodestar set forth in the respective timesheets that we had just examined and applied a common multiplier to them.  The fee that you see results after the multiplier is made and with respect to CMHT-New York, we used the conversion rate at the time we made the allocation.  It's actually slightly less than the conversion rate used in the Tompkins declaration.  And then, below, there are the wiring instructions on the various components, including the amount that was wired from the escrow account to the Kachet law firm.

Q    Did these lodestars, on this particular calculation, include the after-October 31st award time that was submitted?

A    Yes, they do.

Q    So, that the lodestar for Cohen Milstein Hausfeld & Toll LLC includes time after August of 2008, correct?

A    Yes, it includes time up to November 5, 2008.

Q    Right.  And the Hausfeld LLP time or lodestar only for time after November 5th, excuse me, November 6, 2008 up to

Lehmann - Direct                               283

July of 2009, is that correct?

A   That's correct.

Q   Explain to the Judge why the number which those three allocations come up to $10,960 is less than Judge Breyer's reference of $11,161,880?

A   We had to make some additional cost payments, plaintiff incentive payments and additional payments to non-lead counsel, so, the number didn't quite match what Judge Breyer had in his order.

Q   There's moneys that the co-leads had some pay-offs to the representatives, is that part of it?

A   Pay-off either in costs or additional fees to non-lead counsel.

Q   So that, the remainder of the allocation to the co-lead Hausfeld firm, is the number that's reflected on that exhibit?

A   That's correct.

Q   Would you answer Mr. Keeney's questions, please.

A   Yes, sir.

                         CROSS-EXAMINATION

BY MR. KEENEY:

Q   Very briefly, directing your attention specifically to what has been marked as Plaintiff's Exhibit 117, which is this breakdown of numbers.  Was this ever submitted to Judge Breyer?

Lehmann - Cross                              284

A    No.

Q    Was it approved by Judge Breyer?

A    No.

Q    I'd like to direct your attention to the in camera submissions.  I'm going to approach the witness.  I've created an extra copy of Exhibit B, so that you don't have to look at all the in camera submissions.

            THE COURT:  Thank you so much.  This is 116-D?

            MR. KEENEY:  Yes, your Honor.

            THE COURT:  This is the London time?

            MR. KEENEY:  Yes, this is the London time that was submitted -- let me ask the witness.

Q    You agree this is the London time that was submitted, confidential, in camera submission to Judge Breyer, right?

A    Yes.

Q    Submitted in 2009, right?

A    Correct.

Q    And starting at the first page past the exhibit number, this time traces London time started on April 12, 2007, right?

A    That's what it indicates.

Q    And turning the pages, it goes through 2008, keeps going through 2008.  As a matter of fact, if you turn the pages and I'm up to July of 2008, August of 2008.  And my question to you, as I get up almost to the last page of the document,

Lehmann - Cross                                    285

isn't this an exact duplicate of the time that was submitted by the Tompkins declaration as part of the Cohen Milstein time on September 5, 2008?

A   I believe it is, but I haven't checked again for that.

        MR. KEENEY:  We have no further questions, your Honor.

        THE COURT:  Mr. Kittredge, anything?

                    REDIRECT EXAMINATION

BY MR. KITTREDGE:

Q   Was there any obligation or need to present the allocation in Plaintiff's Exhibit 117 to Judge Breyer?

A   No, all he requested was timesheets.

Q   Thank you.

        THE COURT:  All right, thank you.  Anything further by anybody?  All right, sir, thank you for coming.

        THE WITNESS:  Thank you.

        MR. KEENEY:  Your Honor, at this time, we renew our emergency motion.  We have no further evidence to put on and we just want the record to be clear.

        THE COURT:  Why don't we do this, why don't we take a brief recess and you can make argument on that.  So, I'll give everybody a minute to gather our thoughts and we can have argument on that.  Let's resume in about ten minutes.

        MR. KEENEY:  Thank you, your Honor.

        MR. ROSENTHAL:  Just so I'm clear, your Honor, what

286

we're going to be arguing is the emergency motion to release a portion of the $7 million or approximately thereof that CMHT pre-November time, that's what we're talking about?

THE COURT:  Right.

MR. ROSENTHAL:  Thank you.

THE COURT:  I take it you want more time to argue the whole case, but I think part of the issues are going to be subsumed in that, at least, to the extent Mr. Keeney suggests that you have to satisfy, essentially, the injunction standard to prove fraudulent inducement and material omission.  So, I mean, it's going to involve some overlap.

MR. ROSENTHAL:  Understood.

THE COURT:  Okay.

MR. KEENEY:  Thank you, your Honor.

THE COURT:  All right, thank you.

(Court in recess 4:25 to 4:37 o'clock p.m.)

MS. BAUM:  Your Honor, may I approach you just to give the complete Exhibit 52, that we made a copy of.

THE COURT:  Yes, sure, certainly.  This is exhibit what number?

MS. BAUM:  Defendant's Exhibit 52.

THE COURT:  Oh, 52.  I'll give you that back and I'll take that.  Oh, this is the one I had.

MS. BAUM:  Oh, we did, okay.

287

THE COURT:  What's the status of Exhibit 47?

MR. KEENEY:  It has not been put in, your Honor.  We had the testimony, which was permitted with respect to any partner can request information, but 47 is not in.

THE COURT:  All right, Mr. Keeney.

MR. KEENEY:  Okay, your Honor, this is on our emergency motion for relief and release of the funds from the escrow.  Our starting point is we're talking about two different numbers that we think Cohen Milstein is entitled to, a slightly different argument for each.

The first is we think the Court has before it, right now, enough evidence with respect to everything to conclude there's no reason why Cohen Milstein should not have its full 50 percent, which is $5,480,112.50.  But I want to start with the easier argument first, your Honor.  The easier argument is we think there is no argument whatsoever for a continuing pre-judgment attachment on the undisputed part.  This is the $3,000,396.79 portion of what is being held.

I call it the undisputed portion because that's what this --

THE COURT:  3,396.74?

MR. KEENEY:  790.

THE COURT:  Wait a minute, I've got to start again.

MR. KEENEY:  Okay.

THE COURT:  Go ahead, $3 million?

MR. KEENEY:  $3,396,790.

THE COURT:  Got it.

MR. KEENEY:  That's what I call the undisputed portion.  Now, why do I call it the undisputed portion, your Honor?  That's independent of what Hausfeld LLP sent to London.  That independent of what Hausfeld LLP kept for itself.  This is the part which is being withheld by Hausfeld LLP unilaterally on the grounds that, number one, they were fraudulently induced to enter into the agreement and therefore, there is no agreement and therefore, they can get to keep it.

And secondly, they are saying because there was a miscalculation of their capital account balance which is due on December 31, 2009.  That therefore, they should be able to keep those particular amounts.  Now, they also throw in, in their letter from Mr. Rosenthal, two additional points, which I don't fully understand, in which they are claiming that there are some invoices in some other cases from pre-October 31, 2008, that they sent to us, that haven't been paid yet and they're somehow uncertain about these.  A quick answer to those, your Honor.   There's nothing specific in the operating agreement with respect to those.

I start with the operating agreement.  The operating agreement could not be clearer.  We had a right within 48 hours to get 50 percent of the Air Passenger money.  Now,

289

let's start with the undisputed portion, the $3,396,790. We have been suffering the loss of that money for now close to a month, without any of the requirements being met for a pre-judgment attachment. Those requirements first start with some sort of showing of probability of success on the merits.

Now, it makes it easy for your Honor, because your Honor now has a pretty full, factual record with respect to fraudulent inducement and whether it was a miscalculation of the capital account. Even assuming, assuming that there is a miscalculation of the capital account, that's not due until December 31, 2009. There's been no evidence that in 2009 Cohen Milstein cannot pay a judgment of any sort, entered by this Court, as to what the calculation would be. So, there is certainly no reason with respect to this calculation to conclude that there's any probability of success shown that rises to such a level that this Court should freeze money, which under paragraph one, second bullet, very clearly and very expressly was to be paid to Cohen Milstein within 48 hours and wasn't.

Now, let's talk about fraudulent inducement for a second. The evidence that the Court has now heard comes nowhere near to the probability of success that they were going to have to establish to have a pre-judgment attachment, in the first place. Number one, fraudulent inducement. We think the evidence is clear. No one knew, at the time of the

signing agreement, the exact capital balance as of October 31, 2008 for either Michael Hausfeld or Richard Lewis. They didn't know, we didn't know.

The second question though, which is the question that concerns your Honor and you asked Mr. Toll some good questions about this. Well, you had a ballpark idea of what the capital would be. And he replied truthfully, I certainly did. And his ballpark idea was derived essentially from exactly the same argument available to every member of the executive committee, which Michael Hausfeld was through November 6, 2008 and was derived from the monthly financial statements sent to every partner, which showed a continuing year to date loss.

The fraudulent inducement claim that's made in this case is not that they didn't know to the penny what the capital account balance was. The fraudulent inducement claim is that they had no idea that during 2008, their capital had decreased as of the time that they withdrew. They have shown no probability of success on that argument. They have not refuted the fact that the information was sent to all the equity partners every month and so, every month they had the opportunity to look at that exhibit, on the monthly statement, two lines up from the bottom of net loss year to date. I think they haven't shown probability of success.

Now, we also now have to move to the second point,

291

which is to get the extraordinary remedy of pre-judgment attachment, they have to show some sort of severe, irreparable harm.  This is a money case, your Honor.  They have not made the showing that at the end of whatever decision this Court makes, that they are somehow unsecured, that they will not be paid.  Frankly, the shoe is on the other foot here, your Honor.  We're the ones who have had our money seized, which we had a right to get 50 percent of within 48 hours.  We think no showing had been made in terms of establishing a pre-judgment attachment, which is what they're arguing for.

We appreciate the Court's extraordinary diligence, even on vacation, in setting up the escrow account and we think that was the right thing to do, so the Court could hear this on an emergency basis.  You preserved the status quo to hear it on an emergency basis.  But to continue in effect, a pre-judgment attachment requires the meeting of legal criteria, not just wishful thinking by the other side.  And with respect to fraudulent inducement, they haven't made the case on the basis of what they say.  They certainly haven't made it on the basis of what the evidence shows.

The evidence shows a settlement agreement reached before your magistrate in the end of January, beginning of February, 2009 with many, many, many negotiated terms.  Some were favorable to them.  Some were favorable to us.  You

292

can't be allowing a party to come in and say, I didn't know that this was going to be unfavorable to me.  On one particular term, when you have a legal document of such complexity, negotiated at length, by counsel of nationwide standing.  And participated and supervised by a magistrate judge who was with us every step of the way.

THE COURT:  Well, I guess what Mr. Rosenthal.  Who's going to argue, Mr. Kittredge or Mr. Rosenthal?

Mr. Rosenthal, I think what his position is, at least what I anticipate his argument will be, is that your client let Mr. Hausfeld enter into this agreement in the belief that he was getting $2 million more than he was ultimately going to get.  You know, I have to tell you and I'm not saying this resolves the case.  I'm not saying this proves fraudulent inducement, but the lack of candor seemed disappointing, I have to tell you.  Because I think it's fair to say that Mr. Toll and the other partners who were here, at least, judging by the admissions in the deposition, were aware that Mr. Hausfeld thought he was getting around $5 million bucks.  And the fact that they sat there and subjectively knew that he was making a mistake in that assumption and didn't tell me or didn't tell Mr. Hausfeld, is disappointing.

Now, whether that holds the day, I don't know, but that, combined with the delay in giving him the numbers, what

293

am I supposed to take from that?  I mean, that's just, I don't know, it's just shocking to me.

MR. KEENEY:  Okay, your Honor, let me reply to that very specifically.  I actually thought your Honor might have had more detailed notes of what happened in the last two negotiating sessions that were the joint sessions --

THE COURT:  Mm-hmm.

MR. KEENEY:  -- at the end.  Because there were statements and there were statements made by counsel, but if they weren't in your notes, we're not putting them in, your Honor.  I mean, whatever you remember --

THE COURT:  Statements made by you guys?

MR. KEENEY:  By me.

THE COURT:  By you, about Mr. Hausfeld's --

MR. KEENEY:  Yes.

THE COURT:  -- the value of his account?

MR. KEENEY:  I went out of my way to emphasize Mr. Hausfeld admitted recalling something, that there was some discussion about capital accounts go and down over time and your capital account in the beginning of the year --

THE COURT:  Sure, but there was no discussion of the amount.

MR. KEENEY:  No.

THE COURT:  That's my point.

MR. KEENEY:  Nobody knew and except for what was in.

294

THE COURT:  How about what was in Mr. Toll's briefcase?

MR. KEENEY:  Oh, well, we know what that is, your Honor, because we -- that was put into evidence by them. That's Hugh Diamond's initial calculation.

THE COURT:  Yes, but that was pretty close to what Drolet ended up saying, wasn't it?

MR. KEENEY:  Actually, no, it had three major mistakes.

THE COURT:  I know major mistakes, but it wasn't $5 million, it was something less than $5 million.

MR. KEENEY:  It was in the vicinity of $4 million, but it had three huge mistakes.

THE COURT:  Mm-hmm.

MR. KEENEY:  And in addition, your Honor, the situation was it didn't have the review.  I mean, you're assuming that --

THE COURT:  Well, the review, as I read the agreement, the review process doesn't kick in until there's a dispute.

MR. KEENEY:  Oh, no, no.  Oh, no, no, I didn't mean, I didn't mean that.  I mean the firm's review.  In other words, your Honor, if you're running any business, you don't have your staff person send out something unless someone more senior checks it.  Now, it might be a different --

THE COURT:  Three months or however many, let's -- even on the best case scenario was almost two months.

MR. KEENEY:  Right.  And what we're talking about your Honor is the December 31, 2009 payment.  So, looked at in that light, you're talking about a payment as to which was the exact capital balance needed to be known -- no and nobody knew that.  But your point is, was Mr. Hausfeld somehow defrauded or deluded into thinking that his December 31, 2007 balance, which was, you know, more than ten months earlier, continued to be the correct figure.  There's a whole lot of evidence from all the partners here at Cohen Milstein, about how easy it was to calculate that there had been a decline in capital balance.  Everybody else knew it.

Now, what they also knew, your Honor and this is where there is an intuitive leap.  They knew, because of settlement negotiations that Michael Hausfeld had always been demanding.  That he wanted the return of all the capital as of December 31, 2007.  That doesn't mean he's entitled to it.  It doesn't mean the fact that we know he's demanding it.

THE COURT:  Well, that's not in evidence. I don't have that, that he was demanding -- whatever he was negotiating before he got to me.

MR. KEENEY:  Well --

THE COURT:  That's not evidence here.

MR. KEENEY:  Oh, yes.  No, the evidence before you

296

is what Mr. Hausfeld testified to, is that he testified that he believed --

THE COURT:  He thought it was $5 million bucks?

MR. KEENEY:  -- exactly, that's what he thought and we established, through the cross and through the direct, that the $5 million figure was, as calculated on December 31, 2007.

THE COURT:  Well, why didn't -- why didn't somebody affirm, at some point before that settlement agreement was signed --

MR. KEENEY:  Mm-hmm.

THE COURT:  -- say to him, you know what, we don't have the exact figure yet, but it looks like you're going to come in, in this range and give him a chance to walk away if he didn't want to do it.  I mean, doesn't that -- wouldn't that have been right thing to do?

MR. KEENEY:  Well, your Honor, it couldn't be done. Let me just explain.

THE COURT:  Oh, no, I don't buy that for a minute.

MR. KEENEY:  No, oh, no, here's the reason.

THE COURT:  I don't buy that.

MR. KEENEY:  No, no, and here's the reason why, your Honor.  We needed to know were we going to be accepting Pat Drolet's recommendation to, essentially, take the October stated loss as of October 31, which was in the vicinity of

297

$6.7 million and add another $5 million to it.

THE COURT:  Let's face it, if somebody at Cohen Milstein had said to Drolet and Hugh Diamond, work all weekend and get these numbers firmed up, it happens.  Pat Drolet would have done whatever she was told.  And she would have gotten you that number, she seems very efficient and very proficient.

MR. KEENEY:  Right.

THE COURT:  That number could have been obtained relatively easily.  It's just disturbing to me that it took so long when everyone knew that was, at least, one of the main eight or whatever terms of the agreement.  It's just the way people treat each other in this case has just been so bothersome, I have to tell you.  I don't understand why we had to hide the ball so long.

MR. KEENEY:  But, well, your Honor, I can't accept the characterization of hiding the ball, in the sense that if we had actually taken out of whatever Mr. Toll had in his briefcase, what he had gotten from Hugh Diamond, it would have had errors in.  You know, if I had represented to Mr. Rosenthal, at the second mediation, were essentially he was present, that we had a document from Hugh Diamond that said his client was going to get $4 million-some back, but we hadn't checked the numbers yet and we didn't know that it was right or wrong.  We would have had a dispute right then and

298

there and they would have been right, because it was miscalculated.

THE COURT:  Well, no, but somebody could have said, listen, as of January, right now, your capital account -- you look back and I think everybody agrees on that.  As of October 31st, we're going to compute your capital account in the following formula.

MR. KEENEY:  Right.

THE COURT:  That's all that had to be said.

MR. KEENEY:  Right.

THE COURT:  And then Mr. Hausfeld could have deduced that.

MR. KEENEY:  But, your Honor, that's what the agreement actually said, both when we left your chambers the first time in January and when it was finally reduced to writing.  When we left your chambers --

THE COURT:  He didn't know what the firm's financial position was as of October 31?

MR. KEENEY:  But he knew it was going to be calculated and he knew when the date was.  He knew what the words --

THE COURT:  No, he didn't know the number.

MR. KEENEY:  Right, absolutely.  We didn't --

THE COURT:  For all he knew, you guys could have turned the firm around by that October statement.  He didn't

299

get the benefit of that financial statement, because he was out the door.

MR. KEENEY:  Oh, your Honor, he was on the executive committee.

THE COURT:  Not then.

MR. KEENEY:  Yes --

THE COURT:  Not in mid-November.

MR. KEENEY:  No, no, he's on the executive committee up through, not only through October 31, he's on the executive committee right through November 6, 2008.

THE COURT:  But the financial statements, I thought the evidence was, don't come out for a couple weeks later.

MR. KEENEY:  Your Honor, that's where it's more subtle than that.  Yes, you're right, financial statements come out.  But if you're on the executive committee, you're watching the fee recoveries come in on a daily basis.  You heard that from Mr. Toll.

THE COURT:  Yeah.

MR. KEENEY:  In other words, you're coming to the meetings.  There's a lot of talk in -- at the executive committee level.  In other words, if we were talking about someone who was truly disassociated from firm activity, that might be, you know, a more valid point.  But here, you're talking about the chairman of the firm, who knows exactly what the status of the firm is in October.  And he knows that

in October, it's a mess.  And he knows, if you calculate his capital at the end of October, it's not going to be as high as you calculated at the beginning of December of the previous year.

We think the evidence on that, your Honor, in the testimony, is just overwhelming.  So, the question is, has a sufficient showing been made to establish a probability of success for a pre-judgment attachment with respect to money which is owed under a clearly, I'd say clearly explicit settlement agreement with respect to Air Passenger.  And their argument is, well, if we were fraudulently induced, there is no settlement agreement and we're back to square one.  And frankly, right now, your Honor, we feel like we are at square one, because any -- when they get the Air Passenger money, which was the biggest money, they don't give it to us under the settlement agreement.

THE COURT:  Well --

MR. KEENEY:  And they're always going to have a dispute, your Honor, they're just always going to have it.

THE COURT:  I know and I don't like that either.  I don't like a lot of things about this case.  I don't like the fact that they unilaterally did that and I'll be right up front with you about that, Mr. Rosenthal, I thought that was uncalled for, but I think it just goes to the level of mistrust that pervades this relationship and it's kind of sad

301

to see.

MR. KEENEY:  Yes.  And our suggestion, your Honor, is you don't impose a pre-judgment attachment until you make a finding of probability of success and that you have to put in a pre-judgment attachment, in order to preserve the disposition of the findings.

THE COURT:  I understand that.  I understand your argument there.

MR. KEENEY:  And in a money case, you almost never have a pre-judgment attachment unless you're worried about bankruptcy type situation, which in 2009 for Cohen Milstein, just isn't the case.  That is why we believe, with respect to the fraudulent inducement claim, that money should be released right now.  Not that you're making a final finding on fraudulent inducement, far from it, your Honor.  What we're suggesting is you have enough information to make the finding of probability of success and we think they didn't meet it.

I mean, no matter what the Court's concerns, the standard's very high probability of success and you go to the highest standard of probability of success, because even on a sliding scale, which is sometimes done in the 3rd Circuit and in D.C., where you're talking about a money case, holding back somebody else's money is essentially not something which is subject to a pre-judgment attachment under the irreparable

302

harm analysis, because there is no irreparable harm if Mr. Hausfeld actually can get paid his capital, however calculated, at the end of the December 31, 2009 period. There has been no showing that he wouldn't be.

Now, with respect to the larger point and those are just, well, evident -- evident miscalculation, your Honor. The evidence, we think, is actually fairly substantial in terms of being a side show, I mean, Cohen Milstein never used GAAP, clearly admitted.  GAAP is said that has to be used and as of 2003, in one sentence, applies to books of accounting. Their expert witness said it's easy enough to have your books of account kept one way, keep them under GAAP and have your financial statements kept under a cash-based method of accounting, which is what Cohen Milstein's been doing all along.  And you know, custom can trump, but here, it's clearly waived by Mr. Hausfeld.  He's the chairman of the firm, he's on the executive committee and he knows.  He's never objected to it.

So, the idea that somehow you bring in an expert witness who does a GAAP analysis, partially, on the financial statements and corrects two of the items, correcting the revenue, based on his view of the projections.  And correcting some of the liabilities.  He's only correcting the referral fees and leaving everything else unchanged, is essentially -- it's a half GAAP analysis.  It's the glass is

303

half empty, half full, so, even if you thought GAAP was appropriate, it only applies to the books of account. In any event, the analysis wasn't presented to your court.

Now, with respect to their more substantive point, the one that Pat Drolet said was troubling to her, too and I know it troubles the Court. It troubles everybody. It's a difficult legal issue and we agree as to whether the calculation should be done on a 14 percent basis or a 28 percent basis. But nothing in that calculation, which is in the operating agreement, justifies extraordinary injunctive relief of pre-judgment attachment. What we have instead is a situation. If this Court concludes that the capital account should be calculated differently, it will be calculated differently and on December 31, 2009, Mr. Hausfeld and Mr. Lewis will receive their one-half of that capital as calculated differently. Once again, no need for emergency injunctive relief.

Now, that really summarizes their case. I mean, you put aside all the bluster and you get down to is there a probability of success? Is there irreparable harm? There isn't. They haven't met the requirements for continuation of a pre-judgment attachment.

Now, we go farther, your Honor, but you don't have to go farther today. I just wanted to make this very clear. We think the evidence is now clearly before your Honor with

respect to Cohen Milstein's absolute entitlement to the complete $5.4, the $5,480,112.50, the half of what was sent to the Hausfeld LLP firm.

With respect to what was diverted to London, we think it's very clear that even if Mr. Tompkins was an associate when he submitted the declaration, you'll see on the signature page, Mr. Hausfeld's name is on it, although he didn't sign it. You'll also see something I actually found shocking that they'd submit confidentially, in camera, to Judge Breyer, a redo of the London time and attributed it to a totally separate entity. I mean, they took the same time that was submitted, as Cohen Milstein time and re-submitted the 2007 and 2008 time, which is what Exhibit D did, in camera, so nobody could see what they were doing and called it a third law firm. And your Honor, that does not provide any basis for them to then come into this Court and say, with respect to this settlement agreement, that they are excused from their obligations to pay us our 50 percent.

If London has a problem with Hausfeld LLP or with Cohen Milstein, London already has its money. There is no arbitration pending in London. They can institute an arbitration, if they want, against Cohen Milstein. They could institute an arbitration against Michael Hausfeld.

THE COURT: Why did they do that, they already have the money.

MR. KEENEY:  Oh, they have to do that under their --

THE COURT:  No, but why would they?

MR. KEENEY:  Oh, I don't think they would, they have money.

THE COURT:  Yeah, right.

MR. KEENEY:  They have the money.

THE COURT:  Right.

MR. KEENEY:  So, what we have is what the parties have before you, your Honor.  A situation in which $10.9 million came in and we didn't get our 50 percent share.  And there is more than enough in the escrow account, to immediately release our 50 percent share and return the remainder to Hausfeld LLP.

THE COURT:  Well, is there some amount of that that's worked on afterwards that you agree Mr. Hausfeld is entitled to?  Wasn't there like a million-90 or something?

MR. KEENEY:  Well, that's what he claims.  What he does is he has a million-90, where he applies a four-times multiplier for work that's done after the fee has been awarded.

THE COURT:  But everybody got a four-times multiplier.

MR. KEENEY:  Oh, yeah, your Honor, but this is different.  The four-times multiplier is -- reflects the risk

of the work.  When you undertake something on a contingent basis, you may not get paid.  Ordinarily, you don't get a multiplier after you have done the work and after you have applied for the fees and after the Court has awarded the fees.  You know, we're not really contending that, you know, Mr. Hausfeld's entitled to nothing.  But under these circumstances, where he grabbed our half, took his time, multiplied it by four and then shipped off $3 million to his lawyers now in London.  We think the only sensible thing to do is enforce the operating agreement as written or even better, since you don't have to reach that today, conclude that the probability of success has not been established. Which allows them to withhold our $5.4 million, 50 percent fee.

THE COURT:  Well, if you were to get $5.4 million, that would mean I'd have to decide today that it's unlikely that they're going to prevail on their argument on <u>Air Passenger</u>?

MR. KEENEY:  Yes, your Honor, I agree with that. That's why I gave you both alternatives because it's an emergency motion for relief and I realize we're pressing on the Court's schedule.

THE COURT:  That's all right, no, that's all right.

MR. KEENEY:  And I appreciate that.  The emergency, I think, is best dealt with on the interim basis, which is,

307

there is, in my view, an undisputed amount here, which is $3.3 million, which there has been no showing.

THE COURT: But does that $3.3 or $3.4 million, does that account for the post-settlement work --

MR. KEENEY: Yes.

THE COURT: -- that Hausfeld did?

MR. KEENEY: Yes.

THE COURT: It's already been backed out, that money?

MR. KEENEY: Yes, yes, let me explain how the figure gets there, your Honor.

THE COURT: Okay.

MR. KEENEY: As Mr. Toll -- as a matter of fact, if I can just pass this up to the Court, your Honor. This is actually Plaintiff's Exhibit 117.

THE COURT: I have it.

MR. KEENEY: Okay.

THE COURT: Yes. That's one of the one's Mr. Kittredge --

MR. KEENEY: Yes, exactly, this is the one that didn't go to the Court.

THE COURT: Oh, maybe I don't have it. I don't have it. Okay, let me just see if I do, hold on.

MR. KEENEY: A single sheet of paper, Judge.

THE COURT: I should have that here. Yes, I do have

308

it.  Okay, sorry.  Go ahead, I'm all set.

MR. KEENEY:  Okay, if you go over to the total column, the total column is $10,960,225.26, which, by the way, except for the 26 cents, is exactly what Mr. Toll testified to.

THE COURT:  Hold on.

MR. KEENEY:  Okay.

THE COURT:  The total column is -- it says fee award?

MR. KEENEY:  Yeah.

THE COURT:  It says fee?

MR. KEENEY:  Yeah, four lines down.

THE COURT:  $10,960,000.

MR. KEENEY:  $10,960,000.

THE COURT:  I have it.

MR. KEENEY:  Okay.  Now, what happened to that $10 million?  CMHT PLLC, that's us, Cohen Milstein, was --

THE COURT:  You got nothing?

MR. KEENEY:  There's the $6.793,579.59 --

THE COURT:  Yes.

MR. KEENEY:  -- of which we split 50 percent with Hausfeld.  We got none of that.  That's what I call the undisputed portion.

THE COURT:  All right.

MR. KEENEY:  And that's 50 percent of the undisputed

309

portion we think we're entitled to right now, because they haven't met any of the criteria for a pre-judgment attachment. No probability --

THE COURT: Understood.

MR. KEENEY: Now, the next line, just the record's clear, this is what got shot off to London. This is the $3,075,868.12. And notice, your Honor, we're not asking to do anything with respect to London. Never have. We're just suggesting that we are entitled to our half of what was kept from us. HLLP, which is the next line, is what Mr. Hausfeld's firm kept for itself.

THE COURT: Got it.

MR. KEENEY: That's $1,090,777.55. Now, what's in the escrow, your Honor, right now, is all the money except the London money.

THE COURT: Right.

MR. KEENEY: London money's gone, that's in Europe. And so, we have an escrow which enables this Court to take one of the two possible actions today, either release the undisputed portions on a finding that there's been no showing of probability of success or irreparable harm sufficient to justify a pre-judgment attachment and that would release to us one half of that first figure, which is the $6,793,579.59 and that would give us today, $3,396,719 and we could use that for our operating expenses.

310

THE COURT:  Got it.

MR. KEENEY:  And your Honor, that's the argument. Let me turn the floor over to Mr. Rosenthal, unless you have further questions.

THE COURT:  Not yet, thank you.

MR. ROSENTHAL:  Your Honor, I'm going to be very short.  With respect to the likelihood of success on the merits, really success on the merits and your Honor has hit on what the key evidence is with respect to either the fraudulent inducement or material omission claim.  As your Honor knows, they're two different claims, because fraudulent inducement actually requires a deliberate withholding of the information that was material to this settlement, then material omission doesn't require that kind of intent.  It's just that they had information in their possession, they failed to disclose it.  Our clients relied on the representations that were made or I guess, relied on the fact that there was things omitted from the settlement negotiations and entered into a settlement that they would have entered into, but for the fact that they didn't have that information.

Just a couple of other things to sort of add on to what your Honor pointed out with respect to the time line here.  As we know, Mr. Diamond provided Mr. Toll the preliminary calculations, which were actually about $3.8

311

million for Mr. Hausfeld and about $860,000 for Mr. Lewis on January 10th. Mr. Toll did not authorize Mr. Diamond to release those to Ms. Drolet until late in the afternoon on February 5th, which just coincidentally, happened to be after the settlement agreement in this case -- or in this matter before you, was executed.

In the meantime, there was the January 23rd mediation session. Your Honor had some pointed questions, I guess, probably more pointed than I had, to Mr. Toll about what he knew then. And his testimony, as I recall, to your question about, well, didn't you know that it would be less, Mr. Toll said well, he knew the amount would be significantly, I should say, not unsubstantially less than the $5 million. That was his testimony in response to your question.

February 6th, the testimony from Ms. Drolet and I think, Mr. Toll reluctantly admitted, the calculations were basically done. Yes, there was some discussion in the executive committee about whether to change those calculations on or about February 13th, but it was still another week before the fees, I mean, before the figures were actually supplied to counsel. February 20th, which again, just coincidentally, happened to be right after the OSB fees came in and as your Honor knows, the OSB fees were one of the biggest concessions that Mr. Hausfeld made at the every end

312

of the session on January 23rd, in exchange, at least in part, for the accelerated return of capital.

So, that's sort of how the time line played out and then right after the OSB fees are -- are wired into Cohen Milstein, Mr. Toll sends Mr. Sellers this e-mail that we've talked about a lot and I won't go into at great length, other than to say that his testimony, at deposition and I think, although it was a struggle, I got him to say it again today, that he knew Mr. Hausfeld would be upset because Mr. Hausfeld "wouldn't be getting $5 million" and that was his testimony in his deposition and I think that's what he testified today.

If you look at the sort of totality of the circumstances, your Honor, I actually do think there is quite a lot of evidence of fraud in the inducement there.  These things, not authorizing Mr. Diamond to release the information to the outside accountant to check the information before it can be released to Mr. Hausfeld and Mr. Lewis, until coincidentally, right after the settlement agreement is executed.  And then waiting another two weeks, even though Ms. Drolet finalized the figures, as I said, five hours, according to her timesheets and her testimony.  Then waiting another two weeks until after the OSB fee comes in. I mean, it's just too much of a coincidence, your Honor and I think that does prove or establish a likelihood of success on the merits of fraud in the inducement claim.

313

But even putting that aside, even putting that aside, I think there's no question, particularly given Mr. Toll's testimony in response to your question about that he knew it woud be significantly or not unsubstantially less than $5 million, that there was a material omission here.

THE COURT: Well, you know, I agree with all that. The thing that troubles me, Mr. Rosenthal, is this. It is -- because I'm very bothered by the way Cohen Milstein conducted themselves after the settlement. That's beyond question. The problem I have is your client's very sophisticated and he was the chairman of the firm. I mean, he essentially ran this firm for how many years? Five years, four years, I don't know, whatever. He was --

MR. ROSENTHAL: Five years, I think, was what he testified, your Honor.

THE COURT: Yeah, well, a lot. For him to say that given the economic climate that this settlement was negotiated in, that he didn't know that that capital account could be less than $5 million, he has a big mountain to climb. It's hard for me to believe that. I know he probably hoped. I know he definitely thought as of the end of the year, that's what it was. But I think it's unrealistic to think, given all the turmoil that that firm was going through and the worldwide economic situation, that the capital account was going to be what it was, even if they didn't

314

diminish his ownership interest.  Let's just put that aside. Which is another troubling thing.  But even if they didn't do that, how he could think that he was getting $5 million, I'm having a hard time with that, so help me.

MR. ROSENTHAL:  Yes, I think his testimony is that he didn't think that he'd be getting exactly $5 million.  I guess I take issue with Mr. Keeney saying that Mr. Hausfeld thought he'd be getting exactly what his capital account balance was as of December 31, 2007.  Mr. Hausfeld testified that he knew that there would be some fluctuation, as did Mr. Lewis.  But they didn't think it would be much, given that the firm, you know, was in a turn-around situation as, you know, voluminous evidence has shown and the firm ended up turning a profit by year end, as was anticipated at the time that they were kicked out of the firm.

And so, because the firm was having -- was going to have a flat year, he anticipated and Mr. Lewis anticipated that this is where they were going to end up.  And that was reenforced again, because of the settlement negotiations in front of your Honor.  Where, I think the evidence is pretty clear, that a $5 million figure for his capital account, anyway, was mentioned and nobody disabused him of the idea that it was going to be -- there was going to be $5 million or roughly $5 million.  And certainly, nobody told him it was going to $2 million less.  And then there is the additional

315

issue, your Honor, about this retroactive application, using the 14 percent. That is certainly something that he had no ability to foresee. Even if you accept, you know, your Honor's, I guess, pre-supposition that he should have known it was going to be less than $5 million. He had no reason, no reason, at all, to know that they were going to use the 14 percent to kick him out of the firm and then turn around on the back side and use the 28 percent figure to tag him with the loss.

I mean, Mr. Milstein very candidly admitted yesterday, that on October 31st, given the plain language of that memo and given what a percentage interest is under the firm's operating agreement, no. I mean, voting strength and allocation of share loss, it's the same thing. Mr. Toll testified incredibly today that, oh, no, on October 31st, on a single day, the voting strength can be 14 percent, but the allocation of profit or loss can be 14 percent. That's ridiculous. And it's absolutely inconsistent with the operating agreement. So, there's no way he could have foreseen that and your Honor should know that even using the tax basis method of accounting, that makes a million dollar difference, a million dollar difference in the calculation and he had no way of foreseeing that. And that is, as your Honor, I think, understands, what is most troubling, most troubling about this.

316

THE COURT:  But let's assume there's a million dollar swing, Mr. Keeney's argument's going to be that doesn't mean you can hold $4 million.  You know, that's the concern.

MR. ROSENTHAL:  Right, right.  And with respect to that --

THE COURT:  And that's only what we're arguing about today, right?  It's whether he --

MR. ROSENTHAL:  In terms of the irreparable harm, your Honor.

THE COURT:  Yes.

MR. ROSENTHAL:  I mean, Mr. Keeney has made a representation that they're having trouble making payroll and your Honor, I guess, talked about yesterday the fact that, well, you know, we got to make sure the lights stay on.  And you know, we suggested and I will suggest again to you right now, that our clients are willing to allow $1,300,000 to go to CMST to make sure that they can keep their lights on, that they can make their payroll.

THE COURT:  But just like everything else, there's a footnote to that.

MR. ROSENTHAL:  Well, the footnote is -- under the settlement agreement, you know, your Honor, Mr. Keeney and I have had many discussions about these invoices that need to be paid.  And Mr. Keeney has agreed with me that under the

terms of the -- under the settlement agreement, even though it's not expressed, the pre-November 6th expenses have to be paid by Cohen Milstein Sellers & Toll, otherwise, the agreement doesn't -- doesn't otherwise consent.  And they have actually paid some of those invoices, but there's a lot of, well, I mean, there's actually more than the $300,000 I represented yesterday or thereabouts outstanding, because one of the big cases where there's a big outstanding invoice just settled and it's going to be paid.  So, we're not asking for that.  But we do think that that money, that $300,000 or so, needs to be paid to those vendors.  I mean, these are cases that are important cases.

THE COURT:  But isn't that an issue for the vendors to take up with the respected people that hired them?

MR. ROSENTHAL:  Well --

THE COURT:   I agree they need to be paid, but how is that my problem?

MR. ROSENTHAL:  Well --

THE COURT:  For lack of a better word.

MR. ROSENTHAL:  -- because we would argue, your Honor, that it's actually part and parcel of the settlement agreement.  I mean, you know, they're getting, you know, all of the, I guess, unaccounted for fees, those that aren't specified in the settlement for pre-November 6th.  That means that they also have to incur or pay up the expenses for those

318

pre-November 6th cases.  And Mr. Keeney's agreed to that, there is no disagreement with us on that -- Mr. Keeney, now come n, we've talked about that.

THE COURT:  That's all right, well, talk to me.

MR. ROSENTHAL:  Okay --

MR. KEENEY:  They've been paid, your Honor.

THE COURT:  All right.

MR. KEENEY:  There are many that have been paid.

MR. ROSENTHAL:  Right and there's approximately $300,000 outstanding that these vendors --

THE COURT:  Let's put that aside.

MR. ROSENTHAL:  -- hound Hausfeld about because Hausfeld's now the lead counsel in those cases, even though Cohen Milstein owns the -- I mean, owes the money.

THE COURT:  All right, well -- all right, let's just put that aside.  I'm more interested in how it is you can show that your client had a reasonable basis for concluding that his capital account should have been computed under the accrual method of accounting.  Given the fact, the evidence that Mr. Keeney cited.  Namely that he was chairman of the firm and I understand the operating agreement says that, but given the testimony of Ms. Drolet, the testimony of Mr. Milstein, the fact that Mr. Hausfeld let this go on for year after year and never said, wait a minute, what are you doing, this is crazy.  You've got to be giving these people their

capital accounts on the accrual method or you have to be keeping the books -- you're keeping the books the wrong way. I didn't see any evidence of that. So, how can he come in here and say that you have to calculate it that way?

MR. ROSENTHAL: Well, there were two partners and only two partners who had left before him under this particular --

THE COURT: Nussbaum and --

MR. ROSENTHAL: Nussbaum and Gallagher.

THE COURT: And they were both computed --

MR. ROSENTHAL: That's right and Mr. Hausfeld testified --

THE COURT: -- on the old way.

MR. ROSENTHAL: -- that he had no knowledge of the method of calculation. The method of calculation for liquidating credit, because this was something that Mr. Toll and Mr. Diamond handled. I mean, as Mr. Toll testified today, that yes, it was he and Mr. Diamond who handled the departing partners liquidating capital account balances.

THE COURT: I understand, but if -- if there was a pressing issue that like, wait a minute, you guys are violating the operating agreement, he's the chairman of the firm.

MR. ROSENTHAL: Well, I think he testified, your Honor, that he did not really have an understanding of what

320

GAAP meant and so, he didn't press the issue.  And that's as much as I can say.  And the idea that this is what the operating agreement says and just because, you know, it happened, you know, at least, once before in the case of Paul Gallagher, although his capital account was very small. Linda Nussbaum, as you heard from Mr. Toll, and I think from Mr. Sommers, you know, challenged what they were --

THE COURT:  Mm-hmm.

MR. ROSENTHAL:  -- doing and she ended up getting a lump sum payment, you know, as a result of the challenge.  I mean, she got a benefit because she ended up challenging --

THE COURT:  Well, I don't know if that's in evidence, is it, whether she got a benefit from her challenge?

MR. ROSENTHAL:  Well, she got a lump sum payment.

THE COURT:  Yeah, I don't know what that --

MR. ROSENTHAL:  Okay, I'm arguing --

THE COURT:  Yes.

MR. ROSENTHAL:  -- that the benefits were to get all the money up front --

THE COURT:  Oh, I see what you mean, okay.

MR. ROSENTHAL:  -- as opposed to paid out over five years.

THE COURT:  Okay, I got you.

MR. ROSENTHAL:  That's a benefit to her.

321

THE COURT: I got you, but Mr. Hausfeld was chairman of the firm when that happened and he didn't go in and say, wait a minute, Linda, you have to -- we're computing this wrong.

MR. ROSENTHAL: That's right, he was not aware of the -- as he testified, he was not aware of the method of calculation until this dispute came about. That is true. That is not something that, as chairman of the firm, he worried about and that was -- that was delegated to Steve Toll. And that's the way it --

THE COURT: I mean, I thought Mr. Bavis was a good witness, but I don't know if he can outweigh the culture and custom of the firm. I mean, he made a lot of sense.

MR. ROSENTHAL: Right. Well, I think ultimately, your Honor, I mean, we're going to have to brief up this issue on course of dealing versus what's in the actual contract.

THE COURT: But for purposes of tonight, I have to decide whether, you know, it's likely you're going to succeed.

MR. ROSENTHAL: Well, that's true, but that's a separate issue, okay and I'm not making an argument that on, you know, GAAP, we are getting to the probability of success in the merits. We will concede on that particular issue, that's a hotly contested issue and that, itself, is not going

322

to justify holding back the money. The issues we're talking about are fraudulent inducement or material omission on the one hand and then the retroactivity issue on the other.

THE COURT: See, but I think the fraud and the inducement is intertwined with the success on the merits, because in order to succeed and say this whole thing should be tossed out, you're going to have to convince me that Mr. Hausfeld was right and that they computed his capital account wrong both ways, not just one.

MR. ROSENTHAL: When you say both ways, you mean both on the retroactivity --

THE COURT: Yes.

MR. ROSENTHAL: -- and on the failure to --

THE COURT: Let's put retroactivity aside, because I'll tell you right now, Mr. Keeney, I think I told you when you were up there, I have some serious concerns about that, given the memo that was put out, what, November --

MR. ROSENTHAL: November 5th.

THE COURT: -- November 5th and based on the testimony of Mr. Milstein. But on the accrual thing, I don't see how you get the whole ball of wax, given the evidence that I've heard. You know, I haven't made up my mind. I'll listen to whatever you guys want me to listen to.

MR. ROSENTHAL: Right.

THE COURT: But for purposes of tonight, I don't

323

know if I can say, you're going to probably win.

MR. ROSENTHAL:  Right.  And --

THE COURT:  On that.

MR. ROSENTHAL:  -- you know, this will give you a little preview of where we are in the law, your Honor.  But you remember a number of questions I asked, I think, of each of the partners about whether it was the ordinary course of the firm's business to amend the operating agreement in writing when they get --

THE COURT:  Mm-hmm.

MR. ROSENTHAL:  -- because D.C. doesn't have a lot of law in the course of dealing, okay.  But D.C. often looks to Delaware, as a lot of jurisdictions do on the East Coast.

THE COURT:  Mm-hmm.

MR. ROSENTHAL:  With respect to business law contests.

THE COURT:  Right.

MR. ROSENTHAL:  And there is law in Delaware that says that if the course of dealing is to amend things like partnership agreements, only in writing.  Not only by their terms, but as a matter of practice, then you can't alter what's in a contract by a course of dealing.  Okay, there's Delaware case law that says that.

THE COURT:  Even if your client allowed that course of dealing?  I mean, there's a clean-hands equitable argument

324

here, isn't there?  I mean, I understand that in a --

MR. ROSENTHAL:  Well, the idea is, you know, Delaware Law and Delaware Law, obviously, you know, recognizes the sanctity of contracts and the idea --

THE COURT:  I mean, show me a case where the person who is invoking that provision, didn't kind of not enforce that provision for 20 years or how many years, -- net total six years and then we'll talk.

MR. ROSENTHAL:  Right, we will try to present that case to your Honor.

THE COURT:  But I don't know if I can say tonight that you have a substantial or a probability of success on the merits on that.  All right, anything else?

MR. ROSENTHAL:  Okay.  Like I said, the only other thing, your Honor, is that we do think that we have a probability of success on the material omission and fraudulent inducement claim.  We believe that we have a probability of success on the retroactivity claim, okay.  And if we have probability of success on the retroactivity claim, it's our argument that that is a breach of the operating agreement, which doesn't divide the purposes of the percentage interests, a breach of the implied duty of good faith and fair dealing, because, you know, they kicked him out of the firm with a 14 percent and then they turned around and tried to tag him at 28 percent of the loss.  And also

325

breached their fiduciary duties, their ongoing fiduciary duties to him to return to him his full amount of capital.

THE COURT:  And where does that leave you, if you win that?

MR. ROSENTHAL:  Well, where that leaves us, your Honor, is that those kinds of Common Law principles, to the extent that we can prove those things and we believe we do have a likelihood of success on the merits with respect to those things, that would trigger your Honor's equitable powers.  Okay.  And it is our position that if your equitable powers are triggered because of those things, then you can't just say, okay, you know, yeah, they made a mistake, even if they acted in bad faith.  Let's just go with what the settlement agreement says in the first place, no harm, no foul.  You know, Hausfeld gets his, you know, even if you don't go with the GAAP, Hausfeld gets his million dollar delta and Lewis gets his $20,000 delta or whatever and let's be done with it.

It doesn't work that way, your Honor.  I mean, there must be some penalty for the bad faith that they've exhibited here.  And it's our argument that this money, part of this money, again, we're saying that $1.3 million can go, but part of the money needs to be held back to make sure that there's sufficient money remaining to make my clients whole when your Honor rules.  And all I'm doing is taking Mr. Keeney's

326

representation that the money may not be there because these guys, supposedly need money now to, you know, make payroll.

THE COURT:  Well, all right, but you're assuming that if I were to rule your way -- let's say there's no money to put in escrow right now.  That they're not going to be able to pay a judgment and I don't know if that's fair to do and tie up their money right now.  I mean, I don't know if, legally, I can do that under the injunction standards.  Can I?

MR. ROSENTHAL:  I understand where your Honor is --

THE COURT:  I mean, that kind of seems like a pretty aggressive play.

MR. ROSENTHAL:  -- and we obviously, we don't have access to their, you know, to their books, at this point. So, we can't say, all I'm taking is Mr. Keeney's representation that, you know, they're going to trouble making payroll if they don't get this money.

THE COURT:  Well, let me ask Mr. Keeney this question.  Is there some way that the firm can set up some type of reserve within its own books and records to protect against any risk of an adverse ruling?

MR. KEENEY:  Very easily, your Honor and indeed, let me just add, the reason why it's important for payroll, during the month of August, you saw what our historical cycle is.  We're going to be in good shape, we hope, come December

327

31, which is when the first installment is due on the capital. But quite frankly, right now, it's our money and we need to have that money, at least, $3 million of it for the rent and everything else.

THE COURT: All right, well, can you -- I understand that, but can you give me your word that you'll make sure the firm sets up some type of reserve to protect against the risk of an adverse ruling?

MR. KEENEY: I have two members of the executive committee here right now.

THE COURT: Well, there you go.

(Pause.)

THE COURT: My executive committee wants to talk to me.

(Pause.)

MR. ROSENTHAL: Your Honor, let me just, I'm not going to address the issue, that they $5.5 million today, because I think it's clear that your Honor has a decision to make --

THE COURT: Right.

MR. ROSENTHAL: -- with respect to whether the passenger money was appropriately or inappropriately distributed. We obviously believe it was appropriate.

THE COURT: And I need some time to digest all that.

MR. ROSENTHAL: I understand.

328

THE COURT:  I can't decide that tonight, even if you wanted me to.

MR. KEENEY:  Your Honor, from a quorum of our executive committee, there's really no problem about setting that aside and we'll have a reserve set up so we always have preserved that exact amount of money.  We may have transfers in and out, but that's always going to have exactly that amount, so it never goes below.

THE COURT:  What amount is that?  What amount are we talking about in the reserve?

MR. KEENEY:  The offer is actually our full five and if you give us --

THE COURT:  You'll put the full $5 million in reserve?

MR. KEENEY:  Yeah, it would be ours.  It's our reserve.

THE COURT:  Well, I'm not going to give -- that's assuming I can't give you all that tonight.

MR. KEENEY:  Right.  But you know, certainly we could do the full three and you know, it's just not going to be -- it's not going to be a problem, your Honor, because it's just our money and we have to get it out from the Court.

THE COURT:  All right, all right.  Well, I do think -- are you done, Mr. Rosenthal?  I'm sorry, did you want to say something else?

MR. ROSENTHAL: Unless there's other questions from your Honor.

THE COURT: I don't.

MR. ROSENTHAL: And I apologize if this sounds like I'm gilding the lily here. But these invoices are really a concern in these cases and I don't think that there's a question that they are owed and you know, we really need to try to make sure that they are paid. And it's $300,000 and you know, I don't know -- I can talk to Mr. Keeney about it. I've been trying to get him to answer my questions for a long time about them.

THE COURT: Well, I don't know if we can sort that out tonight and I don't know why they're not paid and I don't know enough about it to kind of lean on anybody right now. But, all right, the difference -- using Mr. Bavis' 13.31 and I realize Mr. Toll says the figure should be 14, we're talking roughly $920,000 if you were to prevail on the percentage argument, is that correct?

MR. ROSENTHAL: I'm sorry, $920,000? I think it's approximately, well, I don't have Mr. Bavis' figures in front of me.

THE COURT: I got $920,010. If you were to use the $6.9 million loss times 13.31 percent.

MR. ROSENTHAL: And then subtract it out of the $4.994 million?

330

THE COURT: Well, why don't you guys tell me, what would be the --

MR. ROSENTHAL: Yes, that's -- the $920,000 figure, your Honor?

THE COURT: Mm-hmm.

MR. ROSENTHAL: Would be his allocation of the loss. The figure in the capital account that --

THE COURT: Right.

MR. ROSENTHAL: -- actually, would be the $4 million amount.

THE COURT: So, it would mean Mr. Hausfeld would be entitled to roughly another million dollars?

MR. ROSENTHAL: Yes.

THE COURT: Is that right?

MR. ROSENTHAL: A million -- an extra $1,021,000.

THE COURT: Right. All right.

MR. KEENEY: And your Honor, what we suggest is --

MR. ROSENTHAL: And there's also --

MR. KEENEY: -- it's not due until December 31, 2009, we'll set aside the full million that, you know, you just calculated.

MR. ROSENTHAL: I'm sorry, I think the full million, I mean, it's over $4 million over the course of the next year.

THE COURT: Well, we're talking about two different

331

numbers.  We're talking about the -- well, all right, I understand what you're saying.

MR. ROSENTHAL:  We're talking about approximately $2 million as of December 31 and approximately, $2 million as of July 31, if those are the figures you're going with.

THE COURT:  Right.

MR. ROSENTHAL:  And then we also have Mr. Lewis, I mean, let's not forget Mr. Lewis' capital account, as well. And do you have Mr. Bavis' figures there?

THE COURT:  Yeah, I have them.

MR. ROSENTHAL:  And that is $709,703 and so, again, over the course of the next year, we're talking about approximately $4.7 million or so for Mr. Lewis and Mr. Hausfeld collectively, under Mr. Bavis' calculations.

THE COURT:  Well, why isn't it, why wouldn't be fair, as Mr. Keeney suggested, to return $3.4 million dollars to Cohen Milstein?

MR. ROSENTHAL:  I'm sorry, I'm not following your Honor's math.

THE COURT:  Well, that's what Mr. Keeney suggested, splitting the -- off Exhibit 117 -- splitting the $6.7 and the one million.

MR. ROSENTHAL:  Okay, I understand and so, the question -- you're saying, so, if we split, but this amount of money, the $4.7 million was held in reserve?

332

THE COURT:  Well, it would be $3.4 million held in reserve.

MR. ROSENTHAL:  Oh, oh, I see, the $3.4 that's coming out of the past fee, we don't have a problem with that, your Honor.

THE COURT:  So, is that satisfactory, Mr. Keeney, to put that $3.4 in reserve?

MR. KEENEY:  Your Honor, we could do that.  We think it's actually fairer to put in reserve the payment that's due this year, which is the $2.3.  In other words, give us the $3.4 and for the first time, we change the settlement agreement and we actually put in a reserve account, what they're going to get on December 31, 2009, so they have the additional security of right now, that they're going to get their December 31, 2009 payment, however calculated.

THE COURT:  That is reasonable, but I am somewhat persuaded by Mr. Rosenthal, that I think there has to be some provision made in the event that you were to get an adverse ruling here for any type of damages or fees or whatever.  I mean, that was his argument and I do think, now, I'll tell you very candidly right now, you know, I don't think, Mr. Rosenthal, that there is a probability of success on the merits on the fraudulent inducement or material omission. Because, I think this was a transaction involving highly sophisticated parties, who displayed, both sides, an amazing

command of detail of fees and expenses and finances and indeed, the practice of the law.

I don't think you've established, by a preponderance of the evidence, a reasonable basis for Mr. Hausfeld to believe, you know, under the injunction standard I'm talking about now.  That his -- that future income from the firm would be used pursuant to the GAAP method to compute his capital account balance as of October 31, 2008.  That's the concern and I have because the firm had never used that. Even though the operating agreement said that, the firm had never used that and Mr. Hausfeld had, you know, never raised that objection and he knew that was happening.  Whether he had actual knowledge of it or not, he had constructive knowledge of it and it was happening on his watch, so to speak.  He was aware of how Ms. Nussbaum's capital account was computed in February, 2007 and that was computed the same way, using an accrual method based on the last day of the month before she left.  So, I think it was unreasonable of him to believe that all the money that came into the firm after October was going to be used to calculate his capital account.

So, I can't conclude by a preponderance of the evidence that Cohen Milstein would be liable fraudulently inducing into a settlement or made material omissions based on that.  I thought the focus of the settlement conference was mainly, we didn't discuss necessarily, the amount

precisely.  We didn't have a debate over the value of the account.  The debate we had was how soon he was going to get whatever money he was entitled to under the operating agreement.  So, I mean, the focus was on the accelerated payments, not on the amount.

Now, I do agree that even though I don't think you're going to be able to prove fraudulent inducement, I think you do have some significant issues, in your favor, with respect to the use of the percentage.  And you know, I credit a lot of the arguments you made and I think that gives me a lot of concern whether Cohen Milstein's going to be able to convince me that the use of that percentage, because I've heard the arguments and I've heard the testimony and I'm very troubled by it, that switching somebody's ownership interest in a firm to 14 percent and then, when they find out they're losing money, switching it back to calculate his capital account.  I just don't think that was right.  I think it showed bad faith on their part.  At least, you have a good probability of succeeding on the merits on that.

So, what I'm going to do is, I'm going to release from the, well, you'll get your money back, also.  I'm going to release Cohen Milstein's half of the money that's in escrow.  That will be $3,396,799 and I'm going to direct them to maintain that in a special reserve account, within the firm, for two purposes.  Number one, to have money available

at the end of the year to pay Mr. Lewis' and Mr. Hausfeld's capital account, the first installment. And number two, to have money set aside in the event you are able to convince me that you're entitled to other damages, if you ultimately prevail on your claim relating to the percentage.

I think you have a real steep mountain to climb on the accrual method. I think Mr. Bavis was a very candid, very credible witness, but I don't think, given the course of dealing by your client -- not by them -- by Mr. Hausfeld that his testimony can overcome that. And I think you're going to have some problems with that.

So, what do we have to do mechanically, do you want to submit an order or do you want me to just do an order releasing half the money to you and half the money to you?

MR. KEENEY: Your Honor, we've been arguing about releasing half of the money to us. Keep in mind, we have a claim with respect to the remaining difference between the $3.4 we're getting now and the five and if you give them back $3.4, then what's in the escrow doesn't cover us for our claim, your Honor. So, it seems to me it has to work both ways and you have to have that firm set up an escrow account or you have to keep in escrow just enough so it covers our claim, which I think is a strong one, but again, it hasn't been fully briefed.

THE COURT: Yeah, I don't really, I don't grasp that

336

one fully yet.

MR. KEENEY:  Sure.

THE COURT:  And I want to read your briefs and I want to hear your argument on that.

MR. KEENEY:  Exactly, so, what we're suggesting, your Honor, in terms of exact figures.  We do think that we're entitled today to the $3,396,790.

THE COURT:  You got it.

MR. KEENEY:  Okay.  We think that they are entitled to any excess and we have to do math in our head here, between the $5,480,112.50 that we are claiming with respect to London and what they deducted and the $3.4 that you're giving us today.  Which does give them some extra money in the escrow account that they can get out today.

THE COURT:  Right.  Do you have your calculator still there, Mr. Rosenthal?

MR. ROSENTHAL:  I think we do.  I'm doing a computation right here.  But okay --

THE COURT:  Ms. Upadhyaya.

MS. UPADHYAYA:  Yes, your Honor.

THE COURT:  You look like you're on top and oh, there it is, thanks.  I know Mr. Toll can probably do this in his head, but I'm not that --

MR. KEENEY:  Maybe not.

THE COURT:  -- I'm not that sophisticated.  That

337

seems reasonable, doesn't it, Mr. Rosenthal?

MR. ROSENTHAL:  And I want to make sure that I totally understand where we are.  They're -- okay, so, the $6,793,579.59 is being divided in half.  Half being released to them to go into a reserve account and half being released to us.  And the, with respect to the amount -- by us, I mean to Hausfeld LLP.  And then with respect to the amount going to us, they are saying, well, there's a dispute over the additional and I'm adding the $3 million --

THE COURT:  You're going to get roughly a million dollars and there's going to be $2 million staying in escrow.

MR. ROSENTHAL:  That's exactly right.

THE COURT:  That's what he's suggesting.

MR. ROSENTHAL:  I've got $2,083,322.84 that we would put in escrow.

THE COURT:  Yes.  Does that check out?

MR. ROSENTHAL:  Oh, he's saying a reserve account. A reserve account just like they're putting in a reserve account.  Do I have that wrong, Mr. Keeney, are using --

MR. KEENEY:  No, I'm just pausing because we're giving up our right in a situation in which unilateral action was taken by your client on something that we were owed in the past and I'm just wondering whether the extra $2 million should stay in this court, the highest interest-bearing account that it can be.  Because the difference is, you're

338

talking about will we be able to pay a judgment as of December 31, 2009. We're talking about a payment that we feel we were entitled to get as of 50 percent, as of early July, that's now a month overdue. I mean --

THE COURT: Does it matter who holds it if Mr. Rosenthal gives his word that he's going to make sure it's protected?

MR. ROSENTHAL: We're giving, I mean, my clients will give their word just like Mr. Keeney's clients are giving their word.

THE COURT: I take it, it would help the respective firms if they had that money on their balance sheet in case they had to borrow money or --

MR. KEENEY: I think so, your Honor and the only thing that's troubling me is how quickly, when you know, a payment is supposed to be sent to us, it just doesn't happen.

THE COURT: Well, and I want Mr. Rosenthal to give me his word that if there's future payments under this settlement agreement, your client's not going to unilaterally carve it up, without talking to Mr. Keeney or without coming to me to resolve the dispute. I was really steamed when I heard that. That you guys just decided on your own, to take $11 million and divide it up your own way. I mean, that's just, that's as bad as them playing games with you on how much is in the capital account. You know, you guys have to

339

stop doing this to each other.  Look at all the resources we're spending dealing with things that two people should be able to sit at a table and resolve and I'm going to ask the five lawyers to kind of take control of this and make sure this stuff doesn't happen any more.

MR. ROSENTHAL:  I hear your Honor.

THE COURT:  So, why don't we just let him put it in a reserve in his account, with Mr. Rosenthal and Mr. Kittredge and Ms. Upadhyaya, did I get that right?

MS. UPADHYAYA:  You're close.

THE COURT:  Upadhyaya.

MS. UPADHYAYA:  That's it.

THE COURT:  Yeah, I got it.  Upadhyaya, that they're going to make sure that nothing happens to that money. Because I don't want you guys to be out that money, if it turns out you're entitled to it.  But I think we have to just raise the level of trust just a bit and let the lawyers kind of step in and kind of supervise this.  Because I can't micro-manage this from Philadelphia as to when that money comes in and who it goes out to and all that stuff.  It's just, I'm usually too late, because the money is gone by the time I find out about it.  So, is that agreeable to everyone?

MR. ROSENTHAL:  It's agreeable to us, your Honor.

MR. KEENEY:  It's reluctantly agreeable to us, your Honor, just because we think we're going to be the ones who

340

will be expecting the next payment from Hausfeld LLP and we just really will be very regretful if we have to come back before your Honor.

THE COURT:  Well, I know the three lawyers to your right would not jeopardize their professional standing by letting it not be there, if that comes to that.

MR. KEENEY:  I appreciate that, your Honor and just to give you a head's up, we needed to tell you in which case it's going to be.  We have grave concerns it's going to be Air Cargo.

THE COURT:  What's going to happen in Air Cargo?

MR. KEENEY:  We think we're going to have a similar dispute with respect to Air Cargo.

THE COURT:  Well, that's not going to happen, because when the Air Cargo money hits, you and Mr. Rosenthal and Mr. Kittredge and Ms. Upadhyaya are going to talk about it and I guess, you'll be taking the Acela back up, if you don't work it out.  But there's got to be a better way to do this.

MR. KEENEY:  We agree.

THE COURT:  I mean, you guys are smart and fair, straightforward people.  You have to step in and intervene, because your clients are at war with each other and we've got to have reasonable minds who step in and kind of take control.  We can't just be taking the money and hiding it

341

under a stone and not telling the other person.

All right, so, I'll sign an order releasing $3,396,709 to you and releasing the same amount to Mr. Hausfeld, with the understanding that you're going to put all that money in a reserve account and Mr. Hausfeld is going to put roughly $2 million in a reserve account?

MR. ROSENTHAL:  Yes, we calculated the figure, your Honor.

THE COURT:  All right.  Is there anything we need for the order?  I'll sign that tomorrow.

MR. KEENEY:  Thank you, your Honor.

MR. ROSENTHAL:  Thank you, your Honor.

THE COURT:  Is there anything else we have to do tonight?

MR. KEENEY:  No, your Honor.

MR. ROSENTHAL:  No, your Honor.

THE COURT:  All right, now, you guys, who is packing for vacation?

MR. ROSENTHAL:  If I don't get home by 9:00 o'clock tonight --

THE COURT:  You're in trouble.

MR. ROSENTHAL:  -- I'm in trouble with my wife.

THE COURT:  All right, well, get on a train and I had a trial scheduled for after Labor Day.  If I have some time now, if you need me, if you want to do an argument then,

342

we can do that. If you want to wait until after the briefs hearing, we can do that. You tell me what your schedule permits.

MR. ROSENTHAL: Okay, your Honor, we have to get all the exhibits to you. That's one thing.

THE COURT: Okay, I have some of them, I think.

MR. ROSENTHAL: We have, Ms. Upadhyaya and Mr. Keeney have worked out a list of all the exhibits that are in evidence. I think it's our proposal that you just have the exhibit binders there, instead of us going through them.

THE COURT: Yes, just tell me which ones to use.

MR. ROSENTHAL: And going through the laborious task of taking out those that aren't in?

THE COURT: Yes, I can.

MS. UPADHYAYA: We have agreed on a list that's in evidence.

MR. KEENEY: Yes, we have agreed.

MR. ROSENTHAL: And Ms. Powell, would you be able to make a copy of this for us and then we'll give this to your Honor.

THE COURT: Sure, that's great. I'll just disregard all the other ones.

MR. ROSENTHAL: We know we have post-trial submissions due. I think we decided on September 11th, your Honor.

343

MR. KEENEY:  Yes.

MR. ROSENTHAL:  And I guess that raises the question of whether your Honor thinks that closing arguments on both the issues -- the capital accounts issue on the one hand and the cargo issue -- I mean the passenger issue on the other --

THE COURT:  Well --

MR. ROSENTHAL:  -- are needed.  Or if your Honor thinks that there's a better, more streamlined way to do this, since you've been sitting here for four days and probably don't want to hear from Mr. Keeney and me for another hour.

MR. KEENEY:  And your Honor, we don't think you need closing argument.  You heard all the evidence.  You heard mini-closing arguments from both of us today.  You do need the post-trial briefs and you know, if you want to schedule argument after you get the briefs, I mean, that's obviously fine, all the parties will do what you want.  But I don't think you're going to need to.

THE COURT:  All right, well, I said what I said tonight for a reason and so, I wanted to give both of you kind of a road map of the way the landscape is.  So, my hope is that the only thing, after hearing what I had to say, that you guys can work out the other issues.  And the only thing that I'm going to have to decide is the Air Passenger money.  But, I'll take --

344

MR. ROSENTHAL:  When you say work out the other issues, what do you mean?

THE COURT:  Well, the remaining issues on the merits of the capital account.  I think I've told you what I think your weaknesses of your respective positions are.

MR. ROSENTHAL:  Yes, you have, your Honor.

THE COURT:  So, I mean, I'm not going to issue a final ruling, because you don't want me to do, but I'm telling you that's kind of what I'm thinking right now, so--

MR. ROSENTHAL:  It's your suggestion that we get together and talk to see if we can resolve it before you have to make a decision?

THE COURT:  It might save you a lot of briefing and a lot of work and then you can just focus your attention on the Air Passenger issue.  But I mean, that's the evidence seems to come down pretty clearly on one side and pretty clearly on the other side.  But I'll listen to what you have to say and I'll read your briefs and if -- and I'm not saying I won't change my mind, but I'm saying that while it's fresh in my mind, that's what I'm thinking.

MR. ROSENTHAL:  And you're suggesting we talk?

THE COURT:  I'm suggesting you talk and I know how painful that is for --

MR. ROSENTHAL:  No, no, I'm happy to talk to Mr. Keeney.

345

THE COURT:  But think about it while you're on vacation and if you need more time to do your brief for the Air Passenger thing, just let me know.  And if you need to come back the week after Labor Day, I thought I had a trial, but I don't now, so, I have some time.  So, have a great vacation.

It was, I just wanted to say, I know these things are painful for the clients and for the lawyers and I know how hard all of you worked.  Because I knew I was tired at the end of the day and I can't imagine how tired you guys must have been.  So, I appreciate that.  I appreciate your professionalism.  I thought it was an extremely well-presented case and it was a pleasure having all of you.

MR. ROSENTHAL:  Thank you, we really appreciate that, your Honor.

THE COURT:  All right, thank you, have a great vacation.

(Court adjourned 5:50 o'clock p.m.)

- - -

346

I N D E X

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Steven Toll | | | | |
|   By Mr. Keeney | 2 | | 147 | |
|   By Mr. Rosenthal | | 52 | | |
| Kenneth R. Feinberg | | | | |
|   By Mr. Rosenthal | 156 | | 174, 177 | |
|   By Mr. Keeney | | 170 | | 177 |
| Anthony J. Maton | | | | |
|   By Mr. Rosenthal | 179 | | | |
|   By Mr. Keeney | | 219 | | |
| Steven Toll, Recalled | | | | |
|   By Mr. Keeney | 233 | | | |
|   By Mr. Rosenthal | | 260 | | |
| Michael Lehmann | | | | |
|   By Mr. Kittredge | 269 | | 285 | |
|   By Mr. Keeney | | 283 | | |

- - -

I certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court on September 11, 2009, incorporating redactions of personal identifiers requested by the following attorneys of record:  John C. Keeney, Jr., Esquire, Hogan & Hartson, LLP, and Seth A. Rosenthal, Esquire, Venable, LLP, in accordance with Judicial Conference policy.  Redacted characters appear as an X in the transcript.


Geraldine C. Laws, CET                Dated 12/23/09
Laws Transcription Service